IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | **Case No.: 6:25-bk-04156** |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| Debtor. | |

## DECLARATION OF NEIL LURIA IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Neil Luria, declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of The Villages Health System, LLC ("TVH" or the "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case").

2.       I am also Co-Head of the restructuring and financial advisory practice at GBH SOLIC Holdco, LLC ("SOLIC"). SOLIC is a restructuring and financial advisory firm specializing in advising clients regarding financial restructuring, turnaround, and general business matters affecting clients' profitability. SOLIC is headquartered in Winter Park, Florida, with additional offices in Georgia and Illinois. It is my understanding that TVH selected SOLIC because of SOLIC's extensive experience in the healthcare sector and in the field of business reorganizations under chapter 11 of the Bankruptcy Code.[2]

3.      SOLIC has widespread experience in providing restructuring and financial advisory services in reorganization proceedings. SOLIC's professionals have represented various stakeholders in distressed healthcare and non-healthcare situations over the last 15 years. Furthermore, I have previously served as the Chief Restructuring Officer in chapter 11 healthcare

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

[2] All references to the "Bankruptcy Code" herein refer to 11 U.S.C. §§101-1532.

bankruptcies including serving as (a) Chief Restructuring Officer of Tamarac 10200 and Unipharma, LLC, Case No. 20- bk-23346-PDR (Bankr. S.D. Fla. 2020); (b) Chief Restructuring Officer of Sharity Ministries, Inc., Case No. 21-11001 (Bankr. Del. 2021); (c) Chief Restructuring Officer of Louisiana Medical Center and Heart Hospital, Case No. 17-10353 (Bankr. E.D. La. 2017); (d) Chief Restructuring Officer of PBI Regional Medical Center, Case No. 06-16186 (Bankr. D.N.J 2006); and (e) Chief Restructuring Officer of Pottsville Operations, LLC, *et al.*, Case No. 24-70418-JAD (Bankr. W.D. Pa. 2024).

4.     In addition, I served as Chief Restructuring of various non-healthcare chapter 11 cases including (a) In re Ocala Funding, LLC, Case No. 3:12-bj0945240-JAF (Bankr. M.D. Fla. 2012), and (b) In re Taylor Bean & Whitaker Mortgage Corp., Case No. 3:09-bk-07047- JAF (Bankr. M.D. Fla. 2009). Furthermore, I have served as Chief Restructuring Officer and Chief Executive Officer of various other distressed healthcare and non-healthcare companies that have been restructured outside of chapter 11.

5.     I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of this case, and in support of the motions and other "first day" pleadings filed by TVH (collectively, the "First Day Motions").  I am authorized to submit this Declaration on behalf of TVH.

6.     In my capacity as CRO of TVH, I am familiar with TVH's businesses, day-to-day operations, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon (i) my personal knowledge, (ii) my review of relevant documents and records created and maintained by TVH in the ordinary course of business, (iii) information provided to me by employees and consultants working under my supervision with personal knowledge of the veracity of such information, and/or (iv) my opinion based on experience,

knowledge, and information concerning TVH's operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

7.      On July 3, 2025 (the "Petition Date"), TVH commenced this voluntary bankruptcy case in this Court under chapter 11 of the Bankruptcy Code. Under sections 1107(a) and 1108 of the Bankruptcy Code, TVH continues to operate its business and manage its affairs as a debtor-in-possession. As described in more detail below, immediately prior to filing this Chapter 11 case, TVH entered into a stalking-horse asset purchase agreement, which provides for the sale of substantially all of TVH's assets as a going concern, and Court order approving the sale is a condition of the transaction moving forward.

