## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| In re: | **Case No.: 6:25-bk-04156** |
| **THE VILLAGES HEALTH SYSTEM, LLC,[1]** | **Chapter 11** |
| Debtor. | |

### DEBTOR'S *EMERGENCY* MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) APPROVING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

### (Emergency Hearing Requested)

### BASIS FOR EMERGENCY HEARING AND RELIEF

In accordance with Rule 2081-1(g)(1)-(2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, Debtor respectfully requests that the Court conduct an emergency hearing on the Motion as soon as the Court's schedule permits. Debtor requires immediate access to supplementary funding via the DIP Facility pending an anticipated sale of Debtor and its assets as a going concern in order to preserve ongoing operations and ensure the availability of essential medical care for its more than 55,000 patients. Without immediate approval of the DIP Facility, which includes authorization for the use of cash collateral, Debtor will be unable to meet its day-to-day obligations, including the payment of wages and benefits and acquisition of essential medical supplies. Cessation of operations would severely detriment the interests of creditors, diminish the value of Estate (defined below) assets, and leave its patients without ready access to adequate medical care.

The Villages Health System, LLC (the "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby moves for entry of an order granting the *Debtor's Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expenses Status, (IV)*

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

*Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the

"Motion") and, in so doing, approving, on an interim and final basis, as appropriate, the DIP

Facility (defined below) and granting certain ancillary relief, as described below, and in support

thereof, submits the following and contemporaneously filed *Declaration of Neil Luria in Support*

*of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") and *Declaration of*

*Neal Patel in Support of the Motion for Approval of Debtor in Possession Financing and the Use*

*of Cash Collateral* (the "Patel Declaration"):

## RELIEF REQUESTED

1.      By this Motion, Debtor seeks entry of interim and final orders (the "Interim Order"

and "Final Order," [2] respectively, and collectively, the "DIP Orders"), substantially in the form of

the proposed Interim Order attached hereto as **Exhibit A**:

   a.   authorizing Debtor to obtain $39,000,000 in senior secured postpetition financing
        on a super-priority basis (the "DIP Facility") pursuant to the terms and conditions
        of (i) that certain Terms of Debtor in Possession Financing letter agreement dated
        as of July 3, 2025 (the "DIP Agreement"),[3] by and between Debtor, as borrower,
        and PMA Lender, LLC, a Florida limited liability company (the "DIP Lender" or
        "VLS"), as lender, a copy of which is attached hereto as **Exhibit B** and incorporated
        herein by reference, as applicable, and (ii) the DIP Orders;[4]

   b.   authorizing Debtor to obtain from the DIP Lender pursuant to the DIP Facility,
        during the interim period (*i.e.*, the period beginning upon entry of the Interim Order
        and ending upon entry of the Final Order), up to $5,000,000 in new money advances
        in accordance with the DIP Agreement and Interim Order (the "Interim DIP
        Funding");

   c.   authorizing Debtor to obtain from the DIP Lender, upon entry of the Final Order,
        up to $19,000,000 in new money advances, which shall be in addition to the Interim
        DIP Funding, in accordance with the DIP Agreement and DIP Orders, as applicable
        (the "Final DIP Funding" and, together with the Interim DIP Funding, the "DIP

---

[2] Debtor will file a proposed Final Order prior to the final hearing on the Motion.

[3] Any term defined in the DIP Agreement shall have the same meaning herein.

[4] The DIP Lender has agreed to fund the loans under the DIP Facility (the "DIP Loans") based upon the DIP Agreement
and DIP Orders without the need for further documentation memorializing the terms governing the DIP Facility.  As
such, the DIP Orders shall constitute and contain material provisions of the DIP Agreement and, as appropriate, shall
be considered included within the definition of "DIP Agreement" and "DIP Documents."

Funding");[5]

d.   authorizing Debtor, upon entry of the Final Order, to convert to DIP Obligations (as defined herein) under the DIP Agreement the outstanding Prepetition Obligations (as defined below) in a ratio of 0.625:1 based upon new money advanced under the DIP Facility (the "Prepetition Roll-Up");[6]

e.   authorizing Debtor to execute and deliver the DIP Agreement and any other agreements and documents related thereto (together with the DIP Agreement, the "DIP Documents"), and to perform such other acts as may be prudent or necessary to implement the DIP Documents and DIP Orders and transactions contemplated thereby;

f.   subject to the Carve-Out (as defined in the DIP Documents and Interim Order), granting to the DIP Lender, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents, including the Prepetition Roll-Up (collectively, and including all other obligations as described in the DIP Agreement, the "DIP Obligations"), an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code[7] having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), and 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, in the Chapter 11 Case;

g.   subject to the Carve-Out, granting to the DIP Lender an automatically perfected security interest in and senior liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth in the DIP Agreement and DIP Orders, as applicable;

h.   authorizing and directing Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents (*i.e.*, the DIP Obligations) as such become due, including, without limitation, the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents and DIP Orders;

i.   authorizing the use of Cash Collateral pursuant to Section 363 of the Bankruptcy Code and subject to the Approved Budget (as defined in the Interim Order), which

---

[5] For the avoidance of doubt, the total new money available under the DIP Facility (*i.e.*, the DIP Funding) totals $24,000,000.  The total amount of the DIP Facility includes additional amounts related to the Prepetition Roll-Up (defined herein), payment-in-kind (PIK) interest, and anticipated reimbursable fees and costs.

[6] As expressed herein, roll-up ratios are expressed as X:Y, in which X refers to Prepetition Obligations "rolled-up" into the DIP Facility/DIP Obligations and Y refers to the new money under the DIP Facility.

[7] As used herein, "Bankruptcy Code" refers to title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*  Unless otherwise noted, any reference to a "Section" shall refer to the specified section of the Bankruptcy Code.

4912-2961-2883.2

is attached to the proposed Interim Order as **Exhibit A**, and subject to the Carve-Out, provision of adequate protection in association therewith;

j. subject to the Carve-Out and entry of a Final Order, waiving certain rights of Debtor to surcharge the DIP Collateral or any prepetition collateral of the DIP Lender, as applicable, pursuant to section 506(c) of the Bankruptcy Code, as to the DIP Lender;

k. subject to entry of a Final Order, waiving (i) the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, or profits of any of the DIP Collateral, and (ii) the application of the equitable doctrine of "marshaling," or any other similar doctrine, with respect to any of the DIP Collateral, in each case as to the DIP Lender;

l. modifying and vacating the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and DIP Orders; and

m. granting related relief.

## <u>STATEMENT OF MATERIAL TERMS OF DIP FACILITY</u>

2.     The following chart contains a summary of the material terms of the proposed DIP Facility and Interim Order in accordance with Rules 4001(b)(1)(B) and 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>" and each, a "<u>Bankruptcy Rule</u>"), and Rule 2081-1(g)(1)-(2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "<u>Local Rules</u>" and each, a "<u>Local Rule</u>"):

4912-2961-2883.2

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties to the DIP Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower**:  The Villages Health System, LLC<br><br>**DIP Lender**:  PMA Lender, LLC |
| **Term**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The DIP Facility shall mature, and the DIP Loan shall be payable in full, on the earliest of the following dates, unless extended or waived by the DIP Lender (such date, the "Maturity Date"):<br><br>1. the date 180 days after the Petition Date;<br><br>2. the date on which Debtor closes the sale of all or substantially all assets of the Estate; and<br><br>3. in the event of an Event of Default by Debtor, (a) the date an incurable Event of Default occurs or, (b) with respect to a curable Event of Default, the date 10 business days after the DIP Lender provides written notice of the Event of Default to Debtor, if such Event of Default remains uncured at such time.<br><br>If the Maturity Date is a result of the closing of a Transaction, all outstanding DIP Obligations shall be paid in full prior to or upon closing of the Transaction either (i) directly from the buyer in such Transaction or (ii) directly from the escrow account, via the escrow agent, established for the consummation of the Transaction.  Such payment shall be made by wire transfer of immediately available funds to an account designated in writing by the DIP Lender prior to the closing of such Transaction. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Extensions of credit under the DIP Facility shall not exceed the principal amount of $39,000,000, which amount is comprised of:<br><br>1. $24,000,000 of new money that Debtor requires to fund ongoing operations and administrative expenses of the Chapter 11 Case; plus<br><br>2. $15,000,000 owing under the Prepetition Secured Loan via the Prepetition Roll-Up.<br><br>New money advances under the DIP Facility shall be available on the following schedule: (i) upon entry of the Interim Order, $5,000,000; and (ii) upon entry of the Final Order, the remaining $19,000,000. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Agreement includes standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the DIP Lender to make DIP Loans under the DIP Facility, including the following, to which Debtor must attest at the time of each disbursement:<br><br>1. the Court has entered the Interim DIP Order or Final DIP Order, as applicable;<br><br>2. the DIP Lender shall have received and shall have approved the Budget; and<br><br>3. Debtor has not committed an Event of Default (defined below) which remains uncured.<br><br>Subject to the foregoing conditions being satisfied, the DIP Lender shall release funds to the Debtor under the terms set forth in the DIP Agreement.  For the avoidance of doubt, the DIP Lender may waive any condition precedent at any time in writing. |

| | |
|---|---|
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Interest Rate**: Interest shall accrue at a rate of twelve percent (12%) *per annum* based upon days actual elapsed, using a 360-day annual period, from the closing date to the Maturity Date of the DIP Facility. ***Interest shall accrue <u>solely</u> on new money loaned under the DIP Facility***.<br><br>**Default Interest Rate**: Interest shall accrue at a rate of eighteen percent (18%) *per annum* based upon days actual elapsed, using a 360-day annual period, (a) following an Event of Default by Debtor, *provided* that default interest shall only accrue until Debtor cures the Event of Default, and (b) following the Maturity Date with respect to any unpaid amounts due and owing under the DIP Agreement and/or DIP Orders. |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | As set forth more fully in the DIP Agreement and Approved Budget, Debtor may use proceeds of the DIP Facility and Cash Collateral in any manner permitted by applicable law, subject to the terms and restrictions of the then-applicable Approved Budget and applicable orders of the Court. |
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the DIP Orders, Approved Budget, or the DIP Documents, neither the proceeds of the DIP Facility, the DIP Collateral, the Carve-Out, nor Cash Collateral may be used to fund or pay expenses in connection with:<br><br>1. preventing, hindering, or delaying the DIP Lender's enforcement of the DIP Documents, collection of the DIP Obligations, or realization upon any of the DIP Collateral, subject to compliance with the DIP Documents, orders of the Court, and applicable law;<br><br>2. using or seeking to use the DIP Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender;<br><br>3. outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender;<br><br>4. incurring any junior priority indebtedness without prior notice to the DIP Lender;<br><br>5. incurring any senior priority or equal priority indebtedness without the prior written consent of the DIP Lender;<br><br>6. seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Documents, including the DIP Orders;<br><br>7. objecting to or challenging in any way the DIP Lender Liens, the DIP Obligations, the Prepetition Secured Loan, the DIP Collateral or any other claims or liens, held by or on behalf of the DIP Lender;<br><br>8. examining, asserting, commencing, prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action, or other actions to recover or disgorge payments against the DIP Lender, or any of its respective affiliates, successors and assigns and the partners, shareholders, members, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals;<br><br>9. litigating, objecting to, challenging, or contesting in any manner any of the DIP |

7

| | |
|---|---|
| | Obligations, the DIP Lender Liens, the Prepetition Secured Loan, or any other rights or interests of the DIP Lender; or |
| | 10. seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Secured Loan. |
| **Entities with Interests in Cash Collateral**<br><br>**Bankruptcy Rule 4001(b)(1)(B)(i)** | The DIP Lender is the only party to hold an interest in Cash Collateral. |
| **Fees**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | **Reimbursable Fees/Costs.** The DIP Lender shall be entitled to reimbursement for reasonable fees and costs, including attorneys' fees, incurred in connection with the DIP Facility; *provided* that such reimbursement shall not exceed, subject to permitted variances, the amount provided for such fees and costs, including attorneys' fees, in the Approved Budget.<br><br>**Waiver of Transactional Fees.** The DIP Lender has agreed to fund the DIP Facility without standard transactional fees and charges, including, without limitation, upfront fees, origination fees, unused line fees, exit fees, agent fees, or similar fees or costs, which substantially decreases the cost of the DIP Facility. |
| **Budget**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget, the initial form of which is attached to the Interim Order as <u>Exhibit 1</u> and incorporated herein by reference (together with subsequent versions thereof, the "<u>Budget</u>" or "<u>Approved Budget</u>", as applicable). |
| **Reporting Information**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The DIP Agreement requires customary financial reporting and provision of relevant information, including, without limitation, the provision of budget-to-actual performance information. |
| **Budget Variance Covenant**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Twenty percent (20%) variance to the Approved Budget (the "<u>Permitted Variance</u>"), which shall be calculated based upon the aggregate applicable receipts less aggregate applicable disbursements reflected as Net Cash Flow in the Approved Budget for the subject period.<br><br>Notwithstanding the reporting requirements, Budget compliance shall be tested every other week on a cumulative basis beginning on the fourth full week following the Petition Date. |
| **Chapter 11 Milestones**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The DIP Facility is contingent upon Debtor meeting the following milestones (collectively, the "<u>Milestones</u>") in the Chapter 11 Case:<br><br>1. no later than July 3, 2025, Debtor shall have commenced the Chapter 11 Case;<br><br>2. no later than July 3, 2025, Debtor shall have filed a motion to approve bidding and sale procedures for a sale of substantially all assets of Debtor and the Estate;<br><br>3. no later than July 11, 2025, the Court shall have entered the Interim Order;<br><br>4. no later than July 24, 2025, the Court shall have entered an order approving bidding and sale procedures for a sale of substantially all assets of Debtor and the Estate; |

