**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In Re: | Case No.: 6:25-bk-04156-LVV |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | Chapter 11 |
| Debtor. | |

**DEBTOR'S <u>AMENDED</u>[2] MOTION FOR ENTRY OF ORDERS
(A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS, (C) APPROVING STALKING HORSE BID PROTECTIONS,
(D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE
DEBTOR'S ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE,
AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
<u>AND (H) GRANTING RELATED RELIEF</u>**

The Villages Health System, LLC (the "<u>Debtor</u>" or "<u>TVH</u>"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "<u>Chapter 11 Case</u>"), by and through its undersigned counsel, hereby files this motion (the "<u>Motion</u>"),[3] pursuant to sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order (as applicable, the "<u>Sale Order</u>" or "<u>Bidding Procedures Order</u>"):

    a.    authorizing and approving, as applicable: (A) the sale of substantially all of the assets of the Debtor (as more particularly defined in the governing sale agreements and herein, the "<u>Purchased Assets</u>") free and clear of all liens, interests, claims, and encumbrances (other than any specifically assumed liabilities) to the fullest extent

---

[1] The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

[2] This Motion is amended solely to include the Bidding Procedures as Exhibit 1 to the Biding Procedures Order. The original Motion [Doc. No. 14] did not include the Bidding Procedures.

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the APA or First Day Declaration (each as defined herein), as applicable.

permitted by section 363(f) of the Bankruptcy Code (the "Transaction"); (B) the assumption and assignment of the Assumed Contracts in connection with the Transaction to the fullest extent permitted under section 365 of the Bankruptcy Code; and (C) granting related relief;

b.    establishing the below dates and deadlines for the sale process, subject to the Court's approval and availability:

| Proposed Date | Milestone |
|---|---|
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to serve Sale Notice |
| **The earlier of (a) twenty-one (21) days before the Sale Order Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order** | Deadline to serve initial Contract Assumption and Assignment Notice |
| **Objection to the Sale or Sale Order shall be filed and served no later than August 22, 2025 at 4:00 p.m. (prevailing Eastern Time) (collectively, the "Sale Objection Deadline").** | Sale Objection Deadline[4] |
| **[14 days from service of the initial Contract Assumption and Assignment Notice]** | Contract Objection Deadline |
| **August 20, 2025** | Bid Deadline |
| **August 21, 2025** | Deadline for Debtor to Designate Qualifying Bids |
| **August 22, 2025** | Deadline for Debtor to Designate Baseline Bid |
| **August 25, 2025** | Auction |
| **As soon as practicable (but no later than one (1) business day) after completion of the Auction** | File and serve Post-Auction Notice |
| **August 27, 2025** | Deadline for Supplemental Objections[5] |
| **August 29, 2025** | Sale Order Hearing |

c.    authorizing and approving, among other things, the bidding, auction, and sale procedures for the Purchased Assets (including the bid protections afforded the Stalking Horse Bidder (as defined herein)), in the form attached as Exhibit 1 (the "Bidding Procedures") to the proposed Bidding Procedures Order (*see* **Exhibit A**);

d.    scheduling an auction for the sale of the Purchased Assets (the "Auction") in accordance with the Bidding Procedures;

---

[4] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

[5] Supplemental Objections are objections solely related to (i) adequate assurance of future performance if Successful Bidder is not the Stalking Horse Bidder or (ii) the conduct of the auction.

e.   scheduling a hearing to consider approval of the Transaction (the "Sale Order Hearing") and entry of the proposed Sale Order;

f.   authorizing and approving the form and manner of notice of the Transaction, the Auction, and the Sale Order Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Auction and Sale Notice");

g.   authorizing and approving the form and manner of notice of the Transaction, the Auction, and the Sale Order Hearing that will be provided to patients of the Debtor's medical facilities, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Patient Notice");

h.   authorizing and approving, as applicable, the form and manner of notice to each non-Debtor counterparty (each a "Counterparty" and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Purchased Assets (collectively, the "Executory Contracts") regarding the potential assumption and assignment of such Executory Contracts and the Debtor's calculation of the amount necessary to cure any monetary defaults under such Assumed Contracts (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as Exhibit 4 (the "Contract Assumption and Assignment Notice");

i.   authorizing and approving the form and manner of notice following the Auction, which shall include (A) the applicable Successful Bid and Backup Bid (as such terms are defined below), and (B) the identity of the Successful Bidder and Backup Bidder (as such terms are defined below), substantially in the form attached to the Bidding Procedures Order as Exhibit 5 (the "Post-Auction Notice"); and

j.   granting related relief.

In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.   The United States Bankruptcy Court for the Middle District of Florida (the "Court") has jurisdiction over the Chapter 11 Case and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtor consents to entry of a final order under Article III of the United States Constitution.

2.   Venue of the Chapter 11 Case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3

3. The statutory bases for the relief requested in this Motion are sections 105(a), 363, 364, 365, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014.

## BACKGROUND

4. On July 3, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtor continues to operate its business and manage its properties as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in the Chapter 11 Case, and no statutory committees have been appointed or designated.

5. TVH is a premier health care provider in North Central Florida that operates primary and specialty care centers (the "Business"). In addition to primary care, TVH's health care providers provide specialty care services in the fields of cardiology, neurology, rheumatology, podiatry, urology, gynecology, pain intervention and management, and behavioral and mental health.

6. Throughout its history, TVH has been known for providing exemplary, patient-focused health care to residents of North Central Florida, The Villages,[6] and surrounding communities, and TVH's medical providers have been fixtures in their communities and trusted health care providers to their patients. TVH currently provides essential care to more than 55,000 patients – the majority of whom are participants in Medicare Advantage plans.

7. TVH currently operates ten primary and specialty care clinics (collectively, the

---

[6] The Villages is the premier 55-plus master planned community in the United States, consisting of more than 50,000 residences in eight unique town center neighborhoods, or "Villages", offering world-class amenities in Lake, Sumter, and Marion counties in Florida. The Villages community it built around enriching the lives of its residents by facilitating an active and fulfilling life, while providing convenient access to the day-to-day needs of its community members.

"Care Centers") known as (a) Brownwood Care Center, (b) Colony Care Center, (c) Creekside Care Center, (d) Eastport Care Center, (e) Lake Deaton Care Center, (f) Mulberry Grove Care Center, (g) Pinellas Care Center, (h) Santa Barbara Care Center, (i) Specialty Care at Spanish Springs, and (j) The Center for Advanced Healthcare at Brownwood.

8.       A more detailed description of the Debtor and its business, and the facts and circumstances supporting this Motion and the Debtor's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code are set forth in greater detail in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein.

## PREPETITION MARKETING AND SALE PROCESS

9.       The prepetition and postpetition marketing efforts undertaken by Evercore Group, L.L.C. ("Evercore") are more particularly described in the *Declaration of A.J. Berens in Support of this Motion* attached hereto as **Exhibit B**.

## TERMS OF ASSET PURCHASE AGREEMENT

10.       On July 3, 2025, TVH (the "Seller") and CenterWell (the "Buyer") entered into an Asset Purchase Agreement ("APA") for substantially of the Seller's assets. A true and correct copy of the APA is attached hereto as **Exhibit C**. [7]

11.       Pursuant to Section 2.01 of the APA, the Seller shall sell, assign, convey, transfer and deliver to Buyer and/or one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase and acquire from the Seller (other than the Excluded Assets), all of the Seller's right, title and interest, free and clear of all Liens, Claims and other interests (other than the Assumed

---

[7] This summary of material terms of the APA is qualified in its entirety by the terms of the APA, and for the avoidance of doubt, in the event of a conflict between the summary in this Motion and the APA, the APA controls. All terms not defined herein shall have the same meaning as the APA.

4916-1802-4275.1

Liabilities), in and to all of the tangible and intangible assets of the Seller of every nature (wherever located, whether real, personal or mixed, whether held directly or indirectly and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), used or held for use in, or related to, the Business, including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "Purchased Assets"), which shall include:

a.    all advances, prepaid assets and expenses, security and other deposits and prepayments;

b.    the Transferred Contracts and all rights and benefits thereunder;

c.    all inventory and supplies;

d.    all tangible personal property, including all Devices, equipment, leasehold improvements, computer hardware, furniture, furnishings, machines, tools, supplies, telephones, office equipment, vehicles and all rights in all warranties of any manufacturer or vendor with respect thereto (express or implied), including all such property (i) located at any clinic or administrative site operated by the Seller; or (ii) located at any Business-related facility;

e.    except to the extent listed on Schedule 15.e to the APA, all Intellectual Property Rights and all tangible embodiments thereof, to the extent owned by Seller, but excluding, for the avoidance of doubt, The Villages Health Marks and any other Marks incorporating "THE VILLAGES", subject to Section 2.07 of the APA;

f.    except to the extent listed on Schedule 2.01(f) of the APA, all IT systems, Software programs and all hardware or data processing equipment and data processing system manuals, whether owned or licensed pursuant to any Transferred Contract, subject to Section 2.07 of the APA;

g.    all Seller Information, and all databases and other repositories containing such data and information, and all records, including all data, know-how, Software, and media content, subject to Section 2.07 of the APA;

h.    all regulatory licenses, Permits and accreditations (including any issued or granted by, or filed with or delivered to, any Governmental Entity or accrediting body), and all rights thereunder, subject to Section 2.07 of the APA;

i.    all telephone and facsimile numbers, post office boxes and directory

4916-1802-4275.1

listings;

j.    the Company Plans set forth on Schedule 2.01(j) of the APA (each, an "Assumed Plan") and the Seller's right, title and interest in any assets of or relating thereto;

k.    all claims, causes of action or rights against third parties (including, warranties, indemnities, rebates and guarantees), other than Avoidance Actions and claims, causes of action or rights to the extent related to Excluded Assets or Excluded Liabilities;

l.    any insurance proceeds arising in connection with damage to, or losses related to, the Purchased Assets occurring prior to the Closing, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing and to the extent not relating to an Excluded Asset or Excluded Liability;

m.    all goodwill to the extent relating to or associated with the Purchased Assets or the Business; and

n.    any other assets that are of a type not otherwise addressed by Section 2.01 of the APA that are not Excluded Assets.

12.    In exchange for the Purchased Assets, the Buyer will provide significant value to the Debtor's estate. Under the APA, the Buyer is obligated to, among other things: (i) pay cash to the Seller in the amount of $50,000,000.00 ("Cash Purchase Price") without any financing contingencies; (ii) assume certain liabilities (the "Assumed Liabilities"), including certain contracts, accrued PTO, and all liabilities relating to the ownership, operation, or conduct of the Purchased Assets or the Business following the Closing; (iii) pay any cure costs (the "Cure Costs") up to the Cure Costs Cap associated with the Assumed Liabilities at the closing (the "Closing") of the Transaction; and (iv) subject to certain conditions, offer employment effective as of Closing to all Clinicians and non- Clinicians.

13.    The obligations of the Buyer and Seller to close the Transaction are conditioned upon the Bankruptcy Court entering a Bidding Procedures Order and Sale Order, with such Sale Order being in form and substance acceptable to the Buyer in its sole discretion.

14.     The APA includes various representations, warranties, and covenants by the Seller and the Buyer that are customary in asset purchase agreements, as well as certain conditions to Closing and rights of termination related to the Transaction and the Chapter 11 Case generally.

15.     The terms of the APA are structured to ensure that, from a patient care standpoint, patients will have a relatively seamless transition from the Debtor to the Buyer.

16.     The bid (*i.e.*, the APA) submitted by the Seller (the "Stalking Horse Bid") is subject to higher and better offers made in accordance with the Bidding Procedures Order requested herein.

17.     Subject to the Court's approval, the APA provides the Seller with certain Bid Protections as the sale process continues in bankruptcy, including a Termination Fee (as defined below) and Expense Reimbursement (as defined below) if the Buyer is ultimately not the successful bidder. The Debtor believes that the Stalking Horse Bid is a competitive offer that merits granting these bid protections to the Seller.

## STALKING HORSE PROTECTIONS

18.     By this Motion, the Debtor requests approval of the APA and the Seller to serve as the stalking horse (the "Stalking Horse Bidder") for the Purchased Assets and authority to, among other things, provide the Stalking Horse Bidder with certain bid protections as a component of the APA.

19.     The Debtor seeks approval to provide the Stalking Horse Bidder with a Termination Fee of $1,500,000.00 (3% of the Cash Purchase Price) (the "Termination Fee"), actual legal and due diligence expense reimbursement in an amount not to exceed $1,500,000.00 (the "Expense Reimbursement" and, together with the Termination Fee, the "Bid Protections"). These Bid Protections are reasonable in light of, among other things, the substantial benefits the Stalking

Horse Bidder has provided to the Debtor and its estate by establishing a structure and minimum bid threshold for the auction of the Transferred Assets.

## NEED FOR AN EXPEDITIOUS SALE PROCESS

20.     A prompt sale is the only path to keeping the Business operational, maintaining quality care for patients, and maximizing value for all creditors and parties in interest.

21.     An expeditious process is necessary to ensure that the Transaction is closed in time for the upcoming open enrollment period for Medicare and Medicare Advantage plan recipients beginning on October 15, 2025. The sale process milestones have been drafted with this critical event in mind. Any Successful Bidder will want the Transaction to close prior to the open enrollment period to maximize the value of the Business.

22.     Accordingly, the auction process and time periods set forth in the Bidding Procedures are reasonable under these circumstances and will provide parties with sufficient time and information necessary to formulate a bid to purchase the Purchased Assets. The proposed Transaction timeline is the result of consensus reached through arm's-length, good faith negotiations between the Debtor and the Stalking Horse Bidder.

23.     Given that the Debtor started a marketing process with Evercore more than a year before the Petition Date and will re-market the Business via a comprehensive marketing strategy focused on already identified and to be identified potential strategic buyer parties, the Debtor asserts that the proposed timeline allows ample opportunity to engage with and promote active bidding from interested parties. This ensures a fair and transparent sale process that maximizes the value obtained for the Purchased Assets and reduces the losses associated with continued operations of the facilities in the bankruptcy context.

## THE SALE MUST BE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

4916-1802-4275.1

24.     The Stalking Horse Bidder will only close on the Transaction if the Sale Order expressly provides that the Purchased Assets are being acquired free and clear of all liens, interests, claims and encumbrances (other than Assumed Liabilities) and free from any successor liability claims, including, without limitation, any claims relating to Medicaid or Medicare overpayments in connection with the Business, or any penalties, assessments, or other charges issued by a governmental authority.[8]

## BIDDING PROCEDURES

### A.     Overview

25.     The Bidding Procedures are designed to promote a competitive and expedient sale process. If approved, the Bidding Procedures will allow the Debtor to solicit and identify bids from potential buyers that constitute the highest and/or best offer(s) for the Purchased Assets in an efficient manner and on a reasonable timeline.

26.     The Debtor believes the proposed Bidding Procedures summarized below are fair and appropriate. Because the Bidding Procedures are attached as <u>Exhibit 1</u> to the Bidding Procedures Order, they are not restated in their entirety herein. Among other things, the Bidding Procedures provide the following:[9]

a.     The Debtor will solicit binding bids other than the Stalking Horse Bid by <u>August 20, 2025 at 5:00 p.m.</u> (prevailing Eastern Time) (the "<u>Bid</u>

---

[8] Without limiting the generality of the foregoing, the Stalking Horse Bidder requires, and the Sale Order will provide, that the Purchased Assets be acquired free and clear of (a) losses, obligations, liabilities, settlement payments, damages, awards, judgments, reimbursements, fines, penalties, assessments and interest arising out of, resulting from, or in connection with (1) the self-disclosure to the U.S. Department of Health and Human Services ("<u>HHS</u>") Office of Inspector General ("<u>OIG</u>") and U.S. Department of Justice ("<u>DOJ</u>") made on December 27, 2024, (2) the Debtor's billing, coding and clinical documentation practices, or (3) any related action, charge, order, audit, investigation, formal inquiry, complaint, suit, litigation, arbitration, qui tam action, written notice of violation or noncompliance, other or proceeding, whether administrative, civil, criminal or otherwise; and (b) any losses, obligations, liabilities, settlement payments, damages, awards, judgments, reimbursements, refunds, fines, penalties, assessments and interest, whether now existing or hereafter arising, imposed by, or owed to, the DOJ, OIG or any other Governmental Authority, any Medicare Advantage plan, any federal healthcare program, or any other health plan, third-party payor, patient or person.

[9] To the extent there is any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures will govern.

Deadline");

b.    To be eligible to participate in the Auction, each bid and bidder submitting such a bid ("Potential Bidder") must conform to the following requirements (collectively, the "Participation Requirements"):

(1)    Form and Contents. All Bids shall be in the form of an irrevocable offer letter from a person or persons that the Debtor, in its reasonable discretion taking into account its fiduciary duties, deems financially able to consummate the Transaction, which letter states and includes:

(I)    Marked Agreement. Each Bid must state that the Bidder irrevocably offers to purchase some or all of the Purchased Assets upon the terms and conditions set forth in a duly executed non-contingent and attached complete asset purchase agreement, which shall be in substantially the same form as the Stalking Horse APA, prepared and executed by the Bidder (an electronic version in Word format and blacklined against the Stalking Horse APA), together with its exhibits and schedules, including terms relating to Purchase Price (as defined below) and the time of closing (the "Proposed Agreement");

(II)    Assets. Each Bid must clearly specify the Debtor's assets that are included in the Bid (it being understood that while Bids for a portion or subset of the Purchased Assets may be permitted, in determining whether the Bid is a Qualified Bid, the Debtor may consider whether the combined consideration for the Debtor's assets (taking into account such Bid and other Bids) exceeds the Purchase Price of the Stalking Horse APA and/or other aspects of the Bid);

(III)    Purchase Price. Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, and identify the liabilities to be assumed by the Bidder as part of the Transaction (the "Purchase Price");

(IV)    Overbid. Each Bid (i) must propose a Purchase Price equal to or greater than the sum of (a) the value of the Stalking Horse Bid, as determined by the Debtor in consultation with the Consultation Parties, *plus* (b) the amount of the Termination Fee and the maximum amount of the Expense Reimbursement (i.e., $3,000,000) and (b) an initial overbid of at least $5,000,000 (the "Minimum Initial Topping Bid"); (ii) must be on terms that are not materially more burdensome than the terms of the Stalking Horse Bid; and (iii) must obligate the Bidder to pay, to the extent provided in the Stalking Horse APA, all liabilities and expenses that the

11

Stalking Horse Bidder under the Stalking Horse APA has agreed to pay, including any Assumed Liabilities (as defined in the Stalking Horse APA);

(V)    Capacity to Consummate Transaction; Committed Financing.  Each Bid shall be accompanied by evidence of (i) the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand or (ii) sufficient, non-contingent financing and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing acceptable to the Debtor must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals;

(VI)    Operational Capabilities.    Each Bid shall be accompanied by evidence of the Bidder's ability to maintain Debtor's business as a going concern, including, without limitation, (i) the financial wherewithal to fund operations of the Debtor's business, (ii) experience operating similar businesses, (iii) possession of any authorizations or licenses to operate Debtor's businesses, (iv) implementation of an effective compliance and monitoring program for the business,

(VII)    Contingencies; No Financing or Diligence Outs.  A Bid shall not be conditioned on a Bidder obtaining financing or any internal approval, or on the outcome or review of due diligence, which must be completed before the Bid Deadline, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions;

(VIII)    Due Diligence Representation and Warranty.  Each Bid must represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Debtor's Business and the Purchased Assets prior to submitting its Bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Purchased Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtor's business or the Purchased Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Proposed Agreement, if ultimately accepted and executed by the Debtor;

12

(IX)    <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel the Debtor's advisors should contact regarding such Bid;

(X)    <u>Authorization</u>. Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors, or a comparable governing body, acceptable to the Debtor with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid; *provided*, however, if the Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Transaction by the equity holder(s) of such Bidder;

(XI)    <u>Regulatory or Third-Party Approval</u>. Each Bid must set forth any regulatory or third-party approval required for the Bidder to consummate the Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals, if any;

(XII)    <u>Expenses; Disclaimer to Reimbursement for Fees/Expenses</u>. Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, except as may be exclusively applicable to the Stalking Horse Bidder, no Potential Bidder will be permitted to request, or be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code;

(XIII)    <u>Consummation</u>. Each Bid must include a statement or evidence reflecting (i) that the Bidder is prepared to consummate the Transaction upon entry of an order of the Bankruptcy Court approving the Transaction to the Successful Bidder (the "<u>Sale Order</u>"), (ii) that the Bidder has made or will make as soon as reasonably practicable all necessary filings, if any, with respect to

13

any regulatory, antitrust and other laws and pay the fees associated therewith; and (iii) the Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals, and the proposed timing for the Bidder to undertake the actions required to obtain such approvals, if any;

(XIV)  Irrevocability.  Each Bid must include a statement that, in the event the Debtor selects the Bidder to serve as the Successful Bidder or the Back-Up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the Transaction;

(XV)  Assumed Contracts and Leases.  Each Bid must identify any and all executory contracts of the Debtor and non-Debtor affiliates that the Qualified Bidder wishes to be assumed and assigned to it pursuant to a Transaction.  A Bid must specify that such Bidder will be responsible for any cure costs associated with such assumption on the same or better terms as the Stalking Horse Bid, and include a good faith estimate of such cure costs (which estimate shall be provided by the Debtor).  Further, a Bid must provide evidence of adequate assurance of future performance under such executory contracts to be assumed and assigned in such a Transaction;

(XVI)  Employees.  Each Bid must specify the treatment of the employees of the Debtor;

(XVII) Consent to Jurisdiction.  Each Bidder must submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Transaction documents, and the closing of the Transaction, as applicable; and

(XVIII)  Other Information.  Each Bid must contain such other information as may be reasonably requested by the Debtor.

c.    Potential Bidders will have a due diligence period that expires at the conclusion of the Bid Deadline;

d.    The Debtor will provide each Potential Bidder who has executed a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor with reasonable access to Debtor's confidential electronic data room concerning the Purchased assets (the "Data Room") and any other additional information that the Debtor believes to be reasonable and appropriate under the circumstances; *provided, however,* that the Debtor may withhold or limit access to the Data Room or other

14

diligence materials to a Potential Bidder who has not established the capacity to consummate the Transaction or for competitors or affiliates of a competitor;

e.     Potential Bidders who have satisfied the Participation Requirements in the Debtor's judgment, will be deemed "Qualified Bidders" and each a "Qualified Bidder" and Bids that satisfy all bid requirements, as determined by the Debtor, will be deemed "Qualified Bids." The Debtor will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction.

f.     The Stalking Horse Bidder is deemed Qualified Bidder, and the Stalking Horse Bid is a Qualified Bid in all respects. The Stalking Horse Bidder shall be required to serve as the Backup Bidder if they are not the Successful Bidder but are selected as the Backup Bidder in accordance with the APA.

g.     All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bidding Procedures, the Auction, and the Transaction, provided that the Stalking Horse Bidder is entitled to the Bid Protections.

h.     If there are other Qualifying Bidders, an Auction will be held on August 25, 2025 (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order);

i.     At the Auction, the Debtor shall determine, in its reasonable business judgment, after consultation with its financial and legal advisors and the Consultation Parties (as defined below), which of the Qualified Bids is the highest and/or best bid for the Purchased Assets (the "Successful Bid," and the bidder submitting such Successful Bid, the "Successful Bidder"), and the second highest and/or best bid for the Purchased Assets (the "Backup Bid," and the bidder submitting the Backup Bid, the "Backup Bidder");

j.     Successful Bid(s) and Backup Bid(s) will be subject to approval by the Court at the Sale Order Hearing. At the Sale Order Hearing, the Debtor will seek the entry of the Sale Order approving the Transaction to the Successful Bidder on the terms and conditions of the Successful Bid, as well as approval of the Backup Bid;

k.     Following the Sale Order Hearing and entry of the Sale Order, if the Successful Bidder fails to consummate an approved Transaction, the Backup Bidder will be deemed to be the new Successful Bidder, and the Debtor will be authorized to consummate the Transaction with the Backup Bidder without further order of the Court and the Backup Bidder and Backup Bid shall thereupon be deemed the Successful Bidder and

Successful Bid;

l.   If there are no other Qualifying Bidders as of the Bid Deadline, then Stalking Horse Bidder shall be deemed the Successful Bidder. Additionally, the Stalking Horse Bidder shall be required to serve as the Backup Bidder, only to the extent provided in the APA, upon the Debtor's selection of another party as the Successful Bidder; and

m.   The Bid Deadline may be amended in consultation with (i) PMA Lender, LLC (the "DIP Lender") and (ii) any official committee of unsecured creditors (the "Committee," together with the DIP Lender, the "Consultation Parties"). Without limiting the foregoing, Debtor shall not file any motion or otherwise seek to change, modify or amend: (1) the APA, without prior written approval of the Stalking Horse Bidder, or (2) the Sale Order, without prior written approval of the Stalking Horse Bidder.

## B.   The Assumption and Assignment Procedures

27.   The Debtor also requests that the Court approve the form of the Contract Assumption and Assignment Notice attached to the Bidding Procedures Order as Exhibit 3 and the assumption and assignment procedures described below (the "Assumption and Assignment Procedures"). The Debtor submits that service of the Contract Assumption and Assignment Notice on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures.

28.   To facilitate the Transaction, the Debtor seeks authority to assume and assign the Assumed Contracts to the Successful Bidder(s) in accordance with the following procedures:

i.   By no later than [the earlier of (a) twenty-one (21) days before the Sale Order Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order], the Debtor shall serve an initial notice on all Counterparties to each Existing Contract on the list of Existing Contracts available for assuming and assigning (the Available Contracts List") specifically stating that the Debtor is or may be seeking the assumption and assignment of such Existing Contracts, the Debtor's calculation of the associated Cure Costs, and the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of its Contracts to the Stalking Horse Bidder, or any other Successful Bidder (the initial "Contract Assumption and Assignment Notice").

16

ii.    Pursuant to the Bidding Procedures Order, the counterparties to the Existing Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Existing Contracts on the Available Contracts List. Upon any such objection, such Existing Contract shall become a "Disputed Contract" and, unless the Disputed Contract is rejected (each, a "Rejected Contract"), the Debtor, with the Stalking Horse Bidder's consent to be provided or withheld in its sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Court shall approve as part of the Bidding Procedures Order. The Debtor shall not settle a disputed Cure Cost for any amount with regard to any Existing Contract that has been designated as an assumed contract (each, an "Assumed Contract") without the express written consent of the Stalking Horse Bidder. Upon a final order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such final order or settlement, the Stalking Horse Bidder shall have the option to pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or designate the Disputed Contract as a Rejected Contract and not be responsible for the Cure Cost.

iii.    At the Sale Order Hearing, the Debtor will seek Court approval of the assumption and assignment to the applicable Successful Bidder of the Assumed Contracts that have been selected by such Successful Bidder to be assumed and assigned and request authority to assume and assign to the Successful Bidder any additional Assumed Contracts selected by the Successful Bidder prior to Closing of the Transaction upon payment by the Successful Bidder of the necessary Cure Cost. If additional Assumed Contracts are selected by the Successful Bidder after the Sale Order Hearing, but before Closing of the Transaction, the Debtor will file with the Court and serve on the applicable Counterparties, a notice identifying the Assumed Contracts and the Cure Costs, if any, that the Debtor believes is required to be paid. If the parties are unable to consensually agree to the required Cure Cost, the Debtor will seek a hearing with the Court.

iv.    If no objection is timely filed with respect to an Assumed Contract in accordance with the foregoing procedures: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the applicable Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Contract Assumption and Assignment Notice (and any Amended Assumption and Assignment Notice); and (iii)

17

the Counterparty shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtor and its estate or the Successful Bidder, or the property of any of them.

v.      To the extent that the parties are unable to consensually resolve any dispute with respect to the Cure Cost required to be paid to the applicable Counterparty under sections 365(b)(a)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), the Debtor may (i) assume the applicable Executory Contract prior to the resolution of the Cure Dispute; provided that the applicable Successful Bidder(s) shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Cost within five (5) business days of the Closing of the Transaction and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtor), or (ii) adjourn its request to assume the Assumed Contract pending resolution of the Cure Dispute (an "Adjourned Cure Dispute"); provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtor's and/or Successful Bidder's interests, the Debtor (with the consent of the Successful Bidder(s)) may withdraw the proposed assumption of the applicable Assumed Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.

vi.     Nothing herein or in the Bidding Procedures will obligate the Successful Bidder to satisfy the Cure Cost related to any contract except as expressly provided in the Successful Bid.

vii.    At Closing, all Cure Costs in connection with the assumption and assignment of the Assumed Contracts shall be paid in accordance with the terms of the Successful Bid.

**C.    The Notice Procedures**

29.     The Debtor requests that the Court approve the form of the Auction and Sale Order Hearing Notice, the Patient Notice, the Contract Assumption and Assignment Notice, and the Post-Auction Notice (collectively, the "Notices"), each attached to the proposed Bidding Procedures Order as Exhibit 2 through Exhibit 5, respectively. The Debtor submits that service of the Notices as set forth below (the "Notice Procedures") is proper and sufficient to provide notice of this

Motion and the deadlines that will be set in the Bidding Procedures Order.

30.    <u>Bidding Procedures Hearing Notice</u>. This Motion and notice of the Bidding Procedures Hearing, as set by the Court, will initially be served on the Master Service List.

31.    <u>Auction and Sale Notice</u>. After entry of the Bidding Procedures Order, the Debtor will comply with Bankruptcy Rule 2002(a), which provides that all creditors of a bankruptcy estate are entitled to receive at least 21 days' notice by mail of a proposed sale or property of the estate other than in the ordinary course of business, unless the bankruptcy court for cause shown shortens the time or directs another method of giving notice. To satisfy this requirement, the Debtor proposes to serve notice of the filing of this Motion and the Bidding Procedures Hearing (the "<u>Auction and Sale Notice</u>") by first-class mail, postage prepaid, or electronic mail to counsel who has filed an appearance in the Debtor's case on behalf of any party, and on the following parties (collectively, the "<u>Sale Notice Parties</u>"): (a) all of the Debtor's creditors; (b) all entities that have, to the best knowledge of the Debtor's management and advisors, expressed written interest in purchasing any of the Debtor's facilities or Purchased Assets within the past one (1) year; (c) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Debtor's facilities or Purchased Assets; (d) counsel to PMA Lender, LLC; (e) the U.S. Trustee; (f) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (g) all federal, state, and local regulatory or taxing authorities, including any applicable taxing bodies or recording offices which have a reasonably known interest in the relief granted herein; (h) the Internal Revenue Service; (i) any other governmental authority known or reasonably believed by the Debtor to have or assert a claim against the Debtor in the Chapter 11 Case; (j) the Office of the Attorney General and Office of the Secretary of State for the State of Florida; (k) the Counterparties to the Executory Contracts; (l) all patients at any point in time dating back to two (2) years prior to the Petition Date

or any of such persons' present legal representatives to the extent known by the Debtor, and (m) all persons or entities that have asserted, or threatened to assert, any tort claims against any of the Debtor at any point in time dating back to two (2) years prior to the Petition Date.

32.    The Patient Notice. In addition to the Auction and Sale Notice, the Debtor shall send the Patient Notice to all patients at the Debtor's medical facilities at any point in time dating back to two (2) years prior to the Petition Date or any of such person's present legal representatives to the extent known by the Debtor. The Patient Notice is intended to provide further information to the patients regarding the sale process and intention of the Debtor and Successful Bidder(s) to continue operations of the Debtor's Care Centers.

33.    Contract Assumption and Assignment Notice. By no later than [The earlier of (a) twenty-one (21) days before the Sale Order Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order] or such other date as may be set in the Bidding Procedures Order, the Debtor shall file the Contract Assumption and Assignment Notice with the Court, post such notice on Stretto's Website, and serve such notice by first class mail, postage prepaid, on the following parties (collectively, the "Contract Notice Parties"):

a.    each Counterparty to an Executory Contract;

b.    counsel to PMA Lender, LLC;

c.    counsel to the Stalking Horse Bidder;

d.    counsel to other potential bidders;

e.    counsel to the Committee;

f.    the U.S. Trustee; and

g.    all parties that have requested notice pursuant to Bankruptcy Rule 2002.

If applicable, and as soon as practicable, the Debtor shall file any amended Assumption and

Assignment Notice with the Court, post such notice on Stretto's Website, and serve such notice, by overnight delivery, on the Contract Notice Parties.

34.     Post-Auction Notice. The Debtor shall file on the docket and serve the Post-Auction Notice on the Counterparties to the Assumed Contracts, the Sale Notice Parties, and all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1 via ECF, by email, fax, or overnight delivery, as soon as practicable (but no later than one (1) business day) after completion of the Auction..

35.     The Debtor believes the Notice Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Contract Objection Deadline, the Sale Objection Deadline, the applicable Bid Deadlines, and the date, time, and location of the Auction and Sale Order Hearing. Accordingly, the Debtor requests that the Court find that the Notice Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rules 2002, 6004 and 6006.

## BASIS FOR RELIEF

**I.     APPROVAL OF THE TRANSACTION IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE.**

*A.     The Transaction Should Be Approved as an Exercise of the Debtor's Sound Business Judgment.*

36.     Ample authority exists for approval of the Transaction contemplated by this Motion. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the debtor's sound business judgment. *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D.

21

Fla. 2019) ("Courts approve a Chapter 11 debtor in possession's use, sale or lease of property of the estate where the debtor has used reasonable business judgment and articulated a business justification for such use."); *In re Diplomat Construction, Inc.*, 481 B.R. 215 (Bankr. N.D. Ga. 2012).

37.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

38.     The Debtor submits that its decision to consummate the sale of the Purchased Assets represents a reasonable exercise of the Debtor's business judgment and, accordingly, the Transaction should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. Since the Petition Date, the Debtor has commenced additional marketing efforts with the assistance of Evercore. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtor's estate receives the highest or otherwise best value available for the Purchased Assets and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Bidder or other Successful Bidder and establish that the Debtor and such bidder have proceeded in good faith.

39.     The Debtor has a sound business justification for selling the Purchased Assets pursuant to a competitive-bidding process consistent with the Bidding Procedures. Based on an analysis of the Debtor's ongoing and future business prospects, and the Debtor's potential

liabilities, the Debtor concluded that a sale of the Purchased Assets pursuant to the Bidding Procedures would likely be the best way to maximize recoveries for creditors in this Chapter 11 Case. The Debtor believes that the proposed sale process will produce a fair and reasonable purchase price for the Purchased Assets. Specifically, the Stalking Horse Bid is an offer to purchase the Purchased Assets for a price that the Debtor, after consultation with the Debtor's advisors, already has determined to be fair and reasonable. Given the prepetition marketing process and that the Stalking Horse Bid will serve as a floor for qualifying bids for the Purchased Assets, the Debtor is confident that the post-petition sale process will culminate in the Debtor obtaining the highest or otherwise best offer for such assets, while minimizing on-going operational losses.

40.     As such, the Debtor's determination to sell the Purchased Assets pursuant to a competitive bidding process as provided for in the Bidding Procedures is a valid and sound exercise of the Debtor's business judgment. The Debtor believes that it has proposed a fair process for obtaining the highest and/or best offer and sale of the Purchased Assets for the benefit of the Debtor's estate and its creditors. The fairness and reasonableness of the consideration to be received by the Debtor will be demonstrated by a "market check" through the process outlined in the Bidding Procedures.

**B.      *The Transaction Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.***

41.     Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, and encumbrances (with any such liens, claims, interests, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) if any one of the following conditions is satisfied:

     i.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    ii.      such entity consents;

    iii.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    iv.     such interest is in bona fide dispute; or

    v.      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In re Gulf States Steel, Inc.*, 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met).

    42.    The Court may also authorize the sale of a Debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) of the Bankruptcy Code does not apply. *See In re Dunhill Entities, L.P.*, No. 10-01342, 2010 WL 6982622 (Bankr. S.D. Ala. 2010); *In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

43.     The Debtor submits, and to the extent necessary will demonstrate at the Sale Order

Hearing, that the sale of the Purchased Assets free and clear of all liens, claims, interests, and

encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy

Code.[10] Accordingly, the Debtor requests that the Court authorize the sale of the Purchased Assets

free and clear of any liens, claims, interests and encumbrances, in accordance with section 363(f)

of the Bankruptcy Code, subject to such liens, claims, interests and encumbrances attaching to the

proceeds thereof in the same order of relative priority, with the same validity, force and effect as

prior to such transfer.

### C.     *The Sale Order Must Provide that the Stalking Horse Bidder Does Not Have Successor Liability for the Debtor's Debts.*

44.     The Debtor further requests that the Sale Order specifically provide that the

Stalking Horse Bidder or any other Successful Bidder shall have no successor liability of any kind.

Authorizing a sale free and clean of successor liability claims achieves the very purpose of section

363. *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar.

27, 2001) (further stating that "the prospect of successor liability would deter bidders and create a

serious impediment to the ability of debtors to effect going concern sales under § 363"); *see also*

*In re Lake Burton Development, LLC*, No. 09-22830, 2009 WL 8189351, at *13 (Bankr. N.D. Ga.

July 10, 2009). Moreover, section 363 permits a sale free and clear of any successor liability claims

that arise from the property being sold and are linked to the debtor's operation of its business. *In*

*re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d. Cir. 2003).

---

[10] Moreover, the Debtor will send the Auction and Sale Notice to purported creditors and lienholders. If such creditors and lienholders do not object to the proposed Transaction, then their consent should be presumed. Accordingly, the Debtor requests that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Purchased Assets timely objects to this Motion, such party shall be deemed to have consented to any Transaction approved at the Sale Order Hearing. *See, e.g.*, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent"); *Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

45.    In connection with orders approving asset sales pursuant to section 363 of the Bankruptcy Code, courts within the Eleventh Circuit routinely include a finding that a buyer is not a successor to the Debtor and is not liable for payment of amounts the Debtor owes. *See, e.g., In re TLO, LLC,* No. 13-20853, 2013 WL 7018348 (Bankr. S.D. Fla. 2013); *In re Lake Burton Development, LLC*, No. 09-22830, 2009 WL 8189351 (Bankr. N.D. Ga. 2009).

46.    Thus, this Court should hold that the sale of the Purchased Assets will be free and clear of any claim and enjoin any entities or claimants from attempting to collect any liability of the Debtor from the Stalking Horse Bidder or any other Successful Bidder.

**D.    Liens and Other Interests will Attach to the Sale Proceeds in Accordance with their Existing Priority.**

47.    As provided by the Bankruptcy Code, all valid liens or other interests against the Purchased Assets being sold will attach against the sale proceeds in the order of their existing priority. The net proceeds of the Transaction will be held by the Debtor pending further order of this Court.

**E.    The Transaction Has Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Buyer."**

48.    Pursuant to section 363(m) of the Bankruptcy Code,[11] a good faith Buyer is one who purchases assets for value, in good faith, and without notice of adverse claims. *In re TFLO, LLC,* 574 B.R. 391, 433 (Bankr. S.D. Fla. 2016); *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x. 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986) *In re Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir.

---

[11] Section 363(m) of the Bankruptcy Code provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

2005) (following the *Abbotts Dairies* standard).

49.     An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir.1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *Made In Detroit, Inc.*, 414 F.3d at 581 (6th Cir. 2005) (quoting *In re Rock Indus.*, 572 F.2d at 1998). In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders to demonstrate a lack of good faith. *In re TFLO,* LLC, 574 B.R. 391, 433 (Bankr. S.D. Fla. 2016).

50.     The Debtor submits that the Stalking Horse Bidder is a "good faith buyer" within the meaning of section 363(m) of the Bankruptcy Code. The Debtor and the Stalking Horse Bidder, and their respective advisors, have entered the APA without collusion, in good faith and after extensive arm's-length negotiations. The Stalking Horse Bidder is not an insider of, or otherwise affiliated with, the Debtor.  To the best of the Debtor's knowledge, information and belief, no party has engaged in any conduct that would cause or permit the APA to be set aside under section 363(m) of the Bankruptcy Code.

51.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualifying Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Purchased Assets. Any agreement with a Successful Bidder executed by the Debtor will be negotiated at arm's-length and in good faith. Accordingly, the Debtor seeks a finding that any

27

Successful Bidder (including the Stalking Horse Bidder) are good faith buyers and entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

52.     The Debtor submits, and the testimony presented at the Sale Order Hearing will demonstrate, that the terms and conditions of the Transaction were negotiated by the Debtor and the Stalking Horse Bidder or Successful Bidder, as applicable, at arm's-length and in good faith, with the assistance of the Debtor's professional advisors, and that the parties did not engage in any conduct that would cause or permit the Transaction to be avoided under section 363(n) of the Bankruptcy Code.

53.     Based on the foregoing, the Debtor submits that it has demonstrated that the proposed sale of the Purchased Assets is a sound exercise of the Debtor's business judgment and should be approved as a good faith Transaction.

### F.     *The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006.*

54.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

55.     The Debtor believes that any sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtor requests that any Sale Order approving the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## II.   THE BIDDING PROCEDURES, INCLUDING THE BID PROTECTIONS, SHOULD BE APPROVED.

56.     The Bidding Procedures are appropriate and in the best interests of the Debtor, its estate, and the creditors. The Debtor has designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, maximize value for the Debtor's estate and creditors. The Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtor will receive the highest or best possible consideration for the Purchased Assets.

57.     Furthermore, the Bidding Procedures provide an appropriate framework for the Debtor to review, analyze, and compare any bids received to determine which bids are in the best interests of the Debtor's estate and its creditors. The Debtor submits that the Bidding Procedures are fair and transparent and will derive the highest or best bids for the Transferred Assets. Therefore, the Debtor requests the Court approve the Bidding Procedures.

### A.     *The Stalking Horse Bidder and Stalking Horse Bid Protections Should be Approved.*

58.     The APA provides for Bid Protections, including a Termination Fee in an amount of $1,500,000.00 and an Expense Reimbursement of up to $1,500,000.00 to be paid to the Stalking Horse Bidder on the terms set forth in the APA. The Bid Protections are the result of active and arm's-length negotiations, and the Bid Protections, including the Termination Fee and Expense Reimbursement, were an essential prerequisite for the Stalking Horse Bidders to enter into the APA. Stalking horse bidders virtually always require termination fees (breakup fees) and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence

29

necessary to enter into an asset purchase agreement." *Official Comm. of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 U.S. Dist. LEXIS 73421, at *4 n.2 (E.D. Wis. July 7, 2011). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

59.     Whether termination fees and expenses are allowable is subject to the same standard as other general administrative expenses under section 503 of the Bankruptcy Code. *See In re Nat'l Ass'n of Professional Martial Artists, Inc.*, 328 B.R. 853 (Bankr. M.D. Fla. 2005). These expenses are allowable if they are actually necessary to preserve the value of the bankruptcy estates or if they benefit the debtor's estate. *Id.*

60.     The Termination Fee and Expense Reimbursement included in the APA were necessary to incentivize the Stalking Horse Bidder to (i) commit to the purchase and establish a framework for the terms and conditions governing the Purchased Assets, and (ii) subject its bid to a competitive bidding process. If these protections were not offered, the Debtor and its advisors believe that no entity would be willing to act as a stalking horse bidder, and absent these protections, the Debtor would have to proceed to an auction of its assets with no floor or negotiated transaction framework, which would likely lead to a sale at a much lower value than in the APA – or a sale to a party who does have the capability of operating the Business. Accordingly, the Bid Protections are necessary to preserve the value of the Debtor's estate because they enable the Debtor to secure an adequate floor for the Purchased Assets—a clear benefit to the Debtor's estate.

61.     Moreover, there has been no self-dealing or manipulation of any kind in the negotiation of the Bid Protections; rather, the Bid Protections resulted from good faith, arm's-length negotiations between the Debtor and the Stalking Horse Bidder. The Debtor believes that the agreement to pay the Bid Protections is reasonable and necessary to induce the Stalking Horse

Bidders to enter into the APA.

62.     Pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit a higher or better offer than the bid of the Stalking Horse Bidder, which would be used to fund the Bid Protections. The Stalking Horse Bid attracts additional bidders because they can save time and costs by utilizing documents the Stalking Horse Bidder heavily negotiated, including the APA. Ultimately, if the Purchased Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, it is likely because the Stalking Horse Bidder played a crucial role in initiating interest and setting a minimum acceptable price for others to bid against.

63.     The Debtor believes the dollar amount of the Bid Protections is appropriate and reasonable and consistent with other bid protections approved by other courts. *See Matter of Bouchard Transportation Company, Inc.*, 74 F.4th 743 (5th Cir. 2023) (approving a 3% breakup fee totaling $3.3 million and expense reimbursement of $1 million); *In re Metaldyne Corp.*, 409 B.R. 661 (S.D.N.Y. 2009) (approving a breakup fee of $1.5 million and an expense reimbursement of $750,000.00); *In re American West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Arizona 1994) (approving expense reimbursements of up to $3 million); *In re America Classic Voyages Co.*, Case No. 01-10954 (Bankr. D. Del. March 20, 2002) (approving breakup fee of 6.6% in connection with a $3.75 million sale transaction); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (approving a breakup fee of 5.1%). The Bid Protections are a sound exercise of the Debtor's business judgment and are in the best interests of the Debtor, its estate, and all stakeholders. Accordingly, the Court should approve the Bid Protections.

**B.      This Court Should Approve the Assumption and Assignment Procedures, as well as the Proposed Assumption and Assignment of Contracts.**

64.     The Debtor respectfully submits that the proposed Assumption and Assignment Procedures set forth above are appropriate and reasonably tailored to provide all necessary notices

to the Counterparties, including the deadlines for objecting to the assignment and assumption of their Executory Contracts. Without limitation, the Assumption and Assignment Procedures provide for the payment of any Cure Costs (and resolution of disputes related thereto) owed under the Assumed Contracts upon the assumption and assignment of such contracts. Accordingly, the Debtor submits that implementation of the proposed Assumption and Assignment Procedures is appropriate in this Chapter 11 Case, and that this Court should authorize the Assumption and Assignment Procedures and further authorize the Debtor to assume and assign the Assumed Contracts as may be set forth in the purchase agreement with the Successful Bidder in accordance with such procedures.

65.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

66.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *In re H.M. Bowness, Inc.*, 89 B.R. 238, 241 (Bankr. M.D. Fla. 1988) ("Ordinarily, the decision to assume or reject an executory contract is left entirely to the debtor. Upon proper motion, the court should give perfunctory approval of the decision subject only to review under the business judgment rule. This test simply requires a showing by the Trustee or debtor-in-possession that rejection of the contract will likely benefit the estate.").

67.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

68.     Here, the Debtor has exercised its sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Debtor and its estate, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.

69.     As set forth above, the Transaction will provide significant benefits to the Debtor's estate. To that end, the assumption and assignment of the Assumed Contracts is necessary for the Debtor to obtain the benefits of the APA. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assumed Contract, the Debtor will be relieved from any liability for any subsequent breach associated therewith.

70.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtor proposes to file with the Court, and serve on each Counterparty to an Assumed Contract, the Contract Assumption and Assignment Notice (and, if applicable, an amended Assumption and Assignment Notice) that indicates the proposed Cure Cost for each such contract or lease. As such, each

33

Counterparty will have the opportunity to object to the proposed Cure Cost, if applicable. Moreover, the payment or reserve of the applicable Cure Cost will be a condition to the Debtor's assumption and assignment of any Assumed Contract.

71.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

72.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

73.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract. In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of

34

the Bankruptcy Code (the "Adequate Assurance Information"). Furthermore, given that the Debtor will submit evidence that all requirements for the assumption and assignment of such contracts have been satisfied at the Sale Order Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

74.     Therefore, the Debtor respectfully requests the Court (a) approve the Assignment and Assumption Procedures, (b) approve the proposed assumption and assignment of the Assumed Contracts, and (c) find that all anti-assignment provisions of such contracts are unenforceable under section 365(f) of the Bankruptcy Code.[12]

## NO PRIOR REQUEST

75.     No previous request for the relief sought herein has been made to this Court or any other court.

## NOTICE

76.     Notice of this Motion has been provided by email, facsimile or overnight mail to: (a) the Office of the United States Trustee for the Middle District of Florida; (b) the Debtor; (c) all secured creditors; (d) the Office of the Attorney General of the State of Florida; (e) the twenty (20) largest unsecured creditors for the Debtor; (f) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (g) the Debtors' identified, interested government and regulating entities; (h) other interested parties as identified by the Debtors; and (i) any known

---

[12] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

counsel for (a)-(h). The method of service for each party will be described more fully in the certificate of service prepared by the Debtors' proposed claims and noticing agent. The Debtors respectfully submit that, based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, no further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, and, after the Sale Order Hearing, a Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: July 7, 2025

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*
**Elizabeth A. Green, Esq.**
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
**Jimmy D. Parrish, Esq.**
FL Bar No.: 0526401
E-mail: jparrish@bakerlaw.com
**Andrew V. Layden, Esq.**
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and Debtor in Possession*

4916-1802-4275.1

## <u>Exhibit A</u>
**Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In Re: | Case No.: 6:25-bk-04156 |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | Chapter 11 |
| Debtor. | |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE DEBTOR'S ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (F) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (G) GRANTING RELATED RELIEF</u>**

THIS CASE came before the Court for a hearing on [month] [day], 2025, at _____ a.m./p.m. (the "<u>Bidding Procedures Hearing</u>") upon the for consideration of the Villages Health System, LLC's (the "<u>Debtor</u>") *Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (C)*

---

[1] The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

*Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. X] (the "Motion"),[2] and the Court, having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and the Court having considered the Motion, the arguments of counsel and the evidence presented at the Bidding Procedures Hearing and the entire record; and the Court having found that the Debtor provided due and sufficient notice of the Motion and Bidding Procedures Hearing and the relief sought in the Motion under the particular circumstances, and it appearing no other or further notice need be provided; and the Court having reviewed the Motion, the filings in support of the Motion, and all objections to the relief sought in the Motion; and the Court having found that the relief requested in the Motion is in the best interest of the Debtor, its estates, its creditors, and other parties in interest; and after due deliberation and good and sufficient cause appearing for the relief sought in the Motion, it is hereby **FOUND AND DETERMINED** that:

A.      The findings of fact and conclusions of law set forth in this Bidding Procedures Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusion of law, they are hereby adopted as such. Any

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion or the Stalking Horse APA, as applicable.

findings of fact or conclusions of law stated by the Court on the record at the Bidding Procedures

Hearing are hereby incorporated, to the extent they are not inconsistent with this Order.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory and legal bases for the relief requested in the Motion are sections 105,

363, 364, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and

Rules 2002, 4001, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

D.      A reasonable opportunity to object or be heard regarding the relief requested in the

Motion (including, without limitation, with respect to the Bidding Procedures) has been afforded

to all interested persons and entities, including, but not limited to, the Sale Notice Parties.

E.      Notice of the Motion and the Bidding Procedures Hearing was adequate and

sufficient under the circumstances of the Chapter 11 Case, and such notice complied with sections

102(1), 105(a), 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, and 9014 of

the Bankruptcy Rules.

F.      The legal and factual bases set forth in the Motion establish just cause for the relief

granted herein. Entry of this Order is in the best interests of the Debtor and its estate, creditors,

and all other parties-in-interest.

G.      The Debtor has demonstrated a compelling and sound business justification for the

Court to enter this Order approving a sale process for the sale of the Purchased Assets on terms

similar to those in the Stalking Horse APA attached to this Order as **Exhibit 6**, including the Bid

Protections for the Stalking Horse Bidder that include (a) a Termination Fee of $1,500,000.00 and (b) an Expense Reimbursement in the aggregate amount of up to $1,500,000.00.

H.      The Bid Protections are fair and reasonable and provide a benefit to the Debtor's estate and stakeholders. The Bid Protections, as set forth in the Stalking Horse APA, are: (i) an actual and necessary cost of preserving the Debtor's estates within the meaning of sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (ii) fair, reasonable and appropriate and designed to maximize the value for the benefit of the Debtor's estate; (iii) commensurate to the real and substantial benefits conferred upon the Debtor's estate by the Stalking Horse Bidder; (iv) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Stalking Horse APA, the commitments that have been made by the Stalking Horse Bidder, and the efforts that have been and will be expended by the Stalking Horse Bidder; and (v) necessary to induce the Stalking Horse Bidder to continue to pursue such sale and continue to be bound by the Stalking Horse APA and a condition of the Stalking Horse Bidder's execution of the Stalking Horse APA.  The Stalking Horse APA, including the Bid Protections, represents the highest or otherwise best offer the Debtor has received to date as a result of its efforts to market the Purchased Assets for sale.  The approval of the relief requested is a necessary step toward completion of the sale process.  The Stalking Horse APA and the Bid Protections facilitate competitive bidding and facilitate the Debtor's efforts to obtain the highest or otherwise best bid for its assets through the Bid Procedures.

I.      The Debtor has demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (a) approve the Stalking Horse Bidder and the Bidding Procedures (including the Bid Protections); (b) establish the Assumption and Assignment Procedures; (c) approve the form and manner of the Notices and

the Notice Procedures; (d) schedule a date for the (i) Auction and (ii) Sale Order Hearing; and (e) grant related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

J.       All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

K.       The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtor. The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Stalking Horse APA, subject to (i) compliance with the Bid Procedures and (ii) entry of the Sale Order.

L.       The Bidding Procedures, substantially in the form attached as **Exhibit 1** hereto, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtor's estate.

M.       The Auction and Sale Order Hearing Notice, substantially in the form attached as **Exhibit 2** hereto, is appropriate and reasonably calculated to provide notice of the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, or interests, including, without limitation: (i) the date, time, and place of the Auction, if any; (ii) a summary of the Bidding Procedures; (iii) the deadline for filing objections to the sale of the Purchased Assets; (iv) the date, time, and place of the Sale Order Hearing to consider the sale of the Purchased Assets; (v) that the

sale of the Purchased Assets is free and clear of all Liens, Claims and other interests (other than the Assumed Liabilities), with all Liens, Claims and interests attaching with the same validity and priority to the Transaction proceeds; and (vi) the proposed assumption and assignment of the Assumed Contracts to any Successful Bidder, and no other or further notice of the Transaction shall be required.

N.    The Patient Notice, substantially in the form attached as **Exhibit 3** hereto, is appropriate and reasonably calculated to provide notice to certain patients of the Debtor's medical facilities regarding the proposed Transaction and their right to raise any objections thereto.

O.    The Contract Assumption and Assignment Notice, substantially in the form attached as **Exhibit 4** hereto, is reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of Executory Contracts in connection with the Transaction and the related Cure Costs, and no other or further notice is required.

P.    The Post-Auction Notice, substantially in the form attached as **Exhibit 5** hereto, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s) and Backup Bidder(s), and no other or further notice is required.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that:

1.    The relief requested in the Motion is **GRANTED AND APPROVED** as set forth in this Order.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or have been otherwise satisfied or adequately provided for pursuant to this Order.

**(i)**     **Timeline of the Sale**

3.      The Debtor is authorized to proceed with the sale of the Purchased Assets in accordance with the Bidding Procedures and is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Proposed Date | Milestone |
|---|---|
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to serve Sale Notice |
| **The earlier of (a) twenty-one (21) days before the Sale Order Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order** | Deadline to serve initial Contract Assumption and Assignment Notice |
| **Objection to the Sale or Sale Order shall be filed and served no later than [ ● ], 2025 at 4:00 p.m. (prevailing Eastern Time) (collectively, the "Sale Objection Deadline").** | Sale Objection Deadline[3] |
| **[14 days from service of the initial Contract Assumption and Assignment Notice]** | Contract Objection Deadline |
| **August 20, 2025** | Bid Deadline |
| **August 21, 2025** | Deadline for Debtor to Designate Qualifying Bids |
| **August 22, 2025** | Deadline for Debtor to Designate Baseline Bid |
| **August 25, 2025** | Auction |
| **As soon as practicable (but no later than one (1) business day) after completion of the Auction** | File and serve Post-Auction Notice |
| **August 27, 2025** | Deadline for Supplemental Objections[4] |
| **August 29, 2025** | Sale Order Hearing |

4.      The failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, Bidding Procedures, and/or consummation of the

---

[3] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

[4] Supplemental Objections are objections solely related to (i) adequate assurance of future performance if Successful Bidder is not the Stalking Horse Bidder or (ii) the conduct of the auction.

Transaction, including the assumption and assignment of Assumed Contracts to a Successful Bidder, and shall be deemed to constitute any such party's consent to entry of an order approving the Transaction and consummation of the Transaction and all other transactions related thereto.

5.    The Debtor is authorized to modify the above timeline, subject to the approval of the Stalking Horse Bidder and any rights that the Stalking Horse Bidder may have under the Stalking Horse APA on account of such modification after consultation with (i) [ ● ] (the "DIP Lender") and (ii) any official committee of unsecured creditors (the "Committee," together with the DIP Lender, the "Consultation Parties").

(ii)    <strong><u>The Bidding Procedures</u></strong>

6.    The Bidding Procedures are **APPROVED** in their entirety. The Debtor is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such actions.

7.    The process and requirements associated with submitting a Bid and the designation of a Bid as a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtor's estate, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be August 20, 2025, at 5:00 p.m. (prevailing Eastern Time). Any disputes or objections to the designation of any Qualified Bid, the Successful Bid, or the Backup Bid (each as defined in the Bidding Procedures) shall be resolved by the Court at the Sale Order Hearing as set forth herein.

8.    The Debtor is authorized to conduct and preside over the Auction in accordance with the Bidding Procedures. The Auction, to the extent that an Auction is necessary under the

Bidding Procedures, shall take place at [insert time] (prevailing Eastern Time) on August 25, 2025, at the offices of: (a) Baker & Hostetler, LLP, SunTrust Center, 200 S Orange Ave #2300, Orlando, FL 32801, (b) via in person or a virtual platform, such as Zoom, or (c) such other location, in each case as the Debtor designates (or at any other time and location as the Debtor may hereafter designate on proper notice). The Auction will be conducted openly, and all Qualified Bidders, the Consultation Parties, and the U.S. Trustee will be permitted to attend.

**(iii)**    **Stalking Horse Bidder and Bid Protections**

9.    The Stalking Horse Bidder and the Bid Protections are approved.

10.    The Termination Fee shall be $1,500,000.00 and any Expense Reimbursement shall not exceed $1,500,000.00 in the aggregate, consisting of the Stalking Horse Bidder's reasonable and documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred in connection with the Stalking Horse Bidder's evaluation, consideration and negotiation of a possible transaction with the Debtor and in connection with the transactions contemplated by the Stalking Horse APA. Bid Protections shall be payable in accordance with and subject to the terms and conditions of the Stalking Horse APA. The Stalking Horse Bidder's claim for the Termination Fee and Expense Reimbursement approved in this Order shall be as allowed as a superpriority administrative claim under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

11.    The Stalking Horse Bidder shall be required to serve as the Backup Bidder if it is not the Successful Bidder solely to the extent (and for the time period) required by the Stalking Horse APA.

**(iv)**    **Notice Procedures**

12.     The Auction and Sale Notice, substantially in the form attached as **Exhibit 2** is

**APPROVED**.

13.     As soon as practicable after entry of this Order, the Debtor shall serve the Auction

and Sale Notice, and a copy of this Order, by first-class mail, postage prepaid on the following

parties, provided, however, that to the extent email addresses are available for counsel for any of

the following parties that have appeared in the Debtor's bankruptcy case, such counsel may be

served by email (collectively, the "Sale Notice Parties"): (a) all of the Debtor's creditors; (b) all

entities that have, to the best knowledge of the Debtor's management and advisors, expressed

written interest in purchasing any of the Facilities or Purchased Assets within the past one (1) year;

(c) all entities known to have asserted any Lien, Claim, or other interest in or upon any of the

Facilities and/or Purchased Assets; (d) counsel to the DIP Lender; (e) the U.S. Trustee; (f) all

parties that have requested notice pursuant to Bankruptcy Rule 2002; (g) all federal, state, and

local regulatory or taxing authorities, including any applicable taxing bodies or recording offices

which have a reasonably known interest in the relief granted herein; (h) the Internal Revenue

Service; (i) any other governmental authority known or reasonably believed by the Debtor to have

or assert a claim against any of the Debtor in the Chapter 11 Case, including the United States

Department of Health and Human Services, Centers for Medicare and Medicaid Services; (j) the

Office of the Attorney General and Office of the Secretary of State for the State of Florida; (k) the

counterparties to the Executory Contracts; (l) all patients at any point in time dating back to two

(2) years prior to the Petition Date or any of such persons' present legal representatives to the

extent known by the Debtor; (m) all persons or entities that have asserted, or threatened to assert,

any tort claims against any of the Debtor at any point in time dating back to two (2) years prior to

the Petition Date.

14.     The Patient Notice, substantially in the form attached as **Exhibit 3** is **APPROVED**. In addition to the Auction and Sale Order Hearing Notice, the Debtor shall serve the Patient Notice on all patients at any point in time dating back to two (2) years prior to the Petition Date or any of such persons' present legal representatives to the extent known by the Debtor.

15.     Service of the Auction and Sale Order Hearing Notice and Patient Notice as described above shall be good and sufficient notice of the Transaction and the Assumption and Assignment Procedures with respect to known interested parties.

16.     The Debtor is directed to post the Auction and Sale Order Hearing Notice on its case information website at [insert website].

17.     The form of the Post-Auction Notice substantially in the form attached hereto as **Exhibit 5** is **APPROVED**. The Debtor shall file on the docket and serve the Post-Auction Notice on the Counterparties to the Assumed Contracts, the Sale Notice Parties, and all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1 via ECF, by email, fax, or overnight delivery, as soon as practicable (but no later than one (1) business day) after completion of the Auction.

### (v)     Assumption and Assignment Procedures

18.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein, are hereby **APPROVED**.

19.     The Contract Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 4** is hereby **APPROVED**.

20.     The Debtor shall file with the Court, post on its case information website at [insert website], and serve on each counterparty to an Executory Contract, the initial Contract Assumption and Assignment Notice no later than the earlier of (a) twenty-one (21) days before the Sale Order

Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order. If no Cure Cost is listed for a particular Assumed Contract, the Debtor's asserted Cure Cost for such Executory Contract shall be deemed to be $0.00. The Debtor shall serve, via email to counsel for any party that has appeared in the Debtor's bankruptcy case, if available, or by first-class mail, (a) the Contract Assumption and Assignment Notice that contains the list of Executory Contracts, (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Executory Contracts that may be Assumed Contracts and rights thereunder, (c) the Cure Cost, if any, and (d) the procedures for objecting thereto, on all Counterparties to the Executory Contracts and all parties on the Rule 2002 Notice List. Service of such Contract Assumption and Assignment Notice as set forth herein shall be deemed good and sufficient notice of, among other things, the potential assumption and assignment of the Executory Contracts, the applicable Cure Costs related thereto, and the procedures for objecting thereto, and no other or further notice is necessary.

21.     Any objection with respect to the Debtor's proposed assumption and assignment of any Executory Contract included in the Contract Assumption and Assignment Notice, including, without limitation, any objection to the Cure Cost (a "Contract Objection"), shall be filed by [insert time] (prevailing Eastern Time) on [insert date] (the "Contract Objection Deadline"), for any Counterparties to a Executory Contracts, provided that, with respect to any Contract Objection for any Executory Contract included on an Amended Contract Assumption and Assignment Notice (as defined below) that (i) was not previously included on the initial Contract Assumption and Assignment Notice or a previous Amended Contract Assumption and Assignment Notice or (ii) for which the proposed Cure Cost was reduced from the proposed Cure Cost in the initial Contract Assumption and Assignment Notice or a previous Amended Contract Assumption and Assignment

Notice (as applicable), such Contract Objections shall be filed on or prior to fourteen (14) days following service of such Amended Contract Assumption and Assignment Notice. Any Contract Objection must (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules; (c) be filed with the Court by the Contract Objection Deadline, unless otherwise provided herein; and (d) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

22.     If, after the Contract Assumption and Assignment Notice and Contract Objection Deadline, additional executory contracts or unexpired leases of the Debtor is determined to be potential Assumed Contracts in connection with the Transaction, or the Debtor seek to modify the previously stated Cure Cost associated with any Executory Contract, as soon as practicable thereafter, the Debtor shall file with the Court and serve, by overnight delivery, on the applicable Counterparties, one or more Amended Contract Assumption and Assignment Notices, and such Counterparties shall file any objection to the Cure Cost not later than fourteen (14) days following service of such Amended Contract Assumption and Assignment Notice.

23.     The inclusion of an Executory Contract on the Contract Assumption and Assignment Notice, or any Amended Contract Assumption and Assignment Notice, will not (a) obligate the Debtor to assume any Executory Contract listed thereon nor obligate the Successful Bidder to take assignment of such Executory Contract or (b) constitute any admission or agreement of the Debtor that such Executory Contract is an executory contract.

24.     Any objection to the Stalking Horse Bidder's adequate assurance of future performance must be filed no later than the Sale Objection Deadline and all such objections must specify what the objecting party believes is required to provide such adequate assurance.

25.     If no Contract Objection is timely received with respect to an Assumed Contract: (a) the counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the applicable Successful Bidder); (b) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Contract Assumption and Assignment Notice, or any Amended Contract Assumption and Assignment Notice; and (c) the counterparty shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtor and its estate or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

26.     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Order Hearing, the Debtor may, subject to the Stalking Horse Bidder's or other Successful Bidder's (as applicable) approval, (i) assume the applicable Assumed Contract and assign it to the Successful Bidder prior to the resolution of the Cure Dispute; provided that the Debtor (a) pays to the applicable counterparty the undisputed portion of the Cure Cost within five (5) business days after the Closing of the Transaction and (b) reserves cash in an amount sufficient to pay the disputed portion of the Cure Cost reasonably

asserted by the applicable counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the counterparty and the Debtor), or (ii) adjourn its request to assume and assign the contract or lease pending resolution of the Cure Dispute; provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtor, the Debtor (with the consent of the Successful Bidder(s)) may withdraw the proposed assumption and assignment of the applicable contract or lease after such determination by filing a notice of withdrawal. The Debtor shall file notice of its intention to reserve for a Cure Cost or to adjourn its request for assumption and assignment. An Adjourned Cure Dispute may be resolved after the Closing Date of the Transaction in the Debtor's discretion with the consent of the Successful Bidder(s).

### (vi)    Sale Order Hearing

27.    A Sale Order Hearing to (a) approve a sale of the Debtor's assets to a Successful Bidder(s), (b) approve designation of a Backup Bid(s) and Backup Bidder(s), if applicable, in accordance with the Bidding Procedures, and (c) authorize the assumption and assignment of the Assumed Contracts shall be held at (i) [insert time] (prevailing Eastern Time) on August 29, 2025, and may be adjourned or rescheduled on notice by the Debtor and, if the Stalking Horse Bidder is the Successful Bidder, only upon consent of the Stalking Horse Bidder. At the Sale Order Hearing, the Debtor will seek Court approval of the Successful Bid(s) and Backup Bid(s), if applicable. The Sale Order Hearing shall be a hearing on matters relating to the Transaction and there will be no further bidding at such hearing. In the event that a Successful Bidder cannot or refuses to consummate the Transaction, the Debtor may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new

Successful Bidder, and the Debtor shall be authorized, but not required, to consummate the Transaction with the Backup Bidder without further order of the Court.

28.     Any and all objections, if any, to any proposed Transaction and proposed adequate assurance with respect to the Stalking Horse Bidder must be filed no later than [insert time] (prevailing Eastern Time) on [insert date]. In the event the Successful Bidder is not the Stalking Horse Bidder, any objections regarding proposed adequate assurance must be filed no later than [insert time] (prevailing Eastern Time) on [insert date]. For avoidance of doubt, any objections to a Successful Bidder's proposed form of adequate assurance of future performance of any Assumed Contract will be resolved at the Sale Order Hearing.

29.     All valid liens or other interests against the Purchased Assets being sold will attach against the sale proceeds in the order of their existing priority. The net sale proceeds of the sale are subject to carve-outs for any Bid Protections afforded to the Stalking Horse Bidder. Additionally, the net sale proceeds (for the avoidance of doubt, after payment of any Bid Protections) shall be applied first to the outstanding balance of the DIP Loans (as that term is defined in the DIP Financing Motion and First Day Declaration) and the balance shall be held by the Debtor pending further order of this Court.

### (vii)   Miscellaneous

30.     Except as otherwise provided herein, any objection made pursuant to any of the provisions set forth in the Motion must: (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules, (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor, and (d) be filed with this Court via ECF.

31.     Any substantial contribution claims by any Potential Bidder are deemed waived, to the extent based on such Potential Bidder's submission of a bid in accordance with the Bidding Procedures.

32.     The Debtor is authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Order.

33.     The Debtor is authorized to make any non-material revisions to the exhibits and notices attached hereto without further Court approval.

34.     This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

35.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 9014, or otherwise, this Court, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

36.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, the Stalking Horse APA, and the implementation of this Order.

###

*Attorney Elizabeth A. Green is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of this order.*

# **<u>EXHIBIT 1</u>**

Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In re: | **CHAPTER 11** |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **CASE NO.: 6:25-bk-04156** |
| Debtor. | |

## BID PROCEDURES

In the exercise of its good faith reasonable business judgment, the above-captioned debtor and debtor in possession (the "**Debtor**") has executed an Asset Purchase Agreement (including all exhibits, schedules, and addenda thereto, the "**Stalking Horse APA**") with Centerwell Senior Primary Care (Vitality), Inc. (the "**Stalking Horse Bidder**"), pursuant to which the Stalking Horse Bidder proposes to (i) purchase, acquire, and take assignment and delivery of the Purchased Assets (as defined in the Stalking Horse APA) and (ii) assume certain Assumed Liabilities (as defined in the Stalking Horse APA), each as specifically enumerated in the Stalking Horse APA and subject to the terms and conditions set forth therein.

On [ ● ], 2025, the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**") entered an order [Docket No. [ ● ]] (the "**Bid Procedures Order**") approving, among other things, these bid procedures (the "**Bid Procedures**").

These Bid Procedures set forth the process by which the Debtor is authorized to conduct the auction (the "**Auction**") for the sale (the "**Transaction**") of the Purchased Assets.[2] Subject to the entry of the Sale Order, the Transaction may be implemented pursuant to the terms and conditions of the Stalking Horse APA, as the same may be amended pursuant to the terms thereof, subject to the receipt of higher or otherwise better Bids (as defined below) in accordance with these Bid Procedures. Pursuant to the Bid Procedures, the Debtor, in consultation with the Consultation Parties (defined below), will determine the highest or otherwise best offer for the sale of the Purchased Assets and, if applicable, other of the Debtor's assets. The Debtor, with approval of the Stalking Horse Bidder, and in consultation with the Consultation Parties (defined below) may modify these Bid Procedures.

**A.     Important Dates**

| Proposed Date | Milestone |
|---|---|
| | |

---

[1]  The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

[2]  Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or the Stalking Horse APA, as applicable.

1

| | |
|---|---|
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to serve Sale Notice |
| **The earlier of (a) twenty-one (21) days before the Sale Order Hearing date or (b) five (5) Business Days following entry of the Bidding Procedures Order** | Deadline to serve initial Contract Assumption and Assignment Notice |
| **Objection to the Transaction or Sale Order shall be filed and served no later than August 22, 2025 at 4:00 p.m. (prevailing Eastern Time) (collectively, the "<u>Sale Objection Deadline</u>").** | Sale Objection Deadline[3] |
| **[14 days from service of the initial Contract Assumption and Assignment Notice]** | Contract Objection Deadline |
| **August 20, 2025** | Bid Deadline |
| **August 21, 2025** | Deadline for Debtor to Designate Qualifying Bids |
| **August 22, 2025** | Deadline for Debtor to Designate Baseline Bid |
| **August 25, 2025** | Auction |
| **As soon as practicable (but no later than one (1) business day) after completion of the Auction** | File and serve Post-Auction Notice |
| **August 27, 2025** | Deadline for Supplemental Objections[4] |
| **August 29, 2025** | Sale Order Hearing |

---

[3] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

[4] Supplemental Objections are objections solely related to (i) adequate assurance of future performance if Successful Bidder is not the Stalking Horse Bidder or (ii) the conduct of the auction

**B.      Marketing Process**

**1.      Contact Parties**

The Debtor is conducting a marketing process.  In connection with the marketing process, the Debtor's proposed investment banker, Evercore Group, L.L.C. ("Evercore"), has developed a list of "Contact Parties" who will receive a copy of an "**Information Package**," which is comprised of: (i) marketing materials; (ii) a copy of these proposed Bid Procedures (and once entered by the Court, the Bid Procedures Order); and (iii) a copy of the Stalking Horse APA.  The list of Contact Parties encompasses parties whom the Debtor believes may be interested in pursuing a Transaction and whom the Debtor reasonably believes may have the financial resources to consummate such a transaction.

**2.      Access to Diligence Materials**

To receive due diligence information, including full access to the Debtor's electronic data room (the "**Data Room**") and additional non-public information regarding the Debtor (collectively, the "**Diligence Materials**"), any party interested in submitting a bid, other than the Stalking Horse Bidder (each a "**Potential Bidder**"), must deliver the following documents (collectively, the "**Preliminary Bid Documents**") by email to (i) proposed counsel to the Debtor: Baker & Hostetler LLP, 200 South Orange Avenue #2300, Orlando FL 32801, Attn: Elizabeth Green (egreen@bakerlaw.com), Andrew Layden (alayden@bakerlaw.com); and (ii) (a) counsel for The Villages of Lake-Sumter, Inc. (the "**DIP Lender**"): Trenam Law, 101 East Kennedy Boulevard, Suite 2700, Tampa, FL 33602 and (b) any official committee of unsecured creditors (the "**Committee**," together with the DIP Lender, the "**Consultation Parties**") (collectively, the "**Bid Recipients**"):

(i)      to the extent not already executed, an executed and signed confidentiality agreement on customary terms that are reasonably acceptable to the Debtor (an "**Acceptable Confidentiality Agreement**"); and

(ii)     evidence by the Potential Bidder of its financial capacity to close a proposed Transaction for the Purchased Assets or other of the Debtor's assets, the adequacy of which will be determined by the Debtor (with the assistance of its advisors) in consultation with the Consultation Parties.

The Debtor may decline to provide any Diligence Materials to Potential Bidders who, in the Debtor's business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith or has the capacity to consummate a Transaction for the Purchased Assets or any of the Debtor's assets.

For any Potential Bidder who is a competitor of the Debtor or is affiliated with any competitor of the Debtor, the Debtor reserves the right to withhold any Diligence Materials that the Debtor determines are business-sensitive or otherwise not appropriate for disclosure to such Potential Bidder at such time.

No due diligence will continue after the Bid Deadline (defined below).  The Debtor shall provide the Stalking Horse Bidder with access to all material due diligence materials, management presentations, on-site inspections, and other information provided to any Potential Bidder or Qualified Bidder that were not previously made available to the Stalking Horse Bidder concurrently with the provision of such information or materials to such Potential Bidder or Qualified Bidder (defined below), as applicable.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtor or its advisors regarding such Potential Bidder and its contemplated Transaction.

**3.    Auction Qualification Process**

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "**Bid**"), and each party submitting such a Bid (each, a "**Bidder**"), must be determined by the Debtor, in consultation with the Consultation Parties, to satisfy each of the following conditions:

(i)    <u>Bid Deadline.</u>  Except as set forth herein, the Debtor must receive a Bid in writing (email being sufficient), on or before **August 20, 2025, at 4:00 p.m. (prevailing Eastern Time)** (as may be amended in consultation with the Consultation Parties, the "**Bid Deadline**").  Bids must be sent to the Bid Recipients by the Bid Deadline to be considered.

(ii)    <u>Consultation Parties.</u>  For the avoidance of doubt, if a Consultation Party (or its affiliates, as applicable) is a Potential Bidder, then such party shall no longer be a Consultation Party unless and until the earlier of such Consultation Party's (i) representation in writing to the Debtor that it is no longer a Potential Bidder and does not intend to pursue a Bid in the future and (ii) failure to be designated as the Successful or Back-Up Bidder (each as defined below) following the completion of the Auction (if any); *provided* that if such party is a member of the Committee, then the Committee's counsel and the remaining members of the Committee other than the Potential Bidder shall continue to be Consultation Parties, but shall not provide any information they receive as Consultation Parties to the Potential Bidder.  Neither the Debtor nor its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtor's assets to any party that is not a Potential Bidder or a Consultation Party.

(iii)    <u>Form and Contents.</u>  All Bids shall be in the form of an irrevocable offer letter from a person or persons that the Debtor, in its reasonable discretion taking into account its fiduciary duties, deems financially able to consummate the Transaction, which letter states and includes:

(A)    <u>Marked Agreement.</u>  Each Bid must state that the Bidder irrevocably offers to purchase some or all of the Purchased Assets upon the terms and conditions set forth in a duly executed non-contingent and attached complete asset purchase agreement, which shall be in substantially the same form as the Stalking Horse APA, prepared and executed by the Bidder (an

4

electronic version in Word format and blacklined against the Stalking Horse APA), together with its exhibits and schedules, including terms relating to Purchase Price (as defined below) and the time of closing (the "**Proposed Agreement**");

(B)    Assets.  Each Bid must clearly specify the Debtor's assets that are included in the Bid (it being understood that while Bids for a portion or subset of the Purchased Assets may be permitted, in determining whether the Bid is a Qualified Bid, the Debtor may consider whether the combined consideration for the Debtor's assets (taking into account such Bid and other Bids) exceeds the Purchase Price of the Stalking Horse APA and/or other aspects of the Bid);

(C)    Purchase Price.  Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, and identify the liabilities to be assumed by the Bidder as part of the Transaction (the "**Purchase Price**");

(D)    Overbid.  Each Bid (i) must propose a Purchase Price equal to or greater than the sum of (a) the value of the Stalking Horse Bid, as determined by the Debtor in consultation with the Consultation Parties, *plus* (b) the amount of the Termination Fee[5] in the amount of $1,500,000.00 and the maximum amount of the Expense Reimbursement[6] in the amount of $1,500,000.00 for a total of $3,000,000.00 and (b) an initial overbid of at least $5,000,000 (the "**Minimum Initial Topping Bid**"); (ii) must be on terms that are not materially more burdensome than the terms of the Stalking Horse Bid; and (iii) must obligate the Bidder to pay, to the extent provided in the Stalking Horse APA, all liabilities and expenses that the Stalking Horse Bidder under the Stalking Horse APA has agreed to pay, including any Assumed Liabilities (as defined in the Stalking Horse APA);

(E)    Capacity to Consummate Transaction; Committed Financing.  Each Bid shall be accompanied by evidence of (i) the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand or (ii) sufficient, non-contingent financing and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations

---

[5]    "**Termination Fee**" means, as described in and subject to Section 12.11 of the Stalking Horse APA, the break-up fee payable to the Stalking Horse Bidder equal to $1,500,000.00.

[6]    "**Expense Reimbursement**" means, as described in and subject to Section 12.11 of the Stalking Horse APA, the amount of the Stalking Horse Bidder's reasonable documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred in connection with the Stalking Horse Bidder's evaluation, consideration and negotiation of a possible transaction with the Debtor and in connection with the transactions contemplated hereby, up to a maximum amount of $1,500,000.00.

under its Bid.  Such funding commitments or other financing acceptable to the Debtor must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals;

(F)     Operational Capabilities.  Each Bid shall be accompanied by evidence of the Bidder's ability to maintain Debtor's business as a going concern, including, without limitation, (i) the financial wherewithal to fund operations of the Debtor's business, (ii) experience operating similar businesses, (iii) possession of any authorizations or licenses to operate Debtor's businesses, (iv) implementation of an effective compliance and monitoring program for the business;

(G)     Contingencies; No Financing or Diligence Outs.  A Bid shall not be conditioned on a Bidder obtaining financing or any internal approval, or on the outcome or review of due diligence, which must be completed before the Bid Deadline, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions;

(H)     Due Diligence Representation and Warranty.  Each Bid must represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Debtor's Business and the Purchased Assets prior to submitting its Bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Purchased Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtor's business or the Purchased Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Proposed Agreement, if ultimately accepted and executed by the Debtor;

(I)     Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel the Debtor's advisors should contact regarding such Bid;

(J)     Authorization.  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors, or a comparable governing body, acceptable to the Debtor with respect to the submission of

its Bid and the consummation of the Transactions contemplated in such Bid; *provided*, however, if the Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Transaction by the equity holder(s) of such Bidder;

(K)     Regulatory or Third-Party Approval.  Each Bid must set forth any regulatory or third-party approval required for the Bidder to consummate the Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals, if any;

(L)     Expenses; Disclaimer to Reimbursement for Fees/Expenses.  Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, except as may be exclusively applicable to the Stalking Horse Bidder, no Potential Bidder will be permitted to request, or be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code;

(M)     Consummation.  Each Bid must include a statement or evidence reflecting (i) that the Bidder is prepared to consummate the Transaction upon entry of an order of the Bankruptcy Court approving the Transaction to the Successful Bidder (the "**Sale Order**"), (ii) that the Bidder has made or will make as soon as reasonably practicable all necessary filings, if any, with respect to any regulatory, antitrust and other laws and pay the fees associated therewith; and (iii) the Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals, and the proposed timing for the Bidder to undertake the actions required to obtain such approvals, if any;

(N)     Irrevocability.  Each Bid must include a statement that, in the event the Debtor selects the Bidder to serve as the Successful Bidder or the Back-Up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the Transaction;

(O)     Assumed Contracts and Leases.  Each Bid must identify any and all executory contracts of the Debtor and non-Debtor affiliates that the Qualified Bidder wishes to be assumed and assigned to it pursuant to a Transaction.  A Bid must specify that such Bidder will be responsible for any cure costs associated with such assumption on the same or better terms as the Stalking Horse Bid, and include a good faith estimate of such cure costs (which estimate shall be provided by the Debtor).  Further, a Bid must

7

provide evidence of adequate assurance of future performance under such executory contracts to be assumed and assigned in such a Transaction;

(P) <u>Employees</u>.  Each Bid must specify the treatment of the employees of the Debtor;

(Q) <u>Consent to Jurisdiction</u>.  Each Bidder must submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of Bids, the Auction, the construction and enforcement of these Bid Procedures, the Transaction documents, and the closing of the Transaction, as applicable; and

(R) <u>Other Information</u>.  Each Bid must contain such other information as may be reasonably requested by the Debtor.

(iv) <u>Combination of Bids</u>.  Each Bid shall be based on the Stalking Horse Bid and must exceed, either on its own terms or, in the case of a Bid for a portion or subset of the Debtor's assets, in combination with another Qualified Bid(s) (which combination shall be done by the Debtor, in consultation with the Consultation Parties), the Stalking Horse Bid in relation to the Purchased Assets.  For the avoidance of doubt, joint Bids submitted by multiple Bidders will not be considered.

(v) <u>Back-Up Bidder</u>.  Each Bidder must acknowledge that by submitting a Bid, the Bidder agrees to be a Back-Up Bidder in accordance with the terms of these Bid Procedures, should the Bid be so selected.

(vi) <u>As Is, Where Is</u>.  The sale of the Debtor's assets shall be on an "as is, where is" and "with all defects" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Stalking Horse APA.

(vii) <u>Good Faith Deposit</u>.  Each Qualified Bid must be accompanied by a cash deposit in the amount of 10% of the total Purchase Price to be held in an escrow account to be identified and established by the Debtor (the "**Deposit**").

(viii) <u>Binding Effect</u>.  By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction.

A Bid received before the Bid Deadline will be considered a "**Qualified Bid**" and each Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**" if the Debtor determines in consultation with the Consultation Parties that such Bid meets the requirements above for a Bid as set forth in these Bid Procedures.

The Debtor will notify each Qualified Bidder whether such party is a Qualified Bidder no later than one (1) day after the Bid Deadline(the "**Designation of Qualified Bid Deadline**") and

8

shall provide each Qualified Bidder, including the Stalking Horse Bidder, with a copy of the Baseline Bid no later than 4:00 p.m. (prevailing Eastern Time) on the day before the Auction commences.

Upon determination that any Bid is not a Qualified Bid, the Debtor shall notify such Bidder of such determination forthwith, but in any event not later than the Designation of Qualified Bid Deadline, and shall provide such Bidder with the basis for such determination. In the event that such Bid is determined not to be a Qualified Bid, the Debtor may allow the Bidder until the commencement of the Auction to modify its Bid to increase the Purchase Price or otherwise improve the terms of the Bid in order to comply with the requirements for Qualified Bids as set forth herein.

Between the date that the Debtor notifies a Bidder that it is a Qualified Bidder and the Auction date, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtor, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase its Purchase Price, or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bid Procedures. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times, and the Stalking Horse APA shall be a Qualified Bid.

Prior to 4:00 p.m. (prevailing Eastern Time) on the day before the Auction (the "**Baseline Bid Deadline**"), the Debtor and its advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtor's reasonable business judgment, the highest or otherwise best bid (the "**Baseline Bid**" and the Bidder making such Baseline Bid, the "**Baseline Bidder**"), and shall notify the Stalking Horse Bidder and all Qualifying Bidders of the Baseline Bid no later than the Baseline Bid Deadline.

4.      **Credit Bid**

Any Qualified Bidder who has a valid, undisputed, and perfected lien on any of the Debtor's assets (a "**Secured Creditor**") as of the Bid Deadline shall have the right to credit bid all or a portion of such Secured Creditor's allowed secured claims pursuant to section 363(k) of the Bankruptcy Code; *provided that* a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, the Expense Reimbursement and Termination Fee (collectively, the "Bid Protections" and all claims for which there are valid, perfected, and unavoidable liens on any of the Debtor's assets included in such bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment). All rights to credit bid shall be subject to the terms of the Interim DIP Order. For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any assets to be acquired but that do not constitute collateral securing such Secured Creditor's claim(s), if any, and for which it does not have a valid, undisputed and perfected liens as of the Bid Deadline.

9

### C. Auction

If one or more Qualified Bids are received by the Bid Deadline (other than the Stalking Horse Bid), the Debtor will conduct the Auction to determine the highest or otherwise best Qualified Bid or combination of Qualified Bids. In determining which Qualified Bid constitutes the highest or otherwise best Qualified Bid or combination of Qualified Bids, the Debtor's determination may take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia,* the following non-exhaustive factors: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any, and the excluded assets and/or executory contracts, if any; (iii) the ability of the Qualified Bidder to close the proposed Transaction and the conditions to closing, and the timing thereof; (iv) whether the Bid is a bulk bid or a partial bid for only some of the Debtor's assets; (v) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (vi) any purchase price adjustments; (vii) the impact of the proposed Transaction on any actual or potential litigation or on claims asserted against the Debtor's estate; (viii) the net after-tax consideration to be received by the Debtor's estate; (ix) the tax consequences of such Qualified Bid; (x) the regulatory approvals required to consummate the proposed Transaction; and (xi) the consent of the parties in interest and/or the cost and expense to the Debtor of resolving sale issues before Closing (collectively, the "**Bid Assessment Criteria**").

If no Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, then the Auction will not occur, the Stalking Horse Bid may be deemed the Successful Bid (as defined below), and, subject to the termination rights under the Stalking Horse APA, the Debtor will pursue entry of an order by the Bankruptcy Court authorizing the Transaction to the Stalking Horse Bidder as soon as practicable.

#### 1. Procedures for Auction

The Auction, if necessary, will commence on **August 25, 2025 at 10:00 a.m. (prevailing Eastern Time)** at (a) Baker & Hostetler, LLP, SunTrust Center, 200 S Orange Ave #2300, Orlando, FL 32801, (b) via in person or a virtual platform, such as Zoom, or (c) such other location, in each case as the Debtor designates (or at any other time and location as the Debtor may hereafter designate on proper notice). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any Bids at the Auction. The Stalking Horse Bidder and other Qualified Bidders participating at the Auction shall appear themselves or through a duly authorized representative who is present in person at the Auction. Only the Debtor, the Stalking Horse Bidder, any participating Qualified Bidders, and the Consultation Parties may attend the Auction.

#### 2. The Debtor Shall Conduct the Auction

The Debtor and its professionals shall direct and preside over the Auction and the Auction shall be transcribed or videotaped. The Debtor shall make such transcription or videotape available to the Stalking Horse Bidder and any other Qualified Bidders as soon as practicable following the conclusion of the Auction. Prior to the Baseline Bid Deadline, the Debtor, in consultation with the Consultation Parties, shall determine, in accordance with the requirements herein, the Baseline Bid, and shall promptly notify the Stalking Horse Bidder and all Qualified Bidders with Qualified Bids of such Baseline Bid.

Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid before the end of such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor in its reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction without the consent of the Debtor.

All Bids made during the Auction shall be made and received on the record. The Debtor shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid and all Overbids.

### 3.    Terms of Overbids

An "**Overbid**" is any Bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

### a.    Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $5,000,000 in cash, cash equivalents, or such other consideration that the Debtor, in consultation with the Consultation Parties, deem equivalent (the "**Minimum Overbid Increment**"). For the avoidance of doubt, in calculating the amount of any Overbid made by the Stalking Horse Bidder, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Bid Protections.

### b.    Overbid Procedures

Bidding at the auction will begin with the Baseline Bid, and each participating Qualified Bidder will have the opportunity to submit an Overbid in each round of bidding (each, an "**Overbid Round Deadline**").

After each Overbid Round Deadline, the Debtor shall determine whether an Overbid is higher or otherwise better than the Baseline Bid in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Debtor as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Debtor shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Debtor as the Prevailing Highest Bid, as well as the value attributable by the Debtor to such Prevailing Highest Bid.

### c.    Remaining Terms Are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, the Bid Deadline shall not apply and no additional Deposit shall be required beyond the Deposit previously submitted by a Qualified Bidder. Any Overbid must include, in addition to the amount and form of consideration of the Overbid, a description of

11

all changes (if any) requested by the Qualified Bidder to the applicable previously submitted Proposed Agreement, in connection therewith (including any changes to the designated assumed contracts and assumed liabilities).  Any Overbid must remain open and binding on the Bidder until and unless the Debtor names a Successful Bid and Back-Up Bid.

To the extent not previously provided (which shall be determined by the Debtor in consultation with the Consultation Parties) a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Bidder's ability to close the Transaction proposed by such Overbid; *provided, however*, this shall not apply to an Overbid by the Stalking Horse Bidder.

### d.    No Collusion; Good-Faith *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction (i) it has not engaged in any collusion with respect to the Transaction, bidding (including it has no agreement with any other Bidder or Qualified Bidder to control the price or other terms of any Bid) or any other Transaction and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder or Back-Up Bidder (if the Successful Bidder fails to consummate the proposed Transaction).

### e.    Back-Up Bidder

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party(ies) with the second highest or otherwise second best Qualified Bid (or combination of Qualified Bids) at the Auction, as determined by the Debtor, in the exercise of its business judgment and in consultation with the Consultation Parties, shall be designated by the Debtor as backup bidder (the "**Back-Up Bidder**").  The Back-Up Bidder shall be required to keep its initial Qualified Bid (or if the Back-Up Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "**Back-Up Bid**") open and irrevocable until two (2) business days after the closing of the sale of the Purchased Assets (the "**Outside Back-Up Date**"); *provided*, that if the Stalking Horse Bid is selected as the Back-Up Bid, it must remain irrevocable only for so long as is required under the Stalking Horse APA.  Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved Transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Back-Up Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the Transaction with the Back-Up Bidder without further order of the Bankruptcy Court.  In such case, except, solely for the Stalking Horse Bidder, to the extent otherwise provided in the Stalking Horse APA, the defaulting Successful Bidder's Deposit, if any, shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.  Except to the extent otherwise provided in the Stalking Horse APA with respect to the Stalking Horse Bidder, the Deposit, if any, of the Back-Up Bidder shall be held by the Debtor until two (2) business days after the closing of the Transaction with the Successful Bidder; *provided, however*, in the event the Successful Bidder does not consummate the Transaction as described above and the Debtor provides notice to the Back-Up Bidder that it is the new Successful Bidder, the Back-Up Bidder's Deposit shall be held until the closing of the Transaction with the Back-Up Bidder.  In the event the Back-Up Bidder fails to consummate an approved Transaction because

of a breach or failure to perform on the part of the Back-Up Bidder, the Back-Up Bidder's Deposit shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Back-Up Bidder. Notwithstanding anything to the contrary herein, for the avoidance of doubt, the Deposit submitted by the Stalking Horse Bidder pursuant to the Stalking Horse APA shall be treated, returned to the Stalking Horse Bidder, or forfeited to the Debtor's estate solely in accordance with the terms of the Stalking Horse APA.

4.     **Consent to Jurisdiction as Condition to Bidding**

All Qualified Bidders, shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Stalking Horse APA, the Auction, or the construction and enforcement of any Transaction documents.

5.     **Adjournment of the Auction**

The Debtor reserves the right, in its reasonable business judgment, to adjourn the Auction one (1) or more times to, among other things, (i) facilitate discussions between the Debtor and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require, demonstrating that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Transaction at the Prevailing Highest Bid.

6.     **Closing the Auction**

The Auction shall continue until there is only one (1) Qualified Bid or combination of Qualified Bids that the Debtor determine in its reasonable business judgment, after consultation with its financial and legal advisors and the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction (the "**Successful Bid**" and the Bidder submitting such Successful Bid, the "**Successful Bidder**"). In making this decision, the Debtor, in consultation with its financial and legal advisors and the Consultation Parties, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, in the Debtor's discretion, to submit an Overbid at the Auction to the then-existing Prevailing Highest Bid and the Successful Bidder has submitted fully executed Transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and Successful Bidder. The Debtor will file a notice identifying the Successful Bidder and Back-Up Bidder (the "**Post-Auction Notice**") as soon as reasonably practicable after closing the Auction, if any, and in any event not more than one (1) Business Day following the close of the Auction.

Bids submitted after the closing of the Auction shall not be considered.

**D.      Sale Hearing**

A hearing (the "**Sale Hearing**") shall be held on **August 29, 2025, at [ ● ] [a./p.]m. (prevailing Eastern Time)**, at which hearing the Debtor will seek approval of the Transaction with the Successful Bidder.

**E.      Return of Good Faith Deposits**

The Deposit of the Successful Bidder, if applicable, shall be applied to the Purchase Price of such Transaction at closing.  The Deposits from each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtor in its sole discretion and shall be returned (other than with respect to the Successful Bidder and the Back-Up Bidder) on or before the date that is two (2) business days after the Auction is completed.  Except as otherwise provided in the Stalking Horse APA with respect to the Stalking Horse Bidder, the Back-Up Bidder's Deposit shall be held by the Debtor and shall be returned on or before the date that is two (2) business days after the closing of the Transaction with the Successful Bidder.  In the event the Successful Bidder fails to close the Transaction and the Debtor opts to close on the Transaction set forth in the Back-Up Bid, the Back-Up Bidder's Deposit shall be applied to the Purchase Price of such Transaction at closing. In the event of a breach or failure to consummate a Transaction by the Successful Bidder or the Back-Up Bidder, as applicable, the defaulting Successful Bidder's Deposit or Back-Up Bidder's Deposit, as applicable, shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available remedies against the defaulting Successful Bidder or Back-Up Bidder, as applicable.

**F.      Reservation of Rights/Fiduciary Duties**

Nothing in these Bidding Procedures shall require the Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtor determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary duties under applicable law. The Stalking Horse Bidder reserves all rights under the Stalking Horse APA with respect to any action taken by the Debtor with respect to these Bidding Procedures, or otherwise.

14

# **EXHIBIT 2**

Auction and Sale Order Hearing Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| In Re: | Case No.: 6:25-bk-04156 |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | Chapter 11 |
| Debtor. | |

## NOTICE OF PROPOSED SALE OF SUBSTANTIALLY ALL
## OF THE DEBTOR'S ASSETS, BIDDING
## PROCEDURES, AUCTION, AND SALE ORDER HEARING

**PLEASE TAKE NOTICE** that the Debtor, by and through its undersigned counsel, sought approval from the United States Bankruptcy Court for the Middle District of Florida (the "Court") to effectuate the sale of substantially all of the Debtor's assets in the Debtor's *Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. X] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on [insert date], the Court entered the *Order (A) Approving Bidding Procedures for Sale of Substantially all of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Approving Stalking Horse Bid Protection, (C) Scheduling Auction for and Hearing to Approve Sale of Substantially all of the Debtor's Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* [Doc. No. X] (the "Bidding Procedures Order").[2] The Bidding Procedures Order approved the bidding procedures (the "Bidding Procedures") attached as **Exhibit 1** to the Bidding Procedures Order. The Bidding Procedures set the key dates and times, bid qualification requirements, and the competitive bidding process related to the sale of the Purchased Assets and assumption and assignment of the Executory Contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, all related exhibits, including the Bidding Procedures, and any other filings related to the foregoing are available for free on the website of Debtor's notice agent, Stretto, Inc., at [insert website].

---

[1] The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or Bidding Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Motion, the Debtor seeks to sell substantially all of its assets (the "Purchased Assets") to the Stalking Horse Bidder or any other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (including claims based on theories of successor liability or similar doctrines) pursuant to 11 U.S.C. § 363(f).

**PLEASE TAKE FURTHER NOTICE** that the deadline by which all Qualified Bids for the Purchased Assets must be actually received by the parties specified in the Bidding Procedures is [insert date and time] (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, if one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Bid Deadline, an auction (the "Auction") to sell the Purchased Assets will take place at [insert time] (prevailing Eastern Time) on [insert date] at the offices of: (a) Baker & Hostetler LLP, 200 South Orange Avenue #2300, Orlando FL 32801, (b) via in person or a virtual platform, such as Zoom or GoToMeeting, or (c) such other location, in each case as the Debtor designates and shall be timely communicated to all persons entitled to attend the Auction. The Debtor may cancel the Auction pursuant to the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtor does not timely receive more than one Qualified Bid, the Debtor will not conduct the Auction and, instead, will (a) file a notice with the Court identifying the Stalking Horse APA as the Successful Bid for the Purchased Assets and (b) promptly seek the Court's approval of the sale of the Purchased Assets to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances, and other interests (including claims based on theories of successor liability or similar doctrines) pursuant to 11 U.S.C.§ 363(f).

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Purchased Assets to the Successful Bidder (the "Sale Order Hearing") before the United States Bankruptcy Court for the Middle District of Florida, Courtroom X, 400 W. Washington Street, Suite 5100, Orlando, FL 32801 on [insert time and date] (prevailing Eastern Time), or at such time thereafter as counsel may be heard or at such other time as the Court may determine. The Sale Order Hearing may be adjourned from time to time without further notice to creditors or parties in interest by filing a notice on the Court's docket for the Chapter 11 Case or the making of an announcement at the Sale Order Hearing.

**PLEASE TAKE FURTHER NOTICE** that objections to the Sale, including to the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and other interests (including claims based on theories of successor liability or similar doctrines), if any, (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection, (iv) be filed with the Court no later than [insert time and date] (prevailing Eastern Time) by the Court and (v) served upon the Debtor, the DIP Lender, the Stalking Horse Bidder, and the Committee.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER**

11 CASE MAY RESULT IN THE REJECTION OF YOUR BID FOR THE PURCHASED ASSETS.

PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE SALE(S) AND FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE PURCHASED ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS (INCLUDING CLAIMS BASED ON THEORIES OF SUCCESSOR LIABILITY OR SIMILAR DOCTRINES) THAT SUCH PARTY OR ENTITY MAY HAVE AGAINST THE DEBTOR OR THE PURCHASED ASSETS.

Dated: [●], 2025

Respectfully submitted:

**BAKER & HOSTETLER LLP**

Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Andrew V. Layden, Esq.
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and Debtor in Possession*

**<u>EXHIBIT 3</u>**

Patient Notice

# INSERT LETTERHEAD

[ADDRESS]

TO WHOM IT MAY CONCERN:

You are receiving this letter and enclosed legal notice because you, a loved one, or someone you represent, was or is a patient at one of the medical facilities (the "Facilities") operated by the Villages Health System, LLC.

As discussed in the attached legal notice, the operator of the Facilities has filed a voluntary bankruptcy petition to preserve its assets and pursue a going concern sale of the Facilities. The Facilities are staying open and continuing operations through this process. Anyone who is a current patient at one of the Facilities will continue to receive the same care and services they did before the bankruptcy.

The proposed sale(s) of the Facilities to an approved buyer(s) will be free and clear of all liens, claims, encumbrances, or interests that you or someone you represent may have against the Facilities, the owners, or operators of the Facilities. Furthermore, the operator of the Facilities proposes to assign to the approved buyer(s) all of its contracts with current patients subject to the terms of the attached notice. The approved buyer(s) will continue to provide services after the closing of an approved sale to current patients at the Facilities under any contract assumed by such buyer(s).

If you have any objection to the proposed sale of the Facilities, or the assumption and assignment of your contract to a new owner and operator, you must raise such objections pursuant to the procedures set forth in the attached legal notice by [insert date and time] (ET) or you will be deemed to have consented to the sale of the Facilities free and clear of all liens, claims, encumbrances, or interests (including claims based on theories of successor liability or similar doctrines) that you or someone you represent may have. If you have no objection, then you do not need to take any action. You may wish to consult with an attorney regarding these matters.

Again, the purpose of the bankruptcy cases and the proposed transaction(s) is to ensure that the Facilities continue to provide quality care and services to all residents and patients. If you have any questions regarding these matters, you may send an email to [insert email] or call 855.469.1264 (Toll-Free) and 714.586.5713 (International).

_____
Chief Restructuring Officer

# **EXHIBIT 4**

Contract Assumption and Assignment Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| In Re: | **Case No.: 6:25-bk-04156** |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| Debtor. | |

### NOTICE OF EXECUTORY CONTRACTS THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE TRANSACTION

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES MAY BE A COUNTERPARTY TO ONE OR MORE EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES WITH THE DEBTOR.[2]**
>
> **PARTIES RECEIVING THIS NOTICE SHOULD (I) READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTION DESCRIBED HEREIN AND (II) LOCATE THEIR NAME AND CONTRACT(S) AND/OR LEASE(S) ON SCHEDULE I HERETO**

 **PLEASE TAKE NOTICE** that the Debtor, by and through its undersigned counsel, sought approval from the United States Bankruptcy Court for the Middle District of Florida (the "Court") to effectuate the sale of substantially all of the Debtor's assets in the Debtor's *Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. X] (the "Motion"), including, among other things, establishing certain procedures relating to the Debtor's assumption and assignment of executory contracts and unexpired leases in connection therewith (collectively, the "Assumed Contracts").

 **PLEASE TAKE FURTHER NOTICE** that on [insert date], 2025, the United States Bankruptcy Court for the Middle District of Florida (the "Court") entered its *Order (A) Approving Bidding Procedures for Sale of Substantially all of the Debtor's Assets Free and Clear of all Liens,*

---

[1] The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

[2] This Notice is being sent to counterparties to potential executory contracts and unexpired leases. This Notice is not an admission by the Debtor that such contract or lease is executory or unexpired.

*Claims, Encumbrances, and Interests, (B) Approving Stalking Horse Bid Protection, (C) Scheduling Auction for and Hearing to Approve Sale of Substantially all of the Debtor's Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* [Doc. No. X] (the "Bidding Procedures Order").[3] The Bidding Procedures Order approved the bidding procedures (the "Bidding Procedures") attached as Exhibit 1 to the Bidding Procedures Order. The Bidding Procedures set the key dates and times related to the sale of the Purchased Assets and assumption and assignment of the executory contracts and unexpired leases.

PLEASE TAKE FURTHER NOTICE that copies of the Bidding Procedures Order, all related exhibits, including the Bidding Procedures, and any other filings related to the foregoing are available for free on the website of Debtor's notice agent, Stretto, Inc., at [insert website].

PLEASE TAKE FURTHER NOTICE that, pursuant to the Motion, the Debtor seeks to sell substantially all of its assets (the "Purchased Assets") to the Stalking Horse Bidder or any other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (including claims based on theories of successor liability or similar doctrines) pursuant to 11 U.S.C. § 363(f).

PLEASE TAKE FURTHER NOTICE that, pursuant to the terms of the Bidding Procedures Order, if one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Bid Deadline, an auction (the "Auction") to sell the Purchased Assets will take place at [insert time] (prevailing Eastern Time) on [insert date] at the offices of: (a) Baker & Hostetler LLP, 200 South Orange Avenue #2300, Orlando FL 32801, (b) via in person or a virtual platform, such as Zoom or GoToMeeting, or (c) such other location, in each case as the Debtor designates and shall be timely communicated to all persons entitled to attend the Auction. The Debtor may cancel the Auction pursuant to the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that, in accordance with the proposed Bid Procedures Order, the Debtor may, but is not required to, assume and assign the executory contract(s) and/or unexpired lease(s) to which you may be a counterparty to the Stalking Horse Bidder or such other party that is deemed the Successful Bidder at the conclusion of the Auction. As soon as reasonably practicable after closing the Auction, if any, and in any event not more than twenty-four (24) hours after closing the Auction, the Debtors shall file and serve a notice identifying the Successful Bidder and Back-Up Bidder, if any (the "Post-Auction Notice"). The Post-Auction Notice will also be available online for free on the website of Debtor's notice agent, Stretto, Inc., at [insert website].

PLEASE TAKE FURTHER NOTICE that, if the Debtor does not timely receive more than one Qualified Bid, the Debtor will not conduct the Auction and, instead, will (a) file a notice with the Court identifying the Stalking Horse APA as the Successful Bid for the Purchased Assets and (b) promptly seek the Court's approval of the sale of the Purchased Assets to the Stalking

---

[3] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or Bidding Procedures Order, as applicable.

Horse Bidder free and clear of all liens, claims, encumbrances, and other interests to the fullest extent permitted under 11 U.S.C.§ 363(f) and other applicable law.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Purchased Assets to the Successful Bidder (the "Sale Order Hearing") before the United States Bankruptcy Court for the Middle District of Florida, on [insert date and time], or at such time thereafter as counsel may be heard or at such other time as the Court may determine. The Sale Order Hearing may be adjourned from time to time without further notice to creditors or parties in interest by filing a notice on the Court's docket for this Chapter 11 Case or the making of an announcement at the Sale Order Hearing.

**PLEASE TAKE FURTHER NOTICE** that objections to the Sale, if any, (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection, and (iv) be filed with the Court no later than [insert date and time] (prevailing Eastern Time) by the Court.

**PLEASE TAKE FURTHER NOTICE** that the Debtor has conducted a review of its books and records and has determined the cure amount for unpaid monetary obligations with respect to each contract or lease, which amount is set forth in the right-hand column on **Schedule 1** (the "Cure Amount"). If you object to (i) the potential assumption and assignment of any Assumed Contract to the Stalking Horse Bidder, including the ability of the Stalking Horse Bidder to provide adequate assurance of future performance, and/or (ii) the proposed cure amount to be paid in connection with the assumption and assignment of any Assigned Contract, **you must file an objection with the Bankruptcy Court no later than [ ● ], 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Contract Objection Deadline") and serve such objection on the following parties: (i) proposed counsel to the Debtors: Baker & Hostetler LLP, 200 South Orange Avenue #2300, Orlando FL 32801, Attn: Elizabeth Green (egreen@bakerlaw.com), Andrew Layden (alayden@bakerlaw.com); (ii) counsel for the DIP Lender [ ● ]; (iii) counsel to any statutory committee appointed in these cases; and (iv) the United States Trustee for the Middle District of Florida, [ ● ] (the "Objection Notice Parties") and counsel to the Stalking Horse Bidder, (x) 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: Caroline Reckler, Esq. (email: caroline.reckler@lw.com) and (y) 1271 Avenue of the Americas, New York, NY 10020, Attn: Andrew Sorkin, Esq. (email: andrew.sorkin@lw.com) (the "Stalking Horse Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object (a "Supplemental Objection") solely to (i) the identity of a Successful Bidder and/or (ii) the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contract will be **[ ● ], 2025 at 4:00 p.m. (prevailing Eastern Time) or such other date and time subsequent to the Auction as may be established by the Bankruptcy Court in the Bid Procedures Order or otherwise** (the "Supplemental Objection Deadline"). Any Supplemental Objection must be served on the Objection Notice Parties and Stalking Horse Notice Parties so it is actually received by the Supplemental Objection Deadline and filed with the Clerk of the Bankruptcy Court for the Middle District of Florida, [ ● ]. Any party that fails to timely file a Supplemental Objection will be forever barred from objecting to the identity of the Successful Bidder or to the assignment of that party's executory contract or unexpired lease to the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that if no objection to the Cure Amount or the assignment of your Executory Contract(s) to the Successful Bidder is filed by the Contract Assumption and Assignment Notice Deadline or Supplemental Objection Deadline, as applicable, **you will be (i) forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to your contract(s) or lease(s), and the Debtor and the Stalking Horse Bidder or the Successful Bidder (as applicable) shall be entitled to rely solely upon the Cure Amount, (ii) deemed to have consented to the assumption or assumption and assignment, and (iii) forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such contract(s) and/or lease(s) or that there is any objection or defense to the assumption and assignment of such contract(s) and/or lease(s). For the avoidance of doubt, the Debtor is not required to assume and assign any of the Executory Contract(s) listed in** <u>**Schedule I**</u>**.**

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASE MAY RESULT IN THE REJECTION OF YOUR BID FOR THE PURCHASED ASSETS.**

**PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE SALE(S) AND FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE PURCHASED ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS THAT SUCH PARTY OR ENTITY MAY HAVE AGAINST THE DEBTOR OR THE PURCHASED ASSETS.**

Dated: [●], 2025

Respectfully submitted:

**BAKER & HOSTETLER LLP**

Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Andrew V. Layden, Esq.
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and
Debtor in Possession*

## **<u>SCHEDULE 1</u>**

Potential Assumed Contracts

[TO BE FILED]

## **EXHIBIT 5**

Post-Auction Notice

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In Re: | **Case No.: 6:25-bk-04156** |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| Debtor. | |

## NOTICE OF SUCCESSFUL BID AND BACKUP BID

**PLEASE TAKE NOTICE** that, pursuant to the *Order (A) Approving Bidding Procedures for Sale of Substantially all of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Approving Stalking Horse Bid Protection, (C) Scheduling Auction for and Hearing to Approve Sale of Substantially all of the Debtor's Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* [Doc. No. X] (the "Bidding Procedures Order"), the United States Bankruptcy Court for the Middle District of Florida approved, among other things, the implementation of the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** in connection with the disposition of the Purchased Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, the deadline for submitting a Qualified Bid for the Purchased Assets was [insert date and time] (prevailing Eastern time) (the "Bid Deadline") and in the event that the Debtor timely received one or more Qualified Bids, in addition to the Qualified Bid submitted by the Stalking Horse Bidder, the Debtor would conduct the Auction on [insert date and time] (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that on [insert date], the Debtor conducted the Auction in accordance with the Bidding Procedures. At the Auction, the Debtor determined that the highest and/or best offer was submitted by [●] (the "Successful Bidder" and the Successful Bidder's winning bid, the "Successful Bid") and the second highest and/or best offer was submitted by [●] (the "Backup Bidder," and the Backup Bidder's bid, the "Backup Bid"). Attached hereto as **Exhibit A** is a copy of the final, fully-executed contract for the sale and operations transfer (collectively, the "Transaction Documents", and the transaction contemplated thereby the "Transaction") between the Debtor and the Successful Bidder, containing the terms of the Successful Bid.

**PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Bidding Procedures Order, the Debtor will seek final approval of the Transaction to the Successful Bidder pursuant to

---

[1] The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the Bidding Procedures Order.

the Transaction Documents, during the **Sale Order Hearing on [insert time and date]** before the United States Bankruptcy Court for the Middle District of Florida, in Courtroom X, 400 W. Washington Street, Suite 5100, Orlando, FL 32801. The Sale Order Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court, or by the Debtor in consultation with the Successful Bidder but without further notice to creditors and parties in interest other than by announcement by Debtor of the adjourned date at the Sale Order Hearing.

      **PLEASE TAKE FURTHER NOTICE** that if the Transaction is not consummated with the Successful Bidder pursuant to the Successful Bid, the Debtor may designate the Backup Bidder as the new Successful Bidder and such Backup Bidder's Backup Bid as the new Successful Bid, and the Debtor will be authorized to consummate the Transaction with the Backup Bidder without further order of the Court.

      **PLEASE TAKE FURTHER NOTICE** that the deadline to object to the approval of the Transaction and the sale of the Purchase Assets to the Successful Bidder free and clear is [insert date and time] **(prevailing Eastern time)**, and any objection must comply with the Bidding Procedures Order.

      **PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, the Transaction Documents, and all other documents filed with the Court may be obtained on the website of the Debtor's notice agent, Stretto, Inc. website: [insert website].

      **PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE SALE(S) AND FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE PURCHASED ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS THAT SUCH PARTY OR ENTITY MAY HAVE AGAINST THE DEBTOR OR THE PURCHASED ASSETS.**

Dated: [●], 2025

                  Respectfully submitted:


                  **BAKER & HOSTETLER LLP**

                  Elizabeth A. Green, Esq.
                  FL Bar No.: 0600547
                  Email: egreen@bakerlaw.com
                  Andrew V. Layden, Esq.
                  FL Bar No.: 86070
                  E-mail: alayden@bakerlaw.com
                  200 South Orange Avenue

Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 540-7920
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and*
*Debtor in Possession*

## **<u>EXHIBIT 6</u>**

Stalking Horse APA

*Execution*

**ASSET PURCHASE AGREEMENT**

**by and among**

**CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.,**

**HUMANA INC., solely for the purposes of <u>Section 13.18</u>,**

**and**

**THE VILLAGES HEALTH SYSTEM, LLC**

**July 3, 2025**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINITIONS ...................................................................................................2

    1.01    Definitions...........................................................................................................2
    1.02    Other Defined Terms ........................................................................................13

ARTICLE II PURCHASE AND SALE .............................................................................15

    2.01    Purchase and Sale of Assets.............................................................................15
    2.02    Excluded Assets ...............................................................................................17
    2.03    Assumed Liabilities .........................................................................................18
    2.04    Excluded Liabilities .........................................................................................18
    2.05    Prorated Expenses ............................................................................................18
    2.06    Assignment and Assumption of Certain Contracts...........................................19
    2.07    Consents to Certain Assignments .....................................................................21
    2.08    Designations of Assets and Liabilities..............................................................22
    2.09    Wrong Pockets .................................................................................................22

ARTICLE III PURCHASE PRICE ....................................................................................23

    3.01    Purchase Price ..................................................................................................23
    3.02    Allocation.........................................................................................................23
    3.03    Withholding .....................................................................................................24
    3.04    Deposit .............................................................................................................24

ARTICLE IV THE CLOSING ...........................................................................................25

    4.01    The Closing......................................................................................................25
    4.02    Closing Deliveries............................................................................................25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................26

    5.01    Organization and Power....................................................................................26
    5.02    Authorization; No Breach; Valid and Binding Agreement.................................26
    5.03    Financial Statements .........................................................................................27
    5.04    Absence of Certain Developments; Undisclosed Liabilities ..............................28
    5.05    Title to Assets; Sufficiency...............................................................................28
    5.06    Real Property ....................................................................................................29
    5.07    Tax Matters ......................................................................................................30
    5.08    Contracts and Commitments.............................................................................31
    5.09    Material Payors; Material Referral Sources; Material Vendors .........................34
    5.10    Intellectual Property; Information Technology ..................................................35
    5.11    Litigation; Orders.............................................................................................36
    5.12    Governmental Consents, etc. ............................................................................36
    5.13    Employee Benefit Plans....................................................................................36

5.14     Insurance ...................................................................................................38
5.15     Compliance with Laws ...............................................................................38
5.16     Environmental Matters ...............................................................................39
5.17     Related Party Transactions .........................................................................40
5.18     Employees...................................................................................................40
5.19     Brokerage ...................................................................................................41
5.20     Health Care Compliance .............................................................................42
5.21     No Other Representations or Warranties .....................................................46

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ...............................46

6.01     Organization and Power..............................................................................46
6.02     Authorization ..............................................................................................47
6.03     No Violation.................................................................................................47
6.04     Governmental Consents, etc. ......................................................................47
6.05     Brokerage ...................................................................................................47
6.06     Buyer Financial Resources .........................................................................47
6.07     No Reliance .................................................................................................48
6.08     No Other Representation..............................................................................48

ARTICLE VII PRE-CLOSING COVENANTS OF THE SELLER ......................................48

7.01     Conduct of the Business..............................................................................48
7.02     Access to Books and Records .....................................................................51
7.03     Credentialing Applications; Qualification ..................................................51
7.04     Tail Insurance..............................................................................................51
7.05     Transition Services Agreement ...................................................................52

ARTICLE VIII TAX MATTERS ...................................................................................52

8.01     Cooperation.................................................................................................52
8.02     Apportionment of Property Taxes. ..............................................................52
8.03     Transfer Taxes. ...........................................................................................53
8.04     Tax Audits...................................................................................................53
8.05     Tax Clearance Certificate. ..........................................................................53

ARTICLE IX CONDITIONS TO CLOSING ...................................................................53

9.01     Conditions to Obligations of Each Party ....................................................53
9.02     Conditions to Buyer's Obligations..............................................................54
9.03     Conditions to Seller's Obligations..............................................................55

ARTICLE X SURVIVAL...............................................................................................55

10.01    Survival ......................................................................................................55

ARTICLE XI TERMINATION ................................................................................................56

    11.01  Termination ...............................................................................................56
    11.02  Effect of Termination ................................................................................58

ARTICLE XII ADDITIONAL COVENANTS ........................................................................58

    12.01  Commercially Reasonable Efforts; Cooperation .....................................58
    12.02  Approvals ..................................................................................................58
    12.03  Payor Arrangements..................................................................................59
    12.04  Books and Records ...................................................................................59
    12.05  Pending Audits and Appeals Pre-Closing Access to Information.. .........59
    12.06  Confidentiality .........................................................................................60
    12.07  Submission for Bankruptcy Court Approval ............................................60
    12.08  Overbid Procedures; Adequate Assurance ..............................................62
    12.09  Employee Matters ....................................................................................63
    12.10  Termination Payment ...............................................................................68
    12.11  Further Assurances...................................................................................68

ARTICLE XIII MISCELLANEOUS ......................................................................................68

    13.01  Press Releases and Communications .......................................................68
    13.02  Expenses ..................................................................................................69
    13.03  Notices .....................................................................................................69
    13.04  Assignment ..............................................................................................70
    13.05  Severability ..............................................................................................70
    13.06  References; Interpretation .........................................................................70
    13.07  Construction .............................................................................................71
    13.08  Amendment and Waiver ...........................................................................71
    13.09  Complete Agreement ................................................................................71
    13.10  Third-Party Beneficiaries ........................................................................71
    13.11  Waiver of Trial by Jury ............................................................................72
    13.12  Delivery by Email ....................................................................................72
    13.13  Counterparts; Electronic Delivery ...........................................................72
    13.14  Governing Law .........................................................................................72
    13.15  Jurisdiction ...............................................................................................72
    13.16  Specific Performance ...............................................................................73
    13.17  No Recourse .............................................................................................73
    13.18  Parent Guarantee .....................................................................................74
    13.19  Fiduciary Obligations...............................................................................75

## INDEX OF EXHIBITS

Exhibit A          Amended and Restated Leases:
                   1.  Amended and Restated Lease (Primary Care)
                   2.  Amended and Restated Lease (Specialty Care)
                   3.  Form of Amendment to Lease (Corp/Administrative)
Exhibit B          Form of Amendment to the Facilities Management Agreement
Exhibit C          Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit D          Form of Bidding Procedures Order
Exhibit E          Form of Services Agreement
Exhibit F          Form of Non-Competition Agreement
Exhibit G          Form of Transition Services Agreement
Exhibit H          Form of Escrow Agreement
Exhibit I          Form of Employment Agreement

## INDEX OF SCHEDULES

Schedule A          Non-Competition Agreement Parties

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 3, 2025, is made by and among CenterWell Senior Primary Care (Vitality), Inc., a Florida corporation ("Buyer"), Humana Inc., a Delaware corporation, solely for the purposes of Section 13.18 ("Parent"), and The Villages Health System, LLC, a Florida limited liability company (the "Seller"). Buyer and the Seller shall each be referred to herein from time to time as a "Party" and collectively as the "Parties." Capitalized terms used and not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS:

WHEREAS, the Seller commenced a voluntary case under the Bankruptcy Code in the Bankruptcy Court on July 3, 2025 (the "Petition Date");

WHEREAS, the Seller is engaged in the Business;

WHEREAS, Buyer desires to purchase from the Seller, directly and/or, in the Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, and the Seller desires to sell to Buyer and/or such Buyer Designees, the Purchased Assets, and Buyer desires to assume from the Seller, directly and/or, in Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, the Assumed Liabilities, in each case pursuant to the terms and subject to the conditions set forth herein (the "Acquisition");

WHEREAS, as a condition and inducement of Buyer entering into this Agreement, each Person set forth on Schedule A hereto, concurrently with the execution and delivery of this Agreement, is entering into a Non-Competition Agreement with Buyer, each of which shall become effective as of and contingent upon the Closing of the Transactions;

WHEREAS, the Seller and Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Seller to Buyer shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the Bankruptcy Code; and

WHEREAS, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding Buyer as the prevailing bidder at the Auction, the Seller shall sell and transfer to Buyer, and Buyer shall purchase and acquire from the Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from the Seller the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

1.01     <u>Definitions</u>. For purposes hereof, the following terms when used herein shall have the respective meanings set forth below:

"<u>Accrued PTO</u>" has the meaning set forth in <u>Section 12.09(i)</u>.

"<u>Affiliate</u>" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such particular Person, where "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or ownership interests, by contract or otherwise.

"<u>Affiliate Contract</u>" means any Contract between (a) Seller, on the one hand, and (b) (i) TVHHC or any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC or any of their Affiliates (other than Seller) or (iii) any director, manager or officer of any of the Persons in <u>clause (b)(i)</u> or <u>(ii)</u>, on the other hand.

"<u>Alternative Transaction</u>" means (a) a sale of all or a material portion of the Purchased Assets in one transaction or a series of transactions with a Person or Persons other than the Buyer or an Affiliate of the Buyer (including, for the avoidance of doubt, a Successful Bidder other than the Buyer) and/or (b) a stand-alone reorganization, in which a Person or Persons other than the Buyer or an Affiliate of the Buyer, including any creditors or stakeholders receive all or a material portion of the equity in the Seller or all or a material portion of the Purchased Assets; provided that, for the avoidance of doubt, any liquidation (other than as described in the foregoing) or wind-down of the Seller shall not constitute an Alternative Transaction.

"<u>Amended and Restated Leases</u>" means the amended and restated leases relating to the Leased Realty in substantially the form attached hereto as <u>Exhibit A</u>.

"<u>Amendment to the Facilities Management Agreement</u>" means the amendment to the Facilities Management Agreement between the Seller and TVHHC dated August 1, 2022, in substantially the form attached hereto as <u>Exhibit B</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 12.08(a)</u>.

"<u>Avoidance Actions</u>" means all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code.

"<u>Backup Bidder</u>" has the meaning specified in <u>Section 12.08(c)</u>.

"<u>Backup Termination Date</u>" means the first to occur of (a) 30 days after entry of an order of the Bankruptcy Court approving an Alternative Transaction with a Successful Bidder following the conclusion of the Auction in accordance with the Bidding Procedures Order, (b) consummation

of an Alternative Transaction, or (c) Buyer's receipt of notice from the Seller of the release of Buyer's obligations as Backup Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with an Alternative Transaction.

"Bankruptcy Case" means the voluntary case under the Bankruptcy Code of The Villages Health System, LLC, to be filed in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the Bankruptcy Court for the Middle District of Florida.

"Bidding Procedures Motion" means the Bidding Procedures Motion filed in the Bankruptcy Court by the Seller on July 3, 2025, in form and substance reasonably satisfactory to Buyer, seeking entry of the Bidding Procedures Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit D, approving, among other matters (a) the proposed bidding procedures attached thereto and (b) allowance and payment of the Termination Fee and the Expense Reimbursement in accordance with Section 12.10.

"Bill of Sale, Assignment and Assumption Agreement" means one or more Bill of Sale, Assignment and Assumption Agreements to be executed and delivered by Buyer and/or, if applicable, one or more Buyer Designees, and the Seller at the Closing, substantially in the form of Exhibit C.

"Business" means the operation of Senior-Focused Primary Care Centers located in The Villages in Florida as historically conducted by Seller.

"Business Contract" means any (i) Contract with Third Party Payors and (ii) all other Contracts (excluding the Leases) to which Seller is a party.

"Business Data" means all business information and all Personal Data (whether of employees, contractors, consultants, customers, consumers, or other Persons) that is collected by or on behalf of the Seller.

"Business Day" means a day that is neither a Saturday or Sunday, nor any other day on which banking institutions in New York, New York or The Villages, Florida are authorized or obligated by Law to close.

"Buyer Designee" means one or more Affiliates of Buyer designated by Buyer in writing to the Seller.

"Buyer Fundamental Representations" means the representations and warranties of Buyer set forth in Sections 6.01, 6.02 and 6.05.

"Buyer Material Adverse Effect" means any Effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the ability of Buyer

to carry out timely, or that has had or would prevent or impair Buyer from consummating the Transactions on or prior to the Outside Date.

"<u>Cash</u>" means all cash and cash equivalents and marketable securities, if any, held by the Seller, including checks and drafts received by the Seller or deposited for the account of the Seller.

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"<u>Clinician</u>" means each Physician and each licensed physician assistant, podiatrist, advanced practice registered nurse, licensed clinical social worker, registered dietitian nutritionist, licensed mental health counselor/licensed practical clinician, licensed marriage and family therapist, audiologist, or other licensed healthcare professional employed or engaged by, or contracted with Seller, in each case licensed or registered in the State of Florida.

"<u>CMS</u>" means the Centers for Medicare and Medicaid Services, or any successor Governmental Entity exercising similar authority.

"<u>COBRA</u>" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Company Operating Agreement</u>" means that certain Amended and Restated Operating Agreement of the Seller, as amended.

"<u>Company Plan</u>" means (a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), (b) a share bonus, share purchase, share option, restricted shares, share appreciation right or similar equity-based plan or (c) any other employment, consulting, severance, deferred-compensation, pension, retirement, welfare-benefit, health, dental, disability, life insurance, bonus, incentive or other compensatory, employee benefit plan, policy, program, agreement or arrangement sponsored, maintained, contributed to, or required to be contributed to by Seller or pursuant to which Seller would reasonably be expected to have any Liability, contingent or otherwise, to any current or former employee, officer, director or individual contractor of the Seller.

"<u>Consent</u>" means any consent, approval, clearance, authorization, waiver, permit, filing, notice, report, registration or waiting period expiration or termination required to be obtained from, filed with or delivered to any Person in connection with the consummation of the Transactions.

"<u>Contract</u>" means any agreement, contract, purchase order, arrangement, deed, mortgage, lease, sublease, subcontract, note, loan agreement, guaranty, pledge, bond, evidence of indebtedness, security agreement, license, binding agreement, instrument, commitment, undertaking, indenture or other similar instrument or obligation to which the party in question is a party, whether oral or written. "Contract" shall not include any Company Plan.

"<u>Devices</u>" means cellphones, tablets, iPads, laptop and desktop computers, printers, fax machines, copy machines, and any other electronic device that stores or processes Personal Information in connection with the Business or are otherwise used in connection with the Business

by the Seller's personnel, and for the avoidance of doubt excluding personal devices owned by any Seller personnel.

"DIP Facility" means that certain debtor in possession financing facility to be provided by PMA Lender, LLC pursuant to the DIP Facility Term Sheet and in accordance with the terms of orders entered by the Bankruptcy Court on the Debtor's Emergency Motion for Interim and Final Orders (1) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriroity Administrative Expense Status, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.

"Effect" means any change, effect, event, occurrence or development.

"Employment Agreement" means an employment agreement in substantially the form attached hereto as Exhibit I.

"Environmental Claim" means any written claim, Action, cause of Action, Order, threatened Orders, investigation or notice by any Person alleging potential Liability (including, without limitation, potential Liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, Release or threatened Release of or exposure to any Hazardous Materials at any location, whether or not owned or operated by the Seller, or (b) circumstances forming the basis of any actual or alleged violation of or Liability under any Environmental Law.

"Environmental Laws" means all Laws relating to pollution or protection of the environment, natural resources and human health and safety, including, without limitation, those Laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the generation, manufacture, processing, labeling, distribution, use, treatment, storage, transport, handling of, or exposure to, Hazardous Materials.

"Equity Interests" means, with respect to any entity, any corporate stock, shares, options, warrants, convertible securities, partnership interests, limited liability company interests, membership interests or units, or any other security or equity interests of, or other equity participation in, such entity that confers on any Person the right to receive a share of the profits and losses of, or distribution of the assets of, such entity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

5

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Seller, Buyer, and the Escrow Agent attached hereto as Exhibit H.

"Executory Contract" means any executory Business Contract or unexpired lease to which Seller is a party.

"Final Order" means an Order of the Bankruptcy Court, which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Fraud" means, with respect to a Party to this Agreement, the actual common law fraud in Delaware (and not negligent misrepresentation or omission or any statutory fraud) by such Party with respect to the making of a representation or warranty by such Party expressly set forth in this Agreement (as qualified by the Disclosure Schedules, as applicable) or in any certificates delivered pursuant to Article IX.

"GAAP" means United States generally accepted accounting principles.

"Governmental Entity" means any federal, national, state, foreign, provincial, territorial, local or other government or any governmental, regulatory, administrative authority, self-regulatory authority, executive, legislature, regulator, agency, bureau, board, commission, court, judicial or arbitral body, department, tribunal or other instrumentality thereof.

"Governmental Program" means any "federal health care program" as such term is defined in 42 U.S.C. § 1320a 7b(f), including Medicare, state Medicaid programs and TRICARE.

"Hazardous Materials" means any material, waste or substance that is listed, regulated, categorized or otherwise defined as "hazardous," "toxic," "radioactive," "pollutant," or "contaminant" (or words of similar intent or meaning) under any Environmental Law, including, without limitation, petroleum or petroleum by products, asbestos or asbestos-containing material, polychlorinated biphenyls, chlorinated solvents and per- or polyfluoroalkyl substances.

"Health Care Laws" means all Laws that govern, restrict or relate to the provision of health care services or treatment, healthcare industry or healthcare services regulation, professional, entity and facility licensure, qualification, operation, or certification, patient records and documentation, rate setting, fee splitting, referrals, patient brokering, patient acquisition and management, kickbacks, corporate practice of medicine and any other profession of Persons employed by or contracted with such Person, referrals, billing, coding, coding validation, clinical documentation, claims submission, medical necessity, reimbursement, coverage, collection and submission of false or fraudulent claims to Third Party Payors or Governmental Programs, standards of care, quality assurance, risk management, utilization review, peer review, mandated reporting of incidents, occurrences, diseases and/or events, telehealth, advertising or marketing of health care services, laboratory services, diagnostic testing, pharmacology and the securing, administering and dispensing of drugs, devices and controlled substances, diversion, patient privacy and security, patient confidentiality and informed consent, including (a) any state and federal controlled substance and drug diversion Laws, the Federal Controlled Substances Act, 21 U.S.C. § 801, et seq., all Laws relating to peer review, all Laws relating to mandated reporting of

incidents, occurrences, diseases and/or events, all Laws relating to advertising or marketing of health care services, (b) all Laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals, drugs or devices, (c) the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301 et seq.), (d) health care fraud and abuse, false claims, self-referral, and anti-kickback Laws, including the federal Anti Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Anti Kickback Act of 1986 (41 U.S.C. §§ 51 et seq.), the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Anti Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the Ethics in Patient Referrals Act, as amended (42 U.S.C. § 1395nn) (the "Stark Law"), the Florida Patient Self-Referral Act of 1992 (Fla. Stat. § 456.053), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the exclusion laws (42 U.S.C. § 1320a-7) and criminal Laws relating to health care fraud and abuse, (e) the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and all rules and regulations promulgated thereunder, including the breach notification regulations ("HIPAA"), (f) the Eliminating Kickbacks in Recovery Act of 2018 (Pub. L. 115 271, § 8122), (g) Medicare (Title XVIII of the Social Security Act), (h) the Federal Health Care Fraud Law (18 U.S.C. § 1347), (i) TRICARE (10 U.S.C. § 1071), (j) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a et seq.), (k) Medicaid (Title XIX of the Social Security Act), (l) the Prescription Drug Marketing Act of 1987, (m) the Deficit Reduction Act of 2005, (n) the Consolidated Omnibus Budget Reconciliation Act of 1985, (o) the Patient Protection and Affordable Care Act of 2010 (Pub. L. 111 148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111 152), (p) all applicable Laws governing imaging facilities, radiation therapy centers, ambulatory care facilities and ambulatory surgical facilities, and (q) in each case for the foregoing clause (a)-(p), as amended, and all rules and regulations promulgated thereunder and federal, state, local and foreign equivalents of any of the foregoing.

"Intellectual Property Rights" means any and all common law or statutory rights anywhere in the world arising under or associated with: (a) patents, patent applications, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and all rights therein provided by international treaties and conventions ("Patents"); (b) trademarks (whether or not registered), service marks, trade dress, trade names, logos, and other designations of origin, including application and registrations therefor ("Marks"); (c) domain names, uniform resource locators, Internet Protocol addresses, social media handles, and other names, identifiers, and locators associated with Internet addresses, sites, and services; (d) copyrights and any other equivalent rights in works of authorship (including rights in Software as a work of authorship) and any other related rights of authors ("Copyrights"); (e) trade secrets and industrial secret rights, and rights in know-how, data, and confidential or proprietary business or technical information, in each case, that derives independent economic value, whether actual or potential, from not being known to other Persons ("Trade Secrets"); and (f) other similar or equivalent intellectual property rights anywhere in the world.

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means the computer systems, networks, hardware, digital storage media, applications and Software possessed, maintained, used or operated by Seller, and includes any technical components that Seller uses to Process data.

"knowledge of the Seller" and "the Seller's knowledge" mean the actual or constructive knowledge of those Persons set forth in Schedule 1.01(b), after reasonable inquiry of their respective direct reports as of the applicable date.

"Law" means any law, common law, treaty, rule, statute, code, regulation, treatise, directive, judgment, injunction, Order, ordinance, decree, resolution, promulgation, guidance or other restriction, in each case, enacted, promulgated, issued or put into effect by any Governmental Entity.

"Liabilities" means all indebtedness, debts, claims, obligations and other liabilities of a Person whether known, unknown, accrued, unaccrued, absolute, matured, unmatured, direct or indirect, contingent or otherwise, whether due or to become due.

"Liens" means liens, licenses (excluding non-exclusive licenses with respect to Intellectual Property Rights), options, hypothecations, security interests, encroachments, claims, infringements, rights of first refusal, covenants, restrictions, servitudes, preemptive rights, charges, pledges, bailments, mortgages, deeds of trust, conditional sales and title retention agreements or other restrictions or encumbrances or substantively similar arrangements.

"Local Rules" means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida.

"Material Adverse Effect" means any Effect occurring on or after the date hereof that, individually or considered together with all other Effects has had or would reasonably be expected to have a material adverse effect on the Purchased Assets or condition (financial or otherwise) of the Business, taken as a whole; provided, however, that with respect to clause (a) none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) Effects directly arising from, or attributable to the announcement of the Transactions or the pendency of the Transactions, or the identity of Buyer or any of its Affiliates, including any litigation resulting directly therefrom, any adverse changes in supplier, customer, distributor, employee, financing source, partner, patient, vendor, Third Party Payor, Clinician, regulator or similar relationships resulting directly therefrom; (ii) Effects that generally affect the industry in which the Seller operates (including legal and regulatory changes); (iii) changes to general economic, financial, market, business, regulatory or political conditions (or changes therein) or Effects affecting the financial, credit, securities, commodities or derivatives markets in the United States, including changes in interest rates or foreign exchange rates; (iv) Effects arising from, or attributable to, changes or modifications in GAAP or applicable Law after the date of this Agreement, or the authoritative interpretation thereof; (v) Effects that result from any action taken, or failure to take action, by the Seller that is either (A) in compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or the Transaction Documents, or (B) at the written request of Buyer, or such other changes, in each case, which Buyer or any of its Affiliates has approved, consented to or requested or otherwise taken or omitted to take (or any action not taken as a result of the failure of Buyer to consent to any action requiring Buyer's consent pursuant to Section 7.01); (vi) the failure of the Seller to meet or achieve any internal or published projections, forecasts, estimates or predictions of revenue, earnings, cash flow or cash position and any seasonal changes which are consistent with seasonal changes in prior years in the

results of operations of the Seller for any period ending on or after the date hereof (provided that, to the extent not the subject of any of clauses (i) through (viii) of this definition, the underlying cause of such failure may be taken into account to determine whether a Material Adverse Effect has occurred or will occur); (vii) Effects arising from, or attributable to any national, international or supranational political, geopolitical or similar conditions, including civil unrest, (including riots, looting and revolutions), the threatening of, engagement in, continuation or escalation of, hostilities or war, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or cyber attack or terrorist attack, weather related or other force majeure event (including earthquakes, hurricanes, tornadoes or any other natural disasters (whether or not caused by any Person or any force majeure event)) results of elections or any other national or international calamity or crisis and, in each case, any responses thereto (*e.g.*, sanctions, boycotts, or curfews); (viii) Effects arising from, or attributable to, a hurricane, earthquake, flood or other natural or man made disaster, act of God, force majeure event or any epidemic, pandemic, disease, outbreak or significant public crisis; (ix) (A) events as described in Schedule 1.01(c) or (B) any objections in the Bankruptcy Court to (I) this Agreement or any of the Transactions; (II) the Sale Order; or (III) the assumption or rejection of any Executory Contract by Buyer; provided that any Effect described in any of the foregoing clauses (ii), (iii), (iv), (vii) and (viii) may constitute, or be taken into account in determining whether there has been or would be reasonably be expected to be, such a material adverse effect to the extent that it disproportionately affects the Seller relative to other participants in the industries in which the Seller conducts their business generally.

"Multiemployer Plan" has the meaning set forth in Section 3(37) of ERISA.

"Multiple Employer Plan" means a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA (whether or not the plan is subject to ERISA).

"Non-Competition Agreement" means a non-competition agreement in the form attached hereto as Exhibit F.

"OIG" means the Office of the Inspector General of the U.S. Department of Health and Human Services.

"Patient Records" means all records including "health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, and other patient-related documentation maintained by Seller).

"Permitted Liens" means any of the following: (a) Liens for Taxes, assessments, charges, levies or other claims not yet due and payable; (b) Liens imposed by Law, such as materialmen's, mechanics', carriers', warehousemen's, workmen's and repairmen's liens, and other similar liens incurred in the ordinary course of business, for amounts not yet delinquent and for which adequate reserves or accruals have been made in accordance with GAAP, or the validity of which are being contested in good faith; (c) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (d) with respect to real property, Liens, irregularities, easements, reserves, servitudes, encroachments, rights of way or other minor imperfections of title of record, the existence of which do not, individually or in the aggregate, materially interfere with the use or value of the affected property or the operation of the

Business on the affected property; (e) customary contractual provisions providing for retention of title to goods until payment is made, but only to the extent adequate reserves or accruals have been made in accordance with GAAP; (f) matters disclosed in the Financial Statements; and (g) Liens that will be released by operation of the Sale Order or otherwise prior to the Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Entity or any department, agency or political subdivision thereof, or any other organization or entity of any kind.

"Personal Data" means (a) any information relating to an identified or identifiable natural person, where an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that person, and (b) "personal information," "protected health information," "personal data," or the equivalent term under applicable Privacy and Security Laws.

"Physician" means an individual who is (i) licensed to practice medicine in the State of Florida and (ii) employed or engaged by, or contracted with, the Seller.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Privacy and Security Laws" means (a) HIPAA; and (b) applicable Laws relating to the privacy, security, confidentiality, breach, or Processing of Personal Data or other Business Data, medical records, or other records generated in the course of providing or paying for health care services.

"Privacy Policies" means all published, posted, and internal agreements and policies relating to the Seller's Processing of Personal Data or other Business Data.

"Process," "Processed" or "Processing" means, with respect to any data, the use, collection, processing, storage, protection of, recording, organization, adaption, alteration, transfer, retrieval, consultation, disposal, disclosure, dissemination, or combination of such data.

"Promissory Notes" means each of the promissory notes set forth on Schedule 1.01(d).

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Referral Source" means any Person in a position to refer, recommend or arrange for the referral of patients or other health care business, including any physician, physician practice, hospital or other health care provider.

"Release" means any release, spill, emission, discharge, leaking, pumping, pouring, injection, escaping, emptying, dumping, deposit, disposal, dispersal, leaching or migration into or through the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Motion" means the motion filed by the Seller with the Bankruptcy Court, which may be the Bidding Procedures Motion, in form and substance reasonably satisfactory to Buyer, seeking entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court, which Order shall be in form and substance acceptable to Buyer in its sole discretion and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement and its obligations hereunder and (ii) the sale of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Liens, Claims (including, without limitation, Claims based on theories of successor liability or similar doctrines), and other interests, in each case, other than the Assumed Liabilities, (b) authorize each of the Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the Purchased Assets, and (c) provide that Buyer is receiving good and marketable title to all of the Purchased Assets.

"Seller Fundamental Representations" means the representations and warranties of the Seller set forth in Section 5.01, Section 5.02, Section 5.05(a), the first sentence of Section 5.05(b) and Section 5.19.

"Seller Information" means all data and information, including all Personal Data, Patient Records, used or processed in the conduct of the Business or by or on behalf of the Seller.

"Seller IP Rights" means all Intellectual Property Rights that the Seller owns or purports to own that is included in Purchased Assets.

"Senior-Focused Primary Care Center" means a medical facility that primarily provides primary care medical services and where at least twenty percent (20%) of patients are aged greater than or equal to 62, which shall include any multispecialty medical facility where primary care medical services are provided and where at least twenty percent (20%) of the patients receiving primary care medical services are aged greater than or equal to 62.

"Services Agreement" means the Services Agreement to be executed and delivered by the Seller or an Affiliate thereof to Buyer and/or, if applicable, one or more Buyer Designee at the Closing, substantially in the form of Exhibit E.

"Software" means all computer software, firmware, programs, data libraries and databases, in any form, including source code, object code, apps, extensions including make files, Gerber

files, user interfaces, development tools, library functions, compilers, internet websites, web content and links, all versions, updates, corrections, enhancements, replacements, and modifications thereof, and all documentation related thereto.

"Straddle Period" means any taxable period that begins on or before and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation of which a majority of the total voting power of shares entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more subsidiaries of such Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, association or other business entity or is or controls the managing director or general partner of such partnership, association or other business entity.

"Successful Bid" has the meaning assigned in the Bidding Procedures Motion.

"Successful Bidder" has the meaning assigned in the Bidding Procedures Motion.

"Tax" or "Taxes" means any U.S. federal, state, local or non-U.S. taxes, including income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital shares, social security, unemployment, disability, payroll, license, employee or other withholding, or other similar tax, levy, fee, impost, duty or assessment imposed by any Governmental Entity, including any interest, penalties or additions to tax with respect to the foregoing.

"Tax Returns" means any return, report, information return or form (including schedules or any related or supporting information) filed or required to be filed with any Governmental Entity in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"The Villages Health Marks" means the trademarks set forth on Schedule 1.01(e).

"Third Party Payor" means any insurance company, managed care organization, health maintenance organization, preferred provider organizations, health plan or program or other third-party payor, whether private, commercial or a Governmental Program.

"Transaction Documents" means this Agreement, the Non-Competition Agreements, the Amended and Restated Leases, the Amendment to the Facilities Management Agreement, the Services Agreement, the Bill of Sale, the Bill of Sale, Assignment and Assumption Agreement, the Transition Services Agreement, and any and all certificates, agreements, documents or other instruments to be executed and delivered by any Person pursuant thereto, any exhibits, attachments

or schedules to any of the foregoing, as any of the foregoing may be amended, supplemented or otherwise modified from time to time.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transferred Contracts" has the meaning set forth in Section 2.06(b).

"Transition Services Agreement" means the Transition Services Agreement to be executed and delivered by the Seller to Buyer and/or, if applicable, one or more Buyer Designees, at the Closing, substantially in the form of Exhibit G.

"TVHHC" means The Villages Health Holding Company, LLC, a Florida limited liability company.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act and any similar applicable state, local or foreign law or regulation.

"Willful Breach" means a willful and intentional act or a willful and intentional failure to act, in each case, by a party with awareness that the taking of such act or failure to take such act could reasonably be expected to give rise to a material breach of this Agreement.

1.02    Other Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Term | Section |
|---|---|
| $ | 13.06 |
| Accepted Clinicians | 9.02(e) |
| Accrued PTO | 12.09(i) |
| Acquisition | Recitals |
| Action | 5.11(a) |
| Adjusted Balance Sheet | 5.03(a) |
| Agreement | Preamble |
| Allocation | 3.02 |
| Anti-Bribery Laws | 5.15(d) |
| Assumed Liabilities | 2.03 |
| Assumed Plan | 12.09(n) |
| Auction | 12.08(a) |
| Available Contract Schedule | 2.06(a) |
| Backup Bidder | 12.08(c) |
| Buyer | Preamble |
| Buyer's 401(k) Plan | 12.09(j) |
| Buyer's Prorated Responsibilities | 2.05(a) |
| Buyer's Representatives | 7.02 |
| Closing | 4.01 |
| Closing Date | 4.01 |
| Closing of the Bankruptcy Case | 2.07(b) |

Collective Bargaining Agreement.................................................................5.18(c)
Compensation Payments...........................................................................12.09(h)
Contracting Parties..................................................................................13.17(a)
control ..............................................................................Definition of Affiliate
Copyrights........................................ Definition of Intellectual Property Rights
Coverage Period........................................................................................ 7.04
Cure Costs ........................................................................................... 2.06(g)
Cure Costs Cap ................................................................................... 2.06(g)
Cure Notice .......................................................................................... 2.06(a)
Data Protection Requirements .............................................................5.20(k)
Deposit .................................................................................................3.04(a)
Disclosure Schedule ................................................................................ 13.06
Employee Withholding Documents .......................................................12.09(l)
Excluded Assets ...................................................................................... 2.02
Excluded Liabilities ................................................................................ 2.04
Exhibit ................................................................................................... 13.06
Expense Reimbursement......................................................................... 12.10
Final Allocation ....................................................................................... 3.02
Financial Statements ............................................................................ 5.03(a)
Health Care Permits ..............................................................................5.20(b)
HIPAA .............................................................Definition of Health Care Laws
Labor Union ........................................................................................5.18(c)
Leased Realty .....................................................................................5.06(a)
Leases................................................................................................5.06(b)
Marks .................................................. Definition of Intellectual Property Rights
Material Contracts................................................................................5.08(b)
Material Payor .............................................................................. 5.08(a)(xi)
Material Referral Source ...............................................................5.08(a)(xv)
Material Vendor ............................................................................ 5.08(a)(v)
Non-Party Affiliates..............................................................................13.17(a)
Order .....................................................................................................5.11(b)
Outside Date.........................................................................................11.01(d)
Parent ................................................................................................. Preamble
Parties................................................................................................. Preamble
Party ................................................................................................... Preamble
Patents ............................................... Definition of Intellectual Property Rights
Permits ...................................................................................................5.15(e)
Petition Date............................................................................................ Recitals
Preliminary Executory Contract List ..................................................... 2.06(a)
Prorated Expenses ................................................................................ 2.05(a)
Purchase Price ..................................................................................3.01(a)(iii)
Purchased Assets .................................................................................... 2.01
Related Party ........................................................................................ 5.17
Schedule ................................................................................................. 13.06
Section..................................................................................................... 13.06
Security Incident ..................................................................................5.20(o)

Security Risk Analysis ..................................................................................5.20(n)
Seller ............................................................................................................ Preamble
Seller Disclosure Schedules .......................................................................... Article V
Seller Registered IP.......................................................................................5.10(a)
Seller's 401(k) Plan...................................................................................... 12.09(j)
Seller's Prorated Responsibilities .................................................................. 2.05(a)
Specified Proceeding .....................................................................................7.01(l)
Standard Procedure .......................................................................................12.09(l)
Stark Law ...................................................................Definition of Health Care Laws
Tail Insurance................................................................................................. 7.04
Termination Fee ............................................................................................ 12.10
Termination Payment...................................................................................... 12.10
Trade Secrets................................................... Definition of Intellectual Property Rights
Transfer Taxes ............................................................................................... 8.03
Transferred Contracts..................................................................................... 2.06(b)
Transferred Employee ....................................................................................12.09(c)
Undisclosed Contract ..................................................................................... 2.06(a)
United............................................................................................................9.02(g)
Withholding Agent.......................................................................................... 3.03

## ARTICLE II

## PURCHASE AND SALE

2.01   <u>Purchase and Sale of Assets</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to Buyer and/or one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase and acquire from the Seller (other than the Excluded Assets), all of the Seller's right, title and interest, free and clear of all Liens, Claims and other interests (other than the Assumed Liabilities), in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller of every nature (wherever located, whether real, personal or mixed, whether held directly or indirectly and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), used or held for use in, or related to, the Business, including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "<u>Purchased Assets</u>"); <u>provided</u>, <u>however</u>, that the Purchased Assets shall not include any Excluded Assets, none of which shall be sold, assigned, conveyed, transferred or delivered to Buyer. Without limiting the generality of the foregoing, the Purchased Assets shall include all of Seller's right, title and interest in and to the following assets to the extent used or held for use in, or related to, the Business (except to the extent an Excluded Asset):

(a)      all advances, prepaid assets and expenses, security and other deposits and prepayments;

(b)      the Transferred Contracts and all rights and benefits thereunder;

(c)      all inventory and supplies;

(d)      all tangible personal property, including all Devices, equipment, leasehold improvements, computer hardware, furniture, furnishings, machines, tools, supplies, telephones, office equipment, vehicles and all rights in all warranties of any manufacturer or vendor with respect thereto (express or implied), including all such property (i) located at any clinic or administrative site operated by the Seller; or (ii) located at any Business-related facility;

(e)      except to the extent listed on Schedule 2.01(e), all Intellectual Property Rights and all tangible embodiments thereof, to the extent owned by Seller, but excluding, for the avoidance of doubt, The Villages Health Marks and any other Marks incorporating "THE VILLAGES", subject to Section 2.07;

(f)      except to the extent listed on Schedule 2.01(f), all IT systems, Software programs and all hardware or data processing equipment and data processing system manuals, whether owned or licensed pursuant to any Transferred Contract, subject to Section 2.07;

(g)      all Seller Information, and all databases and other repositories containing such data and information, and all records, including all data, know-how, Software, and media content, subject to Section 2.07;

(h)      all regulatory licenses, Permits and accreditations (including any issued or granted by, or filed with or delivered to, any Governmental Entity or accrediting body), and all rights thereunder, except for any such Permits that are Excluded Assets set forth in Section 2.02(m), subject to Section 2.07;

(i)      all telephone and facsimile numbers, post office boxes and directory listings;

(j)      each Assumed Plan and the Seller's right, title and interest in any assets of or relating thereto;

(k)      all claims, causes of action or rights against third parties (including, warranties, indemnities, rebates and guarantees), other than Avoidance Actions and claims, causes of action or rights to the extent related to Excluded Assets or Excluded Liabilities;

(l)      any insurance proceeds arising in connection with damage to, or losses related to, the Purchased Assets occurring prior to the Closing, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing and to the extent not relating to an Excluded Asset or Excluded Liability;

(m)      all goodwill to the extent relating to or associated with the Purchased Assets or the Business; and

(n)      any other assets that are of a type not otherwise addressed by this Section 2.01 that are not Excluded Assets.

2.02    Excluded Assets. The Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)    any Equity Interests in the Seller or held by the Seller;

(b)    any Equity Interests in TVH Real Estate Holdings, LLC;

(c)    any interest in the real property, or the furniture, fixtures or equipment (excluding Devices) located at 11368 Laufersky Lane, Oxford, Florida, 34484;

(d)    any interest in the lease agreement with respect to 600 Sunbelt Road, The Villages, Florida, 32159 dated May 19, 2025, by and between The Villages Operating Company, as lessor, and Seller, as lessee, or the furniture, fixtures or equipment (excluding Devices) at that premises;

(e)    organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the Seller's organization, maintenance, existence, and operation;

(f)    all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller, including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Closing, and any intercompany receivables between Seller on the one hand, and any Affiliate of Seller on the other hand;

(g)    any Cash;

(h)    all bank accounts of Seller;

(i)    any Contracts other than the Transferred Contracts;

(j)    all Avoidance Actions;

(k)    the Villages Health Marks (subject to any transitional rights granted thereto pursuant to any Transaction Documents), any other Marks incorporating "THE VILLAGES" and domain names (including "thevillageshealth.com"), webpages and social media accounts incorporating or related thereto;

(l)    any insurance policies of the Seller or proceeds thereof or any rights thereunder, except as set forth on Schedule 2.02(l) or described in Section 2.01(l);

(m)    the Seller's Medicare and Medicaid provider numbers and all associated National Provider Identifier (NPI) numbers related to owners, employees and independent contractors of Seller;

17

(n)     any rights to rebates, refunds or discounts due to Seller with respect to assets or services purchased prior to the Closing Date;

(o)     all Company Plans, other than the Assumed Plans and the Seller's right, title and interest in any assets of or relating thereto;

(p)     all payroll records, personnel files and other personnel records; or

(q)     any Tax assets, including prepaid Taxes and any refund, rebate or credit of Taxes.

2.03    <u>Assumed Liabilities</u>. Subject to the terms and conditions of this Agreement, effective as of the Closing, Buyer and/or one or more Buyer Designees shall assume and agree to pay, perform and discharge when due in accordance with their respective terms solely Liabilities (collectively, the "<u>Assumed Liabilities</u>") as follows:

(a)     all Liabilities to the extent relating to the ownership, operation, or conduct of the Purchased Assets or the Business following the Closing, including without limitation Liabilities to the extent arising under Transferred Contracts after the Closing;

(b)     Cure Costs up to the Cure Costs Cap;

(c)     Accrued PTO; and

(d)     (i) Liabilities for Taxes relating to the Purchased Assets or the Business for any Post-Closing Tax Period, as determined pursuant to <u>Section 8.02</u> with respect to any Straddle Period, and (ii) all liability for Transfer Taxes.

2.04    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary herein, neither the Buyer nor any Buyer Designee shall assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities (all such Liabilities that neither the Buyer nor any Buyer Designee is assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

2.05    <u>Prorated Expenses</u>. Except as otherwise expressly provided herein, (i) the Seller shall be responsible for all Prorated Expenses incurred in the operation of the Business prior to the Closing (the "<u>Seller's Prorated Responsibilities</u>"), and (ii) Buyer shall be responsible for all Prorated Expenses incurred in the operation of the Business after the Closing (the "<u>Buyer's Prorated Responsibilities</u>"); provided that in no event shall Buyer's Prorated Responsibilities include any Excluded Liabilities. "<u>Prorated Expenses</u>" shall mean expenses arising from the conduct of the business and operations of the Purchased Assets and the Business (other than Taxes subject to proration pursuant to <u>Article VIII</u> hereof), water charges, sewer, rents, real estate, fuel and utility charges, license fees, assessments and other fees, prepaid and deferred expenses, and other expenses relating to the Purchased Assets and/or the Business. In the event Buyer and the Seller are prohibited by a vendor from paying a partial invoice for the Prorated Expenses, Buyer

shall submit payment in full for such invoice to the vendor, and the Seller agrees to reimburse Buyer for the Seller's pro rata share of the invoice within seven (7) Business Days of Seller's receipt of notice and proof of payment from Buyer that such invoice has been paid by Buyer. In the event that either Buyer or Seller pays any Prorated Expenses that are Seller's Prorated Responsibilities or Buyer's Prorated Responsibilities, respectively, the other party shall promptly reimburse such amount within seven (7) Business Days of receipt of notice and proof of payment from Buyer or Seller that such invoice has been paid by Buyer or Seller, as applicable.

2.06    Assignment and Assumption of Certain Contracts.

(a)    Within fourteen (14) days of the date hereof, the Seller shall deliver to Buyer and file with the Bankruptcy Court a preliminary list setting forth the Executory Contracts and unexpired Leases used in, or otherwise related to, the Business along with its good faith estimate of the Cure Costs associated with each such Executory Contract (the "Preliminary Executory Contract List"), and will in good faith update the Preliminary Executory Contract List to add additional Executory Contracts and unexpired Leases not included in the Preliminary Executory Contract List, correct any inaccuracies in the Preliminary Executory Contract List and file such updated list (such updated list, the "Available Contract Schedule") with the Bankruptcy Court on a rolling weekly basis during the twenty-eight (28) day period following the date hereof with the final such Available Contract Schedule filed on the twenty-eighth day following the date hereof. The Seller shall serve written notice (each, a "Cure Notice") to the non-Seller counterparty to each Executory Contract on the Available Contract Schedule in accordance with the Bidding Procedures Order. From the date hereof through the Closing, the Seller shall cooperate and provide such additional information to Buyer as may be reasonably necessary in order to identify all Executory Contracts. If, at any time after filing of the final Available Contract Schedule and prior to the Closing Date, Seller becomes aware that it is a party to an Executory Contract that is not listed on the Available Contract Schedule (each, an "Undisclosed Contract"), or becomes aware that the Available Contract Schedule reflects inaccurate information, Seller will promptly update the Available Contract Schedule with respect to such Undisclosed Contract or inaccurate information and (i) file with the Bankruptcy Court and provide to Buyer such updated Available Contract Schedule, and (ii) serve a Cure Notice, to the non-Seller counterparty to such Undisclosed Contract. In addition, the Seller shall supplement the Available Contract Schedule to add any Executory Contracts used in, or otherwise related to, the Business that are entered into by the Seller during the pendency of the Bankruptcy Case and provide such updated Available Contract Schedule to the Buyer. The Seller shall provide an update of such good faith estimate of Cure Costs not less than ten (10) Business Days prior to the Closing Date.

(b)    From and after the date hereof until the fifth (5th) Business Day prior to the Closing Date, Buyer may, in its sole discretion, (i) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Contract to be rejected) for assumption and assignment to Buyer or its designee, effective on and as of the Closing (such Executory Contracts, together with any other Executory Contracts assumed by Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Transferred Contracts"), or (ii) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Transferred Contract) for rejection effective on and as of the Closing.

(c)     Seller shall take all actions reasonably required to assume and assign the Transferred Contracts to Buyer or its designee, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Transferred Contracts and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Transferred Contracts to Buyer or a Buyer Designee satisfies all applicable requirements of section 365 of the Bankruptcy Code. If any objections are filed by, or received from, any non-Seller counterparty in response to a Cure Notice, Seller will take all actions reasonably required to resolve any such objections with such non-Seller counterparty.

(d)     From and after the date hereof until the Closing Date, Seller shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Transferred Contract or Executory Contract, not yet designated by Buyer for rejection, or take any affirmative action not required thereby, without the prior written consent of Buyer. For the avoidance of doubt, this Section 2.06(d) shall not apply to the expiration or extension of any Contract in accordance with its terms.

(e)     As part of the Sale Motion (or, as necessary in one or more separate motions), the Seller shall request that by virtue of the Seller providing the Cure Notices, the Bankruptcy Court deem any non-Seller party to such Transferred Contract that does not file an objection with the Bankruptcy Court to have given any required Consent to the assumption of the Transferred Contract by the Seller and assignment to the Buyer and/or one or more Buyer Designees.

(f)     The Sale Order shall provide for the assumption by the Seller, and to the extent permitted by applicable Law, provide for the assignment by the Seller to the Buyer and/or one or more Buyer Designees, effective upon the Closing, of the Transferred Contracts on the terms and conditions set forth in this Section 2.06.

(g)     In connection with the assumption and assignment to the Buyer or a Buyer Designee of any Transferred Contract pursuant to this Section 2.06, the Seller shall pay, at or prior to the Closing, all of the cure amounts ("Cure Costs"), as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Transferred Contracts, that relates to the period prior to the Closing; provided that Buyer hereby agrees to pay to Seller at the Closing in accordance with Section 3.01(a)(iii) (or, solely with respect to any Cure Costs (or portions thereof) for which reserves are established pursuant to Section 2.06(h) hereof, on the date of consensual resolution or final determination by the Bankruptcy Court of the applicable cure objection in accordance with Section 2.06(h) hereof) an amount equal to the lesser of (1) the aggregate amount of applicable Cure Costs and (2) $1,000,000 (the "Cure Costs Cap" and any Cure Costs above the Cure Costs Cap, "Excess Cure Costs") for Transferred Contracts that are not Affiliate Contracts to be paid to non-Seller counterparties pursuant to Section 2.06(h) below.

(h)     If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Transferred Contract that is an Affiliate Contract, Seller shall (x) pay on or before the Closing Date such non-Seller counterparty an amount equal to the undisputed portion of Cure Costs payable with respect to such Transferred Contract and (y) appropriately reserve funding for the disputed portion of such Cure Costs pending

resolution of such cure objection, and, subject to entry by the Bankruptcy Court of the Sale Order, Seller shall assume and assign such Transferred Contract to Buyer at the Closing. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection with respect to any Transferred Contract that is an Affiliate Contract, Seller shall promptly pay to such non-Seller counterparty any remaining Cure Costs owing to such non-Seller counterparty with respect to such Transferred Contract.

2.07    <u>Consents to Certain Assignments</u>.

(a)    If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the efforts of the Seller pursuant to <u>Section 2.06</u>, any Consent is not obtained prior to Closing and as a result thereof the Buyer cannot receive any of the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Seller shall, at the request of Buyer, prior to the Closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in any lawful and reasonable arrangement proposed by Buyer under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer; <u>provided</u>, that the Seller's cooperation obligations contemplated by this <u>Section 2.07</u> shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts. The Seller shall as promptly as practicable pay to the Buyer when received, all monies received by the Seller attributable to such Purchased Asset from and after the Closing Date and the Buyer shall promptly pay the Seller for all reasonable and documented out-of-pocket costs incurred by the Seller associated with, arising or resulting from such arrangement. Subject to the terms and limitations set forth in this Agreement, Seller shall use commercially reasonable efforts (which shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts) to secure such Consent as promptly as practicable after the Closing. Upon receiving any such Consent applicable to such Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

(b)    To the extent that the Buyer has not obtained all of the Permits that are necessary for the Buyer to take title to all of the Purchased Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in a substantially similar manner in all material respects as it was operated by the Seller immediately prior to the Closing, the Seller shall, to the extent permitted by applicable Laws, maintain, at the Buyer's sole expense, after the Closing such Permits that the Buyer requests, until the earlier of the time the Buyer has obtained such Permits and the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning the Seller in the Bankruptcy Case, and such plan has become effective in accordance with its terms (the "<u>Closing of the Bankruptcy Case</u>").

2.08    <u>Designations of Assets and Liabilities</u>.

(a)    At any time on or prior to the second (2nd) Business Day prior to the Closing Date, the Buyer may, in its sole discretion by written notice to the Seller, (a) designate any of the Purchased Assets as Excluded Assets, and (b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or Liabilities so designated; <u>provided</u>, that there shall be no reduction in the Purchase Price in connection with any such designation by the Buyer. Notwithstanding any other provision hereof, the Liabilities of the Seller under or related to any asset designated as an Excluded Asset under this paragraph shall constitute Excluded Liabilities.

2.09    <u>Wrong Pockets</u>.

(a)    During the twelve (12) month period following the Closing, if either Buyer or the Seller becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to Buyer or that any right, property or asset forming part of the Excluded Assets has been transferred to Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to (i) Buyer, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to Buyer at or in connection with the Closing, or (ii) the Seller, in the case of any right, property or asset not forming part of the Excluded Assets which was transferred to Buyer at the Closing.

(b)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates receives any (i) funds or property intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds or property to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds or property, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise) or (ii) mail, courier package or document intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds, property or document to, the other Party.

(c)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates pays any amount to any third party in satisfaction of any Liability of the other Party pursuant to the terms of this Agreement or any other Transaction Document, (i) the paying Party shall promptly notify the other Party of such payment and (ii) the other Party shall promptly reimburse the paying Party for the amount so paid by the paying Party to such third party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such amount, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise).

# ARTICLE III

# PURCHASE PRICE

3.01    <u>Purchase Price</u>.

(a)    The consideration for the sale and transfer of the Purchased Assets from the Seller to Buyer (and one or more Buyer Designees) shall be as follows:

(i)    an amount in cash equal to $50,000,000.00; plus

(ii)    an amount of cash equal to the Cure Costs for Transferred Contracts that are not Affiliate Contracts, subject to the Cure Costs Cap, in accordance with <u>Section 2.06(g)</u> for use by Seller in paying the amounts required pursuant to <u>Section 2.06(h)</u> (such amounts in <u>clauses (i)</u> and <u>(ii)</u>, collectively, the "<u>Cash Purchase Price</u>"); plus

(iii)    the assumption of the Assumed Liabilities by execution of the Bill of Sale, Assignment and Assumption Agreement (such amounts in <u>clauses (i) – (ii)</u>, collectively, the "<u>Purchase Price</u>").

(b)    On the Closing Date, Buyer shall pay or cause to be paid to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller at least three (3) Business Days prior to the Closing, an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price less the Deposit (which shall not be less than $5,000,000 and shall be released to Seller upon the joint instruction of Buyer and Seller instructing the Escrow Agent to pay the Deposit to the Seller).

3.02    <u>Allocation</u>. No later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets (the "<u>Allocation</u>") in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as appropriate) for Seller's review and comments. Any reasonable comments provided by the Seller to Buyer under this <u>Section 3.02</u> shall be considered by Buyer in good faith. The Allocation shall be conclusive and binding on the Parties unless the Seller notifies Buyer in writing that they object to one or more items reflected in the Allocation, and specify the reasonable basis for such objection, within thirty (30) days after delivery to the Seller of the Allocation. In the case of such an objection, the Seller and Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by the Seller and Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "<u>Final Allocation</u>"). If the Seller and Buyer are unable to resolve all disputed items within thirty (30) days after the delivery of the Seller's written objection to Buyer, each of Buyer and the Seller may separately determine the allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets and there shall be no Final Allocation. The Parties agree to file all Tax Returns (including, but not limited to, the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Final Allocation (if any) unless otherwise required by applicable Law;

provided, however, that nothing contained herein shall prevent Buyer or the Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Final Allocation (if any), and neither Buyer nor the Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Final Allocation (if any). In administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Final Allocation (if any) in determining the manner in which the Purchase Price should be allocated as between the Seller and their estate for non-Tax purposes.

3.03    Withholding. Buyer, the Seller and any other Person that has any withholding obligation with respect to any payment made pursuant to this Agreement (each, a "Withholding Agent") shall be entitled to deduct and withhold any amounts otherwise payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code or any other provision of applicable Tax Law. To the extent that amounts are so properly deducted and withheld and paid to the appropriate Governmental Entity, such amounts shall be treated as having been paid to such Person in respect of which such deduction and withholding was made. If a Withholding Agent determines that any such withholding or deduction is required, the Withholding Agent shall use commercially reasonable efforts to notify the payee at least ten (10) days in advance of such withholding or deduction, and shall use commercially reasonable efforts to cooperate with such Person to reduce or eliminate such withholding and deduction (including by providing a reasonable opportunity for such Person to provide documentation establishing exemptions from such withholding or deduction).

3.04    Deposit.

(a)    No later than one (1) Business Day after the date hereof, Buyer will make an earnest money deposit (the "Deposit") into escrow with the Escrow Agent in the amount equal to $5,000,000.00 by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Seller or Buyer and shall be applied against payment of the Cash Purchase Price. At Closing, the Deposit (which shall not be less than $5,000,000) shall be delivered to the Seller in accordance with Section 3.01(b) and the terms of the Escrow Agreement and credited toward payment of the Cash Purchase Price.

(b)    If this Agreement has been validly terminated prior to Closing by the Seller pursuant to Section 11.01(c), then within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to the Seller.

(c)    If this Agreement has been validly terminated prior to the Closing by any party hereto for any reason other than as contemplated by Section 3.04(b) then, within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

# ARTICLE IV

# THE CLOSING

4.01    The Closing. The closing of the Transactions (the "Closing") shall take place remotely by means of electronic delivery or release of documents, at 10:00 a.m., New York City time, on the third (3rd) Business Day following satisfaction or due waiver of all of the closing conditions set forth in Article IX (other than those conditions to be satisfied at the Closing itself, but subject to the satisfaction or waiver of such conditions) or on such other date and/or time as is mutually agreed in writing by Buyer and the Seller. The date and time on which the Closing actually occurs is referred to herein as the "Closing Date." The Closing will be deemed effective as of 12:01 a.m. New York City time, on the Closing Date.

4.02    Closing Deliveries. At the Closing:

(a)    in addition to the payments contemplated by Section 3.01(b), Buyer shall deliver, or cause to be delivered, to the Seller the following items:

(i)    a duly executed counterpart from Buyer and/or one of its Affiliates, as applicable, to each of the Transaction Documents to which Buyer and/or such Affiliate is a party; and

(ii)    the certificate required to be delivered pursuant to Section 9.03(c);

(b)    the Seller shall deliver, or cause to be delivered, to Buyer the following items:

(i)    a duly executed counterpart to each of the Transaction Documents to which the Seller or any of its Affiliates is a party (including, for the avoidance of doubt, the Affiliates of the Seller party to the Non-Competition Agreements, the Amended and Restated Leases, the Services Agreement, and the Amendment to the Facilities Management Agreement);

(ii)    the certificate required to be delivered pursuant to Section 9.02(d);

(iii)    a copy of the Sale Order as entered by the Bankruptcy Court;

(iv)    evidence in a form acceptable to Buyer of payment of the Excess Cure Costs with respect to the Transferred Contracts as of the Closing;

(v)    a properly executed and completed IRS Form W-9 from the Seller; and

(vi)    as promptly as reasonably practicable following the date hereof, but in any event no later than fifteen (15) Business Days prior to the Closing Date, completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in writing in the corresponding section of <u>Article V</u> of the disclosure schedule delivered by Seller to Buyer as of the execution of this Agreement (the "Seller Disclosure Schedules"), or in another section of <u>Article V</u> of the Seller Disclosure Schedules to the extent that the relevance thereof would be reasonably apparent on its face that such disclosure is applicable to such section of <u>Article V</u> of the Seller Disclosure Schedules, the Seller represents and warrants to Buyer, as of the date hereof and as of the Closing (unless the representation and warranty speaks as of a specific date, in which case such representation and warranty shall be made only as of such specific date), as follows:

5.01    <u>Organization and Power</u>. The Seller (i) is a limited liability company duly organized and validly existing under the Laws of the State of Florida and (ii) has paid all fees and filed all reports due to, and the Seller's status is active with, the Florida Department of State. The Seller has all requisite corporate power and authority and all authorizations, licenses and permits necessary to own, lease and operate its properties and assets as they are now being owned, leased and operated and to carry on its businesses as now conducted. The Seller is qualified or licensed to do business and is in good standing (where such concept is recognized) in every jurisdiction where it is required to qualify or be licensed, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected, individually or in the aggregate, be material to the Seller. The Seller has delivered to Buyer true and complete copies of the organizational documents of the Seller (including the Company Operating Agreement), together with any amendments thereto. The Seller is not in material violation of any provision of its operating agreement.

5.02    <u>Authorization; No Breach; Valid and Binding Agreement</u>.

(a)    Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the execution, delivery and performance of this Agreement and any other Transaction Document to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions, including the Acquisition, have been duly and validly authorized and approved by all requisite action on the part of the Seller and upon entry and effectiveness of the Sale Order and subject to receipt of the requisite Bankruptcy Court approvals, in accordance with the terms hereof, will have all necessary corporate or similar authority to consummate the transactions contemplated hereby and thereby, and no other actions or corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party.

(b)    Other than as provided for in <u>Section 5.12</u> and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the Seller's execution, delivery, performance and compliance with the terms and conditions of this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions do not and shall not (i) violate, conflict with, result in any violation, breach of, or constitute a default under any of the provisions of the certificates of

incorporation or bylaws (or equivalent organizational documents) of the Seller, (ii) except as disclosed on <u>Schedule 5.02(b)</u>, require any consent of or other action by any Person or the Seller under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, modification, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any Contract or Permit, (iii) violate any Law or Order to which the Seller is subject or by which any of their respective properties or assets are bound or affected, or (iv) result in the creation or imposition of any Lien (other than those Liens released by operation of the Sale Order or otherwise prior to the Closing) on any properties or assets of the Seller, except where the failure of any of the representations and warranties contained in <u>clause (ii)</u> or <u>(iv)</u> above to be true would not reasonably be expected, individually or in the aggregate, be material to the Seller.

(c)    Assuming this Agreement and the other Transaction Documents are (or, at the Closing, will be) valid and binding obligations of Buyer and its Subsidiaries and Affiliates, as applicable, this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party constitute legal, valid and binding obligations of the Seller, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws of general application, and subject in all cases to the entry and effectiveness of the Sale Order and requisite Bankruptcy Court approvals and limitations imposed by Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

5.03    <u>Financial Statements</u>.

(a)    The Seller's unaudited adjusted consolidated balance sheets as of December 31, 2023, December 31, 2024 and May 31, 2025 (the "<u>Adjusted Balance Sheets</u>") and the related statement of income and cash flows and the unaudited consolidated balance sheet and related unaudited statements of operations, changes in members' deficit and cash flows for the same period (collectively, the "<u>Financial Statements</u>") (i) have been prepared from and are in accordance with the books and records of the Seller, and in accordance with GAAP applied on a consistent basis throughout the periods set forth therein, subject to the notes included therein, and (ii) present fairly in all material respects the consolidated financial condition and results of operations of the Seller as of the times and for the periods referred to therein. The Seller has provided Buyer with true and complete copies of the Financial Statements in <u>Schedule 5.03</u>. Neither the Seller, nor to the knowledge of the Seller, any of their respective officers and independent auditors, have identified or been made aware of any material complaint, allegation, deficiency, assertion or claim, whether written or oral, regarding the Financial Statements.

(b)    The Seller has devised and maintained systems of internal accounting controls with respect to its businesses sufficient to provide reasonable assurances that (i) all transactions are executed in accordance with the general and specific authorization of the management of the Seller and (ii) all transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and to maintain proper accountability for items.

(c)    As of May 31, 2025, the Seller has accrued approximately $16,100,000 of medical expenses in excess of the medical expenses reflected in the service funds prepared by UnitedHealthcare of Florida, Inc. and Blue Cross and Blue Shield of Florida, Inc. for the period

beginning January 1, 2025 and, in the case of Blue Cross and Blue Shield Florida, Inc., ending April 25, 2025, and, in the case of UnitedHealthcare of Florida, Inc., ending April 30, 2025, which service funds are set forth on <u>Schedule 5.03(c)</u>.

5.04    <u>Absence of Certain Developments; Undisclosed Liabilities</u>.

(a)    Other than as a result of the events set out on <u>Schedule 1.01(c)</u> and the preparation for, commencement, and pendency of the Bankruptcy Case, since January 1, 2025, (i) the Business has been conducted in the ordinary course of business and consistent with past practice and (ii) the Seller has not taken any action that, if taken from, and after the date of this Agreement and prior to Closing, would require the consent of the Buyer pursuant to <u>Section 7.01(a)</u>, <u>(b)</u> (provided that solely for purposes of this <u>Section 5.04(a)</u>, references to $10,000 individually shall be deemed to be $50,000 and references to $50,000 in the aggregate shall be deemed to be $500,000), <u>(c)</u>, <u>(d)</u>, <u>(f)</u>, <u>(g)</u> (provided that solely for purposes of this <u>Section 5.04(a)</u>, references to $25,000 shall be deemed to be $100,000), <u>(h)</u>, <u>(i)</u>, <u>(l)</u>, <u>(m)</u>, <u>(n)</u>, <u>(o)</u>, <u>(p)</u>, <u>(q)</u>, <u>(r)</u>, <u>(t)</u>, or <u>(u)</u>, and there has not been any Effect that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)    The Seller does not have any Liability, except for Liabilities (i) specifically and adequately reflected in or reserved against on the face of the Adjusted Balance Sheets, (ii) incurred in the ordinary course of business consistent with past practice since the date of the latest Adjusted Balance Sheet (none of which is a Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation under any Contract or Law or any Action), (iii) otherwise disclosed in <u>Schedule 5.04(b)</u>, (iv) that would not be required to be reflected on a consolidated balance sheet or the notes thereto of the Seller, (v) incurred in connection with this Agreement or the Transactions and (vi) that would not, individually or in the aggregate, be materially adverse to the Seller. The Seller is not a guarantor or is otherwise liable for any Liability of any other Person.

5.05    <u>Title to Assets; Sufficiency</u>.

(a)    The Seller has good, valid and marketable title to, or a valid leasehold interest in or valid license to, each of the Purchased Assets and in each case, free and clear of any Lien, except for Permitted Liens.

(b)    The Purchased Assets, together with the rights under the Transaction Documents and the Excluded Assets, constitute all of the properties and assets used or held for use for the conduct of the Business as of the date hereof and, subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, will constitute all of the assets necessary and sufficient to conduct the Business in all material respects as conducted by the Seller in the 12 (twelve) month period prior to the filing of the Bankruptcy Case, except as disclosed on <u>Schedule 5.05(b)</u>. The Purchased Assets (i) are in good operating and working condition and repair (normal wear and tear excepted), (ii) have been operated and maintained in accordance with customary industry practices and (iii) are suitable and adequate for the purposes for which they are presently used.

28

5.06    Real Property.

(a)    Schedule 5.06(a) sets forth a list of all real property to which the Seller has a valid and existing leasehold, subleasehold, licensed or other occupancy interest (collectively, the "Leased Realty"). The Seller has provided Buyer with true and complete copies of all Leases as currently in effect.

(b)    The Seller possesses valid and existing leasehold interests in the Leased Realty pursuant to the leases, subleases, licenses or other occupancy agreements set forth on Schedule 5.06(b) (including any and all amendments and guaranties thereto, collectively, the "Leases"), free and clear of any Liens, except (i) Permitted Liens and (ii) any Lien on the applicable fee title, the payment or performance of which is not the responsibility of the Seller under the applicable Lease and does not materially impair the current operations by the Seller. Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, and other than as a result of the Bankruptcy Case, with respect to each Lease: (i) such Lease is in full force and effect and is the legal, valid and binding obligation of the Seller, and to the knowledge of the Seller, the other party thereto, in each case, enforceable in accordance with its respective terms, except as the enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (ii) there is no existing default by the Seller or, to the knowledge of the Seller, the counterparty thereto, as applicable, of such Lease and (iii) there exists no event, occurrence, condition or act (including the Transactions), that with or without notice or lapse of time, or both, or the happening of any further event or condition would constitute a default by the Seller or, to the knowledge of the Seller, any counterparty thereto under each such Lease.

(c)    No portion of the Leased Realty is subject to any pending condemnation requisition or taking by any public or municipal authority and to the knowledge of the Seller, no such condemnation, requisition, or taking is threatened or contemplated. To the knowledge of the Seller, the Seller has not been notified in writing of future material improvements by any public authority, any part of the cost of which would or might reasonably be asserted against the Seller.

(d)    To the knowledge of the Seller, no assessment or charge to the Seller is due with respect to any streets, roads and avenues adjoining the Leased Realty. Each of the buildings, improvements and building systems situated or located on the Leased Realty is in good condition and repair for the current uses, reasonable wear and tear and the applicable landlord's repair and replacement obligations excepted.

(e)    Except as set forth on Schedule 5.06(e), no Leased Realty is subject to any options to purchase or lease or purchase or sale contracts in favor of any Person other than the Seller. The Seller is not a lessor, sublessor, grantor or licensor under any sublease, license or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any Leased Realty, as applicable, except as set forth on Schedule 5.06(b).

29

5.07    Tax Matters.

(a)    The Seller has filed all income and other material Tax Returns that are required to be filed by it (taking into account any extensions of time to file), and all such Tax Returns are true and complete in all material respects. All material Taxes (including any Liability for "imputed underpayments" under Section 6225 of the Code) that are due and payable by or with respect to the Seller has been fully paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    The Seller is not the subject of a Tax audit, examination or other proceeding with respect to any material amounts of Taxes and to the knowledge of the Seller, no such Tax audit, examination or other proceeding has been threatened in writing. No outstanding deficiencies for material amounts of Taxes with respect to the Seller has been claimed, proposed or assessed by any Governmental Entity.

(c)    The Seller (i) is not and has not been a member of any affiliated, consolidated, combined, unitary or other group for Tax purposes (other than any such group the common parent of which is the Seller), (ii) has no material Liability for Taxes of any Person (other than the Seller) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) or as a transferee or successor, or (iii) is not subject to any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Tax Law), private letter ruling, or other written agreement with a Governmental Entity regarding Taxes or Tax matters, which agreement or ruling would be binding on the Seller in a taxable period beginning after the Closing Date.

(d)    The Seller has not participated in a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b).

(e)    No claim that remains pending has been made by any Tax authority in writing, in a jurisdiction where the Seller has filed a Tax Return, that such entity is or may be subject to Tax by such jurisdiction.

(f)    The Seller has withheld and remitted all material Taxes required to have been withheld and remitted.

(g)    There are no Liens for Taxes upon the Purchased Assets, other than Permitted Liens.

(h)    The Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)    None of the Contracts, the Liabilities of which are assumed under this Agreement constitute a Tax sharing, Tax allocation, Tax indemnity agreement or similar arrangement (other than any agreement entered into in the ordinary course of business that is not primarily related to Taxes and contains customary Tax indemnification, sharing or gross up provisions), pursuant to which Buyer or any of its Affiliates may have any obligations to make payments after the Closing.

(j)        There are no material Tax Liabilities of Seller or its Affiliates that could result in Liability to Buyer or any of its Affiliates as a transferee or successor or otherwise attach to any of the Assets.

5.08    Contracts and Commitments.

(a)        Schedule 5.08(a) sets forth a complete list, as of the date hereof, of all Contracts to which the Seller is party to or bound by that are of a type described below, excluding (x) purchase orders entered into in the ordinary course of business and (y) Company Plans:

(i)        Contracts (and all related loan documents) or indentures under which (A) the Seller has created, incurred, assumed or guaranteed any indebtedness in excess of $10,000, (B) any Lien has been placed on any Purchased Asset (other than a Permitted Lien), or (C) under which any Person has guaranteed any indebtedness of the Seller;

(ii)        any Collective Bargaining Agreement with any Labor Union;

(iii)        any Contract for capital expenditures in an amount in excess of $50,000 in the current or any subsequent calendar year;

(iv)        any Contract with any Third Party Payor or Governmental Entity;

(v)        any Contract or groups of related Contracts for the purchase by the Seller, or the sale or furnishing to the Seller, of materials, supplies, merchandise, equipment or services that has required aggregate payments in excess of $200,000 in the (12)-month period ending on the date hereof or is reasonably expected to require aggregate payments in excess of $200,000 in the (12)-month period from the date hereof (the counterparty to each such Contract, a "Material Vendor");

(vi)        any Contract under which the Seller is (A) a lessee or sublessee of any machinery, equipment, vehicle or other tangible personal property, or (B) a lessor of any tangible personal property owned by the Seller, in any single lease under the foregoing clause (A) or (B) that has future required scheduled payments in excess of $10,000 per annum;

(vii)        any Contract that contains a license, covenant not to assert, release, agreement not to enforce or prosecute, or other immunity to any Person (A) with respect to material Intellectual Property Rights to the Seller from a third party (other than non-exclusive licenses granted by service providers or licenses to open source Software or licenses for commercially available Software or other technology), or (B) from the Seller to a third party under any material Seller IP Rights (other than non-exclusive licenses granted to service providers for the purpose of providing services to the Seller in the ordinary course of business or licenses to Marks which are ancillary to such Contract);

(viii)        any Contract pursuant to which the Seller develops, acquires, or contracts with any other Person to develop or acquire Seller IP Rights, including under any joint development relationship (but excluding employment, consulting, services or

31

invention assignment agreements entered into in the ordinary course of business with employees, contractors or consultants of the Seller);

(ix)    any Contract involving any partnership, limited liability company agreement (or operating agreement of a limited liability company), joint venture, or similar enterprise, joint operating agreement, or sharing of profit agreement;

(x)    any Contract (A) containing a covenant of the Seller not to compete in any material line of business or with any Person in any geographical area with respect to a material line of business, (B) granting any exclusive right, right of first refusal, right of first offer, preemptive right or similar right to any Person, (C) containing "most favored nation" clauses, (D) limiting the freedom of the Seller to hire, solicit or retain any Person for employment in any geographical area, or (E) obligating the Seller to purchase a minimum of goods or services;

(xi)    any Contract with any health care service plan, health insurer, health maintenance organization, carrier, Company Plan, organized delivery system, hospital and/or other Third Party Payor (including any such Contracts held through a downstream provider agreement, or management services or independent practice association arrangement) (a "Material Payor");

(xii)    any agency, dealer, distributor, sales representative, marketing or other similar agreement;

(xiii)    any letters of credit or bonds required by a Third Party Payor;

(xiv)    any Contracts for "value-based care," gainsharing, shared savings or other upside and/or downside risk-sharing arrangements between the Seller and Third Party Payor, hospital, health system, physician group or other health care provider organization;

(xv)    any Contract with a top ten (10) Referral Source of the Seller for the fiscal year ended December 31, 2024 and the five (5) months ended May 31, 2025 (each, a "Material Referral Source");

(xvi)    any Contract relating to the disposition of (other than sales or acquisitions of inventory in the ordinary course of business) any business, assets or properties of the Seller (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise);

(xvii)    any Contract relating to (A) the acquisition of any Person, business, asset or properties (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise) by the Seller or (B) any disposition of any Equity Interests or Purchased Assets of the Seller in the case of this clause (B) pursuant to which after the Closing the Seller (x) is, or may become, obligated to pay or cause to be paid any amount, including (I) outstanding "earn-out" or deferred payments or (II) purchase price adjustment or (y) is subject to surviving indemnification obligations;

(xviii)    Contracts related to the settlement of any Action that impose material ongoing obligations (including nonmonetary obligations) on the Seller (other than customary release, confidentiality and non-disparagement obligations);

(xix)    other than ordinary course severance and separation agreements, all settlements, conciliations or similar agreements the performance of is reasonably expected to involve any payment by the Seller after the date of the latest Adjusted Balance Sheets;

(xx)    any Affiliate Contract;

(xxi)    Leases, including (A) for any Leased Realty, the primary permitted use of which is medical care, (B) subleases by the Seller to any Person for any Leased Realty, the primary permitted use of which is operation of a health insurance resource center or the provision of medical care, or (C) those other Leases disclosed on Schedule 5.08(a)(xxi); and

(xxii)    any other contractual obligation (or group of related contractual obligations) the performance of which requires payment by the Seller or the contractual counterparty in excess of $1,000,000 per annum.

(b)    Buyer has been supplied with true and complete copies of all Contracts (excluding purchase orders), including all amendments, modification and supplements thereto, that are referred to on Schedule 5.08(a) (collectively, the "Material Contracts"). Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, each Material Contract is in full force and effect and is a valid and binding obligation of, and enforceable against, the Seller and, to the knowledge of the Seller, is a valid and binding obligation of, and enforceable against, each other party thereto.

(c)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller (or, if applicable, its Affiliates) has not in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract. To the knowledge of the Seller, no other Person has, in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract and, to the knowledge of the Seller, no event or circumstance has occurred that with or without notice or lapse of time, or both, would constitute a breach or default in any material respect under or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of benefit under any Material Contract. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller has properly paid all amounts to be paid and otherwise performed all material obligations required to be performed by it under the Material Contracts. The Seller nor any of its Affiliates has received written notice from any other party to any Material Contract threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

5.09    <u>Material Payors; Material Referral Sources; Material Vendors</u>.

(a)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement and as described on <u>Schedule 5.09(a)</u>, to the knowledge of the Seller, no Material Payor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Payor has proposed to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business, including the scope of services, with the Business that is inconsistent with the terms of its existing agreement with the Seller. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, and as described on <u>Schedule 5.09(a)</u>, to the knowledge of the Seller, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Payor. Except as described on <u>Schedule 5.09(a)</u>, the Seller has not, or has not been in the last three (3) years, involved in any material claim or dispute with any of its Third Party Payors.

(b)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on <u>Schedule 5.09(b)</u>, to the knowledge of the Seller, no Material Referral Source plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Referral Source has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify terms or amount of the business relationship with the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Referral Source. Except as described on <u>Schedule 5.09(b)</u>, the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Referral Sources.

(c)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on <u>Schedule 5.09(c)</u>, to the knowledge of the Seller, no Material Vendor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Vendor has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business with, as applicable, the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Vendor. Except as described on <u>Schedule 5.09(c)</u>, is the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Vendors.

5.10    Intellectual Property; Information Technology.

(a)    Schedule 5.10(a) sets forth a true, correct and complete list as of the date hereof of all Patents, registered Marks, registered Copyrights and domain name registrations included in the Seller IP Rights (the "Seller Registered IP").

(b)    Except as disclosed on Schedule 5.10(b), the Seller exclusively owns all Seller IP Rights free and clear of all Liens (other than Permitted Liens). The Seller Registered IP is subsisting and has not expired, been cancelled, or been abandoned and, to the knowledge of the Seller, not invalid or unenforceable. The Seller is current in the payment of all registration, maintenance and renewal fees with respect to the Seller Registered IP, except in each case as the Seller has elected in its reasonable business judgment to abandon or permit to lapse a registration or application.

(c)    None of the Seller Registered IP is subject to any Order adversely affecting the use thereof or rights thereto by the Seller. There is no opposition or cancellation Action pending or, to the knowledge of the Seller, threatened in writing against the Seller concerning the ownership, validity, enforceability, registration, use or ownership of any Seller Registered IP (other than ordinary course proceedings related to the application for any item of Seller IP Rights).

(d)    The Seller owns, licenses, sublicenses, or otherwise possesses legally enforceable and sufficient rights to all Intellectual Property Rights necessary to conduct the Business as currently conducted, all of which rights shall survive the consummation of the Transactions without being terminated or materially changed, other than the Excluded Assets, taking into account the rights to be provided under the Transaction Documents and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals. The Seller IP Rights, together with the rights under the Transaction Documents and the Excluded Assets, together with all Intellectual Property Rights of third parties which are licensed or sublicensed to the Seller or for which the Seller otherwise has a legally enforceable right to use, constitute all Intellectual Property Rights necessary to conduct the Business as currently conducted.

(e)    During the three (3) years prior to the date of this Agreement, the Seller has not (i) received any written notice alleging that the conduct of its business infringes, misappropriates, or violates the Intellectual Property Rights of a third party, or (ii) made an allegation in writing that a third party is infringing or misappropriating, or otherwise violating any Seller IP Rights.

(f)    The conduct of the Business, as currently conducted or as conducted during the three (3) years prior to the date of this Agreement has not infringed, violated, or misappropriated any Intellectual Property Rights of any Person and, to the knowledge of the Seller, no Person is infringing, misappropriating or otherwise violating any Seller IP Rights.

(g)    The Seller has taken commercially reasonable steps to protect the confidentiality of material Trade Secrets included in the Seller IP Rights and all such Intellectual Property Rights have been maintained in confidence in accordance with procedures that are customarily used in the industry to protect rights of like importance. The Seller has obtained, either by operation of Law or by valid assignment or transfer, exclusive ownership of all Intellectual

Property Rights from each employee or contractor who is or was involved in the creation or development of any material Intellectual Property Rights for the Seller and, all employees and contractors with access to material Trade Secrets and other material confidential information constituting Seller IP Rights are bound by confidentiality obligations that obligate such Person to protect the material Trade Secrets and other material confidential information constituting such Seller IP Rights.

5.11    Litigation; Orders.

(a)    During the three (3)-year period prior to the date of this Agreement, except for the Bankruptcy Case and as set forth on Schedule 5.11(a), there has not been any material charge, claim, cross-claim or third-party claim, complaint, legal action, litigation, suit, arbitration, prosecution, audit, investigation, inquiry, hearing or proceeding (whether civil, criminal, regulatory or otherwise or federal, state, local or foreign), audit, assessment, grievance, charge, complaint or demand at Law or in equity, by or before any Governmental Entity ("Action"), pending or threatened in writing (or, to the knowledge of the Seller, threatened orally) against (i) the Seller or its respective officers or directors or (ii) any Clinician with respect to the Business.

(b)    The Seller is not, nor any of its assets or properties are, subject to any settlement, stipulation, order, writ, judgment, injunction, decree, ruling, determination or award of any court or of any Governmental Entity ("Order") that (i) restricts the manner in which the Seller may conduct their business or which would, individually or in the aggregate, reasonably be expected to be material to the Seller or its business, (ii) would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the execution, delivery, performance and consummation of the Transactions or (iii) could otherwise materially affect the ability of the Seller or any of its Affiliates to perform its or their obligations pursuant to any Material Contract.

5.12    Governmental Consents, etc. Except as set forth on Schedule 5.12, and to the extent not obviated by the Sale Order, (a) the Seller is not required to submit any material notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and (b) no material consent, approval, clearance or authorization of any Governmental Entity is required to be obtained by the Seller in connection with its execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party or the consummation by the Seller of the Transactions.

5.13    Employee Benefit Plans.

(a)    Schedule 5.13(a) sets forth, as of the date hereof, each Company Plan. With respect to each material Company Plan, the Seller has provided or made available to Buyer or its representatives prior to the date hereof true and complete copies, as applicable, of: (i) the plan and trust documents, and any amendments thereto, and the most recent summary plan description, (ii) the most recent annual report filed on Form 5500 or other annual regulatory filing, (iii) the most recent financial statements and actuarial reports (iv) the most recent favorable determination or opinion letter from the Internal Revenue Service with respect to each Company Plan intended to qualify under Section 401(a) of the Code, (v) the results of annual compliance testing for the

most recently completed plan year and (vi) all non-routine, material correspondence with any Governmental Entity in the past three (3) years.

(b)    No Company Plan is a Multiemployer Plan, Multiple Employer Plan or a plan that is subject to Title IV of ERISA. No Company Plan is a "registered pension plan" as that term is defined in Section 248(1) of the Income Tax Act. No Company Plan provides, and the Seller does not otherwise have any obligation to provide, any health or other welfare benefits to current or former employees of the Seller following their termination of employment, other than health continuation coverage pursuant to COBRA or other similar applicable Law.

(c)    Each Company Plan has been maintained and administered in compliance in all material respects with its terms and the applicable requirements of ERISA, the Code and any other applicable Laws. All amounts due and owing under any Company Plan have been paid in full or accrued up to the Closing Date in accordance with GAAP. Each Company Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter or is the subject of a favorable opinion letter from the Internal Revenue Service on the form of such Company Plan on which the Seller can rely and nothing has occurred, whether by action or failure to act, that would reasonably be expected to affect the qualified status of any such Company Plan.

(d)    There are no actions, suits, claims or disputes pending, or, to the knowledge of the Seller, threatened, anticipated or expected to be asserted against or with respect to any Company Plan or the assets of any such plan (other than routine claims for benefits and appeals of denied routine claims).

(e)    No Liability under Title IV of ERISA has been or, to the knowledge of the Seller, is reasonably expected to be incurred by the Seller. Without limiting the generality of the foregoing, neither the Seller nor its ERISA Affiliates has maintained or contributed to an employee benefit plan that is subject to Title IV of ERISA during the last six years.

(f)    The Seller has not engaged in any transaction with respect to any Company Plan that would be reasonably likely to subject the Seller to any material Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law during the last six years.

(g)    Neither the execution and delivery of this Agreement nor the consummation of the Transactions would (either alone or in conjunction with any other event) (i) cause the accelerated vesting, funding or delivery of, increase the amount or value of, or result in, any payment or benefit to any employee, officer, individual contractor or director of the Seller, or (ii) result in any limitation on the right of the Seller to amend, merge, terminate or receive a reversion of assets from any Assumed Plan or related trust.

(h)    Without limiting the generality of Section 5.13(g), no amount paid or payable in connection with the Transactions (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

(i)      The Seller does not have any obligation to gross-up, indemnify or otherwise reimburse any current or former employee, officer, director or individual contractor of the Seller for any Tax incurred by such individual, including under Section 409A or 4999 of the Code.

(j)      Each Company Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code) that is subject to Section 409A of the Code has been maintained and operated in documentary and operational compliance with Section 409A of the Code and the regulations thereunder.

(k)      The Seller has not made any loan or advance to any current or former employee of the Seller, other than advances for business and travel expenses in the ordinary course of business. There are no outstanding obligations of the Seller under any promissory note or similar obligation of the Seller issued to any current or former employee of the Seller, except for the Promissory Notes.

5.14      Insurance. Schedule 5.14 lists each material insurance policy maintained by the Seller as of the date hereof, including the type of insurance, policy number, term, identity of the issuer, coverage limits and applicable deductibles. The Seller has provided to Buyer true and complete copies of all such policies. Neither the Seller nor any of its Affiliates have received any written notice of pending cancellation of, premium increase with respect to, or material alteration of coverage under, any of such policies. Since January 1, 2021, the Seller has complied in all material respects with the terms and conditions of such policies. All such policies are (i) in full force and effect, (ii) fully paid and valid and binding in accordance with their terms and (iii) have not been subject to any lapse in coverage, and the Seller is not in material breach or material default thereunder. There is no material claim by or with respect to the Seller pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies or in respect of which such underwriters have reserved their rights, and the Seller has not failed to present any material claim which is still outstanding to the carrier of any such policy. Such policies are in amounts and provide coverages as required by the applicable Governmental Entity, applicable Laws and any Contract to which Seller is a party or by which any of its assets or properties is bound. Each Clinician providing professional services on behalf of the Seller as of the date hereof (a) currently maintains and historically has maintained (during all periods that such Person provided services to or on behalf of the Seller) valid professional liability insurance policies, with liability limits of at least $1,000,000 per occurrence and $3,000,000 in the aggregate and (b) is listed on the declarations page of the Seller's professional liability insurance policies.

5.15      Compliance with Laws.

(a)      The Seller (including its directors, officers and employees, and, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is, and during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Laws in all material respects.

(b)      No written (or to the knowledge of the Seller, oral) notices or inquires have been received by and no claims have been filed or threatened against the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller (i) alleging a violation by such Person of any applicable Laws, or (ii) indicating that such Person is under investigation, inspection,

inquiry or audit related to a potential violation or breach of any applicable Law (in each case, regardless of whether such violation would constitute a criminal, civil, administrative or other violation) applicable to their business, operations, assets and properties. During the five (5)-year period prior to the date of this Agreement, the Seller has not received any allegation by any Person or has reasonable cause to believe that the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller has violated applicable Laws or company compliance policies, in any material respects, in the performance of its responsibilities or business.

(c)     The Seller (nor any of its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) has established or maintained any unrecorded fund or asset or made any false entries on any books or records of the Seller for any purpose.

(d)     Without limiting the other provisions of this <u>Section 5.15</u>, the Seller (including its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended and other federal, foreign, or state anti-corruption or anti-bribery Laws or requirements applicable to the Seller (the "<u>Anti-Bribery Laws</u>"). During the five (5)-year period prior to the date of this Agreement, the Seller has not received any written communication, or to the knowledge of the Seller, oral communication from any Governmental Entity or from any third Person that alleges that the Seller or any employee or agent of the Seller is in violation of any Anti-Bribery Laws.

(e)     All material approvals, filings, permits, franchises, consents, exemptions, licenses, bonds, approvals, rights, privileges, registrations, certificates, accreditations, enrollments, supplier or provider numbers and similar authorizations of Governmental Entities or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound (collectively, "<u>Permits</u>") required to conduct the Business (including the receipt of payment or reimbursement from customers and Third Party Payors), (i) are in the possession of the Seller, (ii) are valid and in full force and effect, (iii) have been and are being complied with in all material respects, and (iv) the Seller is not in material breach or violation of, or default under, any such Permit, and to the knowledge of the Seller, no event has occurred that, with or without notice or lapse of time or both, would constitute any material breach, violation or default.

5.16     <u>Environmental Matters</u>.

(a)     Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on the Seller, the Seller is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the Seller of all Permits and other governmental authorizations required under applicable Environmental Laws to conduct the Business, and compliance with the terms and conditions thereof).

(b)     There is no material Environmental Claim existing, pending or, to the knowledge of the Seller, threatened against or adversely affecting the Seller or any of its Leased Realty.

(c)    The Seller has not Released any Hazardous Materials at, in, on, under or from any location and no Hazardous Materials have been Released by the Seller or, to the knowledge of the Seller, by any other Person at any Leased Realty, in either case in a quantity or manner that would reasonably be expected to result in the Seller incurring any material Liability under Environmental Law or any material obligation for cleanup or remedial action.

(d)    The Seller has not assumed by contract, Order or by operation of Law any material Liability of any other Person under any Environmental Law (including any obligation to remediate any Release of any Hazardous Material).

(e)    The Seller has delivered for inspection to Buyer true and complete copies of material studies, audits, assessments, memoranda and investigations regarding the Seller's current and former operations and their compliance with or Liabilities arising under applicable Environmental Laws and the environmental condition of the Leased Realty that are in the possession or under the reasonable control of the Seller.

5.17    Related Party Transactions. Except as set out on Schedule 5.17, neither (i) TVHHC nor any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC nor any of their Affiliates (other than Seller) nor (iii) any director, manager or officer of any of the Persons in clause (i) or (ii) (any such Person, a "Related Party") nor, to the knowledge of the Seller, any member of the immediate family of any Related Party, (a) is or has been a party to any Contract or material transaction with the Seller or otherwise indebted to the Seller or has any ownership interest in any Material Payor, Material Referral Source or Material Vendor or other business relationship material to the conduct of the Business as currently conducted (other than ownership of five percent (5%) or less of any class of securities of a company whose securities are publicly traded), other than Company Plans and employment arrangements with the Seller entered into in the ordinary course of business (for the avoidance of doubt, Company Plans and employment arrangements with a Person who is only included in the foregoing due to an employment relationship with the Seller shall be considered entered into in the ordinary course of business) or (b) directly or indirectly, owns any material property or right, tangible or intangible, used by the Seller in the conduct of the Business.

5.18    Employees.

(a)    Schedule 5.18(a) sets forth a complete and accurate list of all Clinicians and non-Clinician employees of the Seller, in each case, as of June 15, 2025 identifying for each such employee: his/her name, position/title, date of hire, rate of compensation, any target bonus amounts for 2025, any bonus amounts paid in 2025, work location, any visa or work permit status and the date of expiration, if applicable, status (active or on-leave) and, solely with respect to Physicians and Non-Physician Providers (in each case, as identified in Column N of Schedule 5.18(a)), medical specialty. The Seller has made available to Buyer the Contract of employment or engagement between each Clinician and the Seller as of the date hereof.

(b)    Schedule 5.18(b) sets forth a complete and accurate schedule of the accrued sick, vacation and personal leave for all Clinician and non-Clinician employees of the Seller, in each case, as of June 15, 2025.

(c)  The Seller currently is not, and has not been during the past three (3) years, a party to or bound by any collective bargaining, works council, or other labor agreement ("Collective Bargaining Agreement") with any union, employee association, works council, or other labor organization ("Labor Union"). To the Seller's knowledge, no employee of the Seller is represented by a Labor Union in connection with such employment. There is, and during the past three (3) years there has been, no pending or, to the knowledge of the Seller, threatened (i) slowdown, labor strike, lockout, concerted work stoppage, or other material labor disputes or disruptions or (ii) to the Seller's knowledge, union organizing activity.

(d)  The Seller is in material compliance, and in the past three (3) years has complied, in each case, in all material respects, with applicable Law respecting employment, employment practices and labor with respect to employees and any independent contractors, including overtime, wages and hours, prevailing wages, equal pay, classification of workers (including exempt and non-exempt employee classification, independent contractor classification and leased workers from another employer), meal periods and rest breaks, affirmative action, employment discrimination, retaliation, harassment, whistleblower protections, background checks and screenings (including use of consumer reports), employee privacy, employee trainings and notices, drug testing, recordkeeping, paid sick days/leave, vacation and other entitlements and benefits, workers' compensation, leaves of absence, immigration, occupational safety and health, collective bargaining, plant closures and mass layoffs, hiring, promotion, demotion and termination, and withholding of Taxes.

(e)  There have not been in the past three (3) years, and there are no pending or threatened, unfair labor practice charges or Actions against the Seller before the National Labor Relations Board or any Governmental Entity relating to an alleged violation or breach of any applicable Laws respecting employment and employment practices. There has not been, within the past four (4) years, and there are no pending or, to the knowledge of the Seller, threatened, material labor or employment related audit or investigation of the Seller including those concerning discrimination, harassment, retaliation, wages and hours, classification and/or occupational safety and health. The Seller is not subject to any employment related consent decree. The Seller is not delinquent in any material respects in any payments to any employee or independent contractor, including wages, commissions, incentives, bonuses, severance or other compensation, or any Taxes or any penalty for failure to comply with withholding or reporting requirements.

(f)  The Seller has not incurred any Liabilities, nor failed to provide any required notice, under the Worker Adjustment and Retraining Notification Act, or any similar applicable state or local law. As of the date hereof, no employee of the Seller is involuntarily on temporary layoff or working hours that have been reduced by fifty percent (50%) or more.

(g)  Each current employee and independent contractor of the Seller is properly so classified. No employee of the Seller is working in the United States on a visa or requires a visa sponsorship in order to work in the United States. Each current employee of the Seller is authorized to work in the United States.

5.19  Brokerage. No broker, finder, financial advisor, investment banker or similar agent is entitled to any brokerage, finder's, financial advisor's or investment banker's fee or commission

or similar payment in connection with the Transactions based upon arrangements made by or on behalf of the Seller.

5.20    Health Care Compliance.

(a)    The Seller is, and for the past five (5) years has been, in compliance with all Health Care Laws, in each case, in all material respects. The Seller has not received in the five (5) years prior to the date hereof any written or, to the Seller's knowledge, other notification of any pending or threatened Action from any Governmental Entity, Third Party Payor or other Person alleging potential or actual material non-compliance by, or material Liability of, the Seller under any Health Care Laws. No officers, directors, managers, employees or Clinicians of the Seller is, or has been (during the shorter of (i) the past five (5) years, or (ii) since such officer, director, manager, employee or Clinician has been employed or engaged by the Seller) in material violation of or subject to any materially adverse finding, penalty, assessment, judgment, civil investigative demand, enforcement action or other Action related to noncompliance with or a breach of, or to the Seller's knowledge, investigated by any Governmental Entity for any material violation of or non-compliance with, any Health Care Laws. Each of the services and items provided to patients by the Seller (including the Seller's Clinicians) has for the past five (5) years been provided in compliance with Health Care Laws in all material respects. To the Seller's knowledge, no Person has filed or has threatened in writing to file any Action against any the Seller under the federal False Claims Act (31 U.S.C. §§ 3729, et seq.) or analogous state whistleblower Laws.

(b)    The Seller, and for the past five (5) years has held, all such material Permits required under applicable Health Care Laws for the conduct of its business and currently (or then) conducted (collectively, the "Health Care Permits") and all Health Care Permits are, and have been for the past five (5) years, valid and in full force and effect. The Seller is, and for the past five (5) years has been, in compliance with all terms and conditions of any Health Care Permit in all material respects. In the past five (5) years, the Seller has not received any written or, to the Seller's knowledge, other communication from any Governmental Entity that alleges material noncompliance with any Health Care Permits or any pending or threatened Action to terminate, revoke, suspend, or withdraw any such Health Care Permit.

(c)    During the shorter of (A) the past five (5) years, or (B) since such Clinician has been employed or engaged by the Seller to provide professional services, each Clinician (i) has held all material Permits required under Health Care Laws to perform the functions that he or she performs for the Seller and for the Seller to obtain reimbursement from Third Party Payors and related fiscal intermediaries or administrative contractors with respect to the services provided by such Clinician on behalf of the Seller; (ii) to the extent required in connection with the scope of such Clinician's practice, is, and has been, validly registered with the United States Drug Enforcement Administration under Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq. and any similar applicable state Health Care Laws; (iii) is not, and has not been, debarred, suspended, excluded from or otherwise ineligible to participate in any Governmental Program, in each case; and (iv) is not, and has not been, subject to any material pending (or threatened) disciplinary proceeding, inquiry, monitoring, investigation or other Action under the bylaws or rules of procedure of the Seller, any state professional board or agency or other Governmental Entity charged with regulating the professional activities of such

Person or any other Health Care Law related to such Clinician role with the Seller, including any denial or revocation of medical staff privileges or licensure of any Clinician. During the past five (5) years, while employed or engaged by the Seller, to the Seller's knowledge each Clinician is and has been appropriately providing services within the relevant scope of practice, and has entered into and maintained compliance with all reasonable and necessary collaborative practice, supervision and other similar arrangements. To the knowledge of the Seller, no event has occurred, and no fact, circumstance or condition exists, that has resulted or may result in the denial, loss, restriction, revocation or rescission of any Clinician's professional license, certification, or registration. During the past five (5) years, all disciplinary actions, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for any Clinician while any such Clinician has been employed or engaged by the Seller requiring reporting to local, state, federal or quasi-public authorities that are required of the Seller have been effected in all material respects as required.

(d)    The Seller and its unitholders, members, officers, directors, employees and to the knowledge of the Seller, agents are not, and have not been while any such Person has been employed or engaged by the Seller, debarred, suspended or otherwise ineligible to participate in any Governmental Program or Third Party Payor program, and no such Action is pending or to the Seller's knowledge, threatened. The Seller has not received any written notice during the past five (5) years that the Seller or its respective officers, directors, employees and agents is or has been investigated, charged with or convicted of a criminal offense related to any Governmental Program or Third Party Payor program, patient neglect or abuse in connection with the delivery of a healthcare item or service, or Fraud, theft, embezzlement, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service.

(e)    The Seller is not subject to, and for the past five (5) years have not been subject to any pending or, to the Seller's knowledge, threatened material Actions, audits, investigations or focused reviews by any Third Party Payor, against it in connection with the provision of healthcare services or goods by the Seller for overpayment, recoupment, offset, refund or improper billing practices of any nature. During the past five (5) years, no Third Party Payor has imposed any material fine, penalty or other sanction against the Seller. The Seller has not received and identified during the past five (5) years any material undisputed overpayment by the Seller, which has not been repaid to such Governmental Program.

(f)    During the past five (5) years, the Seller (i) has not been a party to a corporate integrity agreement with the OIG or similar agreement with any Governmental Entity, deferred or non prosecution agreement, monitoring agreement, consent decree, or any similar agreement with any Governmental Entity and (ii) has no material reporting obligations pursuant to any settlement agreement entered into with any Governmental Entity. During the past five (5) years, the Seller has not been served with or received any search warrant, subpoena or civil investigation demand by or from any Governmental Entity with regard to any alleged or actual violation of Health Care Laws by the Seller. During the past five (5) years, the Seller has not made any material voluntary disclosure to any Governmental Entity relating to any Governmental Program or violation of any Health Care Law, and no such disclosure is pending.

(g)      The Seller maintains a compliance program having the elements of an effective corporate compliance and ethics program identified in U.S.S.G. § 8B2 designed to comply with applicable Health Care Laws.

(h)      The Seller and, to the Seller's knowledge, each Clinician employed by Seller as of the date hereof that participates in a Governmental Program is qualified to participate in such Governmental Program and is enrolled and certified in such Governmental Program as a provider of health care services, except as would not be material to the Seller. During the past five (5) years, received written notice of any Action by any Governmental Entity to terminate, revoke, suspend, withdraw or materially limit the participation of, or impose any payment suspension or termination on, the Seller in any Governmental Program. To the Seller's knowledge, each Clinician is operating and, at all times during the shorter of (i) the past five (5) years, or (ii) since such Clinician has been employed or engaged by the Seller, has operated, in compliance in all material respects with, all Governmental Program rules and regulations and each Governmental Program contract to which it is party or by which it is bound. The Seller is not, nor, to the Seller's knowledge, any Clinician (x) is party to an individual or corporate integrity agreement with the OIG, (y) has during the past five (5) years (and with respect to Clinicians, while such Clinician was employed or engaged by the Seller if shorter than five (5) years) made, intends to make, a voluntary disclosure to any Governmental Entity for any material violation of Health Care Laws, including pursuant to the OIG or CMS self disclosure protocols, or (z) otherwise has any material continuing reporting obligations pursuant to any deferred prosecution, settlement or other agreement with any Governmental Entity.

(i)      All documentation, coding, billing and collection practices of the Seller, and all claims submitted to Third Party Payors are, and for the past five (5) years have been, in compliance in all material respects with all applicable Health Care Laws and applicable Third Party Payor requirements governing (1) the provision, documentation, coding and billing of healthcare services and the preparation and submission of claims, and (2) capitated risk reimbursement, including reserves, bonds, and letters of credit. With respect to each Contract with a Third Party Payor to which the Seller is a party, the Seller has complied with all material applicable requirements, including, without limitation, conditions of payment or participation, applicable manuals, instructions, FAQs and guidance and is not in material breach of or default under any such Contract and no other party to such Contract is in material breach thereof or default thereunder. To the knowledge of the Seller, no event has occurred, is pending or has been threatened, which, after the giving of notice, lapse of time or otherwise, would constitute a material breach or default by the Seller under any such Contract or any other party to such Contract. During the past five (5) years, the Seller (i) has timely filed all material reports and billings required to be filed, all of which were prepared in compliance in all material respects with all applicable Health Care Laws governing reimbursement and claims, (ii) has paid all known and undisputed material refunds, overpayments, discounts and adjustments due with respect to any such report or billing, (iii) is not aware of any pending or, to the Seller's knowledge, threatened material appeal, adjustment, challenge, audit (including written notice of an intent to audit), written inquiry or litigation concerning the billing practices of the Seller, and (iv) has adequately reserved for all performance based reimbursement incentives and penalties, including all quality performance metrics, in each case, except as would not be material to the Seller, taken as a whole. All billings submitted by the Seller during the past five (5) years were for goods actually sold and services

actually performed in accordance in all material respects with applicable Health Care Laws and the Seller has sufficient documentation that is required to support such findings.

(j)    The Seller and its respective Affiliates, officers, directors, managers, employees and, to the knowledge of the Seller, agents are operating and during the past five (5) years (and, with respect to officers, directors, managers, employees and Clinicians, while such Persons have been employed by the Seller) have operated in compliance in all material respects with the federal health care program anti-kickback statute (42 U.S.C. § 1320a-7b, et seq.), and any similar state Health Care Laws, the federal physician self referral law (commonly known as the Stark Law) (42 U.S.C. § 1395nn, et seq., and its implementing regulations, 42 C.F.R. Subpart J), any patient brokering Laws, and all other applicable Health Care Laws with respect to direct and indirect compensation arrangements, ownership interests or other relationships between such Person and any past, present or potential patient, physician, supplier, contractor, customer, Third Party Payor or other Referral Source or to whom such Person refers, recommends or arranges for the referral of patients or other health care business.

(k)    The Seller's Processing of Personal Data presently materially complies, and has during the last five (5) years materially complied with (i) all applicable Privacy and Security Laws, (ii) applicable industry standards to which the Seller has agreed to be bound, including the Payment Card Industry Data Security Standard, (iii) terms of any Contracts relating to the Processing of Personal Data by which the Seller is bound, and (iv) all Privacy Policies, consents and authorizations that apply to the Seller's Processing of Personal Data (collectively, "Data Protection Requirements").

(l)    To the knowledge of the Seller, the IT Systems are adequate for and perform in all material respects as required in connection with the operation of the Business as currently conducted, free and clear of all material bugs, errors, defects, trojan horses, time bombs, malware and other corruptants. The Seller has taken all commercially reasonable measures to protect and maintain the integrity, security and confidential nature of the IT Systems, and all Personal Data and Business Data and to protect it against loss, corruption, and unauthorized access to or other Processing. To the Seller's knowledge, no third party has experienced, or made or has been required to make any notifications under any applicable Data Protection Requirements in connection with, any Security Incident. The Seller has implemented and maintained, all commercially reasonable privacy and security policies and procedures as required by Data Protection Requirements.

(m)    The Seller has requisite authority, including applicable consents and Permits, to Process the Personal Data in the Seller's possession or under its control to the extent required and in the manner in which it is Processed by the Seller in connection with the operation of the Seller's businesses as currently conducted, except as would not be material to the Seller, taken as a whole. To the extent required by HIPAA, the Seller has executed a "business associate agreement" with each Person who is a "covered entity" or "business associate" (as such terms are defined under HIPAA), as required for the conduct of the Business.

(n)    During the past five (5) years, the Seller has not received written notice of, and there is no Action pending or, to the Seller's knowledge, threatened with respect to, the Seller's compliance with Data Protection Requirements, including with respect to any alleged "breach" (as

45

defined in 45 C.F.R. § 164.402) or any other violation of HIPAA by the Seller or its "workforce" (as defined in 45 C.F.R. § 160.103), except as would not be material to the Seller, taken as a whole. The Seller has performed a security risk analysis that meets the standards set forth at 45 C.F.R. § 164.308(a)(1)(ii) (A) (the "Security Risk Analysis") and have remediated all risks identified in the Security Risk Analysis as critical or high risks.

(o)    During the past five (5) years there has been (i) no material "breach" or other material violation of HIPAA the Seller or its "workforce" or successful "security incident" with respect to "protected health information" (each as defined under HIPAA) in the possession or under the control of the Seller, and (ii) no material unauthorized access to, or use, acquisition or disclosure of, the IT Systems or any Business Data including Personal Data Processed by or on behalf of the Seller (each, a "Security Incident"). During the past five (5) years, the Seller has not notified, either voluntarily or as required by Data Protection Requirements, any affected individual, customer, employee, any Governmental Entity or the media or any other Person of any unauthorized Processing of any Personal Data.

(p)    The Seller does not transmit or store any Personal Data outside of the United States and do not have in effect any Contract with any third party vendor under which, to the Seller's knowledge, the third party vendor transmits or stores any Personal Data of the Seller outside of the United States.

5.21    No Other Representations or Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS Article V OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO BUYER PURSUANT TO SECTION 9.02(D), THE SELLER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER OR ITS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller, as of the date hereof and as of the Closing, as follows:

6.01    Organization and Power. Buyer is a Florida corporation, incorporated, validly existing and in good standing under the Laws of the State of Florida, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder. There are no pending, or to the knowledge of Buyer, threatened, actions for the dissolution, liquidation or insolvency of Buyer.

6.02 _Authorization_. The execution, delivery and performance of this Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action, and no other proceedings on the part of Buyer are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which Buyer is (or, at the Closing, will be) a party. This Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party has been or will be duly executed and delivered by Buyer and, assuming that this Agreement is a valid and binding obligation of the other Parties, this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party constitute a valid and binding obligation of Buyer, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

6.03 _No Violation_. Neither the execution and delivery of this Agreement, the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party, nor the consummation by Buyer of the Transactions, nor compliance by Buyer with any of the provisions hereof or thereof, will: (i) conflict with or result in a breach of any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Buyer; or (ii) except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, (x) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Buyer is a party or by which any of their respective properties or assets is bound or (y) violate any Order or Law applicable to Buyer or any of its properties or assets in any material respect.

6.04 _Governmental Consents, etc._ Subject to entry into and effectiveness of the Sale Order and requisite Bankruptcy Court approvals, Buyer is not required to submit any notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and no consent, approval, clearance or authorization of any Governmental Entity or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party or the consummation of the Transactions.

6.05 _Brokerage_. Except for any fees that will be paid solely by Buyer or its Subsidiaries, there are no claims for brokerage commissions, finders' fees, financial advisor fees, investment banker fees, agents fees or similar compensation in connection with the Transactions based on any agreement made by or on behalf of Buyer.

6.06 _Buyer Financial Resources_. Buyer will have available on the Closing Date sufficient readily available funds to make payment of the Cash Purchase Price and Cure Costs up to the amount of the Cure Costs Cap, on the Closing Date and to consummate the Transactions. The obligations of Buyer under this Agreement are not subject to any conditions regarding

Buyer's, its Affiliates' or any other Person's ability to obtain any financing for the consummation of the Transactions.

6.07    No Reliance. Buyer acknowledges and agrees that it has not relied and is not relying on any representations, warranties, or other statements whatsoever, whether written or oral, by the Seller or any Person acting on their respective behalf, other than those expressly set forth in Article V or in any other Transaction Document, in the certificate to be delivered to Buyer pursuant to Section 9.02(d), or any document or instrument pursuant hereto or thereto.

6.08    No Other Representation. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER IN THIS ARTICLE VI OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO THE SELLER PURSUANT TO SECTION 9.03(c), BUYER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO BUYER OR ITS BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE SELLER OR ANY OF ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VII

## PRE-CLOSING COVENANTS OF THE SELLER

7.01    Conduct of the Business. From the date hereof until the earlier of the termination of this Agreement and the Closing Date except (i) as set forth on Schedule 7.01 of the Disclosure Schedules, (ii) if Buyer shall have consented in writing (which such consent shall not be unreasonably withheld, conditioned or delayed), (iii) as required by applicable Laws or Order of the Bankruptcy Court, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as otherwise expressly permitted or required by this Agreement or any of the other Transaction Documents, the Seller shall (1) conduct the Business in accordance with applicable Law, including Health Care Laws and at the direction of relevant Governmental Entities, (2) conduct the Business in the ordinary course of business in all material respects, (3) preserve intact, in all material respects the business, organization, operations, workforce, assets, properties, rights, relationships and goodwill of the Business and the Purchased Assets, including with Third Party Payors, (4) preserve and maintain in good standing all of its Permits, (5) maintain its tangible personal property in the same condition, in all material respects, as they were on the date hereof and make all necessary repairs to restore all such tangible personal property to such condition, in all material respects, subject in all cases to reasonable wear and tear and disposal consistent with the ordinary course of business, (6) maintain the Seller Information in all material respects, and (7) with respect to the compliance, documentation, coding, billing and collection practices of the Business, undertake and implement the items forth in Schedule 7.01(7); provided, however, that no action or inaction by the Seller with respect to matters specifically addressed by the second sentence of this Section 7.01 shall be deemed a breach of this first sentence of this Section 7.01 unless such action or inaction would constitute a breach of the second sentence of this Section 7.01. Except as described in Schedule 7.01 of the Disclosure Schedules, as required by Law, or the Bankruptcy

Court, as expressly permitted or required by this Agreement or any other Transaction Document, to the extent related to an Excluded Asset or Excluded Liability, or with the prior written consent of Buyer (which such consent shall not be unreasonably withheld, conditioned or delayed), the Seller covenants and agrees that, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, the Seller shall not:

> (a)    amend or make any change to the organizational documents of the Seller (except for ministerial changes);

> (b)    sell, assign, transfer or dispose of any Purchased Assets in excess of $10,000 individually or $50,000 in the aggregate, in each case, except for sales of obsolete assets or assets no longer used in the operation of the Business;

> (c)    sell, assign, abandon, permit to lapse, transfer, or license any Seller IP Rights, except non-exclusive licenses in the ordinary course of business;

> (d)    fail to maintain or abandon any Seller Registered IP;

> (e)    amend, modify, waive, supplement, grant any release or relinquishment of any material rights under or, let lapse, terminate or consent to the termination of (in each case, other than expiration of Executory Contracts in accordance with their terms), renew or extend, fail to perform any material obligations under any Executory Contract.

> (f)    provide any loan or advance to any Person, other than advances to employees for business and travel expenses in the ordinary course of business;

> (g)    enter into any new commitment to make capital expenditures that individually or in the aggregate cost in excess of $25,000;

> (h)    enter into any transaction with a Related Party other than the DIP Facility;

> (i)    enter into any Collective Bargaining Agreement with any Labor Union;

> (j)    except as required under the terms of any Company Plan or applicable Law: (i) grant or pay any special bonus (other than spot bonuses in the ordinary course of business not exceeding $5,000 each), severance, termination, incentive, change in control, transaction or retention compensation or benefits, (ii) make any increase in the salaries, bonuses or other compensation and benefits payable by the Seller to any of its employees, officers or directors other than increases in base salary or wages of up to three percent (3%) in the aggregate per year in the ordinary course of business for any current employee of the Seller whose annual base salary does not exceed $185,000, (iii) terminate or amend any Company Plan, other than annual renewals of welfare benefit plans that do not materially increase costs, (iv) adopt or enter into any plan, policy or arrangement that would be a Company Plan if it were in existence as of the date hereof, other than in connection with the renewal of an expired agreement with a Clinician that provides for substantially the same compensation terms as the expired agreement, except as otherwise permitted pursuant to this Section 7.01(j), or (v) accelerate the time of payment or vesting of any compensation and benefits of any employee or director of the Seller (or pay to any such individual any amount not otherwise due);

(k)     (i) terminate (other than for cause) any Clinician employed by Seller as of the date hereof or (ii) hire or promote any employee, unless such employee is (A) a Clinician hired in the ordinary course of business, or (B) a non-Clinician hired to fill a vacancy arising following the date of this Agreement or disclosed on Schedule 7.01(k);

(l)     commence or initiate any Action or compromise, waive, release, resolve or settle the matter disclosed on Schedule 5.20(f) (the "Specified Proceeding") or any other Action (other than any Action in respect of Taxes, which shall be governed exclusively by clause (p) below);

(m)     other than pursuant to the DIP Facility, create, incur, guaranty, assume or otherwise become liable for any indebtedness for borrowed money;

(n)     create, incur or permit any Lien on any Purchased Asset;

(o)     make any material change to its financial accounting methods, policies or practices or practices with respect to the maintenance of books of account and records, except as required by GAAP or applicable Law;

(p)     except to the extent Buyer reasonably agrees that any action set forth in this clause (p) is not expected to result in a Tax Liability to Buyer or any of its Affiliates, (i) make, change or revoke any material Tax election, (ii) file any material amended Tax Return, (iii) enter into any closing agreement with a Governmental Entity (iv) fail to timely file (taking into account valid extensions) any material Tax Return required to be filed, in each case, with respect to the Purchased Assets or (v) fail to timely pay any material amount of Tax with respect to the Purchased Assets when due;

(q)     fail to maintain insurance coverage substantially equivalent to the insurance coverage maintained as of the date of this Agreement with respect to the Purchased Assets;

(r)     make any change to the policies or practices with respect to cash management, the payment of accounts payable or accrued expenses or the collection of the accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable;

(s)     make any changes to the policies, practices and processes with respect to documentation, billing, coding and collection practices of the Seller;

(t)     engage in any new line of business;

(u)     grant, or permit any Affiliates or other third parties to grant, any licenses or sublicenses to any third party to use any of The Villages Health Marks;

(v)     authorize any of, or agree or commit to do any of, the foregoing actions.

Notwithstanding the foregoing, Seller shall, at all times prior to the Closing Date and consistent with applicable Law, exercise complete control and supervision over the Business and operations.

7.02    <u>Access to Books and Records</u>. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, and subject to permissibility under applicable Law, the Seller shall, upon reasonable notice, (a) provide Buyer and its authorized representatives (the "<u>Buyer's Representatives</u>") with reasonable access during normal business hours, to the properties, assets, personnel and agents, Contracts, books and records and other documents and data of the Seller and (b) otherwise cooperate with Buyer and Buyer's Representatives in order for such Person to have the opportunity to make such investigation as it shall reasonably desire; <u>provided</u>, <u>however</u>, that (a) all such requests shall be coordinated through the Seller's designee, who shall be solely responsible for coordinating all such requests and all access permitted pursuant to this <u>Section 7.02</u> and (b) any request for access pursuant to this <u>Section 7.02</u> shall be for the purpose of facilitating the Transaction or Buyer's post-Closing integration planning. Notwithstanding anything to the contrary set forth in this Agreement, the Seller and its Affiliates shall not be required to disclose to Buyer or Buyer's Representatives any information (i) if doing so would violate any applicable Law to which the Seller is a party or is bound; (ii) which would (in the good faith judgment of the Seller's legal counsel) violate or result in the loss of the ability to assert attorney client, work product or similar privileges; or (iii) if the Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse (or would reasonably be expected to be adverse) parties in a litigation or similar proceeding and such information is reasonably pertinent thereto; <u>provided</u> that the Seller shall, provide Buyer, or Buyer's Representatives access and disclosure to the maximum extent possible in a manner that would not result in the adverse effects described in this sentence, including by providing redacted copies if necessary, entering into join defense agreements (to the extent related to a pending or threatened action) or by obtaining the consent of the applicable third parties to permit disclosure. The Seller may elect to limit disclosure of any competitively sensitive information to certain Persons designated as belonging to a "clean team" by Buyer, provided such Persons are reasonably acceptable to the Seller for such purpose. Notwithstanding anything contained herein to the contrary, no access or examination provided pursuant to this <u>Section 7.02</u> shall qualify or limit any representation or warranty set forth herein or the conditions to Closing set forth in <u>Section 9.02(a)</u>.

7.03    <u>Credentialing Applications; Qualification</u>.

(a)    The Seller shall as promptly as reasonably practicable following the date hereof, and in no event later than fifteen (15) Business Days prior to the Closing Date, deliver to Buyer completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

(b)    Buyer will use commercially reasonable efforts as promptly as practicable following the date hereof to (A) either (i) have all Accepted Clinicians qualified by United under United's current payor arrangements with the Buyer; or (ii) enter into a new payor arrangement with United to qualify all of the Accepted Clinicians, on terms consistent in all material respects with Seller's or Buyer's existing payor arrangement with United; and (B) provide reasonable assistance as may be reasonably requested by Seller in connection with the preparation of provider credentialing applications and medical malpractice applications or waivers.

7.04    <u>Tail Insurance</u>. The Seller shall use commercially reasonable efforts to obtain "tail insurance" on or prior to the Closing Date for medical malpractice liability in respect of

Transferred Employees for claims made under such policies related to any period prior to Closing, with a carrier or carriers reasonably acceptable to Buyer and with the same per-claim and aggregate coverage limits as in effect prior to the Closing for the Seller's existing insurance coverage in connection with such types of insurance (the "Tail Insurance"), and naming Buyer as additional insureds, effective for a period of not less than the lesser of (a) the applicable statute of limitations in the State of Florida, or (b) six (6) years after the Closing Date (the "Coverage Period"). In the event any medical malpractice claim is asserted against Buyer during the Coverage Period arising out of or relating to the operation of the acquired Senior-Focused Primary Care Centers prior to the Closing, (i) Seller shall be responsible for any deductible payment required under the Tail Insurance, and (ii) Seller shall promptly assign the proceeds under the Tail Insurance to Buyer to the extent of the losses incurred by Buyer.

7.05    Transition Services Agreement. Buyer and Seller will work in good faith prior to the Closing Date to reasonably identify the services to be provided pursuant to the Transition Services Agreement.

## ARTICLE VIII

## TAX MATTERS

8.01    Cooperation. Buyer and Seller agree to use reasonable best efforts to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to books and records, as is reasonably necessary for the filing of all Tax Returns by Buyer or Seller, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Each of Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Date.

8.02    Apportionment of Property Taxes.

To the extent not otherwise provided in this Agreement, (i) Seller shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period, and (ii) Buyer shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Post-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes, Buyer or Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 8.02 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement but in no event earlier than three (3) days prior to the due date for payment of the relevant Property

Taxes (taking into account extensions). In the event that Buyer or Seller makes any payment to a taxing authority for which it is entitled to reimbursement under this Section 8.02, the applicable party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. For purposes of this Agreement, in the case of any Straddle Period, Taxes (other than Property Taxes) for the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the end of the day on the Closing Date.

8.03    Transfer Taxes.

All transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with this Agreement and the transactions contemplated hereby ("Transfer Taxes") will be borne by Buyer.

8.04    Tax Audits.

Seller shall notify Buyer in writing as soon as practicable upon receipt by Seller of notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of Seller that reasonably may be expected to relate to or give rise to a Lien on the Purchased Assets or the Business. Each of Buyer and Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Tax audit or assessment challenging the Allocation.

8.05    Tax Clearance Certificate.

Seller shall use its commercially reasonable efforts to provide Buyer, at the Closing, a clearance certificate or similar document(s) that may be required by any state taxing authority in order to relieve Buyer of any obligation to withhold any portion of the Purchase Price.

# ARTICLE IX

# CONDITIONS TO CLOSING

9.01    Conditions to Obligations of Each Party. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction or written waiver in their sole discretion, as of the Closing, of each of the following conditions as of the Closing Date:

(a)    No Governmental Entity having competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order, in each case, after the date of this Agreement, that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions; and

(b)    The Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order (declaring, among other things, that the Purchased Assets can be sold free and clear of all Liens, Claims and interests (other than the Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code).

9.02    Conditions to Buyer's Obligations. The obligations of Buyer to consummate the Transactions are subject to the satisfaction or written waiver in Buyer's sole discretion of each of the following conditions as of the Closing Date:

(a)    (i) The Seller Fundamental Representations shall be true in all respects (other than de minimis inaccuracies) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date) and (ii) all other representations and warranties of the Seller contained in Article V, and any certificate or other writing delivered pursuant hereto, shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (in each case, except to the extent expressly made only as of an earlier date, in which case only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct does not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)    Seller shall have performed and complied in all material respects with each of the covenants and agreements required to be performed or complied with by it under this Agreement at or prior to the Closing (including the due delivery of the items required pursuant to Section 4.02(b));

(c)    Since the date of this Agreement, no Material Adverse Effect shall have occurred that is continuing;

(d)    Seller shall have delivered to Buyer a certificate of an authorized officer of Seller, in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in Sections 9.02(a) (with respect to Seller's representations and warranties) and 9.02(b) (with respect to Seller) have been satisfied;

(e)    At least eighty-five (85%) of all the Clinicians offered employment pursuant to Section 12.09(a) shall have accepted an offer of employment and delivered to the Buyer an executed Employment Agreement (such Clinicians, "Accepted Clinicians") (provided that Buyer may not delay the Closing based on a failure of the foregoing condition to be satisfied if Buyer has failed to comply in any material respect with its obligations to make offers of employment to Clinicians under Section 12.09(a));

(f)    The Sale Order shall have become a Final Order;

(g)    UnitedHealthcare of Florida Inc. and United Behavioral Health, Inc. (collectively, "United") shall have agreed in definitive documentation with Buyer to either (i) qualify all the Accepted Clinicians under United's current payor arrangement with the Buyer and amended such arrangement to cover all primary care, specialty care and other health care services provided by the Accepted Clinicians; or (ii) enter into a new payor arrangement with Buyer to cover all primary care, specialty care and other health care services provided by Accepted Clinicians and to qualify all of the Accepted Clinicians, on terms consistent in all material respects with either the Seller's or Buyer's or one of its Affiliate's existing payor arrangement with United (provided that Buyer may not delay the Closing based on a failure of the foregoing condition to be

satisfied if Buyer has failed to comply in any material respect with its obligations to qualify Accepted Clinicians with United under Section 7.03(a)). For purposes of this condition, qualifying an Accepted Clinician includes privileging, credentialing, and enrolling each Accepted Clinician for immediate in-network reimbursement for primary care and specialty care; and

(h)    Seller or any of its Affiliates have not entered into or otherwise agreed in principle with the U.S. Department of Justice, the OIG, CMS, any Third Party Payor or any other Governmental Entity, a settlement agreement, corporate integrity agreement, deferred or non prosecution agreement, monitoring agreement, consent decree, correction action plan or any other resolution, Order or Contract (any of the foregoing, a "Resolution") that requires, imposes or otherwise makes the Buyer, any of its Affiliates, or the Purchased Assets subject to any ongoing compliance, auditing, monitoring, disclosure or reporting obligations or oversight other than any obligations under Section 12.04.

9.03    Conditions to Seller's Obligations. The obligation of the Seller to consummate the Transactions is subject to the satisfaction or written waiver by the Seller in writing in Seller's sole discretion of each of the following conditions as of the Closing Date:

(a)    (i) The Buyer Fundamental Representations shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at and as of the Closing Date and (ii) all other representations and warranties contained in Article VI shall be true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) has not had, and would not have, individually or in the aggregate, a Buyer Material Adverse Effect;

(b)    Buyer shall have performed and complied with in all material respects each of the covenants and agreements required to be performed by it or complied with them under this Agreement at or prior to the Closing (including the due delivery of the items required pursuant to Section 4.02(a)); and

(c)    Buyer shall have delivered to the Seller a certificate of an authorized officer of Buyer in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in Sections 9.03(a) and 9.03(b) have been satisfied.

# ARTICLE X

# SURVIVAL

10.01    Survival. None of the representations and warranties of any party contained in this Agreement shall survive the Closing. The covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole before the Closing shall terminate on the Closing, and, except in the case of Fraud or Willful Breach by such Party, no Party shall have any Liability from and after Closing for any breach by Buyer or the Seller of any of the covenants or

agreements contained herein that by their terms are required to be performed in whole before the Closing. Unless otherwise indicated, the covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole or in part after the Closing, shall survive the Closing until they have been fully performed or satisfied in accordance with their terms.

## ARTICLE XI

## TERMINATION

11.01    Termination. Subject to Section 12.08, this Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(b)    by Buyer, if Seller shall have breached any of its representations or warranties set forth in Article V, or if Seller has failed to perform any covenant or agreement set forth in this Agreement, such that the conditions to Closing set forth in either Section 9.02(a) or Section 9.02(b) would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Seller; provided that Buyer may not terminate this Agreement pursuant to this Section 11.01(b) if Buyer is in breach of this Agreement such that the conditions to Closing set forth in Section 9.03(a) or Section 9.03(b) would not be satisfied;

(c)    by Seller, if Buyer shall have breached any of the representations or warranties of Buyer set forth in Article VI, or if Buyer has failed to perform any covenant or agreement on the part of Buyer, respectively, set forth in this Agreement, in each case such that the conditions to Closing set forth in either Section 9.03(a) or Section 9.03(b) would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Buyer; provided that Seller may not terminate this Agreement pursuant to this Section 11.01(c) if Seller is then in breach of this Agreement such that the conditions to Closing set forth in Section 9.02(a) or Section 9.02(b) would not be satisfied;

(d)    by Buyer, on the one hand, or Seller, on the other hand, if the Transactions shall not have been consummated on or prior to January 3, 2026 (the "Outside Date"); provided, that Buyer may extend the Outside Date in its sole discretion; provided, further, however, that Buyer (if Buyer is seeking to terminate this Agreement pursuant to this Section 11.01(d)) or Seller (if Seller is seeking to terminate this Agreement pursuant to this Section 11.01(d)), as applicable, shall not have the right to terminate this Agreement pursuant to this Section 11.01(d) if, in the case of Buyer, it is in breach of this Agreement such that the conditions to Closing set forth in Section 9.03(a) or Section 9.03(b) would not be satisfied or, in the case of Seller, it is then in

breach of this Agreement such that the conditions to Closing set forth in <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> would not be satisfied;

(e)  by Buyer, on the one hand, or Seller, on the other hand, if the Bankruptcy Court or any Governmental Entity having competent jursidiction shall have enacted, issued, promulgated, enforced or entered any Law or final Order that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions;

(f)  by Buyer, if (i) Seller has not filed the Sale Motion on the Petition Date, (ii) the Bankruptcy Court has not entered the Bidding Procedures Order by the date that is twenty-one (21) days after the Petition Date, or (iii) following the entry of the Bidding Procedures Order but prior to the entry of the Sale Order, the Bidding Procedures Order (A) ceases to be in full force and effect, (B) is revoked, rescinded, vacated, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction, or (C) is amended, modified or supplemented in a manner that is materially adverse to the Buyer;

(g)  by Buyer, if the Auction contemplated by the Sale Motion is not conducted and completed pursuant to the Bidding Procedures Order by the date that is fifty-five (55) days after the Petition Date;

(h)  by Buyer, if (i) Buyer is not selected as the Successful Bidder or the Backup Bidder at the conclusion of the Auction, or (ii) Buyer has been selected as Backup Bidder and the Backup Termination Date has occurred without the Closing having occurred;

(i)  by Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is sixty (60) days after the Petition Date; <u>provided</u>, <u>however</u>, that Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 11.01(i)</u> if the failure of the Bankruptcy Court to enter the Sale Order by such date is solely the result of delay by the Bankruptcy Court in entering the Sale Order following the conclusion of the hearing to consider entry thereof;

(j)  by Seller or Buyer, if Seller enters into a definitive agreement, or seeks approval from the Bankruptcy Court with respect to, or otherwise consummates or effects, an Alternative Transaction including if Buyer is not the Successful Bidder at the conclusion of the Auction or the Backup Bidder; <u>provided</u>, that Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 11.01(j)</u> if Buyer is selected as the Backup Bidder in connection with any such Alternative Transaction constituting a Successful Bid (it being understood that, notwithstanding Buyer's selection as Backup Bidder, Buyer shall be permitted to terminate this Agreement pursuant to any other applicable subsection of this <u>Section 11.01</u>, including, without limitation, <u>Section 11.01(h)</u>);

(k)  by Seller, if the Board of Directors of Seller (or other equivalent governing body) determines in good faith after consultation with outside counsel that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its fiduciary duties under applicable Law; or

(l)     by Buyer, if (i) the Seller withdraws the Sale Motion, (ii) the Seller moves to voluntarily dismiss the Bankruptcy Case or the Bankruptcy Court otherwise orders such dismissal, (iii) the Seller moves for conversion of the Bankruptcy Case to Chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders such conversion, or (iv) the Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders such appointment.

11.02   Effect of Termination. In the event this Agreement is terminated by either Buyer or the Seller as provided above, the provisions of this Agreement shall immediately become wholly void and of no further force and effect (other than Article I, Article XIII, Section 3.04, Section 3.02, this Section 11.02, Section 12.08 and, Section 12.10, which shall survive the termination of this Agreement (other than the provisions of Section 13.16, which shall terminate)), and there shall be no Liability on the part of Buyer or the Seller to one another except as provided in such surviving provisions, including, without limitation, Section 12.08; provided that no such termination shall relieve any Party hereto from any Liability or damages resulting from, incurred by or suffered by another Party as a result of Fraud or Willful Breach of this Agreement prior to such termination. No termination of this Agreement shall affect the obligations contained in the Confidentiality Agreement, all of which obligations shall survive termination of this Agreement in accordance with their terms.

## ARTICLE XII

## ADDITIONAL COVENANTS

12.01   Commercially Reasonable Efforts; Cooperation. Subject to the terms of this Agreement, including Section 12.02, the Seller, on the one hand, and Buyer, on the other, agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, as promptly as practicable and in any event before the Outside Date, the Transactions and to obtain satisfaction or waiver of the conditions precedent to the consummation of the Transactions, including the execution and delivery of any additional instruments necessary to consummate the Transactions, and to fully carry out the purposes of, this Agreement; provided that no Party shall be required to (a) pay any fees or make other payments in connection with any Consent other than normal filing fees, (b) commence any Action, or (c) waive the benefits of any representation, warranty or covenant under this Agreement or any condition precedent to its obligations to consummate the Closing.

12.02   Approvals. The Seller, on the one hand, and Buyer, on the other, shall, within fifteen (15) Business Days after the date hereof, make or cause to be made all filings to any Governmental Entity set forth on Schedule 5.02(b). The Seller and Buyer shall reasonably cooperate in obtaining all other consents and authorizations required to be obtained from, and the making of any filings required to be made with, any Governmental Entity and reasonably cooperate with and provide reasonable assistance as may be requested by any other Party in responding to, as promptly as reasonably practicable, to any request for additional information, data or documentary material as may be requested by any such Governmental Entity.

12.03    Payor Arrangements. From and after the date hereof, Buyer shall use commercially reasonable efforts to put in place new payor arrangements (on terms substantially similar to Buyer's or the Business' existing payor arrangements) with UnitedHealthcare of Florida Inc. and Blue Cross Blue Shield of Florida of Florida, Inc. for respective periods of not less than three (3) years after the Closing Date. From and after the Closing Date, Buyer shall use commercially reasonable efforts to maintain payor arrangements with at least three (3) Medicare Advantage payors (in each case as selected by Buyer in its sole discretion).

12.04    Books and Records. For a period of five (5) years following the Closing, each of Buyer and the Seller shall (and shall cause their respective Affiliates to) maintain all books and records relating to the Purchased Assets to the extent relating to periods ending on or prior to the Closing (in the case of the Seller and their Affiliates, to the extent that such books and records are in the possession of the Seller and their Affiliates as of the Closing) and use commercially reasonable efforts to provide reasonable access to Buyer or the Seller, as the case may be, and their respective Representatives to such books and records and, in the case of Seller, to any Transferred Employees, upon reasonable advance notice during normal business hours as may be reasonably necessary for (i) the preparation of financial statements, (ii) complying with any audit request, subpoena or other investigative demand by any Governmental Entity or for any Action (other than Actions as between Parties to this Agreement) (including for the purpose of furnishing such books and records to any such Governmental Entity) and (iii) solely with respect to access by Buyer, any reasonable business purpose, provided, however, any such access which is contemplated by the Transition Services Agreement shall be governed by the Transition Services Agreement. Any such access by Seller and their Affiliates shall be subject in all cases to reasonable restrictions imposed from time to time upon advice of counsel in respect of any applicable Law relating to the confidentiality of information (provided that Buyer shall use commercially efforts to provide such access and information to the maximum extent so that no such violation or waiver shall occur) and shall be conducted in such a manner so as not to interfere unreasonably with the operation of the business of Buyer and its Affiliates. In no event will Buyer, the Seller, or their respective Affiliates, be required to furnish any documents or information pursuant to this Section 12.04 that are required by any applicable Law or Order to be kept confidential, or if furnishing such documents or information would reasonably be expected to jeopardize the status of such documents or information as privileged; provided that Buyer, the Seller, or their respective Affiliates, as applicable, shall use commercially reasonable efforts to provide such access and information to the maximum extent so that no such waiver shall occur. Notwithstanding the foregoing, if the Parties are in an adversarial relationship in any Action, the furnishing of information, documents or records in accordance with this Section 12.04 shall be subject to any applicable rules relating to discovery. Nothing in this Section 12.04 shall change any obligation of Seller to fully deliver all books and records in connection with Section 2.01(g).

12.05    Pending Audits and Appeals Pre-Closing Access to Information. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, the Seller shall, prior to entering into any settlement or repayment agreement or other Resolution or otherwise agree in principle with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding (i) a Resolution of the Specified Proceeding, (ii) any material negative findings resulting from any audits by the U.S. Department of Justice, OIG, CMS or a Third Party Payor in connection with or relating to the Specified Proceeding, or (iii) any other Actions by any Governmental Entity or Third Party Payor in connection with or relating to the Specified Proceeding, provide Buyer a copy

of the proposed settlement agreement and notice of such discussions and an opportunity to communicate with the Seller or its counsel regarding such settlement agreement or Resolution. The Seller must promptly notify Buyer of any correspondence or other communication with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding any material negative findings or any settlement or repayment agreement or potential Resolution of any audits or other Action by any Governmental Entity or Third Party Payor.

      12.06   <u>Confidentiality</u>.

      (a)     Each of the Parties shall hold, and shall cause its representatives to hold, in confidence all documents and information furnished to it by or on behalf of the other Parties in connection with the Transactions pursuant to the terms of the Confidentiality Agreement and all documents and information furnished to any party to this Agreement or its representatives by any of the other Parties to this Agreement or their respective representatives in connection with the Transactions shall be deemed to be Confidential Information (as defined in the Confidentiality Agreement) and, if applicable, Clean Team Information (as defined in that certain Clean Team Non-Disclosure Agreement by and among the Seller, TVHHC and Humana Inc. dated as of May 8, 2024) until the Closing Date, at which time obligations under the Confidentiality Agreement or the Clean Team Non-Disclosure Agreement with respect to (i) Sections 11 and 12 of the Confidentiality Agreement and (ii) information concerning the Business shall cease to apply to Humana Inc., Buyer and their Affiliates; <u>provided</u>, that the Confidentiality Agreement shall continue in full force and effect with respect to information concerning the Seller and its Affiliates, including any equityholder of TVHHC, or any Person affiliated with any equityholder of TVHHC. Notwithstanding anything to the contrary herein, if this Agreement is terminated prior to the Closing Date, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with their terms.

      (b)     Following the Closing until three (3) years following the Closing, the Seller shall not, and shall cause each of its Representatives and Affiliates not to, directly or indirectly, without the prior written consent of Buyer, disclose to any third party or use in any manner (other than for the express purposes set forth in the Transaction Documents) any confidential or proprietary information to the extent related to the Seller or the Business; provided that the foregoing restriction shall not (i) apply to any information generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), or (ii) prohibit any use or disclosure (A) required by Law or any Governmental Entity or self-regulatory authority process so long as, to the extent legally permissible and reasonably practicable, Seller provides Buyer with reasonable prior notice of such disclosure and a reasonable opportunity to contest such disclosure, (B) to comply with reporting, disclosure, filing or other requirements imposed on Seller (including under applicable securities Laws) by any Governmental Entity or self-regulatory authority, (C) made in connection with the enforcement of any right or remedy relating to this Agreement or any other Transaction Document or the Transactions, or (D) in the course of performing any duties for the Seller as an employee or pursuant to any contract. Nothing herein shall prevent Seller or any of its Representatives or Affiliates from using or disclosing information that is not specific to the Business or related to the Buyer or its Affiliates.

      12.07   <u>Submission for Bankruptcy Court Approval</u>.

(a)    The Seller shall use commercially reasonable efforts to take all actions necessary to cause the Sale Order to be issued and entered by the Bankruptcy Court and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court, which Sale Order shall provide for the transfer of the Purchased Assets free and clear from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the Local Rules in obtaining entry of the Sale Order. In furtherance of the foregoing, the Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens in the Purchased Assets and all non-debtor parties to all Contracts, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by the Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code relating to this Agreement.

(b)    No later than the date that is one (1) Business Day following the date hereof, the Seller shall commence the Bankruptcy Case, and file the Bidding Procedures Motion on such date. All of the Parties shall use their respective reasonable best efforts to have the Bidding Procedures Order entered no later than 21 days after the Petition Date. All of the Parties shall use their respective reasonable best efforts to have the Auction concluded no later than 55 days after the Petition Date and the Sale Order entered no later than 60 days after the Petition Date.

(c)    The Seller and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order, including, (i) the Seller providing to Buyer the Bidding Procedures Motion, Sale Motion, any proposed Bidding Procedures Order, any proposed Sale Order, together with any motions, declarations, or replies submitted by the Seller in support of entry of the Bidding Procedures Order or the Sale Order, in each case, as promptly as practicable in advance of filing same, and (ii) to the extent reasonably practicable, the Seller providing to buyer any drafts of any other documents in connection with the Sale Order, in each case, as promptly as practicable in advance of filing same. Seller shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without the prior written consent of the Buyer. The Seller shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order or any other

order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to the Buyer and its counsel.

(d)    If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Seller shall diligently defend such appeal, petition or motion and use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

12.08    Overbid Procedures; Adequate Assurance.

(a)    The Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Seller acknowledges that the Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Seller's business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that any additional qualified prospective bidder desires to bid for the Business, conducting an auction (the "Auction").

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court, so long as it is consistent in all material respects with Exhibit D or otherwise acceptable to Buyer in its sole discretion. Buyer agrees and acknowledges that, until the conclusion of the Auction, the Seller and their Affiliates and the Seller's Representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order and agrees and acknowledges that the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement.

(c)    If an Auction is conducted, and the Buyer is not the Successful Bidder at the Auction but is the next highest bidder at the Auction, Buyer shall serve as a backup bidder (the "Backup Bidder") and keep the Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement open and irrevocable, notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to Article XI hereof, until the Backup Termination Date. Following the Sale Hearing and prior to the Backup Termination Date, if the Successful Bidder fails to consummate the Successful Bid as a result of a breach or failure to perform on the part of such Successful Bidder and the purchase agreement with such Successful Bidder is terminated, the Backup Bidder (as the next highest bidder at the Auction in Buyer's sole discretion) will be deemed to have the new prevailing bid, and the Seller will be authorized, without further order of the Bankruptcy Court, to consummate the transactions

contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Backup Bidder so long as Buyer has not previously terminated this Agreement in accordance with its terms.

(d)     Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer or any applicable Buyer Designee of each Transferred Contract. Buyer agrees that it will reasonably cooperate with the Seller to obtain a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Transferred Contracts, including furnishing affidavits, non-confidential financial information and other non-confidential documents or information for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court upon reasonable prior notice.

(e)     The Seller and the Buyer agree, and the Bidding Procedures Motion shall reflect the fact, that the provisions of this Agreement, including this Section 12.08 and Section 12.10, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Purchased Assets.

12.09   Employee Matters.

(a)     Offers of Employment to Clinicians. Following the date hereof and no later than twenty (20) Business Days prior to the Closing Date, subject to each Clinician's completion of Buyer's credentialing process and satisfaction of the underwriting guidelines for Buyer's or its Affiliate's captive insurance company in accordance with Section 7.03(a), the Buyer or an Affiliate of the Buyer shall offer employment to each Clinician who is employed by the Seller and its Affiliates as of the date of this Agreement, with such employment with Buyer (or its applicable Affiliate) to be effective as of Closing. The offer of employment to each such Clinician shall provide for: (i) a term of employment no greater than such Clinician's term of employment under the employment agreement then in effect between such Clinician and the Seller, or, in the absence of such agreement, a term of employment that is comparable to that which applies to similarly situated Clinicians of Buyer and its Affiliates, and (ii) substantially the same duration and geographic scope of non-compete and non-solicit restrictions as those applicable to such Clinician as of the Petition Date, or, if no such restrictive covenants applied to the Clinician as of the Petition Date, restrictive covenants comparable to those which apply to similarly situated Clinicians of Buyer and its Affiliates.

(b)     Offers of Employment to Non-Clinicians. Following the date hereof and no later than ten (10) days prior to the Closing Date, the Buyer or an Affiliate of the Buyer may offer employment, effective as of Closing, to those non-Clinician employees of the Seller as the Buyer may elect at its sole discretion, on terms and conditions of employment reasonably determined by the Buyer in its discretion. The Buyer shall provide notice to Seller of those non-Clinicians who have been offered employment by the Buyer or an Affiliate of Buyer.

(c)     Termination of Employment by the Seller. Not later than the Closing Date, the Seller shall terminate the employment of any Clinician or non-Clinician employee who has accepted or not rejected an offer of employment from the Buyer or an Affiliate of the Buyer. Any Clinician or non-Clinician who accepts an offer of employment from the Buyer or an Affiliate of

the Buyer (including, in the sole discretion of the Buyer, a deemed acceptance) and commences employment with the Buyer or an Affiliate of the Buyer shall be hereinafter referred to as a "Transferred Employee" effective as of the Closing. Any Clinician or non-Clinician who fails to accept an offer of employment from the Buyer or an Affiliate of the Buyer, or who otherwise fails to commence employment with the Buyer or an Affiliate of the Buyer on the Closing Date, will not become an employee of the Buyer or an Affiliate of the Buyer, and, for the avoidance of doubt, the Buyer or an Affiliate of the Buyer will have no obligations of any kind with respect to such employees. Except as expressly set forth herein, the Buyer or an Affiliate of the Buyer will not assume or be obligated under any Contracts, commitments or undertakings between the Seller and the Transferred Employees.

(d)    Except for any liabilities, claims and losses arising directly as a result of any material breach by the Buyer or any of its Affiliates of its obligations under, or as otherwise specifically provided for in, this Section 12.09, the Seller shall be solely responsible for, and shall indemnify and hold harmless Buyer and its Affiliates against, all potential or actual employment- or employee benefits- or compensation-related liabilities, claims and losses relating to (i) the Transferred Employees that arise as a result of an event that occurred on or prior to the Closing Date (including any severance, termination, change in control, retention or other compensation or benefits payable as a result of the execution of this Agreement or the transactions contemplated hereby) or (ii) any current or former employee of the Seller (or any dependent or beneficiary of any such employee) other than the Transferred Employees (and their dependents or beneficiaries). For purposes of clarification, the Buyer shall be solely responsible for any and all severance or similar liabilities relating to the termination of employment of any Transferred Employee by the Buyer or its Affiliates after the Closing Date.

(e)    Employee Census. Following the date of this Agreement, the Seller shall update Schedule 5.18(a) and Schedule 5.18(b) as promptly as practicable upon the reasonable request of the Buyer, to reflect any termination or hiring of employees as permitted by this Agreement, or any voluntary resignations of employees, in each case, following the date of this Agreement.

(f)    Communications; Cooperation. (i) No later than thirty (30) days after the date of this Agreement, the Seller shall provide to the Buyer (A) with respect to each Clinician employed by Seller as of the date hereof, the employment contract by and between the Seller or its applicable Affiliate and such Clinician and any current incentive compensation plan or arrangement applicable to the Clinician (including, without limitation, compensation in the form of Relative Value Units (RVUs)), and (B) with respect to the non-Clinician employees of Seller as of the date hereof, the forms of employment agreement, offer letter or similar employment contract, if any, with the Seller or its applicable Affiliate (along with a list setting forth the form applicable to each such non-Clinician), and, to the extent any individual employment agreement, offer letter or similar employment contract with a non-Clinician employee of Seller as of the date hereof materially differs from the provided forms thereof, each such materially different individual employment agreement, offer letter or similar employment contract by and between the Seller or its applicable Affiliate and each non-Clinician employee of Seller as of the date hereof, (ii) any employee notices or communication materials (including website postings and offers of employment) from Buyer or its Affiliates to the employees of the Seller, including notices or communication materials with respect to employment, compensation or benefits matters addressed

in this Agreement or related, directly or indirectly, to the transactions contemplated by this Agreement or employment thereafter, shall be subject to the prior review, comment and approval of the Seller (such approval not to be unreasonably withheld, conditioned or delayed) and (iii) the Buyer and its Affiliates shall not make oral or other unwritten communications to the employees of the Seller without Seller's prior written approval (such approval not to be unreasonably withheld, conditioned or delayed). With respect to any Clinician or non-Clinician hired by the Seller in accordance with this Agreement after the date hereof, the Seller shall provide to the Buyer the documents contemplated by clause (i) of the preceding sentence with respect to such Clinician or non-Clinician, as applicable, no later than fifteen (15) days after such individual's commencement of employment with the Seller. From and after the date of this Agreement, and subject to applicable Law, the Seller and the Buyer shall, and each shall cause their respective Affiliates to, reasonably cooperate with the other parties hereto and their respective Affiliates to provide such information regarding and access to any employee of the Seller as may be necessary to facilitate the transactions and activities contemplated by this Agreement, including (i) exchanging information and data relating to workers' compensation and employee benefit and compensation plans (including, without limitation, COBRA continuation coverage under such employee benefit plans), (ii) sharing with each other and their respective agents and vendors all participant information reasonably necessary for the efficient and accurate administration of their respective employee benefit plans with respect to employees of the Seller, (iii) resolving any and all employment-related claims regarding employees of the Seller, and (iv) in responding to questions posed by employees or any other individual service providers. The Seller and the Buyer shall each cooperate with the other in good faith to provide any employment-related notice required by Law or Contract in connection with the transactions contemplated by this Agreement.

(g)     WARN Act. Seller shall timely provide all notices required pursuant to the WARN Act in connection with the termination of employees or contractors of the Seller resulting from or relating to the transactions contemplated by this Agreement. On the Closing Date, Seller shall provide the Buyer with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any employee of the Seller during the ninety (90) day period ending on the Closing Date. For purposes of clarification, the Buyer or its applicable Affiliate shall be responsible for providing any notice required pursuant to the WARN Act with respect to the termination of Transferred Employees that occurs after the Closing Date.

(h)     Compensation Payments. The Seller shall continue to provide all employee benefits and fringe benefits including continued participation in the Company Plans to all Transferred Employees through the Closing for the applicable Transferred Employee and, except with respect to any Accrued PTO, shall cause to be taken whatever steps are necessary to pay to Transferred Employees, at Seller's sole expense, all accrued compensation and benefits arising and payable under the Company Plans or any employment or consulting Contract, or relating to payroll, compensation, vacation, sick leave, workers' compensation, unemployment benefits, retirement or pension benefits, profit sharing plans, healthcare plans or benefits, bonus or commission arrangements, severance or other termination pay or benefits, and any other employer plans or benefits or similar Liabilities of the Seller to any current or former employee, contractor or other similar Person, in each case to the extent allocable to services performed on or prior to the Closing Date for the applicable Transferred Employee in accordance with applicable Laws, and Seller, at its sole expense, shall timely pay all employment or other withholding Taxes with respect to such payments to the appropriate taxing authority (collectively, the "Compensation Payments").

Such Compensation Payments shall be made, for each Transferred Employee, on the Closing Date or the next regularly scheduled payroll following the Closing Date, in each case, in accordance with applicable Laws. The intent of this Section 12.09(h) is to ensure that Buyer and its Affiliates will have no Liability, responsibility or obligation whatsoever at any time in the future with respect to any of the Seller's employees, consultants or other similar Persons with respect to periods up to and including the Closing Date, including under any Company Plan and with respect to the Compensation Payments, and any such Liability shall be an Excluded Liability.

(i)       Paid Time Off. Subject to applicable Law, effective as of the Closing, the Buyer shall credit, or cause to be credited, each Transferred Employee under the applicable paid-time-off policies of the Buyer and its Affiliates, with the paid-time-off unused and accrued by such Transferred Employee as of the Closing under the applicable paid-time-off policies of Seller and its Affiliates (such unused and accrued paid-time-off of all Transferred Employees, in the aggregate, the "Accrued PTO").

(j)       401(k) Plan. The Seller shall cause the accounts of the Transferred Employees in the Company Plan that is a defined contribution plan with a qualified cash or deferred cash arrangement within the meaning of Section 401(k) of the Code ("Seller's 401(k) Plan") to be fully vested as of immediately prior to the Closing Date. Following the Closing, the Buyer agrees to cause a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code that is sponsored by Buyer or an Affiliate of Buyer ("Buyer's 401(k) Plan") to allow each Transferred Employee to make a "direct rollover" to the Buyer's 401(k) Plan of the account balances of such Transferred Employee (including promissory notes evidencing any outstanding loans that are not in default as of the date such rollover is elected by the Transferred Employee) if the Seller's 401(k) Plan permits such a direct rollover and if such direct rollover is elected in accordance with applicable Law by such Transferred Employee. The rollovers described herein shall comply with applicable Law, and each party shall make all filings and take any actions required of such party under applicable Law in connection therewith. The Buyer shall have no responsibility for any failure of the Seller to properly administer Seller's 401(k) Plan in accordance with its terms and applicable Law, including, without limitation, any failure to properly administer the accounts of Transferred Employees and their beneficiaries who elect a direct rollover pursuant to this Section 12.09(j). The Seller shall not take any action to terminate Seller's 401(k) Plan during the ninety (90)-day period following the Closing Date.

(k)       COBRA. Notwithstanding any contrary provision of this Agreement, Seller shall be responsible and liable for providing, or continuing to provide, health care continuation coverage as required under COBRA with respect to any individual who experienced a COBRA "qualifying event" on or prior to the Closing Date under any Company Plan subject to COBRA, other than an Assumed Plan.

(l)       Standard Procedure. The Buyer and Seller agree to comply with the Standard Procedure described in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320 (the "Standard Procedure"). With respect to Transferred Employees, the Seller shall, in accordance with the Standard Procedure, retain all responsibility for preparing and filing Forms W-2, Wage and Tax Statement; Forms W-3, Transmittal of Income and Tax Statements; Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, Forms 941, Employer's

Quarterly Federal Tax Return; and Forms W-4, Employee's Withholding Allowance Certificate including any state and local equivalents (collectively, the "Employee Withholding Documents") with regard to wages paid through the day before the Closing Date. Buyer shall assume all responsibility for preparing and filing the Employee Withholding Documents with regard to wages paid to Transferred Employees on and after the Closing Date. The Buyer and the Seller shall cooperate in good faith to the extent necessary to permit each Party to comply with the Standard Procedure.

(m)    Enforcement of Restrictive Covenants. As applied to any Transferred Employee's employment with the Buyer or any of its Affiliates on and following the Closing, the Seller shall not, and shall cause its Affiliates not to, enforce against the Buyer, its Affiliates or any Transferred Employee (i) any noncompetition provision that would purport to prohibit such individual from working for the Buyer or any of its Affiliates; (ii) any confidentiality restrictions relating to a Transferred Employee's, the Buyer's or its Affiliates' ability to use or disclose non-public, confidential, proprietary or trade secret information relating to the Business or the Buyer or its Affiliates in the course of their employment with the Buyer or any of its Affiliates; and/or (iii) any employee, customer or supplier nonsolicitation or noninterference obligations. The Seller hereby assigns to the Buyer the right to enforce any rights of the Seller or any of its Affiliates with respect to any obligation of any Transferred Employee or any other former employees or current or former independent contractors or consultants of the Business to refrain from (x) competing with all or any portion of the Business, (y) soliciting any employees, customers or suppliers of the Business or (z) disclosing confidential information or other non-public or proprietary information of the Business, in each case in accordance with the terms of the agreement setting forth such obligations. To the extent the assignment in the prior sentence is not permitted by the applicable agreement, from and after the Closing, the Seller agrees, if requested by the Buyer, to enforce such obligation and the Buyer shall reimburse the Seller for all reasonable out-of-pocket costs and expenses incurred by the Seller in connection with any such enforcement at the Buyer's request.

(n)    Assumed Plans. Following the date hereof and no later than thirty (30) days prior to the Closing Date, Buyer shall deliver to Seller a list of each Company Plan that shall be considered Purchased Assets for purposes of this Agreement (each, an "Assumed Plan"), as determined by Buyer in its sole discretion.

(o)    No Third Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to, or shall, (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Company Plan or other benefit plan, agreement or arrangement of the Buyer or its Affiliates, (ii) limit the right of the Buyer or its Affiliates to amend, terminate or otherwise modify any benefit plan, agreement or arrangement of the Buyer for any Transferred Employee following the Closing Date, or (iii) create any third party beneficiary or other right (x) in any Person, including any current or former employee of the Seller, any participant in any Company Plan or other benefit plan, agreement or arrangement (or any dependent or beneficiary thereof) of the Buyer or (y) to continued employment with the Buyer and its Affiliates. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer or its Affiliates to terminate, reassign, promote or demote any of the Transferred Employees after the Closing Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations,

or terms or conditions of employment of such employees. For the avoidance of doubt, the Assumed Plans, neither Buyer nor its Affiliates shall assume sponsorship of, or any obligations under, or Liabilities with respect to, or receive any right or interest in any trusts relating to, any assets of or any insurance, administration or other contracts pertaining to any Company Plan.

12.10   <u>Termination Payment</u>. In consideration of Buyer serving as a stalking horse bidder in connection with the Auction, if (a) this Agreement is terminated by Buyer pursuant to <u>Sections 11.01(b)</u>, <u>11.01(f)(ii)(C)</u>, <u>11.01(h)</u>, <u>11.01(i)</u>, or <u>11.01(j)</u>, or by Seller pursuant to <u>Section 11.01(k)</u>, and the Seller subsequently consummates an Alternative Transaction, the Buyer will be entitled to receive from the proceeds of any Alternative Transaction, without further order of the Bankruptcy Court, (i) an amount in cash equal to $1,500,000.00 (the "<u>Termination Fee</u>") <u>plus</u> (ii) the amount of the Buyer's reasonable documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred in connection with the Buyer's evaluation, consideration and negotiation of a possible transaction with the Seller and in connection with the transactions contemplated hereby, up to a maximum amount of $1,500,000.00 (the "<u>Expense Reimbursement</u>" and, together with the Termination Fee, the "<u>Termination Payment</u>"). Such Termination Payment shall be made by wire transfer of immediately available funds to an account designated by the Buyer and such payment shall be made on or before the first (1st) Business Day following the consummation of such Alternative Transaction. The Bidding Procedures Order shall provide that the claim of the Buyer in respect of the Termination Payment shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Seller, as administrative expenses under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case and shall be paid in cash prior to delivery of any sale proceeds to any other party.

12.11   <u>Further Assurances</u>. From and after the Closing Date, the Parties shall, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as reasonably required or appropriate to carry out and/or evidence the Transactions consistent with the terms of this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

13.01   <u>Press Releases and Communications</u>. No press release or public statement or announcement related to this Agreement or the Transactions shall be issued or made by or on behalf of any Party hereto (nor any of their Affiliates) without the prior approval of each of Buyer(which consent shall not be unreasonably withheld, conditioned or delayed); <u>provided</u> that, that a Party may, without the prior consent of the other Parties issue such press release or make such public statement (a) to the extent required by applicable Law (including (x) the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and applicable Local Rules to the extent reasonably necessary to obtain entry of the Bidding Procedures Order, or if the Buyer is selected as the Successful Bid, the Sale Order and (y) in any filing made by the Seller and its Affiliates with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of the Seller or its representatives to obtain Bankruptcy Court approval of the Transactions or in connection with conducting the Auction) or the applicable rules or regulations of any stock exchange or (b) to the extent such, press release, public statement or announcement is consistent

with previous press releases, public statements and/or announcements made jointly by or otherwise agreed to by Buyer in accordance with this <u>Section 13.01</u>. For the avoidance of doubt, from and after the Closing, Buyer may make other statements to the public regarding the operation of the Business following the Closing.

13.02   <u>Expenses</u>. Except as otherwise expressly provided herein, the Seller, Buyer and the Representative shall pay all of their own costs, fees and expenses incurred in connection with this Agreement and the Transactions, whether or not the Closing shall have occurred, including the fees and disbursements of counsel, financial advisors and accountants.

13.03   <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when sent via e-mail to the email address set out below if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient (to the extent that no "bounce back," "out of office" or similar message indicating non-delivery is received with respect thereto on the date of delivery), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, return receipt requested, postage prepaid. Notices, demands and communications, in each case to the respective Parties, shall be sent to the applicable address set forth below, unless another address has been previously specified in writing by such Party:

Notices to Buyer:

**c/o Humana Inc.**
500 West Main Street
Louisville, Kentucky 40202
Attention:      Joseph M. Ruschell, Vice President, Associate General
Counsel and Corporate Secretary
Email:          JRuschell1@humana.com

with copies to (which shall not constitute notice):

**Latham & Watkins LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Attention:      Brian Mangino
                Amber Banks
Email:          brian.mangino@lw.com

amber.banks@lw.com

Notices to Seller:

**The Villages Health System LLC**
c/o GBH SOLIC Holdco LLC
425 W. New England Avenue, Suite 300
Winter Park, Florida 32789
Attention:      Neil Luria, CRO
Email:           nluria@soliccapital.com

with copies to (before the Closing) (which shall not constitute notice):

**BakerHostetler LLP**
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
Attention:      Andrew V. Layden
                      Elizabeth A. Green
                      Jimmy D. Parrish
Email:           alayden@bakerlaw.com
                      egreen@bakerlaw.com
                      jparrish@bakerlaw.com

13.04   Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated without the prior written consent of the non-assigning Parties, provided that Buyer shall have the right to assign to a Buyer Designee without prior consent of any other Party its rights, interests and obligations under this Agreement.

13.05   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

13.06   References; Interpretation. The table of contents and the section and other headings and subheadings contained in this Agreement and the exhibits hereto are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement or any exhibit hereto. All references to days (excluding

Business Days) or months shall be deemed references to calendar days or months. All references to "$" shall be deemed references to U.S. dollars. Unless the context otherwise requires, any reference to a "Section," "Exhibit," "Disclosure Schedule" or "Schedule" shall be deemed to refer to a section of this Agreement, exhibit to this Agreement or a schedule to this Agreement, as applicable. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Whenever the word "or" is used in this Agreement, it shall not be deemed exclusive. Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms. The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. Any reference to any particular Code section or Law shall be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified. Accounting terms that are not otherwise defined in this Agreement have the meanings given to them under GAAP. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement shall control. Whenever the phrase "ordinary course of business" is used, it shall be deemed to include the phrase "in accordance with past practices" and take into account the matters set forth in Schedule 1.1(c).

13.07    Construction. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. The information contained in this Agreement and in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of Law or breach of contract).

13.08    Amendment and Waiver. Any provision of this Agreement or the Disclosure Schedules hereto may be amended or waived only in a writing signed by, (a) in respect of any amendment or waiver on or prior to the Closing Date, Buyer, and, only if such amendment or waiver is applicable to the Seller, the Representative, and, only if such amendment or waiver is applicable to the Representative, the Representative; and (b) in respect of any amendment or waiver following the Closing Date, Buyer and the Representative. No waiver of any provision hereunder or any breach or default thereof shall extend to or affect in any way any other provision or prior or subsequent breach or default.

13.09    Complete Agreement. This Agreement, the Transaction Documents, and the documents referred to herein (including the Confidentiality Agreement) contain the complete agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, that may have related to the subject matter hereof in any way, including any data room agreements, bid letters, term sheets, summary issues lists or other agreements.

13.10    Third-Party Beneficiaries. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing expressed or referred to in this Agreement shall be construed to give any

Person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

13.11    Waiver of Trial by Jury. THE PARTIES TO THIS AGREEMENT EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

13.12    Delivery by Email. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered via electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party hereto or to any such contract, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such contract shall raise the use of email to deliver a signature or the fact that any signature or contract was transmitted or communicated through email as a defense to the formation of a contract and each such Party forever waives any such defense.

13.13    Counterparts; Electronic Delivery. This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one (1) Party, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties. Signatures to this Agreement transmitted by electronic mail in "portable document format" form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

13.14    Governing Law. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the Laws of the State of Florida, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Florida or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Florida.

13.15    Jurisdiction. Any suit, Action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Transaction Documents, or the Transactions shall be brought before, heard by and determined exclusively by the Bankruptcy Court; provided that, if the Bankruptcy Court does not have jurisdiction, any such

suit, Action or proceeding shall be brought exclusively in the Fifth Circuit Court of either Lake, Marion, or Sumter County of the State of Florida (or, if the Fifth Circuit Courts decline to accept jurisdiction over a particular matter, any state or federal court within the Fifth District of the State of Florida and any direct appellate court therefrom). Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such suit, Action or proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with Section 13.03, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, Action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, Action or proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Process in any such suit, Action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.03 shall be deemed effective service of process on such Party.

13.16   Specific Performance. Each of the Parties acknowledges that the rights of each other Party to consummate the Transactions are unique and recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Party may have no adequate remedy at Law. Accordingly, the Parties agree that prior to a valid termination of this Agreement in accordance with this Agreement, such non-breaching Party shall have the right, in addition to any other rights and remedies existing in its favor at Law or in equity, to enforce its rights and the other Party's obligations hereunder not only by an Action or Actions for damages but also by an Action or Actions for specific performance, injunctive and/or other equitable relief (without posting of bond or other security). Each of the Parties agrees that it shall not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, on the basis that the other Parties have an adequate remedy at Law or an award of specific performance is not an appropriate remedy for any reason at Law or equity and hereby waives any requirement under Law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief. Each Party agrees that it shall not oppose a motion for, or the granting of, expedition of any Action or Actions for specific performance, injunctive and/or other equitable relief.

13.17   No Recourse.

(a)      Except as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, all claims, obligations, liabilities, or causes of action (whether at Law, in equity, in contract, in tort or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) the Parties that are expressly identified in the preamble to this Agreement and only to the extent expressly

identified in the case of Parent (the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any current, former or future equity holder, incorporator, controlling Person, partner, member, Affiliate, representative, or assignee of, and any financial advisor or lender to, any Contracting Party, or any current, former or future equity holder, incorporator, controlling Person, partner, Affiliate, representative, or assignee of, and any lender to, any of the foregoing or any of their respective successors, predecessors or assigns (or any successors, predecessors or assigns of the foregoing) (the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in Law or in equity, whether in contract or in tort or otherwise) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents), including any alleged non-disclosure or misrepresentations made by any such Person or as a result of the use or reliance on any information, documents or materials made available by such Person, and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents) against any such Non-Party Affiliates; <u>provided</u> that, for clarity, no party to the Confidentiality Agreement, or any of the Transaction Documents shall be deemed a Non-Party Affiliate with respect to such documents to which it is a party.

(b) Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, (i) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available, whether at Law, in equity, in contract, in tort or otherwise, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, in each case arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents); and (ii) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

(c) The provisions of this <u>Section 13.17</u> are intended to be for the benefit of, and shall be enforceable by, each Non-Party Affiliate (each of whom shall be an express third party beneficiary of this <u>Section 13.17</u>), and his or her successors, heirs and representatives.

13.18   <u>Parent Guarantee</u>.

(a) As a material inducement to the Seller's willingness to enter into this Agreement and perform their respective obligations hereunder, Parent agrees to guarantee the

performance by Buyer of its obligations in this Agreement (and in any valid amendment and/or modification hereof or thereof) to pay the Purchase Price and Cure Costs up to the amount of the Cure Costs Cap. The obligation of Parent pursuant to this <u>Section 13.18</u> is an unconditional and irrevocable guaranty of payment and performance and may be enforced directly against Parent as a primary obligation of Parent, as if Parent were the principal party obligated to perform such financial obligations.

(b)    Parent hereby represents and warrants as follows: (i) Parent is a corporation duly formed and validly existing under the Laws of the State of Delaware, and has the requisite corporate power and authority to execute, deliver and perform obligations created by this <u>Section 13.18</u>; (ii) the execution, delivery and performance of this Agreement by Parent has been duly and validly authorized and approved by all necessary corporate action; (iii) this Agreement has been duly executed and delivered by Parent and constitutes a valid and legally binding obligation of Parent, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies; (iv) neither the execution and delivery of this Agreement nor compliance by Parent with any of the provisions hereof or thereof, will: (A) conflict with or result in a breach of any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Parent; (B) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Parent is a party or by which any of their respective properties or assets is bound or (C) violate any Order or Law applicable to Parent or any of its properties or assets in any material respect, except as would not prevent or materially impair or delay, or would not reasonably be expected to prevent or materially impair or delay, the performance of Parent's obligations and covenants under this <u>Section 13.18</u>; and (v) Parent will have available on the Closing Date, sufficient readily available funds to satisfy the payment obligations hereunder.

13.19    <u>Fiduciary Obligations</u>. Subject to <u>Section 11.01</u> and the consequences thereof, nothing in this Agreement, or any Transaction Document, will require Seller or any of its managers, officers, members or directors, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, (i) Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate, and (ii) Buyer retains all rights under this Agreement (including remedies for breach and the ability to terminate and collect a fee and expenses) in the event Seller exercises its rights under this <u>Section 13.19</u>.

\* \* \* \*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Seller:                                      **THE VILLAGES HEALTH SYSTEM, LLC**

                                             By:    _____
                                             Name:  Neil F. Luria
                                             Its:   Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Buyer:

**CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.**

By: *Renée J. Buckingham*

Name: Renee J. Buckingham

Its:    President

Parent:

**HUMANA INC.**
**Solely for the purposes of Section 13.18**

By: _____

Name: Celeste M. Mellet

Its:    Chief Financial Officer

**Schedule A**

**Non-Competition Agreement Parties**

1. The Villages Health System, LLC
2. The Villages of Lake-Sumter, Inc.
3. The Villages Health Holding Company, LLC
4. Mark Morse
5. Jennifer L. Parr
6. Tracy L. Matthews
7. Elliot Sussman
8. Bob Trinh

*The attachments have been removed and are available upon request*

**<u>Exhibit B</u>**
**Declaration of A.J. Berens in Support**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156 |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| Debtor. | |

**DECLARATION OF A.J. BERENS ON BEHALF**
**OF EVERCORE GROUP, LLC IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY**
**OF ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S**
**ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND**
**INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF**
**SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) APPROVING STALKING**
**HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO**
**APPROVE THE SALE OF THE DEBTOR'S ASSETS, (E) APPROVING FORM AND**
**MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (F)**
**APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G)**
**AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES,**
**AND (H) GRANTING RELATED RELIEF**

I, **A.J. BERENS**, declare that the following is true to the best of my knowledge, information, and belief.

1.      I am over the age of 18 and competent to testify and make this declaration (this "Declaration").

2.      I understand that on July 3, 2025 (the "Petition Date"), the Villages Health System, LLC (the "Debtor" or "TVH") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Chapter 11 Case") in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Court").

3.      I am submitting this Declaration at the request of the Debtor in support of the

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

*Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "Sale Motion").[2]

4.     I make this Declaration in support of the proposed sale transaction (the "Sale" or "Transaction") to CenterWell Senior Primary Care (Vitality), Inc. ("CenterWell") as more particularly described in the Asset Purchase Agreement ("APA") attached to the Sale Motion as Exhibit C.

5.     Except as otherwise indicated, all statements in this Declaration are based on: (a) my personal knowledge, views, and experiences; (b) my review of relevant documents and records; (c) information provided to me by employees and consultants working for Evercore Group, LLC ("Evercore") with personal knowledge of the veracity of such information; and/or (d) information provided to me by, or discussions with, members of the Debtor's team, Debtor's professionals, and Debtor's consultants. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

6.     I am currently the Managing Director of Evercore's strategic advisory practice. Since joining Evercore in 2015, I have advised numerous healthcare companies on their long-term strategies, mergers and acquisitions, and capital raising, as well as financial sponsors investing in healthcare services and technologies. I focus specifically on healthcare services industries,

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion or the Asset Purchase Agreement (defined herein), as appropriate.

including, but not limited to, care delivery (e.g., physician practices, outpatient facilities, and hospitals), health insurance (e.g., managed care plans, risk-based provider organizations), pharmacy, and technologies that support these end markets (e.g., electronic health records, revenue cycle, and population health management). Most relevant to TVH, I lead Evercore's efforts in risk-based primary and specialty care, which requires specific knowledge of care delivery operations, US healthcare reimbursement programs (e.g., Medicare, Medicaid, commercial insurance), and the mechanics and systems that enable capable providers to deliver value-based care. I maintain relationships with key leadership and M&A-focused teams with relevant companies and investors in this space. Relevant engagements (not exhaustive) include advising the ad hoc lender group of Cano Health (risk-based primary care provider) on its Chapter 11 restructuring, advising LifeLabs (largest Canadian lab) on its sale to Quest Diagnostics, advising Medicus (healthcare staffing) on its sale to Great Hill Partners, advising athenahealth (largest physician RCM/EHR platform) on its sale to a private equity consortium led by Hellman Friedman and Bain Capital, and advising the Kelsey-Seybold Clinic (risk-based multi-specialty provider) on its strategic partnership with TPG Capital and subsequent sale to Optum. Prior to joining Evercore, I worked at Barclays in its healthcare mergers and acquisitions practice.

7.       Evercore is a leading independent investment banking advisory and investment management firm. Evercore's investment banking business includes its advisory business, which counsels multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions. In addition, through its investment banking business, Evercore provides capital markets advice, underwrites securities, raises funds for financial sponsors, and offers equity research and agency-only equity securities

trading for institutional investors. Evercore's investment management business includes private equity investing, institutional asset management, and wealth management.

8.      Evercore and its affiliates serve a diverse set of clients around the world from offices in New York, Boston, Chicago, Los Angeles, Washington D.C., San Francisco, Houston, Minneapolis, Menlo Park, Singapore, Hong Kong, London, Frankfurt, Toronto, Mexico City, Beijing, Dubai, Tel Aviv, and Tokyo, among other locations. Since its founding, Evercore has advised on over $5.0 trillion of transactions. Evercore's restructuring professionals provide investment banking services in financially distressed situations, including advising debtors, creditors, and other constituents in chapter 11 proceedings and out-of-court restructurings.

9.      Evercore and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases. Evercore professionals have actively been retained as investment bankers in numerous cases, including, among others: *In re: Convergeone Holdings, Inc., et al*, No. 24-90194 (CML) (Bankr. S.D. Tex. April 4, 2024); *In re Lucky Bucks, LLC*, No. 23-10758 (KBO) (Bankr. D. Del. June 8, 2023); *In re Avaya Inc.,* No. 23-90088 (DRJ) (Bankr. S.D. Tex. Feb. 14, 2023); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2023); *In re Lumileds Holding B.V.*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 13, 2022); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex, Oct. 6, 2022); *In re OSG Grp. Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Sept. 9, 2022); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. July 8, 2022); *In re Seadrill Partners LLC*, No. 20- 35740 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2021); *In re iQor Holdings Inc.*, No. 20-34500 (DRJ) (Bankr. S.D. Tex. Nov. 6, 2020); *In re Frontier Commc'ns Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. Oct. 30, 2020); *In re Arena Energy, LP*, No. 20-34215 (MI) (Bankr. S.D. Tex. Sep. 25, 2020); *In re*

*Denbury Res. Inc.*, No. 20-33801 (DRJ) (Bankr. S.D. Tex. Sep. 22, 2020); *In re Noble Corp. plc*, No. 20-33826 (DRJ) (Bankr. S.D. Tex. Sep. 3, 2020); *In re Sable Permian Res.*, LLC, No. 20-33193 (MI) (Bankr. S.D. Tex. Aug. 7, 2020); *In re Chisholm Oil and Gas Operating, LLC*, No. 20-11593 (BLS) (Bankr. D. Del. July 29, 2020); *In re GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 20, 2020); *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. June 19, 2020); *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. June 16, 2020); *In re LSC Commc'ns, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re The McClatchy Co.*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. Mar. 26, 2020); *Alta Mesa Res., Inc.*, No. 19-35133 (MI) (Bankr. S.D. Tex. Mar. 2, 2020); *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 11, 2019); *In re Southern Foods Grp., LLC*, No. 19-36313 (DRJ) (Bankr. S.D. Tex. Dec. 6, 2019); and *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019).

10.     Since September 2022, Evercore has provided extensive services to the Debtor in preparation for and to assist with the Debtor's restructuring efforts, including but not limited to the following:

      a. Reviewing and analyzing the Debtor's business, operations, financial projections, and valuations;

      b. Assisting Debtor's management in evaluating asset sales and other strategic alternatives;

      c. Identifying and engaging strategic counterparties;

      d. Facilitating extensive diligence for various parties in interest;

      e. Conducting meetings and extensive negotiations with various parties in interest;

f. Soliciting proposals from various parties in interest and third parties;

g. Assisting the Debtors in evaluating, negotiating, and executing various transactions;

h. Advising the Debtors on restructuring strategies;

i. Assisting in evaluating, raising, and negotiating prepetition and debtor-in possession financing; and

j. Providing additional financial advice and investment banking services in preparation for the filing of the Chapter 11 case.

11. Between September 2022 and September 2023, Evercore assisted the company in evaluating in-bound interest from a select group of counterparties with either relationships with TVH and its owners, or managed care health plans that were present within the TVH network. Efforts to sell the company were put on hold as both the Debtor and counterparties analyzed the go-forward financial and operational impact of the Centers of Medicare and Medicaid Services' ("CMS") release of its revised risk adjustment model.

12. Starting in September 2023, Evercore engaged in a formal marketing process to solicit Debtor's Business (as defined in the Sale Motion) or assets to strategic counterparties. In conjunction with TVH management and its owners, Evercore identified parties that generally met a set of qualifications ("Core Qualifications") to determine counterparty fit and qualification to acquire, integrate, and successfully operate the Debtor's Business or assets, including but not limited to the following: quality-of-care functions, capital, familiarity and experience operating similar clinic-based, multi-specialty care businesses within Florida, familiarity and experience operating businesses who contract with Medicare Advantage plans and receive value-based reimbursement (e.g., capitation, STARS/quality bonuses, gainshare), and proven success acquiring

6

and integrating similar businesses to TVH. Evercore's outreach to strategic counterparties considered the complexity and operational rigor required to manage physician organizations that assume responsibility for the full cost of patient care, and the continuity and quality of care for the greater than 55,000 primarily elderly patients within the Debtor's network.

13.     After evaluating Core Qualifications, Evercore extended outreach to ten (10) different counterparties (the "Outreach Parties" or each an "Outreach Party"). Of the ten (10) Outreach Parties, six (6) executed non-disclosure agreements, five (5) visited the Debtor's care facilities and management team, four (4) submitted an indication of value for the Debtor, and CenterWell was ultimately the only Outreach Party to sign a term sheet.

14.     As a result of Evercore's strategic process, in April of 2024, CenterWell signed a term sheet and emerged as the party most seriously interested in acquiring the Debtor. CenterWell completed significant due diligence, conducted numerous site visits with key leadership, and at the time, substantially negotiated a sale and purchase agreement before the process was suspended in July of 2024. That potential transaction was paused due to the discovery in the fall of 2024 of the coding issues discussed in more particularity in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions*. In May of 2025, CenterWell has reengaged in a due diligence "bring-down" and reopened negotiations regarding a potential sale transaction.

15.     I understand that on or about July 2, 2025, CenterWell entered an APA with the Debtor and the Debtor seeks to use the APA as a Stalking Horse Bid. I believe the APA was the result of good faith and arms' length negotiations between CenterWell and the Debtor after significant due diligence. I further believe that the terms of the APA are reflective of the market value for Debtor's assets and reasonable under the circumstances. Any buyer of the Debtor's

7

Business or assets will have to endure current losses and re-invest capital to turn around the Business.

16.     Additionally, I believe that CenterWell is a strong strategic partner and has a demonstrated ability to successfully operate the Debtor's Business long-term. CenterWell meets all Core Qualifications. As more fully described in the Sale Motion, and if approved by the Court, the Debtor will conduct a sale process that permits Potential Bidders to submit competing bids to the APA and participate in a potential Auction. The Bidding Procedures will allow the Debtor to solicit and identify bids from potential buyers that constitute the highest and/or best offer(s) for the Purchased Assets in an efficient manner.

17.     The Debtor and Evercore have agreed on a strategy to re-market the Debtor's assets following the Petition Date to maximize value for the Debtor. Evercore has marketing materials and other information prepared and will start communicating with strategic counterparties immediately following the Petition Date. Evercore will re-market the Purchased Assets to a group of identified strategic counterparties ("Postpetition Counterparties"). The Postpetition Counterparties have been targeted because they meet the Core Qualifications and have capacity to engage with Evercore on an expedited due diligence timeline. It is critical for Evercore to focus its efforts on parties who can successfully navigate Florida and Medicare Advantage markets.

18.     Evercore will approach the Postpetition Counterparties and seek an indication of interest. If interested, Evercore will provide a series of information to the Postpetition Counterparties. Evercore will work quickly to ensure any interested Postpetition Counterparties can conduct as much due diligence as possible within the Court approved sale timeline. Evercore has significant experience assisting and advising companies in chapter 11 cases with assets sales.

19.     I believe that the Debtor and Evercore's prepetition and post-petition marketing efforts will result in the best possible offer for the Debtor's assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 3, 2025                             */s/ A.J. Berens* _____
                                                Managing Director
                                                Evercore Group, LLC

## Exhibit C
### APA

**ASSET PURCHASE AGREEMENT**

**by and among**

**CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.,**

**HUMANA INC., solely for the purposes of <u>Section 13.18</u>,**

**and**

**THE VILLAGES HEALTH SYSTEM, LLC**

**July 3, 2025**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..................................................................................2

    1.01    Definitions.................................................................................2
    1.02    Other Defined Terms ...........................................................13

ARTICLE II PURCHASE AND SALE ...............................................................15

    2.01    Purchase and Sale of Assets................................................15
    2.02    Excluded Assets ...................................................................17
    2.03    Assumed Liabilities .............................................................18
    2.04    Excluded Liabilities .............................................................18
    2.05    Prorated Expenses ...............................................................18
    2.06    Assignment and Assumption of Certain Contracts .............19
    2.07    Consents to Certain Assignments ........................................21
    2.08    Designations of Assets and Liabilities.................................22
    2.09    Wrong Pockets .....................................................................22

ARTICLE III PURCHASE PRICE ......................................................................23

    3.01    Purchase Price ......................................................................23
    3.02    Allocation.............................................................................23
    3.03    Withholding .........................................................................24
    3.04    Deposit .................................................................................24

ARTICLE IV THE CLOSING .............................................................................25

    4.01    The Closing...........................................................................25
    4.02    Closing Deliveries................................................................25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLER .........................26

    5.01    Organization and Power.......................................................26
    5.02    Authorization; No Breach; Valid and Binding Agreement.......26
    5.03    Financial Statements ............................................................27
    5.04    Absence of Certain Developments; Undisclosed Liabilities .................................28
    5.05    Title to Assets; Sufficiency..................................................28
    5.06    Real Property .......................................................................29
    5.07    Tax Matters ..........................................................................30
    5.08    Contracts and Commitments................................................31
    5.09    Material Payors; Material Referral Sources; Material Vendors .........................34
    5.10    Intellectual Property; Information Technology ....................35
    5.11    Litigation; Orders.................................................................36
    5.12    Governmental Consents, etc. ...............................................36
    5.13    Employee Benefit Plans.......................................................36

i

5.14    Insurance ...................................................................................38
5.15    Compliance with Laws ..............................................................38
5.16    Environmental Matters ..............................................................39
5.17    Related Party Transactions .......................................................40
5.18    Employees ................................................................................40
5.19    Brokerage .................................................................................41
5.20    Health Care Compliance ...........................................................42
5.21    No Other Representations or Warranties ...................................46

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ..................46

6.01    Organization and Power ............................................................46
6.02    Authorization ...........................................................................47
6.03    No Violation .............................................................................47
6.04    Governmental Consents, etc. ....................................................47
6.05    Brokerage .................................................................................47
6.06    Buyer Financial Resources .......................................................47
6.07    No Reliance ..............................................................................48
6.08    No Other Representation ...........................................................48

ARTICLE VII PRE-CLOSING COVENANTS OF THE SELLER ..........................48

7.01    Conduct of the Business ............................................................48
7.02    Access to Books and Records ...................................................51
7.03    Credentialing Applications; Qualification ................................51
7.04    Tail Insurance ..........................................................................51
7.05    Transition Services Agreement .................................................52

ARTICLE VIII TAX MATTERS ............................................................................52

8.01    Cooperation ..............................................................................52
8.02    Apportionment of Property Taxes. ............................................52
8.03    Transfer Taxes. .........................................................................53
8.04    Tax Audits ................................................................................53
8.05    Tax Clearance Certificate. ........................................................53

ARTICLE IX CONDITIONS TO CLOSING ..........................................................53

9.01    Conditions to Obligations of Each Party ...................................53
9.02    Conditions to Buyer's Obligations ............................................54
9.03    Conditions to Seller's Obligations ............................................55

ARTICLE X SURVIVAL ........................................................................................55

10.01    Survival ..................................................................................55

ARTICLE XI TERMINATION...........................................................................................56

    11.01  Termination.................................................................................................56
    11.02  Effect of Termination.................................................................................58

ARTICLE XII ADDITIONAL COVENANTS .............................................................58

    12.01  Commercially Reasonable Efforts; Cooperation ....................................58
    12.02  Approvals...................................................................................................58
    12.03  Payor Arrangements..................................................................................59
    12.04  Books and Records ....................................................................................59
    12.05  Pending Audits and Appeals Pre-Closing Access to Information.. ...........59
    12.06  Confidentiality ..........................................................................................60
    12.07  Submission for Bankruptcy Court Approval ............................................60
    12.08  Overbid Procedures; Adequate Assurance................................................62
    12.09  Employee Matters .....................................................................................63
    12.10  Termination Payment ................................................................................68
    12.11  Further Assurances....................................................................................68

ARTICLE XIII MISCELLANEOUS ............................................................................68

    13.01  Press Releases and Communications ........................................................68
    13.02  Expenses ...................................................................................................69
    13.03  Notices ......................................................................................................69
    13.04  Assignment ...............................................................................................70
    13.05  Severability ...............................................................................................70
    13.06  References; Interpretation .........................................................................70
    13.07  Construction..............................................................................................71
    13.08  Amendment and Waiver ...........................................................................71
    13.09  Complete Agreement ................................................................................71
    13.10  Third-Party Beneficiaries .........................................................................71
    13.11  Waiver of Trial by Jury.............................................................................72
    13.12  Delivery by Email.....................................................................................72
    13.13  Counterparts; Electronic Delivery ...........................................................72
    13.14  Governing Law .........................................................................................72
    13.15  Jurisdiction ...............................................................................................72
    13.16  Specific Performance ................................................................................73
    13.17  No Recourse ..............................................................................................73
    13.18  Parent Guarantee ......................................................................................74
    13.19  Fiduciary Obligations...............................................................................75

# INDEX OF EXHIBITS

Exhibit A                   Amended and Restated Leases:
                            1.  Amended and Restated Lease (Primary Care)
                            2.  Amended and Restated Lease (Specialty Care)
                            3.  Form of Amendment to Lease (Corp/Administrative)
Exhibit B                   Form of Amendment to the Facilities Management Agreement
Exhibit C                   Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit D                   Form of Bidding Procedures Order
Exhibit E                   Form of Services Agreement
Exhibit F                   Form of Non-Competition Agreement
Exhibit G                   Form of Transition Services Agreement
Exhibit H                   Form of Escrow Agreement
Exhibit I                   Form of Employment Agreement

# INDEX OF SCHEDULES

Schedule A                  Non-Competition Agreement Parties

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 3, 2025, is made by and among CenterWell Senior Primary Care (Vitality), Inc., a Florida corporation ("Buyer"), Humana Inc., a Delaware corporation, solely for the purposes of Section 13.18 ("Parent"), and The Villages Health System, LLC, a Florida limited liability company (the "Seller"). Buyer and the Seller shall each be referred to herein from time to time as a "Party" and collectively as the "Parties." Capitalized terms used and not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS:

WHEREAS, the Seller commenced a voluntary case under the Bankruptcy Code in the Bankruptcy Court on July 3, 2025 (the "Petition Date");

WHEREAS, the Seller is engaged in the Business;

WHEREAS, Buyer desires to purchase from the Seller, directly and/or, in the Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, and the Seller desires to sell to Buyer and/or such Buyer Designees, the Purchased Assets, and Buyer desires to assume from the Seller, directly and/or, in Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, the Assumed Liabilities, in each case pursuant to the terms and subject to the conditions set forth herein (the "Acquisition");

WHEREAS, as a condition and inducement of Buyer entering into this Agreement, each Person set forth on Schedule A hereto, concurrently with the execution and delivery of this Agreement, is entering into a Non-Competition Agreement with Buyer, each of which shall become effective as of and contingent upon the Closing of the Transactions;

WHEREAS, the Seller and Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Seller to Buyer shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the Bankruptcy Code; and

WHEREAS, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding Buyer as the prevailing bidder at the Auction, the Seller shall sell and transfer to Buyer, and Buyer shall purchase and acquire from the Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from the Seller the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

1.01   <u>Definitions</u>. For purposes hereof, the following terms when used herein shall have the respective meanings set forth below:

"<u>Accrued PTO</u>" has the meaning set forth in <u>Section 12.09(i)</u>.

"<u>Affiliate</u>" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such particular Person, where "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or ownership interests, by contract or otherwise.

"<u>Affiliate Contract</u>" means any Contract between (a) Seller, on the one hand, and (b) (i) TVHHC or any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC or any of their Affiliates (other than Seller) or (iii) any director, manager or officer of any of the Persons in <u>clause (b)(i)</u> or <u>(ii)</u>, on the other hand.

"<u>Alternative Transaction</u>" means (a) a sale of all or a material portion of the Purchased Assets in one transaction or a series of transactions with a Person or Persons other than the Buyer or an Affiliate of the Buyer (including, for the avoidance of doubt, a Successful Bidder other than the Buyer) and/or (b) a stand-alone reorganization, in which a Person or Persons other than the Buyer or an Affiliate of the Buyer, including any creditors or stakeholders receive all or a material portion of the equity in the Seller or all or a material portion of the Purchased Assets; provided that, for the avoidance of doubt, any liquidation (other than as described in the foregoing) or wind-down of the Seller shall not constitute an Alternative Transaction.

"<u>Amended and Restated Leases</u>" means the amended and restated leases relating to the Leased Realty in substantially the form attached hereto as <u>Exhibit A</u>.

"<u>Amendment to the Facilities Management Agreement</u>" means the amendment to the Facilities Management Agreement between the Seller and TVHHC dated August 1, 2022, in substantially the form attached hereto as <u>Exhibit B</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 12.08(a)</u>.

"<u>Avoidance Actions</u>" means all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code.

"<u>Backup Bidder</u>" has the meaning specified in <u>Section 12.08(c)</u>.

"<u>Backup Termination Date</u>" means the first to occur of (a) 30 days after entry of an order of the Bankruptcy Court approving an Alternative Transaction with a Successful Bidder following the conclusion of the Auction in accordance with the Bidding Procedures Order, (b) consummation

of an Alternative Transaction, or (c) Buyer's receipt of notice from the Seller of the release of Buyer's obligations as Backup Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with an Alternative Transaction.

"Bankruptcy Case" means the voluntary case under the Bankruptcy Code of The Villages Health System, LLC, to be filed in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the Bankruptcy Court for the Middle District of Florida.

"Bidding Procedures Motion" means the Bidding Procedures Motion filed in the Bankruptcy Court by the Seller on July 3, 2025, in form and substance reasonably satisfactory to Buyer, seeking entry of the Bidding Procedures Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit D, approving, among other matters (a) the proposed bidding procedures attached thereto and (b) allowance and payment of the Termination Fee and the Expense Reimbursement in accordance with Section 12.10.

"Bill of Sale, Assignment and Assumption Agreement" means one or more Bill of Sale, Assignment and Assumption Agreements to be executed and delivered by Buyer and/or, if applicable, one or more Buyer Designees, and the Seller at the Closing, substantially in the form of Exhibit C.

"Business" means the operation of Senior-Focused Primary Care Centers located in The Villages in Florida as historically conducted by Seller.

"Business Contract" means any (i) Contract with Third Party Payors and (ii) all other Contracts (excluding the Leases) to which Seller is a party.

"Business Data" means all business information and all Personal Data (whether of employees, contractors, consultants, customers, consumers, or other Persons) that is collected by or on behalf of the Seller.

"Business Day" means a day that is neither a Saturday or Sunday, nor any other day on which banking institutions in New York, New York or The Villages, Florida are authorized or obligated by Law to close.

"Buyer Designee" means one or more Affiliates of Buyer designated by Buyer in writing to the Seller.

"Buyer Fundamental Representations" means the representations and warranties of Buyer set forth in Sections 6.01, 6.02 and 6.05.

"Buyer Material Adverse Effect" means any Effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the ability of Buyer

to carry out timely, or that has had or would prevent or impair Buyer from consummating the Transactions on or prior to the Outside Date.

"Cash" means all cash and cash equivalents and marketable securities, if any, held by the Seller, including checks and drafts received by the Seller or deposited for the account of the Seller.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Clinician" means each Physician and each licensed physician assistant, podiatrist, advanced practice registered nurse, licensed clinical social worker, registered dietitian nutritionist, licensed mental health counselor/licensed practical clinician, licensed marriage and family therapist, audiologist, or other licensed healthcare professional employed or engaged by, or contracted with Seller, in each case licensed or registered in the State of Florida.

"CMS" means the Centers for Medicare and Medicaid Services, or any successor Governmental Entity exercising similar authority.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Operating Agreement" means that certain Amended and Restated Operating Agreement of the Seller, as amended.

"Company Plan" means (a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), (b) a share bonus, share purchase, share option, restricted shares, share appreciation right or similar equity-based plan or (c) any other employment, consulting, severance, deferred-compensation, pension, retirement, welfare-benefit, health, dental, disability, life insurance, bonus, incentive or other compensatory, employee benefit plan, policy, program, agreement or arrangement sponsored, maintained, contributed to, or required to be contributed to by Seller or pursuant to which Seller would reasonably be expected to have any Liability, contingent or otherwise, to any current or former employee, officer, director or individual contractor of the Seller.

"Consent" means any consent, approval, clearance, authorization, waiver, permit, filing, notice, report, registration or waiting period expiration or termination required to be obtained from, filed with or delivered to any Person in connection with the consummation of the Transactions.

"Contract" means any agreement, contract, purchase order, arrangement, deed, mortgage, lease, sublease, subcontract, note, loan agreement, guaranty, pledge, bond, evidence of indebtedness, security agreement, license, binding agreement, instrument, commitment, undertaking, indenture or other similar instrument or obligation to which the party in question is a party, whether oral or written. "Contract" shall not include any Company Plan.

"Devices" means cellphones, tablets, iPads, laptop and desktop computers, printers, fax machines, copy machines, and any other electronic device that stores or processes Personal Information in connection with the Business or are otherwise used in connection with the Business

by the Seller's personnel, and for the avoidance of doubt excluding personal devices owned by any Seller personnel.

"DIP Facility" means that certain debtor in possession financing facility to be provided by PMA Lender, LLC pursuant to the DIP Facility Term Sheet and in accordance with the terms of orders entered by the Bankruptcy Court on the Debtor's Emergency Motion for Interim and Final Orders (1) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriroity Administrative Expense Status, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.

"Effect" means any change, effect, event, occurrence or development.

"Employment Agreement" means an employment agreement in substantially the form attached hereto as Exhibit I.

"Environmental Claim" means any written claim, Action, cause of Action, Order, threatened Orders, investigation or notice by any Person alleging potential Liability (including, without limitation, potential Liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, Release or threatened Release of or exposure to any Hazardous Materials at any location, whether or not owned or operated by the Seller, or (b) circumstances forming the basis of any actual or alleged violation of or Liability under any Environmental Law.

"Environmental Laws" means all Laws relating to pollution or protection of the environment, natural resources and human health and safety, including, without limitation, those Laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the generation, manufacture, processing, labeling, distribution, use, treatment, storage, transport, handling of, or exposure to, Hazardous Materials.

"Equity Interests" means, with respect to any entity, any corporate stock, shares, options, warrants, convertible securities, partnership interests, limited liability company interests, membership interests or units, or any other security or equity interests of, or other equity participation in, such entity that confers on any Person the right to receive a share of the profits and losses of, or distribution of the assets of, such entity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Seller, Buyer, and the Escrow Agent attached hereto as Exhibit H.

"Executory Contract" means any executory Business Contract or unexpired lease to which Seller is a party.

"Final Order" means an Order of the Bankruptcy Court, which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Fraud" means, with respect to a Party to this Agreement, the actual common law fraud in Delaware (and not negligent misrepresentation or omission or any statutory fraud) by such Party with respect to the making of a representation or warranty by such Party expressly set forth in this Agreement (as qualified by the Disclosure Schedules, as applicable) or in any certificates delivered pursuant to Article IX.

"GAAP" means United States generally accepted accounting principles.

"Governmental Entity" means any federal, national, state, foreign, provincial, territorial, local or other government or any governmental, regulatory, administrative authority, self-regulatory authority, executive, legislature, regulator, agency, bureau, board, commission, court, judicial or arbitral body, department, tribunal or other instrumentality thereof.

"Governmental Program" means any "federal health care program" as such term is defined in 42 U.S.C. § 1320a 7b(f), including Medicare, state Medicaid programs and TRICARE.

"Hazardous Materials" means any material, waste or substance that is listed, regulated, categorized or otherwise defined as "hazardous," "toxic," "radioactive," "pollutant," or "contaminant" (or words of similar intent or meaning) under any Environmental Law, including, without limitation, petroleum or petroleum by products, asbestos or asbestos-containing material, polychlorinated biphenyls, chlorinated solvents and per- or polyfluoroalkyl substances.

"Health Care Laws" means all Laws that govern, restrict or relate to the provision of health care services or treatment, healthcare industry or healthcare services regulation, professional, entity and facility licensure, qualification, operation, or certification, patient records and documentation, rate setting, fee splitting, referrals, patient brokering, patient acquisition and management, kickbacks, corporate practice of medicine and any other profession of Persons employed by or contracted with such Person, referrals, billing, coding, coding validation, clinical documentation, claims submission, medical necessity, reimbursement, coverage, collection and submission of false or fraudulent claims to Third Party Payors or Governmental Programs, standards of care, quality assurance, risk management, utilization review, peer review, mandated reporting of incidents, occurrences, diseases and/or events, telehealth, advertising or marketing of health care services, laboratory services, diagnostic testing, pharmacology and the securing, administering and dispensing of drugs, devices and controlled substances, diversion, patient privacy and security, patient confidentiality and informed consent, including (a) any state and federal controlled substance and drug diversion Laws, the Federal Controlled Substances Act, 21 U.S.C. § 801, et seq., all Laws relating to peer review, all Laws relating to mandated reporting of

incidents, occurrences, diseases and/or events, all Laws relating to advertising or marketing of health care services, (b) all Laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals, drugs or devices, (c) the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301 et seq.), (d) health care fraud and abuse, false claims, self-referral, and anti-kickback Laws, including the federal Anti Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Anti Kickback Act of 1986 (41 U.S.C. §§ 51 et seq.), the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Anti Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the Ethics in Patient Referrals Act, as amended (42 U.S.C. § 1395nn) (the "<u>Stark Law</u>"), the Florida Patient Self-Referral Act of 1992 (Fla. Stat. § 456.053), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the exclusion laws (42 U.S.C. § 1320a-7) and criminal Laws relating to health care fraud and abuse, (e) the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and all rules and regulations promulgated thereunder, including the breach notification regulations ("<u>HIPAA</u>"), (f) the Eliminating Kickbacks in Recovery Act of 2018 (Pub. L. 115 271, § 8122), (g) Medicare (Title XVIII of the Social Security Act), (h) the Federal Health Care Fraud Law (18 U.S.C. § 1347), (i) TRICARE (10 U.S.C. § 1071), (j) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a et seq.), (k) Medicaid (Title XIX of the Social Security Act), (l) the Prescription Drug Marketing Act of 1987, (m) the Deficit Reduction Act of 2005, (n) the Consolidated Omnibus Budget Reconciliation Act of 1985, (o) the Patient Protection and Affordable Care Act of 2010 (Pub. L. 111 148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111 152), (p) all applicable Laws governing imaging facilities, radiation therapy centers, ambulatory care facilities and ambulatory surgical facilities, and (q) in each case for the foregoing <u>clause (a)-(p)</u>, as amended, and all rules and regulations promulgated thereunder and federal, state, local and foreign equivalents of any of the foregoing.

"<u>Intellectual Property Rights</u>" means any and all common law or statutory rights anywhere in the world arising under or associated with: (a) patents, patent applications, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and all rights therein provided by international treaties and conventions ("<u>Patents</u>"); (b) trademarks (whether or not registered), service marks, trade dress, trade names, logos, and other designations of origin, including application and registrations therefor ("<u>Marks</u>"); (c) domain names, uniform resource locators, Internet Protocol addresses, social media handles, and other names, identifiers, and locators associated with Internet addresses, sites, and services; (d) copyrights and any other equivalent rights in works of authorship (including rights in Software as a work of authorship) and any other related rights of authors ("<u>Copyrights</u>"); (e) trade secrets and industrial secret rights, and rights in know-how, data, and confidential or proprietary business or technical information, in each case, that derives independent economic value, whether actual or potential, from not being known to other Persons ("<u>Trade Secrets</u>"); and (f) other similar or equivalent intellectual property rights anywhere in the world.

"<u>IRS</u>" means the U.S. Internal Revenue Service.

"<u>IT Systems</u>" means the computer systems, networks, hardware, digital storage media, applications and Software possessed, maintained, used or operated by Seller, and includes any technical components that Seller uses to Process data.

"knowledge of the Seller" and "the Seller's knowledge" mean the actual or constructive knowledge of those Persons set forth in Schedule 1.01(b), after reasonable inquiry of their respective direct reports as of the applicable date.

"Law" means any law, common law, treaty, rule, statute, code, regulation, treatise, directive, judgment, injunction, Order, ordinance, decree, resolution, promulgation, guidance or other restriction, in each case, enacted, promulgated, issued or put into effect by any Governmental Entity.

"Liabilities" means all indebtedness, debts, claims, obligations and other liabilities of a Person whether known, unknown, accrued, unaccrued, absolute, matured, unmatured, direct or indirect, contingent or otherwise, whether due or to become due.

"Liens" means liens, licenses (excluding non-exclusive licenses with respect to Intellectual Property Rights), options, hypothecations, security interests, encroachments, claims, infringements, rights of first refusal, covenants, restrictions, servitudes, preemptive rights, charges, pledges, bailments, mortgages, deeds of trust, conditional sales and title retention agreements or other restrictions or encumbrances or substantively similar arrangements.

"Local Rules" means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida.

"Material Adverse Effect" means any Effect occurring on or after the date hereof that, individually or considered together with all other Effects has had or would reasonably be expected to have a material adverse effect on the Purchased Assets or condition (financial or otherwise) of the Business, taken as a whole; provided, however, that with respect to clause (a) none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) Effects directly arising from, or attributable to the announcement of the Transactions or the pendency of the Transactions, or the identity of Buyer or any of its Affiliates, including any litigation resulting directly therefrom, any adverse changes in supplier, customer, distributor, employee, financing source, partner, patient, vendor, Third Party Payor, Clinician, regulator or similar relationships resulting directly therefrom; (ii) Effects that generally affect the industry in which the Seller operates (including legal and regulatory changes); (iii) changes to general economic, financial, market, business, regulatory or political conditions (or changes therein) or Effects affecting the financial, credit, securities, commodities or derivatives markets in the United States, including changes in interest rates or foreign exchange rates; (iv) Effects arising from, or attributable to, changes or modifications in GAAP or applicable Law after the date of this Agreement, or the authoritative interpretation thereof; (v) Effects that result from any action taken, or failure to take action, by the Seller that is either (A) in compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or the Transaction Documents, or (B) at the written request of Buyer, or such other changes, in each case, which Buyer or any of its Affiliates has approved, consented to or requested or otherwise taken or omitted to take (or any action not taken as a result of the failure of Buyer to consent to any action requiring Buyer's consent pursuant to Section 7.01); (vi) the failure of the Seller to meet or achieve any internal or published projections, forecasts, estimates or predictions of revenue, earnings, cash flow or cash position and any seasonal changes which are consistent with seasonal changes in prior years in the

results of operations of the Seller for any period ending on or after the date hereof (<u>provided</u> that, to the extent not the subject of any of <u>clauses (i)</u> through <u>(viii)</u> of this definition, the underlying cause of such failure may be taken into account to determine whether a Material Adverse Effect has occurred or will occur); (vii) Effects arising from, or attributable to any national, international or supranational political, geopolitical or similar conditions, including civil unrest, (including riots, looting and revolutions), the threatening of, engagement in, continuation or escalation of, hostilities or war, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or cyber attack or terrorist attack, weather related or other force majeure event (including earthquakes, hurricanes, tornadoes or any other natural disasters (whether or not caused by any Person or any force majeure event)) results of elections or any other national or international calamity or crisis and, in each case, any responses thereto (*e.g.*, sanctions, boycotts, or curfews); (viii) Effects arising from, or attributable to, a hurricane, earthquake, flood or other natural or man made disaster, act of God, force majeure event or any epidemic, pandemic, disease, outbreak or significant public crisis; (ix) (A) events as described in <u>Schedule 1.01(c)</u> or (B) any objections in the Bankruptcy Court to (I) this Agreement or any of the Transactions; (II) the Sale Order; or (III) the assumption or rejection of any Executory Contract by Buyer; <u>provided</u> that any Effect described in any of the foregoing <u>clauses (ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(vii)</u> and <u>(viii)</u> may constitute, or be taken into account in determining whether there has been or would be reasonably be expected to be, such a material adverse effect to the extent that it disproportionately affects the Seller relative to other participants in the industries in which the Seller conducts their business generally.

"<u>Multiemployer Plan</u>" has the meaning set forth in Section 3(37) of ERISA.

"<u>Multiple Employer Plan</u>" means a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA (whether or not the plan is subject to ERISA).

"<u>Non-Competition Agreement</u>" means a non-competition agreement in the form attached hereto as <u>Exhibit F</u>.

"<u>OIG</u>" means the Office of the Inspector General of the U.S. Department of Health and Human Services.

"<u>Patient Records</u>" means all records including "health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, and other patient-related documentation maintained by Seller).

"<u>Permitted Liens</u>" means any of the following: (a) Liens for Taxes, assessments, charges, levies or other claims not yet due and payable; (b) Liens imposed by Law, such as materialmen's, mechanics', carriers', warehousemen's, workmen's and repairmen's liens, and other similar liens incurred in the ordinary course of business, for amounts not yet delinquent and for which adequate reserves or accruals have been made in accordance with GAAP, or the validity of which are being contested in good faith; (c) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (d) with respect to real property, Liens, irregularities, easements, reserves, servitudes, encroachments, rights of way or other minor imperfections of title of record, the existence of which do not, individually or in the aggregate, materially interfere with the use or value of the affected property or the operation of the

Business on the affected property; (e) customary contractual provisions providing for retention of title to goods until payment is made, but only to the extent adequate reserves or accruals have been made in accordance with GAAP; (f) matters disclosed in the Financial Statements; and (g) Liens that will be released by operation of the Sale Order or otherwise prior to the Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Entity or any department, agency or political subdivision thereof, or any other organization or entity of any kind.

"Personal Data" means (a) any information relating to an identified or identifiable natural person, where an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that person, and (b) "personal information," "protected health information," "personal data," or the equivalent term under applicable Privacy and Security Laws.

"Physician" means an individual who is (i) licensed to practice medicine in the State of Florida and (ii) employed or engaged by, or contracted with, the Seller.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Privacy and Security Laws" means (a) HIPAA; and (b) applicable Laws relating to the privacy, security, confidentiality, breach, or Processing of Personal Data or other Business Data, medical records, or other records generated in the course of providing or paying for health care services.

"Privacy Policies" means all published, posted, and internal agreements and policies relating to the Seller's Processing of Personal Data or other Business Data.

"Process," "Processed" or "Processing" means, with respect to any data, the use, collection, processing, storage, protection of, recording, organization, adaption, alteration, transfer, retrieval, consultation, disposal, disclosure, dissemination, or combination of such data.

"Promissory Notes" means each of the promissory notes set forth on Schedule 1.01(d).

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Referral Source" means any Person in a position to refer, recommend or arrange for the referral of patients or other health care business, including any physician, physician practice, hospital or other health care provider.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, pumping, pouring, injection, escaping, emptying, dumping, deposit, disposal, dispersal, leaching or migration into or through the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"<u>Sale Hearing</u>" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"<u>Sale Motion</u>" means the motion filed by the Seller with the Bankruptcy Court, which may be the Bidding Procedures Motion, in form and substance reasonably satisfactory to Buyer, seeking entry of the Sale Order.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court, which Order shall be in form and substance acceptable to Buyer in its sole discretion and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement and its obligations hereunder and (ii) the sale of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Liens, Claims (including, without limitation, Claims based on theories of successor liability or similar doctrines), and other interests, in each case, other than the Assumed Liabilities, (b) authorize each of the Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the Purchased Assets, and (c) provide that Buyer is receiving good and marketable title to all of the Purchased Assets.

"<u>Seller Fundamental Representations</u>" means the representations and warranties of the Seller set forth in <u>Section 5.01</u>, <u>Section 5.02</u>, <u>Section 5.05(a)</u>, the first sentence of <u>Section 5.05(b)</u> and <u>Section 5.19</u>.

"<u>Seller Information</u>" means all data and information, including all Personal Data, Patient Records, used or processed in the conduct of the Business or by or on behalf of the Seller.

"<u>Seller IP Rights</u>" means all Intellectual Property Rights that the Seller owns or purports to own that is included in Purchased Assets.

"<u>Senior-Focused Primary Care Center</u>" means a medical facility that primarily provides primary care medical services and where at least twenty percent (20%) of patients are aged greater than or equal to 62, which shall include any multispecialty medical facility where primary care medical services are provided and where at least twenty percent (20%) of the patients receiving primary care medical services are aged greater than or equal to 62.

"<u>Services Agreement</u>" means the Services Agreement to be executed and delivered by the Seller or an Affiliate thereof to Buyer and/or, if applicable, one or more Buyer Designee at the Closing, substantially in the form of <u>Exhibit E</u>.

"<u>Software</u>" means all computer software, firmware, programs, data libraries and databases, in any form, including source code, object code, apps, extensions including make files, Gerber

files, user interfaces, development tools, library functions, compilers, internet websites, web content and links, all versions, updates, corrections, enhancements, replacements, and modifications thereof, and all documentation related thereto.

"<u>Straddle Period</u>" means any taxable period that begins on or before and ends after the Closing Date.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation of which a majority of the total voting power of shares entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more subsidiaries of such Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, association or other business entity or is or controls the managing director or general partner of such partnership, association or other business entity.

"<u>Successful Bid</u>" has the meaning assigned in the Bidding Procedures Motion.

"<u>Successful Bidder</u>" has the meaning assigned in the Bidding Procedures Motion.

"<u>Tax</u>" or "<u>Taxes</u>" means any U.S. federal, state, local or non-U.S. taxes, including income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital shares, social security, unemployment, disability, payroll, license, employee or other withholding, or other similar tax, levy, fee, impost, duty or assessment imposed by any Governmental Entity, including any interest, penalties or additions to tax with respect to the foregoing.

"<u>Tax Returns</u>" means any return, report, information return or form (including schedules or any related or supporting information) filed or required to be filed with any Governmental Entity in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"<u>The Villages Health Marks</u>" means the trademarks set forth on <u>Schedule 1.01(e)</u>.

"<u>Third Party Payor</u>" means any insurance company, managed care organization, health maintenance organization, preferred provider organizations, health plan or program or other third-party payor, whether private, commercial or a Governmental Program.

"<u>Transaction Documents</u>" means this Agreement, the Non-Competition Agreements, the Amended and Restated Leases, the Amendment to the Facilities Management Agreement, the Services Agreement, the Bill of Sale, the Bill of Sale, Assignment and Assumption Agreement, the Transition Services Agreement, and any and all certificates, agreements, documents or other instruments to be executed and delivered by any Person pursuant thereto, any exhibits, attachments

or schedules to any of the foregoing, as any of the foregoing may be amended, supplemented or otherwise modified from time to time.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transferred Contracts" has the meaning set forth in Section 2.06(b).

"Transition Services Agreement" means the Transition Services Agreement to be executed and delivered by the Seller to Buyer and/or, if applicable, one or more Buyer Designees, at the Closing, substantially in the form of Exhibit G.

"TVHHC" means The Villages Health Holding Company, LLC, a Florida limited liability company.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act and any similar applicable state, local or foreign law or regulation.

"Willful Breach" means a willful and intentional act or a willful and intentional failure to act, in each case, by a party with awareness that the taking of such act or failure to take such act could reasonably be expected to give rise to a material breach of this Agreement.

1.02    Other Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Term | Section |
|---|---|
| $ | 13.06 |
| Accepted Clinicians | 9.02(e) |
| Accrued PTO | 12.09(i) |
| Acquisition | Recitals |
| Action | 5.11(a) |
| Adjusted Balance Sheet | 5.03(a) |
| Agreement | Preamble |
| Allocation | 3.02 |
| Anti-Bribery Laws | 5.15(d) |
| Assumed Liabilities | 2.03 |
| Assumed Plan | 12.09(n) |
| Auction | 12.08(a) |
| Available Contract Schedule | 2.06(a) |
| Backup Bidder | 12.08(c) |
| Buyer | Preamble |
| Buyer's 401(k) Plan | 12.09(j) |
| Buyer's Prorated Responsibilities | 2.05(a) |
| Buyer's Representatives | 7.02 |
| Closing | 4.01 |
| Closing Date | 4.01 |
| Closing of the Bankruptcy Case | 2.07(b) |

13

Collective Bargaining Agreement........................................................................5.18(c)
Compensation Payments..................................................................................12.09(h)
Contracting Parties..........................................................................................13.17(a)
control ...............................................................................Definition of Affiliate
Copyrights.......................................................Definition of Intellectual Property Rights
Coverage Period..................................................................................................7.04
Cure Costs ......................................................................................................2.06(g)
Cure Costs Cap ...............................................................................................2.06(g)
Cure Notice .....................................................................................................2.06(a)
Data Protection Requirements ..........................................................................5.20(k)
Deposit ............................................................................................................3.04(a)
Disclosure Schedule ..........................................................................................13.06
Employee Withholding Documents ...................................................................12.09(l)
Excluded Assets ...................................................................................................2.02
Excluded Liabilities .............................................................................................2.04
Exhibit ................................................................................................................13.06
Expense Reimbursement.......................................................................................12.10
Final Allocation ...................................................................................................3.02
Financial Statements ..........................................................................................5.03(a)
Health Care Permits ..........................................................................................5.20(b)
HIPAA ............................................................................Definition of Health Care Laws
Labor Union .....................................................................................................5.18(c)
Leased Realty ...................................................................................................5.06(a)
Leases...............................................................................................................5.06(b)
Marks ...........................................................Definition of Intellectual Property Rights
Material Contracts.............................................................................................5.08(b)
Material Payor..............................................................................................5.08(a)(xi)
Material Referral Source.................................................................................5.08(a)(xv)
Material Vendor ............................................................................................5.08(a)(v)
Non-Party Affiliates..........................................................................................13.17(a)
Order ...............................................................................................................5.11(b)
Outside Date.....................................................................................................11.01(d)
Parent ..................................................................................................................Preamble
Parties..................................................................................................................Preamble
Party ...................................................................................................................Preamble
Patents ..........................................................Definition of Intellectual Property Rights
Permits..............................................................................................................5.15(e)
Petition Date..........................................................................................................Recitals
Preliminary Executory Contract List ...............................................................2.06(a)
Prorated Expenses ...........................................................................................2.05(a)
Purchase Price ..............................................................................................3.01(a)(iii)
Purchased Assets .................................................................................................2.01
Related Party ......................................................................................................5.17
Schedule .............................................................................................................13.06
Section.................................................................................................................13.06
Security Incident ..............................................................................................5.20(o)

Security Risk Analysis ................................................................................... 5.20(n)
Seller ....................................................................................................... Preamble
Seller Disclosure Schedules ......................................................................... Article V
Seller Registered IP ....................................................................................... 5.10(a)
Seller's 401(k) Plan ...................................................................................... 12.09(j)
Seller's Prorated Responsibilities ................................................................... 2.05(a)
Specified Proceeding ....................................................................................... 7.01(l)
Standard Procedure ....................................................................................... 12.09(l)
Stark Law ................................................................... Definition of Health Care Laws
Tail Insurance .................................................................................................. 7.04
Termination Fee ............................................................................................... 12.10
Termination Payment ....................................................................................... 12.10
Trade Secrets ................................................. Definition of Intellectual Property Rights
Transfer Taxes .................................................................................................. 8.03
Transferred Contracts ..................................................................................... 2.06(b)
Transferred Employee ...................................................................................... 12.09(c)
Undisclosed Contract ...................................................................................... 2.06(a)
United ........................................................................................................... 9.02(g)
Withholding Agent ........................................................................................... 3.03

# ARTICLE II

# PURCHASE AND SALE

2.01    Purchase and Sale of Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to Buyer and/or one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase and acquire from the Seller (other than the Excluded Assets), all of the Seller's right, title and interest, free and clear of all Liens, Claims and other interests (other than the Assumed Liabilities), in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller of every nature (wherever located, whether real, personal or mixed, whether held directly or indirectly and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), used or held for use in, or related to, the Business, including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "Purchased Assets"); provided, however, that the Purchased Assets shall not include any Excluded Assets, none of which shall be sold, assigned, conveyed, transferred or delivered to Buyer. Without limiting the generality of the foregoing, the Purchased Assets shall include all of Seller's right, title and interest in and to the following assets to the extent used or held for use in, or related to, the Business (except to the extent an Excluded Asset):

(a)    all advances, prepaid assets and expenses, security and other deposits and prepayments;

(b)    the Transferred Contracts and all rights and benefits thereunder;

(c)    all inventory and supplies;

(d)    all tangible personal property, including all Devices, equipment, leasehold improvements, computer hardware, furniture, furnishings, machines, tools, supplies, telephones, office equipment, vehicles and all rights in all warranties of any manufacturer or vendor with respect thereto (express or implied), including all such property (i) located at any clinic or administrative site operated by the Seller; or (ii) located at any Business-related facility;

(e)    except to the extent listed on Schedule 2.01(e), all Intellectual Property Rights and all tangible embodiments thereof, to the extent owned by Seller, but excluding, for the avoidance of doubt, The Villages Health Marks and any other Marks incorporating "THE VILLAGES", subject to Section 2.07;

(f)    except to the extent listed on Schedule 2.01(f), all IT systems, Software programs and all hardware or data processing equipment and data processing system manuals, whether owned or licensed pursuant to any Transferred Contract, subject to Section 2.07;

(g)    all Seller Information, and all databases and other repositories containing such data and information, and all records, including all data, know-how, Software, and media content, subject to Section 2.07;

(h)    all regulatory licenses, Permits and accreditations (including any issued or granted by, or filed with or delivered to, any Governmental Entity or accrediting body), and all rights thereunder, except for any such Permits that are Excluded Assets set forth in Section 2.02(m), subject to Section 2.07;

(i)    all telephone and facsimile numbers, post office boxes and directory listings;

(j)    each Assumed Plan and the Seller's right, title and interest in any assets of or relating thereto;

(k)    all claims, causes of action or rights against third parties (including, warranties, indemnities, rebates and guarantees), other than Avoidance Actions and claims, causes of action or rights to the extent related to Excluded Assets or Excluded Liabilities;

(l)    any insurance proceeds arising in connection with damage to, or losses related to, the Purchased Assets occurring prior to the Closing, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing and to the extent not relating to an Excluded Asset or Excluded Liability;

(m)    all goodwill to the extent relating to or associated with the Purchased Assets or the Business; and

(n)    any other assets that are of a type not otherwise addressed by this Section 2.01 that are not Excluded Assets.

2.02    <u>Excluded Assets</u>. The Purchased Assets shall not include the following (collectively, the "<u>Excluded Assets</u>"):

(a)    any Equity Interests in the Seller or held by the Seller;

(b)    any Equity Interests in TVH Real Estate Holdings, LLC;

(c)    any interest in the real property, or the furniture, fixtures or equipment (excluding Devices) located at 11368 Laufersky Lane, Oxford, Florida, 34484;

(d)    any interest in the lease agreement with respect to 600 Sunbelt Road, The Villages, Florida, 32159 dated May 19, 2025, by and between The Villages Operating Company, as lessor, and Seller, as lessee, or the furniture, fixtures or equipment (excluding Devices) at that premises;

(e)    organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the Seller's organization, maintenance, existence, and operation;

(f)    all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller, including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Closing, and any intercompany receivables between Seller on the one hand, and any Affiliate of Seller on the other hand;

(g)    any Cash;

(h)    all bank accounts of Seller;

(i)    any Contracts other than the Transferred Contracts;

(j)    all Avoidance Actions;

(k)    the Villages Health Marks (subject to any transitional rights granted thereto pursuant to any Transaction Documents), any other Marks incorporating "THE VILLAGES" and domain names (including "thevillageshealth.com"), webpages and social media accounts incorporating or related thereto;

(l)    any insurance policies of the Seller or proceeds thereof or any rights thereunder, except as set forth on <u>Schedule 2.02(l)</u> or described in <u>Section 2.01(l)</u>;

(m)    the Seller's Medicare and Medicaid provider numbers and all associated National Provider Identifier (NPI) numbers related to owners, employees and independent contractors of Seller;

(n)      any rights to rebates, refunds or discounts due to Seller with respect to assets or services purchased prior to the Closing Date;

(o)      all Company Plans, other than the Assumed Plans and the Seller's right, title and interest in any assets of or relating thereto;

(p)      all payroll records, personnel files and other personnel records; or

(q)      any Tax assets, including prepaid Taxes and any refund, rebate or credit of Taxes.

2.03    <u>Assumed Liabilities</u>. Subject to the terms and conditions of this Agreement, effective as of the Closing, Buyer and/or one or more Buyer Designees shall assume and agree to pay, perform and discharge when due in accordance with their respective terms solely Liabilities (collectively, the "<u>Assumed Liabilities</u>") as follows:

(a)      all Liabilities to the extent relating to the ownership, operation, or conduct of the Purchased Assets or the Business following the Closing, including without limitation Liabilities to the extent arising under Transferred Contracts after the Closing;

(b)      Cure Costs up to the Cure Costs Cap;

(c)      Accrued PTO; and

(d)      (i) Liabilities for Taxes relating to the Purchased Assets or the Business for any Post-Closing Tax Period, as determined pursuant to <u>Section 8.02</u> with respect to any Straddle Period, and (ii) all liability for Transfer Taxes.

2.04    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary herein, neither the Buyer nor any Buyer Designee shall assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities (all such Liabilities that neither the Buyer nor any Buyer Designee is assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

2.05    <u>Prorated Expenses</u>. Except as otherwise expressly provided herein, (i) the Seller shall be responsible for all Prorated Expenses incurred in the operation of the Business prior to the Closing (the "<u>Seller's Prorated Responsibilities</u>"), and (ii) Buyer shall be responsible for all Prorated Expenses incurred in the operation of the Business after the Closing (the "<u>Buyer's Prorated Responsibilities</u>"); provided that in no event shall Buyer's Prorated Responsibilities include any Excluded Liabilities. "<u>Prorated Expenses</u>" shall mean expenses arising from the conduct of the business and operations of the Purchased Assets and the Business (other than Taxes subject to proration pursuant to <u>Article VIII</u> hereof), water charges, sewer, rents, real estate, fuel and utility charges, license fees, assessments and other fees, prepaid and deferred expenses, and other expenses relating to the Purchased Assets and/or the Business. In the event Buyer and the Seller are prohibited by a vendor from paying a partial invoice for the Prorated Expenses, Buyer

shall submit payment in full for such invoice to the vendor, and the Seller agrees to reimburse Buyer for the Seller's pro rata share of the invoice within seven (7) Business Days of Seller's receipt of notice and proof of payment from Buyer that such invoice has been paid by Buyer. In the event that either Buyer or Seller pays any Prorated Expenses that are Seller's Prorated Responsibilities or Buyer's Prorated Responsibilities, respectively, the other party shall promptly reimburse such amount within seven (7) Business Days of receipt of notice and proof of payment from Buyer or Seller that such invoice has been paid by Buyer or Seller, as applicable.

2.06    Assignment and Assumption of Certain Contracts.

(a)    Within fourteen (14) days of the date hereof, the Seller shall deliver to Buyer and file with the Bankruptcy Court a preliminary list setting forth the Executory Contracts and unexpired Leases used in, or otherwise related to, the Business along with its good faith estimate of the Cure Costs associated with each such Executory Contract (the "Preliminary Executory Contract List"), and will in good faith update the Preliminary Executory Contract List to add additional Executory Contracts and unexpired Leases not included in the Preliminary Executory Contract List, correct any inaccuracies in the Preliminary Executory Contract List and file such updated list (such updated list, the "Available Contract Schedule") with the Bankruptcy Court on a rolling weekly basis during the twenty-eight (28) day period following the date hereof with the final such Available Contract Schedule filed on the twenty-eighth day following the date hereof. The Seller shall serve written notice (each, a "Cure Notice") to the non-Seller counterparty to each Executory Contract on the Available Contract Schedule in accordance with the Bidding Procedures Order. From the date hereof through the Closing, the Seller shall cooperate and provide such additional information to Buyer as may be reasonably necessary in order to identify all Executory Contracts. If, at any time after filing of the final Available Contract Schedule and prior to the Closing Date, Seller becomes aware that it is a party to an Executory Contract that is not listed on the Available Contract Schedule (each, an "Undisclosed Contract"), or becomes aware that the Available Contract Schedule reflects inaccurate information, Seller will promptly update the Available Contract Schedule with respect to such Undisclosed Contract or inaccurate information and (i) file with the Bankruptcy Court and provide to Buyer such updated Available Contract Schedule, and (ii) serve a Cure Notice, to the non-Seller counterparty to such Undisclosed Contract. In addition, the Seller shall supplement the Available Contract Schedule to add any Executory Contracts used in, or otherwise related to, the Business that are entered into by the Seller during the pendency of the Bankruptcy Case and provide such updated Available Contract Schedule to the Buyer. The Seller shall provide an update of such good faith estimate of Cure Costs not less than ten (10) Business Days prior to the Closing Date.

(b)    From and after the date hereof until the fifth (5th) Business Day prior to the Closing Date, Buyer may, in its sole discretion, (i) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Contract to be rejected) for assumption and assignment to Buyer or its designee, effective on and as of the Closing (such Executory Contracts, together with any other Executory Contracts assumed by Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Transferred Contracts"), or (ii) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Transferred Contract) for rejection effective on and as of the Closing.

19

(c)     Seller shall take all actions reasonably required to assume and assign the Transferred Contracts to Buyer or its designee, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Transferred Contracts and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Transferred Contracts to Buyer or a Buyer Designee satisfies all applicable requirements of section 365 of the Bankruptcy Code. If any objections are filed by, or received from, any non-Seller counterparty in response to a Cure Notice, Seller will take all actions reasonably required to resolve any such objections with such non-Seller counterparty.

(d)     From and after the date hereof until the Closing Date, Seller shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Transferred Contract or Executory Contract, not yet designated by Buyer for rejection, or take any affirmative action not required thereby, without the prior written consent of Buyer. For the avoidance of doubt, this Section 2.06(d) shall not apply to the expiration or extension of any Contract in accordance with its terms.

(e)     As part of the Sale Motion (or, as necessary in one or more separate motions), the Seller shall request that by virtue of the Seller providing the Cure Notices, the Bankruptcy Court deem any non-Seller party to such Transferred Contract that does not file an objection with the Bankruptcy Court to have given any required Consent to the assumption of the Transferred Contract by the Seller and assignment to the Buyer and/or one or more Buyer Designees.

(f)     The Sale Order shall provide for the assumption by the Seller, and to the extent permitted by applicable Law, provide for the assignment by the Seller to the Buyer and/or one or more Buyer Designees, effective upon the Closing, of the Transferred Contracts on the terms and conditions set forth in this Section 2.06.

(g)     In connection with the assumption and assignment to the Buyer or a Buyer Designee of any Transferred Contract pursuant to this Section 2.06, the Seller shall pay, at or prior to the Closing, all of the cure amounts ("Cure Costs"), as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Transferred Contracts, that relates to the period prior to the Closing; provided that Buyer hereby agrees to pay to Seller at the Closing in accordance with Section 3.01(a)(iii) (or, solely with respect to any Cure Costs (or portions thereof) for which reserves are established pursuant to Section 2.06(h) hereof, on the date of consensual resolution or final determination by the Bankruptcy Court of the applicable cure objection in accordance with Section 2.06(h) hereof) an amount equal to the lesser of (1) the aggregate amount of applicable Cure Costs and (2) $1,000,000 (the "Cure Costs Cap" and any Cure Costs above the Cure Costs Cap, "Excess Cure Costs") for Transferred Contracts that are not Affiliate Contracts to be paid to non-Seller counterparties pursuant to Section 2.06(h) below.

(h)     If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Transferred Contract that is an Affiliate Contract, Seller shall (x) pay on or before the Closing Date such non-Seller counterparty an amount equal to the undisputed portion of Cure Costs payable with respect to such Transferred Contract and (y) appropriately reserve funding for the disputed portion of such Cure Costs pending

20

resolution of such cure objection, and, subject to entry by the Bankruptcy Court of the Sale Order, Seller shall assume and assign such Transferred Contract to Buyer at the Closing. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection with respect to any Transferred Contract that is an Affiliate Contract, Seller shall promptly pay to such non-Seller counterparty any remaining Cure Costs owing to such non-Seller counterparty with respect to such Transferred Contract.

2.07    Consents to Certain Assignments.

(a)    If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the efforts of the Seller pursuant to Section 2.06, any Consent is not obtained prior to Closing and as a result thereof the Buyer cannot receive any of the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Seller shall, at the request of Buyer, prior to the Closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in any lawful and reasonable arrangement proposed by Buyer under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer; provided, that the Seller's cooperation obligations contemplated by this Section 2.07 shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts. The Seller shall as promptly as practicable pay to the Buyer when received, all monies received by the Seller attributable to such Purchased Asset from and after the Closing Date and the Buyer shall promptly pay the Seller for all reasonable and documented out-of-pocket costs incurred by the Seller associated with, arising or resulting from such arrangement. Subject to the terms and limitations set forth in this Agreement, Seller shall use commercially reasonable efforts (which shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts) to secure such Consent as promptly as practicable after the Closing. Upon receiving any such Consent applicable to such Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

(b)    To the extent that the Buyer has not obtained all of the Permits that are necessary for the Buyer to take title to all of the Purchased Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in a substantially similar manner in all material respects as it was operated by the Seller immediately prior to the Closing, the Seller shall, to the extent permitted by applicable Laws, maintain, at the Buyer's sole expense, after the Closing such Permits that the Buyer requests, until the earlier of the time the Buyer has obtained such Permits and the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning the Seller in the Bankruptcy Case, and such plan has become effective in accordance with its terms (the "Closing of the Bankruptcy Case").

2.08    <u>Designations of Assets and Liabilities</u>.

(a)    At any time on or prior to the second (2nd) Business Day prior to the Closing Date, the Buyer may, in its sole discretion by written notice to the Seller, (a) designate any of the Purchased Assets as Excluded Assets, and (b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or Liabilities so designated; <u>provided</u>, that there shall be no reduction in the Purchase Price in connection with any such designation by the Buyer. Notwithstanding any other provision hereof, the Liabilities of the Seller under or related to any asset designated as an Excluded Asset under this paragraph shall constitute Excluded Liabilities.

2.09    <u>Wrong Pockets</u>.

(a)    During the twelve (12) month period following the Closing, if either Buyer or the Seller becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to Buyer or that any right, property or asset forming part of the Excluded Assets has been transferred to Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to (i) Buyer, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to Buyer at or in connection with the Closing, or (ii) the Seller, in the case of any right, property or asset not forming part of the Excluded Assets which was transferred to Buyer at the Closing.

(b)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates receives any (i) funds or property intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds or property to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds or property, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise) or (ii) mail, courier package or document intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds, property or document to, the other Party.

(c)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates pays any amount to any third party in satisfaction of any Liability of the other Party pursuant to the terms of this Agreement or any other Transaction Document, (i) the paying Party shall promptly notify the other Party of such payment and (ii) the other Party shall promptly reimburse the paying Party for the amount so paid by the paying Party to such third party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such amount, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise).

# ARTICLE III

# PURCHASE PRICE

3.01    <u>Purchase Price</u>.

    (a)    The consideration for the sale and transfer of the Purchased Assets from the Seller to Buyer (and one or more Buyer Designees) shall be as follows:

        (i)    an amount in cash equal to $50,000,000.00; plus

        (ii)    an amount of cash equal to the Cure Costs for Transferred Contracts that are not Affiliate Contracts, subject to the Cure Costs Cap, in accordance with <u>Section 2.06(g)</u> for use by Seller in paying the amounts required pursuant to <u>Section 2.06(h)</u> (such amounts in <u>clauses (i)</u> and <u>(ii)</u>, collectively, the "<u>Cash Purchase Price</u>"); plus

        (iii)    the assumption of the Assumed Liabilities by execution of the Bill of Sale, Assignment and Assumption Agreement (such amounts in <u>clauses (i) – (ii)</u>, collectively, the "<u>Purchase Price</u>").

    (b)    On the Closing Date, Buyer shall pay or cause to be paid to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller at least three (3) Business Days prior to the Closing, an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price less the Deposit (which shall not be less than $5,000,000 and shall be released to Seller upon the joint instruction of Buyer and Seller instructing the Escrow Agent to pay the Deposit to the Seller).

    3.02    <u>Allocation</u>. No later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets (the "<u>Allocation</u>") in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as appropriate) for Seller's review and comments. Any reasonable comments provided by the Seller to Buyer under this <u>Section 3.02</u> shall be considered by Buyer in good faith. The Allocation shall be conclusive and binding on the Parties unless the Seller notifies Buyer in writing that they object to one or more items reflected in the Allocation, and specify the reasonable basis for such objection, within thirty (30) days after delivery to the Seller of the Allocation. In the case of such an objection, the Seller and Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by the Seller and Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "<u>Final Allocation</u>"). If the Seller and Buyer are unable to resolve all disputed items within thirty (30) days after the delivery of the Seller's written objection to Buyer, each of Buyer and the Seller may separately determine the allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets and there shall be no Final Allocation. The Parties agree to file all Tax Returns (including, but not limited to, the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Final Allocation (if any) unless otherwise required by applicable Law;

provided, however, that nothing contained herein shall prevent Buyer or the Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Final Allocation (if any), and neither Buyer nor the Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Final Allocation (if any). In administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Final Allocation (if any) in determining the manner in which the Purchase Price should be allocated as between the Seller and their estate for non-Tax purposes.

3.03    Withholding. Buyer, the Seller and any other Person that has any withholding obligation with respect to any payment made pursuant to this Agreement (each, a "Withholding Agent") shall be entitled to deduct and withhold any amounts otherwise payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code or any other provision of applicable Tax Law. To the extent that amounts are so properly deducted and withheld and paid to the appropriate Governmental Entity, such amounts shall be treated as having been paid to such Person in respect of which such deduction and withholding was made. If a Withholding Agent determines that any such withholding or deduction is required, the Withholding Agent shall use commercially reasonable efforts to notify the payee at least ten (10) days in advance of such withholding or deduction, and shall use commercially reasonable efforts to cooperate with such Person to reduce or eliminate such withholding and deduction (including by providing a reasonable opportunity for such Person to provide documentation establishing exemptions from such withholding or deduction).

3.04    Deposit.

(a)    No later than one (1) Business Day after the date hereof, Buyer will make an earnest money deposit (the "Deposit") into escrow with the Escrow Agent in the amount equal to $5,000,000.00 by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Seller or Buyer and shall be applied against payment of the Cash Purchase Price. At Closing, the Deposit (which shall not be less than $5,000,000) shall be delivered to the Seller in accordance with Section 3.01(b) and the terms of the Escrow Agreement and credited toward payment of the Cash Purchase Price.

(b)    If this Agreement has been validly terminated prior to Closing by the Seller pursuant to Section 11.01(c), then within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to the Seller.

(c)    If this Agreement has been validly terminated prior to the Closing by any party hereto for any reason other than as contemplated by Section 3.04(b) then, within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

**ARTICLE IV**

**THE CLOSING**

4.01    The Closing. The closing of the Transactions (the "Closing") shall take place remotely by means of electronic delivery or release of documents, at 10:00 a.m., New York City time, on the third (3rd) Business Day following satisfaction or due waiver of all of the closing conditions set forth in Article IX (other than those conditions to be satisfied at the Closing itself, but subject to the satisfaction or waiver of such conditions) or on such other date and/or time as is mutually agreed in writing by Buyer and the Seller. The date and time on which the Closing actually occurs is referred to herein as the "Closing Date." The Closing will be deemed effective as of 12:01 a.m. New York City time, on the Closing Date.

4.02    Closing Deliveries. At the Closing:

(a)    in addition to the payments contemplated by Section 3.01(b), Buyer shall deliver, or cause to be delivered, to the Seller the following items:

(i)    a duly executed counterpart from Buyer and/or one of its Affiliates, as applicable, to each of the Transaction Documents to which Buyer and/or such Affiliate is a party; and

(ii)    the certificate required to be delivered pursuant to Section 9.03(c);

(b)    the Seller shall deliver, or cause to be delivered, to Buyer the following items:

(i)    a duly executed counterpart to each of the Transaction Documents to which the Seller or any of its Affiliates is a party (including, for the avoidance of doubt, the Affiliates of the Seller party to the Non-Competition Agreements, the Amended and Restated Leases, the Services Agreement, and the Amendment to the Facilities Management Agreement);

(ii)    the certificate required to be delivered pursuant to Section 9.02(d);

(iii)    a copy of the Sale Order as entered by the Bankruptcy Court;

(iv)    evidence in a form acceptable to Buyer of payment of the Excess Cure Costs with respect to the Transferred Contracts as of the Closing;

(v)    a properly executed and completed IRS Form W-9 from the Seller; and

(vi)    as promptly as reasonably practicable following the date hereof, but in any event no later than fifteen (15) Business Days prior to the Closing Date, completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in writing in the corresponding section of Article V of the disclosure schedule delivered by Seller to Buyer as of the execution of this Agreement (the "Seller Disclosure Schedules"), or in another section of Article V of the Seller Disclosure Schedules to the extent that the relevance thereof would be reasonably apparent on its face that such disclosure is applicable to such section of Article V of the Seller Disclosure Schedules, the Seller represents and warrants to Buyer, as of the date hereof and as of the Closing (unless the representation and warranty speaks as of a specific date, in which case such representation and warranty shall be made only as of such specific date), as follows:

5.01    Organization and Power. The Seller (i) is a limited liability company duly organized and validly existing under the Laws of the State of Florida and (ii) has paid all fees and filed all reports due to, and the Seller's status is active with, the Florida Department of State. The Seller has all requisite corporate power and authority and all authorizations, licenses and permits necessary to own, lease and operate its properties and assets as they are now being owned, leased and operated and to carry on its businesses as now conducted. The Seller is qualified or licensed to do business and is in good standing (where such concept is recognized) in every jurisdiction where it is required to qualify or be licensed, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected, individually or in the aggregate, be material to the Seller. The Seller has delivered to Buyer true and complete copies of the organizational documents of the Seller (including the Company Operating Agreement), together with any amendments thereto. The Seller is not in material violation of any provision of its operating agreement.

5.02    Authorization; No Breach; Valid and Binding Agreement.

(a)    Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the execution, delivery and performance of this Agreement and any other Transaction Document to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions, including the Acquisition, have been duly and validly authorized and approved by all requisite action on the part of the Seller and upon entry and effectiveness of the Sale Order and subject to receipt of the requisite Bankruptcy Court approvals, in accordance with the terms hereof, will have all necessary corporate or similar authority to consummate the transactions contemplated hereby and thereby, and no other actions or corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party.

(b)    Other than as provided for in Section 5.12 and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the Seller's execution, delivery, performance and compliance with the terms and conditions of this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions do not and shall not (i) violate, conflict with, result in any violation, breach of, or constitute a default under any of the provisions of the certificates of

26

incorporation or bylaws (or equivalent organizational documents) of the Seller, (ii) except as disclosed on Schedule 5.02(b), require any consent of or other action by any Person or the Seller under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, modification, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any Contract or Permit, (iii) violate any Law or Order to which the Seller is subject or by which any of their respective properties or assets are bound or affected, or (iv) result in the creation or imposition of any Lien (other than those Liens released by operation of the Sale Order or otherwise prior to the Closing) on any properties or assets of the Seller, except where the failure of any of the representations and warranties contained in clause (ii) or (iv) above to be true would not reasonably be expected, individually or in the aggregate, be material to the Seller.

(c)     Assuming this Agreement and the other Transaction Documents are (or, at the Closing, will be) valid and binding obligations of Buyer and its Subsidiaries and Affiliates, as applicable, this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party constitute legal, valid and binding obligations of the Seller, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws of general application, and subject in all cases to the entry and effectiveness of the Sale Order and requisite Bankruptcy Court approvals and limitations imposed by Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

5.03    Financial Statements.

(a)     The Seller's unaudited adjusted consolidated balance sheets as of December 31, 2023, December 31, 2024 and May 31, 2025 (the "Adjusted Balance Sheets") and the related statement of income and cash flows and the unaudited consolidated balance sheet and related unaudited statements of operations, changes in members' deficit and cash flows for the same period (collectively, the "Financial Statements") (i) have been prepared from and are in accordance with the books and records of the Seller, and in accordance with GAAP applied on a consistent basis throughout the periods set forth therein, subject to the notes included therein, and (ii) present fairly in all material respects the consolidated financial condition and results of operations of the Seller as of the times and for the periods referred to therein. The Seller has provided Buyer with true and complete copies of the Financial Statements in Schedule 5.03. Neither the Seller, nor to the knowledge of the Seller, any of their respective officers and independent auditors, have identified or been made aware of any material complaint, allegation, deficiency, assertion or claim, whether written or oral, regarding the Financial Statements.

(b)     The Seller has devised and maintained systems of internal accounting controls with respect to its businesses sufficient to provide reasonable assurances that (i) all transactions are executed in accordance with the general and specific authorization of the management of the Seller and (ii) all transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and to maintain proper accountability for items.

(c)     As of May 31, 2025, the Seller has accrued approximately $16,100,000 of medical expenses in excess of the medical expenses reflected in the service funds prepared by UnitedHealthcare of Florida, Inc. and Blue Cross and Blue Shield of Florida, Inc. for the period

beginning January 1, 2025 and, in the case of Blue Cross and Blue Shield Florida, Inc., ending April 25, 2025, and, in the case of UnitedHealthcare of Florida, Inc., ending April 30, 2025, which service funds are set forth on Schedule 5.03(c).

     5.04    Absence of Certain Developments; Undisclosed Liabilities.

     (a)    Other than as a result of the events set out on Schedule 1.01(c) and the preparation for, commencement, and pendency of the Bankruptcy Case, since January 1, 2025, (i) the Business has been conducted in the ordinary course of business and consistent with past practice and (ii) the Seller has not taken any action that, if taken from, and after the date of this Agreement and prior to Closing, would require the consent of the Buyer pursuant to Section 7.01(a), (b) (provided that solely for purposes of this Section 5.04(a), references to $10,000 individually shall be deemed to be $50,000 and references to $50,000 in the aggregate shall be deemed to be $500,000), (c), (d), (f), (g) (provided that solely for purposes of this Section 5.04(a), references to $25,000 shall be deemed to be $100,000), (h), (i), (l), (m), (n), (o), (p), (q), (r), (t), or (u), and there has not been any Effect that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

     (b)    The Seller does not have any Liability, except for Liabilities (i) specifically and adequately reflected in or reserved against on the face of the Adjusted Balance Sheets, (ii) incurred in the ordinary course of business consistent with past practice since the date of the latest Adjusted Balance Sheet (none of which is a Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation under any Contract or Law or any Action), (iii) otherwise disclosed in Schedule 5.04(b), (iv) that would not be required to be reflected on a consolidated balance sheet or the notes thereto of the Seller, (v) incurred in connection with this Agreement or the Transactions and (vi) that would not, individually or in the aggregate, be materially adverse to the Seller. The Seller is not a guarantor or is otherwise liable for any Liability of any other Person.

     5.05    Title to Assets; Sufficiency.

     (a)    The Seller has good, valid and marketable title to, or a valid leasehold interest in or valid license to, each of the Purchased Assets and in each case, free and clear of any Lien, except for Permitted Liens.

     (b)    The Purchased Assets, together with the rights under the Transaction Documents and the Excluded Assets, constitute all of the properties and assets used or held for use for the conduct of the Business as of the date hereof and, subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, will constitute all of the assets necessary and sufficient to conduct the Business in all material respects as conducted by the Seller in the 12 (twelve) month period prior to the filing of the Bankruptcy Case, except as disclosed on Schedule 5.05(b). The Purchased Assets (i) are in good operating and working condition and repair (normal wear and tear excepted), (ii) have been operated and maintained in accordance with customary industry practices and (iii) are suitable and adequate for the purposes for which they are presently used.

5.06    Real Property.

(a)    Schedule 5.06(a) sets forth a list of all real property to which the Seller has a valid and existing leasehold, subleasehold, licensed or other occupancy interest (collectively, the "Leased Realty"). The Seller has provided Buyer with true and complete copies of all Leases as currently in effect.

(b)    The Seller possesses valid and existing leasehold interests in the Leased Realty pursuant to the leases, subleases, licenses or other occupancy agreements set forth on Schedule 5.06(b) (including any and all amendments and guaranties thereto, collectively, the "Leases"), free and clear of any Liens, except (i) Permitted Liens and (ii) any Lien on the applicable fee title, the payment or performance of which is not the responsibility of the Seller under the applicable Lease and does not materially impair the current operations by the Seller. Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, and other than as a result of the Bankruptcy Case, with respect to each Lease: (i) such Lease is in full force and effect and is the legal, valid and binding obligation of the Seller, and to the knowledge of the Seller, the other party thereto, in each case, enforceable in accordance with its respective terms, except as the enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (ii) there is no existing default by the Seller or, to the knowledge of the Seller, the counterparty thereto, as applicable, of such Lease and (iii) there exists no event, occurrence, condition or act (including the Transactions), that with or without notice or lapse of time, or both, or the happening of any further event or condition would constitute a default by the Seller or, to the knowledge of the Seller, any counterparty thereto under each such Lease.

(c)    No portion of the Leased Realty is subject to any pending condemnation requisition or taking by any public or municipal authority and to the knowledge of the Seller, no such condemnation, requisition, or taking is threatened or contemplated. To the knowledge of the Seller, the Seller has not been notified in writing of future material improvements by any public authority, any part of the cost of which would or might reasonably be asserted against the Seller.

(d)    To the knowledge of the Seller, no assessment or charge to the Seller is due with respect to any streets, roads and avenues adjoining the Leased Realty. Each of the buildings, improvements and building systems situated or located on the Leased Realty is in good condition and repair for the current uses, reasonable wear and tear and the applicable landlord's repair and replacement obligations excepted.

(e)    Except as set forth on Schedule 5.06(e), no Leased Realty is subject to any options to purchase or lease or purchase or sale contracts in favor of any Person other than the Seller. The Seller is not a lessor, sublessor, grantor or licensor under any sublease, license or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any Leased Realty, as applicable, except as set forth on Schedule 5.06(b).

5.07    Tax Matters.

(a)    The Seller has filed all income and other material Tax Returns that are required to be filed by it (taking into account any extensions of time to file), and all such Tax Returns are true and complete in all material respects. All material Taxes (including any Liability for "imputed underpayments" under Section 6225 of the Code) that are due and payable by or with respect to the Seller has been fully paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    The Seller is not the subject of a Tax audit, examination or other proceeding with respect to any material amounts of Taxes and to the knowledge of the Seller, no such Tax audit, examination or other proceeding has been threatened in writing. No outstanding deficiencies for material amounts of Taxes with respect to the Seller has been claimed, proposed or assessed by any Governmental Entity.

(c)    The Seller (i) is not and has not been a member of any affiliated, consolidated, combined, unitary or other group for Tax purposes (other than any such group the common parent of which is the Seller), (ii) has no material Liability for Taxes of any Person (other than the Seller) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) or as a transferee or successor, or (iii) is not subject to any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Tax Law), private letter ruling, or other written agreement with a Governmental Entity regarding Taxes or Tax matters, which agreement or ruling would be binding on the Seller in a taxable period beginning after the Closing Date.

(d)    The Seller has not participated in a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b).

(e)    No claim that remains pending has been made by any Tax authority in writing, in a jurisdiction where the Seller has filed a Tax Return, that such entity is or may be subject to Tax by such jurisdiction.

(f)    The Seller has withheld and remitted all material Taxes required to have been withheld and remitted.

(g)    There are no Liens for Taxes upon the Purchased Assets, other than Permitted Liens.

(h)    The Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)    None of the Contracts, the Liabilities of which are assumed under this Agreement constitute a Tax sharing, Tax allocation, Tax indemnity agreement or similar arrangement (other than any agreement entered into in the ordinary course of business that is not primarily related to Taxes and contains customary Tax indemnification, sharing or gross up provisions), pursuant to which Buyer or any of its Affiliates may have any obligations to make payments after the Closing.

(j)    There are no material Tax Liabilities of Seller or its Affiliates that could result in Liability to Buyer or any of its Affiliates as a transferee or successor or otherwise attach to any of the Assets.

5.08    <u>Contracts and Commitments</u>.

(a)    <u>Schedule 5.08(a)</u> sets forth a complete list, as of the date hereof, of all Contracts to which the Seller is party to or bound by that are of a type described below, excluding (x) purchase orders entered into in the ordinary course of business and (y) Company Plans:

(i)    Contracts (and all related loan documents) or indentures under which (A) the Seller has created, incurred, assumed or guaranteed any indebtedness in excess of $10,000, (B) any Lien has been placed on any Purchased Asset (other than a Permitted Lien), or (C) under which any Person has guaranteed any indebtedness of the Seller;

(ii)    any Collective Bargaining Agreement with any Labor Union;

(iii)    any Contract for capital expenditures in an amount in excess of $50,000 in the current or any subsequent calendar year;

(iv)    any Contract with any Third Party Payor or Governmental Entity;

(v)    any Contract or groups of related Contracts for the purchase by the Seller, or the sale or furnishing to the Seller, of materials, supplies, merchandise, equipment or services that has required aggregate payments in excess of $200,000 in the (12)-month period ending on the date hereof or is reasonably expected to require aggregate payments in excess of $200,000 in the (12)-month period from the date hereof (the counterparty to each such Contract, a "<u>Material Vendor</u>");

(vi)    any Contract under which the Seller is (A) a lessee or sublessee of any machinery, equipment, vehicle or other tangible personal property, or (B) a lessor of any tangible personal property owned by the Seller, in any single lease under the foregoing <u>clause (A)</u> or <u>(B)</u> that has future required scheduled payments in excess of $10,000 per annum;

(vii)    any Contract that contains a license, covenant not to assert, release, agreement not to enforce or prosecute, or other immunity to any Person (A) with respect to material Intellectual Property Rights to the Seller from a third party (other than non-exclusive licenses granted by service providers or licenses to open source Software or licenses for commercially available Software or other technology), or (B) from the Seller to a third party under any material Seller IP Rights (other than non-exclusive licenses granted to service providers for the purpose of providing services to the Seller in the ordinary course of business or licenses to Marks which are ancillary to such Contract);

(viii)    any Contract pursuant to which the Seller develops, acquires, or contracts with any other Person to develop or acquire Seller IP Rights, including under any joint development relationship (but excluding employment, consulting, services or

invention assignment agreements entered into in the ordinary course of business with employees, contractors or consultants of the Seller);

(ix)     any Contract involving any partnership, limited liability company agreement (or operating agreement of a limited liability company), joint venture, or similar enterprise, joint operating agreement, or sharing of profit agreement;

(x)     any Contract (A) containing a covenant of the Seller not to compete in any material line of business or with any Person in any geographical area with respect to a material line of business, (B) granting any exclusive right, right of first refusal, right of first offer, preemptive right or similar right to any Person, (C) containing "most favored nation" clauses, (D) limiting the freedom of the Seller to hire, solicit or retain any Person for employment in any geographical area, or (E) obligating the Seller to purchase a minimum of goods or services;

(xi)     any Contract with any health care service plan, health insurer, health maintenance organization, carrier, Company Plan, organized delivery system, hospital and/or other Third Party Payor (including any such Contracts held through a downstream provider agreement, or management services or independent practice association arrangement) (a "Material Payor");

(xii)     any agency, dealer, distributor, sales representative, marketing or other similar agreement;

(xiii)    any letters of credit or bonds required by a Third Party Payor;

(xiv)    any Contracts for "value-based care," gainsharing, shared savings or other upside and/or downside risk-sharing arrangements between the Seller and Third Party Payor, hospital, health system, physician group or other health care provider organization;

(xv)     any Contract with a top ten (10) Referral Source of the Seller for the fiscal year ended December 31, 2024 and the five (5) months ended May 31, 2025 (each, a "Material Referral Source");

(xvi)    any Contract relating to the disposition of (other than sales or acquisitions of inventory in the ordinary course of business) any business, assets or properties of the Seller (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise);

(xvii)   any Contract relating to (A) the acquisition of any Person, business, asset or properties (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise) by the Seller or (B) any disposition of any Equity Interests or Purchased Assets of the Seller in the case of this clause (B) pursuant to which after the Closing the Seller (x) is, or may become, obligated to pay or cause to be paid any amount, including (I) outstanding "earn-out" or deferred payments or (II) purchase price adjustment or (y) is subject to surviving indemnification obligations;

(xviii)  Contracts related to the settlement of any Action that impose material ongoing obligations (including nonmonetary obligations) on the Seller (other than customary release, confidentiality and non-disparagement obligations);

(xix)    other than ordinary course severance and separation agreements, all settlements, conciliations or similar agreements the performance of is reasonably expected to involve any payment by the Seller after the date of the latest Adjusted Balance Sheets;

(xx)    any Affiliate Contract;

(xxi)    Leases, including (A) for any Leased Realty, the primary permitted use of which is medical care, (B) subleases by the Seller to any Person for any Leased Realty, the primary permitted use of which is operation of a health insurance resource center or the provision of medical care, or (C) those other Leases disclosed on Schedule 5.08(a)(xxi); and

(xxii)  any other contractual obligation (or group of related contractual obligations) the performance of which requires payment by the Seller or the contractual counterparty in excess of $1,000,000 per annum.

(b)    Buyer has been supplied with true and complete copies of all Contracts (excluding purchase orders), including all amendments, modification and supplements thereto, that are referred to on Schedule 5.08(a) (collectively, the "Material Contracts"). Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, each Material Contract is in full force and effect and is a valid and binding obligation of, and enforceable against, the Seller and, to the knowledge of the Seller, is a valid and binding obligation of, and enforceable against, each other party thereto.

(c)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller (or, if applicable, its Affiliates) has not in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract. To the knowledge of the Seller, no other Person has, in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract and, to the knowledge of the Seller, no event or circumstance has occurred that with or without notice or lapse of time, or both, would constitute a breach or default in any material respect under or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of benefit under any Material Contract. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller has properly paid all amounts to be paid and otherwise performed all material obligations required to be performed by it under the Material Contracts. The Seller nor any of its Affiliates has received written notice from any other party to any Material Contract threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

5.09    Material Payors; Material Referral Sources; Material Vendors.

(a)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement and as described on Schedule 5.09(a), to the knowledge of the Seller, no Material Payor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Payor has proposed to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business, including the scope of services, with the Business that is inconsistent with the terms of its existing agreement with the Seller. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, and as described on Schedule 5.09(a), to the knowledge of the Seller, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Payor. Except as described on Schedule 5.09(a), the Seller has not, or has not been in the last three (3) years, involved in any material claim or dispute with any of its Third Party Payors.

(b)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on Schedule 5.09(b), to the knowledge of the Seller, no Material Referral Source plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Referral Source has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify terms or amount of the business relationship with the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Referral Source. Except as described on Schedule 5.09(b), the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Referral Sources.

(c)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on Schedule 5.09(c), to the knowledge of the Seller, no Material Vendor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Vendor has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business with, as applicable, the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Vendor. Except as described on Schedule 5.09(c), is the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Vendors.

5.10    <u>Intellectual Property; Information Technology</u>.

(a)    <u>Schedule 5.10(a)</u> sets forth a true, correct and complete list as of the date hereof of all Patents, registered Marks, registered Copyrights and domain name registrations included in the Seller IP Rights (the "<u>Seller Registered IP</u>").

(b)    Except as disclosed on <u>Schedule 5.10(b)</u>, the Seller exclusively owns all Seller IP Rights free and clear of all Liens (other than Permitted Liens). The Seller Registered IP is subsisting and has not expired, been cancelled, or been abandoned and, to the knowledge of the Seller, not invalid or unenforceable. The Seller is current in the payment of all registration, maintenance and renewal fees with respect to the Seller Registered IP, except in each case as the Seller has elected in its reasonable business judgment to abandon or permit to lapse a registration or application.

(c)    None of the Seller Registered IP is subject to any Order adversely affecting the use thereof or rights thereto by the Seller. There is no opposition or cancellation Action pending or, to the knowledge of the Seller, threatened in writing against the Seller concerning the ownership, validity, enforceability, registration, use or ownership of any Seller Registered IP (other than ordinary course proceedings related to the application for any item of Seller IP Rights).

(d)    The Seller owns, licenses, sublicenses, or otherwise possesses legally enforceable and sufficient rights to all Intellectual Property Rights necessary to conduct the Business as currently conducted, all of which rights shall survive the consummation of the Transactions without being terminated or materially changed, other than the Excluded Assets, taking into account the rights to be provided under the Transaction Documents and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals. The Seller IP Rights, together with the rights under the Transaction Documents and the Excluded Assets, together with all Intellectual Property Rights of third parties which are licensed or sublicensed to the Seller or for which the Seller otherwise has a legally enforceable right to use, constitute all Intellectual Property Rights necessary to conduct the Business as currently conducted.

(e)    During the three (3) years prior to the date of this Agreement, the Seller has not (i) received any written notice alleging that the conduct of its business infringes, misappropriates, or violates the Intellectual Property Rights of a third party, or (ii) made an allegation in writing that a third party is infringing or misappropriating, or otherwise violating any Seller IP Rights.

(f)    The conduct of the Business, as currently conducted or as conducted during the three (3) years prior to the date of this Agreement has not infringed, violated, or misappropriated any Intellectual Property Rights of any Person and, to the knowledge of the Seller, no Person is infringing, misappropriating or otherwise violating any Seller IP Rights.

(g)    The Seller has taken commercially reasonable steps to protect the confidentiality of material Trade Secrets included in the Seller IP Rights and all such Intellectual Property Rights have been maintained in confidence in accordance with procedures that are customarily used in the industry to protect rights of like importance. The Seller has obtained, either by operation of Law or by valid assignment or transfer, exclusive ownership of all Intellectual

Property Rights from each employee or contractor who is or was involved in the creation or development of any material Intellectual Property Rights for the Seller and, all employees and contractors with access to material Trade Secrets and other material confidential information constituting Seller IP Rights are bound by confidentiality obligations that obligate such Person to protect the material Trade Secrets and other material confidential information constituting such Seller IP Rights.

5.11    Litigation; Orders.

(a)    During the three (3)-year period prior to the date of this Agreement, except for the Bankruptcy Case and as set forth on Schedule 5.11(a), there has not been any material charge, claim, cross-claim or third-party claim, complaint, legal action, litigation, suit, arbitration, prosecution, audit, investigation, inquiry, hearing or proceeding (whether civil, criminal, regulatory or otherwise or federal, state, local or foreign), audit, assessment, grievance, charge, complaint or demand at Law or in equity, by or before any Governmental Entity ("Action"), pending or threatened in writing (or, to the knowledge of the Seller, threatened orally) against (i) the Seller or its respective officers or directors or (ii) any Clinician with respect to the Business.

(b)    The Seller is not, nor any of its assets or properties are, subject to any settlement, stipulation, order, writ, judgment, injunction, decree, ruling, determination or award of any court or of any Governmental Entity ("Order") that (i) restricts the manner in which the Seller may conduct their business or which would, individually or in the aggregate, reasonably be expected to be material to the Seller or its business, (ii) would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the execution, delivery, performance and consummation of the Transactions or (iii) could otherwise materially affect the ability of the Seller or any of its Affiliates to perform its or their obligations pursuant to any Material Contract.

5.12    Governmental Consents, etc. Except as set forth on Schedule 5.12, and to the extent not obviated by the Sale Order, (a) the Seller is not required to submit any material notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and (b) no material consent, approval, clearance or authorization of any Governmental Entity is required to be obtained by the Seller in connection with its execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party or the consummation by the Seller of the Transactions.

5.13    Employee Benefit Plans.

(a)    Schedule 5.13(a) sets forth, as of the date hereof, each Company Plan. With respect to each material Company Plan, the Seller has provided or made available to Buyer or its representatives prior to the date hereof true and complete copies, as applicable, of: (i) the plan and trust documents, and any amendments thereto, and the most recent summary plan description, (ii) the most recent annual report filed on Form 5500 or other annual regulatory filing, (iii) the most recent financial statements and actuarial reports (iv) the most recent favorable determination or opinion letter from the Internal Revenue Service with respect to each Company Plan intended to qualify under Section 401(a) of the Code, (v) the results of annual compliance testing for the

36

most recently completed plan year and (vi) all non-routine, material correspondence with any Governmental Entity in the past three (3) years.

(b)     No Company Plan is a Multiemployer Plan, Multiple Employer Plan or a plan that is subject to Title IV of ERISA. No Company Plan is a "registered pension plan" as that term is defined in Section 248(1) of the Income Tax Act. No Company Plan provides, and the Seller does not otherwise have any obligation to provide, any health or other welfare benefits to current or former employees of the Seller following their termination of employment, other than health continuation coverage pursuant to COBRA or other similar applicable Law.

(c)     Each Company Plan has been maintained and administered in compliance in all material respects with its terms and the applicable requirements of ERISA, the Code and any other applicable Laws. All amounts due and owing under any Company Plan have been paid in full or accrued up to the Closing Date in accordance with GAAP. Each Company Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter or is the subject of a favorable opinion letter from the Internal Revenue Service on the form of such Company Plan on which the Seller can rely and nothing has occurred, whether by action or failure to act, that would reasonably be expected to affect the qualified status of any such Company Plan.

(d)     There are no actions, suits, claims or disputes pending, or, to the knowledge of the Seller, threatened, anticipated or expected to be asserted against or with respect to any Company Plan or the assets of any such plan (other than routine claims for benefits and appeals of denied routine claims).

(e)     No Liability under Title IV of ERISA has been or, to the knowledge of the Seller, is reasonably expected to be incurred by the Seller. Without limiting the generality of the foregoing, neither the Seller nor its ERISA Affiliates has maintained or contributed to an employee benefit plan that is subject to Title IV of ERISA during the last six years.

(f)     The Seller has not engaged in any transaction with respect to any Company Plan that would be reasonably likely to subject the Seller to any material Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law during the last six years.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions would (either alone or in conjunction with any other event) (i) cause the accelerated vesting, funding or delivery of, increase the amount or value of, or result in, any payment or benefit to any employee, officer, individual contractor or director of the Seller, or (ii) result in any limitation on the right of the Seller to amend, merge, terminate or receive a reversion of assets from any Assumed Plan or related trust.

(h)     Without limiting the generality of Section 5.13(g), no amount paid or payable in connection with the Transactions (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

(i)    The Seller does not have any obligation to gross-up, indemnify or otherwise reimburse any current or former employee, officer, director or individual contractor of the Seller for any Tax incurred by such individual, including under Section 409A or 4999 of the Code.

(j)    Each Company Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code) that is subject to Section 409A of the Code has been maintained and operated in documentary and operational compliance with Section 409A of the Code and the regulations thereunder.

(k)    The Seller has not made any loan or advance to any current or former employee of the Seller, other than advances for business and travel expenses in the ordinary course of business. There are no outstanding obligations of the Seller under any promissory note or similar obligation of the Seller issued to any current or former employee of the Seller, except for the Promissory Notes.

5.14    Insurance. Schedule 5.14 lists each material insurance policy maintained by the Seller as of the date hereof, including the type of insurance, policy number, term, identity of the issuer, coverage limits and applicable deductibles. The Seller has provided to Buyer true and complete copies of all such policies. Neither the Seller nor any of its Affiliates have received any written notice of pending cancellation of, premium increase with respect to, or material alteration of coverage under, any of such policies. Since January 1, 2021, the Seller has complied in all material respects with the terms and conditions of such policies. All such policies are (i) in full force and effect, (ii) fully paid and valid and binding in accordance with their terms and (iii) have not been subject to any lapse in coverage, and the Seller is not in material breach or material default thereunder. There is no material claim by or with respect to the Seller pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies or in respect of which such underwriters have reserved their rights, and the Seller has not failed to present any material claim which is still outstanding to the carrier of any such policy. Such policies are in amounts and provide coverages as required by the applicable Governmental Entity, applicable Laws and any Contract to which Seller is a party or by which any of its assets or properties is bound. Each Clinician providing professional services on behalf of the Seller as of the date hereof (a) currently maintains and historically has maintained (during all periods that such Person provided services to or on behalf of the Seller) valid professional liability insurance policies, with liability limits of at least $1,000,000 per occurrence and $3,000,000 in the aggregate and (b) is listed on the declarations page of the Seller's professional liability insurance policies.

5.15    Compliance with Laws.

(a)    The Seller (including its directors, officers and employees, and, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is, and during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Laws in all material respects.

(b)    No written (or to the knowledge of the Seller, oral) notices or inquires have been received by and no claims have been filed or threatened against the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller (i) alleging a violation by such Person of any applicable Laws, or (ii) indicating that such Person is under investigation, inspection,

inquiry or audit related to a potential violation or breach of any applicable Law (in each case, regardless of whether such violation would constitute a criminal, civil, administrative or other violation) applicable to their business, operations, assets and properties. During the five (5)-year period prior to the date of this Agreement, the Seller has not received any allegation by any Person or has reasonable cause to believe that the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller has violated applicable Laws or company compliance policies, in any material respects, in the performance of its responsibilities or business.

(c)     The Seller (nor any of its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) has established or maintained any unrecorded fund or asset or made any false entries on any books or records of the Seller for any purpose.

(d)     Without limiting the other provisions of this <u>Section 5.15</u>, the Seller (including its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended and other federal, foreign, or state anti-corruption or anti-bribery Laws or requirements applicable to the Seller (the "<u>Anti-Bribery Laws</u>"). During the five (5)-year period prior to the date of this Agreement, the Seller has not received any written communication, or to the knowledge of the Seller, oral communication from any Governmental Entity or from any third Person that alleges that the Seller or any employee or agent of the Seller is in violation of any Anti-Bribery Laws.

(e)     All material approvals, filings, permits, franchises, consents, exemptions, licenses, bonds, approvals, rights, privileges, registrations, certificates, accreditations, enrollments, supplier or provider numbers and similar authorizations of Governmental Entities or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound (collectively, "<u>Permits</u>") required to conduct the Business (including the receipt of payment or reimbursement from customers and Third Party Payors), (i) are in the possession of the Seller, (ii) are valid and in full force and effect, (iii) have been and are being complied with in all material respects, and (iv) the Seller is not in material breach or violation of, or default under, any such Permit, and to the knowledge of the Seller, no event has occurred that, with or without notice or lapse of time or both, would constitute any material breach, violation or default.

5.16   <u>Environmental Matters</u>.

(a)     Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on the Seller, the Seller is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the Seller of all Permits and other governmental authorizations required under applicable Environmental Laws to conduct the Business, and compliance with the terms and conditions thereof).

(b)     There is no material Environmental Claim existing, pending or, to the knowledge of the Seller, threatened against or adversely affecting the Seller or any of its Leased Realty.

(c)     The Seller has not Released any Hazardous Materials at, in, on, under or from any location and no Hazardous Materials have been Released by the Seller or, to the knowledge of the Seller, by any other Person at any Leased Realty, in either case in a quantity or manner that would reasonably be expected to result in the Seller incurring any material Liability under Environmental Law or any material obligation for cleanup or remedial action.

(d)     The Seller has not assumed by contract, Order or by operation of Law any material Liability of any other Person under any Environmental Law (including any obligation to remediate any Release of any Hazardous Material).

(e)     The Seller has delivered for inspection to Buyer true and complete copies of material studies, audits, assessments, memoranda and investigations regarding the Seller's current and former operations and their compliance with or Liabilities arising under applicable Environmental Laws and the environmental condition of the Leased Realty that are in the possession or under the reasonable control of the Seller.

5.17    Related Party Transactions. Except as set out on Schedule 5.17, neither (i) TVHHC nor any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC nor any of their Affiliates (other than Seller) nor (iii) any director, manager or officer of any of the Persons in clause  (i) or (ii) (any such Person, a "Related Party") nor, to the knowledge of the Seller, any member of the immediate family of any Related Party, (a) is or has been a party to any Contract or material transaction with the Seller or otherwise indebted to the Seller or has any ownership interest in any Material Payor, Material Referral Source or Material Vendor or other business relationship material to the conduct of the Business as currently conducted (other than ownership of five percent (5%) or less of any class of securities of a company whose securities are publicly traded), other than Company Plans and employment arrangements with the Seller entered into in the ordinary course of business (for the avoidance of doubt, Company Plans and employment arrangements with a Person who is only included in the foregoing due to an employment relationship with the Seller shall be considered entered into in the ordinary course of business) or (b) directly or indirectly, owns any material property or right, tangible or intangible, used by the Seller in the conduct of the Business.

5.18    Employees.

(a)     Schedule 5.18(a) sets forth a complete and accurate list of all Clinicians and non-Clinician employees of the Seller, in each case, as of June 15, 2025 identifying for each such employee: his/her name, position/title, date of hire, rate of compensation, any target bonus amounts for 2025, any bonus amounts paid in 2025, work location, any visa or work permit status and the date of expiration, if applicable, status (active or on-leave) and, solely with respect to Physicians and Non-Physician Providers (in each case, as identified in Column N of Schedule 5.18(a)), medical specialty. The Seller has made available to Buyer the Contract of employment or engagement between each Clinician and the Seller as of the date hereof.

(b)     Schedule 5.18(b) sets forth a complete and accurate schedule of the accrued sick, vacation and personal leave for all Clinician and non-Clinician employees of the Seller, in each case, as of June 15, 2025.

(c)     The Seller currently is not, and has not been during the past three (3) years, a party to or bound by any collective bargaining, works council, or other labor agreement ("Collective Bargaining Agreement") with any union, employee association, works council, or other labor organization ("Labor Union"). To the Seller's knowledge, no employee of the Seller is represented by a Labor Union in connection with such employment. There is, and during the past three (3) years there has been, no pending or, to the knowledge of the Seller, threatened (i) slowdown, labor strike, lockout, concerted work stoppage, or other material labor disputes or disruptions or (ii) to the Seller's knowledge, union organizing activity.

(d)     The Seller is in material compliance, and in the past three (3) years has complied, in each case, in all material respects, with applicable Law respecting employment, employment practices and labor with respect to employees and any independent contractors, including overtime, wages and hours, prevailing wages, equal pay, classification of workers (including exempt and non-exempt employee classification, independent contractor classification and leased workers from another employer), meal periods and rest breaks, affirmative action, employment discrimination, retaliation, harassment, whistleblower protections, background checks and screenings (including use of consumer reports), employee privacy, employee trainings and notices, drug testing, recordkeeping, paid sick days/leave, vacation and other entitlements and benefits, workers' compensation, leaves of absence, immigration, occupational safety and health, collective bargaining, plant closures and mass layoffs, hiring, promotion, demotion and termination, and withholding of Taxes.

(e)     There have not been in the past three (3) years, and there are no pending or threatened, unfair labor practice charges or Actions against the Seller before the National Labor Relations Board or any Governmental Entity relating to an alleged violation or breach of any applicable Laws respecting employment and employment practices. There has not been, within the past four (4) years, and there are no pending or, to the knowledge of the Seller, threatened, material labor or employment related audit or investigation of the Seller including those concerning discrimination, harassment, retaliation, wages and hours, classification and/or occupational safety and health. The Seller is not subject to any employment related consent decree. The Seller is not delinquent in any material respects in any payments to any employee or independent contractor, including wages, commissions, incentives, bonuses, severance or other compensation, or any Taxes or any penalty for failure to comply with withholding or reporting requirements.

(f)     The Seller has not incurred any Liabilities, nor failed to provide any required notice, under the Worker Adjustment and Retraining Notification Act, or any similar applicable state or local law. As of the date hereof, no employee of the Seller is involuntarily on temporary layoff or working hours that have been reduced by fifty percent (50%) or more.

(g)     Each current employee and independent contractor of the Seller is properly so classified. No employee of the Seller is working in the United States on a visa or requires a visa sponsorship in order to work in the United States. Each current employee of the Seller is authorized to work in the United States.

5.19    Brokerage. No broker, finder, financial advisor, investment banker or similar agent is entitled to any brokerage, finder's, financial advisor's or investment banker's fee or commission

or similar payment in connection with the Transactions based upon arrangements made by or on behalf of the Seller.

5.20    Health Care Compliance.

(a)    The Seller is, and for the past five (5) years has been, in compliance with all Health Care Laws, in each case, in all material respects. The Seller has not received in the five (5) years prior to the date hereof any written or, to the Seller's knowledge, other notification of any pending or threatened Action from any Governmental Entity, Third Party Payor or other Person alleging potential or actual material non-compliance by, or material Liability of, the Seller under any Health Care Laws. No officers, directors, managers, employees or Clinicians of the Seller is, or has been (during the shorter of (i) the past five (5) years, or (ii) since such officer, director, manager, employee or Clinician has been employed or engaged by the Seller) in material violation of or subject to any materially adverse finding, penalty, assessment, judgment, civil investigative demand, enforcement action or other Action related to noncompliance with or a breach of, or to the Seller's knowledge, investigated by any Governmental Entity for any material violation of or non-compliance with, any Health Care Laws. Each of the services and items provided to patients by the Seller (including the Seller's Clinicians) has for the past five (5) years been provided in compliance with Health Care Laws in all material respects. To the Seller's knowledge, no Person has filed or has threatened in writing to file any Action against any the Seller under the federal False Claims Act (31 U.S.C. §§ 3729, et seq.) or analogous state whistleblower Laws.

(b)    The Seller, and for the past five (5) years has held, all such material Permits required under applicable Health Care Laws for the conduct of its business and currently (or then) conducted (collectively, the "Health Care Permits") and all Health Care Permits are, and have been for the past five (5) years, valid and in full force and effect. The Seller is, and for the past five (5) years has been, in compliance with all terms and conditions of any Health Care Permit in all material respects. In the past five (5) years, the Seller has not received any written or, to the Seller's knowledge, other communication from any Governmental Entity that alleges material noncompliance with any Health Care Permits or any pending or threatened Action to terminate, revoke, suspend, or withdraw any such Health Care Permit.

(c)    During the shorter of (A) the past five (5) years, or (B) since such Clinician has been employed or engaged by the Seller to provide professional services, each Clinician (i) has held all material Permits required under Health Care Laws to perform the functions that he or she performs for the Seller and for the Seller to obtain reimbursement from Third Party Payors and related fiscal intermediaries or administrative contractors with respect to the services provided by such Clinician on behalf of the Seller; (ii) to the extent required in connection with the scope of such Clinician's practice, is, and has been, validly registered with the United States Drug Enforcement Administration under Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq. and any similar applicable state Health Care Laws; (iii) is not, and has not been, debarred, suspended, excluded from or otherwise ineligible to participate in any Governmental Program, in each case; and (iv) is not, and has not been, subject to any material pending (or threatened) disciplinary proceeding, inquiry, monitoring, investigation or other Action under the bylaws or rules of procedure of the Seller, any state professional board or agency or other Governmental Entity charged with regulating the professional activities of such

Person or any other Health Care Law related to such Clinician role with the Seller, including any denial or revocation of medical staff privileges or licensure of any Clinician. During the past five (5) years, while employed or engaged by the Seller, to the Seller's knowledge each Clinician is and has been appropriately providing services within the relevant scope of practice, and has entered into and maintained compliance with all reasonable and necessary collaborative practice, supervision and other similar arrangements. To the knowledge of the Seller, no event has occurred, and no fact, circumstance or condition exists, that has resulted or may result in the denial, loss, restriction, revocation or rescission of any Clinician's professional license, certification, or registration. During the past five (5) years, all disciplinary actions, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for any Clinician while any such Clinician has been employed or engaged by the Seller requiring reporting to local, state, federal or quasi-public authorities that are required of the Seller have been effected in all material respects as required.

(d)       The Seller and its unitholders, members, officers, directors, employees and to the knowledge of the Seller, agents are not, and have not been while any such Person has been employed or engaged by the Seller, debarred, suspended or otherwise ineligible to participate in any Governmental Program or Third Party Payor program, and no such Action is pending or to the Seller's knowledge, threatened. The Seller has not received any written notice during the past five (5) years that the Seller or its respective officers, directors, employees and agents is or has been investigated, charged with or convicted of a criminal offense related to any Governmental Program or Third Party Payor program, patient neglect or abuse in connection with the delivery of a healthcare item or service, or Fraud, theft, embezzlement, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service.

(e)       The Seller is not subject to, and for the past five (5) years have not been subject to any pending or, to the Seller's knowledge, threatened material Actions, audits, investigations or focused reviews by any Third Party Payor, against it in connection with the provision of healthcare services or goods by the Seller for overpayment, recoupment, offset, refund or improper billing practices of any nature. During the past five (5) years, no Third Party Payor has imposed any material fine, penalty or other sanction against the Seller. The Seller has not received and identified during the past five (5) years any material undisputed overpayment by the Seller, which has not been repaid to such Governmental Program.

(f)       During the past five (5) years, the Seller (i) has not been a party to a corporate integrity agreement with the OIG or similar agreement with any Governmental Entity, deferred or non prosecution agreement, monitoring agreement, consent decree, or any similar agreement with any Governmental Entity and (ii) has no material reporting obligations pursuant to any settlement agreement entered into with any Governmental Entity. During the past five (5) years, the Seller has not been served with or received any search warrant, subpoena or civil investigation demand by or from any Governmental Entity with regard to any alleged or actual violation of Health Care Laws by the Seller. During the past five (5) years, the Seller has not made any material voluntary disclosure to any Governmental Entity relating to any Governmental Program or violation of any Health Care Law, and no such disclosure is pending.

(g)    The Seller maintains a compliance program having the elements of an effective corporate compliance and ethics program identified in U.S.S.G. § 8B2 designed to comply with applicable Health Care Laws.

(h)    The Seller and, to the Seller's knowledge, each Clinician employed by Seller as of the date hereof that participates in a Governmental Program is qualified to participate in such Governmental Program and is enrolled and certified in such Governmental Program as a provider of health care services, except as would not be material to the Seller. During the past five (5) years, received written notice of any Action by any Governmental Entity to terminate, revoke, suspend, withdraw or materially limit the participation of, or impose any payment suspension or termination on, the Seller in any Governmental Program. To the Seller's knowledge, each Clinician is operating and, at all times during the shorter of (i) the past five (5) years, or (ii) since such Clinician has been employed or engaged by the Seller, has operated, in compliance in all material respects with, all Governmental Program rules and regulations and each Governmental Program contract to which it is party or by which it is bound. The Seller is not, nor, to the Seller's knowledge, any Clinician (x) is party to an individual or corporate integrity agreement with the OIG, (y) has during the past five (5) years (and with respect to Clinicians, while such Clinician was employed or engaged by the Seller if shorter than five (5) years) made, intends to make, a voluntary disclosure to any Governmental Entity for any material violation of Health Care Laws, including pursuant to the OIG or CMS self disclosure protocols, or (z) otherwise has any material continuing reporting obligations pursuant to any deferred prosecution, settlement or other agreement with any Governmental Entity.

(i)    All documentation, coding, billing and collection practices of the Seller, and all claims submitted to Third Party Payors are, and for the past five (5) years have been, in compliance in all material respects with all applicable Health Care Laws and applicable Third Party Payor requirements governing (1) the provision, documentation, coding and billing of healthcare services and the preparation and submission of claims, and (2) capitated risk reimbursement, including reserves, bonds, and letters of credit. With respect to each Contract with a Third Party Payor to which the Seller is a party, the Seller has complied with all material applicable requirements, including, without limitation, conditions of payment or participation, applicable manuals, instructions, FAQs and guidance and is not in material breach of or default under any such Contract and no other party to such Contract is in material breach thereof or default thereunder. To the knowledge of the Seller, no event has occurred, is pending or has been threatened, which, after the giving of notice, lapse of time or otherwise, would constitute a material breach or default by the Seller under any such Contract or any other party to such Contract. During the past five (5) years, the Seller (i) has timely filed all material reports and billings required to be filed, all of which were prepared in compliance in all material respects with all applicable Health Care Laws governing reimbursement and claims, (ii) has paid all known and undisputed material refunds, overpayments, discounts and adjustments due with respect to any such report or billing, (iii) is not aware of any pending or, to the Seller's knowledge, threatened material appeal, adjustment, challenge, audit (including written notice of an intent to audit), written inquiry or litigation concerning the billing practices of the Seller, and (iv) has adequately reserved for all performance based reimbursement incentives and penalties, including all quality performance metrics, in each case, except as would not be material to the Seller, taken as a whole. All billings submitted by the Seller during the past five (5) years were for goods actually sold and services

actually performed in accordance in all material respects with applicable Health Care Laws and the Seller has sufficient documentation that is required to support such findings.

(j)    The Seller and its respective Affiliates, officers, directors, managers, employees and, to the knowledge of the Seller, agents are operating and during the past five (5) years (and, with respect to officers, directors, managers, employees and Clinicians, while such Persons have been employed by the Seller) have operated in compliance in all material respects with the federal health care program anti-kickback statute (42 U.S.C. § 1320a-7b, et seq.), and any similar state Health Care Laws, the federal physician self referral law (commonly known as the Stark Law) (42 U.S.C. § 1395nn, et seq., and its implementing regulations, 42 C.F.R. Subpart J), any patient brokering Laws, and all other applicable Health Care Laws with respect to direct and indirect compensation arrangements, ownership interests or other relationships between such Person and any past, present or potential patient, physician, supplier, contractor, customer, Third Party Payor or other Referral Source or to whom such Person refers, recommends or arranges for the referral of patients or other health care business.

(k)    The Seller's Processing of Personal Data presently materially complies, and has during the last five (5) years materially complied with (i) all applicable Privacy and Security Laws, (ii) applicable industry standards to which the Seller has agreed to be bound, including the Payment Card Industry Data Security Standard, (iii) terms of any Contracts relating to the Processing of Personal Data by which the Seller is bound, and (iv) all Privacy Policies, consents and authorizations that apply to the Seller's Processing of Personal Data (collectively, "Data Protection Requirements").

(l)    To the knowledge of the Seller, the IT Systems are adequate for and perform in all material respects as required in connection with the operation of the Business is currently conducted, free and clear of all material bugs, errors, defects, trojan horses, time bombs, malware and other corruptants. The Seller has taken all commercially reasonable measures to protect and maintain the integrity, security and confidential nature of the IT Systems, and all Personal Data and Business Data and to protect it against loss, corruption, and unauthorized access to or other Processing. To the Seller's knowledge, no third party has experienced, or made or has been required to make any notifications under any applicable Data Protection Requirements in connection with, any Security Incident. The Seller has implemented and maintained, all commercially reasonable privacy and security policies and procedures as required by Data Protection Requirements.

(m)    The Seller has requisite authority, including applicable consents and Permits, to Process the Personal Data in the Seller's possession or under its control to the extent required and in the manner in which it is Processed by the Seller in connection with the operation of the Seller's businesses as currently conducted, except as would not be material to the Seller, taken as a whole. To the extent required by HIPAA, the Seller has executed a "business associate agreement" with each Person who is a "covered entity" or "business associate" (as such terms are defined under HIPAA), as required for the conduct of the Business.

(n)    During the past five (5) years, the Seller has not received written notice of, and there is no Action pending or, to the Seller's knowledge, threatened with respect to, the Seller's compliance with Data Protection Requirements, including with respect to any alleged "breach" (as

defined in 45 C.F.R. § 164.402) or any other violation of HIPAA by the Seller or its "workforce" (as defined in 45 C.F.R. § 160.103), except as would not be material to the Seller, taken as a whole. The Seller has performed a security risk analysis that meets the standards set forth at 45 C.F.R. § 164.308(a)(1)(ii) (A) (the "Security Risk Analysis") and have remediated all risks identified in the Security Risk Analysis as critical or high risks.

(o)     During the past five (5) years there has been (i) no material "breach" or other material violation of HIPAA the Seller or its "workforce" or successful "security incident" with respect to "protected health information" (each as defined under HIPAA) in the possession or under the control of the Seller, and (ii) no material unauthorized access to, or use, acquisition or disclosure of, the IT Systems or any Business Data including Personal Data Processed by or on behalf of the Seller (each, a "Security Incident"). During the past five (5) years, the Seller has not notified, either voluntarily or as required by Data Protection Requirements, any affected individual, customer, employee, any Governmental Entity or the media or any other Person of any unauthorized Processing of any Personal Data.

(p)     The Seller does not transmit or store any Personal Data outside of the United States and do not have in effect any Contract with any third party vendor under which, to the Seller's knowledge, the third party vendor transmits or stores any Personal Data of the Seller outside of the United States.

5.21   No Other Representations or Warranties.   NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS Article V OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO BUYER PURSUANT TO SECTION 9.02(D), THE SELLER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER OR ITS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller, as of the date hereof and as of the Closing, as follows:

6.01   Organization and Power. Buyer is a Florida corporation, incorporated, validly existing and in good standing under the Laws of the State of Florida, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder. There are no pending, or to the knowledge of Buyer, threatened, actions for the dissolution, liquidation or insolvency of Buyer.

6.02    Authorization. The execution, delivery and performance of this Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action, and no other proceedings on the part of Buyer are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which Buyer is (or, at the Closing, will be) a party. This Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party has been or will be duly executed and delivered by Buyer and, assuming that this Agreement is a valid and binding obligation of the other Parties, this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party constitute a valid and binding obligation of Buyer, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

6.03    No Violation. Neither the execution and delivery of this Agreement, the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party, nor the consummation by Buyer of the Transactions, nor compliance by Buyer with any of the provisions hereof or thereof, will: (i) conflict with or result in a breach of any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Buyer; or (ii) except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, (x) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Buyer is a party or by which any of their respective properties or assets is bound or (y) violate any Order or Law applicable to Buyer or any of its properties or assets in any material respect.

6.04    Governmental Consents, etc. Subject to entry into and effectiveness of the Sale Order and requisite Bankruptcy Court approvals, Buyer is not required to submit any notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and no consent, approval, clearance or authorization of any Governmental Entity or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party or the consummation of the Transactions.

6.05    Brokerage. Except for any fees that will be paid solely by Buyer or its Subsidiaries, there are no claims for brokerage commissions, finders' fees, financial advisor fees, investment banker fees, agents fees or similar compensation in connection with the Transactions based on any agreement made by or on behalf of Buyer.

6.06    Buyer Financial Resources. Buyer will have available on the Closing Date sufficient readily available funds to make payment of the Cash Purchase Price and Cure Costs up to the amount of the Cure Costs Cap, on the Closing Date and to consummate the Transactions. The obligations of Buyer under this Agreement are not subject to any conditions regarding

Buyer's, its Affiliates' or any other Person's ability to obtain any financing for the consummation of the Transactions.

6.07    No Reliance. Buyer acknowledges and agrees that it has not relied and is not relying on any representations, warranties, or other statements whatsoever, whether written or oral, by the Seller or any Person acting on their respective behalf, other than those expressly set forth in Article V or in any other Transaction Document, in the certificate to be delivered to Buyer pursuant to Section 9.02(d), or any document or instrument pursuant hereto or thereto.

6.08    No Other Representation. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER IN THIS ARTICLE VI OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO THE SELLER PURSUANT TO SECTION 9.03(c), BUYER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO BUYER OR ITS BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE SELLER OR ANY OF ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VII

## PRE-CLOSING COVENANTS OF THE SELLER

7.01    Conduct of the Business. From the date hereof until the earlier of the termination of this Agreement and the Closing Date except (i) as set forth on Schedule 7.01 of the Disclosure Schedules, (ii) if Buyer shall have consented in writing (which such consent shall not be unreasonably withheld, conditioned or delayed), (iii) as required by applicable Laws or Order of the Bankruptcy Court, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as otherwise expressly permitted or required by this Agreement or any of the other Transaction Documents, the Seller shall (1) conduct the Business in accordance with applicable Law, including Health Care Laws and at the direction of relevant Governmental Entities, (2) conduct the Business in the ordinary course of business in all material respects, (3) preserve intact, in all material respects the business, organization, operations, workforce, assets, properties, rights, relationships and goodwill of the Business and the Purchased Assets, including with Third Party Payors, (4) preserve and maintain in good standing all of its Permits, (5) maintain its tangible personal property in the same condition, in all material respects, as they were on the date hereof and make all necessary repairs to restore all such tangible personal property to such condition, in all material respects, subject in all cases to reasonable wear and tear and disposal consistent with the ordinary course of business, (6) maintain the Seller Information in all material respects, and (7) with respect to the compliance, documentation, coding, billing and collection practices of the Business, undertake and implement the items forth in Schedule 7.01(7); provided, however, that no action or inaction by the Seller with respect to matters specifically addressed by the second sentence of this Section 7.01 shall be deemed a breach of this first sentence of this Section 7.01 unless such action or inaction would constitute a breach of the second sentence of this Section 7.01. Except as described in Schedule 7.01 of the Disclosure Schedules, as required by Law, or the Bankruptcy

Court, as expressly permitted or required by this Agreement or any other Transaction Document, to the extent related to an Excluded Asset or Excluded Liability, or with the prior written consent of Buyer (which such consent shall not be unreasonably withheld, conditioned or delayed), the Seller covenants and agrees that, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, the Seller shall not:

(a)     amend or make any change to the organizational documents of the Seller (except for ministerial changes);

(b)     sell, assign, transfer or dispose of any Purchased Assets in excess of $10,000 individually or $50,000 in the aggregate, in each case, except for sales of obsolete assets or assets no longer used in the operation of the Business;

(c)     sell, assign, abandon, permit to lapse, transfer, or license any Seller IP Rights, except non-exclusive licenses in the ordinary course of business;

(d)     fail to maintain or abandon any Seller Registered IP;

(e)     amend, modify, waive, supplement, grant any release or relinquishment of any material rights under or, let lapse, terminate or consent to the termination of (in each case, other than expiration of Executory Contracts in accordance with their terms), renew or extend, fail to perform any material obligations under any Executory Contract.

(f)     provide any loan or advance to any Person, other than advances to employees for business and travel expenses in the ordinary course of business;

(g)     enter into any new commitment to make capital expenditures that individually or in the aggregate cost in excess of $25,000;

(h)     enter into any transaction with a Related Party other than the DIP Facility;

(i)     enter into any Collective Bargaining Agreement with any Labor Union;

(j)     except as required under the terms of any Company Plan or applicable Law: (i) grant or pay any special bonus (other than spot bonuses in the ordinary course of business not exceeding $5,000 each), severance, termination, incentive, change in control, transaction or retention compensation or benefits, (ii) make any increase in the salaries, bonuses or other compensation and benefits payable by the Seller to any of its employees, officers or directors other than increases in base salary or wages of up to three percent (3%) in the aggregate per year in the ordinary course of business for any current employee of the Seller whose annual base salary does not exceed $185,000, (iii) terminate or amend any Company Plan, other than annual renewals of welfare benefit plans that do not materially increase costs, (iv) adopt or enter into any plan, policy or arrangement that would be a Company Plan if it were in existence as of the date hereof, other than in connection with the renewal of an expired agreement with a Clinician that provides for substantially the same compensation terms as the expired agreement, except as otherwise permitted pursuant to this Section 7.01(j), or (v) accelerate the time of payment or vesting of any compensation and benefits of any employee or director of the Seller (or pay to any such individual any amount not otherwise due);

(k)      (i) terminate (other than for cause) any Clinician employed by Seller as of the date hereof or (ii) hire or promote any employee, unless such employee is (A) a Clinician hired in the ordinary course of business, or (B) a non-Clinician hired to fill a vacancy arising following the date of this Agreement or disclosed on <u>Schedule 7.01(k)</u>;

(l)      commence or initiate any Action or compromise, waive, release, resolve or settle the matter disclosed on <u>Schedule 5.20(f)</u> (the "<u>Specified Proceeding</u>") or any other Action (other than any Action in respect of Taxes, which shall be governed exclusively by <u>clause (p)</u> below);

(m)      other than pursuant to the DIP Facility, create, incur, guaranty, assume or otherwise become liable for any indebtedness for borrowed money;

(n)      create, incur or permit any Lien on any Purchased Asset;

(o)      make any material change to its financial accounting methods, policies or practices or practices with respect to the maintenance of books of account and records, except as required by GAAP or applicable Law;

(p)      except to the extent Buyer reasonably agrees that any action set forth in this <u>clause (p)</u> is not expected to result in a Tax Liability to Buyer or any of its Affiliates, (i) make, change or revoke any material Tax election, (ii) file any material amended Tax Return, (iii) enter into any closing agreement with a Governmental Entity (iv) fail to timely file (taking into account valid extensions) any material Tax Return required to be filed, in each case, with respect to the Purchased Assets or (v) fail to timely pay any material amount of Tax with respect to the Purchased Assets when due;

(q)      fail to maintain insurance coverage substantially equivalent to the insurance coverage maintained as of the date of this Agreement with respect to the Purchased Assets;

(r)      make any change to the policies or practices with respect to cash management, the payment of accounts payable or accrued expenses or the collection of the accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable;

(s)      make any changes to the policies, practices and processes with respect to documentation, billing, coding and collection practices of the Seller;

(t)      engage in any new line of business;

(u)      grant, or permit any Affiliates or other third parties to grant, any licenses or sublicenses to any third party to use any of The Villages Health Marks;

(v)      authorize any of, or agree or commit to do any of, the foregoing actions.

Notwithstanding the foregoing, Seller shall, at all times prior to the Closing Date and consistent with applicable Law, exercise complete control and supervision over the Business and operations.

7.02    <u>Access to Books and Records</u>. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, and subject to permissibility under applicable Law, the Seller shall, upon reasonable notice, (a) provide Buyer and its authorized representatives (the "<u>Buyer's Representatives</u>") with reasonable access during normal business hours, to the properties, assets, personnel and agents, Contracts, books and records and other documents and data of the Seller and (b) otherwise cooperate with Buyer and Buyer's Representatives in order for such Person to have the opportunity to make such investigation as it shall reasonably desire; provided, however, that (a) all such requests shall be coordinated through the Seller's designee, who shall be solely responsible for coordinating all such requests and all access permitted pursuant to this <u>Section 7.02</u> and (b) any request for access pursuant to this <u>Section 7.02</u> shall be for the purpose of facilitating the Transaction or Buyer's post-Closing integration planning. Notwithstanding anything to the contrary set forth in this Agreement, the Seller and its Affiliates shall not be required to disclose to Buyer or Buyer's Representatives any information (i) if doing so would violate any applicable Law to which the Seller is a party or is bound; (ii) which would (in the good faith judgment of the Seller's legal counsel) violate or result in the loss of the ability to assert attorney client, work product or similar privileges; or (iii) if the Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse (or would reasonably be expected to be adverse) parties in a litigation or similar proceeding and such information is reasonably pertinent thereto; provided that the Seller shall, provide Buyer, or Buyer's Representatives access and disclosure to the maximum extent possible in a manner that would not result in the adverse effects described in this sentence, including by providing redacted copies if necessary, entering into join defense agreements (to the extent related to a pending or threatened action) or by obtaining the consent of the applicable third parties to permit disclosure. The Seller may elect to limit disclosure of any competitively sensitive information to certain Persons designated as belonging to a "clean team" by Buyer, provided such Persons are reasonably acceptable to the Seller for such purpose. Notwithstanding anything contained herein to the contrary, no access or examination provided pursuant to this <u>Section 7.02</u> shall qualify or limit any representation or warranty set forth herein or the conditions to Closing set forth in <u>Section 9.02(a)</u>.

7.03    <u>Credentialing Applications; Qualification</u>.

(a)    The Seller shall as promptly as reasonably practicable following the date hereof, and in no event later than fifteen (15) Business Days prior to the Closing Date, deliver to Buyer completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

(b)    Buyer will use commercially reasonable efforts as promptly as practicable following the date hereof to (A) either (i) have all Accepted Clinicians qualified by United under United's current payor arrangements with the Buyer; or (ii) enter into a new payor arrangement with United to qualify all of the Accepted Clinicians, on terms consistent in all material respects with Seller's or Buyer's existing payor arrangement with United; and (B) provide reasonable assistance as may be reasonably requested by Seller in connection with the preparation of provider credentialing applications and medical malpractice applications or waivers.

7.04    <u>Tail Insurance</u>. The Seller shall use commercially reasonable efforts to obtain "tail insurance" on or prior to the Closing Date for medical malpractice liability in respect of

Transferred Employees for claims made under such policies related to any period prior to Closing, with a carrier or carriers reasonably acceptable to Buyer and with the same per-claim and aggregate coverage limits as in effect prior to the Closing for the Seller's existing insurance coverage in connection with such types of insurance (the "Tail Insurance"), and naming Buyer as additional insureds, effective for a period of not less than the lesser of (a) the applicable statute of limitations in the State of Florida, or (b) six (6) years after the Closing Date (the "Coverage Period"). In the event any medical malpractice claim is asserted against Buyer during the Coverage Period arising out of or relating to the operation of the acquired Senior-Focused Primary Care Centers prior to the Closing, (i) Seller shall be responsible for any deductible payment required under the Tail Insurance, and (ii) Seller shall promptly assign the proceeds under the Tail Insurance to Buyer to the extent of the losses incurred by Buyer.

7.05    Transition Services Agreement. Buyer and Seller will work in good faith prior to the Closing Date to reasonably identify the services to be provided pursuant to the Transition Services Agreement.

## ARTICLE VIII

## TAX MATTERS

8.01    Cooperation. Buyer and Seller agree to use reasonable best efforts to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to books and records, as is reasonably necessary for the filing of all Tax Returns by Buyer or Seller, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Each of Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Date.

8.02    Apportionment of Property Taxes.

To the extent not otherwise provided in this Agreement, (i) Seller shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period, and (ii) Buyer shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Post-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes, Buyer or Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 8.02 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement but in no event earlier than three (3) days prior to the due date for payment of the relevant Property

Taxes (taking into account extensions). In the event that Buyer or Seller makes any payment to a taxing authority for which it is entitled to reimbursement under this Section 8.02, the applicable party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. For purposes of this Agreement, in the case of any Straddle Period, Taxes (other than Property Taxes) for the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the end of the day on the Closing Date.

8.03    Transfer Taxes.

All transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with this Agreement and the transactions contemplated hereby ("Transfer Taxes") will be borne by Buyer.

8.04    Tax Audits.

Seller shall notify Buyer in writing as soon as practicable upon receipt by Seller of notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of Seller that reasonably may be expected to relate to or give rise to a Lien on the Purchased Assets or the Business. Each of Buyer and Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Tax audit or assessment challenging the Allocation.

8.05    Tax Clearance Certificate.

Seller shall use its commercially reasonable efforts to provide Buyer, at the Closing, a clearance certificate or similar document(s) that may be required by any state taxing authority in order to relieve Buyer of any obligation to withhold any portion of the Purchase Price.

## ARTICLE IX

## CONDITIONS TO CLOSING

9.01    Conditions to Obligations of Each Party. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction or written waiver in their sole discretion, as of the Closing, of each of the following conditions as of the Closing Date:

(a)    No Governmental Entity having competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order, in each case, after the date of this Agreement, that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions; and

(b)    The Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order (declaring, among other things, that the Purchased Assets can be sold free and clear of all Liens, Claims and interests (other than the Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code).

9.02    <u>Conditions to Buyer's Obligations</u>. The obligations of Buyer to consummate the Transactions are subject to the satisfaction or written waiver in Buyer's sole discretion of each of the following conditions as of the Closing Date:

(a)    (i) The Seller Fundamental Representations shall be true in all respects (other than de minimis inaccuracies) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date) and (ii) all other representations and warranties of the Seller contained in <u>Article V</u>, and any certificate or other writing delivered pursuant hereto, shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (in each case, except to the extent expressly made only as of an earlier date, in which case only as of such date), except, in the case of this <u>clause (ii)</u>, where the failure of such representations and warranties to be so true and correct does not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)    Seller shall have performed and complied in all material respects with each of the covenants and agreements required to be performed or complied with by it under this Agreement at or prior to the Closing (including the due delivery of the items required pursuant to <u>Section 4.02(b)</u>);

(c)    Since the date of this Agreement, no Material Adverse Effect shall have occurred that is continuing;

(d)    Seller shall have delivered to Buyer a certificate of an authorized officer of Seller, in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in <u>Sections 9.02(a)</u> (with respect to Seller's representations and warranties) and <u>9.02(b)</u> (with respect to Seller) have been satisfied;

(e)    At least eighty-five (85%) of all the Clinicians offered employment pursuant to <u>Section 12.09(a)</u> shall have accepted an offer of employment and delivered to the Buyer an executed Employment Agreement (such Clinicians, "<u>Accepted Clinicians</u>") (provided that Buyer may not delay the Closing based on a failure of the foregoing condition to be satisfied if Buyer has failed to comply in any material respect with its obligations to make offers of employment to Clinicians under <u>Section 12.09(a)</u>);

(f)    The Sale Order shall have become a Final Order;

(g)    UnitedHealthcare of Florida Inc. and United Behavioral Health, Inc. (collectively, "<u>United</u>") shall have agreed in definitive documentation with Buyer to either (i) qualify all the Accepted Clinicians under United's current payor arrangement with the Buyer and amended such arrangement to cover all primary care, specialty care and other health care services provided by the Accepted Clinicians; or (ii) enter into a new payor arrangement with Buyer to cover all primary care, specialty care and other health care services provided by Accepted Clinicians and to qualify all of the Accepted Clinicians, on terms consistent in all material respects with either the Seller's or Buyer's or one of its Affiliate's existing payor arrangement with United (provided that Buyer may not delay the Closing based on a failure of the foregoing condition to be

satisfied if Buyer has failed to comply in any material respect with its obligations to qualify Accepted Clinicians with United under Section 7.03(a)). For purposes of this condition, qualifying an Accepted Clinician includes privileging, credentialing, and enrolling each Accepted Clinician for immediate in-network reimbursement for primary care and specialty care; and

(h)     Seller or any of its Affiliates have not entered into or otherwise agreed in principle with the U.S. Department of Justice, the OIG, CMS, any Third Party Payor or any other Governmental Entity, a settlement agreement, corporate integrity agreement, deferred or non prosecution agreement, monitoring agreement, consent decree, correction action plan or any other resolution, Order or Contract (any of the foregoing, a "Resolution") that requires, imposes or otherwise makes the Buyer, any of its Affiliates, or the Purchased Assets subject to any ongoing compliance, auditing, monitoring, disclosure or reporting obligations or oversight other than any obligations under Section 12.04.

9.03    Conditions to Seller's Obligations. The obligation of the Seller to consummate the Transactions is subject to the satisfaction or written waiver by the Seller in writing in Seller's sole discretion of each of the following conditions as of the Closing Date:

(a)     (i) The Buyer Fundamental Representations shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at and as of the Closing Date and (ii) all other representations and warranties contained in Article VI shall be true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) has not had, and would not have, individually or in the aggregate, a Buyer Material Adverse Effect;

(b)     Buyer shall have performed and complied with in all material respects each of the covenants and agreements required to be performed by it or complied with them under this Agreement at or prior to the Closing (including the due delivery of the items required pursuant to Section 4.02(a)); and

(c)     Buyer shall have delivered to the Seller a certificate of an authorized officer of Buyer in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in Sections 9.03(a) and 9.03(b) have been satisfied.

## ARTICLE X

## SURVIVAL

10.01   Survival. None of the representations and warranties of any party contained in this Agreement shall survive the Closing. The covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole before the Closing shall terminate on the Closing, and, except in the case of Fraud or Willful Breach by such Party, no Party shall have any Liability from and after Closing for any breach by Buyer or the Seller of any of the covenants or

agreements contained herein that by their terms are required to be performed in whole before the Closing. Unless otherwise indicated, the covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole or in part after the Closing, shall survive the Closing until they have been fully performed or satisfied in accordance with their terms.

## ARTICLE XI

## TERMINATION

11.01  <u>Termination</u>. Subject to <u>Section 12.08</u>, this Agreement may be terminated at any time prior to the Closing:

(a)  by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(b)  by Buyer, if Seller shall have breached any of its representations or warranties set forth in <u>Article V</u>, or if Seller has failed to perform any covenant or agreement set forth in this Agreement, such that the conditions to Closing set forth in either <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Seller; <u>provided</u> that Buyer may not terminate this Agreement pursuant to this <u>Section 11.01(b)</u> if Buyer is in breach of this Agreement such that the conditions to Closing set forth in <u>Section 9.03(a)</u> or <u>Section 9.03(b)</u> would not be satisfied;

(c)  by Seller, if Buyer shall have breached any of the representations or warranties of Buyer set forth in <u>Article VI</u>, or if Buyer has failed to perform any covenant or agreement on the part of Buyer, respectively, set forth in this Agreement, in each case such that the conditions to Closing set forth in either <u>Section 9.03(a)</u> or <u>Section 9.03(b)</u> would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Buyer; <u>provided</u> that Seller may not terminate this Agreement pursuant to this <u>Section 11.01(c)</u> if Seller is then in breach of this Agreement such that the conditions to Closing set forth in <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> would not be satisfied;

(d)  by Buyer, on the one hand, or Seller, on the other hand, if the Transactions shall not have been consummated on or prior to January 3, 2026 (the "<u>Outside Date</u>"); <u>provided</u>, that Buyer may extend the Outside Date in its sole discretion; <u>provided</u>, <u>further</u>, <u>however</u>, that Buyer (if Buyer is seeking to terminate this Agreement pursuant to this <u>Section 11.01(d)</u>) or Seller (if Seller is seeking to terminate this Agreement pursuant to this <u>Section 11.01(d)</u>), as applicable, shall not have the right to terminate this Agreement pursuant to this <u>Section 11.01(d)</u> if, in the case of Buyer, it is in breach of this Agreement such that the conditions to Closing set forth in <u>Section 9.03(a)</u> or <u>Section 9.03(b)</u> would not be satisfied or, in the case of Seller, it is then in

breach of this Agreement such that the conditions to Closing set forth in <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> would not be satisfied;

(e)    by Buyer, on the one hand, or Seller, on the other hand, if the Bankruptcy Court or any Governmental Entity having competent jursidiction shall have enacted, issued, promulgated, enforced or entered any Law or final Order that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions;

(f)    by Buyer, if (i) Seller has not filed the Sale Motion on the Petition Date, (ii) the Bankruptcy Court has not entered the Bidding Procedures Order by the date that is twenty-one (21) days after the Petition Date, or (iii) following the entry of the Bidding Procedures Order but prior to the entry of the Sale Order, the Bidding Procedures Order (A) ceases to be in full force and effect, (B) is revoked, rescinded, vacated, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction, or (C) is amended, modified or supplemented in a manner that is materially adverse to the Buyer;

(g)    by Buyer, if the Auction contemplated by the Sale Motion is not conducted and completed pursuant to the Bidding Procedures Order by the date that is fifty-five (55) days after the Petition Date;

(h)    by Buyer, if (i) Buyer is not selected as the Successful Bidder or the Backup Bidder at the conclusion of the Auction, or (ii) Buyer has been selected as Backup Bidder and the Backup Termination Date has occurred without the Closing having occurred;

(i)    by Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is sixty (60) days after the Petition Date; <u>provided</u>, <u>however</u>, that Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 11.01(i)</u> if the failure of the Bankruptcy Court to enter the Sale Order by such date is solely the result of delay by the Bankruptcy Court in entering the Sale Order following the conclusion of the hearing to consider entry thereof;

(j)    by Seller or Buyer, if Seller enters into a definitive agreement, or seeks approval from the Bankruptcy Court with respect to, or otherwise consummates or effects, an Alternative Transaction including if Buyer is not the Successful Bidder at the conclusion of the Auction or the Backup Bidder; *provided*, that Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 11.01(j)</u> if Buyer is selected as the Backup Bidder in connection with any such Alternative Transaction constituting a Successful Bid (it being understood that, notwithstanding Buyer's selection as Backup Bidder, Buyer shall be permitted to terminate this Agreement pursuant to any other applicable subsection of this <u>Section 11.01</u>, including, without limitation, <u>Section 11.01(h)</u>);

(k)    by Seller, if the Board of Directors of Seller (or other equivalent governing body) determines in good faith after consultation with outside counsel that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its fiduciary duties under applicable Law; or

(l)    by Buyer, if (i) the Seller withdraws the Sale Motion, (ii) the Seller moves to voluntarily dismiss the Bankruptcy Case or the Bankruptcy Court otherwise orders such dismissal, (iii) the Seller moves for conversion of the Bankruptcy Case to Chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders such conversion, or (iv) the Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders such appointment.

11.02    Effect of Termination. In the event this Agreement is terminated by either Buyer or the Seller as provided above, the provisions of this Agreement shall immediately become wholly void and of no further force and effect (other than Article I, Article XIII, Section 3.04, Section 3.02, this Section 11.02, Section 12.08 and, Section 12.10, which shall survive the termination of this Agreement (other than the provisions of Section 13.16, which shall terminate)), and there shall be no Liability on the part of Buyer or the Seller to one another except as provided in such surviving provisions, including, without limitation, Section 12.08; provided that no such termination shall relieve any Party hereto from any Liability or damages resulting from, incurred by or suffered by another Party as a result of Fraud or Willful Breach of this Agreement prior to such termination. No termination of this Agreement shall affect the obligations contained in the Confidentiality Agreement, all of which obligations shall survive termination of this Agreement in accordance with their terms.

## ARTICLE XII

## ADDITIONAL COVENANTS

12.01    Commercially Reasonable Efforts; Cooperation. Subject to the terms of this Agreement, including Section 12.02, the Seller, on the one hand, and Buyer, on the other, agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, as promptly as practicable and in any event before the Outside Date, the Transactions and to obtain satisfaction or waiver of the conditions precedent to the consummation of the Transactions, including the execution and delivery of any additional instruments necessary to consummate the Transactions, and to fully carry out the purposes of, this Agreement; provided that no Party shall be required to (a) pay any fees or make other payments in connection with any Consent other than normal filing fees, (b) commence any Action, or (c) waive the benefits of any representation, warranty or covenant under this Agreement or any condition precedent to its obligations to consummate the Closing.

12.02    Approvals. The Seller, on the one hand, and Buyer, on the other, shall, within fifteen (15) Business Days after the date hereof, make or cause to be made all filings to any Governmental Entity set forth on Schedule 5.02(b). The Seller and Buyer shall reasonably cooperate in obtaining all other consents and authorizations required to be obtained from, and the making of any filings required to be made with, any Governmental Entity and reasonably cooperate with and provide reasonable assistance as may be requested by any other Party in responding to, as promptly as reasonably practicable, to any request for additional information, data or documentary material as may be requested by any such Governmental Entity.

12.03   <u>Payor Arrangements</u>. From and after the date hereof, Buyer shall use commercially reasonable efforts to put in place new payor arrangements (on terms substantially similar to Buyer's or the Business' existing payor arrangements) with UnitedHealthcare of Florida Inc. and Blue Cross Blue Shield of Florida of Florida, Inc. for respective periods of not less than three (3) years after the Closing Date. From and after the Closing Date, Buyer shall use commercially reasonable efforts to maintain payor arrangements with at least three (3) Medicare Advantage payors (in each case as selected by Buyer in its sole discretion).

12.04   <u>Books and Records</u>. For a period of five (5) years following the Closing, each of Buyer and the Seller shall (and shall cause their respective Affiliates to) maintain all books and records relating to the Purchased Assets to the extent relating to periods ending on or prior to the Closing (in the case of the Seller and their Affiliates, to the extent that such books and records are in the possession of the Seller and their Affiliates as of the Closing) and use commercially reasonable efforts to provide reasonable access to Buyer or the Seller, as the case may be, and their respective Representatives to such books and records and, in the case of Seller, to any Transferred Employees, upon reasonable advance notice during normal business hours as may be reasonably necessary for (i) the preparation of financial statements, (ii) complying with any audit request, subpoena or other investigative demand by any Governmental Entity or for any Action (other than Actions as between Parties to this Agreement) (including for the purpose of furnishing such books and records to any such Governmental Entity) and (iii) solely with respect to access by Buyer, any reasonable business purpose, <u>provided</u>, <u>however</u>, any such access which is contemplated by the Transition Services Agreement shall be governed by the Transition Services Agreement. Any such access by Seller and their Affiliates shall be subject in all cases to reasonable restrictions imposed from time to time upon advice of counsel in respect of any applicable Law relating to the confidentiality of information (provided that Buyer shall use commercially efforts to provide such access and information to the maximum extent so that no such violation or waiver shall occur) and shall be conducted in such a manner so as not to interfere unreasonably with the operation of the business of Buyer and its Affiliates. In no event will Buyer, the Seller, or their respective Affiliates, be required to furnish any documents or information pursuant to this <u>Section 12.04</u> that are required by any applicable Law or Order to be kept confidential, or if furnishing such documents or information would reasonably be expected to jeopardize the status of such documents or information as privileged; provided that Buyer, the Seller, or their respective Affiliates, as applicable, shall use commercially reasonable efforts to provide such access and information to the maximum extent so that no such waiver shall occur. Notwithstanding the foregoing, if the Parties are in an adversarial relationship in any Action, the furnishing of information, documents or records in accordance with this <u>Section 12.04</u> shall be subject to any applicable rules relating to discovery. Nothing in this <u>Section 12.04</u> shall change any obligation of Seller to fully deliver all books and records in connection with <u>Section 2.01(g)</u>.

12.05   <u>Pending Audits and Appeals Pre-Closing Access to Information</u>. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, the Seller shall, prior to entering into any settlement or repayment agreement or other Resolution or otherwise agree in principle with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding (i) a Resolution of the Specified Proceeding, (ii) any material negative findings resulting from any audits by the U.S. Department of Justice, OIG, CMS or a Third Party Payor in connection with or relating to the Specified Proceeding, or (iii) any other Actions by any Governmental Entity or Third Party Payor in connection with or relating to the Specified Proceeding, provide Buyer a copy

of the proposed settlement agreement and notice of such discussions and an opportunity to communicate with the Seller or its counsel regarding such settlement agreement or Resolution. The Seller must promptly notify Buyer of any correspondence or other communication with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding any material negative findings or any settlement or repayment agreement or potential Resolution of any audits or other Action by any Governmental Entity or Third Party Payor.

12.06    Confidentiality.

(a)    Each of the Parties shall hold, and shall cause its representatives to hold, in confidence all documents and information furnished to it by or on behalf of the other Parties in connection with the Transactions pursuant to the terms of the Confidentiality Agreement and all documents and information furnished to any party to this Agreement or its representatives by any of the other Parties to this Agreement or their respective representatives in connection with the Transactions shall be deemed to be Confidential Information (as defined in the Confidentiality Agreement) and, if applicable, Clean Team Information (as defined in that certain Clean Team Non-Disclosure Agreement by and among the Seller, TVHHC and Humana Inc. dated as of May 8, 2024) until the Closing Date, at which time obligations under the Confidentiality Agreement or the Clean Team Non-Disclosure Agreement with respect to (i) Sections 11 and 12 of the Confidentiality Agreement and (ii) information concerning the Business shall cease to apply to Humana Inc., Buyer and their Affiliates; provided, that the Confidentiality Agreement shall continue in full force and effect with respect to information concerning the Seller and its Affiliates, including any equityholder of TVHHC, or any Person affiliated with any equityholder of TVHHC. Notwithstanding anything to the contrary herein, if this Agreement is terminated prior to the Closing Date, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with their terms.

(b)    Following the Closing until three (3) years following the Closing, the Seller shall not, and shall cause each of its Representatives and Affiliates not to, directly or indirectly, without the prior written consent of Buyer, disclose to any third party or use in any manner (other than for the express purposes set forth in the Transaction Documents) any confidential or proprietary information to the extent related to the Seller or the Business; provided that the foregoing restriction shall not (i) apply to any information generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), or (ii) prohibit any use or disclosure (A) required by Law or any Governmental Entity or self-regulatory authority process so long as, to the extent legally permissible and reasonably practicable, Seller provides Buyer with reasonable prior notice of such disclosure and a reasonable opportunity to contest such disclosure, (B) to comply with reporting, disclosure, filing or other requirements imposed on Seller (including under applicable securities Laws) by any Governmental Entity or self-regulatory authority, (C) made in connection with the enforcement of any right or remedy relating to this Agreement or any other Transaction Document or the Transactions, or (D) in the course of performing any duties for the Seller as an employee or pursuant to any contract. Nothing herein shall prevent Seller or any of its Representatives or Affiliates from using or disclosing information that is not specific to the Business or related to the Buyer or its Affiliates.

12.07    Submission for Bankruptcy Court Approval.

(a)    The Seller shall use commercially reasonable efforts to take all actions necessary to cause the Sale Order to be issued and entered by the Bankruptcy Court and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court, which Sale Order shall provide for the transfer of the Purchased Assets free and clear from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the Local Rules in obtaining entry of the Sale Order. In furtherance of the foregoing, the Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens in the Purchased Assets and all non-debtor parties to all Contracts, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by the Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code relating to this Agreement.

(b)    No later than the date that is one (1) Business Day following the date hereof, the Seller shall commence the Bankruptcy Case, and file the Bidding Procedures Motion on such date. All of the Parties shall use their respective reasonable best efforts to have the Bidding Procedures Order entered no later than 21 days after the Petition Date. All of the Parties shall use their respective reasonable best efforts to have the Auction concluded no later than 55 days after the Petition Date and the Sale Order entered no later than 60 days after the Petition Date.

(c)    The Seller and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order, including, (i) the Seller providing to Buyer the Bidding Procedures Motion, Sale Motion, any proposed Bidding Procedures Order, any proposed Sale Order, together with any motions, declarations, or replies submitted by the Seller in support of entry of the Bidding Procedures Order or the Sale Order, in each case, as promptly as practicable in advance of filing same, and (ii) to the extent reasonably practicable, the Seller providing to buyer any drafts of any other documents in connection with the Sale Order, in each case, as promptly as practicable in advance of filing same. Seller shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without the prior written consent of the Buyer. The Seller shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order or any other

order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to the Buyer and its counsel.

(d)     If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Seller shall diligently defend such appeal, petition or motion and use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

12.08    Overbid Procedures; Adequate Assurance.

(a)     The Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Seller acknowledges that the Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Seller's business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that any additional qualified prospective bidder desires to bid for the Business, conducting an auction (the "Auction").

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court, so long as it is consistent in all material respects with Exhibit D or otherwise acceptable to Buyer in its sole discretion. Buyer agrees and acknowledges that, until the conclusion of the Auction, the Seller and their Affiliates and the Seller's Representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order and agrees and acknowledges that the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement.

(c)     If an Auction is conducted, and the Buyer is not the Successful Bidder at the Auction but is the next highest bidder at the Auction, Buyer shall serve as a backup bidder (the "Backup Bidder") and keep the Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement open and irrevocable, notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to Article XI hereof, until the Backup Termination Date. Following the Sale Hearing and prior to the Backup Termination Date, if the Successful Bidder fails to consummate the Successful Bid as a result of a breach or failure to perform on the part of such Successful Bidder and the purchase agreement with such Successful Bidder is terminated, the Backup Bidder (as the next highest bidder at the Auction in Buyer's sole discretion) will be deemed to have the new prevailing bid, and the Seller will be authorized, without further order of the Bankruptcy Court, to consummate the transactions

contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Backup Bidder so long as Buyer has not previously terminated this Agreement in accordance with its terms.

(d)     Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer or any applicable Buyer Designee of each Transferred Contract. Buyer agrees that it will reasonably cooperate with the Seller to obtain a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Transferred Contracts, including furnishing affidavits, non-confidential financial information and other non-confidential documents or information for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court upon reasonable prior notice.

(e)     The Seller and the Buyer agree, and the Bidding Procedures Motion shall reflect the fact, that the provisions of this Agreement, including this Section 12.08 and Section 12.10, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Purchased Assets.

12.09   Employee Matters.

(a)     Offers of Employment to Clinicians. Following the date hereof and no later than twenty (20) Business Days prior to the Closing Date, subject to each Clinician's completion of Buyer's credentialing process and satisfaction of the underwriting guidelines for Buyer's or its Affiliate's captive insurance company in accordance with Section 7.03(a), the Buyer or an Affiliate of the Buyer shall offer employment to each Clinician who is employed by the Seller and its Affiliates as of the date of this Agreement, with such employment with Buyer (or its applicable Affiliate) to be effective as of Closing. The offer of employment to each such Clinician shall provide for: (i) a term of employment no greater than such Clinician's term of employment under the employment agreement then in effect between such Clinician and the Seller, or, in the absence of such agreement, a term of employment that is comparable to that which applies to similarly situated Clinicians of Buyer and its Affiliates, and (ii) substantially the same duration and geographic scope of non-compete and non-solicit restrictions as those applicable to such Clinician as of the Petition Date, or, if no such restrictive covenants applied to the Clinician as of the Petition Date, restrictive covenants comparable to those which apply to similarly situated Clinicians of Buyer and its Affiliates.

(b)     Offers of Employment to Non-Clinicians. Following the date hereof and no later than ten (10) days prior to the Closing Date, the Buyer or an Affiliate of the Buyer may offer employment, effective as of Closing, to those non-Clinician employees of the Seller as the Buyer may elect at its sole discretion, on terms and conditions of employment reasonably determined by the Buyer in its discretion. The Buyer shall provide notice to Seller of those non-Clinicians who have been offered employment by the Buyer or an Affiliate of Buyer.

(c)     Termination of Employment by the Seller. Not later than the Closing Date, the Seller shall terminate the employment of any Clinician or non-Clinician employee who has accepted or not rejected an offer of employment from the Buyer or an Affiliate of the Buyer. Any Clinician or non-Clinician who accepts an offer of employment from the Buyer or an Affiliate of

the Buyer (including, in the sole discretion of the Buyer, a deemed acceptance) and commences employment with the Buyer or an Affiliate of the Buyer shall be hereinafter referred to as a "Transferred Employee" effective as of the Closing. Any Clinician or non-Clinician who fails to accept an offer of employment from the Buyer or an Affiliate of the Buyer, or who otherwise fails to commence employment with the Buyer or an Affiliate of the Buyer on the Closing Date, will not become an employee of the Buyer or an Affiliate of the Buyer, and, for the avoidance of doubt, the Buyer or an Affiliate of the Buyer will have no obligations of any kind with respect to such employees. Except as expressly set forth herein, the Buyer or an Affiliate of the Buyer will not assume or be obligated under any Contracts, commitments or undertakings between the Seller and the Transferred Employees.

(d)    Except for any liabilities, claims and losses arising directly as a result of any material breach by the Buyer or any of its Affiliates of its obligations under, or as otherwise specifically provided for in, this Section 12.09, the Seller shall be solely responsible for, and shall indemnify and hold harmless Buyer and its Affiliates against, all potential or actual employment- or employee benefits- or compensation-related liabilities, claims and losses relating to (i) the Transferred Employees that arise as a result of an event that occurred on or prior to the Closing Date (including any severance, termination, change in control, retention or other compensation or benefits payable as a result of the execution of this Agreement or the transactions contemplated hereby) or (ii) any current or former employee of the Seller (or any dependent or beneficiary of any such employee) other than the Transferred Employees (and their dependents or beneficiaries). For purposes of clarification, the Buyer shall be solely responsible for any and all severance or similar liabilities relating to the termination of employment of any Transferred Employee by the Buyer or its Affiliates after the Closing Date.

(e)    Employee Census. Following the date of this Agreement, the Seller shall update Schedule 5.18(a) and Schedule 5.18(b) as promptly as practicable upon the reasonable request of the Buyer, to reflect any termination or hiring of employees as permitted by this Agreement, or any voluntary resignations of employees, in each case, following the date of this Agreement.

(f)    Communications; Cooperation. (i) No later than thirty (30) days after the date of this Agreement, the Seller shall provide to the Buyer (A) with respect to each Clinician employed by Seller as of the date hereof, the employment contract by and between the Seller or its applicable Affiliate and such Clinician and any current incentive compensation plan or arrangement applicable to the Clinician (including, without limitation, compensation in the form of Relative Value Units (RVUs)), and (B) with respect to the non-Clinician employees of Seller as of the date hereof, the forms of employment agreement, offer letter or similar employment contract, if any, with the Seller or its applicable Affiliate (along with a list setting forth the form applicable to each such non-Clinician), and, to the extent any individual employment agreement, offer letter or similar employment contract with a non-Clinician employee of Seller as of the date hereof materially differs from the provided forms thereof, each such materially different individual employment agreement, offer letter or similar employment contract by and between the Seller or its applicable Affiliate and each non-Clinician employee of Seller as of the date hereof, (ii) any employee notices or communication materials (including website postings and offers of employment) from Buyer or its Affiliates to the employees of the Seller, including notices or communication materials with respect to employment, compensation or benefits matters addressed

in this Agreement or related, directly or indirectly, to the transactions contemplated by this Agreement or employment thereafter, shall be subject to the prior review, comment and approval of the Seller (such approval not to be unreasonably withheld, conditioned or delayed) and (iii) the Buyer and its Affiliates shall not make oral or other unwritten communications to the employees of the Seller without Seller's prior written approval (such approval not to be unreasonably withheld, conditioned or delayed). With respect to any Clinician or non-Clinician hired by the Seller in accordance with this Agreement after the date hereof, the Seller shall provide to the Buyer the documents contemplated by clause (i) of the preceding sentence with respect to such Clinician or non-Clinician, as applicable, no later than fifteen (15) days after such individual's commencement of employment with the Seller. From and after the date of this Agreement, and subject to applicable Law, the Seller and the Buyer shall, and each shall cause their respective Affiliates to, reasonably cooperate with the other parties hereto and their respective Affiliates to provide such information regarding and access to any employee of the Seller as may be necessary to facilitate the transactions and activities contemplated by this Agreement, including (i) exchanging information and data relating to workers' compensation and employee benefit and compensation plans (including, without limitation, COBRA continuation coverage under such employee benefit plans), (ii) sharing with each other and their respective agents and vendors all participant information reasonably necessary for the efficient and accurate administration of their respective employee benefit plans with respect to employees of the Seller, (iii) resolving any and all employment-related claims regarding employees of the Seller, and (iv) in responding to questions posed by employees or any other individual service providers. The Seller and the Buyer shall each cooperate with the other in good faith to provide any employment-related notice required by Law or Contract in connection with the transactions contemplated by this Agreement.

(g)    WARN Act. Seller shall timely provide all notices required pursuant to the WARN Act in connection with the termination of employees or contractors of the Seller resulting from or relating to the transactions contemplated by this Agreement. On the Closing Date, Seller shall provide the Buyer with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any employee of the Seller during the ninety (90) day period ending on the Closing Date. For purposes of clarification, the Buyer or its applicable Affiliate shall be responsible for providing any notice required pursuant to the WARN Act with respect to the termination of Transferred Employees that occurs after the Closing Date.

(h)    Compensation Payments. The Seller shall continue to provide all employee benefits and fringe benefits including continued participation in the Company Plans to all Transferred Employees through the Closing for the applicable Transferred Employee and, except with respect to any Accrued PTO, shall cause to be taken whatever steps are necessary to pay to Transferred Employees, at Seller's sole expense, all accrued compensation and benefits arising and payable under the Company Plans or any employment or consulting Contract, or relating to payroll, compensation, vacation, sick leave, workers' compensation, unemployment benefits, retirement or pension benefits, profit sharing plans, healthcare plans or benefits, bonus or commission arrangements, severance or other termination pay or benefits, and any other employer plans or benefits or similar Liabilities of the Seller to any current or former employee, contractor or other similar Person, in each case to the extent allocable to services performed on or prior to the Closing Date for the applicable Transferred Employee in accordance with applicable Laws, and Seller, at its sole expense, shall timely pay all employment or other withholding Taxes with respect to such payments to the appropriate taxing authority (collectively, the "Compensation Payments").

Such Compensation Payments shall be made, for each Transferred Employee, on the Closing Date or the next regularly scheduled payroll following the Closing Date, in each case, in accordance with applicable Laws. The intent of this Section 12.09(h) is to ensure that Buyer and its Affiliates will have no Liability, responsibility or obligation whatsoever at any time in the future with respect to any of the Seller's employees, consultants or other similar Persons with respect to periods up to and including the Closing Date, including under any Company Plan and with respect to the Compensation Payments, and any such Liability shall be an Excluded Liability.

(i)     Paid Time Off. Subject to applicable Law, effective as of the Closing, the Buyer shall credit, or cause to be credited, each Transferred Employee under the applicable paid-time-off policies of the Buyer and its Affiliates, with the paid-time-off unused and accrued by such Transferred Employee as of the Closing under the applicable paid-time-off policies of Seller and its Affiliates (such unused and accrued paid-time-off of all Transferred Employees, in the aggregate, the "Accrued PTO").

(j)     401(k) Plan. The Seller shall cause the accounts of the Transferred Employees in the Company Plan that is a defined contribution plan with a qualified cash or deferred cash arrangement within the meaning of Section 401(k) of the Code ("Seller's 401(k) Plan") to be fully vested as of immediately prior to the Closing Date. Following the Closing, the Buyer agrees to cause a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code that is sponsored by Buyer or an Affiliate of Buyer ("Buyer's 401(k) Plan") to allow each Transferred Employee to make a "direct rollover" to the Buyer's 401(k) Plan of the account balances of such Transferred Employee (including promissory notes evidencing any outstanding loans that are not in default as of the date such rollover is elected by the Transferred Employee) if the Seller's 401(k) Plan permits such a direct rollover and if such direct rollover is elected in accordance with applicable Law by such Transferred Employee. The rollovers described herein shall comply with applicable Law, and each party shall make all filings and take any actions required of such party under applicable Law in connection therewith. The Buyer shall have no responsibility for any failure of the Seller to properly administer Seller's 401(k) Plan in accordance with its terms and applicable Law, including, without limitation, any failure to properly administer the accounts of Transferred Employees and their beneficiaries who elect a direct rollover pursuant to this Section 12.09(j). The Seller shall not take any action to terminate Seller's 401(k) Plan during the ninety (90)-day period following the Closing Date.

(k)     COBRA. Notwithstanding any contrary provision of this Agreement, Seller shall be responsible and liable for providing, or continuing to provide, health care continuation coverage as required under COBRA with respect to any individual who experienced a COBRA "qualifying event" on or prior to the Closing Date under any Company Plan subject to COBRA, other than an Assumed Plan.

(l)     Standard Procedure. The Buyer and Seller agree to comply with the Standard Procedure described in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320 (the "Standard Procedure"). With respect to Transferred Employees, the Seller shall, in accordance with the Standard Procedure, retain all responsibility for preparing and filing Forms W-2, Wage and Tax Statement; Forms W-3, Transmittal of Income and Tax Statements; Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, Forms 941, Employer's

Quarterly Federal Tax Return; and Forms W-4, Employee's Withholding Allowance Certificate including any state and local equivalents (collectively, the "Employee Withholding Documents") with regard to wages paid through the day before the Closing Date. Buyer shall assume all responsibility for preparing and filing the Employee Withholding Documents with regard to wages paid to Transferred Employees on and after the Closing Date. The Buyer and the Seller shall cooperate in good faith to the extent necessary to permit each Party to comply with the Standard Procedure.

(m)    Enforcement of Restrictive Covenants. As applied to any Transferred Employee's employment with the Buyer or any of its Affiliates on and following the Closing, the Seller shall not, and shall cause its Affiliates not to, enforce against the Buyer, its Affiliates or any Transferred Employee (i) any noncompetition provision that would purport to prohibit such individual from working for the Buyer or any of its Affiliates; (ii) any confidentiality restrictions relating to a Transferred Employee's, the Buyer's or its Affiliates' ability to use or disclose non-public, confidential, proprietary or trade secret information relating to the Business or the Buyer or its Affiliates in the course of their employment with the Buyer or any of its Affiliates; and/or (iii) any employee, customer or supplier nonsolicitation or noninterference obligations. The Seller hereby assigns to the Buyer the right to enforce any rights of the Seller or any of its Affiliates with respect to any obligation of any Transferred Employee or any other former employees or current or former independent contractors or consultants of the Business to refrain from (x) competing with all or any portion of the Business, (y) soliciting any employees, customers or suppliers of the Business or (z) disclosing confidential information or other non-public or proprietary information of the Business, in each case in accordance with the terms of the agreement setting forth such obligations. To the extent the assignment in the prior sentence is not permitted by the applicable agreement, from and after the Closing, the Seller agrees, if requested by the Buyer, to enforce such obligation and the Buyer shall reimburse the Seller for all reasonable out-of-pocket costs and expenses incurred by the Seller in connection with any such enforcement at the Buyer's request.

(n)    Assumed Plans. Following the date hereof and no later than thirty (30) days prior to the Closing Date, Buyer shall deliver to Seller a list of each Company Plan that shall be considered Purchased Assets for purposes of this Agreement (each, an "Assumed Plan"), as determined by Buyer in its sole discretion.

(o)    No Third Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to, or shall, (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Company Plan or other benefit plan, agreement or arrangement of the Buyer or its Affiliates, (ii) limit the right of the Buyer or its Affiliates to amend, terminate or otherwise modify any benefit plan, agreement or arrangement of the Buyer for any Transferred Employee following the Closing Date, or (iii) create any third party beneficiary or other right (x) in any Person, including any current or former employee of the Seller, any participant in any Company Plan or other benefit plan, agreement or arrangement (or any dependent or beneficiary thereof) of the Buyer or (y) to continued employment with the Buyer and its Affiliates. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer or its Affiliates to terminate, reassign, promote or demote any of the Transferred Employees after the Closing Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations,

or terms or conditions of employment of such employees. For the avoidance of doubt, the Assumed Plans, neither Buyer nor its Affiliates shall assume sponsorship of, or any obligations under, or Liabilities with respect to, or receive any right or interest in any trusts relating to, any assets of or any insurance, administration or other contracts pertaining to any Company Plan.

12.10   <u>Termination Payment</u>. In consideration of Buyer serving as a stalking horse bidder in connection with the Auction, if (a) this Agreement is terminated by Buyer pursuant to <u>Sections 11.01(b)</u>, <u>11.01(f)(ii)(C)</u>, <u>11.01(h)</u>, <u>11.01(i)</u>, or <u>11.01(j)</u>, or by Seller pursuant to <u>Section 11.01(k)</u>, and the Seller subsequently consummates an Alternative Transaction, the Buyer will be entitled to receive from the proceeds of any Alternative Transaction, without further order of the Bankruptcy Court, (i) an amount in cash equal to $1,500,000.00 (the "<u>Termination Fee</u>") <u>plus</u> (ii) the amount of the Buyer's reasonable documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred in connection with the Buyer's evaluation, consideration and negotiation of a possible transaction with the Seller and in connection with the transactions contemplated hereby, up to a maximum amount of $1,500,000.00 (the "<u>Expense Reimbursement</u>" and, together with the Termination Fee, the "<u>Termination Payment</u>"). Such Termination Payment shall be made by wire transfer of immediately available funds to an account designated by the Buyer and such payment shall be made on or before the first (1st) Business Day following the consummation of such Alternative Transaction. The Bidding Procedures Order shall provide that the claim of the Buyer in respect of the Termination Payment shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Seller, as administrative expenses under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case and shall be paid in cash prior to delivery of any sale proceeds to any other party.

12.11   <u>Further Assurances</u>. From and after the Closing Date, the Parties shall, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as reasonably required or appropriate to carry out and/or evidence the Transactions consistent with the terms of this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

13.01   <u>Press Releases and Communications</u>. No press release or public statement or announcement related to this Agreement or the Transactions shall be issued or made by or on behalf of any Party hereto (nor any of their Affiliates) without the prior approval of each of Buyer(which consent shall not be unreasonably withheld, conditioned or delayed); <u>provided</u> that, that a Party may, without the prior consent of the other Parties issue such press release or make such public statement (a) to the extent required by applicable Law (including (x) the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and applicable Local Rules to the extent reasonably necessary to obtain entry of the Bidding Procedures Order, or if the Buyer is selected as the Successful Bid, the Sale Order and (y) in any filing made by the Seller and its Affiliates with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of the Seller or its representatives to obtain Bankruptcy Court approval of the Transactions or in connection with conducting the Auction) or the applicable rules or regulations of any stock exchange or (b) to the extent such, press release, public statement or announcement is consistent

with previous press releases, public statements and/or announcements made jointly by or otherwise agreed to by Buyer in accordance with this <u>Section 13.01</u>. For the avoidance of doubt, from and after the Closing, Buyer may make other statements to the public regarding the operation of the Business following the Closing.

13.02   <u>Expenses</u>. Except as otherwise expressly provided herein, the Seller, Buyer and the Representative shall pay all of their own costs, fees and expenses incurred in connection with this Agreement and the Transactions, whether or not the Closing shall have occurred, including the fees and disbursements of counsel, financial advisors and accountants.

13.03   <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when sent via e-mail to the email address set out below if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient (to the extent that no "bounce back," "out of office" or similar message indicating non-delivery is received with respect thereto on the date of delivery), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, return receipt requested, postage prepaid. Notices, demands and communications, in each case to the respective Parties, shall be sent to the applicable address set forth below, unless another address has been previously specified in writing by such Party:

<u>Notices to Buyer</u>:

**c/o Humana Inc.**
500 West Main Street
Louisville, Kentucky 40202
Attention:      Joseph M. Ruschell, Vice President, Associate General Counsel and Corporate Secretary
Email:      JRuschell1@humana.com

with copies to (which shall not constitute notice):

**Latham & Watkins LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Attention:      Brian Mangino
              Amber Banks
Email:      brian.mangino@lw.com

amber.banks@lw.com

Notices to Seller:

**The Villages Health System LLC**
c/o GBH SOLIC Holdco LLC
425 W. New England Avenue, Suite 300
Winter Park, Florida 32789
Attention:      Neil Luria, CRO
Email:          nluria@soliccapital.com

with copies to (before the Closing) (which shall not constitute notice):

**BakerHostetler LLP**
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
Attention:      Andrew V. Layden
                Elizabeth A. Green
                Jimmy D. Parrish
Email:          alayden@bakerlaw.com
                egreen@bakerlaw.com
                jparrish@bakerlaw.com

13.04    Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated without the prior written consent of the non-assigning Parties, provided that Buyer shall have the right to assign to a Buyer Designee without prior consent of any other Party its rights, interests and obligations under this Agreement.

13.05    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

13.06    References; Interpretation. The table of contents and the section and other headings and subheadings contained in this Agreement and the exhibits hereto are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement or any exhibit hereto. All references to days (excluding

Business Days) or months shall be deemed references to calendar days or months. All references to "$\underline{\$}$" shall be deemed references to U.S. dollars. Unless the context otherwise requires, any reference to a "Section," "Exhibit," "Disclosure Schedule" or "Schedule" shall be deemed to refer to a section of this Agreement, exhibit to this Agreement or a schedule to this Agreement, as applicable. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Whenever the word "or" is used in this Agreement, it shall not be deemed exclusive. Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms. The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. Any reference to any particular Code section or Law shall be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified. Accounting terms that are not otherwise defined in this Agreement have the meanings given to them under GAAP. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement shall control. Whenever the phrase "ordinary course of business" is used, it shall be deemed to include the phrase "in accordance with past practices" and take into account the matters set forth in Schedule 1.1(c).

13.07    Construction. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. The information contained in this Agreement and in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of Law or breach of contract).

13.08    Amendment and Waiver. Any provision of this Agreement or the Disclosure Schedules hereto may be amended or waived only in a writing signed by, (a) in respect of any amendment or waiver on or prior to the Closing Date, Buyer, and, only if such amendment or waiver is applicable to the Seller, the Representative, and, only if such amendment or waiver is applicable to the Representative, the Representative; and (b) in respect of any amendment or waiver following the Closing Date, Buyer and the Representative. No waiver of any provision hereunder or any breach or default thereof shall extend to or affect in any way any other provision or prior or subsequent breach or default.

13.09    Complete Agreement. This Agreement, the Transaction Documents, and the documents referred to herein (including the Confidentiality Agreement) contain the complete agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, that may have related to the subject matter hereof in any way, including any data room agreements, bid letters, term sheets, summary issues lists or other agreements.

13.10    Third-Party Beneficiaries. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing expressed or referred to in this Agreement shall be construed to give any

Person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

13.11    <u>Waiver of Trial by Jury</u>. THE PARTIES TO THIS AGREEMENT EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

13.12    <u>Delivery by Email</u>. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered via electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party hereto or to any such contract, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such contract shall raise the use of email to deliver a signature or the fact that any signature or contract was transmitted or communicated through email as a defense to the formation of a contract and each such Party forever waives any such defense.

13.13    <u>Counterparts; Electronic Delivery</u>. This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one (1) Party, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties. Signatures to this Agreement transmitted by electronic mail in "portable document format" form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

13.14    <u>Governing Law</u>. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the Laws of the State of Florida, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Florida or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Florida.

13.15    <u>Jurisdiction</u>. Any suit, Action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Transaction Documents, or the Transactions shall be brought before, heard by and determined exclusively by the Bankruptcy Court; <u>provided</u> that, if the Bankruptcy Court does not have jurisdiction, any such

suit, Action or proceeding shall be brought exclusively in the Fifth Circuit Court of either Lake, Marion, or Sumter County of the State of Florida (or, if the Fifth Circuit Courts decline to accept jurisdiction over a particular matter, any state or federal court within the Fifth District of the State of Florida and any direct appellate court therefrom). Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such suit, Action or proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 13.03</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, Action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, Action or proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Process in any such suit, Action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.03</u> shall be deemed effective service of process on such Party.

13.16    <u>Specific Performance</u>. Each of the Parties acknowledges that the rights of each other Party to consummate the Transactions are unique and recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Party may have no adequate remedy at Law. Accordingly, the Parties agree that prior to a valid termination of this Agreement in accordance with this Agreement, such non-breaching Party shall have the right, in addition to any other rights and remedies existing in its favor at Law or in equity, to enforce its rights and the other Party's obligations hereunder not only by an Action or Actions for damages but also by an Action or Actions for specific performance, injunctive and/or other equitable relief (without posting of bond or other security). Each of the Parties agrees that it shall not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, on the basis that the other Parties have an adequate remedy at Law or an award of specific performance is not an appropriate remedy for any reason at Law or equity and hereby waives any requirement under Law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief. Each Party agrees that it shall not oppose a motion for, or the granting of, expedition of any Action or Actions for specific performance, injunctive and/or other equitable relief.

13.17    <u>No Recourse</u>.

(a)    Except as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, all claims, obligations, liabilities, or causes of action (whether at Law, in equity, in contract, in tort or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) the Parties that are expressly identified in the preamble to this Agreement and only to the extent expressly

identified in the case of Parent (the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any current, former or future equity holder, incorporator, controlling Person, partner, member, Affiliate, representative, or assignee of, and any financial advisor or lender to, any Contracting Party, or any current, former or future equity holder, incorporator, controlling Person, partner, Affiliate, representative, or assignee of, and any lender to, any of the foregoing or any of their respective successors, predecessors or assigns (or any successors, predecessors or assigns of the foregoing) (the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in Law or in equity, whether in contract or in tort or otherwise) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents), including any alleged non-disclosure or misrepresentations made by any such Person or as a result of the use or reliance on any information, documents or materials made available by such Person, and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents) against any such Non-Party Affiliates; <u>provided</u> that, for clarity, no party to the Confidentiality Agreement, or any of the Transaction Documents shall be deemed a Non-Party Affiliate with respect to such documents to which it is a party.

(b)     Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, (i) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available, whether at Law, in equity, in contract, in tort or otherwise, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, in each case arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents); and (ii) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

(c)     The provisions of this <u>Section 13.17</u> are intended to be for the benefit of, and shall be enforceable by, each Non-Party Affiliate (each of whom shall be an express third party beneficiary of this <u>Section 13.17</u>), and his or her successors, heirs and representatives.

13.18   <u>Parent Guarantee</u>.

(a)     As a material inducement to the Seller's willingness to enter into this Agreement and perform their respective obligations hereunder, Parent agrees to guarantee the

performance by Buyer of its obligations in this Agreement (and in any valid amendment and/or modification hereof or thereof) to pay the Purchase Price and Cure Costs up to the amount of the Cure Costs Cap. The obligation of Parent pursuant to this <u>Section 13.18</u> is an unconditional and irrevocable guaranty of payment and performance and may be enforced directly against Parent as a primary obligation of Parent, as if Parent were the principal party obligated to perform such financial obligations.

(b)     Parent hereby represents and warrants as follows: (i) Parent is a corporation duly formed and validly existing under the Laws of the State of Delaware, and has the requisite corporate power and authority to execute, deliver and perform obligations created by this <u>Section 13.18</u>; (ii) the execution, delivery and performance of this Agreement by Parent has been duly and validly authorized and approved by all necessary corporate action; (iii) this Agreement has been duly executed and delivered by Parent and constitutes a valid and legally binding obligation of Parent, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies; (iv) neither the execution and delivery of this Agreement nor compliance by Parent with any of the provisions hereof or thereof, will: (A) conflict with or result in a breach of any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Parent; (B) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Parent is a party or by which any of their respective properties or assets is bound or (C) violate any Order or Law applicable to Parent or any of its properties or assets in any material respect, except as would not prevent or materially impair or delay, or would not reasonably be expected to prevent or materially impair or delay, the performance of Parent's obligations and covenants under this <u>Section 13.18</u>; and (v) Parent will have available on the Closing Date, sufficient readily available funds to satisfy the payment obligations hereunder.

13.19  <u>Fiduciary Obligations</u>. Subject to <u>Section 11.01</u> and the consequences thereof, nothing in this Agreement, or any Transaction Document, will require Seller or any of its managers, officers, members or directors, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, (i) Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate, and (ii) Buyer retains all rights under this Agreement (including remedies for breach and the ability to terminate and collect a fee and expenses) in the event Seller exercises its rights under this <u>Section 13.19</u>.

\* \* \* \*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Seller:                                    **THE VILLAGES HEALTH SYSTEM, LLC**

                                           By: _____
                                           Name:  Neil F. Luria
                                           Its:      Chief Restructuring Officer

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Buyer:                              **CENTERWELL  SENIOR  PRIMARY  CARE (VITALITY), INC.**

By:     *Renée J. Buckingham*
Name: Reneé J. Buckingham
Its:      President

Parent:                             **HUMANA INC.**
                                    **Solely for the purposes of Section 13.18**

By:     _____
Name: Celeste M. Mellet
Its:      Chief Financial Officer

**Schedule A**

**Non-Competition Agreement Parties**

1. The Villages Health System, LLC
2. The Villages of Lake-Sumter, Inc.
3. The Villages Health Holding Company, LLC
4. Mark Morse
5. Jennifer L. Parr
6. Tracy L. Matthews
7. Elliot Sussman
8. Bob Trinh

*The attachments have been removed and are available upon request*