**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

———————————————————— x

In re                                                           :          Chapter 11
                                                                :
THE VILLAGES HEALTH SYSTEM, LLC,[1]          :          Case No.: 6:25-bk-04156-LVV
                                                                :
Debtor.                                                      :
                                                                :
———————————————————— x

**UNITEDHEALTHCARE INSURANCE COMPANY AND UNITEDHEALTHCARE OF
FLORIDA, INC.'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR ENTRY OF
ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) APPROVING STALKING
HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO
APPROVE THE SALE OF THE DEBTOR'S ASSETS, (E) APPROVING FORM AND
MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING,
(F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES,
(G) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF**

UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc.,

together with their affiliates (collectively, "UnitedHealthcare"), hereby submit this objection (the

"Objection") to the proposed sale timeline, bidding procedures, stalking horse protections and

contract assumption and assignment procedures as set forth in the *Debtor's Amended Motion for*

*Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of*

*All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for Sale of*

*Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D)*

*Scheduling Auction for and Hearing to Approve the Sale of the Debtor's Assets, (E) Approving*

---

[1]     The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax
        identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

*Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving*

*Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of*

*Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [D.I. 29][2] (the

"Motion") and respectfully state as follows:

## Preliminary Statement

1.     UnitedHealthcare has asked the Debtor to postpone the July 23 hearing on

its Motion to designate CenterWell as the stalking horse bidder for a rushed sale.  Postponement

would allow the parties time to negotiate and, if negotiations are not successful, to prepare for a

contested evidentiary hearing on the Motion.  The Debtor is considering this request.  In the

event an adjournment is not agreed to, UnitedHealthcare files this Objection to the Motion.

2.     Several unusual circumstances of this Chapter 11 Case suggest it is

prudent to delay designating a stalking horse bidder and setting the case direction and timelines

until more information is made available to stakeholders and the Court.

3.     *First*, there is no emergency here that requires decisions on the Debtor's

Motion immediately.  The Debtor chose the timing of its chapter 11 filing for strategic reasons.

The Debtor has no liquidity concern (other than already-financed costs of its voluntary case) and

lists no material creditors other than a single unsecured claim of the United States government

for alleged Medicare overpayments.  Settlement discussions are apparently ongoing between the

government, the Debtor and, presumably, the Debtor's controlling owners.  It is unclear why the

Debtor rushed to file for chapter 11 now, before a settlement is achieved, especially when

settlement could alleviate the need for a filing.

---

[2]     For the avoidance of doubt, UnitedHealthcare also objects to the original motion on the same grounds as this
Objection [D.I. 14].  Additionally, UnitedHealthcare reserves all rights to object to any proposed transaction
pursuant to the Motion.

4.      *Second*, there is a record of corporate misbehavior.  The Debtor has admitted to the submission of incorrect information to its health insurance companies significant enough to cause the Debtor to self-report to the government, suspend an M&A process, and "reassign" its primary compliance officer.  (Luria Declaration, ¶¶ 28-30.)  The Debtor says a "preliminary assessment" indicated the exposure could be "at or above $350 million."  (*Id*. ¶ 30.)

5.      *Third*, the Debtor is a closely held corporation and was during the period of the alleged misbehavior.  The Debtor is owned and controlled by the same individuals that own and control the Villages, an intertwined business that literally surrounds the Debtor.  The Debtor has six directors, presumably appointed by the same controlling owners.  Five are continuing directors from the past and only one director is new.  The new director was not appointed when the compliance function was changed in November 2024.  The new director was appointed over six months later and less than 60 days before the commencement of this Chapter 11 Case.  (*Id*. ¶ 17.)  The new director is the sole member of a "Restructuring Committee."  The new director appears not to have been delegated any authority with respect to dealing with the alleged misbehavior and not even full authority to make the decision to commence this Chapter 11 Case, which decision was made by the prepetition board and, presumably, the controlling owners on the convenient "recommendation" of the new director obviously chosen by the tainted incumbents for that purpose.  (*Id*. ¶¶ 6, 17.)

6.      *Fourth,* the primary controlling owner—despite having no value in its equity—has proposed to be the DIP lender for the case and has set milestones to get this sale closed as quickly as possible.  Speed is the controlling owner's agenda.

