**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156-LVV |
| **THE VILLAGES HEALTH SYSTEM, LLC,[1]** | **Chapter 11** |
| Debtor. | |

**DEBTOR'S RESPONSE IN SUPPORT OF ITS *AMENDED MOTION FOR ENTRY OF ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) APPROVING STALKING HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE DEBTOR'S ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF***

The Villages Health System, LLC ("Debtor"), files this response ("Response") in support of the *Amended Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "Sale Motion") [Doc. No. 29] and in response to the objection to the Sale Motion (the "Objection") [Doc. No. 85] filed by UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc.

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

(collectively, "United").[2]

This Response is supported by (i) the *Supplemental Declaration of A.J. Berens in Support of the Debtor's Sale Motion* ("Berens Declaration") attached hereto as **Exhibit A**, and (ii) the *Declaration of Neil Luria in Support of the Debtor's Sale Motion* ("Luria Declaration") attached hereto as **Exhibit B**.  For the reasons set forth herein and in the supporting declarations, this Court should overrule the Objection and grant the Debtor's Sale Motion.

## PRELIMINARY STATEMENT

1.     The Debtor stands firmly behind its pre- and post-petition marketing process as market-based and reasonable under the circumstances. The process is being executed by capable professionals, including Evercore Group, LLC ("Evercore") as investment banker, with the assistance of (i) Neil Luria, the Debtor's Chief Restructuring Officer ("CRO") and support staff from GBH SOLIC Holdco, LLC ("SOLIC") and (ii) the Debtor's management and compliance teams.

2.     The initial results of Debtor's marketing process is a fully executed $50 million stalking horse purchase agreement (the "Stalking Horse APA") with CenterWell Senior Primary Care, Inc. ("CenterWell" or the "Stalking Horse Bidder"), a reputable counterparty that can timely close the sale and continue the high-quality care for the Debtor's more than 55,000 patients.

3.     Approval of the Stalking Horse APA is a critical step forward in the Debtor's marketing process. The extensively negotiated transactional documents provide a bidding floor and a comprehensive framework to guide competitive bidding. The Stalking Horse APA and related documents are being made available to all potential bidders that sign an NDA, and the bid

---

[2] All terms capitalized herein but not defined shall have the meaning set forth in the Sale Motion.

procedures contemplate that competitive bids identify all changes from the Stalking Horse APA structure, allowing the estate to make an "apples-to-apples" comparison of competing bids.

4.      The Stalking Horse APA includes customary and market-based bid protections, including a break-up fee of 3% of the cash purchase price (the "Termination Fee") and up to $1,500,000.00 in expense reimbursement (the "Expense Reimbursement") (collectively, the "Bid Protections"). The Bid Protections were negotiated in good faith and at arms-length with the Stalking Horse Bidder, and were necessary to secure the Stalking Horse Bidder's commitment to the proposed competitive bidding process and to fully execute the Stalking Horse APA.

5.      The Debtor's Sale Motion also sets forth a reasonable and appropriate bidding procedures timeline that will maximize competitive bidding and provide clarity to potentially interested parties. The Debtor, Evercore, the CRO, and other professionals have been, and will continue to be, committed to providing timely information to interested parties to facilitate a robust and competitive process.

6.      United makes a flurry of misplaced allegations in an attempt to derail the Debtor's sale process and gain leverage in the case. Significantly, United's Objection is not supported by declarations or evidence of any kind.

7.      United begins its Objection with an argument that despite the Debtor's projected need to borrow approximately $24 million to sustain operations and provide funding for the bankruptcy case from July 7, 2025, to October 3, 2025, the Debtor is not in financial distress and should not have sought bankruptcy relief without getting permission from United.[3] Shortly thereafter, United alleges it can take the Debtor's revenue to repay itself any amounts the Debtor may (or may not) owe United.[4] To be clear, United's threatened actions would worsen the Debtor's

---

[3] See Objection at ¶ 1; Approved DIP Budget, Doc. No. 60, Exhibit 1; Luria Declaration at ¶ 6.
[4] Objection at ¶ 16.

liquidity concerns and require the Debtor to borrow even more than the projected $24 million to sustain operations and provide funding for the bankruptcy case.[5]

8.      United also tries to argue it's unfair that United is not the Stalking Horse Bidder. United correctly states that "certain affiliates of UnitedHealthcare had expressed an earlier interest in the business," and participated in the Evercore marketing process; however, United ultimately withdrew from the process and chose not to move forward with any transaction.[6]

9.      To be clear, the Debtor would be happy to have United participate in the competitive bidding process, and a United-affiliated entity has already executed an NDA in connection with the Debtor's post-petition marketing efforts. Now that United is under an NDA, it will have access to the same information as any other bidder and be subject to the same bidding procedures as any other bidder. Beyond due diligence type information in the Evercore virtual data room, United already has an extensive knowledge of the Debtor's business and its claims history because UNH processes approximately 80% of the Debtor's Medicare claims.

