IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - - - - - - - - - - - - - - - x
IN RE:                          : Case No. 8:25-bk-4156-LVV
                                :   Chapter 11
THE VILLAGES HEALTH SYSTEM, LLC,:
                                :
        Debtor                  :
- - - - - - - - - - - - - - - - x
                                United States Courthouse
                                400 West Washington Street
                                Orlando, Florida 32801
                                Orlando, Florida
                                July 23, 2025
                                10:04 A.M.

**TRANSCRIPT OF HEARING**

(1) Debtor's Emergency Motion for Entry of Interim and
Final Orders (I) Authorizing the Debtor to (A) Maintain its
Cash Management System and Pay Bank Fees, (B) Waive Certain
Bankruptcy Code and U.S. Trustee Requirements, and (C)
Continue Using Existing Checks and Business Forms, and (II)
Authorizing and Directing the Debtor's Banks to Honor All
Employee Related Payment Requests (Doc. #6);

*[NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

**BEFORE THE HONORABLE LORI V. VAUGHAN**
**UNITED STATES BANKRUPTCY JUDGE**

*PROCEEDINGS RECORDED BY COURT PERSONNEL.*
*TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE*
*APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.*

_____
SCHULTZ REPORTING OF PASCO, INC.
3350 Chickadee Dr.
Holiday, Florida 34690
(727) 808-1484

*[NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

**TRANSCRIPT OF HEARING (Continued)**

(2) Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue its Insurance Program, (II) Pay All Pre-Petition and Post-Petition Obligations with Respect Thereto, and (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Insurance Obligations (Doc. #8);

(3) Debtor's Amended Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for Sale of Substantially All of the Debtor's Assets, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve the Sale of the Debtor's Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief (Doc. #29); Objection by United Health Care Insurance Company (Doc. #85); Response by Debtor (Doc. #92);

(4) Debtor's Expedited Motion for Entry of Order (I) Authorizing Debtor to (A) Pay and Honor Prepetition Patient Refund Obligations, and (B) Maintain and Administer its Existing Patient Refund Program, and (II) Granting Related Relief (Doc. #77).

A P P E A R A N C E S
VIA IN-PERSON, ZOOM, AND/OR TELEPHONE


For Debtor:                    ANDREW V. LAYDEN, Esquire
                               BakerHostetler LLP
                               200 South Orange Avenue
                               Suntrust Center, Suite 2300
                               Orlando, Florida 32801
                               (321) 439-1711
                               alayden@bakerlaw.com

                               ELIZABETH GREEN, Esquire
                               BakerHostetler LLP
                               200 South Orange Avenue
                               Suntrust Center, Suite 2300
                               Orlando, Florida 32801
                               (407) 649-4000
                               egreen@bakerlaw.com

                               MICHAEL T. DELANEY, Esquire
                               BakerHostetler LLP
                               127 Public Square
                               Cleveland, Ohio 44114
                               (216) 621-0200
                               mdelaney@bakerlaw.com

                               BENJAMIN TAYLOR, Esquire
                               BakerHostetler LLP
                               200 South Orange Avenue
                               Suntrust Center, Suite 2300
                               Orlando, Florida 32801
                               (407) 540-7924
                               brtaylor@bakerlaw.com



[APPEARANCES CONTINUED ON NEXT PAGE]

A P P E A R A N C E S    [Continued from prior page]


For United States
Trustee's Office:              WANDA MURRAY, Esquire
                               400 West Washington Street
                               Suite 1100
                               Orlando, Florida 32801
                               (407) 648-6070
                               wanda.murray@usdoj.gov

                               SCOTT E. BOMKAMP, Esquire
                               400 West Washington Street
                               Suite 1100
                               Orlando, Florida 32801
                               (407) 648-6069
                               scott.e.bomkamp@usdoj.gov

For United Health Care
and United Health Care
of Florida:                    PATRICIA A. REDMOND, Esquire
                               Stearns Weaver Miller
                               150 West Flagler Street
                               Suite 2200
                               Miami, Florida 33130
                               (305) 789-3200
                               predmond@stearnsweaver.com

                               ANDREW G. DIETDERICH, Esquire
                               Sullivan & Cromwell
                               535 Madison Avenue
                               New York, New York 10022
                               (212) 558-3830
                               dietdericha@sullcrom.com

                               JUSTIN J. DECAMP, Esquire
                               Sullivan & Cromwell
                               535 Madison Avenue
                               New York, New York 10022
                               (212) 558-4000
                               decampj@sullcrom.com


[APPEARANCES CONTINUED ON NEXT PAGE]

A P P E A R A N C E S     [Continued from prior page]


                         ANGELA ZHU, Esquire
                         Sullivan & Cromwell
                         535 Madison Avenue
                         New York, New York 10022
                         (212) 558-4000
                         zhua@sullcrom.com


For CenterWell Senior
Primary Care (Vitality),
Inc:                     ANDREW D. SORKIN, Esquire
                         Latham & Watkins, LLP
                         555 11th Street NW
                         Washington, DC 20004
                         (202) 637-3302
                         andrew.sorkin@lw.com

                         CAROLINE A. RECKLER, Esquire
                         Latham & Watkins, LLP
                         330 North Wabash Avenue
                         Suite 2800
                         Chicago, Illinois 60611
                         (312) 876-7663
                         caroline.reckler@lw.com

                         PAUL J. BATTISTA, Esquire
                         Venable LLP
                         801 Brickell Avenue
                         Suite 1500
                         Miami, Florida 33131
                         (305) 372-2457
                         pjbattista@venable.com


          [APPEARANCES CONTINUED ON NEXT PAGE]

A P P E A R A N C E S    [Continued from prior page]


For PMA Lender, LLC:      RHYS P. LEONARD, Esquire
                          Trenam Law
                          Post Office Box 1102
                          Tampa, Florida 33601
                          (813) 223-7474
                          rleonard@trenam.com

For United States of
America:                  CHRISTOPHER J. EMDEN, Esquire
                          U.S. Attorney's Office
                          400 North Tampa Street
                          Suite 3200
                          Tampa, Florida 33602
                          (813) 274-6000
                          christopher.emden@usdoj.gov


Also present:             Neil Luria
                          Bob Trinh
                          Matt Rubin
                          Raoul Nowitz
                          A.J. Berens

1           **P R O C E E D I N G S**

2           COURTROOM DEPUTY:  All rise.  The United States

3  Bankruptcy Court for the Middle District of Florida is now

4  in session.  The Honorable Lori V. Vaughan presiding.  May

5  God save the United States and this Honorable Court.

6           THE COURT:  You may be seated.

7           COURTROOM DEPUTY:  Case No. 25-4156, The Villages

8  Health System, LLC.  Interested parties please come forward

9  and enter your appearances.

