# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156-LVV |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | Chapter 11 |
| Debtor. | |

**DECLARATION OF NEIL LURIA IN SUPPORT OF THE**
*DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTOR TO BORROW ADDITIONAL FUNDS UNDER THE EXISTING DIP FACILITY, WITH CERTAIN MODIFICATIONS, AND (II) GRANTING RELATED RELIEF*

I, Neil Luria, declare as follows:

1.   I am the Chief Restructuring Officer ("CRO") of The Villages Health System, LLC ("TVH" or "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Chapter 11 Case").

2.   In my capacity as CRO of the Debtor, I am familiar with the Debtor's business, day-to-day operations, and financial affairs. Except as otherwise indicated, the facts set forth in this declaration are based upon (i) my personal knowledge, (ii) my review of relevant documents and records created and maintained by the Debtor in the ordinary course of business, (iii) information provided to me by employees and consultants working under my supervision with personal knowledge of the veracity of such information, and/or (iv) my opinion based on experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

3.       I submit this declaration in support of the Debtor's *Emergency Motion for Entry of Order (I) Authorizing the Debtor to Borrow Additional Funds Under the Existing DIP Facility, with Certain Modifications, and (II) Granting Related Relief* (the "Amended DIP Motion").[2]

4.       A discussion of the Debtor and its business operations, the facts and circumstances supporting the Modified DIP Motion, and events precipitating the Debtor's bankruptcy filing are set forth in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* (Doc. No. 3) ("First Day Declaration"), which is incorporated herein by reference and not restated.

5.       On July 3, 2025, the Debtor filed its *Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expense Status, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Doc. No 4) (the "DIP Motion").

6.       The DIP Motion sought approval of the $39 million dollar DIP Facility, consisting of $24 million in new money loans and a proposed roll-up of $15 million in first priority senior secured pre-petition debt held by the DIP Lender. The Debtor's obligation to repay the DIP Facility was secured by, among other things, a first priority lien on substantially all of the Debtor's assets other than Avoidance Actions and an allowed superpriority administrative expense claim. Under the terms of the DIP Facility, $5 million of new money loans were available upon entry of an interim order approving the DIP Motion, with the remaining amounts available upon entry of a final order approving the DIP Facility. The DIP Motion was supported by two declarations establishing that the Debtor had exposed the proposed DIP Facility to the market and that the DIP Facility was the best available financing available to the Debtor under the circumstances (Doc. Nos. 3, 19).

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Amended DIP Motion.

7. In accordance with the Existing DIP Order, the Debtor borrowed $5 million upon interim approval of the DIP Facility. The principal balance under the DIP Facility currently totals $5 million.

8. The Debtor's originally filed financial projections provided a reasonable and good faith estimate of the Debtor's going-forward need to borrow cash to continue operations (Doc. No. 60, p. 29) (the "DIP Budget"). The DIP Budget reflects that from July 7 through October 3, 2025, the Debtor needed to borrow approximately $24,000,000 to sustain operations and provide funding for the bankruptcy case.

9. Since the Petition Date, UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc. (together, "UnitedHealthcare") has unilaterally withheld certain payments historically paid to Debtor under the parties' agreements (the "Surplus Payments"). The Debtor anticipates that UnitedHealthcare's withholding of Surplus Payments is currently in excess of $7.6 million on a post-petition basis and will cause an approximately $20 million receipts shortfall under the current DIP Budget - thereby rendering the original amount of the current DIP Facility insufficient to fund the Chapter 11 Case and facilitate an orderly administration of the bankruptcy estate.

10. The DIP Facility and original DIP Budget were predicated on the continued receipt of funds from the payors, subject to certain conservative adjustments, and did not fully anticipate post-petition unilateral actions by the payors to change the historical payments made to the Debtor. Without the Surplus Payments, the Debtor anticipates that it will be unable to continue operations in the ordinary course of business without additional funding.

11. The Debtor's professionals are also conducting a forensic analysis of the Debtor's sources and uses of pre-petition funds, and have so far found no evidence of missing or

unaccounted for funds. The Debtor's professionals have completed an initial analysis for the years 2022-2024, with the analysis of years 2020-2021 nearing completion, which preliminarily supports the following:

    a. For the year 2022, the Debtor's operating receipts were approximately $164.3 million and its operating disbursements were approximately $100.7 million, including approximately $10.7 million in rent paid to related entities for the Debtor's state of the art facilities, yielding a net operating cash flow of approximately $63.6 million. The Debtor's line of credit with its majority shareholder, which accrued interest at approximately 5.85%, was paid down on a net basis by approximately $63.0 million. Tax-related distributions to the owners of the Debtor (a "flow-through" entity for tax purposes) totaled $0.

    b. For the year 2023, the Debtor's operating receipts were approximately $188.2 million and its operating disbursements were approximately $118.5 million, including approximately $11.3 million in rent paid to related entities for the Debtor's state of the art facilities, yielding a net operating cash flow of approximately $69.8 million. The Debtor's line of credit with its majority shareholder, which accrued interest at approximately 5.85%, was paid down on a net basis by approximately $22.7 million. Tax-related distributions to the owners of the Debtor (a "flow-through" entity for tax purposes) totaled approximately $44.9 million.

    c. For the year 2024, the Debtor's operating receipts were approximately $186.6 million and its operating disbursements were approximately $133.4 million, including approximately $11.8 million in rent paid to related entities for the Debtor's state of the art facilities, yielding a net operating cash flow of approximately $53.1 million. The Debtor's line of credit with its majority shareholder, which accrued interest at approximately 5.85%, was paid down on a net basis by approximately $32.5 million. Tax-related distributions to the owners of the Debtor (a "flow-through" entity for tax purposes) totaled approximately $19.3 million.

The Debtor's CRO and additional personnel are continuing to review and analyze the Debtor's pre-petition sources and uses of funds and the Debtor intends to provide the conclusions of this analysis to all parties in interest.

    12.    After the withholding of the Surplus Payments began, the Debtor began expedited negotiations with the DIP Lender and UnitedHealthcare. The Debtor received and evaluated an offer to provide DIP funding from a party other than the DIP Lender. After conveying that offer to

the DIP Lender, the Debtor also negotiated with the DIP Lender regarding additional borrowing under the existing DIP Facility and modifications to the DIP Lender terms. The terms ultimately offered by the DIP Lender were substantially more favorable to the Debtor than those offered by the other party.  It is the Debtor's business judgment that the Amended DIP Facility represents the best currently available offer and is in the best interest of the bankruptcy estate.

13.    Based on my experience in the insolvency industry and my role as CRO of the Debtor, it is my opinion that the Debtor's decision to obtain funding under the Amended DIP Facility is a sound exercise of its business judgment and based on a careful evaluation of the Amended DIP Facility and reasonable alternatives. I believe that the Amended DIP Facility represents the best financing option available under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: August 14, 2025                                     /s/ *Neil Luria*_____
                                                                          Neil Luria