## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |  |
|---|---|---|
| ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ x | | |
| In re | : | Chapter 11 |
| | : | |
| THE VILLAGES HEALTH SYSTEM, LLC,[1] | : | Case No.: 6:25-bk-04156-LVV |
| | : | |
| Debtor. | : | |
| | : | |
| ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ x | | |

## UNITEDHEALTHCARE INSURANCE COMPANY AND UNITEDHEALTHCARE OF FLORIDA, INC.'S OBJECTION TO DEBTOR'S *EMERGENCY* MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTOR TO BORROW ADDITIONAL FUNDS UNDER THE EXISTING DIP FACILITY, WITH CERTAIN MODIFICATIONS, AND (II) GRANTING RELATED RELIEF

UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc., together with their affiliates (collectively, "UnitedHealthcare"), hereby submit this objection (the "Objection") to the *Debtor's* Emergency *Motion for Entry of Order (I) Authorizing the Debtor to Borrow Additional Funds Under the Existing DIP Facility, with Certain Modifications, and (II) Granting Related Relief* [D.I. 159] (the "Modified DIP Motion").  In support of the Objection, UnitedHealthcare also submits the *Declaration of Andrew G. Dietderich in Support of UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc.'s Objection to Debtor's* Emergency *Motion for Entry of Order (I) Authorizing the Debtor to Borrow Additional Funds Under the Existing DIP Facility, with Certain Modifications, and (II) Granting Related Relief*, filed concurrently herewith (the "Dietderich Declaration").  In further support of the Objection, UnitedHealthcare respectfully states as follows:

---

[1]    The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

**Preliminary Statement**

1.      The Debtor's Modified DIP Motion is remarkable both for what it says and—perhaps even more so—for what it does not say.  Starting with what is clear from the face of the filing, the Debtor is pressing forward with a DIP facility provided by an affiliate owned and controlled by insiders that still contains non-market terms transparently designed to stifle any investigation into claims against them.  The Debtor, which purportedly filed its surprise chapter 11 petition because it discovered that it had erroneously sought and received approximately $350 million in overpayments, chiefly from UnitedHealthcare, now admits on the seventh week of this case that it distributed, in a three-year period from 2022 to 2024, a very substantial portion of **$183 million**, consisting of $64.2 million in "tax-related distributions" and $118.8 million to pay down a supposed "line of credit with its majority shareholder"—to members of the Morse family, who own and control The Villages through various corporate entities.  The Debtor claims not to know how much it distributed in 2020 and 2021, but we can only assume that the total amount paid out to insiders will go up once that information is revealed.  In any event, even with only the limited financial information the Debtor has disclosed to date, if the Debtor was overpaid by approximately $350 million (or even a substantially lower amount), there should have been no "tax-related distributions"—making the $64.2 million of such distributions immediately avoidable.  And further investigation may well show that the outlays that the Debtor has described as paying down a purported "line of credit with its majority shareholder" were in substance dividends from operations or otherwise intended as a means of distributing profits—of which, according to the Debtor, there were none—to equity holders.

2.      As for the terms of the Modified DIP Facility, although some of the most egregious terms have been changed, several non-market terms designed solely to benefit insiders and affiliates, including the controlling owner, at the expense of the Debtor's estate and creditors

remain.  *First*, the Modified DIP Facility would still allow the Affiliate DIP Lender to encumber

any proceeds from avoidance actions and claims against insiders and affiliates (including the

Morse family members who own and control the Affiliate DIP Lender), which rightfully belong

to creditors.  *Second*, the Modified DIP Facility would still cede sole control over the Debtor's

budget and case milestones to the Affiliate DIP Lender.  There is no commercial justification for

these restrictions; they are simply designed to limit the resources and time available to the

Debtor and its creditors to conduct any investigation of prepetition transfers or claims against

insiders and affiliates, which now appear likely to be the estate's most valuable assets.  The

Modified DIP Facility still contains hair triggers on events of default for missing milestones—for

an auction *four days after the bid deadline* and a sale order *three days after the auction.*  No non-

affiliate DIP lender would insist on such an unreasonably tight timeline, which would give the

Debtor no time to fulfill its fiduciary duties by making a fully informed and deliberate decision

among competing bidders.  *Third*, the Modified DIP Facility would provide other unjustified

benefits to insiders and affiliates, including insulating the Debtor's prepetition affiliate financing

from avoidance actions and setting equally hair trigger milestones relating to the implementation

of a chapter 11 plan (a key component of which is likely to be the creation of a litigation trust to

pursue claims against the controlling owner of the Affiliate DIP Lender and related parties for

the benefit of UnitedHealthcare and other creditors).

       3.      In addition to insisting on these self-serving restrictions, the Affiliate DIP

Lender is plagued by serious conflicts of interest.  The Debtor's estate and creditors clearly have

an interest in maximizing the proceeds of the sale of the company and the value of litigation

claims against insiders and affiliates.  Based on the company's current valuation, the Debtor's

controlling owner is out of the money.  It therefore has little incentive in obtaining the best price

for the Debtor's assets, which in any case is far outweighed by its interest in a quick sale with little time and resources for investigation and in controlling the identity of the buyer (separate from price). And its interest in stymieing any investigation of claims against insiders and affiliates is obvious.