8.      To minimize any adverse effects on the estate from the commencement of this Chapter 11 Case, TVH has filed customary First Day Motions seeking relief on an immediate basis. This includes requests that the Court: (a) approve TVH's entry into a debtor-in-possession loan facility and use of cash collateral, which will provide the liquidity necessary for TVH to continue operating its business during the Chapter 11 Case; (b) authorize TVH to pay in full and in the ordinary course of business certain prepetition claims, including employee wages, benefits, and expense reimbursements; (c) authorize TVH to continue using its existing bank accounts and cash management system, and (d) authorize the implementation of certain administrative procedures to minimize any disruption to TVH's operations. In my opinion, the relief sought in the First Day Motions (a) is critical to preserve and maximize value for all stakeholders and will position TVH for success as it transitions into chapter 11, and (b) is narrowly tailored and necessary to achieve the goals of this Chapter 11 Case. The facts set forth in each of the First Day Motions are incorporated herein by reference.

9.      This Declaration is divided into four parts. Part I provides an overview of TVH's history and operations. Part II describes TVH's organizational and capital structure. Part III describes the financial and operational challenges that led to TVH's filing of the Chapter 11 Case. Part IV provides a summary of the First Day Motions and the factual basis for the relief sought in the First Day Motions.

**Part I**
**TVH's History**

10.     TVH is a premier health care provider in North Central Florida that operates primary and specialty care centers. In addition to primary care, TVH's health care providers provide specialty care services in the fields of cardiology, neurology, rheumatology, podiatry, urology, gynecology, pain intervention and management, and behavioral and mental health.

11.     TVH was formed in 2012 as the result of a collaboration between The Villages and The University of South Florida, which developed a plan for offering high-quality health care by offering patients enhanced resources and time with medical providers by reducing the physician-to-patient ratio and, in so doing, increasing the availability of and interactions with primary care physicians and specialists.

12.     Throughout its history, TVH has been known for providing exemplary, patient-focused health care to residents of North Central Florida, The Villages,[3] and surrounding communities, and TVH's medical providers have been fixtures in their communities and trusted health care providers to their patients. TVH currently provides essential care to more than 55,000 patients – the majority of whom are participants in Medicare Advantage plans.

---

[3] The Villages is the premier 55-plus master planned community in the United States, consisting of more than 50,000 residences in eight unique town center neighborhoods, or "Villages", offering world-class amenities in Lake, Sumter, and Marion counties in Florida. The Villages community it built around enriching the lives of its residents by facilitating an active and fulfilling life, and providing convenient access to the day-to-day needs of its community members.

13.     TVH currently operates ten primary and specialty care clinics (collectively, the "Care Centers") known as (a) Brownwood Care Center, (b) Colony Care Center, (c) Creekside Care Center, (d) Eastport Care Center, (e) Lake Deaton Care Center, (f) Mulberry Grove Care Center, (g) Pinellas Care Center, (h) Santa Barbara Care Center, (i) Specialty Care at Spanish Springs, and (j) The Center for Advanced Healthcare at Brownwood.[4]



14.     TVH employs physicians, medical professionals, and staff who are passionate about providing exceptional patient care. TVH's efforts have led to unprecedented patient satisfaction and staff retention, which further increases the quality of health care by creating open lines of communication and relationships of trust between patients and medical staff.  For example, TVH's employee satisfaction is over 80%, staff vacancy rates are less than 7%, the Net Promoter Score for TVH and its services is 96 out of a possible 100, and patient reviews frequently rate TVH and its Care Centers 4.9 or 5.0 out of a possible 5.0.

---

[4] The Brownwood Care Center is pictured above.

15.    As of the Petition Date, TVH's workforce is comprised of more than 800 employees, including more than 80 primary and specialty care physicians, with the vast majority of TVH's employees serving in full-time roles.

**Part II**
**TVH'S Organizational and Capital Structure**

16.    TVH is a Florida limited liability company formed in 2012. Approximately 70% of the equity of TVH is owned by The Villages Health Holdings LLC ("TVHH"), and approximately 30% is owned by current or former medical providers and employees of TVH.