|  | |
|---|---|
|  | 5. no later than August 15, 2025, the Court shall have entered the Final Order; |
|  | 6. no later than September 1, 2025, (a) Debtor shall have held and completed any auction in connection with the proposed sale and (b) the Court shall have entered an order approving a sale of substantially all assets of Debtor and the Estate; |
|  | 7. no later than October 3, 2025, Debtor shall have closed the sale transaction; |
|  | 8. no later than October 31, 2025, Debtor shall have filed (a) a proposed chapter 11 plan and disclosure statement and (b) motion for approval of the disclosure statement and solicitation procedures; |
|  | 9. no later than November 28, 2025, the Court shall have entered an order approving the disclosure statement and solicitation procedures for the chapter 11 plan; |
|  | 10. no later than December 31, 2025, voting on the chapter 11 plan shall have concluded; and |
|  | 11. no later than January 30, 2026, the Court shall have entered an order confirming a chapter 11 plan. |
|  | *Provided* that the Milestones and Debtor's obligation to comply therewith (i) may be waived by the DIP Lender, in whole or in part, at any time and (ii) shall be moot and expire upon full satisfaction of the DIP Obligations. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | **First-Priority Security Interest**. Subject to the Carve-out (defined below), the DIP Obligations shall be secured by a valid, non-avoidable, automatically perfected first-priority security interest in and lien on (the "DIP Lender Liens") the DIP Collateral and all cash and non-cash proceeds of any DIP Collateral pursuant to Section 364(c)(2) of the Bankruptcy Code.<br><br>"DIP Collateral" means and refers to all Estate assets under Section 541 of the Bankruptcy Code, whether tangible or intangible, whether now existing or hereafter arising or acquired, and wherever located, including, without limitation:<br><br>1. all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including governmental and credit card receivables), chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable) and investment property, hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accession and proceeds of the foregoing, including insurance or other proceeds (provided that the liens and rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property);<br><br>2. all proceeds of leased real property;<br><br>3. subject to entry of the Final Order, the proceeds of any avoidance actions |

| | |
|---|---|
| | brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; |
| | 4.  proceeds from Debtor's exercise of rights under Sections 506(c) and 550 of the Bankruptcy Code; |
| | 5.  all property of Debtor that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date; and |
| | 6.  all proceeds from the sale, assignment, or other disposition of (i) commercial real estate leases and (ii) Debtor's right to select, identify, and designate which commercial leases may be assumed and assigned under Section 365 of the Bankruptcy Code. |
| | Notwithstanding the foregoing, DIP Collateral shall not include Debtor's real property leases (but shall include all proceeds of such leases), solely to the extent that the grant of a DIP Lender Lien is prohibited or restricted by the terms of such real property leases or applicable non-bankruptcy law to attach to any such real property leases. |
| | **Super-priority Administrative Claim.**  In addition to the DIP Lender Liens, the DIP Obligations shall constitute allowed super-priority administrative expense claims, having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of Debtor, including, but not limited to, the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114, and any other provision of the Bankruptcy Code or otherwise (the "Super-Priority DIP Claim") pursuant to Section 364(c)(1) of the Bankruptcy Code. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B), Guidelines § II(B)(6) | The DIP Agreement and DIP Orders provide a carve-out (the "Carve-Out") for certain statutory and allowed professional fees, which shall remain in the Estate notwithstanding the occurrence of an Event of Default or repayment of the DIP Facility.<br><br>The amount of the Carve-Out shall be determined by the following formula:<br><br>All unpaid professional fees and administrative costs incurred by Debtor and any statutory committee, *plus*<br><br>$250,000 for wind-down fees and expenses of the Estate, *plus*<br><br>All unpaid and anticipated fees owing to the Court or United States Trustee or which Debtor is or will be obligated to pay prior to the closing of the Chapter 11 Case.<br><br>The Carve-Out shall be calculated as of the first date following the effective date of the operative Carve-Out Trigger Notice (as defined in the DIP Agreement). |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Agreement and Interim Order provide for a challenge period with respect to the DIP Lender's claims and interests relating to the Prepetition Secured Loan, which shall commence on the Petition Date and expire on the earlier of (x) forty-five (45) calendar days after the Petition Date and (y) the date established by the Court for the submission of qualified bids to purchase the Debtor or Debtor's assets (the "Challenge Period"). |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | No adequate protection is required as (i) the DIP Lender is the sole prepetition secured creditor and (ii) the Prepetition Secured Loan will be subsumed in the DIP Obligations via the Prepetition Roll-Up; *provided, however*, if adequate protection is deemed necessary, adequate protection shall be provided via the maintenance and preservation of the DIP Collateral. |

10

| | |
|---|---|
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Agreement and DIP Orders contain events of default that are usual and customary for debtor in possession financing and the use of cash collateral, including the following (collectively, "<u>Events of Default</u>" and, each individually, an "<u>Event of Default</u>"):<br><br>1.   failure to comply with the Approved Budget, subject to notice and opportunity to cure such default;<br><br>2.   failure to make any payment required under the DIP Documents, subject to notice and opportunity to cure such default;<br><br>3.   failure to obtain approval of the DIP Facility in a form satisfactory to the DIP Lender, subject to notice and opportunity to cure such default;<br><br>4.   dismissal or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, unless the subject order is stayed pending and reversed on appeal;<br><br>5.   appointment of a chapter 11 trustee or other fiduciary or estate representative resulting in Debtor no longer acting as debtor in possession, unless the subject order is stayed pending and reversed on appeal; or<br><br>6.   failure to achieve any of the Milestones, unless extended or waived by the DIP Lender in writing, subject to notice and opportunity to cure such default. |
| **Waiver/Modification of Nonbankruptcy Law Related to Perfection and Enforcement of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for customary waivers of and modifications to non-bankruptcy law pertaining to the perfection or enforcement of liens. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Debtor agrees to indemnify and hold harmless the DIP Lender and certain agents and affiliates in accordance with the terms and conditions of the DIP Agreement. |
| **Limitations of Section 506(c) of the Bankruptcy Code** | All rights to surcharge the DIP Lender Liens or DIP Collateral under Section 506(c) of the Bankruptcy Code or other applicable law shall be waived upon entry of the Final Order. |
| **Liens on Claims/ Causes of Action** | Subject to entry of the Final Order, the DIP Lender Liens shall attach to and encumber the proceeds of any claims or causes of action, including avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. |
| **Liens on Unencumbered Real Property** | The DIP Collateral includes any unencumbered real property owned by Debtor. |

11

## JURISDICTION AND VENUE

3.      This court (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Debtor consents to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders, judgments, or decrees consistent with Article III of the United States Constitution.

6.      This Motion and relief requested herein are predicated upon sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2081-1(g)(1)-(2).

## BACKGROUND

7.      On July 3, 2025 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy in the Court—thereby commencing the above-captioned Chapter 11 Case.  Debtor continues to operate its businesses and manage its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee") has not appointed any creditor or equity committee(s), nor has the Court appointed any trustee, examiner, ombudsman, or other fiduciary, or limited the rights of Debtor, as debtor in possession, in the Chapter 11 Case.

8.      A discussion of the Debtor and its business operations, the facts and circumstances supporting this Motion, and events precipitating the Debtor's bankruptcy filing are set forth in the First Day Declaration, which is incorporated herein by reference.

*[Remainder of this page was intentionally left blank]*

## A.      Debtor's Prepetition Debt

### 1.      Prepetition Secured Loan

9.      In April 2025, Debtor entered into a secured credit facility with VLS, an affiliate of the Debtor and operator of certain The Villages communities—pursuant to which VLS agreed to provide Debtor a line of credit in the initial principal amount of $15 million (the "VLS Loan Facility"). The amounts due and owing under the VLS Loan Facility are secured by a first-priority security interest in all assets of Debtor. As of the Petition Date, the principal balance on the VLS Loan Facility is $15 million (the "VLS Loan Obligation"). Other than the VLS Loan Facility, Debtor has no other prepetition secured debt, other than equipment leases.

## B.      Debtor's Cash Collateral

10.      As of the Petition Date, Debtor holds approximately $6.0 million in cash. Per Local Rule 2081-1(g)(1)(A)(ii), a summary of such accounts, including the amount of Cash Collateral held therein, is set forth below.

| Bank | Account No. | Type | Account Balance |
|---|---|---|---|
| Citizens First Bank | xx5906 | Checking – Operating Account | $0.00 |
| Citizens First Bank | xx6313 | Money Market | $6,329,535.87 |
| Citizens First Bank | xx0248 | FSA Activity | $40,341.57 |
| USB Bank | xx6400 | Fee for Service Collections | $67,753.10 |

## C.      Necessity of DIP Financing and Authority to Use Cash Collateral

11.      As demonstrated by the Budget, Debtor requires immediate access to the DIP Facility and continued access to and use of the Cash Collateral in order to meet near- and long-term operational and administrative/ restructuring expenses. The following is a summary of Debtor's current liquid assets as well as its anticipated expenditures, which are detailed further in the Approved Budget.

**D.      The DIP Lender and DIP Facility**

12.     PMA Lender, LLC (*i.e.*, the DIP Lender) is an affiliate of Debtor by virtue of common ownership or control.  Due to liquidity issues, Debtor secured a $15 million revolving line of credit from the DIP Lender (*i.e.*, the VLS Loan Facility) in April 2025, which Debtor used to fund, *inter alia*, budgetary shortfalls and operational expenses.  In or about May 2025, Debtor determined that addressing certain obligations through bankruptcy was necessary to facilitate a sale of all or substantially all assets of the Debtor as a going concern; accordingly, Debtor launched a process to identify a potential lender.  Acting for Debtor, Evercore identified and solicited proposals from no less than seven (7) potential lenders qualified and capable of providing postpetition funding, including the DIP Lender.

13.     After considering the proposals and reasonable alternatives to postpetition funding, Debtor determined (in consultation with its advisors) that the proposal presented by the DIP Lender best served the needs and interests of Debtor and its creditors.  Accordingly, by and through their respective counsel, Debtor and the DIP Lender engaged in arm's-length negotiations in an effort to reach mutually acceptable terms for postpetition financing, which ultimately proved successful and culminated in the DIP Agreement and DIP Facility.  The terms upon which the DIP Lender agreed to provide postpetition financing are exceedingly fair—being below market in nearly every way.  For instance, the DIP Facility provides up to $24,000,000 via a postpetition, new money line of credit at a fixed interest rate of 12% *per annum*, accruing solely on the new money advances, and without any financing fees and a roll-up ratio (on account of the VLS Loan Facility) of 0.625:1—*i.e.*, $0.625 of prepetition roll-up for every $1.00 in new money.  While "insider" loans raise heightened scrutiny, the relationship between Debtor and the DIP Lender is the only reason Debtor was able to obtain such inordinately beneficial terms for the DIP Facility.

14

**BASIS FOR RELIEF REQUESTED**

**A.      Approval of and Authorization to Obtain the DIP Facility are Necessary
and Appropriate Under Sections 364(c) and (d) of the Bankruptcy Code**

14.      Pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Court may approve and authorize a debtor to obtain postpetition financing on a super-priority administrative basis and/or secured by pre- and postpetition assets of the debtor and its estate.  11 U.S.C. §§ 364(c), (d)(1).  Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  Section 364(d)(1) of the Bankruptcy Code, in turn, provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

15.      In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis based upon certain considerations, including:

> a.      whether unencumbered credit or alternative financing without super-priority status is available to the debtor;

15

      b.    whether the credit transactions are necessary to preserve assets of the estate;

      c.    whether the terms of the credit agreement are fair, reasonable, and adequate;

      d.    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

      e.    whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

16.    For the reasons discussed *below*, Debtor respectfully submits that the requirements for approval of the DIP Facility, including the allowance of super-priority administrative claim status and first priority secured interests in pre- and postpetition assets of the Debtor pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, are satisfied under the circumstances.

     **1.**    **The Terms of the DIP Facility are the Best Available Under the Circumstances, and DIP Financing on a Junior Secured or Unsecured Basis is Not Available**

17.    In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987). Moreover, if few lenders are likely to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.,*
*Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re*
*Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981).

18.     Debtor engaged in a process, through its advisors, Evercore, to solicit and evaluate
proposals for post-petition financing.  Debtor evaluated potential lenders, including available
funding, experience in the subject industries, and prior involvement, if any, in postpetition
financing.  Ultimately, Debtor identified seven (7) potential lenders, including the DIP Lender.
Through Evercore, Debtor contacted and solicited proposals from the protection lenders.  After
evaluating the responses, the DIP Facility provided the required postpetition financing on the most
advantageous terms.

19.     Based on the foregoing, and after evaluating approved postpetition facilities in
similar cases, Debtor has determined in its sound business judgment that the DIP Facility is fair,
reasonable, and appropriate, meets the Debtor's anticipated financing needs pending conclusion
of the Chapter 11 Case, provides the financing required on the most cost-effective and beneficial
terms, and, based on the circumstances presented, is the only reasonable proposal for postpetition
financing—considering, among other factors, the adequacy of funds available, the applicable
interest rates, fees and ancillary charges, conditions of lending, repayment and default terms, and
milestones imposed for the administration of the Chapter 11 Case.