7.      *Fifth*, health insurance companies who contract with the Debtor have been excluded from the prepetition discussions and are not even listed as creditors.  If the Debtor is

correct that it has been overpaid, then it has been overpaid *by its health insurance companies*, and these insurers have direct claims against the Debtor side-by-side with any governmental claims. UnitedHealthcare believes it may be the largest non-governmental creditor of the Debtor, assuming the Medicare overpayments are even a fraction of what the Debtor contends. The Debtor must understand this. But for whatever reason, the Debtor neglected to list its insurers as creditors or to propose how the interests of insurers will be protected during the Chapter 11 Case.

8.      *Sixth*, this Chapter 11 Case was filed as a surprise to UnitedHealthcare and, presumably, all insurers other than Humana, the owner of CenterWell. Even in a liquidity-driven emergency, coordination is expected and commonplace. Here, the Debtor had no immediate liquidity concern and no excuse to surprise its key stakeholders. The complex relationship between a Medicare Advantage insurer and a health care provider raises numerous issues. Payments and adjustments are made continuously, including for pre and postpetition periods, and the parties routinely share sensitive and confidential information. It is remarkable that a Debtor operating a health care business would risk any disruption to patient care by surprising its payors with a chapter 11 filing rather than coordinating in advance. Something unusual must have caused this total absence of communication about the bankruptcy with the health insurance companies, who in this case are the most significant (and only substantial) private creditors as well as critical business partners and the initial victims of the Debtor's alleged submission of incorrect information.

9.      *Seventh*, the failure to coordinate with UnitedHealthcare is even more unusual because of the Debtor's commercial relationships with UnitedHealthcare. UnitedHealthcare is not only one of the largest insurers contracting with the Debtor, but it also is

party to a perpetual, exclusive marketing arrangement with a non-Debtor affiliate. UnitedHealthcare prepaid for these exclusive marketing rights, which will be a central issue in any strategic process relating to the Debtor.

10.    *Finally*, and most unusual of all, if the purpose of this Chapter 11 Case is to sell the company to the highest bidder, the Debtor appears to have made no effort before its chapter 11 filing to seek the highest stalking horse bid.  Evercore is a well-respected and experienced investment banking firm that has conducted hundreds of stalking horse processes. They normally would not advise a client to select a stalking horse bidder without soliciting proposals from past and likely participants.  Here, there is no evidence that they made a *single call* about a stalking horse proposal to any entity other than CenterWell.  Certain affiliates of UnitedHealthcare had expressed an earlier interest in the business and would be likely stalking horse candidates, but they were never contacted, even when the purchase price dropped significantly as a result of the November disclosures.  The only likely conclusion is that Evercore was directed not to solicit better stalking horse proposals, a fundamental problem under applicable law as discussed below.

11.    In short, this case has every possible flashing red light.  The Debtor is a closely-held family-owned company whose officers, directors and owners face hundreds of millions of dollars of liability for submitting false information to its health insurance companies. The Debtor had no liquidity challenge that caused this filing, and no independent corporate governance during the period of alleged misbehavior.  It decided to file for chapter 11 and sell its business as quickly as possible at the instruction (and with financing from) its controlling owner in a process where neither the Debtor nor the controlling owner has shown any concern with creditor recoveries – or even identifying creditors accurately – and no concern with the price at

which the business is sold.  And it did so by taking its significant private sector creditors by surprise.

12.     All of these concerns are highly relevant to the Debtor's falsely urgent Motion to pay a non-competitive stalking horse and set an aggressive timeline to sell the business.  Stalking horse arrangements are not free.  They set procedures and a timeline (here, much too fast), create an obligation for debtors to pay meaningful amounts of money if the stalking horse bid is topped, and can chill bids from other parties if the sense in the market is that the "game is up" and there is neither time nor debtor interest in exploring alternatives.  Even at a preliminary sale hearing that merely approves break-up fee, expense reimbursement, contract forms, and overbidding and notice procedures, the law requires the debtor to present evidence that the sale process is proposed in good faith, that the debtor exercised reasonable business judgment in choosing a stalking horse bidder and that the break-up fee and other financial protections are necessary to preserve estate value and are associated with the best available starting bid for the estate's assets.  Here, there is no evidence from Evercore that the price and other terms of the CenterWell transaction are appropriate other than conclusory statements, nor could there be given the absence of either a valuation by Evercore or any prepetition marketing process to select the stalking horse among competitors.  Without evidence that the stalking horse transaction is the best available (or at least reasonable) transaction, the incurrence by the Debtor of the cost of stalking horse bid protections should not be approved.