10.      Finally, despite the Debtor initiating a voluntary self-disclosure to the Office of Inspector General ("OIG") regarding the existence of, and the circumstances relating to, the coding issues, forming a restructuring committee (with an independent manager as its sole member),  and appointing the CRO, United makes various vague allegations about the Debtor engaging in misconduct and purports to be the Debtor's largest non-governmental creditor. The Debtor acknowledges – as it has throughout this bankruptcy case – that there could be amounts owed to the Debtor's insurance payors; however, that has not been determined, and the scope of the Debtor's defenses to United's claims are currently unknown.

---

[5] Luria Declaration at ¶ 9.
[6] Objection at ¶ 10.

4

11.    As set forth herein, and in the Berens Declaration and Luria Declaration, (i) the Debtor's sale process, both before and after the filing of this Chapter 11 case, has been appropriate under the circumstances, (ii) the Stalking Horse APA was negotiated on an arm's length basis and represents the highest and best offer currently available to the Debtor and is subject to a reasonable and competitive bidding process, and (iii) the bid protections for the Stalking Horse Bidder are reasonable and market based and provide significant benefits to the Debtor and its creditors in the form of a fully negotiated transaction framework that is made available to all competing bidders and allows the Debtor to entice and efficiently evaluate competing bids. Accordingly, this Court should overrule the Objection and allow the sale process to proceed.

## LEGAL STANDARD

12.    A chapter 11 debtor-in-possession has the power to sell, use or lease property of the estate under Section 363(b) of the Bankruptcy Code outside the ordinary course of business subject to court approval. *See* 11 U.S.C. § 363(b). Courts should approve a transaction where the debtor-in-possession has used reasonable business judgment and articulated a business justification. *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla. 2019); *see also In re Wildwood Villages, LLC*, Case No. 3:20-bk-02569-RCT, 2021 WL 1784074 at *2 (Bankr. M.D. Fla. February 22, 2021). The business judgment standard is satisfied if a debtor acted on an informed basis, in good faith, and with the honest belief that the action was taken in the best interest of the company. *In re Wildwood Villages, LLC*, Case No. 3:20-bk-02569-RCT, 2021 WL 1784074 at *3 (Bankr. M. D. Fla. February 22, 2021).

13.    The debtor-in-possession's management of the procedural details surrounding bidding and sales are "ultimately a matter of discretion that depends upon the dynamics of the particular situation." *In re Phillips*, Case No. 2:12-cv-585-FTM-29, 2103 WL 1899611 at *10

(M.D. Fla. May 7, 2013) (internal citations omitted). The debtor-in-possession is entitled to exercise business judgment in deciding which bid to accept, and this business judgment is entitled to great judicial deference. *Id.* A debtor-in-possession's business judgment should be approved unless it is so manifestly unreasonable that it could not be based upon sound business judgment, but only bad faith, whim or caprice. *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla. 2019).

14.     Where a stalking horse bid contains bid protections, Section 503(b) of the Bankruptcy Code governs whether such bid protections should be approved. *See, e.g., In re LP Watch Group, Inc.*, Case No. 10-29910, 2011 WL 3897129 at *1 (Bankr. S.D. Fla. July 11, 2011). To approve bid protections, courts within the Eleventh Circuit examine whether such protections are in the best interest of the bankruptcy estate and consider the following factors:

i)     Whether the fee requested correlates with a maximization of value to the debtor's estate;

ii)     Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

iii)     Whether the principal secured creditors and the official creditors committee are supportive of the concession;

iv)     Whether the subject fee constitutes a fair and reasonable percentage of the proposed purchase price;

v)     Whether the dollar amount of the fee is so substantial that it provides a chilling effect on other potential bidders;

vi)     The existence of available safeguards beneficial to the debtor's estate in the event the transaction falls through; and

vii)     Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Sea Island Co.*, Case No. 10-21034, 2010 WL 4393269 at *3 (Bankr. S.D. Ga. September 15, 2010) (citing *In re Hupp Industries, Inc.* 140 B.R. 191 (Bankr. N.D. Ohio 1992); *In re: Antaramian Properties, LLC*, 564 B.R. 762, 768 (M.D. Fla. 2016) (citing favorably to *In re Sea Island Co.*).