10          THE COURT:  I'll take appearances in the

11 courtroom first, please.

12          MS. MURRAY:  Good morning, Your Honor.  Wanda

13 Murray on behalf of the United States Trustee.

14          THE COURT:  Thank you.

15          MR. LAYDEN:  Good morning, Your Honor.  Andrew

16 Layden from Baker Hostetler on behalf of the Debtor.  Also

17 here from Baker Hostetler are Ms. Elizabeth Green, Mr. Mike

18 Delaney, Mr. Ben Taylor.  And then we have some

19 representatives from the Debtor, the CRO Mr. Neil Luria, as

20 well as some folks from Solic, Mr. Matt Rubin and Raoul

21 Nowitz, and the Debtor's CEO Mr. Bob Trinh, as well.

22          THE COURT:  Thank you.  Welcome.

23          MS. REDMOND:  Good morning, Your Honor.  Patricia

24 Redmond appearing from Stearns Weaver.  I'm joined in the

25 courtroom by Mr. Dietderich, Mr. DeCamp, and Ms. Zhu from

1   the Sullivan & Cromwell firm, and we're appearing for

2   United Health Care Insurance Company and United Health Care

3   of Florida.

4          THE COURT:  All right.  Thank you.

5          MR. SORKIN:  Good morning, Your Honor.  Andrew

6   Sorkin, Lathem & Watkins, appearing on behalf of

7   CenterWell, the proposed stalking horse bidder.  I'm joined

8   this morning by my partner Caroline Reckler and our co-

9   counsel at Venable, Paul Battista.

10          THE COURT:  All right.  Thank you.

11          MR. LEONARD:  Good morning, Your Honor.  Rhys

12   Leonard of Trenam Law on behalf of the proposed DIP lender

13   PMA Lender, LLC.

14          THE COURT:  All right.  Thank you.  Anyone else

15   in the courtroom need to make an appearance?

16          (No response)

17          THE COURT:  Okay.  And then on Zoom.

18          MR. EMDEN:  Good morning, Your Honor.

19   Christopher Emden for the United States.

20          THE COURT:  All right.  Thank you.  I think

21   you're the only one listed with a live line even though we

22   have a lot of people listening in.

23          All right.  So with that, we'll go ahead and get

24   started.  This is our second hearing in this Chapter 11

25   case.  Last time we were here we dealt with a bunch of

1  first-day motions.  And today we have continued hearings on

2  a few of those, along with the Debtor's -- the main, I

3  think, issue today is the Debtor's motion to approve

4  bidding procedures and a breakup fee with respect to its

5  request to enter into an auction process with the stalking

6  horse bidder.

7          So Mr. Layden, why don't I turn to you?  How do

8  you want to proceed today?

9          MR. LAYDEN:  Thank you, Your Honor.

10          First, I want to introduce someone that I just

11  forgot, and I apologize --

12          THE COURT:  Okay.

13          MR. LAYDEN:  -- Mr. A.J. Berens who is at

14  Evercore, the investment banker for the Debtor.

15          THE COURT:  Uh-huh.

16          MR. LAYDEN:  I neglected to introduce him with

17  everyone else.

18          We would propose to take the calendar slightly

19  out of order with the Court's permission and that is to do

20  the bid procedures motion first and then the remaining

21  items in calendar order after that.

22          THE COURT:  That's fine with me.  Go ahead.

23          MR. LAYDEN:  Okay.  Your Honor, the bid

24  procedures -- sale motion and bid procedures motion is at

25  docket 29.  We received one objection to the motion and

1  that was by United and the Debtor responded to the

2  objection yesterday and filed supporting declarations in

3  support of the Debtor's motion and in opposition to the

4  United objection.

5          The parties disagree about a lot of things, but

6  what we're here today to announce is a consensual

7  resolution of the motion that allows the case to move

8  forward.  That was the result of a significant level of

9  negotiation over the last week to 10 days, over the

10  weekend, up until last night when the agreement was reached

11  between the parties.  And that is the Debtor, the stalking

12  horse bidder, United, and some of the agreements had to be

13  approved by the DIP lender because they changed some of the

14  milestones under the DIP loan because the APA milestones

15  are mirrored in the DIP loan.

16          So some of the mile -- some of the agreement, as

17  you'll hear, Your Honor, moved, for example, the bid

18  deadline which is also incorporated into the DIP loan.  All

19  those parties agree to the agreement and the result of it

20  is that as modified, all parties support the entry of a

21  order granting the bid procedures motion.  And what I would

22  -- unless the Court has questions about the motion, the

23  objection, the response, I would basically leave it at

24  there are a number of disputes that are not -- are not

25  going to be disputed today but we have an agreement and I

1    would move to that unless the Court has -- unless Your

2    Honor has questions.

3          THE COURT:  Right.  An agreement on the process,

4    that's really the big issue, and then of course the

5    approval of the bid protections for the stalking horse.

6    Usually those are the two big issues.  So, yeah, tell me

7    what the agreement is.  What changes on what you're seeking

8    today?

9          MR. LAYDEN:  Your Honor, I'm going to read from

10   the email chain that everyone agreed to --

11         THE COURT:  Okay.

12         MR. LAYDEN:  -- to avoid any issues.  So the --

13   so it may be a little tedious but I think that's probably

14   the best way to move forward.