4.      So much for what can be gleaned from the face of the Debtor's Modified DIP Motion, which alone provides sufficient grounds to reject it. What has the Debtor left out? Most significantly, the Debtor has omitted that *UnitedHealthcare was the party that offered the competing DIP loan*. Instead of disclosing that important fact, which led to the modifications to the facility proposed by the Affiliate DIP Lender, the Debtor unfairly seeks to paint UnitedHealthcare as a disgruntled contract counterparty withholding payments. In fact, UnitedHealthcare offered a DIP loan for $45.5 million to ensure that the Debtor had sufficient liquidity notwithstanding any disputed contractual payments, which (as the Debtor also fails to mention) are based on prior period amounts that now appear inflated based on the Debtor's own estimates and can be resolved at a later stage of the case. UnitedHealthcare offered this DIP loan for three reasons: (1) to safeguard continuity of care to the Debtor's patients, many of which are UnitedHealthcare's own members, (2) to ensure that the sale process can proceed in an unencumbered fashion most likely to achieve the highest price, and (3) to prevent the Debtor's controlling owner and other insiders and affiliates from interfering in the investigation of claims against them to force a lowball settlement and release of those claims. UnitedHealthcare further made clear to the Debtor that these were its interests, that UnitedHealthcare would agree to extended milestones and that economic terms would not stand in the way of a UnitedHealthcare DIP loan.

5.      Rather than countering or seeking in any way to negotiate terms with UnitedHealthcare, as would be expected—and indeed required—of an estate fiduciary, the Debtor inexplicably declined to respond to UnitedHealthcare's offer.  No counteroffer has been received, and the Debtor has made almost no attempt to negotiate the UnitedHealthcare DIP loan proposal, despite the fact that it raised none of the obvious problems involved in borrowing money from and ceding case control to the Morse family.  Instead, the Debtor appears simply to have gone back to the Affiliate DIP Lender and agreed on a Modified DIP Facility that removed some, but not all, of the non-market, pro-insider, and anti-creditor terms, and then filed its Modified DIP Motion by surprise late last Thursday night, on the eve of the scheduled final hearing on the Debtor's Affiliate DIP Facility.  Under these circumstances, it is not clear how the Debtor could possibly conclude—let alone represent to the Court in a sworn declaration—that the Debtor has determined in its "business judgment that the Amended DIP Facility represents the best currently available offer and is in the best interest of the bankruptcy estate."  (Luria Decl. at ¶12.)

6.      In any event, these suspicious circumstances require that the Court review the proposed transaction under the heightened entire fairness standard rather than the business judgment standard.  When applying this heightened scrutiny to an insider transaction, the debtor has the burden to prove the inherent fairness of the transaction, which requires a showing that both (a) the price and terms of the transaction and (b) the process leading to the transaction not only appear fair but are fair.  The Debtor fails to carry its burden under either of these two prongs.  The Debtor fails to meet its burden to demonstrate that the terms of the revised Affiliate DIP Facility are fair and in the best interest of the estate because the facility is plagued with terms that provide benefits solely to the Affiliate DIP Lender at the expense of the Debtor's

estate and all its creditors.  The Debtor also fails to meet its burden to demonstrate that the process leading to the revised Affiliate DIP Facility was fair where the Debtor did not solicit competing DIP loan proposals, did not engage with UnitedHealthcare's competing DIP loan proposal, and presents no record of a bona fide independent process to negotiate with the Affiliate DIP Lender.

7.       For these reasons, the Court should deny the Modified DIP Motion, which seeks approval of an Affiliate DIP Facility that is divorced from any economic incentives of a lender and designed to result in a quick sale of the business, the return of proceeds to the controlling owner, and a cheap settlement of claims against the controlling owner and other insiders and affiliates without a proper investigation.  Alternatively, the Court should not decide the Modified DIP Motion without a full evidentiary record, and the Court should continue the hearing so that discovery can be taken to develop that record.

## **Background**

### I.      **The Debtor's Chapter 11 Case**

8.       On July 3, 2025 (the "Petition Date"), The Villages Health System, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida (the "Court").  Certain facts of the above-referenced case (this "Chapter 11 Case") are included in the *Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* [D.I. 3] (the "First Day Declaration").

### II.     **The DIP Motion**

9.       On July 3, 2025, the Debtor filed the *Debtor's* Emergency *Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use  of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expense Status,*

*(IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 4] (the "DIP Motion") seeking approval of postpetition financing in an amount of $39 million on a super-priority basis (the "Affiliate DIP Facility"), which included $5 million in interim financing, $19 million in new money advances and a $15 million roll-up (the "Prepetition Roll-Up") of the Debtor's prepetition secured facility.  The proposed postpetition lender, PMA Lender, LLC (the "Affiliate DIP Lender"), is an affiliate of the Debtor and lender under the Debtor's prepetition secured facility.  (Mot. at ¶12.)

10.    The original Affiliate DIP Facility included a 12% interest rate, the payment of the Affiliate DIP Lender's professional fees, and consent rights for the Affiliate DIP Lender with respect to the budget and milestones in this Chapter 11 Case.  (Mot. at ¶2.)  The DIP Motion also sought approval of, among other things, (i) an allowed super-priority administrative expense claim on the full $39 million, including the Prepetition Roll-Up, (ii) senior liens (the "DIP Lender Liens") on all of the property of the Debtor's estate, including proceeds of avoidance actions and claims against insiders and affiliates, and (iii) waiver of the section 506(c) surcharge, waiver of application of the "equities of the case" exception and waiver of the "marshaling" doctrine.  (*Id.*)  In support of the DIP Motion, the Debtor submitted a declaration [D.I. 19] (the "Patel Declaration") by Neal Patel of the Debtor's investment banker, Evercore Group L.L.C.

11.    Upon learning of the filing of this Chapter 11 Case, hiring counsel and reviewing the motion, UnitedHealthcare informed the Debtor of its intention to raise objections to the Affiliate DIP Facility.  (Dietderich Decl. at ¶3.)  The Debtor modified its requested interim relief accordingly, limiting its initial emergency interim borrowing to $5 million (prepayable

without penalty) and delaying the proposed effectiveness of certain relief until there could be a hearing on the motion after adequate notice.

12.     On July 11, 2025, the Court entered the *Interim Order Granting Debtor's Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expense Status, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 60] (the "Interim Order").