17.    TVH is managed by a six-member board of managers ("Board of Managers"). On approximately May 5, 2025, the Board of Managers unanimously approved the appointment of Anna Phillips ("Ms. Phillips") as an independent manager of TVH and formed a restructuring committee (the "Restructuring Committee") with Ms. Phillips as its sole member. The appointment of Ms. Phillips increased the number of managers from five to six. Prior to Ms. Phillips' appointment, the Board of Managers interviewed multiple potential candidates and selected Ms. Phillips due to her strong credentials and experience in the restructuring field, including with healthcare companies. Ms. Phillips was not associated with TVH prior to her appointment as an independent manager. The Restructuring Committee is vested with the authority to take certain actions related to a potential restructuring of TVH's assets, liabilities, and business, including (i) overseeing a sale of substantially all of TVH's assets and (ii) making a recommendation to the Board of Managers to file a chapter 11 petition.

18.    After interviewing multiple candidates for the role of Chief Restructuring Officer, the Restructuring Committee retained SOLIC to provide the services of Neil Luria as CRO of TVH and certain additional support staff.

19.    As of the Petition Date, TVH's executive leadership team consists of the following individuals:

| Name | Role |
| --- | --- |
| Bob Trinh | Chief Executive Officer |
| Neil Luria | Chief Restructuring Officer |
| James Flaherty | Chief Medical Officer |
| Christina Steiner | Chief Compliance Officer |
| Patrick Chunn | Chief Financial Officer |
| Cheri Benedetti | Chief Human Resources Officer |
| Emilio Noble | Chief Growth Officer |

20.    TVH's assets consist primarily of its top-tier workforce of medical providers and dedicated support staff, and their relationships to the patients. TVH is a party to long-term leases for each of its Care Centers, and TVH leases much of the significant medical equipment used in the day-to-day operation of the Care Centers.

21.    As of the Petition Date, TVH's was a party to one prepetition secured credit facility, a secured line of credit held by PMA Lender LLC, a Florida limited liability company, with a principal balance of $15 million (the "PMA Loan Facility"). The amounts due and owing under the PMA Loan Facility are secured by a first priority security interest in all assets of TVH. Other than the PMA Loan Facility, TVH has no other material secured debt other than equipment leases.

22.    TVH has no known unpaid tax liabilities and no known and liquidated unpaid claims that would qualify as priority claims under Section 507 of the Bankruptcy Code, other than wages and benefits owed to employees that are the subject of a First Day Motion.

23.    TVH has a relatively small amount of general unsecured trade debt and it has generally been TVH's practice to pay all outstanding and undisputed unsecured trade debts in the ordinary course of its business. TVH has between 200-300 general unsecured creditors consisting of patients who are owed very small amounts (an average of approximately $75 each), almost all

of which were issued checks that were never cashed. With respect to these amounts, TVH intends to file a motion seeking Court authority to honor the checks or reissue these payments. As to trade debt, TVH believes it owes funds to approximately 100 vendors totaling approximately $200,000 (an average of approximately $2,000 each). The majority of TVH's general unsecured debt is anticipated to arise from or relate to the historical billing issues discussed herein.

## Part III
## Financial and Operational Challenges Leading to the Chapter 11 Case.

24.     For multiple years, TVH has been working to find a strategic partner to acquire TVH's business or assets and continue TVH's mission of providing high-quality healthcare to residents in the surrounding communities. Since September 2022, Evercore Group, LLC ("Evercore") has worked with TVH as its investment banker and advisor. Evercore is a leading independent investment banking advisory and investment management firm. Evercore's restructuring professionals provide investment banking services in financially distressed situations, including advising debtors, creditors, and other constituents in chapter 11 proceedings and out-of-court restructurings. Evercore assisted the Debtor's management in evaluating sales and other strategic alternatives, identifying and engaging strategic counterparties, facilitating due diligence for various parties in interest, and soliciting proposals from various parties in interest and third parties, among other services.