     **2.     The DIP Facility is Necessary to Preserve the Value of the Debtor's**
          **Estate**

20.     As debtor in possession, Debtor has a fiduciary duty to protect and maximize the
value of the Estate's assets for the benefit of creditors and other interest holders.  *See, e.g., In re*
*Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  Debtor intends to administer the assets
of the Estate through a sale of all, or substantially all, of such assets and, thereafter, the

17

confirmation of a chapter 11 plan.  Debtor, however, lacks sufficient revenues to preserve its business operations and assets, or fund restructuring costs, pending a sale—which is most readily demonstrated by the Budget.  *See* Ex. A.  To avoid immediate and irreparable harm, Debtor requires a significant infusion of cash to fund operational expenses and preserve assets, and more importantly, to ensure adequate healthcare for its patients.  Sustaining operations is essential to preserving the value of Estate assets pending a sale, which inures to the benefit of all creditors and interest holders.  Without additional funding, Debtor will be unable to fund operations or maintain patient services, which will negatively affect the value of Estate assets, including, without limitation, the value of good will established with Debtor's 55,000 patients.

### 3. The Terms of the DIP Facility are Fair, Reasonable and Adequate Under the Circumstances

21.     The DIP Facility terms are fair, reasonable and adequate, given the circumstances of the Debtor and DIP Lender.  *See Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).  While it is true the DIP Lender is an affiliate of Debtor, the objective terms of the DIP Facility and surrounding circumstances demonstrate that the DIP Facility provides financing on extremely beneficial terms for the Debtor.  By way of example:

|  | **Market Term** | **DIP Facility Term** |
|---|---|---|
| **Interest** | Variable Interest Rate (65% of sample) and Fixed Interest Rate (35% of sample) <br> Interest on total DIP Facility <br> 12% *per annum* interest | Fixed Interest Rate <br> Interest solely on new money under DIP Facility <br> 12% *per annum* interest |
| **Fees** | 3% Closing/Upfront Fee | No Financing Fees |
| **Roll-Up** | Roll-up Ratio of 0.75:1 | Roll-up Ratio of 0.625:1 |

Additionally, Debtor engaged in an objective process to solicit and evaluate potential postpetition financing options and, in so doing, ensure the reasonableness of the DIP Facility.  *See, supra*, at

18

pp. 11-12.  In consultation with its professionals and advisors, Debtor selected the DIP Facility.

Thereafter, Debtor and the DIP Lender engaged in lengthy, arm's-length negotiations through

independent counsel regarding the particular terms and memorialization of the proposed DIP

Facility, which resulted in the DIP Agreement and proposed Interim Order.

22.     Based on the foregoing, Debtor submits that the DIP Facility is procedurally and

substantively fair, reasonable, and appropriate under the circumstances presented.

### 4.     Entry into the DIP Documents Reflects the Debtor's Reasonable Business Judgment

23.     A debtor's decision to obtain postpetition financing under a particular credit facility

pursuant to section 364 of the Bankruptcy Code is governed by the business judgment standard.

*See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994); *Ames Dep't Stores,*

*Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to

be utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Grp. of*

*Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko*

*Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the

board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio

1983) (same).  Unless arbitrary and capricious, bankruptcy courts typically defer to a debtor's

business judgment on decisions concerning postpetition financing.  *See In re Trans World Airlines,*

*Inc.*, 163 B.R. at 974.  Indeed, "[m]ore exacting scrutiny would slow the administration of the

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

19

24. Debtor's decision to obtain funding under the DIP Facility is a sound exercise of its business judgment following a robust marketing process and careful evaluation of the DIP Facility and reasonable alternatives. Specifically, Debtor and its advisors evaluated Debtor's financial condition and projected revenues, which demonstrated Debtor required significant financing to support the administration of the Chapter 11 Case and ongoing operations. Debtor conducted an unbiased process to solicit proposal for postpetition financing and, after selecting the DIP Facility, negotiated the DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective counsel and advisors. Based on relevant concerns, as discussed *above*, Debtor believes that the DIP Facility represents the best financing option available under the circumstances. *See* Patel Declaration, ¶ 8. Accordingly, Debtor submits that the decision to incur the DIP Obligations under the DIP Facility is the result of a reasonable exercise of Debtor's business judgment.

### 5. Preservation of Estate Assets Provides Adequate Protection to Prepetition Secured Creditors

25. Pursuant to section 364(d)(1)(B) of the Bankruptcy Code, the Court may only approve a "priming" or *pari passu* lien under a postpetition credit facility if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). Section 361 of the Bankruptcy Code provides a non-exclusive list of possible "adequate protection"; however, bankruptcy courts must evaluate the need and adequacy of proposed "adequate protection" on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The purpose and guiding principal of the adequate-protection requirement is the protection of a prepetition secured creditor from the diminution in the value of its interest in the collateral. *See*

*Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

26.     Debtor submits that adequate protection is not required as the DIP Lender is the sole holder of a prepetition security interest in the DIP Collateral, and as a result of the Prepetition Roll-Up, the DIP Lender will no longer hold a prepetition secured claim upon entry of the Final Order—thereby eliminating the need to provide the DIP Lender adequate protection.  That said, if the Court deems adequate protection necessary, the DIP Lender's prepetition interest in the DIP Collateral shall be adequately protected by preservation of the DIP Collateral pending a sale and the rights and privileges afforded the DIP Lender under the DIP Documents, including the Prepetition Roll-Up.

**6.      The Debtor Should be Authorized to Use Cash Collateral per the DIP Documents and Budget**

27.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Debtor has an urgent need to access and use cash collateral of the DIP Lender (as both pre- and postpetition lender) to pay expenses essential to maintaining operations and costs associated with the Chapter 11 Case.  Absent such relief, Debtor lacks access to any cash, let alone sufficient cash, to fund operations, which will result in the immediate closure of its healthcare facilities and cessation of services to its patients.  Beyond

21

the financial harm, the cessation of services poses a significant risk of harm to Debtor's patients, which are comprised (almost exclusively) of senior citizens residing in The Villages communities in Central Florida.  Furthermore, Debtor believes that the terms and conditions of its use of Cash Collateral are appropriate and reasonable and, as described above, that the proposed adequate protection is sufficient to protect the DIP Lender's interest in the Cash Collateral, including, without limitation, the restrictions on the use of Cash Collateral pursuant to the Budget, which requires the DIP Lender's approval.  Thus, for the reasons set forth herein, Debtor submits that it should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

**B.      Modification of the Automatic Stay is Necessary and Appropriate**

28.      By and through the Motion, Debtor requests that the Court modify the automatic stay to permit Debtor and the DIP Lender, as applicable, to, among other things: (a) grant the security interests, liens, and super-priority claims described above in favor of the DIP Lender, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default, for the DIP Lender to exercise any remedies available to them pursuant to the DIP Documents and DIP Orders; and (c) implement the terms of the DIP Orders, including payment of all amounts referred to in the DIP Documents.

29.      Stay modifications, similar to those requested, are frequently and readily approved as necessary to effectuate the terms and purposes of postpetition financing, and based on the circumstances presented, are appropriate under the circumstances presented.  *See, e.g., In re Red Lobster Management LLC, et al.*, Case No. 24-02486-GER (Bankruptcy M.D. Fla. May 19, 2024); *In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla. Dec. 30, 2020); *In re Just One More Restaurant Corp., et al.*, Case No. 9:19-bk-

22

1947 (Bankr. M.D. Fla. Feb. 14, 2020); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015).  Accordingly, Debtor respectfully requests that the Court modify the automatic stay as requested herein.

### C.    Expedited Relief is Required to Avoid Immediate and Irreparable Harm

30.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  Moreover, pursuant to Bankruptcy Rule 6003(b), a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition, if necessary to avoid immediate and irreparable harm.

31.    Based on the foregoing, the Court may grant interim relief under sections 363(c) and 364 of the Bankruptcy Code and authorize compliance with prepetition repayment obligations if such relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). As described herein and in the First Day Declaration, Debtor faces immediate and irreparable harm absent immediate relief due to the significant disruption to its business operations and resulting harm to the business as a going concern—not to mention the potential harm to the envisioned sale transaction, licensing, and patients.

32.    Due to the importance of immediate access to funding, courts routinely approve interim relief in similar circumstances. *See, e.g., In re Red Lobster Management LLC, et al.*, Case

23

No. 24-02486-GER (Bankruptcy M.D. Fla. May 19, 2024); *In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla. Dec. 30, 2020); *In re It'Sugar FL U LLC et al.*, Case No. 20-20259-RAM (Bankr. S.D. Fla. Oct. 1, 2020); *In re Midtown Campus Properties, LLC*, Case No. 20-1573-RAM (Bankr. S.D. Fla. May 26, 2020); *In re Cinemex USA Real Estate Holdings, Inc., et al.*, Case No. 20-14695-LMI (Bankr. S.D. Fla. May 18, 2020); *In re ProHCM Holdings, Inc.*, Case No. 18-23156-AJC (Bankr. S.D. Fla. Nov. 1, 2018); *In re Miami International Medical Center, LLC*, Case No. 18-12741-LMI (Bankr. S.D. Fla. Mar. 15, 2018); *In re Magnum Construction Management, LLC*, Case No. 19-12821-AJC (Bankr. S.D. Fla. Mar. 8, 2019); *In re Adinath Corp, et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. Apr. 17, 2015).

**D.      Request For a Final Hearing**

33.    Debtor respectfully requests that the Court schedule a hearing on final approval of the DIP Facility for a date no later than August 15, 2025, as required to comply with the Milestones.

**E.      Waiver of Stays pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h)**

34.    To implement the foregoing successfully, Debtor requests that the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property or modifying the automatic stay under Bankruptcy Rules 4001(a)(3) and 6004(h) and find the Interim Order immediately effective and enforceable upon entry.   As discussed herein, Debtor requires immediate relief to avoid irreparable harm to its operations, the value and salability of Estate assets, and its more than 55,000 patients.   Debtor submits that these risks of immediate and irreparable harm provide ample cause to justify waiver of any stay on the effectiveness of the Interim Order imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), or otherwise, to the extent

24

applicable to the Interim Order and relief requested therein.

## RESERVATION OF RIGHTS

35.     Nothing contained in this Motion or any order granting the relief requested in this Motion, herein, and no action taken pursuant to such relief requested or granted, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of any right to dispute any claim against, or interest in, Debtor, its property, or its Estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise entitled to preferential treatment of the sort discussed herein; (f) an implication, admission, or finding as to (i) the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of Debtor or its Estate or (ii) a waiver or limitation on any party's ability to challenge, recharacterize as equity, void, claw back, or seek other relief with respect to any particular payments authorized hereunder; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

36.     Notice of this Motion has been provided by email, facsimile or overnight mail to: (a) the Office of the United States Trustee for the Middle District of Florida; (b) the Debtor; (c) all secured creditors; (d) the Office of the Attorney General of the State of Florida; (e) the twenty (20) largest unsecured creditors for the Debtor; (f) the Debtors' identified, interested taxing authorities,

including the Internal Revenue Service; (g) the Debtors' identified, interested government and regulating entities; (h) other interested parties as identified by the Debtors; and (i) any known counsel for (a)-(h). The method of service for each party will be described more fully in the certificate of service prepared by the Debtors' proposed claims and noticing agent. The Debtors respectfully submit that, based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, no further notice is required.

  **WHEREFORE**, Debtor respectfully requests that the Court enter an order in substantially the form attached hereto as **Exhibit A** (i) granting this Motion and the relief requested herein on an interim basis and, after a final hearing, on a final basis, (ii) authorizing Debtor to enter into the DIP Agreement and the other DIP Documents and to take such actions as Debtor reasonably believes necessary or appropriate to effectuate the terms and purposes of the DIP Documents and the Interim Order, (iii) authorizing the use of Cash Collateral pursuant to section 363 of the Bankruptcy Code, (iv) approving the DIP Lender Liens and super-priority administrative expense claim in an amount equal to the DIP Obligations, (v) modifying the automatic stay as necessary to effectuate the terms and purposes of the DIP Documents, (vi) scheduling a final hearing on the Motion, and (vii) granting such other and further relief as the Court deems just and proper.

[Signature Page to Follow]

Dated: July 3, 2025

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*

**Elizabeth A. Green, Esq.**
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
**Jimmy D. Parrish, Esq.**
FL Bar No.: 0526401
E-mail: jparrish@bakerlaw.com
**Andrew V. Layden, Esq.**
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and Debtor
in Possession*

27

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In re: | **Case No.: 6:25-bk-04156** |
| **THE VILLAGES HEALTH SYSTEM, LLC,[1]** | **Chapter 11** |
| Debtor. | |

**INTERIM ORDER GRANTING DEBTOR'S _EMERGENCY_ MOTION FOR
INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING,
(II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) APPROVING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) MODIFYING
AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND
(VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of The Villages Health System, LLC (the "Debtor"), the

debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case"),

for entry of interim and final orders (respective, the "Interim Order" and "Final Order" and,

together, the "DIP Orders") pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of title 11

of the United States Code, 11 U.S.C. §§ 101, _et seq_. (the "Bankruptcy Code"), Rules 2002, 4001,

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

[2] Unless otherwise defined herein, all terms defined in the Motion or DIP Agreement, as applicable, shall have the same meanings herein.