13.     There is time for discussion and more preparation, and perhaps a better stalking horse bid.  The Debtor's only liquidity concerns arise from the costs of administration of this Chapter 11 Case, and the Debtor is otherwise operating in the ordinary course with adequate liquidity.  This Chapter 11 Case was voluntarily initiated at the time and in the manner chosen by

the Debtor under suspicious circumstances, without any prepetition marketing process for a stalking horse.  The Debtor's team of new professionals deserves a chance to prove to stakeholders and the Court that they will be independent and care about creditor recoveries, not the prepetition agenda of the incumbent insiders.  But if the Debtor decides to proceed with a hearing on its motion to approve a non-competitive stalking horse for a fire sale of the business in these circumstances without taking a deep breath and talking to its stakeholders, its Motion should be denied.

## **Background**

### *The Debtor's Chapter 11 Case*

14.     On July 3, 2025 (the "Petition Date"), The Villages Health System, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida (the "Court").  Certain facts of the above-referenced case (this "Chapter 11 Case") are included in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* [D.I. 3] (the "Luria Declaration").

15.     On July 7, 2025, the Debtor filed the Motion in this Chapter 11 Case seeking Court approval of, among other things, (i) bidding, auction and sale procedures, (ii) CenterWell Senior Primary Care (Vitality), Inc. ("CenterWell") as the stalking horse bidder, (iii) bid protections of a $1.5 million termination fee and up to $1.5 million of expense reimbursements, and (iv) contract assumption and assignment procedures and related notices.

### *UnitedHealthcare Plans and Agreements*

16.     UnitedHealthcare is one of the largest providers of Medicare Advantage plans and certain other benefit plans of the Debtor's customers.  UnitedHealthcare and the Debtor have been parties to a network provider agreement since 2013.  Under the network

provider agreement, the Debtor agrees to provide services to UnitedHealthcare's members, to accept reimbursement at specific fixed rates or capitated rates for such services, and not to bill UnitedHealthcare's members for any other amounts (except under limited circumstances).  The network provider agreement allows UnitedHealthcare to, among other things, recoup overpayments and offset future payments to the Debtor for past overpayments.

17.    Additionally, UnitedHealthcare is party to an intellectual property license agreement (the "IP Agreement") with Holding Company of The Villages, Inc. (the "Villages Holding"), the Debtor's parent or affiliate company, the Debtor and The Villages Health Holding Company, LLC.  Pursuant to the IP Agreement, UnitedHealthcare owns a perpetual, exclusive license (the "IP License") to use certain of the Villages Holding's intellectual property in the Debtor's service area.  By its terms, UnitedHealthcare has already fully paid for the IP License. UnitedHealthcare underwrites Medicare Advantage plans with The Villages branding to the Debtor's customers.

18.    Finally, UnitedHealthcare is also party to a general agency agreement with a third party, pursuant to which the third party receives the exclusive right to market and sell UnitedHealthcare's Medicare Advantage plans, among other things, in the service area that covers the Debtor's facilities.

## Objections

A.    **The Debtor Did Not Conduct Any Competitive Process for the Stalking Horse Bid and Failed To Prove the Necessity of the Bid Protections.**

19.    The Debtor failed to conduct *any*, let alone a competitive process in selecting CenterWell as the stalking horse bidder.  According to the declaration (the "Evercore Declaration") from the Debtor's investment banker, Evercore Group, L.L.C. ("Evercore"), a previous process to sell the Debtor's business was suspended in July 2024 due to the discovery in

the fall of 2024 of the HCC coding issues. (Mot. Ex. B ¶ 14.) CenterWell had signed a term sheet prior to the suspension of the sale process. (*Id.*) In May 2025, the Debtor reengaged only with CenterWell and eventually entered into the APA in July 2025 at a greatly reduced price. (*Id.* ¶ 15.) There is no mention of *any* process or even any attempt to solicit, between July 2024 and July 2025, other interested bidders to serve as the stalking horse bidder. The discovery in the fall of 2024 of the HCC coding issues negatively affected the value of the Debtor's business. The Debtor could and should have renewed its competitive marketing process by reaching out to past and likely bidding participants in light of the dramatic drop in price. Without doing so, the Debtor cannot demonstrate that the stalking horse bid is fair and reasonable and should be approved. *See In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (citing *In re Global Crossing Ltd.*, 295 B.R. 726, 744–45 (Bankr. S.D.N.Y. 2003)) (holding that debtors should exercise reasonable business judgment in choosing stalking horse bidder where presence of disinterestedness of the board, the extent of the board's deliberations, and their lengthy consideration of the relevant facts and their options would support such finding).