## RESPONSE TO UNITED OBJECTION

15.    The record and evidence presented conclusively demonstrates that the Debtor exercised its reasonable business judgment and discretion in selecting the Stalking Horse Bidder, negotiating and entering into the Stalking Horse APA, and establishing the bidding procedures.

16.    After nearly two years of the Evercore sale process, the Debtor selected CenterWell as the Stalking Horse Bidder under the terms of the Stalking Horse APA. The Stalking Horse APA was the result of good faith and arms-length negotiations between independent parties represented by competent counsel. The Debtor selected CenterWell because it believes in good faith that the Stalking Horse APA is in the best interest of the Debtor and its creditors, and made that decision after consulting its management team, the CRO, Evercore, and its other professionals. There is no evidence that the Debtor or CenterWell has not acted in good faith, at arm's length, or has acted in an inappropriate manner with respect to the proposed sale.[7]

17.    Approval of the Stalking Horse APA will provide substantial benefit to the Debtor's estate by establishing a transactional framework for competing bids. The Stalking Horse APA documents are being made available to all potential bidders and any competing offers must identify the differences between the bid and the Stalking Horse APA, which will allow the estate to effectively compare the value of competing bids. The Bid Protections were necessary to encourage the Stalking Horse Bidder to assume the risk of a competitive bidding process and allow the Stalking Horse APA to be used as a benchmark for other interested parties. The Termination Fee (3% of the Cash Purchase Price under the Stalking Horse APA) is well within the range of reasonableness for the Eleventh Circuit. *See In re: Silver Airways, LLC*, Case No. 24-23623-PDR, Doc. No. 715 (Bankr. S.D. Fla. December 30, 2024) (approving a 3% break-up fee); *In re Sea*

---

[7] Luria Declaration at ¶ 15.

*Island Co.*, Case No. 10-21034, 2010 WL 4393269 at *3 (Bankr. S.D. Ga. September 15, 2010) (approving a 3% break-up fee); *In re: Antaramian Properties, LLC*, 564 B.R. 762, 768-69 (M.D. Fla. 2016) (suggesting a 3% break-up fee is fair and reasonable). In fact, courts within the Eleventh Circuit have approved break-up fees over 4% and 5% of a cash purchase price. *See, e.g., In re Lake Burton Development, LLC,* Case No. 09–22830 (Bankr. N.D. Ga. Apr. 1, 2010) (approving break-up fee equal to 4.75% of the cash purchase price); *In re Dan River, Inc.,* Case No. 04–10990 (Bankr. N.D. Ga. Dec. 17, 2004) (approving break-up fee equal to 5.3% of the cash purchase price). Additionally, the Expense Reimbursement is appropriate and reasonable to compensate the Stalking Horse Bidder for the substantial expenses it has incurred performing due diligence, negotiating and drafting the Stalking Horse APA, and otherwise communicating with the Debtors and its professionals during the marketing and sale process. The Stalking Horse Bidder has incurred far more than the $1,500,000.00 cap to get to this point. The Stalking Horse Bidder must be compensated for providing the estate with a floor of $50,000,000.00 as the Cash Purchase Price for the sale.

18.     Similarly, approval of the going forward bidding procedures will provide clarity for interested parties to complete due diligence and submit competing bids. The bidding procedures provide interested parties with sufficient time to conduct due diligence and make competitive offers, and there is no evidence that the bidding procedures as structured will chill bidding for the Debtor's assets.