15         The first is as to the process or the timing,

16   Your Honor, and the agreement is that the parties agree to

17   entry of the bidding procedures with the following

18   milestones.  The bid procedures hearing July 23rd, which is

19   today.  The bid deadline being extended by two weeks to

20   September 3rd.  The designation of qualified bids being

21   moved by two weeks to September 4th.  The sale objection

22   deadline being moved to September 5th.  The designation of

23   the baseline bid being moved to September 5th.  The

24   auction, if there are multiple qualified bids received, to

25   occur on September 8th.  A supplemental sale objection

1    deadline of September 10.  And the sale hearing to occur,

2    subject to the Court's availability, on September 12.  That

3    is the timing piece and there are a number of other ones

4    that I would go through now.

5              THE COURT:  Okay.

6              MR. LAYDEN:  Okay.  The second one is -- I'll

7    read the bullet, is Affiliate Litigation.  And the

8    agreement is:  Seller and buyer agree to modify the APA to

9    provide that all estate claims and causes of action of any

10   nature, (i) against current or former officers, directors,

11   owners, affiliates, and related persons; or (ii) related to

12   health insurer overpayments against third parties should be

13   carved out from the sale to CenterWell, paren (with the

14   exception of contractual claims under assumed contracts and

15   leases) closed paren.  The --

16             THE COURT:  So it's the -- just to paraphrase,

17   the potential insider litigation and claims against third

18   parties for overpayment; is that what I'm hearing?

19             MR. LAYDEN:  Related -- what the agreement says

20   is related to health insurance --

21             THE COURT:  Okay.

22             MR. LAYDEN:  -- health insurer overpayments.  But

23   it essentially expands the category of assets excluded from

24   the stalking horse --

25             THE COURT:  Okay.

1          MR. LAYDEN:  -- proposed sale.

2          At the third point is Titled Cooperation.

3   United, or UHC, has informed the Debtor that it intends to

4   conduct a full and professional investigation into the

5   circumstances surrounding the historical operations of the

6   Debtor, the commencement of the Chapter 11 case, and any

7   events that could give rise to the types of claims that are

8   excluded from the APA.

9          United and the Debtor confirm that (a) they will

10  cooperate with discovery in good faith and in compliance

11  with applicable law; (b) the Debtor will not propose a

12  settlement of such claims within the next 180 days unless

13  the Debtor's board determines and its fiduciary duties

14  requirement it; and, (c), the Debtor will discuss with

15  United in good faith the disposition of litigation claims

16  in connection with any Chapter 11 plan prior to filing that

17  plan.

18          The fourth bullet, Your Honor, is called

19  Affiliate Contracts.  And the language there is:  That the

20  stalking horse bidder and/or the Debtor will disclose on

21  the docket for the Chapter 11 case all affiliate contracts

22  as defined in the stalking horse APA designated for

23  potential assignment as a transferred contract to the

24  stalking horse bidder and associated cure costs in

25  connection with its bid on or before the bid deadline

1   provided that (i) with respect to any affiliate contracts

2   that have not been disclosed to the stalking horse bidder

3   in accordance with Section 2.06 of the stalking horse APA

4   as of the date of this order such affiliate contracts,

5   paren (if designated for potential assignment to the

6   stalking horse bidder) closed paren, shall only be required

7   to be disclosed on the docket in accordance with this

8   paragraph 4 by the later of (a) the bid deadline, and (b)

9   14 days from disclosure of such affiliate contracts to the

10   stalking horse bidder in accordance with Section 2.06(a) of

11   the stalking horse APA.

12          And (2), nothing herein shall preclude the

13   stalking horse bidder from excluding any affiliate contract

14   from the transferred contracts at any time, including for

15   the avoidance of doubt after the applicable deadlines set

16   forth in this paragraph 4.  It basically creates a separate

17   treatment for affiliate contracts.  Or a separate

18   disclosure requirement for affiliate contracts.

19          THE COURT:  Okay.  Understood.

20          MR. LAYDEN:  Number 5 is Closing Condition with

21   United.  With respect to the closing condition, CenterWell

22   confirms that arrangements with United affiliates,

23   consistent in all material respects with the current

24   national agreements between United and CenterWell, will be

25   sufficient to satisfy the condition.

1          That's for number 5, Your Honor.  There's a

2    closing condition in the APA --

3          THE COURT:  Uh-huh.

4          MR. LAYDEN:  -- for the buyer that there be

5    arrangements in place with United in order for the buyer to

6    have to close --

7          THE COURT:  Uh-huh.

8          MR. LAYDEN:  -- and that's the agreement with

9    respect to that condition.

10          THE COURT:  Okay.

11          MR. LAYDEN:  Number 6 is called Current Marketing

12    Arrangements.  The Debtor and CenterWell acknowledge that

13    the intellectual property, marketing, and relating rights

14    of United disclosed to CenterWell with respect to The

15    Villages, Villages Health and derivative marks are covered

16    by Section 3.6(iii) of the services agreement attached as

17    Exhibit E to the APA.

18          Number 7, Your Honor.  The Debtor agrees to

19    modify the bidding procedures so that the total initial

20    overbid requirement is 5 million, inclusive of the 3

21    million of financial protections for the buyer.  So the

22    stalking horse offer is $50 million, Your Honor, with the

23    $3 million of bid protection and $2 million overbid, the

24    first bid would be at 55 million if you're just comparing

25    cash.

1          THE COURT:  Uh-huh.  Is there a modification to

2    subsequent bids as far as the bidding increments?

3          MR. LAYDEN:  There is not under our agreement,

4    Your Honor.  Typically our bid procedures set forth a

5    bidding increment and then give the Debtor discretion to

6    modify that --

7          THE COURT:  Flexibility.  Okay.

8          MR. LAYDEN:  -- going forward.

9          Number 8, Your Honor, is titled Deal Protection.

10   A pre-authorized unsecured administrative claim is

11   acceptable if the APA is modified so that the termination

12   fee and expense reimbursement are paid only to the extent

13   of greater cash proceeds from an overbid.

14         And the final point, Your Honor, is titled Equal

15   Access to Information.  The Debtor agrees with United that

16   it will provide to all qualified bidders, including Optum

17   if it decides to participate, access to the same

18   information provided by CenterWell.