13.     On July 22, 2025, the United States Trustee for Region 21 (the "U.S. Trustee") filed a limited objection [D.I. 89] (the "UST Objection") to the DIP Motion, objecting to the approval of the Prepetition Roll-Up and the DIP Lender Liens encumbering proceeds from avoidance actions.  The U.S. Trustee raised concerns with the Affiliate DIP Facility particularly due to the Affiliate DIP Lender being "an insider that may have an incentive to insulate affiliates and related entities."  (UST Obj. at ¶9.)

### III.    UnitedHealthcare's DIP Offer and Modified DIP Motion

14.     On August 3, 2025, UnitedHealthcare made an offer to the Debtor to provide postpetition financing in the amount of $45.5 million, in order to resolve all of the Debtor's stated liquidity concerns and eliminate insider control.  (Dietderich Decl. at ¶4.)  The increased amount of the financing was designed to eliminate any near-term need for resolution of a contractual dispute between the Debtor and UnitedHealthcare relating to payments based on prior period amounts cast into doubt by the Debtor's estimate that it had been overpaid by approximately $350 million.  UnitedHealthcare proposed arm's-length economic terms, including a $500,000 funding fee, $1.5 million exit fee, and interest rate of 12%.  (*See id*.)  The arm's-length terms were intended to avoid one creditor (UnitedHealthcare) subsidizing any other

creditors and were open to negotiation.  (*Id*. at ¶6.)  UnitedHealthcare conveyed to the Debtor

this rationale for arm's-length economic terms and also that economic terms would not be an

impediment to agreement on a UnitedHealthcare DIP loan and that UnitedHealthcare would

agree to extended milestones.  (*Id*. at ¶¶6–7.)  UnitedHealthcare's interests as a prospective DIP

lender were defensive and aligned with those of all the Debtor's creditors—to ensure liquidity

and continuity of care, an unencumbered sale process, and a thorough investigation of claims

against insiders and affiliates.  In furtherance of the latter interest, together with the DIP loan

proposal, UnitedHealthcare proposed a draft protocol (again, open to negotiation) pursuant to

which the Debtor and UnitedHealthcare would cooperate in the investigation of claims against

the Debtor's affiliates and insiders.  (*Id*. at ¶4.)  The draft protocol was designed to prevent the

Debtor's affiliates and insiders from controlling the investigation of claims against them and to

ensure that the Debtor's estate would not be compromised in investigating, pursuing, litigating

and settling such claims as a fiduciary for all creditors.  UnitedHealthcare made clear to the

Debtor that UnitedHealthcare would accommodate the Debtor's concerns about the timing of the

investigation, including by delaying discovery from the Debtor until after the sale process was

concluded.  (*Id*.)  UnitedHealthcare also took care to insulate the DIP loan from the M&A

process, limiting UnitedHealthcare's right to credit bid the DIP loan so as to stay below the cash

amount of the opening bid at the auction and clarifying to the Debtor that UnitedHealthcare, as

DIP lender, was prepared to negotiate or even remove the hair-trigger sale milestones apparently

demanded by the Affiliate DIP Lender.  (*See id*. at ¶6.)

15.    After UnitedHealthcare made the offer, the Debtor went silent for almost

an entire week.  (*See id*. at ¶5.)  On August 12, 2025, the Debtor informed UnitedHealthcare of

an improved offer from the Affiliate DIP Lender—with whom the Debtor apparently had shared

UnitedHealthcare's DIP proposal soon after receipt.  (*See id.*)  The Debtor did not make a counteroffer to UnitedHealthcare, ask UnitedHealthcare to modify the arm's-length economic terms, or otherwise seek any further offers from UnitedHealthcare.  (*Id.*)

16.    On August 13, 2025, UnitedHealthcare informed the Debtor that its only motives in providing the DIP offer were to ensure liquidity and continuity of care, an unencumbered sale process, and a thorough investigation of claims against insiders and affiliates. (*Id.* at ¶7.)  UnitedHealthcare informed the Debtor that, since the Debtor appeared determined to borrow money only from the Morse family, if the Affiliate DIP Facility could be modified to protect creditors, UnitedHealthcare also could support it instead.  (*Id.*)  UnitedHealthcare then outlined certain changes to the improved Affiliate DIP Facility to resolve UnitedHealthcare's objections.  (*Id.*)  UnitedHealthcare and the Debtor, through counsel, exchanged emails on the settlement proposal over the course of August 14, 2025.  (*Id.*)

17.    However, without providing any notice whatsoever to UnitedHealthcare, late on the evening of August 14, 2025, the Debtor filed the Modified DIP Motion seeking approval of the improved Affiliate DIP Facility (the "Revised Affiliate DIP Facility").  (*Id.* at ¶8.)  The Revised Affiliate DIP Facility addressed some of the concerns raised by UnitedHealthcare and, on information and belief, the U.S. Trustee.  The Revised Affiliate DIP Facility removes the Prepetition Roll-Up, increases the facility size from $24 million to $46 million, reduces the interest rate from 12% to 10% for new advances, and extends the challenge period with respect to the proposed stipulations by the Debtor in the Interim Order to October 9, 2025.  In support of the Modified DIP Motion, the Debtor submitted a declaration [D.I. 160] (the "Luria Declaration") by the Debtor's Chief Restructuring Officer.  The Revised Affiliate DIP Facility leaves the other problems identified by UnitedHealthcare unaddressed.