25.     Between September 2022 and September 2023, Evercore assisted TVH in evaluating ad hoc in-bound interest from a select group of counterparties with either affiliations with TVH and its owners, or managed care health plans that were present within the TVH network. Then, starting in September 2023, Evercore engaged in a formal marketing process to solicit Debtor's business to strategic counterparties. In conjunction with TVH management and its owners, Evercore identified parties that generally met a set of qualifications to determine

counterparty fit and qualification to acquire, integrate, and successfully operate the Debtor's business, including but not limited to the following: quality-of-care functions, capital, familiarity and experience operating similar clinic-based, multi-specialty care businesses within Florida, familiarity and experience operating businesses who contract with Medicare Advantage plans and receive value-based reimbursement (e.g., capitation, STARS/quality bonuses, gainshare), and proven success acquiring and integrating similar businesses to TVH. Evercore's outreach to strategic counterparties considered the complexity and operational rigor required to manage physician organizations that assume responsibility for the full cost of patient care, and the continuity and quality of care for the numerous elderly patients within the Debtor's network.

26.    In April 2024, CenterWell Senior Primary Care, Inc. ("CenterWell") signed a term sheet and emerged as the party most seriously interested in acquiring the Debtor. That transaction was structured as a purchase of TVH's stock and contemplated CenterWell entering into contracts with non-debtor parties related to the transaction. CenterWell completed significant due diligence, conducted numerous site visits with key leadership, and at the time substantially negotiated a sale and purchase agreement before the process was suspended due to the discovery of the coding issues discussed below.

27.    TVH is a health care provider that primarily serves Medicare patients. TVH accepts Medicare payment primarily through Medicare Advantage ("MA") and some traditional Medicare. TVH accepts MA through contracts with MA plans such as United Healthcare Insurance Company and Blue Cross Blue Shield of Florida, Inc., which receive payments directly from the Centers for Medicare and Medicaid Services ("CMS"). TVH receives a monthly payment per member ("PMPM") for each MA beneficiary that it treats. The PMPM amount that CMS pays MA plans depend on a number of risk adjustments factors ("RAF Scores") that are meant to reflect the illness

level of patients. Generally speaking, MA plans receive higher PMPM payments for patients who have higher RAF Scores and are anticipated to have higher medical expenses than patients with lower RAF Scores. Hierarchical Condition Categories ("HCC") codes are a significant input in the calculation of RAF Scores. Through its contracts with MA plans, TVH generally receives larger payments for beneficiaries with higher RAF Scores.

28.    In approximately August 2024, TVH became aware of a potential issue with respect to its HCC guidance. At that time, TVH learned that it may have submitted HCC diagnosis codes that were not clinically supported or otherwise did not meet Medicare coding and payment guidance. For example, TVH engaged in a retrospective review program (in which patients' medical histories were reviewed to identify instances in which TVH believed additional codes were supportable and could be added) that may not have been consistent with Medicare coding and payment guidance. Upon learning of the potential coding issue, TVH immediately engaged with the law firm of Foley & Larder LLP and thereafter retained Goodwin Procter LLP ("Goodwin") to conduct an investigation into TVH's coding practices and the scope of the issue. Additionally, through Goodwin, FTI Consulting Inc. ("FTI") was engaged to evaluate the accuracy of TVH's HCC coding and to assist in assessing the scope of any potential overpayment. Based on the investigation, TVH's coding practices appear to have been inconsistent with Medicare guidance. The investigation identified codes TVH submitted that did not appear to be supported by a sufficiently documented clinical basis. The investigation also identified that the retrospective amendments appear to have been inconsistent with CMS guidance and based on a misunderstanding of the relevant guidance on medical record amendments, including when it is appropriate to amend a patient record more than 90 days after an encounter.

29.     As soon as reasonably practicable after discovery of the issue regarding TVH's coding practices, TVH terminated its retrospective amendments and related practices. TVH has worked with Goodwin and FTI to ensure it has appropriate policies and procedures, training, and review with respect to future coding and any amendments to medical records. Additionally, TVH retained Alvarez and Marsal to advise on its compliance functions. Recently, TVH, retained Christina Steiner, who previously led TVH's outside compliance team at Alvarez and Marsal, as its Chief Compliance Officer. TVH has enhanced and formalized its compliance functions, which included the formation of a board compliance committee in or about November 2024. Around the same time, TVH reassigned its previous Chief Compliance Officer from having responsibility for the compliance program. The board compliance committee is now comprised of Anna Phillips, Tom Menichino, and Tom Brooks. Among other things, the board compliance committee focuses on enhancing and maintaining a well-designed, adequately resourced, and effective compliance program on behalf of TVH. TVH has substantially enhanced its compliance program by, among other things, (1) developing and providing medical documentation and coding baseline training for physicians and coders; (2) enhancing training of its providers on sound medical documentation practices and its coders on professional and Medicare coding guidance; and (3) developing and implementing a stand-alone anonymous compliance hotline.