6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and

each, a "Bankruptcy Rule"), and Rules 2081-1(g)(1)-(2) of the Local Rules (the "Local Rules" and

each, a "Local Rule") of the United States Bankruptcy Court for the Middle District of Florida (the

"Court"), providing as follows:

    a.     authorizing Debtor to obtain $39,000,000 in senior secured postpetition financing on a super-priority basis (the "DIP Facility") pursuant to the terms and conditions of (i) that certain Terms of Debtor in Possession Financing letter agreement dated as of July 3, 2025 (the "DIP Agreement"), by and between Debtor, as borrower, and PMA Lender, LLC, a Florida limited liability company (the "DIP Lender"), as lender, a copy of which is attached to the Motion as **Exhibit B** and incorporated herein by reference, as applicable, and (ii) the DIP Orders;

    b.     authorizing Debtor to obtain from the DIP Lender pursuant to the DIP Facility, during the interim period (*i.e.*, the period beginning upon entry of the Interim Order and ending upon entry of the Final Order), up to $5,000,000 in new money advances in accordance with the DIP Agreement and Interim Order (the "Interim DIP Funding");

    c.     authorizing Debtor to obtain from the DIP Lender, upon entry of the Final Order, up to $19,000,000 in new money advances, which shall be in addition to the Interim DIP Funding, in accordance with the DIP Agreement and DIP Orders, as applicable (the "Final DIP Funding" and, together with the Interim DIP Funding, the "DIP Funding");[3]

    d.     authorizing Debtor, upon entry of the Final Order, to convert to DIP Obligations (as defined herein) under the DIP Agreement the outstanding Prepetition Obligations (as defined below) (the "Prepetition Roll-Up");

    e.     authorizing Debtor to execute and deliver the DIP Agreement and any other agreements and documents related thereto (together with the DIP Agreement, the "DIP Documents"), and to perform such other acts as may be prudent or necessary to implement the DIP Documents and DIP Orders and transactions contemplated thereby;

    f.     subject to the Carve-Out, granting to the DIP Lender, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents, including the Prepetition Roll-Up (collectively, and including all other obligations as described in the DIP Agreement, the "DIP Obligations"), an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code

---

[3] For the avoidance of doubt, the total new money available under the DIP Facility (*i.e.*, the DIP Funding) totals $24,000,000. The total amount of the DIP Facility includes additional amounts related to the Prepetition Roll-Up (defined herein), payment-in-kind (PIK) interest, and anticipated reimbursable fees and costs.

having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), and 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, in the Chapter 11 Case;

g.    subject to the Carve-Out, granting to the DIP Lender an automatically perfected security interest in and senior liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth in the DIP Agreement and DIP Orders, as applicable;

h.    authorizing and directing Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents (*i.e.*, the DIP Obligations) as such become due, including, without limitation, the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents and DIP Orders;

i.    authorizing the use of Cash Collateral pursuant to section 363 of the Bankruptcy Code and subject to the Approved Budget, which is attached hereto as **Exhibit 1**, and subject to the Carve-Out, provision of adequate protection in association therewith;

j.    subject to the Carve-Out and entry of a Final Order, waiving certain rights of Debtor to surcharge the DIP Collateral or any prepetition collateral of the DIP Lender, as applicable, pursuant to section 506(c) of the Bankruptcy Code, as to the DIP Lender;

k.    subject to entry of a Final Order, waiving (i) the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, or profits of any of the DIP Collateral, and (ii) the application of the equitable doctrine of "marshaling," or any other similar doctrine, with respect to any of the DIP Collateral, in each case as to the DIP Lender;

l.    modifying and vacating the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and DIP Orders; and

m.    granting related relief;

and the Court having held a hearing to consider Debtor's request for interim relief on the Motion on July __ , 2025 (the "Interim Hearing"); and the Court having received and considered the representations and evidence admitted during the Interim Hearing, including the First Day Declaration and Patel Declaration, as well as the arguments of counsel and other evidence and

3

matters adduced during the Interim Hearing; and the Court having reviewed and considered the Motion, DIP Documents, and other information and documentation submitted in the Chapter 11 Case; and after due deliberation and consideration, finding sufficient cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED,[4] that:

1.      *Petition Date*. On July 3, 2025 (the "<u>Petition Date</u>"), Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Debtor continues to operate its businesses and manage its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Office of the United States Trustee for the Middle District of Florida (the "<u>U.S. Trustee</u>") has not appointed any creditor or equity committee(s), nor has this Court appointed any trustee, examiner, ombudsman, or other fiduciary, or limited the rights of Debtor, as debtor in possession, in the Chapter 11 Case.

2.      *Jurisdiction and Venue*. This Court has core jurisdiction over the Chapter 11 Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The Court may enter a final order consistent with Article III of the United States Constitution.

3.      *Notice*. Debtor has provided notice of the Motion, relief requested therein and the proposed Interim Order to: (a) the Office of the United States Trustee for the Middle District of Florida; (b) the Debtor; (c) all secured creditors; (d) the Office of the Attorney General of the State of Florida; (e) the twenty (20) largest unsecured creditors for the Debtor; (f) the Debtor's identified, interested taxing authorities, including the Internal Revenue Service; (g) the Debtor's identified, interested government and regulating entities; (h) other interested parties as identified by the

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Debtor; and (i) any known counsel for (a)-(h).  Under the circumstances, such notice constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c), and (d) and all applicable Local Rules, and no further or additional notice is necessary or appropriate.

4.      *Debtor's Stipulations*.  After consultation with its advisors, and without prejudice to the rights of any committee that may be appointed in the Chapter 11 Case or other parties in interests, except as otherwise limited herein, the Debtor, on its behalf and on behalf of its Estate, shall be deemed to admit, stipulate, acknowledge, and agree as follows (collectively, the "Stipulations"):

(a)      as of the Petition Date, the Debtor was party or otherwise obligated under the Prepetition Secured Loan and truly and justly indebted and liable to VLS, without defense, objection, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $15,000,000 on account thereof (the "VLS Loan Obligation");

(b)      the VLS Loan Obligation constitutes a legal, valid, binding, and non-avoidable obligation of the Debtor and is not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) VLS by or on behalf of the Debtor prior to the Petition Date under or in connection with the VLS Loan Facility is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;

(c)      the security interest and liens related to the VLS Loan Facility (collectively, the "VLS Prepetition Liens") are: (i) legal, valid, binding, perfected, enforceable, first priority

liens on and security interests in the subject collateral (the "VLS Prepetition Collateral") to secure the VLS Loan Obligation, (ii) not subject to avoidance, recharacterization, offset or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law or other challenge, and (iii) after giving effect to this Interim Order and subject to the Carve-Out, subject and subordinate only to other valid and unavoidable senior priority liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), solely to the extent such liens are permitted under the VLS Loan Facility and related agreements (collectively, the "VLS Loan Documents") to be senior to the liens securing the VLS Loan Obligation;

(d)      Debtor, on its behalf and on behalf of its Estate, forever and irrevocably releases, discharges, and acquits the DIP Lender and VLS, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of the DIP Lender and VLS (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, solely arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the VLS Loan Documents, and/or the transactions contemplated hereunder or thereunder, including (x) any so-called "lender

liability" or equitable subordination or disallowance claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Lender or VLS, *provided* that the releases set forth in this section shall be limited to such claims arising on or before the date on which the Court enters this Interim Order.  Debtor also waives and releases any defense, right of counterclaim, right of setoff or deduction of the payment of the VLS Loan Obligations and the DIP Obligations that Debtor now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order; and

(e)      no portion of any of the VLS Loan Obligations shall be subject to contest, attack, avoidance, impairment, disallowance, defense, counterclaim, recharacterization, reduction, recoupment, setoff, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, *except* as permitted herein during the Challenge Period.

5.      *Findings Regarding the DIP Loans.*

(a)      Debtor seeks authority to (i) obtain postpetition financings pursuant to the DIP Facility on the terms described herein and in the DIP Loan Documents, and (ii) use Cash Collateral on the terms described herein to, *inter alia*, administer the Chapter 11 Case and fund operations; *provided, however*, that Debtor requests such relief, and the Court grants the relief provided herein, on an interim basis and subject to the Final Hearing and entry of the Final Order, which Debtor shall provide in accordance with this Interim Order.

(b)      Debtor has an immediate need for funding under the DIP Facility and authority to use Cash Collateral in order to, among other things, permit the orderly continuation of its business operations, preserve the going concern value of Debtor, satisfy the ongoing obligations

of the business, including payroll, working capital, and general corporate expenses, and facilitate the anticipated sale and chapter 11 plan through the Chapter 11 Case. The ability of Debtor to maintain business relationships with their vendors, suppliers, and patients, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The unavailability of either funding source would immediately and irreparably harm Debtor, its estates, creditors, and other parties in interest, including Debtor's more than 55,000 patients, as Debtor does not have sufficient available sources of working capital and financing to operate its businesses in the ordinary course of business and preserve its valuable assets and position in the community as a trusted healthcare provider.

(c)     Despite a thorough marketing and solicitation process (given the circumstances presented), Debtor has been unable to obtain financing on terms more favorable than the DIP Facility or from sources other than the DIP Lender.  As relevant here, Debtor has been unable to obtain (i) postpetition financing as an administrative expense pursuant to section 364(b) of the Bankruptcy Code or, exclusively, as a super-priority administrative expense having priority over that of administrative expenses arising under sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, or (ii) secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without (x) granting priming or *pari passu* liens under section 364(d)(1) of the Bankruptcy Code as well as a super-priority administrative claim under section 364(c)(1) and (y) subject to entry of the Final DIP Order, "rolling-up" the VLS Loan Obligation into the DIP Facility.

(d)     The terms and conditions of the DIP Facility pursuant to the DIP Documents (including the payment of fees contemplated thereunder), including the Cash Collateral, pursuant to this Interim Order are fair, reasonable, and the best available to Debtor under the circumstances,

8

are ordinary and appropriate for secured financing to debtors in possession, reflect Debtor's exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents, the use of Cash Collateral, and the grant of adequate protection, to the extent necessary, hereunder have been the subject of extensive negotiations conducted in good faith and at arm's length among Debtor and the DIP Lender, and all of Debtor's obligations and indebtedness arising under or in connection with the DIP Documents, this Interim Order, and the DIP Obligations shall be deemed to have been extended by the DIP Lender in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.  Any such reversal, modification, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder or any lien, claim, or priority authorized or created hereby.  Any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such reversal, modification, or vacatur of this Interim Order shall be governed in all respects by the original provisions of the DIP Documents and this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(f)     Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the interim relief set forth in this Interim Order, Debtor's estate and its business operations will be immediately and irreparably harmed; thus, obtaining postpetition financing pursuant to the DIP Facility and authorizing the use of the Cash Collateral, in accordance with this Interim Order and the DIP Documents are in the best interest of the Estate and its creditors and other parties in interest.  Good cause has been shown

9

for the immediate entry of this Interim Order.

6.      *Adequate Notice.*   Notice of the Interim Hearing and the relief requested in the Motion has been provided by Debtor in accordance with applicable rules and orders of this Court, whether by facsimile, electronic mail, overnight courier, hand delivery or other permitted means, to the Notice Parties.  Debtor has made reasonable efforts to afford the best notice possible under the circumstances and no further or additional notice is required prior to granting the relief set forth in this Interim Order.

7.      *Authorization of the DIP Loans and the DIP Documents.*

(a)      Debtor is hereby authorized (i) to enter into and perform under the DIP Documents and, (ii) to borrow under the DIP Agreement up to an aggregate principal amount of $39,000,000 (inclusive of the Prepetition Roll-Up) in DIP Loans, the proceeds of which shall be used for, subject to the terms of this Interim Order, the DIP Documents and the Approved Budget, among other things, working capital and other general corporate purposes of Debtor, including fees, costs, and expenses related to the Chapter 11 Case and the DIP Documents, capital expenditures, and to pay interest, fees, and expenses in connection with the DIP Facility, including any adequate protection or adequate assurance payments.

(b)      In furtherance of the foregoing and without further approval of this Court, Debtor is authorized and empowered to perform all acts and to execute and deliver all instruments and documents that the DIP Lender determines to be reasonably required or necessary for Debtor's performance of its obligations under the applicable DIP Documents, including:

(i)      the execution, delivery, and performance of the DIP Documents;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in accordance with the terms of the applicable DIP Documents and in such form as Debtor and the DIP Lender may agree), without further approval of this Court, *provided* that the subject amendment, waiver, consent or other

10

modification to and under the DIP Documents does not materially and adversely affect Debtor and does not (A) shorten the scheduled maturity of the DIP Loans, (B) increase the principal amount of the DIP Facility or the rate of interest payable on the DIP Loans, or (C) change any Event of Default, add any covenants or amend the covenants therein, in any such case to be materially more restrictive on or affect the rights of Debtor; *provided, however*, that a copy of any such amendment, waiver, consent or other modification shall be filed by Debtor with this Court and delivered by Debtor to counsel for the U.S. Trustee and any statutory committee (the "Committee") appointed in the Chapter 11 Case, which Debtor shall complete within three (3) Business Days of its effectiveness; and

(iii)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon the execution thereof, the DIP Documents shall constitute valid and binding obligations of Debtor, enforceable against Debtor in accordance with the terms of this Interim Order and the DIP Documents. No obligation, payment, transfer or grant of security by Debtor under the DIP Documents or this Interim Order shall be voidable, avoidable, restrained, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Avoidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

(d)    All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the Approved Budget, the DIP Documents, and this Interim Order, and Debtor shall not use any portion of the proceeds of the DIP Facility or any Cash Collateral, directly or indirectly, in excess of the amounts set forth in the Approved Budget (subject to the Permitted Variance).  The Approved Budget may be updated and amended from time to time in accordance with the DIP Agreement and subject to the DIP Lender's approval, *provided* that such updated or amended Approved Budget shall be promptly provided to counsel for the Committee and filed with the Court.