20.     Bid protections are a use of estate property under section 363 of the Bankruptcy Code and must be in the best interests of the estate and other stakeholders. *See In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534–35 (3d Cir. 1999) (quoting *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994)) ("The proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected. The analysis conducted by the Court must therefore include a determination that all aspects of the transaction are in the best interests of all concerned."). Because the only consideration to the estate in exchange for the bid protections is the underlying bid itself, the Debtor must demonstrate the binding nature, viability,

fairness and reasonableness of the price and other terms of the underlying bid in order for the Court to grant the bid protections.  The Debtor apparently concedes as much by including a sentence to that effect in the declaration from its investment banker, albeit without providing any factual basis for it.  Indeed, the Debtor rests its Motion on the following testimony from Evercore:  "I further believe that the terms of the APA are reflective of the market value for Debtor's assets and reasonable under the circumstances."  (Mot. Ex. B ¶ 15.)  This statement neither holds up to scrutiny nor carries the Debtor's burden to show that the stalking horse selection is in the best interest of the estate and its stakeholders.  Approval of the Motion would require additional evidence that the stalking horse's bid is actually reflective of market value and is reasonable under the circumstances (*i.e.*, better than other alternatives diligently considered).  This is not something to be left to the future auction.  The Court is being asked to grant financial protections to the stalking horse bidder as an administrative expense by final order.  The question is thus whether the Debtor has carried its burden for that relief *now*.  *See In re O'Brien Environmental Energy, Inc.*, 181 F.3d at 535 ("We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.  Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context.").

21.    Even if the stalking horse bid were the best available (which there is no evidence to support), the Debtor has not carried its burden to show that the allowance of an administrative expense is appropriate.  The bid protections for which the Debtor seeks approval include an allowed administrative expense of $1.5 million (styled as a "Termination Fee") and

up to $1.5 million of expense reimbursement.  These amounts are paid in a variety of circumstances even if there is no successful topping bid.  (*See* APA Section 12.10 (providing for a variety of termination events where Debtor consummates an Alternative Transaction and no requirement that an "Alternative Transaction" be for higher value than the stalking horse bid.))

22.    Approval of a "Termination Fee" and expense reimbursement payable to a losing bidder must meet the requirements of section 503(b) of the Bankruptcy Code, which allows postpetition administrative expenses only for "actual, necessary costs and expenses of preserving the estate."[3]  11 U.S.C. § 503(b)(1)(A); *see In re O'Brien Environmental Energy, Inc.*, 181 F.3d at 535.  The "necessary" standard in section 503(b) of the Bankruptcy Code is a higher standard than the business judgment standard.  *See In re O'Brien Environmental Energy, Inc.*, 181 F.3d at 535 ("We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  The auction has not happened, and the Debtor, having conducted no updated marketing process, has no reliable information on bidding dynamics at this time.  Moreover, the absence of a requirement that the bid protections only be paid out of the proceeds of a higher and better offer is fatal to the advance approval of bid protections.  *Id*.  Accordingly, the Debtor cannot at this time carry its burden and the grant of an administrative expense for the Termination Fee and expense reimbursement should be denied (without prejudice to the right of the Debtor or the bidder to seek compensation for benefits

---

[3]    Even if the Court decides to apply a lesser standard, the Debtor has not presented any evidence on the necessity of the bid protections and would thus fail under any standard.

actually delivered to the estate in the future if and when an appropriate factual record is established).

**B.      The Proposed Sale and Sale Timeline Raise Numerous Conflict of Interest Issues.**

23.    Many other elements of the Motion and the related sales and contract procedures are flawed and require discussion and negotiation.  In particular, issues and undisclosed information concerning the Debtor's relationships with its affiliates and insiders are littered throughout the proposed bid procedures, sale timeline and stalking horse APA.  Absent full disclosure of these relationships and clarity regarding certain issues, the proposed bid procedures, sale timeline and stalking horse APA should not be approved.