19.     Despite United's unsupported allegations, United has not and cannot demonstrate that the Debtor acted in bad faith, whim, or caprice with respect to its decision to select the Stalking Horse Bidder or enter into Stalking Horse APA on the heavily negotiated terms set forth therein. Nor can United demonstrate that Debtor should have run into a liquidity crisis before seeking relief

4898-8655-9063.3

before the Bankruptcy Court. United complains about what it calls an "aggressive" bidding procedures timeline, but United – as a result of prior due diligence and extensive knowledge of Debtor's assets and operations as an integral business partner for more than a decade – has extensive amounts of information about the Debtor's business and claims submission process upon which to base a bid and falls far short of saying it's unable to submit a timely competing bid. United also raises issues with the Stalking Horse APA terms themselves, such as the scope of the cure costs and the scope of included assets. Such arguments, however, are premature and inapplicable to the question presented—*i.e.*, the approval of the bidding procedures and bid protections.  Moreover, the Stalking Horse APA embodies arm's length negotiated terms that are subject to competitive overbidding by interested parties, including United, which (via an affiliate) has executed an NDA and gained access to the data room and appears intent on participating in the bidding process.

20.     In short, the declaration attached to the Sale Motion, the Luria Declaration, and the Berens Declaration provide unrebutted evidence that the legal standard governing approval of the stalking horse selection, the terms of the Stalking Horse APA, and the proposed bidding procedures constituted reasonable and appropriate exercises of the Debtor's business judgment and should be approved.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order: (1) overruling the Objection; (2) entering an order approving the Bid Procedures; and (3) granting the relief requested herein and such other and further relief as the Court may deem just and proper.

4898-8655-9063.3

Dated: July 22, 2025

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*
Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Andrew V. Layden, Esq.
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtor and Debtor
in Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on July 22, 2025, a true and correct copy of the foregoing was served via electronic mail using the Court's CM/ECF system, which will provide notice to all parties requesting such notice.

*/s/ Elizabeth A. Green*
Elizabeth A. Green, Esq.

4898-8655-9063.3

**<u>Exhibit A</u>**
**Supplemental Declaration of A.J. Berens**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156-LVV |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| Debtor. | |

**SUPPLEMENTAL DECLARATION OF A.J. BERENS**
**IN SUPPORT OF THE DEBTOR'S SALE MOTION**

I, A.J. Berens, declare as follows:

1.      I am over the age of 18 and competent to testify and to submit this supplemental declaration (this "Supplemental Declaration").  I am duly authorized to submit this Supplemental Declaration on behalf of The Villages Health System, LLC ("TVH" or the "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case").

2.      I am submitting this Supplemental Declaration in support of the Debtor's *Amended Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (Doc. No. 29) (the "Sale Motion").

3.      This Supplemental Declaration is intended to supplement, without superseding, the

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

*Declaration of A.J. Berens on behalf of Evercore Group, LLC in Support of Debtor's Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Docket No. 14, at pp. 158-167] (the "<u>Declaration</u>").[2]

4.      Except as otherwise indicated, all statements in this Supplemental Declaration are based on: (a) my personal knowledge, views, and experiences; (b) my review of relevant documents and records; (c) information provided to me by employees and consultants working for Evercore Group, LLC ("<u>Evercore</u>") with personal knowledge of the veracity of such information; and/or (d) information provided to me by, or discussions with, members of the Debtor's team, Debtor's professionals, and Debtor's consultants.  If called upon to testify, I could and would testify competently to the facts set forth in this Supplemental Declaration.

5.      On July 21, 2025, UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc. (together, "<u>United</u>") filed an objection to the Sale Motion [Docket No. 85] (the "<u>United Objection</u>").  I have reviewed the United Objection, which contains assertions that are inconsistent with the marketing and sale process undertaken by the Debtor.  This Supplemental Declaration seeks to provide context and correction for the assertions in the United Objection.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion or Declaration, as appropriate.

4920-6602-4023.4

6.      In or about September 2023, the Debtor engaged Evercore to conduct a marketing process to elicit proposals for the acquisition of the Debtor and/or all, or substantially all, of Debtor's assets (a potential "Transaction").

7.      Multiple parties meaningfully evaluated the Debtor's assets, including UnitedHealthcare, who chose not to bid on February 27, 2024.

8.      Centerwell conducted significant internal and third-party due diligence during the Winter and Spring of 2024, including the near-final development of definitive purchase documentation. The transaction was suspended upon the discovery of certain historical billing issues, after which the Debtor voluntarily self-reported these issues to appropriate regulatory authorities.

9.      Following the suspension of discussions, CenterWell maintained communication with the Debtor, continuing through the internal Debtor investigation, the self-reporting procedures with the government, and the execution of the remediation plan.  CenterWell continuously showed interest in seeing through the transaction despite the Debtor's regulatory challenges, and further performance pressures facing the industry at-large.