19         That is all the agreed-upon points, Your Honor,

20   under which the parties agree to support the --

21         THE COURT:  Okay.

22         MR. LAYDEN:  -- approval of the bid procedures.

23   And that will take a couple of forms, Your Honor.  One is

24   an amendment to the APA between the Debtor and the stalking

25   horse bidder to effectuate some of those terms, and then

1    other of those terms will go into the proposed bidding

2    procedures order and the bid procedures themselves.  And I

3    believe in the 30 minutes or hour before the hearing we

4    filed a redline of the proposed -- the original proposed

5    bidding procedures and bid procedures order verse a

6    modified one.  Our plan would be to circulate it to the

7    parties again and make sure that everyone agrees to all the

8    language.  Changes were being made up until right when we

9    filed it, but those changes are all effectuating what I

10   just read.

11          I do have printouts of the redline that we just

12   filed recently.  If you would like me to flip through them

13   and kind of point them out, I'm happy to do that.

14          THE COURT:  I have it here.  I don't think I need

15   you to hand anything up.  I actually made notes on my copy

16   of the bid procedures.

17          Okay.  So with respect to the -- one thing that

18   your recitation triggered for me is with this investigation

19   that's ongoing.  So we anticipate that that will proceed

20   past the date of the actual auction and sale, correct, 180

21   days?

22          MR. LAYDEN:  Well, yes, Your Honor.  All parties

23   are agreeing to cooperate with --

24          THE COURT:  Okay.

25          MR. LAYDEN:  -- each other's discovery efforts.

SCHULTZ REPORTING OF PASCO, INC.   (727) 808-1484

1          THE COURT:  United is not trying to complete that

2    before the sale?

3          MR. LAYDEN:  No.  There's no deadline for United

4    to do anything with respect to that if they wish to or not

5    to.

6          THE COURT:  Okay.

7          MR. LAYDEN:  And that would all be pushed to the

8    normal discovery rules --

9          THE COURT:  Uh-huh.

10         MR. LAYDEN:  -- under the Bankruptcy Code, Your

11   Honor, and that's how we would propose to deal with that.

12         THE COURT:  And then it raised in my mind the

13   question of what's the status of whether we might have a

14   committee in this case.  I haven't seen anything.  So I

15   don't know -- Ms. Murray or Mr. Bomkamp is standing up.  He

16   could probably tell me.  Last time he said he didn't expect

17   based, you know, on the circumstances here that we'd get

18   enough interest.  I just wonder if that's changed.

19         MR. BOMKAMP:  Your Honor, I would say interest is

20   trickling in.  It's not an avalanche.  We are still hopeful

21   of a committee.  In some respects we would kind of raise

22   the concerns that a committee would raise in the absence of

23   a committee and my question based on Mr. Layden's

24   presentation.  So there's going to be an examination of

25   essentially what happened to these overpayments --

1           THE COURT:  Uh-huh.

2           MR. BOMKAMP:  -- for Medicare.  And are these

3  causes of action, are they going to be reserved for

4  unsecured creditors as a class?  I think that would be my

5  general -- to the extent that they exist.

6           THE COURT:  Well it sounds like they're not being

7  sold.

8           MR. LAYDEN:  They would remain property of the

9  estate to the extent they're property of the estate, so

10 they would not be subject to the stalking horse --

11          THE COURT:  Uh-huh.

12          MR. LAYDEN:  -- offer.  How they would be

13 classified, for example, in a plan is not something that is

14 determined by this.

15          THE COURT:  Yeah.

16          MR. BOMKAMP:  Okay.

17          THE COURT:  And remain in the estate.

18          MR. BOMKAMP:  And, you know, I think that is

19 consistent with the upshot of most of our objections, you

20 know, to the encumbrance of the, you know, possible

21 fraudulent transfer claims.  I think that's what a

22 committee would be worried about is, hey, to the extent

23 that these things exist, and we're not saying that they do,

24 that they would be reserved for a procedure that happens

25 after the sale, perhaps a litigating trust or some other

1  mechanism to make sure that they're addressed for the

2  benefit of unsecured creditors.

3           THE COURT:  And --

4           MR. LAYDEN:  They would remain property of the

5  estate.

6           THE COURT:  Yeah.  And I think these procedures

7  kind of protect that for now, right?  We'll see what

8  happens when we get to an auction.

9           MR. LAYDEN:  That's right.

10          THE COURT:  Okay.  Anyone want to -- anyone else

11 want to comment -- maybe I'll hear from United -- on the

12 agreement here?  Mr. Bomkamp?

13          MR. BOMKAMP:  I'm so sorry.  Me again.  Just

14 because it does connect to the sale procedure motion.

15          THE COURT:  Uh-huh.

16          MR. BOMKAMP:  The Debtor has agreed to a consumer

17 privacy ombudsman in the case who -- we will make best

18 efforts to make the same person as the patient care

19 ombudsman in the case.  And that actually is an aspect of

20 sale procedures.  So we would -- I think it's appropriate

21 to announce that now, Your Honor.

22          THE COURT:  Okay.  Yeah.  It was on my list of

23 things to talk about because I did notice that the Debtor

24 withdrew their motion to be excused from that appointment.

25          MR. LAYDEN:  Yes, Your Honor.  Very briefly.  The

1    -- in discussions with both the U.S. Trustee and the U.S.

2    Attorney, the Debtor's view remains the same, that the

3    level of patient care is extremely high at The Villages

4    Health, but those parties prefer the process of a patient

5    care ombudsman, and so we withdrew that motion.  And the

6    U.S. Trustee also raised the issue of a privacy ombudsman.

7    That would likely be the same person and we are consenting

8    to that as well.  And so pursuant to that, we did file a

9    notice of withdrawal of the motion to excuse the

10   appointment of a patient care ombudsman.

11        THE COURT:  Okay.  And normally with a patient

12   care ombudsman I would enter an order directing the U.S.

13   Trustee to appoint one.  And in this case, I don't know,

14   Mr. Bomkamp, if you have an order you want to propose or

15   you want the Court to prepare its own?