18.     The Debtor's Modified DIP Motion also completely misrepresents the role that UnitedHealthcare has played in this Chapter 11 Case.  The very first communications to the Debtor by UnitedHealthcare stressed the critical need to ensure continuity of service for UnitedHealthcare members in the face of the self-interested and reckless decision by the owners and managers of the Debtor to file their healthcare provider for free-fall bankruptcy without adequate liquidity or even an attempt to alert the Debtor's concentrated handful of major creditors and business relationships.  (*See* Dietderich Decl. at ¶2.)  And UnitedHealthcare is the undisclosed party that made an offer for a larger and superior DIP loan to the Debtor.  (*See* Amended Mot. at ¶3; Dietderich Decl. at ¶4.)  Rather than *withholding* liquidity for this ill-conceived surprise bankruptcy, as the Debtor alleges, UnitedHealthcare has done the opposite. Its substantial contributions as creditor so far include increasing the new money from both the now-competing DIP loan proposals, eliminating the roll-up of $15 million of gratuitous estate liabilities to insiders, eliciting the grudging initial disclosure to the Court of at least $183 million of historical payments, including to the insiders behind the Affiliate DIP Lender, removing lender control over the M&A process (assuming the Debtor agrees to do so), highlighting undisclosed conflicts of interest, and improving case liquidity, case runway and debt terms for the benefit of all creditors.

19.     The Luria Declaration is also misleading.  It states that "[a]fter the withholding of the Surplus Payments began, the Debtor began expedited negotiations with the DIP Lender and UnitedHealthcare.  The Debtor received and evaluated an offer to provide DIP funding from a party other than the DIP Lender."  (Luria Decl. at ¶12.)  It failed to disclose that this "party" was precisely UnitedHealthcare.  Moreover, it is untrue that the Debtor began "expedited negotiations" with UnitedHealthcare.  After UnitedHealthcare made the DIP offer,

the Debtor went silent for almost an entire week before informing UnitedHealthcare on

August 12, 2025 about the improved offer from the Affiliate DIP Lender.

20.     From the date UnitedHealthcare proposed its alternative DIP facility to the

date of this Objection, the Debtor has made almost no effort to engage with UnitedHealthcare to

negotiate the terms of its DIP loan proposal.  (Dietderich Decl. at ¶5.)

## IV.    The Debtor's Ongoing Sale Process

21.     On July 28, 2025, the Court entered an order [D.I. 110] (the "<u>Bidding</u>

<u>Procedures Order</u>") approving, among other things, bidding procedures for sale of substantially

all of the Debtor's assets.  By the same order, the Court set a bid deadline of September 3, 2025,

an auction on September 7, 2025, and a sale hearing on September 9, 2025.

22.     Under the Revised Affiliate DIP Facility, the Debtor may not extend the

bid deadline, the auction deadline or the sale hearing deadline by a single day without causing an

immediate Event of Default and permitting the Affiliate DIP Lender to exercise remedies.

UnitedHealthcare has informed the Debtor that this is unsupportable and the Debtor and the

Affiliate DIP Lender have refused to modify these terms.  UnitedHealthcare has informed the

Debtor that, if the Affiliate DIP Lender would not provide appropriate runway, the DIP loan

proposed by UnitedHealthcare would not involve similar hair-trigger milestones, but instead

would have a true 180-day maturity available to fully maximize the value of the Debtor's assets

in a considered and deliberate process.  (Dietderich Decl. at ¶6.)

<u>Objection</u>

## A.    The Court Should Apply the Entire Fairness Standard of Review to the Affiliate DIP Facility.

23.     As a threshold matter, the Modified DIP Motion and the proposed Revised

Affiliate DIP Facility should be subject to the "entire fairness" standard or "heightened scrutiny"

as opposed to the more deferential business judgment standard.  The business judgment rule is inapplicable to transactions with insiders, and for good reason:  "[t]hose kinds of transactions are inherently suspect because 'they are rife with the possibility of abuse.'"  *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769–71 (Bankr. S.D.N.Y. 2020) (citation omitted) (demanding the debtor satisfy the "entire fairness test" by showing the DIP facility "results from fair dealing and reflects a fair price"); *In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (applying heightened scrutiny to approval of DIP loan from affiliate of debtor's directors); *In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[I]nsiders' loans in a bankruptcy must be subject to rigorous scrutiny"), aff'd, 198 F.3d 234 (2d Cir. 1999).

24.    Courts therefore apply a "heightened scrutiny" or "entire fairness" standard when the transaction involves a debtor and its insiders.  *In re Latam Airlines Grp. S.A.*, 620 B.R. at 769–71 (citing *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)); *see, e.g.*, *In re Republic Airways Holdings Inc*, 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) (internal quotations and citation omitted) ("In determining whether to authorize post-petition financing . . . bankruptcy courts will consider whether . . . the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender."); *see also In re Barbara K Enters., Inc.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (citation omitted) (courts will only defer to the debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.").  Indeed, in *Pepper* v. *Litton*, the U.S. Supreme Court noted that dealings between an entity and its controlling shareholder "are subjected to rigorous scrutiny and where any of [the insider's] contracts or engagements

with the [entity] is challenged[,] the burden is on the [insider to] not only prove the good faith of the transaction but also to show its inherent fairness." 308 U.S. 295, 306 (1939). Even the Debtor acknowledged that "heightened scrutiny" applies to insider loans. (Mot. at ¶13 ("While 'insider' loans raise heightened scrutiny, the relationship between Debtor and the DIP Lender is the only reason Debtor was able to obtain such inordinately beneficial terms for the DIP Facility.")).[2]

25.      Courts in the Eleventh Circuit have adopted this "heightened scrutiny" standard, reasoning that transactions with insiders are "subject to heightened scrutiny because insiders 'usually have greater opportunities for . . . inequitable conduct,'" *In re Breland*, 2021 Bankr. LEXIS 1514, at *14 (Bankr. S.D. Ala. June 3, 2021) (citation omitted), and that, when applying this heightened scrutiny to an insider transaction with the debtor, the burden of proof shifts to the insider. *In re Nilhan Developers, LLC*, 620 B.R. 385, 415 (Bankr. N.D. Ga. 2020) ("[B]urden is on the insider to show not only good faith but also the inherent fairness of the transaction.").