30.     In December 2024, TVH initiated a voluntary self-disclosure to the Office of Inspector General ("OIG") for the Department of Health & Human Services ("HHS"). In the self-disclosure, TVH voluntarily disclosed the existence of, and the circumstances relating to, the coding issues. Additionally, TVH issued and delivered a written statement to its patients. TVH was officially accepted into the OIG self-disclosure protocol on January 31, 2025. Since that time, TVH, through its counsel, has been in contact with OIG and the Department of Justice, Civil

Division ("DOJ") regarding the potential overpayments. In April 2025, TVH, through its counsel, provided FTI's preliminary analysis to OIG and DOJ. This preliminary analysis indicated that TVH's potential overpayments arising from its historical coding practices could be at or above $350 million.

31.     Since TVH's self-disclosure, CenterWell has engaged in further due diligence efforts, and after extensive negotiations with TVH and its retained professionals, an affiliate of CenterWell, CenterWell Senior Primary Care (Vitality), Inc. (the "Stalking Horse Bidder") has entered into a stalking horse Asset Purchase Agreement and related documents to acquire substantially all of TVH's assets (collectively, the "Stalking Horse APA"). Among other terms, the Stalking Horse APA (i) contemplates the Stalking Horse Bidder and TVH working together on continuing to provide high-quality and seamless health care to patients during any transition period; (ii) contemplates the Stalking Horse Bidder offering employment to all or substantially all current employees of TVH on competitive and market rate terms, (iii) contemplates an all cash purchase price for TVH's assets and no financing contingencies; and (iv) is conditioned on TVH filing this Chapter 11 Case and obtaining approval of the proposed transaction through a Court-approving bidding and sale process on a timeline with appropriate milestones acceptable to TVH. The terms of Stalking Horse APA and the proposed bidding procedures associated therewith are the subject of a bidding procedures and sale motion filed by TVH concurrently with this Declaration.

32.     CenterWell has experience purchasing similar distressed assets in bankruptcy proceedings. For example, CenterWell's sister brand, Conviva Senior Primary Care, has entered into an agreement to purchase substantially all assets in MBMG Holding, LLC (d/b/a Clinical Care

Medical Centers) and its affiliates' bankruptcy cases pending in the Southern District of Florida under lead case 24-20576.

33.     The Debtor and Evercore have agreed on a strategy to re-market the Debtor's assets following the Petition Date to maximize value for the Debtor. Evercore has marketing materials and other information prepared and will start communicating with strategic counterparties immediately following the Petition Date. Evercore will re-market the Purchased Assets to a group of identified strategic counterparties who have been targeted because they meet the core qualifications identified above and have capacity to engage with Evercore on an expedited due diligence timeline. It is critical for Evercore to focus its efforts on parties who can successfully navigate Florida and Medicare Advantage markets. Evercore will work quickly to ensure any interested buyers can conduct as much due diligence as possible within the Court approved sale timeline.

34.     On or about July 2, 2025, the TVH Board of Managers adopted resolutions (collectively, the "Resolutions"): (a) approving CenterWell Senior Primary Care (Vitality), Inc. as the "stalking horse bidder" and approving TVH entering into the Stalking Horse APA as the "stalking horse bid" for the sale of substantially all assets of TVH by and through a chapter 11 bankruptcy case, and (b) authorizing the commencement of the Chapter 11 Case, as well as other associated restructuring efforts, including obtaining DIP Financing (defined below) necessary to maintain operations in the ordinary course of business pending closing of any sale transaction.