8.    *Super-priority Claims.*

11

(a) Subject in all respects to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations, including the Prepetition Roll-Up (once effective), shall constitute an allowed senior administrative expense claim (the "Super-priority Claim") against Debtor (without the need to file a proof of claim or request for payment) with priority over any and all administrative expenses, adequate protection claims, and all other claims against Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of Debtor. Other than the Carve-Out, no priority claims are, or will be, senior to, prior to, or *pari passu* with the Super-priority Claims, or any of the DIP Obligations, or with any other claims of the DIP Lender arising hereunder or under the other DIP Documents, or otherwise in connection with the DIP Facility.

9. *Carve-Out.*

(a) For purposes hereof, the "Carve-Out" means the aggregate amount of (i) all unpaid professional fees and disbursements incurred by the Debtor and any statutory committees appointed in the Chapter 11 Case pursuant to sections 327, 363 and 1103 of the Bankruptcy Code for any of their respective professionals retained by final order of the Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "Case Professionals") at any time prior to the delivery of the Carve-Out Trigger Notice to the extent allowed by the Court (the "Allowed Professional Fees"), in an aggregate amount not to exceed the amounts set forth in

the Approved Budget for professional fees prior to the delivery of a Carve-Out Trigger Notice, *plus* (ii) $250,000 on account of anticipated professional fees and disbursements incurred, or to be incurred, by the Case Professionals following the delivery of the Carve-Out Trigger Notice (the "Wind-Down Carve-Out Amount"), *plus* (iii) any fees required to be paid to the Clerk of the Court or U.S. Trustee pursuant to 28 U.S.C. § 1930(a) for the time period beginning on the Petition Date and ending on the Carve-Out Effective Date, which fees shall not be limited to amounts that may be set forth in the Approved Budget.

10.     *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Lender of any property, the following security interests in and liens and mortgages upon the DIP Collateral (described below) are hereby granted to the DIP Lender, subject only to the Carve-Out in all respects (all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens").  "DIP Collateral" shall consist of all property of the Estate under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtor, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including governmental and credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property, hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the

avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accession and proceeds of the foregoing, wherever located, including insurance or other proceeds (provided that the liens and rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property); (b) all proceeds of leased real property; (c) subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from Debtor's exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (e) all property of Debtor that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date; and (f) all proceeds from the sale, assignment, or other disposition of (i) commercial real estate leases and (ii) Debtor's right to select, identify, and designate which commercial leases may be assumed and assigned under section 365 of the Bankruptcy Code; *provided, however,* that "DIP Collateral" shall _not_ include Debtor's real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien thereon is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law.

(a)     The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or in any other proceeding related to any of the foregoing (such Chapter 11 Case, chapter 7 case, or other proceedings, "Successor Cases"), and/or upon the dismissal of the Chapter 11 Case.  Subject to the entry of the Final Order, the DIP Liens shall not be subject to section 510 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the

Bankruptcy Code, section 506(c) of the Bankruptcy Code, or sections 549, 550 or 551 of the Bankruptcy Code.

11.    *Budget*.  All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the budget attached as **Exhibit 1** to the DIP Agreement, as the same may be modified from time to time by the consent of the DIP Lender and Debtor (the "Budget" or "Approved Budget," as applicable), subject to such variances (the "Permitted Variance") permitted under the DIP Agreements, which is described therein as follows:

> For purposes of compliance with the DIP Document[s], receipts, operating disbursements, capital expenditures and non-operating disbursements, shall be tested every other week on a cumulative basis beginning on the fourth full week following the Petition Date (i.e., from the Petition Date through the Friday prior to each testing date) in each case, on an aggregate basis (i.e., the aggregate applicable receipts less aggregate applicable disbursements reflected as Net Cash Flow in the approved Budget) and subject to a twenty (20%) permitted variance.

12.    *Events of Default*. The occurrence of any of the following events, unless waived by the DIP Lender in writing, shall constitute an event of default under the DIP Documents and this Interim Order (collectively, the "Events of Default" and each, an "Event of Default"): (a) Debtor fails to operate in accordance with the Approved Budget (after taking into account Permitted Variances) or comply with any reporting requirement, and such failure remains uncured 10 business days after the DIP Lender notifies Debtor thereof; (b) Debtor fails to make any required payment, including, but not limited to, the payment of the full balance of the DIP Facility upon default or at the Maturity Date; (c) any order authorizing the Debtor to obtain the DIP Facility, whether on an interim or final basis, is not in a form satisfactory to the DIP Lender or is reversed, vacated, stayed, amended, supplemented, or otherwise modified in a manner which shall materially and adversely affect the rights of the DIP Lender; (d) the Chapter 11 Case is either dismissed or converted to a case under chapter 7 pursuant to a final order of the Court, the effect of which has not been stayed; (e) a chapter 11 trustee is appointed in the Chapter 11 Case pursuant to a final

order of the Court, the effect of which has not been stayed; and (f) Debtor fails to achieve any of the Milestones, unless extended or waived by the DIP Lender in writing.

13.     *Remedies after Event of Default.*  Upon the occurrence of an Event of Default, the automatic stay under section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Lender to exercise its rights and remedies under the DIP Agreement and VLS Loan Documents, as applicable, as to Debtor and the DIP Collateral and VLS Prepetition Collateral, including terminating Debtor's access to and use of any DIP Facility proceeds and Cash Collateral, *provided that* Debtor's right to and use of the Carve-Out shall not be affected by the occurrence of an Event of Default.

14.     *Limitation on Charging Expense against Collateral.*  Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no such consent shall be implied from any other action or inaction by the DIP Lender.

15.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, other than the Carve-Out.

16.     *Cash Collateral.*  All of Debtor's cash as of the Petition Date on deposit or maintained by Debtor in any account or accounts subject to a valid control agreement in favor of VLS as well as any cash proceeds of the disposition of any VLS Prepetition Collateral constitute

Cash Collateral of VLS within the meaning of section 363(a) of the Bankruptcy Code.

17.      *Use of Cash Collateral.*   Debtor is hereby authorized to use the Cash Collateral, during the period from the Petition Date through and including the Termination Date (as defined below) for working capital and general corporate purposes, including fees, costs and expenses related to the Chapter 11 Case and the DIP Documents, capital expenditures, and to pay interest, fees, and expenses in connection with the DIP Loans, including adequate protection and adequate assurance payments, in accordance with the terms and conditions of this Interim Order and subject to compliance with the Approved Budget.  As used herein, "<u>Termination Date</u>" means the earliest to occur of (a) the Maturity Date (as defined in the DIP Agreement) and (b) the date on which the Debtor commits an incurable, material breach of the DIP Agreement, which relieves the DIP Lender of any obligation to continue performing.

18.      *Adequate Protection.*   As VLS is the sole prepetition lender secured by the VLS Prepetition Collateral, the Court finds that adequate protection of VLS's interests under the VLS Loan Documents in and to the VLS Prepetition Collateral is not required as VLS is acting as DIP Lender; *notwithstanding*, the Court finds that VLS's interests are adequately protected for purposes of sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, by virtue of the rights conferred under the DIP Documents and use of the DIP Facility to, among other things, preserve the VLS Prepetition Collateral; *provided, further* that VLS's rights to the VLS Prepetition Collateral, subject only to the DIP Facility and Carve-out, shall constitute continuing, valid, binding, enforceable, and non-avoidable obligations of Debtor and VLS Prepetition Liens shall be deemed automatically perfected post-petition security interests in and liens on all of VLS the Prepetition Collateral, subject only to the DIP Liens and Carve-out.

19.      *Perfection of DIP Liens.*

17

(a)     The DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens granted to it hereunder, in each case, subject to the terms of the DIP Documents, and the automatic stay is hereby modified to permit such authorized actions.  Whether or not the DIP Lender chooses to file such financing statements, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens, such DIP Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order, *except* as otherwise provided herein.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Debtor shall execute and deliver to the DIP Lender, all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

(d)     Subject to entry of the Final Order, any provision of any lease or other license, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties, or (ii) the payment of any fees or obligations to any governmental entity, in order for Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, and any such provisions shall have no force and effect with respect to the granting of the DIP Liens on such leasehold interest or the

18

proceeds of any assignment and/or sale thereof by Debtor in favor of the DIP Lender in accordance with the terms of the DIP Documents or this Interim Order.

20.    *Preservation of Rights Granted Under the Order.*

(a)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute an Event of Default and a termination of the right to use the Cash Collateral if (i) Debtor seeks, or if there is entered, any modification of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender, or (ii) an order is entered converting or dismissing the Chapter 11 Case.

(b)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur, or (ii) the validity, priority, or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of the Cash Collateral, any DIP Obligations incurred by Debtor to the DIP Lender prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of the DIP Documents and this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, the DIP Documents (with respect to all DIP Obligations), and uses of the Cash Collateral.

(c)    Except as expressly provided in this Interim Order or in the DIP Documents, the Carve-Out, the DIP Liens, the Super-priority Claims, and all other rights and remedies of the DIP Lender granted by this Interim Order and the DIP Documents shall survive, and shall not be

19

modified, impaired, or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Case, or (ii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Case, *provided* that Debtor has waived any discharge as to any remaining DIP Obligations pursuant to section 1141(d)(4) of the Bankruptcy Code.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Case, and in any Successor Cases, and the DIP Liens, the DIP Obligations, the Carve-Out, the Super-priority Claims, and the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Lender granted by this Interim Order and/or the DIP Documents, shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash.

21.     *Effect of Stipulations on Third Parties.*

(a)     The stipulations and admissions contained in this Interim Order shall be binding upon all other parties in interest unless prior to the expiration of the Challenge Period (defined below) a party in interest (including the Committee, if any, or any chapter 7 or chapter 11 trustee appointed or elected for Debtor) (each, a "Challenge Party") has (i) commenced an adversary proceeding or contested matter challenging the Stipulations or (ii) filed a request for standing to pursue such a challenge, if the party in interest did not have standing prior to such request.  The "Challenge Period" shall commence on the Petition Date and end on the earlier of (x) forty-five (45) calendar days after the Petition Date and (y) the date established by the Court for the submission of qualified bids in connection with the sale of all or substantially all assets of the Estate, which shall be set forth in a separate order of this Court; *provided* that the DIP Lender may agree to extend the Challenge Period, either generally or with respect to a particular party, without further order of the Court, *subject to* such agreement being set forth in writing and a notice

20

of such extension being filed with the Court. Upon notice and a motion of a party in interest, the Court may extend the Challenge Period upon a showing of good cause.

(b)    If no Challenge is timely filed in respect of the VLS Loan Obligation or VLS Prepetition Liens, (x) the VLS Loan Obligation shall constitute allowed claims, not subject to counterclaim, setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, recovery, for all purposes in the Chapter 11 Case and any subsequent chapter 7 case, (y) the VLS Prepetition Liens on the VLS Prepetition Collateral securing the VLS Loan Obligation shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in herein, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery, and (z) the VLS Loan Obligation and the VLS Prepetition Liens on the VLS Prepetition Collateral granted to secure the VLS Loan Obligation shall not be subject to any other or further challenge by any party in interest (including any Committee), and every party in interest shall be enjoined from seeking to exercise the rights of Debtor's Estate, including any successor thereto (including any estate representative or a chapter 7 or 11 trustee appointed or elected for any of Debtor). Nothing in this Interim Order shall confer standing on any party in interest to assert any claims or defenses or otherwise bring any claim or cause of action, and such standing shall remain solely with Debtor unless otherwise ordered by the Court.

(c)    If any Challenge is timely filed, the stipulations and admissions contained herein (*i.e.*, the Debtor Stipulations) shall nonetheless remain binding and preclusive on all parties in interest, including the Committee, *except* as to any such findings and admissions that were expressly and, ultimately, successfully challenged, if any, and solely to the extent expressly set forth in the final order sustaining such Challenge.

21

22.     *Limitation on Use of DIP Loans and DIP Collateral.*  Except as otherwise permitted in the DIP Orders, Budget, or the DIP Documents, neither the funds available under the DIP Facility, the DIP Collateral, nor the Carve-Out may be used to fund or pay expenses in connection with: (a) preventing, hindering, or delaying the DIP Lender's enforcement of the DIP Documents, collection of the DIP Obligations, or realization upon any of the DIP Collateral, subject to compliance with the DIP Documents, orders of the Court, and applicable law; (b) using or seeking to use the DIP Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender; (d) incurring any junior priority indebtedness without prior notice to the DIP Lender; (e) incurring any senior priority or equal priority indebtedness without the prior written consent of the DIP Lender; (f) seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Documents, including the DIP Orders; (g) objecting to or challenging in any way the DIP Documents, the DIP Lender Liens, the DIP Obligations, the DIP Collateral, the VLS Loan Documents, the VLS Prepetition Liens, the VLS Loan Obligation, or VLS Prepetition Collateral, or any other claims or liens held by or on behalf of the DIP Lender, whether directly or indirectly, or whether in whole or in part, *except* as otherwise provided herein; (h) examining, asserting, commencing, prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Lender, or any of its respective affiliates, successors and assigns and the partners, shareholders, members, controlling persons, directors, officers, employees, agents,

4912-2961-2883.2

attorneys, advisors, and professionals; or (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the VLS Loan Obligation.