24.    *First*, the APA provides that the sale includes "all claims, causes of action or rights against third parties (including, warranties, indemnities, rebates and guarantees), other than Avoidance Actions and claims, causes of action or rights to the extent related to Excluded Assets or Excluded Liabilities."  (APA Section 2.01(k).)  The "claims" and "causes of action" to be sold by the Debtor are so broadly defined that they appear to include claims against owners, affiliates, officers, directors or other related parties of the Debtor.[4]  The proposed sale cannot, and should not, result in a backdoor settlement or release of such insiders without any compensation at the expense of the Debtor's estate and creditors.  The Court should require that the Debtor fully disclose what these claims and causes of action are, what (if anything) the Debtor has done to investigate them, whether any claims or causes of actions against the Debtor's insiders and affiliates are being sold and, if so, what considerations the Debtor is receiving in exchange.

---

[4]    These Debtor claims against related parties are not carved out through the definition of "Avoidance Actions," "Excluded Assets" or "Excluded Liabilities."

25.     *Second*, the APA contains a "Cure Costs Cap" of $1 million for non-Affiliate Contracts to be assumed and assigned to the buyer.  (APA Section 2.06(g).) Interestingly, no such cure costs cap exists for Affiliate Contracts.[5]  Moreover, the APA provides additional protection for Affiliate Contracts that is not available to non-Affiliate Contracts—if any objection on cure costs with respect to a transferred Affiliate Contract is not resolved by the sale closing date, then the Debtor must pay the undisputed portion of the cure costs and reserve funding for the disputed portion of the cure costs.  (APA Section 2.06(h).)  The Court should require the Debtor to disclose all Affiliate Contracts being assumed and assigned and all facts concerning the sale of such Affiliate Contracts and to explain why non-Affiliate Contracts are not receiving the same treatment as Affiliate Contracts.

26.     *Third*, the Debtor proposes an overly aggressive sale timeline that gives interested parties less than one month to submit a bid and to object to the sale.[6]  A UnitedHealthcare affiliate promptly requested access to the Debtor's dataroom in connection with the sale process.  The Debtor and its advisors have been dragging their feet in the negotiations of a non-disclosure agreement, however, and UnitedHealthcare affiliate still has not gained access to the dataroom.  The less-than-one-month diligence period remaining is insufficient for any meaningful due diligence and submission of a competitive bid and does not promote a competitive bidding process, especially in light of the lack of a prepetition marketing process, to maximize value for the Debtor's estate and stakeholders.

---

[5]    "Affiliate Contracts" are defined in the APA as "any Contract between (a) [the Debtor], on the one hand, and (b) (i) [the Debtor's parent company] or any of its Affiliates (other than [the Debtor]), (ii) any equityholder of [the Debtor's parent company] or any of their Affiliates (other than [the Debtor]) or (iii) any director, manager or officer of any of the Persons in clause (b)(i) or (ii), on the other hand."

[6]    The proposed bid deadline is August 20, 2025., and the sale objection deadline is August 22, 2025.

27.     The Debtor argues that such a compressed timeline is necessary because the sale needs to close by the open enrollment period for Medicare and Medicare Advantage plan recipients, which begins on October 15, 2025.  But the Debtor does not explain why the timeline cannot be pushed back by two weeks with sale closing to occur by October 14, 2025.  What the Debtor does not mention is another deadline that it faces—one imposed in connection with the yet-to-be approved DIP financing from its affiliate.  The DIP financing currently includes a milestone of a sale closing by October 3, 2025.  Full disclosure should be required on whether the sale timeline is solely driven by this proposed DIP financing milestone.  The Debtor should not be allowed to prioritize the interests of its affiliates at the expense of its estate and creditors.

28.     The conflicts of interest in the proposed sale and the sale timeline underscore the need for the Court to require additional disclosures from the Debtor.  Accordingly, the Court should not approve the currently proposed stalking horse APA, bid procedures and sale timeline.

**C.     The Bid Procedures Are Not Designed To Yield a Competitive Process.**

29.     The proposed bid procedures require an overbid to be $8 million above the stalking horse bid.  (Mot. ¶ 26.b(1)(IV) ("Each Bid (i) must propose a Purchase Price equal to or greater than the sum of (a) the value of the Stalking Horse Bid, as determined by the Debtor in consultation with the Consultation Parties, *plus* (b) the amount of the Termination Fee and the maximum amount of the Expense Reimbursement (i.e., $3,000,000) and (b) an initial overbid of at least $5,000,000 . . . .").)  Given that the stalking horse bid is $50 million, the overbid represents 16 percent of the totality of the stalking horse bid.  This seems wholly unreasonable.  As discussed above, the Debtor has not demonstrated the value of the stalking horse bid protections.  Even if the value of the stalking horse bid protections were reasonable, however, the additional $5 million overbid requirement is clearly unreasonable and is likely too high to yield a