10.     The challenges impacting the Debtor's industry are not "normal course". The continued pressures of recent CMS code regulations (e.g. CMS v.28), heightened care utilization, physician supply / demand imbalances, and other inflationary forces are severely impacting risk-based provider groups nationally. Few scaled transactions (outside of restructuring situations) have materialized. Traditional investors in this space, including private equity and private-equity owned provider groups, have been careful and highly-scrutinizing of Medicare Advantage exposure. The Debtor takes significant comfort, as does Evercore, that against this backdrop and citing all the

3

reasons above, CenterWell represents the best foundation to support this bankruptcy process as a stalking horse.

11.    Furthermore, United is one of the most sophisticated acquirors of businesses like TVH in the healthcare industry. Arguably, as the Debtor's largest managed care partner within The Villages (covering approximately 80% of all Medicare-eligible patients in The Villages), United has ample runway, insight, and information to put forth a fair and competitive bid.

12.    In my opinion, CenterWell's selection as the Stalking Horse Bidder was reasonable and logical for several reasons: *first,* their significant time, resources and expense committed to the marketing process; *second* their continual motivation to the own and operate TVH in the interim period between the process suspension and the pre-petition filing, further supporting deal certainty against an uncertain market and regulatory backdrop; *third* the willingness to absorb near-term financial losses, replenish Medicare receivables not transferring with the business, and providing cash consideration to the Debtor, and *fourth,* able to provide seamless continuity of care to TVH's patients and transition operations effectively.  It was this unique combination of motivation, certainty, speed and value that resulted in CenterWell's selection as a stalking horse.

13.    United was not called during the evaluation of the stalking horse bid for several reasons: *first*, despite conducting significant diligence in the previous process, United chose not to bid, citing a valuation that would likely be perceived as non-competitive to our process. That valuation assessment was *before* the coding issues were identified; therefore, it was the Debtor's judgment that United would continue to be disinterested at a significantly lower performance profile *and* higher risk situation resulting from the coding remediation; *second*, a stated reticence by United to acquiror assets with negative earnings; and *third* to Evercore's knowledge, virtually

4

no interaction or outreach from United during the interim period to reengage in ownership discussions.

14.    Under the circumstances, I believe the buyer protections are reasonable—striking a balance between accounting for CenterWell's substantial investment and designing an auction process intended to encourage competitive bidding.

15.    Similarly, I believe the milestones for the sale process are reasonable and attainable under the circumstances, especially for United.  United has been integrally involved in Debtor's business for more than a decade and, next to Debtor's employees, likely knows the most about Debtor's operation.  United, moreover, began conducting due diligence regarding a potential Transaction in or about December 2022—more than two and a half years ago.  As part of that due diligence process, United was provided access to a data room substantially similar to the data room established for the post-petition overbid process and containing most, if not all, of the same relevant documents and information.  And, United has access to the post-petition data room and information and documents contained therein and Debtor stands by to facilitate any due diligence United requires to evaluate Debtor's assets and whether to submit a competing bid.

16.    Nonetheless, Evercore and the Debtor are supportive of a two-week extension to the bid deadline (and associated milestones). We believe this further provides bidders sufficient diligence time to submit qualified bids.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: July 22, 2025                                 _/s/  A.J. Berens_____
                                                                     Managing Director
                                                                     Evercore Group, LLC

**<u>Exhibit B</u>**
**Declaration of Neil Luria**

4898-8655-9063.3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156-LVV |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| **Debtor.** | |

**DECLARATION OF NEIL LURIA
IN SUPPORT OF THE DEBTOR'S SALE MOTION**

I, Neil Luria, declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of The Villages Health System, LLC ("TVH" or "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case").

2.      In my capacity as CRO of the Debtor, I am familiar with the Debtor's business, day-to-day operations, and financial affairs. Except as otherwise indicated, the facts set forth in this declaration are based upon (i) my personal knowledge, (ii) my review of relevant documents and records created and maintained by the Debtor in the ordinary course of business, (iii) information provided to me by employees and consultants working under my supervisions with personal knowledge of the veracity of such information, and/or (iv) my opinion based on experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

3.      I submit this declaration (i) in support of the *Debtor's Amended Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All*

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

*Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (Doc. No. 29) (the "Sale Motion"), (ii) in opposition to the Objection (Doc. No. 85) to the Sale Motion filed by UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc. (collectively, "United"), and (iii) in support of the Debtor's Response in support of the Sale Motion.[2]

4.      The background relating to the Debtor's historical coding issues, voluntary self-disclosure of those issues to the U.S. government and other parties, and the affirmative steps taken to remedy the issues on a going forward basis are set forth in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* [Doc. No. 3] and are not restated here.