16        MR. BOMKAMP:  Your Honor, we could submit an

17   order that would say, you know, the Court directs the

18   United States Trustee to appoint a patient care ombudsman

19   and a consumer privacy ombudsman and in the sole discretion

20   of the U.S. Trustee, these can be the same person,

21   essentially.  Better words, but that.

22        THE COURT:  Okay.  So you're going to submit

23   something or you want me to?

24        MR. BOMKAMP:  I would be happy --

25        THE COURT:  Because I have something we've used

1    in the past that I can --

2              MR. BOMKAMP:  I would be happy to do it --

3              THE COURT:  Okay.

4              MR. BOMKAMP:  -- just because we have both kind

5    of ombudsmen here.  I don't know if it would deviate from

6    the form order, but --

7              THE COURT:  Right.  Why don't you submit a

8    proposed order on that and I'll take a look at it, okay?

9              MR. BOMKAMP:  Yes, Your Honor.

10             THE COURT:  Thank you.  All right.  And then I

11   think at this point I'll hear from United.  It seemed like

12   they wanted to be heard with respect to the changes to the

13   bidding procedures.

14             MR. DIETDERICH:  Thank you.  And good morning,

15   Your Honor.  For the record, Andrew Dietderich, Sullivan &

16   Cromwell.  With me is my colleague in our Corporate Finance

17   Investigation and Litigation Practice, Justin DeCamp, and

18   my colleague Angela Zhu.

19             Your Honor, I can confirm that Debtor's counsel

20   accurately recited our agreement struck over this weekend.

21   We have already reviewed the revised papers the Debtor's

22   submitted on the docket and we confirm our acceptance of

23   those as well.  So on that basis we do support the relief

24   being entered today.  But I would like to just mention a

25   few points very briefly on how we got there and why.

1          THE COURT:  Okay.  Go ahead.

2          MR. DIETDERICH:  Your Honor, United Health Care

3  asked us to come down here today because of the unusual

4  circumstances of the case.  This is not an ordinary

5  circumstance where a business is being sold for $50

6  million.  This is a missing money case.  There is a great

7  deal of money that is missing.  It is a serious and

8  significant problem and a serious and significant amount of

9  money.  As with any situation like that, it's important to

10  proceed deliberatively and not jump to conclusions.

11  However, by the Debtor's own statements, there does appear

12  to be a significant amount of missing money.

13          It's also a missing information case.  Because

14  the Debtor has said nothing on the record so far about

15  where the money went.  All that we know from the Debtor is

16  that $361 million, paid in substantial part from United

17  Health Care, disappeared into The Villages.  And the main

18  question in this case is where the money went, who has it,

19  and how are we going to get it back.

20          From United Health Care's perspective, we are

21  here as a creditor.  We are in some ways a contingent

22  creditor and we do not know the amount of our claim.  The

23  amount of our claim will depend upon the amount of those

24  overpayments.  It could be more, it could be less.  Even

25  the Debtor itself says it's only done a preliminary review

1   of the situation.

2          What we intend to conduct, as we told the Debtor

3   and as recited in Court today, not a preliminary review of

4   the situation, but a full and comprehensive investigation

5   of the situation.  And to answer Your Honor's question, we

6   intend to conduct that review both on behalf of United

7   Health Care, but with an aim towards the interest of other

8   potential creditors as well.

9          As Your Honor knows, there are no material

10  creditors in this case other than the health insurance

11  companies not listed for any particular reason we

12  understand on the list of creditors, and potentially the

13  United States government.

14         But to the extent that our investigation uncovers

15  estate claims or the ability of the estate to bring money

16  back into the estate, we're very cognizant that although

17  the substantial part of the money was advanced by United

18  Health, there are other people that might be interested in

19  that money, as well, chiefly the other health care

20  insurance companies.

21         Now, Your Honor, I think there's two main tasks

22  for this case.  One is to sell the business and the other

23  is this forensic investigation that needs to happen.  In

24  terms of the sale of the business, we support the relief

25  today, not because we're thrilled about the price.  As our

1    submission indicates, we don't think there was a proper

2    marketing process before the case.  However, we do support

3    the sale of the business chiefly because the current owners

4    of the business are the same ones who lost the money and we

5    should move the business into the hands of a new operator

6    as quickly and promptly as we can.

7           The sale price currently proposed barely clears

8    the amount of expenses the Debtor has incurred and will be

9    incurring in connection with these cases.  We hope the

10   competitive process yields a higher result, but our sense

11   is that the litigation element or the investigation element

12   of this case will be far more important for creditor

13   recoveries than the M&A process.  That's not to say we

14   shouldn't do the best possible job on the M&A process, but

15   this case is about the missing money.

16          In that respect, we have as recited in the deal,

17   tried our best to separate the M&A process from the

18   forensic investigation.  So also in answer to Your Honor's

19   question, we do anticipate that the sale should happen as

20   promptly as it can happen.  We need to make sure there's a

21   little bit more time so there can be a competitive process,

22   but our view -- we only asked for two weeks.  Other sale

23   processes could take much longer, but we recognize that

24   continuity of care and getting it in new hands is very

25   important.  These patients are chiefly, in substantial

1    part, United Health Care plan members.

2          The -- but we have made sure that the

3    investigation issues are separate from the M&A and no one,

4    not the Debtor, not the owners, not CenterWell, not United

5    Health Care, does anything to use the sale process for

6    influence or to chill a full investigation of the record

7    here.  And that means that not only are the affiliate and

8    related claims entirely carved out, there's the undertaking

9    from the Debtor that was mentioned about a 180 day waiting

10   period before anybody attempts to settle these claims.

11         There is attention -- the situation is

12   commercially quite complicated because the Debtor is

13   literally surrounded by The Villages and affiliate

14   contracts could be a way -- could be, not necessarily, but

15   could be a way to circumvent the payment of the full

16   purchase price to the estate.  And so we made a comment to

17   make sure that if affiliate contracts are to be assumed,

18   they're to be done so where assumption and cure is on the

19   docket so everybody can see what's going on.