26.      This burden has two prongs, requiring a showing that both (a) the price and terms of the transaction and (b) the process leading to the transaction "not only appear fair but are fair." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *see also Pepper*, 308 U.S. at 306–07; *In re Los Angeles Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (insider DIP financing "requires proof of fair dealing and fair price and terms"); *In re Anchorage Boat Sales, Inc.*, 29 B.R. 275, 278 (Bankr. E.D.N.Y. 1983) (challenges to the contracts of insiders place the burden on the insider "to prove both the good faith and fairness of

---

[2]      As demonstrated later in this Objection, the Affiliate DIP Lender must have ulterior motives for providing the DIP loan than just being a lender.

the transactions"); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) ("the conduct of bankruptcy proceedings not only should be right but must seem right"). As the U.S. Supreme Court has explained, this standard "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper*, 308 U.S. at 307.

27.     Here, heightened scrutiny is particularly necessary where several suspicious elements are present. *First*, the Affiliate DIP Lender is not a lender or otherwise in the business of making loans (other than to the Debtor). As the Debtor acknowledged, its willingness to lend to the Debtor is solely because it is an insider of the Debtor. (*See* Mot. at ¶13 ("While 'insider' loans raise heightened scrutiny, the relationship between Debtor and the DIP Lender is the only reason Debtor was able to obtain such inordinately beneficial terms for the DIP Facility.")) And it has good reasons for doing so—as a postpetition lender to the Debtor, the Affiliate DIP Lender would be able to control the Debtor and this Chapter 11 Case through the Debtor's budget and the milestones, all to its own benefit and without any meaningful checks or balances. The insider stands to reap other benefits from the estate at the expense of creditors by controlling both the Affiliate DIP Lender and the Debtor.

28.     *Second*, the economic terms of the Revised Affiliate DIP Facility are not arm's length—they are "significantly below normal market terms in nearly every respect"—and thus the Affiliate DIP Lender must have incentives other than economics in providing the DIP loan. (Patel Decl. at ¶5.) If the Affiliate DIP Facility was below market, then the Revised Affiliate DIP Facility is undoubtedly below market. The only reasonable explanation for why the Affiliate DIP Lender wants to make such a loan is that it has its eyes on something other than the economics.

29.     *Third*, the Debtor has disclosed surprisingly few facts concerning the Affiliate DIP Lender.  All that is known is that it is "an affiliate of Debtor by virtue of common ownership or control."  (Mot. at ¶12.)  UnitedHealthcare believes that the Affiliate DIP Lender is controlled and funded by one or more members of the Morse family, who also control the Debtor.  The Affiliate DIP Lender would thus be an "insider" of the Debtor within the definition of the Bankruptcy Code.  *See* 11 U.S.C. § 101(31).  Without a factual record that supports the application of the business judgment standard, heightened scrutiny must apply.

30.     *Fourth*, based on the Modified DIP Motion and the Luria Declaration, there have been over $180 million of prepetition transfers from the Debtor to affiliates or insiders of the Debtor over the course of 2022 through 2024.  (*See* Modified DIP Mot. at ¶12; Luria Decl. at ¶11.)  These prepetition transfers appear highly suspicious.  Without further details, it is unclear what the purpose of the purported prepetition line of credit between the Debtor and its majority shareholder was, or whether the prepetition paydowns of $118.8 million were de facto debt repayments or disguised equity distributions.  It also appears that the $64.2 million of "tax-related payments" should not have been made based on the Debtor's own estimate that it was overpaid by approximately $350 million.  (First Day Decl. at ¶30.)  The failure of the Debtor to timely disclose these facts and potential conflicts of interest underscores the necessity that the Court scrutinize every term of the Revised Affiliate DIP Facility under the entire fairness (or heightened scrutiny) standard.  The Debtor and the Affiliate DIP Lender cannot be permitted to hide the ball and must satisfy that standard.

**B.     The Debtor Has Failed To Show that the Terms of the Revised Affiliate DIP Facility Are Fair and in the Best Interest of the Estate.**

31.     The Debtor has failed to meet its burden under the entire fairness standard (or any standard) to demonstrate that the terms of the Revised Affiliate DIP Facility are fair and

in the best interest of the estate because the Revised Affiliate DIP Facility is plagued with terms

that provide benefits to the Affiliate DIP Lender at the expense of the Debtor's estate and all its

creditors.

32.    To obtain postpetition financing under section 364(d)[3] of the Bankruptcy

Code, a debtor has the burden of demonstrating that (i) the credit transaction is necessary to

preserve the estate, and (ii) the terms of the transaction are fair and reasonable given the

circumstances.  *See In re L.A. Dodgers LLC*, 457 B.R. at 312 ("[T]he Debtors have the burden of

proving that . . . (1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by

allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) the credit

transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction

are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the

proposed lender."); *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M.

2002) (explaining that a debtor must prove that the proposed post-petition financing arrangement

meets the requirements of 11 U.S.C. §§ 364(c) or (d)).

33.    Courts will ***not*** approve postpetition financing where it is designed to

favor the lender at the expense of other creditors and is not in the best interests of the estate.  *See*

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (citing *In re Crouse Grp.*,

71 B.R. 544, 547 (Bankr. E.D. Pa. 1987)) (explaining that courts should not approve proposed

financing "where it is apparent that the purpose of the financing is to benefit a creditor rather

than the estate."); *In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex.

Jan. 2, 2018) (rejecting approval of DIP financing noting that bankruptcy courts "do not allow

---

[3]    The Modified DIP Motion seeks approval of the Revised Affiliate DIP Facility under both Bankruptcy Code
sections 364(c)(3) and 364(d)(1).

terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (the financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of a secured creditor).

34.     The Court must also assess whether "the proposed terms [of the DIP facility] would prejudice the powers and rights that the Code confers for the benefit of all creditors [and leverage] the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest." *In re Berry Good, LLC*, 400 B.R. 741,747 (Bankr. D. Ariz. 2008).  Postpetition financing proposals should not be approved when "a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit." *Gen. Elec. Cap. Corp.* v. *Hoerner (In re Grand Valley Sport & Marine)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992).