35.     TVH filed this Chapter 11 Case in order to maintain its day-to-day operations uninterrupted while pursuing the following key objectives: (i) continuing to provide high-quality health care for its patients; (ii) obtaining Court approval of an asset sale transaction to a strategic buyer who can continue offering high-quality healthcare going forward; and (iii) effectuating an

orderly transition of TVH's assets, medical providers, and employees to the strategic buyer in a way that maintains or enhances patient care and maintains jobs for the outstanding employees of TVH.

**Part IV**
**The First Day Motions**

36.     As to each of the First Day Motions identified below, I have reviewed each motion or application, including the attachments thereto, and believe the facts set forth therein are true and correct, to the best of my knowledge, information and belief.  I believe that the relief sought in each of the First Day Motions is appropriate under the circumstances presented and necessary to preserve the assets and operations of TVH for the benefit of the estates and their creditors pending completion of a sale and/or confirmation of a plan of reorganization or liquidating in this Chapter 11 Case.

37.     I believe that it is critical that the First Day Motions be heard as soon as practicable. If such motions are not considered on an expedited basis, it could threaten TVH's ability to satisfy maintain operations and ensure ongoing health care for patients, as well as TVH's ability to meet its obligations, including payroll obligations—leading to immediate and irreparable harm to TVH's businesses and patients.  Accordingly, I believe expedited consideration and approval of the emergency First Day Motions is vital to the continued viability of TVH and is in the best interest of all interested parties in the Chapter 11 Case.

38.     Concurrently with the filing of the Chapter 11 Case, TVH has filed the following First Day Motions requesting relief on an emergency basis:

   a. *Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and other Employee Obligations, (II) Maintain Employee Benefit Programs, and (III) for Related Relief* (the "<u>Wages Motion</u>").

b. *Debtor's Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Financing Motion").

c. *Debtor's Emergency Motion for Interim and Final Orders (A) Authorizing the Debtor to (I) Continue to Use Existing Cash Management System, (II) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, (B) Granting a Waiver of Certain Investment and Deposit Guidelines, and (C) Granting Related Relief* (the "Cash Management Motion").

d. *Debtor's Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Honor Certain Obligations in Respect Thereof; and (III) for Related Relief* (the "Insurance Motion").

e. *Debtor's Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. § 366(b) and Local Rule 2081-1(g)(7): (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, (II) Deeming Utilities Adequate Assured of Payment, and (IV) Granting Related Relief* (the "Utilities Motion").

f. *Motion for Entry of Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information and Establishing Patient Noticing Procedures* (the "Patient Privacy Motion").

g. *Motion for Entry of an Order: (I) Approving the Form and Manner of Notifying Creditors of the Commencement of this Chapter 11 Case; (II) Establishing Employee Notice Procedures; (III) Establishing Scope of Notice; (IV) Approving the Opt-In Procedure for Additional Notice; and (V) Granting Related Relief* (the "Notice Procedures Motion").

h. *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman* (the "PCO Motion").

i. *Debtor's Application to Employ Stretto, Inc. as Claims and Noticing Agent* (the "Claims Agent Motion").

j. *Debtor's Application for Entry of an Order Authorizing Employment and Retention of Stretto, Inc. as Administrative Agent Effective as the Petition Date* (the "Administrative Agent Motion").

39.     I have reviewed each of the First Day Motions, including the attachments thereto, and believe the facts set forth therein are true and correct, to the best of my knowledge, information, and belief, and based on the information provided to me by the Debtor and its employees. The facts set forth in the First Day Motions are incorporated herein to the extent necessary to support the relief requested. I believe that the relief sought in each of the First Day Motions is appropriate under the circumstances presented and necessary to preserve the assets and operations of the Debtor for the benefit of its estate. The basis for seeking the relief sought in the First Day Motions is described in more detail below.