23.     *Professional Expenses*. Debtor authorized to pay all reasonable and documented prepetition and post-petition fees and out-of-pocket expenses due and outstanding to the DIP Lender related to the Chapter 11 Case *provided* (i) that such fees and expenses are not subject to a *bona fide* dispute and (ii) that such fees do not exceed the allocation therefor in the Approved Budget.  Payment of such fees and expenses shall not be subject to allowance by the Court. Professionals for DIP Lender shall not be required to submit invoices in any particular format; however, any time such professionals seek payment of fees and expenses from Debtor, each professional shall provide copies of its invoices to the U.S. Trustee and counsel for any Committee contemporaneously with the delivery of such fee and expense statements to Debtor.   Any objections raised by Debtor, the U.S. Trustee or a Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days of the receipt of such invoice.  If the parties are unable to resolve the objection within ten (10) business days thereof, the objection will be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid by Debtor in accordance with the terms of the DIP Documents and this Interim Order.  No attorney or advisor to the DIP Lender shall be required to file an application seeking employment or compensation for services or reimbursement of expenses with the Court.

24.     *Insurance*.  Debtor shall maintain insurance post-petition consistent with its prepetition practices.  Debtor shall maintain all insurance on all VLS Prepetition Collateral and DIP Collateral as required under the VLS Loan Documents and DIP Documents.  The DIP Lender shall be deemed the loss payee under Debtor's insurance policies and shall act in that capacity and

subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment of the VLS Loan Obligation until paid in full, and *second*, to the payment of the DIP Obligations, and *third*, to the Estate.

25.     *No Marshaling/Applications of Proceeds*. Subject to entry of a Final Order, VLS shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the VLS Prepetition Collateral.

26.     *Section 552(b)*.  Subject to entry of a Final Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the VLS Prepetition Collateral.

27.     *Indemnification*.  The Debtor shall indemnify and hold harmless the DIP Lender and each of its respective shareholders, directors, members, managers, principals, agents, advisors, officers, subsidiaries and affiliates in such capacity in accordance with, and subject to, the terms and conditions of the DIP Documents, except to the extent of such party's actual fraud, gross negligence, recklessness or willful misconduct as determined in a final and non-appealable order by a court of competent jurisdiction.

28.     *Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

29.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including the DIP Lender and Debtor, and their respective successors and assigns, including any chapter 7 or chapter 11 trustee, any examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a

legal representative of Debtor or with respect to the property of the Estate, and shall inure to the benefit of the DIP Lender and Debtor, and their respective successors and assigns; *provided* that, except to the extent expressly set forth in this Interim Order or the DIP Documents, the DIP Lender shall have no obligation to permit the use of the DIP Loans or the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the Estate.

30.     *Limitation of Liability.*  In determining whether to make any loan under the DIP Agreement, to permit the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lender shall not solely by reason thereof be deemed in control of the operations of Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of Debtor, as such terms, or any similar terms, may be used by or applicable to any applicable federal or state statute. Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or post-petition activities of Debtor.

31.     *Proofs of Claim.*  The DIP Lender shall not be required to file proofs of claim in the Chapter 11 Case, or any Successor Cases, for any claim allowed herein or otherwise arising from the DIP Facility or VLS Prepetition Facility.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including administrative claims) in the Chapter 11 Case, or any Successor Cases, shall not apply to the DIP Lender or any claims of the DIP Lender.

32.     *No Waiver.*  The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or the VLS Loan Documents, or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lender's rights.  Except as expressly provided herein, the entry of the DIP Order is without prejudice to, and does not

25

constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court.

33.    *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, third party, or incidental beneficiary.

34.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Interim Order.  Any stay imposed by the Bankruptcy Code or Bankruptcy Rules is hereby waived.

35.    *Final Hearing*.  The Court shall hold a hearing to consider approval of the DIP Facility on a final basis (the "Final Hearing") on [_____], 2025, at [●]:[●] [a.m./p.m.], prevailing Eastern Time, before this Court.  Debtor shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the Notice Parties. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve on Debtor a written objection, which shall be filed no later than [_____], 2025.

# # #

*Attorney Elizabeth A. Green is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this order.*

Exhibit 1

Budget

**THE VILLAGE HEALTH SYSTEM ("TVH")**
Weekly Cash Flow Summary
As of: 7/3/2025

## TVH DIP BUDGET

| Weekly Cash Flow Summary | F 1 | F 2 | F 3 | F 4 | F 5 | F 6 | F 7 | F 8 | F 9 | F 10 | F 11 | F 12 | F 13 | Total Forecast October | Total Forecast November | Total Forecast December | Total Forecast 13-Week | Total Forecast Current-EOY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 7/7/25 | 7/14/25 | 7/21/25 | 7/28/25 | 8/4/25 | 8/11/25 | 8/18/25 | 8/25/25 | 9/1/25 | 9/8/25 | 9/15/25 | 9/22/25 | 9/29/25 | 10/6/25 | 11/3/25 | 12/1/25 | 7/7/25 | 7/7/25 |
| Week Ending | 7/11/25 | 7/18/25 | 7/25/25 | 8/1/25 | 8/8/25 | 8/15/25 | 8/22/25 | 8/29/25 | 9/5/25 | 9/12/25 | 9/19/25 | 9/26/25 | 10/3/25 | 10/31/25 | 11/28/25 | 1/2/26 | 10/3/25 | 1/2/26 |
| **RECEIPTS** | | | | | | | | | | | | | | | | | | |
| Total Receipts | $1,230,000 | $6,997,410 | $480,000 | $4,062,493 | $480,000 | $1,244,740 | $10,758,000 | $526,106 | $480,000 | $1,230,000 | $6,997,070 | $525,000 | $526,106 | $1,900,000 | $4,307,364 | $2,640,000 | $35,536,926 | $44,384,290 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | |
| Payroll Wages, Tax, Bonus, Benefits | ($3,351,635) | ($192,500) | ($3,223,151) | ($212,500) | ($3,998,126) | ($162,500) | ($3,170,651) | ($171,500) | ($3,388,871) | ($218,500) | ($3,128,930) | ($171,500) | ($3,408,430) | ($3,366,984) | $0 | $0 | ($24,798,795) | ($28,165,779) |
| Rent | $0 | $0 | $0 | $0 | ($1,135,000) | $0 | $0 | $0 | ($1,135,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($2,270,000) | ($2,270,000) |
| Utilities | $0 | ($13,500) | ($8,000) | ($8,000) | $0 | ($8,000) | ($13,500) | $0 | ($8,000) | ($8,000) | ($13,500) | ($8,000) | ($8,000) | ($41,100) | $0 | $0 | ($104,500) | ($145,600) |
| Insurance | $0 | ($75,000) | $0 | ($150,000) | ($88,010) | $0 | $0 | $0 | ($150,000) | $0 | ($88,010) | $0 | ($3,190,921) | $0 | $0 | $0 | ($3,741,941) | ($3,741,941) |
| All Other Expenses | ($500,000) | ($545,086) | ($560,448) | ($1,305,093) | ($663,889) | ($392,050) | ($615,989) | ($1,333,704) | ($886,935) | ($358,360) | ($644,379) | ($1,131,377) | ($1,071,124) | ($1,107,723) | ($1,514,156) | ($1,095,132) | ($10,008,433) | ($13,725,444) |
| Total Operating Expenses | ($3,851,635) | ($826,086) | ($3,791,599) | ($1,675,593) | ($5,893,025) | ($562,550) | ($3,800,140) | ($1,655,204) | ($5,418,807) | ($672,870) | ($3,786,809) | ($1,310,877) | ($7,678,476) | ($4,515,807) | ($1,514,156) | ($1,095,132) | ($40,923,669) | ($48,048,764) |
| Net Cash Flow before Non-Op. Disb. | ($2,621,635) | $6,171,324 | ($3,311,599) | $2,386,900 | ($5,413,025) | $682,190 | $6,957,861 | ($1,129,098) | ($4,938,807) | $557,130 | $3,210,261 | ($785,877) | ($7,152,370) | ($2,615,807) | $2,793,208 | $1,544,868 | ($5,386,744) | ($3,664,475) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Total Bankruptcy Fees [A] | $0 | ($575,000) | ($125,000) | ($3,255,000) | ($350,000) | $0 | ($216,667) | ($3,081,667) | ($416,667) | ($150,000) | ($275,000) | ($2,825,000) | ($6,200,000) | ($2,850,000) | ($2,340,000) | ($2,048,854) | ($17,470,000) | ($24,708,854) |
| Capex | $0 | ($154,821) | $0 | $0 | $0 | ($154,821) | $0 | $0 | $0 | $0 | ($154,821) | $0 | $0 | $0 | $0 | $0 | ($464,464) | ($464,464) |
| DIP Interest Expense | $0 | $0 | $0 | $0 | ($148,038) | $0 | $0 | $0 | $0 | ($206,712) | $0 | $0 | ($261,673) | $0 | $0 | $0 | ($616,423) | ($616,423) |
| Total Non-Operating Disb. | $0 | ($729,821) | ($125,000) | ($3,255,000) | ($498,038) | ($154,821) | ($216,667) | ($3,081,667) | ($416,667) | ($356,712) | ($429,821) | ($2,825,000) | ($6,461,673) | ($2,850,000) | ($2,340,000) | ($2,048,854) | ($18,550,887) | ($25,789,742) |
| Net Cash Flow | ($2,621,635) | $5,441,503 | ($3,436,599) | ($868,100) | ($5,911,063) | $527,368 | $6,741,194 | ($4,210,765) | ($5,355,473) | $200,418 | $2,780,439 | ($3,610,877) | ($13,614,043) | ($5,465,807) | $453,208 | ($503,986) | ($23,937,631) | ($29,454,216) |
| **CASH BALANCE** | | | | | | | | | | | | | | | | | | |
| Beginning Book Balance | $6,437,631 | $3,815,995 | $9,257,498 | $5,820,900 | $5,000,000 | $5,000,000 | $5,527,368 | $12,268,563 | $8,057,798 | $5,000,000 | $5,200,418 | $7,980,858 | $5,000,000 | $6,500,000 | $1,034,193 | $1,487,401 | $6,437,631 | $6,437,631 |
| Net Cash Flow | ($2,621,635) | $5,441,503 | ($3,436,599) | ($868,100) | ($5,911,063) | $527,368 | $6,741,194 | ($4,210,765) | ($5,355,473) | $200,418 | $2,780,439 | ($3,610,877) | ($13,614,043) | ($5,465,807) | $453,208 | ($503,986) | ($23,937,631) | ($29,454,216) |
| Ending Book Bal. before DIP Draw | $3,815,995 | $9,257,498 | $5,820,900 | $4,952,800 | ($911,063) | $5,527,368 | $12,268,563 | $8,057,798 | $2,702,325 | $5,200,418 | $7,980,858 | $4,369,981 | ($8,614,043) | $1,034,193 | $1,487,401 | $983,415 | ($17,500,000) | ($23,016,586) |
| DIP Borrowings | $0 | $0 | $0 | $47,200 | $5,911,063 | $0 | $0 | $0 | $2,297,675 | $0 | $0 | $630,019 | $15,114,043 | $0 | $0 | $0 | $24,000,000 | $24,000,000 |
| DIP (Repayment) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ending Book Bal. after DIP Draw | $3,815,995 | $9,257,498 | $5,820,900 | $5,000,000 | $5,000,000 | $5,527,368 | $12,268,563 | $8,057,798 | $5,000,000 | $5,200,418 | $7,980,858 | $5,000,000 | $6,500,000 | $1,034,193 | $1,487,401 | $983,415 | $6,500,000 | $983,415 |
| **LOAN BALANCE** | | | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | $15,000,000 | $15,000,000 | $15,000,000 | $15,000,000 | $15,047,200 | $20,958,263 | $20,958,263 | $20,958,263 | $20,958,263 | $23,255,938 | $23,255,938 | $23,255,938 | $23,885,957 | $0 | $0 | $0 | $15,000,000 | $15,000,000 |
| DIP Borrowings | $0 | $0 | $0 | $47,200 | $5,911,063 | $0 | $0 | $0 | $2,297,675 | $0 | $0 | $630,019 | $15,114,043 | $0 | $0 | $0 | $24,000,000 | $24,000,000 |
| Ending Loan Balance | $15,000,000 | $15,000,000 | $15,000,000 | $15,047,200 | $20,958,263 | $20,958,263 | $20,958,263 | $20,958,263 | $23,255,938 | $23,255,938 | $23,255,938 | $23,885,957 | $39,000,000 | $0 | $0 | $0 | $39,000,000 | $39,000,000 |

[A] Bankruptcy Professional Fees relate to the services provided by Debtor Bankruptcy Counsel, Debtor Financial Advisor & Investment Banker, Regulatory & Corporate Counsel, Compliance Consultants, Advisors for the UCC, Ombudsman, U.S. Trustee, and others.  Such amounts are preliminary and subject to change

## <u>EXHIBIT B</u>

**DIP Agreement**

**EXECUTION VERSION**

July 3, 2025

From:  PMA Lender, LLC, a Florida limited liability company (the "<u>DIP Lender</u>")

To:    The Villages Health System, LLC, a Florida limited liability company (the "<u>Debtor</u>" and, together with the DIP Lender, the "<u>Parties</u>")

Re:    Terms of Debtor-in-Possession Financing

To Whom it May Concern:

This letter agreement (together with any attachments and appendices hereto, the "<u>Letter Agreement</u>"), dated as of the date first written above (the "<u>Effective Date</u>"), memorializes the terms of the debtor-in-possession credit facility (the "<u>DIP Facility</u>") to be provided by the DIP Lender to the Debtor.