competitive process for assets of this size and type. For example, in *In re Prospect Medical Holdings, Inc.*, Case No. 25-80002 (SGJ) (Bankr. S.D. Tex., Mar. 19, 2025), D.I. 1264, in which over $700 million in assets are being sold (*i.e.*, more than 14 times the $50 million cash consideration here), the overbid increment is only $1 million.[7] As with a number of things related to this proposed sale, the Debtor has not explained why the overbid should be as high as $5 million. Accordingly, absent any meaningful rationale and support otherwise, the Court should require the Debtor to lower the overbid increment to $1 million.

> **D.    The Proposed Contract Assumption and Assignment Notice Period Is Insufficient.**

30.    The Debtor and the successful bidder/buyer should be required to finalize their contract assumption and assignment schedule sooner than is contemplated under the Debtor's proposed contract assumption and assignment procedures. Under the APA, the buyer has until five business days prior to the sale closing to designate any contract for assumption and assignment or for rejection. (APA Section 2.06(b).) The proposed contract assumption and assignment procedure provides that contract counterparties would have 14 days following service of an amended contract assumption and assignment notice to file any objections on such assignment or on cure costs. (Mot. Proposed Order ¶¶ 21 & 22.) If the buyer determines to add a contract to the assignment schedule five business days prior to the sale closing, the contract counterparty would not have 14 days to object because the sale would have already closed by the time the objection deadline passes. The Debtor should amend its procedures to require that any buyer must finalize designation of any contract for assumption and assignment or for rejection at

---

[7]    *See* Press Release, *Astrana Health Announces Closing of Prospect Health Acquisition* (Jul. 2, 2025), *available at* https://ir.astranahealth.com/news-events/press-releases/detail/261/astrana-health-announces-closing-of-prospect-health-acquisition.

least 14 days before the sale closing to ensure that contract counterparties have at least 14 days to object.

31.     The contract assumption and assignment procedures also do not allow UnitedHealthcare adequate time to provide notice to its members that a particular acquired hospital or medical group may go out of its network of providers at the respective closing date. Under the APA, UnitedHealthcare might receive notice of rejection of its contract only five business days prior to sale closing. (APA Section 2.06(b).) State and federal law requires UnitedHealthcare to give members certain advance notice that a hospital or provider will go out of its network. Moreover, providing such advance notice is necessary to prevent substantial prejudice to UnitedHealthcare's members. Five business days prior to sale closing would not provide enough time for UnitedHealthcare to give notice to its members of any benefit changes, and very importantly, these members might not receive subsequent notice from UnitedHealthcare or other insurance companies before they make their open enrollment decisions starting October 15, 2025. UnitedHealthcare therefore requests that the Debtor provide UnitedHealthcare with at least 15 days written notice prior to the closing of the sale of the successful bidder's irrevocable decision whether to have any of the contracts between UnitedHealthcare and the Debtor assumed and assigned to it in the sale and the cure costs for such contracts.

**E.     UnitedHealthcare's Interests Could Be Negatively Impacted by the Proposed Sale.**

32.     The proposed stalking horse bid contains a $1 million cap for contract cure costs payable by the buyer on any non-"Affiliate Contracts" to be assigned to the buyer. (APA Section 2.06(g).) The Debtor would be responsible for any cure costs on non-Affiliate Contracts that exceed this cap. (APA Section 4.02(b)(iv).) UnitedHealthcare's contract with the Debtor could be among the non-Affiliate Contracts that the Debtor decides to assume and assign to the

buyer.  There is no assurance that the Debtor would be able to pay for the cure costs in excess of the cure costs cap.  And the Debtor has not provided evidence showing the reasonableness of the $1 million cure costs cap.  The buyer could be reaping the full benefit of the transferred contracts without paying adequate consideration at the expense of the Debtor's estate and creditors.

33.     UnitedHealthcare owns and has fully paid for a perpetual, exclusive license to use certain intellectual property owned by the Debtor's parent or affiliate company in connection with UnitedHealthcare's products in accordance with the IP Agreement.  It is unclear from the Motion or the APA that the proposed sale would not affect UnitedHealthcare's interests in such intellectual property.  The Debtor should provide explicit assurance that any sale would not impact UnitedHealthcare's interests in such intellectual property.