5.      Based on my experience in the insolvency industry and my role as CRO of the Debtor, it is my opinion that the Debtor has significant financial distress and any assertion in the United Objection that the Debtor has no liquidity concerns or no need to move expeditiously through a sale process is wrong.

6.      The Debtor's publicly filed financial projections provide a reasonable and good faith estimate of the Debtor's going-forward need to borrow cash to continue operations (Doc. No. 60, p. 29) (the "DIP Budget").  The DIP Budget reflects that from July 7 through October 3, 2025, the Debtor needs to borrow approximately $24,000,000 to sustain operations and provide funding

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Sale Motion and Response.

for the bankruptcy case. In addition, the Debtor will be unable to repay any of the $15,000,000 in pre-petition indebtedness to its pre-petition secured creditor.

7.      The Debtor's business is not forecasted to operate profitably on a cash basis, and based on my professional knowledge and experience, the only realistic option to avoid a shutdown of TVH's operations is a sale to a third party with sufficient resources and capitalization to lead a turnaround effort.

8.      Due to the Debtor's financial circumstances, it is critical that the Debtor have access to borrow money under the Court-approved DIP loan going forward and the Debtor move expeditiously through a Court-approved sale process and toward a transaction closing.

9.      To the extent United or other payors withhold certain funds from the Debtor's projected revenue, the Debtor's cash needs would likely be even greater than forecasted.

10.      Based on my experience in the insolvency industry and my role as CRO of the Debtor, in my opinion, the sale process undertaken by Evercore both before and after the filing of this Chapter 11 case was appropriate under the circumstances, and a going forward bidding structure should be approved as soon as reasonably practicable to provide a framework and clarity for interested parties to complete due diligence and submit competing bids.

11.      The Stalking Horse APA was negotiated on an arm's length basis by sophisticated parties represented by competent counsel.

12.      One of the conditions of the Stalking Horse APA was that the Debtor file a Chapter 11 bankruptcy case and obtain Bankruptcy Court approval of the proposed transaction under 11 U.S.C. § 363, after the conclusion of a customary and Bankruptcy Court-approved competitive bidding process.

13.     I understand timing plays a critical role in the bid procedures process as the Medicare and Medicare Advantage plan open enrollment in Florida begins on or about October 15, 2025. Accordingly, commencing the bidding and sale process as early as possible was crucial to allow any potential purchaser of the Debtor's assets the opportunity to address elements associated with the open enrollment process. I believe that the inability to participate in the open enrollment process may diminish the value of the Debtor's assets. Furthermore, the Debtor was unable to cover operational shortfalls, the APA required the filing of the bankruptcy case, and execution of the APA was critical to the ability of the Debtor to continue to provide continuity of care.

14.     To the best of my knowledge, the Stalking Horse is not an affiliate or insider of the Debtor, and the Stalking Horse has not acted in a collusive manner with any person or entity with respect to the proposed sale.

15.     I believe the Stalking Horse Bid currently represents the best offer available to the Debtor and reflects a good faith, arms-length transaction.

16.     Under the circumstances, I do not believe that delaying the bidding or sale process will benefit the Debtor, its creditors, or its estate.

17.     Based on my experience, I also believe that the proposed bid protections in the form of a $1.5 million termination fee and up to $1.5 million of expense reimbursements provided to CenterWell are appropriate under the circumstances.

18.     First, I believe the $1.5 million as the expense reimbursement cap is a market-based term and is significantly less than that amounts the Stalking Horse Bidder has actually expended on outside advisors in connection with the proposed transaction and negotiating the documents that create the framework for competing bids. Having a fully negotiated transaction framework

4

and making those documents available to other bidders will provide benefit to the bankruptcy estate and will facilitate competitive bidding.

19.     Second, I believe the $1.5 million termination fee, which is 3% of the cash purchase price, is appropriate. In my experience, the market rate for termination fees is between 1% to 4% of the purchase price, with transactions under $100 million trending toward the higher end of that range. The 3% termination fee falls within that market rate window. I believe 3% is appropriate in this case in light of the complexity and uncertainty of this transaction.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.


Dated: July 22, 2025                              /s/ *Neil Luria*_____
                                                  Neil Luria