20         And then finally, the cooperation covenants that

21   we have in terms of making sure that this investigation

22   could be done in a full manner.  But we are pleased with

23   the relief today, mostly because it allows us to start the

24   sale process, but the business in the hands of a new

25   operator, whoever that ends up being, but also preserves

1    what we think is the main business of the case, which is

2    finding what happened to the money.

3              So, thank you, Your Honor.

4              THE COURT:  All right.  Thank you.  Mr. Layden,

5    you wanted to say something?

6              MR. LAYDEN:  Yes, Your Honor.  I'll be brief

7    because I -- you know, today is not the time to determine a

8    lot of these things.

9              THE COURT:  Yeah.  I mean this is a -- right.

10              MR. LAYDEN:  I would note a couple of things.

11    The Debtor upon becoming aware of the billing issue

12    retained the firm of Goodwin Procter and Goodwin Procter

13    retained the forensic accounting firm of FTI.  And there

14    was an internal investigation conducted at that time in

15    connection with the self-disclosure to the United States

16    government and those discussions are ongoing.  And at this

17    time I'm not going to say more about the nature of that at

18    this point.

19              The second thing I will say, Your Honor, is that

20    the Debtor's chief restructuring officer and support staff

21    are also conducting an analysis about sources and uses of

22    capital by the Debtor looking back.  Going forward we do

23    understand that United will likely seek discovery from the

24    bankruptcy estate and I think likely the bankruptcy estate

25    will have questions about United's role and involvement in

1   the adjudication of the claims.  Around 80 percent of the

2   Debtor's claims flow through United to the United States

3   government.

4           It has been reported that there are

5   investigations of United's Medicare Advantage program

6   occurring by the federal government, so I do think that

7   there will probably be discovery both ways, which is what

8   led to the agreement that both parties would cooperate with

9   discovery.  And so the scope of that and those types of

10  things would be determined as we go forward.

11          So those are the only comments I have at this

12  time.

13          THE COURT:  All right.  Thank you.  And I

14  realize, you know, today we're talking about bidding

15  procedures and moving forward.  Obviously, the Court is not

16  adjudicating any of this, especially on such short notice.

17  But I think Mr. Dietderich is right, we're dealing with the

18  sale now, but there needs to be a look at what transpired

19  and the correct mechanism to do so.  Hopefully we have a

20  committee that can be involved in that process, but if not

21  we'll consider whether other steps need to be taken later

22  on.  But for now, we'll move forward with the sale process

23  because it seems like everyone agrees that that's the best

24  way to proceed.

25          So no changes, Mr. Layden, as to the termination

 1  fee and the reimbursement?

 2          MR. LAYDEN:  No, Your Honor.  Those -- the

 3  agreement is that the parties would agree to those, that

 4  the termination or break-up fee is 3 percent of the

 5  purchase price, $1.5 million, and the expense reimbursement

 6  is also up to --

 7          THE COURT:  Up to one point five.  Okay.

 8          MR. LAYDEN:  -- $1.5 million.

 9          THE COURT:  Understood.  All right.  Thank you.

10          Anyone in the courtroom wish to be heard on the

11  Debtor's motion to approve the bidding procedures and the

12  break-up fee?

13      (No response)

14          THE COURT:  No one is standing up.  Okay.

15          Mr. Emden, since you're the only one

16  participating on Zoom, do you wish to be heard on the

17  motion?

18          MR. EMDEN:  No, Your Honor.  I mean obviously we

19  share some of the concerns about where the money went, but

20  that's not what we're here for today.  So we do not have

21  any pressing concerns with the announcements that were made

22  on the record today about the process going forward.

23          THE COURT:  Okay.  All right.  Thank you.

24          So the Court has before it today the Debtor's

25  motion to approve bidding procedures and also to approve

1   the break-up fee to the stalking horse purchaser.  You

2   know, the Court looks at these on a business judgment

3   standard, whether it's a proper exercise of the Debtor's

4   business judgment.  There's no disagreement here that a

5   sale of the assets of this estate or sale of the business

6   is the appropriate course of action considering where we

7   are, and I'm pleased that the Debtor was able to reach

8   agreement with the interested parties as to the timeline of

9   the sale.

10          It's aggressive, but I do think it's appropriate

11   considering the constraints that we're under and the amount

12   of work that's gone into getting the business ready for the

13   sale and the work with the stalking horse bidder at this

14   point.

15          So based on the agreement of the parties

16   involved, the lack of objection, the need to move forward,

17   I do think it's in the best interest of the estate to move

18   forward with the process and the timeline that has been

19   proposed.

20          I will also approve the break-up fee, the

21   termination fee, and the expense reimbursement to the

22   stalking horse bidder.  These things are always kind of,

23   you know, a two-edged sword, right?  At what point --

24   there's a fine line of at what point do we encourage the

25   bidding and then at what point do we go to the point of

1   chilling bidding.  I think what has been proposed here is

2   appropriate.  It seems consistent with the market and the

3   amount of work that has already been done and needs to be

4   done with this case.  And I do think it would actually

5   improve bidding and not chill bidding in this case.

6         So for that reason it's in the best interest of

7   creditors and I'll go ahead and approve the bidding

8   procedures and the break-up fee, as revised of course here

9   in open court today.  And I'll take a look at that redline

10  order, have you go ahead and submit that once you finalize

11  it with all the parties involved.  Okay?

12        MR. LAYDEN:  Thank you, Your Honor.

13        THE COURT:  Anything else on the sale motion

14  before we move on, any questions?

15        MR. LAYDEN:  Nothing from me, Your Honor.

16        THE COURT:  Okay.  All right.  And then we

17  already talked about the ombudsman.  Where do we want to go

18  next then, the two interim orders?

19        MR. LAYDEN:  That would be fine, Your Honor.  In

20  calendar order, the first one is the prepetition bank

21  account motion.

22        THE COURT:  Oh, hold on.  Let me just stop on the

23  sale.  I need to give you a hearing date.