35.     Here, the Court should deny approval of the Revised Affiliate DIP Facility in its current form because its terms are in direct contravention of all these requirements.

*(a)      Insider Claims and Avoidance Actions Should Be Preserved for Creditors.*

36.     The Affiliate DIP Lender seeks to obtain a first priority lien on substantially all of the Debtor's assets, including avoidance actions[4] and the Debtor's claims against affiliates and insiders that would be carved out from any sale of the Debtor's asset (collectively, such claims, the "Excluded Claims").  As the Court is aware, the Debtor has agreed

---

[4]     The Luria Declaration incorrectly states that "The Debtor's obligation to repay the DIP Facility was secured by, among other things, a first priority lien on substantially all of the Debtor's assets *other than* Avoidance Actions . . . ."  (Luria Decl. at ¶6 (emphasis added).)

not to settle these Excluded Claims for 180 days unless the Debtor's board of directors determines its fiduciary duties require it, which agreement the Debtor's counsel read into the record at the hearing held on July 23, 2025. Based on the purchase price from the stalking horse bid and the amounts necessary to repay the DIP Facility, the sale of the Debtor's assets likely will not result in significant recovery to the Debtor's creditors. As a result, the Debtor's creditors are relying on these Excluded Claims as a significant source of recovery.

37.     But, under the terms of the Revised Affiliate DIP Facility, the Affiliate DIP Lender will have a senior secured claim over all proceeds recovered from these Excluded Claims—proceeds that the Debtor might have recovered from the controlling owner of the Affiliate DIP Lender. The result is that the Affiliate DIP Lender will benefit from the settlement of claims against itself or its affiliates and owners, and unsecured creditors will be left holding the bag. Proceeds from the Excluded Claims must be carved out of the DIP collateral and should not be collateral to secure the Revised Affiliate DIP Facility. Similarly, the terms of the Revised Affiliate DIP Facility must explicitly provide that the Affiliate DIP Lender shall have no recourse to any proceeds from Excluded Claims. Without these modifications, the Amended Motion cannot be approved.

(b)     *The Affiliate DIP Lender Should Not Have Full Control of Budget and Sale Milestones.*

38.     Approval of the Modified DIP Motion would give the Affiliate DIP Lender full control over the Debtor's budget and milestones. (*See* Interim Order at ¶11 ("All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the budget . . . as the same may be modified from time to time by the consent of the DIP Lender and Debtor . . . ."); *id*. at ¶12 (providing that it is an Event of Default if "Debtor fails to achieve any of the Milestones, unless extended or waived by the DIP Lender in writing").) It is unreasonable

and not "below normal market terms" for a DIP lender to insist on hair-trigger sale milestones. (Patel Decl. at ¶5.) With these terms, the Affiliate DIP Lender would be able to, among other things, control the resources the Debtor uses to investigate Excluded Claims and the amount of time it has to do so. It is patently unfair and unreasonable to cede control over the investigation into prepetition amounts received by the Affiliate DIP Lender and/or its affiliates and owners and the Debtor's ability to claw back such amounts to the very targets of that investigation. This aspect of the Revised Affiliate DIP Facility also cannot be approved.

39.     Moreover, the Affiliate DIP Lender has serious conflicts of interest with the goal of the Debtor's estate and its creditors in the ongoing sale process to maximize sale proceeds. The Debtor has said that it is potentially liable to the U.S. government for approximately $350 million or more in overpayments arising from the Debtor's historical coding practices. (First Day Decl. at ¶30.) The stalking horse bid has a cash floor of $50 million. (*See* Bidding Proc. Order Ex. 6, Section 3.01(a)(i).) The Debtor and the Affiliate DIP Lender's common controlling owner is therefore vastly out of the money. It has little incentive to obtain the best price for the Debtor's assets. To the contrary, the Affiliate DIP Lender has a strong interest in a quick sale with little time for investigation and, potentially, its own preferences as to the identity of the buyer (separate from price) given that the Morse family own and control The Villages through various corporate entities. Any control of the sale milestones by the Affiliate DIP Lender—especially the unusual hair-trigger controls proposed with respect to the auction and the selection and Court approval of the winning bidder—is therefore inappropriate and must be denied.

(c)      *The Affiliate DIP Lender Should Not Benefit from Unwarranted Debtor Stipulations.*

40.      Many of the Debtor stipulations contained in the proposed DIP order are also problematic.  For example, the Debtor would stipulate that, among other things, (i) no prepetition payments made by the Debtor to the Affiliate DIP Lender in connection with the prepetition facility are subject to avoidance, (ii) the Debtor's prepetition obligation to the Affiliate DIP Lender is non-avoidable and is not subject to avoidance, (iii) the security interest and liens related to the prepetition facility are also not subject to avoidance, and (iv) the Debtor and its estate forever release the Affiliate DIP Lender and its former, current and future officers, directors, owners, shareholders, etc., of all claims relating to the [Revised] Affiliate DIP Facility, the DIP documents and the prepetition loan documents.  (Interim Order at pp. 5–7.)  There is simply not an adequate record to determine, at this stage, that such stipulations are appropriate, or releases are fair, to the estate or in the best interest of creditors.  *See* Bankruptcy Code section 502(d) (disallowing claims by recipients of avoidance transfers).

41.      Even more problematic, the proposed challenge period to make these determinations is impermissibly short.  Creditors would only have 52 days from the date of the second interim hearing of the Modified DIP Motion to do any investigation.  UnitedHealthcare submits that any order approving Revised Affiliate DIP Facility should not include any stipulations regarding the prepetition affiliate debt.  In the event that any such stipulations are to be included, the proposed challenge period must be increased by at least six months to provide creditors enough time to comb through the web of complex transactions the Debtor, the Affiliate DIP Lender, their controlling owners and any other insiders engaged in before the Petition Date and, if appropriate, seek standing to bring such claims.