40.     **Wages Motion**: The Debtor has filed an emergency motion requesting the authority to pay certain pre-petition obligations due to the Debtor's employees (the "Employees"). The Debtor requests authority pay the Employees' prepetition wages and honor certain employee policies (for example, paid time off and health and welfare obligations). The Debtor's next payroll payment is due on July 11, 2025, which includes a pre-petition portion of a pay period. It is critical to the Debtor's ability to continue operating the Care Centers and preserving estate assets that it timely pays its Employees. If the Debtor is not permitted to fulfill its obligations to Employees, the Employees will not receive full payment for services that have already been performed. I believe such a result would undermine the morale and loyalty of the Debtor's workforce and substantially jeopardize the Debtor's bankruptcy efforts. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

41.     **DIP Financing Motion**: The Debtor requires immediate access to funding to preserve the assets of the estate for the benefit of creditors and ensure the protection of its patients. The Debtor will seek the Court's authorization to use cash collateral and enter into a financing agreement with the PMA Lender LLC (the "DIP Lender") that generally provides the Debtor

access to a post-petition new money DIP loan facility of up to approximately $24 million. I believe the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors. It will also provide the necessary financing to fund the Chapter 11 Case and achieve the Debtor's bankruptcy goals.

42. **Cash Management Motion**: The Debtor has filed an emergency motion requesting that the Court authorize the Debtor to continue using its prepetition cash management system, including existing bank accounts and business forms. The Debtor maintains a cash management system in the ordinary course of the Debtor's business. This system allows the Debtor to identify the Debtor's cash requirements, transfer cash as needed, forecast cash needs, maintain accounting records, and pay necessary expenses. I believe that discontinuing the use of the Debtor's existing cash management system would require a significant amount of time and effort and could negatively impact the Debtor's ability to efficiently fund necessary expenses and preserve assets of the estate. These negative results would ultimately adversely affect the Debtor's ability to maximize the value of its estate for the benefit of all interested parties. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

43. **Insurance Motion**: The Debtor has filed an emergency motion requesting authority but not direction to continue operating its Insurance Program (as defined in the Motion) and pay certain pre-petition Insurance Program expenses to keep the insurance policies in place. The Debtor's Insurance Program is essential to the continued operation of the Debtor's business. This relief is critical to preserve the status quo and ensure continued patient care at the Care Centers. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

44.     **Utilities Motion**: The Debtor has filed an emergency motion requesting that the Court determine that the Debtor has provided adequate assurance of payment for certain utility services and preclude these utility providers from altering, refusing, or discontinuing utility services. The monthly average cost of these utility services combined is approximately $45,000. In my opinion, the continuity of these utility services is essential for the Debtor to preserve and prevent damage to the value of the Debtor's estate. I believe a deposit payable to each utility is adequate assurance of payment for these utility services. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

45.     **Notice Procedure Motion and Patient Privacy Motion**: The Debtor has filed two motions addressing the scope of service, employee and patient notice procedures, and other related relief. These notice procedures will benefit the Debtor's bankruptcy estate and all interested parties, by decreasing the administrative burden on the estate while giving patients, employees, and all other interested parties proper notice of the filing. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

46.     **PCO Motion**: The Debtor has filed a motion to excuse the appointment of a patient care ombudsman because the Debtor has sufficient oversight and processes in place to ensure that patient care retains its high quality and patients can protect their rights. I believe that the administrative burden of a patient care ombudsman is not appropriate in this case considering the licensing and/or supervising entities who oversee the Debtor's Care Centers and the Debtor's internal compliance functions implemented by Christina Steiner, the Chief Compliance Officer, and the compliance committee. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

47.     **Stretto Claims Agent Motion and Administrative Agent Motion**: The Debtor has filed applications requesting that the Court approve the Debtor's retention of Stretto, Inc. ("Stretto"), as a claims and noticing agent and to assist with the preparation of the Debtor's schedules and SOFAs. I believe the retention of a claims and noticing agent is necessary primarily to (i) handle the significant burden of noticing interested parties, including the Debtor's patients, employees, residents, and vendors and (ii) handle the potentially voluminous proofs of claim filed in this Chapter 11 Case. I also believe the retention of Stretto to assist with the schedules and SOFAs is necessary and appropriate in this case to ease the significant burden that compiling the schedules and SOFAs will place on the Debtor's bankruptcy professionals and employees. I believe that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors.

*[The remainder of this page is intentionally blank]*

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated:  July 3, 2025

_____
Neil Luria