This Letter Agreement shall not become binding unless and until (1) it is signed by the DIP Lender and the Debtor, and (2) it is approved by the U.S. Bankruptcy Court (the "<u>Bankruptcy Court</u>") presiding over the Debtor's bankruptcy case via an order acceptable in form and substance to the DIP Lender in its reasonable discretion and which provides the DIP Lender the protections of Section 364(e) of the Bankruptcy Code (defined below). Prior to satisfaction of the two conditions set forth in the immediately preceding sentence, this Letter Agreement shall be non-binding, for discussion purposes only and shall not be construed as an unconditional commitment of any kind to provide the DIP Facility.

1.      **The Purpose of the DIP Facility; Chapter 11 Bankruptcy Filing**.  The Debtor anticipates filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, on or about July 3, 2025 (the "<u>Petition Date</u>").  The Debtor requires funding for, among other expenses, the costs associated with the bankruptcy case and related proceedings as well as the envisioned sale of all, or substantially all, of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code (the "<u>Transaction</u>").  The Debtor has requested, and the DIP Lender has agreed to loan certain amounts to the Debtor on the terms and conditions set forth in this Letter Agreement, as may be amended or otherwise altered by the agreement of the Parties or order of the Bankruptcy Court, via the DIP Facility.  The DIP Facility is intended to provide short-term liquidity pursuant to mutually agreed-upon budgets and subject to the oversight of the Bankruptcy Court and DIP Lender.  The Parties agree to use reasonable efforts to seek promptly the Bankruptcy Court's approval of the DIP Facility and Transaction. For the avoidance of doubt, all documents and filings related to the DIP Facility and approval thereof must be in a form approved by the DIP Lender, which approval shall not be unreasonably delayed or withheld.

2.      **The DIP Facility**.  On or before two (2) business days after the Petition Date, the Debtor shall file a motion (the "<u>DIP Motion</u>") with the Bankruptcy Court requesting authority to enter into the DIP Facility on the terms as more fully described in the DIP Facility Term Sheet attached hereto as **Exhibit A** and incorporated by reference herein (and as to which all capitalized terms not defined therein shall have the meaning set forth in this Letter Agreement).

3.    **Events of Default.**  See attached **Exhibit A**, which is incorporated by reference herein.

4.    **Miscellaneous.**

A.    **Entire Agreement.** This Letter Agreement, including the DIP Facility Term Sheet, and the documents executed in connection herewith shall contain the entire agreement between and among the Parties with respect to the subject matter hereof.  There are no oral agreements between or among the Parties with respect to this Letter Agreement. All prior negotiations between the Parties are merged into this Letter Agreement.  This Letter Agreement may only be amended or extended in writing signed by the Parties.  No course of dealing shall vary the express terms of this Letter Agreement.

B.    **Governing Law.** This Letter Agreement and the DIP Facility shall be governed by the law of the State of Florida, without respect to applicable conflicts of laws principles, and the Bankruptcy Code.

C.    **Headings.** The headings contained in this Letter Agreement and any exhibits hereto are inserted for convenience only and shall not affect the meaning or interpretation of this Letter Agreement or any provision hereof.

D.    **Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein shall be deemed to include the plural of such noun or pronoun, and pronouns of one gender or no gender shall be deemed to include the equivalent pronoun of any or no gender.  The Parties acknowledge that each of the Parties and its counsel have reviewed this Letter Agreement and DIP Facility Term Sheet and hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Letter Agreement or any amendments or exhibits hereto.

E.    **3rd-Party Beneficiaries; No Assignment.** Except as expressly provided herein, no person, organization, or association other than the Parties shall have any rights or claims under this Letter Agreement, which shall be binding on the successors, heirs, and assigns of the undersigned.

F.    **Delivery; Counterparts.** Each of the Parties agrees to execute and deliver such other documents and instruments as may be reasonably necessary to fully affect the purposes of this Letter Agreement.  This Letter Agreement may be executed in one or more counterparts which, when combined, shall constitute one completed original.  A facsimile signature or electronically scanned copy of a signature shall constitute and shall be deemed to be sufficient evidence of a party's execution of this Letter Agreement without necessity of further proof. Each such copy shall be deemed an original, and it shall not be necessary in making proof of this Letter Agreement to produce or account for more than one such counterpart.

G.     **Severability.** If any provision of this Letter Agreement is determined to be unenforceable or is not approved by the Bankruptcy Court, then the DIP Lender, in its sole and absolute discretion, shall have the right to declare whether the remainder of this Letter Agreement shall remain in full force and effect or be deemed null and void.

H.     **Authorization; Legal Representation.** The Parties have each approved the terms of this Letter Agreement, as further described in the DIP Facility Term Sheet, and have duly authorized the individual designated below to execute this Letter Agreement on its behalf.  The Parties each acknowledge that they are represented by counsel and have had a full and complete opportunity to review this Letter Agreement and DIP Facility Term Sheet and negotiate the terms and conditions contained herein and the documents appended hereto or contemplated hereunder.

I.     **Bankruptcy Court Approval.** The Parties acknowledge that effectiveness of this Letter Agreement is conditioned upon entry of an order by the Bankruptcy Court approving the DIP Facility on the terms set forth herein and in the DIP Facility Term Sheet.

EXECUTION VERSION

## Exhibit A

## DIP FACILITY TERM SHEET[1]

**This DIP Facility Term Sheet describes the terms and conditions of the proposed DIP Facility.  This DIP Facility Term Sheet is incorporated into the Letter Agreement.**

| | |
|---|---|
| **The DIP Facility Parties** | Borrower: The Villages Health System, LLC<br><br>DIP Lender: PMA Lender, LLC |
| **Facility Structure and Commitment** | Senior secured super-priority debtor-in-possession loan facility (the "DIP Facility") in the Chapter 11 Case, for the extensions of credit not to exceed the initial principal amount of $39,000,000 (the "DIP Loan"), which amount is comprised of the sum of (a) $24,000,000 of new money that the Debtor requires for the continued operation of its business during the pendency of the Chapter 11 Case plus (b) $15,000,000 to "roll-up" advances made prepetition by the DIP Lender to the Debtor pursuant to that certain $15,000,000.00 Line of Credit dated as of April 7, 2025 and as amended on May 30, 2025, June 13, 2025 and June 27, 2025 (the "Roll-up"), as evidenced and secured by a Master Secured Promissory Note, Security Agreement, UCC-1 Financing Statement, and Deposit Account Control Agreement (the "Prepetition Secured Loan").<br><br>"New money" under the DIP Facility shall be available on the following schedule: (i) upon interim approval, $5,000,000 and (ii) upon final approval, the remaining $19,000,000.<br><br>The Roll-up of advances under the Prepetition Secured Loan shall be dollar-for-dollar with advances under the DIP Facility; *provided, however*, that the Roll-up shall not take effect until final approval of the DIP Facility.  Once effective, the funds subject to the Roll-up shall constitute principal under the DIP Loan.<br><br>Funds shall be advanced upon request by the Debtor, via the CRO or other preapproved representative, in writing with a copy to counsel for the Debtor and DIP Lender.  Such requests shall include (i) the specific amount requested and (ii) a statement that (A) the Debtor is not in default under the DIP Documentation (defined below) and (B) notifying the DIP Lender of any deviation from the Budget (except for Permitted Variances). |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Letter Agreement.

|  | The DIP Lender shall respond to the funding request within two (2) business days of the date of the request by either (i) transferring the requested funds or (ii) objecting to the request in writing and, in so doing, providing a detailed description of all reasons for the objection; *provided, however*, that the DIP Lender and the Debtor will work together to coordinate an immediate draw on the DIP Facility immediately after entry of the interim DIP Order. |
| **Documentation** | The Letter Agreement, this DIP Facility Term Sheet, and the interim and final DIP orders (together, the "<u>DIP Orders</u>") shall constitute the definitive DIP documents (the "<u>DIP Documents</u>"); *provided, however*, that the DIP Orders shall control in the event of conflicting or inconsistent terms, with the final DIP order controlling in the event of any conflict or inconsistency with the interim DIP order.<br><br>The DIP Documents shall be in form and substance reasonably acceptable to the Parties. |
| **Maturity Date** | The DIP Facility shall mature and the DIP Loan be payable in full on the "<u>Maturity Date</u>," which shall mean the earliest of the following dates (unless extended by the DIP Lender):<br><br>1) 180 days from the Petition Date;<br><br>2) the date on which Debtor closes a Transaction; and<br><br>3) the date of an Event of Default, if such Event of Default is either (a) incapable of being cured or (b) capable of being cured but has not been cured within 10 business days of the Debtor receiving a written notice of an Event of Default from the DIP Lender.<br><br>If the Maturity Date is a result of the closing of a Transaction, all outstanding DIP Obligations shall be paid in full prior to or upon closing of the Transaction either (i) directly from the buyer in such Transaction or (ii) directly from the escrow account, via the escrow agent, established for the consummation of the Transaction. Such payment shall be made by wire transfer of immediately available funds to an account designated in writing by the DIP Lender prior to the closing of such Transaction. |
| **Interest Rate** | A *per annum* rate equal to 12%, which shall be calculated on the basis of the actual days elapsed in a year of 360 days from the Closing date to the Maturity Date and actual "new money" loaned under the DIP Facility. Upon the occurrence of an Event of Default, and thereafter until such default is cured, and following the Maturity Date, if the DIP |

| | |
|---|---|
| | Facility has not been paid in full, interest on the unpaid amounts due under the DIP Facility shall accrue at a rate of 18% *per annum*. |
| **Fees and Costs** | The DIP Lender shall be entitled to reimbursement for any reasonable fees and costs, including attorneys' fees, incurred by DIP Lender in connection with the DIP Facility; *provided* that such reimbursement shall not exceed, subject to permitted variances, the amount provided for the reasonable fees and costs, including attorneys' fees, of the DIP Lender in the Budget. |
| **DIP Budget; Budget Testing; Budget Reporting** | Subject to the terms of the DIP Documents, as may be amended, the DIP Lender consents to, and the Debtor shall be authorized to, use any "cash collateral" of the DIP Lender, and any proceeds thereof, and the DIP Facility in accordance with the Budget attached hereto as <u>Schedule I</u>; *provided, however*, that the Parties may agree to amend or otherwise alter the Budget at any time, and without further approval of the Bankruptcy Court, if the alteration does not increase the initial principal commitment under the DIP Facility.<br><br>For purposes of compliance with the DIP Documents, receipts, operating disbursements, capital expenditures and non-operating disbursements, shall be tested every other week on a cumulative basis beginning on the fourth full week following the Petition Date (i.e., from the Petition Date through the Friday prior to each testing date) in each case, on an aggregate basis (i.e., the aggregate applicable receipts less aggregate applicable disbursements reflected as Net Cash Flow in the approved Budget) and subject to a twenty (20%) permitted variance) (the "<u>Permitted Variance</u>").<br><br>Any modifications to the Budget must be approved by the DIP Lender in its reasonable discretion.<br><br>By no later than 5:00 p.m. (Eastern Time) on Friday of the first full calendar week following the Petition Date (and each Friday thereafter), the Debtor shall provide a variance report to the DIP Lender comparing the previous week's budget-to-actuals and shall provide backup information upon request. |
| **Security and Priority of The DIP Facility** | Subject to Bankruptcy Court approval and, as applicable, the Carve-out (defined below), the indebtedness and other amounts due under the DIP Facility to the DIP Lender, including, without limitation, all principal and accrued interest, costs, fees, expenses, and other amounts due under the DIP Facility (collectively, the "<u>DIP Obligations</u>"), shall be entitled to the following classification and treatment in the Debtor's chapter 11 case: |

6

1) pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior secured super-priority administrative expense claims, having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Debtor, including, but not limited to, the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114, and any other provision of the Bankruptcy Code or otherwise (the "Super-Priority DIP Claim"); and

2) pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, non-avoidable, automatically perfected first priority security interest in and lien on (the "DIP Lender Liens") the DIP Collateral and all cash and non-cash proceeds of DIP Collateral.[2]

For the avoidance of doubt, the DIP Lender Liens shall be effective and perfected with the foregoing specified priority as of the entry of the interim DIP Order and without requiring the execution, filing, or recording of mortgages, security agreements, intercreditor agreements, subordination agreements, control agreements, acknowledgments, financing statements, fixture filings, or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral; however, if the DIP Lender so requires, the Debtor shall use reasonable efforts to execute, file or record any documents and/or take any actions necessary or prudent to ensure the perfection of the DIP