34.     One of the closing conditions in the APA is that UnitedHealthcare of Florida Inc. and United Behavioral Health, Inc. have agreed "in definitive documentation with Buyer to either (i) qualify all the Accepted Clinicians under [UnitedHealthcare]'s current payor arrangement with the Buyer and amended such arrangement to cover all primary care, specialty care and other health care services provided by the Accepted Clinicians; or (ii) enter into a new payor arrangement with Buyer to cover all primary care, specialty care and other health care services provided by Accepted Clinicians and to qualify all of the Accepted Clinicians, on terms consistent in all material respects with either the Seller's or Buyer's or one of its Affiliate's existing payor arrangement with [UnitedHealthcare] . . . ."  (APA Section 9.02(g).)  A similar pre-closing covenant requires the buyer to use commercially reasonable efforts to meet this condition.  (APA Section 7.03(b).)  The Debtor should be required to provide more information on what these provisions entail and how they impact UnitedHealthcare's interests.

35.    Finally, many of these arrangements with UnitedHealthcare are conditions to closing of the stalking horse bid, despite UnitedHealthcare being surprised by the chapter 11 filing and the proposed sale.  In particular, the closing condition giving the stalking horse buyer the right to walk away from its commitments if UnitedHealthcare does not agree to new commercial arrangements with the buyer is problematic on many levels.  If UnitedHealthcare does not agree (which it has not yet), the buyer's purchase commitment is entirely illusory and not an appropriate binding contract for the launch of a stalking horse process and the award of stalking horse financial protections.  Moreover, it appears that the Debtor intends to reject UnitedHealthcare's prepetition contracts—asking UnitedHealthcare essentially to enter into new agreements voluntarily as an "assumption and assignment without cure."  UnitedHealthcare, of course, could normally just say no.  But to do so after the proposed procedures elapse would waste millions of dollars of case expense and put UnitedHealthcare in the difficult position of needing to risk the Debtor's liquidity and potentially the continuity of care for UnitedHealthcare plan members as a condition to UnitedHealthcare protecting its rights.  No party should be compelled by sale procedures to accept "assumption and assignment without cure," and the Debtor should sell only what it has to sell, not presumed new agreements with UnitedHealthcare. The closing conditions to the APA should be modified accordingly, or the Debtor and the stalking horse bidder—if they wish to compel assumption of the UnitedHealthcare contracts— should cure as required by the Bankruptcy Code.

## Reservation of Rights

36.    As stated above, UnitedHealthcare, taken by surprise and not consulted in the filing of this Chapter 11 Case and denied fair access to basic information as a stakeholder, has requested that the Debtor postpone the hearing on its Motion by two weeks to allow an exchange of information and discussion.  If the Debtor decides nevertheless to proceed,

UnitedHealthcare respectfully reserves all rights to supplement this Objection, as well as to assert any other objection at the appropriate time in connection with the proposed sale transaction and proposed assumption or assignment of any UnitedHealthcare contracts, or continuity of care obligations under applicable law.

## Conclusion

WHEREFORE, for the reasons set forth herein, UnitedHealthcare respectfully requests that the Court deny approval of the Motion except as consistent with the foregoing and grant UnitedHealthcare such additional relief as this Court deems just and equitable.

Dated: July 21, 2025

**SULLIVAN & CROMWELL LLP**
*/s/* Andrew G. Dietderich
Andrew G. Dietderich, New York Bar No. 2850584
Justin J. DeCamp, New York Bar No. 4373163
Alexa J. Kranzley, New York Bar No. 4707386
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:dietdericha@sullcrom.com
       decampj@sullcrom.com
       kranzleya@sullcrom.com
*Counsel to UnitedHealthcare Insurance Company*
*and UnitedHealthcare of Florida, Inc.*

AND

**STEARNS WEAVER MILLER**
**WEISSLER ALHADEFF &**
**SITTERSON, P.A.**
/s/ Patricia A. Redmond
Florida Bar No. 303739
Patricia A. Redmond, Esquire
Stearns Weaver Miller
Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Miami, Florida  33130
Phone: (305) 789-3553
predmond@stearnsweaver.com
*Co-Counsel to UnitedHealth Care Insurance Company*
*and UnitedHealthcare of Florida, Inc.*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on July 21, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

           By: /s/ Patricia A. Redmond
              Florida Bar No. 303739