24        MR. LAYDEN:  Thank you, Your Honor.

25        THE COURT:  All right.  So according to your

1    recitation, we would have a sale hearing on -- around

2    September 12th; is that right?

3            MR. LAYDEN:  That is correct, Your Honor.

4            THE COURT:  You're always looking for Fridays for

5    some reason.  And I'm out, am I not?  Yes.  I'm going to be

6    out of town from September 10th through the 20th, which

7    makes that a little tricky.  So with the deadlines that

8    you've proposed -- and what is our date to have the sale

9    close, is that still that October 3rd date?  Do I have that

10   right?

11           MR. LAYDEN:  It is right now, Your Honor.  And

12   perhaps I could take a moment and huddle up with everybody.

13   If we had maybe a date or two that would work for the

14   Court, perhaps we could see if we can get consensus on it.

15           THE COURT:  Yeah.  Let me take a look and see

16   what my plans are.  I just have to open up another

17   application here.  Yeah.  I think the latest day I'm going

18   to be here in court is September 9th.  And you have

19   supplemental objections due on the 10th, so that's not

20   really going to work for you, the auction on September 8th.

21   I mean one option is for me to do it remotely, have you

22   folks here, but that doesn't help us if we end up having a

23   contested hearing on the approval.

24           So I guess the question is, can the hearing be

25   moved back.  Because I'm going to be at the NBCJ Conference

1    starting on Monday, so basically that entire week of the

2    15th.

3          MR. LAYDEN:  Understood.

4          THE COURT:  Could we move this back to September

5    22nd and still meet your timelines?

6          MR. LAYDEN:  I will inquire.  And then the week

7    of the 8th, Your Honor, the auction is on the 8th and we

8    had proposed the sale hearing -- Wednesday the 8th, we

9    proposed a sale hearing on the 12th.  Your Honor is out

10   beginning the 10th, did you say?

11         THE COURT:  Yeah.  So I fly out that morning.

12   And for me to --

13         MR. LAYDEN:  Understood.

14         THE COURT:  -- adjust that, I can maybe adjust

15   that and perhaps we can circle back after the hearing

16   instead of trying to do it here in open court as to whether

17   I can make the 10th work.  But that would be -- it would be

18   really hard on something like the 12th.

19         MR. LAYDEN:  Understood.  If -- let me have a

20   minute.  I mean -- and we can -- or another option, Your

21   Honor, we could go through the other motions while we let

22   everyone talk --

23         THE COURT:  Yeah.

24         MR. LAYDEN:  -- and then maybe take a break and

25   then announce what we think.

SCHULTZ REPORTING OF PASCO, INC.   (727) 808-1484

1          THE COURT:  Why don't we do that.  Yeah.

2          MR. LAYDEN:  Okay.  Thank you, Your Honor.

3    That's helpful to understand.

4          So for the rest of the hearing today there's

5    three motions and they're all uncontested.  The first one,

6    going in calendar order, Your Honor, is the motion to

7    approve on a final basis the motion for authority to

8    maintain the prepetition bank accounts, authorize the

9    Debtor to maintain its cash management system --

10          THE COURT:  Uh-huh.

11          MR. LAYDEN:  -- and pay bank fees and waive

12    certain related things.  That was granted on an interim

13    basis at the first hearing and continued to today.  The

14    agreed resolution on this one, Your Honor, is to ask that

15    it be again continued on an interim basis -- or granted on

16    an interim basis pending the 11/8 hearing and have it

17    continued -- sorry, the 8/11 hearing --

18          THE COURT:  Right.

19          MR. LAYDEN:  -- have it continued to that

20    hearing.  The Debtor is a long way down the road to having

21    a workable solution here that we've discussed with the U.S.

22    Trustee, and we understand the U.S. Trustee agrees with it

23    but it's not 100 percent done.  Essentially, bank accounts

24    are being set up at Regions.  The existing bank accounts

25    will still be used, but money will be swept into the

1   Regions DIP accounts and then disbursements will occur out
2   of the Regions DIP accounts.
3          THE COURT:  Uh-huh.
4          MR. LAYDEN:  But the mechanics of that are still
5   being finalized.  And so we hope that by August 11th that
6   will be completed and that could be described in a final
7   order approving the motion.
8          THE COURT:  Okay.  Any objection?  Anybody want
9   to be heard?
10      (No response)
11         THE COURT:  All right.  Then I will grant further
12  authority to maintain prepetition bank accounts on an
13  interim basis with the final hearing to be held on August
14  11th.  I think we're at 2:00 o'clock that day.  Okay.
15         MR. LAYDEN:  Thank you, Your Honor.  We will
16  submit an order on that.
17         THE COURT:  Yes.
18         MR. LAYDEN:  The second motion on the calendar,
19  Your Honor, is the motion to approve on a final basis the
20  Debtor's emergency motion for entry of interim and final
21  orders authorizing the Debtor to continue its insurance
22  program, pay all prepetition and post-petition obligations
23  with respect thereto, and authorizing banks to honor and
24  process checks and transfers related to such insurance
25  obligations.  That's at docket entry 8.

SCHULTZ REPORTING OF PASCO, INC.   (727) 808-1484

1          THE COURT:  Uh-huh.

2          MR. LAYDEN:  That motion was granted on an

3    interim basis at the first day hearing, continued to today

4    for a final hearing.  There are no objections, is our

5    understanding, to that being granted on a final basis.

6          THE COURT:  All right.  Any objections or anybody

7    wish to be heard on this motion?

8       (No response)

9          THE COURT:  All right.  Hearing none, I'll go

10   ahead and grant that on a final basis and look to Mr.

11   Layden for that order.

12         MR. LAYDEN:  The final motion set for today, Your

13   Honor, is the Debtor's expedited motion for entry of an

14   order authorizing the Debtor to (a) pay and honor

15   prepetition patient refund obligations, and (b) maintain

16   and administer its existing patient refund program and

17   granting related relief.  There are no objections to that

18   motion, Your Honor.  I understand from a call yesterday

19   that the United States Trustee's Office consents to it.