(d)    *The Proposed Section 506(c), Marshalling and  Equities of the Case" Waivers Are Inappropriate Given the Circumstances of the Case.*

42.    Under the proposed Modified DIP Facility, the Affiliate DIP Lender would receive full waivers of Bankruptcy Code section 506(c) surcharge, marshaling, and "equities of the case" rights regarding proceeds of the prepetition collateral.  (*See* Interim Order at pp. 13–15.)  Waiving these key protections for unsecured creditors is yet another way the Revised Affiliate DIP Facility provides a windfall to the Debtor's insiders at unsecured creditors' expense.

43.    Through the proposed section 506(c) waiver, the Debtor would waive the estate's rights to charge certain costs or expenses incurred in the administration of this Chapter 11 Case against the collateral preserved or disposed of during the case.  (Interim Order ¶10(a).)  This provision should be stricken from any final order unless and until adequate provision has been made for prompt payment of all accrued and unpaid administrative expenses from sale proceeds, including claims arising under section 503(b)(9) of the Bankruptcy Code.

44.    Approving a section 506(c) waiver would fundamentally undermine the essential purpose of 506(c), which is to "prevent a windfall to the secured creditor."  *Precision Steel Shearing* v. *Fremont Fin. Cor. (In re Visual Indus.)*, 57 F. 3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . .  The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate.") (citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *In re Smith*

*Intern. Enterprises, Inc.*, 325 B.R. 450, 453 (M.D. Fla. 2005) (noting section 506(c) is used to

"'prevent a windfall to a secured creditor at the expense of the estate'") (citation omitted);

*Matter of SayBrook Mfg. Co., Inc.*, 130 B.R. 1013, 1021 (M.D. Ga. 1991) (approving request by

debtor because a denial would result in a secured creditor receiving a "windfall").

45.     The Affiliate DIP Lender also seeks to waive the equitable doctrine of

marshaling.  (Interim Order ¶25.)  The waiver of any marshaling requirements is particularly

problematic where there may be no value for unsecured creditors from any source other than

assets that were unencumbered as of the Petition Date—mainly, proceeds from Excluded Claims.

Secured creditors should have to marshal against their collateral first before using unencumbered

property to satisfy their claims.

46.     The Affiliate DIP Lender would also receive waiver of the "equities of the

case" exception under section 552(b) of the Bankruptcy Code.  (Interim Order ¶26.)  The

"equities of the case" exception in section 552(b) allows a debtor, creditors or other party in

interest to exclude postpetition proceeds from prepetition collateral on equitable grounds,

including to avoid using unencumbered assets to fund the cost of a secured lender's foreclosure.

"The purpose of the equity exception is to prevent a secured creditor from reaping benefits from

collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of

other assets of the estate (which normally would go to general creditors) to cause the appreciated

value."  *In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v.

*Prod. Credit Ass'n*, 104 B.R. 824, 826 (E.D. Mich. 1989)); *see also In re Diamond Mfg. Co.,*

*Inc.*, 1995 WL 17004722, at *2 (Bankr. S.D. Ga. Feb. 17, 1995) (explaining that the "equities of

the case" exception is designed to "avoid an unjust benefit to the secured party . . . at the expense

of the estate.").  There is no reason to waive such rights here.  *See, e.g.*, *In re Metaldyne Corp.*,

2009 Bankr. LEXIS 1533, at *19 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its

discretion, declines to waive prospectively an argument that other parties in interest may make.

If, in the event, the Committee or any other party [in] interest argues that the equities of the case

exception should apply to curtail a particular lenders' rights, the Court will consider it."); *Sprint*

*Nextel Corp.* v. *U.S. Bank Nat'l Ass'n (In re TerreStar Networks)*, 457 B.R. 254, 272–73 (Bankr.

S.D.N.Y. 2011) (request for section 552(b) waiver was premature because factual record not

fully developed).  The Court should not take what the Bankruptcy Code gave without requiring

full disclosure by the Debtor and the Affiliate DIP Lender of their relationship, the prepetition

lending, the prepetition transfers and all conflicts of interest.

> 47.    Because these waivers would eliminate a possible avenue for recovery for

the estate and creditors, and increase the risk that certain costs of this Chapter 11 Case will be

borne by the creditors, UnitedHealthcare objects to such waivers.

**C.    The Debtor Has Failed To Show that the Modified DIP Facility Was the Result of Fair Dealing.**

> 48.    The Debtor has not only failed to show that the terms of the Modified DIP

Facility are substantively fair, as it must under the entire fairness standard, but also failed to meet

its burden to demonstrate that the process leading to the Revised Affiliate DIP Facility was fair.

*See In re LATAM Airlines Grp. S.A.*, 620 B.R. at 777 (internal citation omitted) (emphasis added)

(applying the "entire fairness test" to a DIP Facility provided by an insider, and finding that the

Debtors' process was "fair" because it was "*widely marketed*" as well as the debtors' "*careful,*

*well-informed and open consideration of the issues* relating to the DIP financing"); *see, e.g., In*

*re Big Rivers Elec. Corp.*, 233 B.R. 726, 734, 739 (Bankr. W.D. Ky. 1998) (determining debtor-

in-possession's entry into a transaction that included "No-Shop" clause, preventing further

marketing of the assets, to be a breach of debtor's fiduciary duties), *aff'd*, 233 B.R. 739 (W.D.

Ky. 1998); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("The cases clearly establish that although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b).").