---

[2] "DIP Collateral" means: all property of the estate under Section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtor, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including governmental and credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property, hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accession and proceeds of the foregoing, wherever located, including insurance or other proceeds (provided that the liens and rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property); (b) all proceeds of leased real property; (c) subject to entry of the final DIP Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtor's exercise of rights under Section 506(c) and 550 of the Bankruptcy Code; (e) all property of the Debtor that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date; (f) all proceeds from the sale, assignment, or other disposition of (i) commercial real estate leases and (ii) Debtor's right to select, identify, and designate which commercial leases may be assumed and assigned under Section 365 of the Bankruptcy Code.  Notwithstanding the foregoing, DIP Collateral shall not include the Debtor's real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease.

| | |
|---|---|
| | Lender Liens, *provided* that such obligation shall be subject to the requirements and restrictions of the Bankruptcy Code.<br><br>The DIP Lender Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and/or upon dismissal of the Chapter 11 Case.<br><br>The DIP Lender Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.<br><br>No lien or interest avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Lender Liens. |
| **Use of DIP Facility and Cash Collateral** | The proceeds of the DIP Loan will be used solely in accordance with the Budget and DIP Orders. |
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the DIP Orders, Budget, or the DIP Documents, neither the funds available under the DIP Facility, the DIP Collateral, nor the Carve-Out may be used to fund or pay expenses in connection with: (a) preventing, hindering, or delaying the DIP Lender's enforcement of the DIP Documents, collection of the DIP Obligations, or realization upon any of the DIP Collateral, subject to compliance with the DIP Documents, orders of the Bankruptcy Court, and applicable law; (b) using or seeking to use the DIP Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender; (d) incurring any junior priority indebtedness without prior notice to the DIP Lender; (e) incurring any senior priority or equal priority indebtedness without the prior written consent of the DIP Lender; (f) seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Documents, including the DIP Orders; (g) objecting to or challenging in any way the DIP Lender Liens, the DIP Obligations, the Prepetition Secured Loan, the DIP Collateral or any other claims or liens, held by or on behalf of the DIP Lender; (h) examining, asserting, commencing, prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Lender, or any of its respective affiliates, successors and assigns and the partners, |

| | |
|---|---|
| | shareholders, members, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (i) litigating, objecting to, challenging, contesting in any manner, or raising any of the DIP Obligations, the DIP Lender Liens, the Prepetition Secured Loan, or any other rights or interests of the DIP Lender; or (j) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Secured Loan. |
| **Challenge Period** | Debtor acknowledges the validity and enforceability of the DIP Lender's prepetition liens relating to the Prepetition Secured Loan and waives any claims and potential claims against the DIP Lender relating to the Prepetition Secured Loan; *provided, however,* that such acknowledgement shall not affect or be binding upon any non-Debtor estate representative or party in interest until the conclusion of the Challenge Period (defined below). |
| | The DIP Orders, as applicable, shall provide for a limited period of time (i.e., the Challenge Period) in which parties in interest may challenge the Debtor's lien acknowledgement and claim waiver relating to the DIP Lender's Prepetition Secured Loan.  The Challenge Period shall commence on the Petition Date and expire on the earlier of (x) forty-five (45) calendar days after the Petition Date and (y) the date established by the Court for the submission of Qualified Bids (as defined in the 363 Sale Motion) to purchase the Debtor's assets (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "Challenge Period").  Challenges to the Debtor's lien acknowledgement and claim waiver relating to the DIP Lender's Prepetition Secured Loan shall be deemed made, for purposes of the Challenge Period, on the earlier of (i) the commencement of an adversary proceeding or contested matter challenging the acknowledgement/waiver or (ii) filing a request for standing to pursue such challenge, if the party in interest did not have standing prior to such request. |
| | The DIP Lender may agree to extend the Challenge Period, either generally or with respect to a particular party, without further order of the Bankruptcy Court; *provided* that such agreement must be in writing signed by the DIP Lender and a notice of such extension is filed on the Bankruptcy Case docket. |
| | Parties in interest may seek to extend the Challenge Period for good cause upon motion to the Bankruptcy Court. |
| **Representations & Warranties** | The Debtor hereby represents and warrants that: |
| | 1) The DIP Motion and interim and final DIP Order shall be consistent with this DIP Facility Term Sheet and in all other respects in form and substance reasonably satisfactory to the DIP |

| | |
|---|---|
| | Lender; |
| | 2) The execution and delivery of all agreements, instruments, and other documents evidencing or securing the DIP Facility consistent with this DIP Facility Term Sheet and in all other respects in form and substance reasonably satisfactory to the DIP Lender; and |
| | 3) All necessary governmental, shareholder, and third-party approvals and/or consents have been obtained by the Debtor and remain in effect. |
| **Condition Precedent to Lending** | The obligation of the DIP Lender to fund the DIP Loan shall be subject to the condition precedent that on the date of such release, the following statements shall be true: |
| | 1) The Bankruptcy Court has entered the Interim DIP Order or Final DIP Order, as applicable; |
| | 2) The DIP Lender shall have received and shall have approved the Budget; and |
| | 3) The Debtor has not committed an Event of Default (defined below) which remains uncured at the time of lending. |
| | Subject to the foregoing conditions being satisfied, the DIP Lender shall release funds to the Debtor under the terms set forth herein. For the avoidance of doubt, the DIP Lender may waive any of the conditions precedent at any time in writing. |
| **Mandatory Prepayment** | Upon the Maturity Date, the Debtor shall repay to the DIP Lender the aggregate outstanding principal amount under the DIP Facility and all accrued but unpaid interest thereon (collectively, the "DIP Facility Obligations"). The Debtor may prepay without penalty all or any portion of the DIP Facility. |
| **Carve-Out Reserve** | The DIP Lender agrees to a carve-out reserve (the "Carve-Out"), which sum as calculated herein shall remain in the estate notwithstanding the exercise of the DIP Lender of its rights as a result of an Event of Default and/or repayment of the DIP Loan. |
| | The Carve-Out shall be calculated as the sum of the following amounts as of the earliest day the DIP Lender issues a Carve-Out Trigger Notice ("Carve-Out Effective Date"): (i) all unpaid professional fees and disbursements incurred by the Debtor and any statutory committees appointed in the Chapter 11 Case pursuant to Sections 327, 328, 363 and |

|  | 1103 of the Bankruptcy Code for any of their respective professionals retained by final order of the Bankruptcy Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "<u>Case Professionals</u>") at any time prior to the delivery of the Carve-Out Trigger Notice to the extent allowed by the Bankruptcy Court (the "<u>Allowed Professional Fees</u>"), in an aggregate amount not to exceed the amounts set forth in the Budget for Professional Fees prior to the delivery of a Carve-Out Trigger Notice; and (ii) the payment of allowed and unpaid professional fees and disbursements incurred by the Case Professionals following the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $250,000 (the "<u>Wind-Down Carve-Out Amount</u>"), plus (iii) the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk of the Court for the Debtor for the time period beginning on the petition date and ending on the Carve-Out Effective Date, which fees shall not be limited to amounts that may be set forth in the Budget.<br><br>"Carve-Out Trigger Notice" means a written notice, delivered by email or U.S. Mail by the DIP Lender to the Debtor, its counsel, the U.S. Trustee, and counsel to any committees, of any default hereunder.<br><br>The Carve-Out and Wind-Down Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender or any affiliates of the DIP Lender, or any of their respective officers, directors, employees, agents, advisors, and counsel. |
| **No Permitted Liens** | The Debtor shall not create or incur any senior priority or equal priority liens on any of the collateral to which the DIP Lender Liens attach, without DIP Lender's consent. |
| **Assignments and Participations** | The DIP Facility may not be assigned by the Debtor without the prior written consent of the DIP Lender. |
| **Events of Default** | The following shall be events of default (collectively, "<u>Events of Default</u>" and, each individually, an "<u>Event of Default</u>"):<br><br>   1) The Debtor fails to operate in accordance with the Budget (after taking into account Permitted Variances) or any reporting requirement, and such defect or deviation remains uncured 10 business days after the DIP Lender notifies the Debtor thereof;<br><br>   2) The Debtor fails to make any required payment, including, but not limited to, the payment of the full balance of the DIP Facility upon default or at the Maturity Date; |

11

3) Any order authorizing the Debtor to obtain the DIP Facility, whether on an interim or final basis, is not in a form satisfactory to the DIP Lender or is reversed, vacated, stayed, amended, supplemented, or otherwise modified in a manner which shall materially and adversely affect the rights of the DIP Lender;

4) The Debtor's Chapter 11 Case is either dismissed or converted to a case under chapter 7 pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed;

5) A chapter 11 trustee is appointed such that the Debtor is no longer a debtor-in-possession, pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed; or

6) The Debtor fails to achieve any of the Milestones (the "Milestones") set forth below, unless extended or waived by the DIP Lender in writing:

| | |
|---|---|
| July 3, 2025 | Deadline to file voluntary petition for relief under chapter 11 of the Bankruptcy Code. |
| July 3, 2025 | Last date to file motion for approval of bidding procedures for the Transaction and sale of estate assets |
| July 11, 2025 | Last date to obtain interim approval of DIP Facility |
| July 24, 2025 | Last date to obtain Bankruptcy Court approval of the bidding procedures for the Transaction |
| August 15, 2025 | Last date to obtain final approval of DIP Facility |
| September 1, 2025 | Last date to conduct and complete any auctions related to the Transaction |
| September 1, 2025 | Last date to obtain Bankruptcy Court approval of the Transaction |
| October 3, 2025 | Last date to close the Transaction |

**EXECUTION VERSION**

|  | October 31, 2025 | Last date for Debtor to propose a chapter 11 plan and file a disclosure statement related thereto |
|--|--|--|
|  | November 28, 2025 | Last date to obtain Bankruptcy Court approval of disclosure statement |
|  | December 31, 2025 | Last date for Debtor to solicit votes on the chapter 11 plan |
|  | January 30, 2026 | Last date to obtain Bankruptcy Court approval and confirm chapter 11 plan |

*Provided* that the foregoing milestones and Debtor's obligation to comply therewith (i) may be waived by the DIP Lender, in whole or in part, at any time and (ii) shall be moot and expire upon full satisfaction of the DIP Obligations.

| **Remedies** | Upon the occurrence of an Event of Default, the DIP Lender shall give written notice of such Event of Default (the "<u>Default Notice</u>") to counsel for the Debtor, counsel to the Official Committee of Unsecured Creditors (if any), and to the Office of the United States Trustee (the "<u>Notice Parties</u>") (which notice shall be given by e-mail transmission, the automatic stay being deemed lifted for such purpose to the extent necessary).

Upon the delivery of a Default Notice, the Debtor and the DIP Lender consent to an expedited hearing on not less than five (5) business days' notice to consider: (i) whether an Event of Default has occurred; and (ii) the appropriate relief or remedies.

During the ten (10) business days following the date a Default Notice is delivered (the "<u>Remedies Notice Period</u>"), the DIP Lender shall continue to perform under the DIP Facility and DIP Orders and the Debtor shall have authority to use Cash Collateral and DIP Facility proceeds in accordance with the DIP Documents and applicable Budget to avoid immediate and irreparable harm to the Debtor's estate.

At the end of the Remedies Notice Period, the Debtor's rights to use the DIP Facility or cash collateral shall immediately cease and all cash collateral or proceeds of the DIP Facility shall be held pending further order of the Bankruptcy Court, except as necessary to fund the Carve-Out, unless (i) otherwise agreed by the Parties, (ii) otherwise ordered by the Bankruptcy Court, or (iii) the Event of Default has been cured or waived. |
|--|--|
| **Indemnity** | The Debtor agrees to indemnify and hold harmless the DIP Lender, and each of its respective shareholders, directors, members, managers, |

13

|  | principals, agents, advisors, officers, subsidiaries and affiliates in such capacity (each, an "Indemnified Person") from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, the transactions contemplated thereby or hereby, or any claim, action, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Borrower or any other person or entity, except to the extent resulting from the fraud, gross negligence, recklessness or willful misconduct of such Indemnified Person, as determined by a final non-appealable order of a court of competent jurisdiction. |
|---|---|
| **Amendment and Waiver** | No waiver, modification, or amendment of the terms of this DIP Facility Term Sheet shall be valid unless such waiver, modification, or amendment is in writing and has been signed by the Debtor and the DIP Lender. No waiver of any of the provisions of this DIP Facility Term Sheet shall be deemed or constitute a waiver of any other provisions of this DIP Facility Term Sheet, whether or not similar, nor shall any waiver be deemed a continuing waiver. |
| **Other Terms** | Adequate Protection. No adequate protection shall be provided to any prepetition creditor, except on terms acceptable to the DIP Lender in its reasonable discretion.<br><br>506(c) Waiver. All rights to surcharge the DIP Lender Liens, or the collateral to which such DIP Lender Liens attach, under Section 506(c) of the Bankruptcy Code shall be waived in the Final DIP Order.<br><br>552(b)(1) Entitlement.  The DIP Lender shall be entitled to all of the rights and benefits of Section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply in the Final DIP Order.<br><br>Granting of Lien on Claims/Causes of Action.  Subject to entry of the Final DIP Order, the DIP Lender Liens shall attach to and encumber the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. |