20         The Debtor owes around a little less than $12,000

21   in patient refunds to patients where checks were issued to

22   them but they were never cashed.  Perhaps the check didn't

23   get to the right address, something of that nature.  The

24   average amount of the checks, I believe, are between 40 and

25   70 dollars to a few hundred patients and together are less

1   than $12,000 to the best of our information.  So we're

2   seeking approval to reissue those checks to patients and

3   pay them the amounts they're owed.

4            They are pre-petition.  The -- our position is

5   that those amounts are not property of the Debtor's estate

6   under 541, but to the extent they are, they would satisfy

7   the requirements of authorizing the payment on a

8   prepetition claim because they're critical to the Debtor's

9   operations and maintaining good will and those types of

10  things.  So I'm happy to address that in more detail, but

11  our understanding is that motion is not objected to.

12           THE COURT:  All right.  Any objections or anybody

13  wish to be heard?

14       (No response)

15           THE COURT:  Okay.  I -- yeah.  I mean considering

16  the amounts, the Debtor's obligation and the issue with

17  respect to property of the estate, I do think it's

18  appropriate to go ahead and grant that and allow the Debtor

19  to reimburse those -- or issue those refunds, or reissue

20  those refunds as needed.  So I'll grant it.  I'll ask Mr.

21  Layden to give me an order.

22           With respect to schedules, we don't have

23  schedules yet, do we?  Or did I miss that?  I'm looking for

24  them right now.

25           MR. LAYDEN:  I don't believe so, Your Honor.

1            THE COURT:  Okay.

2            MR. LAYDEN:  I believe there's a motion either

3    pending to extend it --

4            THE COURT:  To extend the time?

5            MR. LAYDEN:  -- for 14 days.

6            THE COURT:  And that would have been my only

7    question, is what impact that would have if you've

8    scheduled these amounts, et cetera.  So if you're going to

9    reconcile this before you file the schedules, perhaps then

10   you don't need to make that amendment.  But I just make

11   that not to you --

12           MR. LAYDEN:  Understood.

13           THE COURT:  -- to adjust as as needed.  Okay.

14   All right.

15           And is that the last thing on our calendar for

16   today?  It looks like it is.

17           MR. LAYDEN:  It is, Your Honor.  I think the only

18   remaining thing is that hearing date.

19           THE COURT:  Yeah.  So what I'll propose is that

20   we take a break.  And while we do, I'll go back and circle

21   back to see.  I mean one option too is if we need to have a

22   hearing that week, see if one of my colleagues can handle a

23   hearing.  But you circle back and see.  I prefer not to do

24   that only because, you know, it's easier for me to know

25   what's going on, but let me go see what my other options

1    are because it will be a little difficult for me to break

2    up this trip in the middle.  But let me take a look.  About

3    a 10 minute break.  You can let Ms. Johnson know when

4    you're ready to go back on the record, okay?

5              MR. LAYDEN:  Understood.

6              THE COURT:  All right. Thank you.

7              MR. LAYDEN:  Your Honor, there is a chance I -- I

8    have an 11:00 o'clock hearing in front of Judge Geyer, so

9    it may not be me standing here, but we'll be here.

10             THE COURT:  Okay.

11             MR. LAYDEN:  Someone will be here on behalf of

12    the Debtor.

13             THE COURT:  All right.  Thank you.

14             MR. LAYDEN:  Thank you.

15             COURTROOM DEPUTY:  All rise.

16        (Recess taken from 10:48 a.m. to 11:04 a.m.)

17             COURTROOM DEPUTY:   All rise.  Court is back in

18    session.

19             THE COURT:  You may be seated.  All right.  So we

20    lost Mr. Layden.

21             MS. GREEN:  We did.  Good morning, Your Honor.

22    Elizabeth Green on behalf of the Debtor.

23             We have caucused and I think we've found a

24    solution that should work.

25             THE COURT:  Okay.

1          MS. GREEN:  We're actually going to hold the

2     auction on Sunday, September 7th --

3          THE COURT:  Okay.

4          MS. GREEN:  -- with subsequent objections due on

5     the 8th and the hearing on the 9th.  And that should make

6     that work.  And actually it probably -- although Sunday is

7     kind of an odd day for the auction, at least we would have

8     people here and they wouldn't have to stay for a really

9     long period of time.  So I think it will work.

10          THE COURT:  Right.  They would be here basically

11     for the week.  Or partial week.  Yeah.

12          MS. GREEN:  Yeah.  Just for a couple days.

13          THE COURT:  Yeah.  Okay.  So September 9th at

14     1:30.  Does that work or do you think you need longer than

15     half a day?  I know you don't really know right now --

16          MS. GREEN:  We don't really know --

17          THE COURT:  -- whether it's going to be

18     contested.

19          MS. GREEN:  -- at this point so I mean I think if

20     there's assumption issues I think we can kind of kick those

21     down the road and get the sale approved depending on what

22     issue it is related to assumption.  But I think we should

23     be able to make it work.

24          THE COURT:  Okay.  Because I can also -- I mean,

25     we could say 1:00 o'clock to maybe give us a few extra

1   minutes if needed.

2            MS. GREEN:  Okay.

3            THE COURT:  Let's say that.  September 9th at

4   1:00 p.m.  And if you believe it's going to be a contested

5   hearing, I would just appreciate a head's up.  Okay?

6            MS. GREEN:  Of course.

7            THE COURT:  All right.  And I think that takes

8   care of everything that we had to do today.

9            Any questions or anything else we need to handle?

10  Otherwise we'll be back -- barring any emergencies, we'll

11  be back on August 11th at 2:00 p.m.

12           MS. GREEN:  Thank you.

13           THE COURT:  All right.  Thank you, everyone.

14           (Whereupon, proceedings adjourned at 11:06 a.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


I, Gretchen L. Schultz, Certified Electronic Reporter and Transcriber, hereby certify that the foregoing is the official transcript, prepared to the best degree possible from the digital audio recording provided by the court.

I further certify that I am neither counsel for, nor related to, nor an employee of any of the parties to the action in which this hearing was taken.

I further certify that I have no personal interest in the outcome of the action.

SIGNED this 4th day of August, 2025.


GRETCHEN L. SCHULTZ, CER 3573

Transcriber