49.    Based on the sparse and conclusory factual assertions that the Debtor has made to date, the marketing process was clearly insufficient.  The Debtor submitted a three-page long declaration from its investment banker that contained no detail on any marketing efforts for a third-party postpetition financing source other than that Evercore "identified and solicited proposals from no less than seven (7) potential lenders, including the [Affiliate DIP Lender]." (Patel Decl. at ¶3.)  There is no mention of the criteria that Evercore used to select its outreach targets, the terms of financing requests in the solicitation package or how many outreach targets made offers and whether Evercore and the Debtor negotiated for better offers.  S*ee In re LATAM Airlines Grp. S.A.*, 620 B.R. at 780 (emphasizing the importance of a "robust marketing process" of the assets under the "entire fairness test").

50.    The Debtor's decision-making process was also deficient.  The Patel Declaration states that the Debtor and the Affiliate DIP Lender "engaged in arm's-length negotiations."  (Patel Decl. at ¶5.)  But, there is no information on whether the Debtor's independent director and Special Committee were in charge of negotiating with the Affiliate DIP Lender or whether the Debtor was instead under the control of the common controlling owners of the Affiliate DIP Lender during those negotiations.  *See Fox*, 2012 WL 6680349, at *8 (Bankr. N.D. Ill. Dec. 21, 2012) (emphasis added) ("[C]ourts have identified additional indicia of fairness. These include *diligent efforts by an independent special committee* to obtain the best possible deal, the existence of a pre- or post-signing market check, and a showing that the deal

price represents a premium."). Did the Debtor consider the pledge on proceeds from Excluded

Claims and the grant of various waivers when deciding that the Affiliate DIP Lender presented

the best offer the Debtor can get? Did the Debtor consider the $15 million Prepetition Roll-Up

when it determined that the Affiliate DIP Facility terms were "below normal market terms"?

(Patel Decl. at ¶5.) An independent decision-making process would not have left all these

questions unanswered. *See*, *e.g.*, *In re MSR Hotels & Resorts, Inc.,* 2013 WL 5716897, at *1

(Bankr. S.D.N.Y. Oct. 1, 2013) ("[T]he standard here does not permit a debtor to purposely

choose not to seek financing on better terms, on the basis that they themselves subjectively

believe the financing they've obtained is the best terms possible."); *In re LATAM Airlines Grp.*

*S.A.*, 620 B.R. at 780-81 (requiring evidence and justification for debtors' failure to test the

market (including existing lenders) for a DIP proposal before agreeing to an insider transaction).

51.     The lack of a marketing process for postpetition financing and the lack of

arm's length negotiation with the Affiliate DIP Lender are evident in the events that unfolded

postpetition. On August 3, 2025, UnitedHealthcare made an offer to the Debtor to provide

postpetition financing on better terms than the Affiliate DIP Facility. (Dietderich Decl. at ¶4.)

UnitedHealthcare's offer would have provided the Debtor with more liquidity, no lien on

proceeds from Excluded Claims, and no control from insiders. After UnitedHealthcare made the

offer, the Debtor went silent for almost an entire week. (Dietderich Decl. at ¶5.) The Debtor

then reverted on August 12, 2025 to inform UnitedHealthcare that the Affiliate DIP Lender was

willing to improve its proposal by dropping the interest rate by two percentage points, increasing

the facility size by $22 million, removing the Prepetition Roll-Up, and extending the challenge

period. (*See id*.) The Debtor never made any counteroffers to UnitedHealthcare or otherwise

asked for any improved terms from UnitedHealthcare. (*See id*.) Had the Debtor run a genuine

and robust marketing process prepetition, it would have gotten a better offer from a non-insider financing source a long time ago.

52.     The Debtor appears to have conducted the entire marketing and negotiation process, such as it was, as a mere formality so that it can proceed with the Modified Affiliate DIP Facility, quickly sell the business, return proceeds to the controlling owner, and help the controlling owner and other insiders and affiliates cheaply get rid of the Debtor's creditors along the way.  The focus on speed and keeping insiders in control throughout the process can only be designed to deflect attention from any potential improprieties of the prepetition transfers and other improper dealings on the part of the controlling owner and other insiders and affiliates.  The Court cannot, and should not, approve the Revised Affiliate DIP Facility without the Debtor carrying its burden under the law.

53.     For these reasons, the Court should deny the Modified DIP Motion. Alternatively, the Court should not decide the Modified DIP Motion without a full evidentiary record, and the Court should continue the hearing so that discovery can be taken to develop that record.

## Reservation of Rights

54.     UnitedHealthcare respectfully reserves all rights to supplement this Objection, as well as to assert any other objection at the appropriate time in connection with the proposed Revised Affiliate DIP Facility.

## Conclusion

WHEREFORE, for the reasons set forth herein, UnitedHealthcare respectfully requests that the Court (a) deny approval of the Modified DIP Motion except as consistent with the foregoing, or alternatively, (b) not decide the Modified DIP Motion without a full evidentiary

record, and continue the hearing so that discovery can be taken to develop that record and

(c) grant UnitedHealthcare such additional relief as this Court deems just and equitable.

Dated: August 17, 2025

**SULLIVAN & CROMWELL LLP**
/s/ *Andrew G. Dietderich*
Andrew G. Dietderich, New York Bar No. 2850584
Justin J. DeCamp, New York Bar No. 4373163
Alexa J. Kranzley, New York Bar No. 4707386
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:     dietdericha@sullcrom.com
            decampj@sullcrom.com
            kranzleya@sullcrom.com
*Counsel to UnitedHealthcare Insurance Company
and UnitedHealthcare of Florida, Inc.*

AND

**STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.**
/s/ *Patricia A. Redmond*
Florida Bar No. 303739
Patricia A. Redmond, Esquire
Stearns Weaver Miller
Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Miami, Florida 33130
Phone: (305) 789-3553
predmond@stearnsweaver.com
*Co-Counsel to UnitedHealth Care Insurance
Company and UnitedHealthcare of Florida, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 17, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

By: /s/ *Patricia A. Redmond*
    Florida Bar No. 303739
    Patricia A. Redmond

-29-