## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |  |
|---|---|---|
| In re | x<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>x | Chapter 11 |
| THE VILLAGES HEALTH SYSTEM, LLC,[1] |  | Case No.: 6:25-bk-04156-LVV |
| Debtor. |  |  |

### DECLARATION OF ANDREW G. DIETDERICH IN SUPPORT OF UNITEDHEALTHCARE INSURANCE COMPANY AND UNITEDHEALTHCARE OF FLORIDA, INC.'S OBJECTION TO DEBTOR'S *EMERGENCY* MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTOR TO BORROW ADDITIONAL FUNDS UNDER THE EXISTING DIP FACILITY, WITH CERTAIN MODIFICATIONS, AND (II) GRANTING RELATED RELIEF

I, Andrew G. Dietderich, hereby declare under penalty of perjury as follows:

1.      I am a member in good standing of the Bar of the State of New York and have been admitted *pro hac vice* to practice before this Court.  I am a partner of Sullivan & Cromwell LLP ("S&C").  I submit this declaration in connection with *UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc.'s Objection to Debtor's* Emergency *Motion for Entry of Order (I) Authorizing the Debtor to Borrow Additional Funds Under the Existing DIP Facility, with Certain Modifications, and (II) Granting Related Relief* (the "Objection"),[2] filed concurrently herewith, to place before the Court certain information referred to in the Objection.

---

[1]      The Debtor in this Chapter 11 Case is The Villages Health System, LLC and the last four digits of its federal tax identification number are 6436. The Debtor's address is 600 Sunbelt Road, The Villages, FL 32159.

[2]      Capitalized terms not defined herein are as defined in the Objection.

2.     The very first communications to the Debtor by UnitedHealthcare in this Chapter 11 Case stressed the critical need to ensure continuity of service for UnitedHealthcare members.

3.     Upon learning of the filing of this Chapter 11 Case, hiring counsel and reviewing the initial DIP motion, UnitedHealthcare informed the Debtor of its intention to raise objections to the Affiliate DIP Facility.

4.     On August 3, 2025, UnitedHealthcare made an offer, as reflected in the term sheet attached hereto as Exhibit A, to the Debtor to provide postpetition financing in the amount of $45.5 million.  As part of the offer, UnitedHealthcare proposed to the Debtor a draft investigation protocol, which was open to negotiation, to address the concerns on insider control under the Affiliate DIP Facility.  The draft investigation protocol is attached hereto as Exhibit B. The draft protocol was designed to prevent the Debtor's controlling owner and other insiders and affiliates from controlling the investigation of claims against them and to ensure that the Debtor's estate would not be compromised in investigating, pursuing, litigating and settling such claims as a fiduciary for all creditors.  UnitedHealthcare made clear to the Debtor that UnitedHealthcare would accommodate the Debtor's concerns about the timing of the investigation, including by delaying certain discovery until after the sale process was concluded.

5.     From the date UnitedHealthcare proposed its alternative DIP facility to the date of the Objection, the Debtor has made almost no effort to engage with UnitedHealthcare to negotiate the terms of its DIP loan proposal.  Following the communication of UnitedHealthcare's DIP loan proposal, the Debtor did not contact UnitedHealthcare concerning its DIP financing proposal until August 12.  On August 12, 2025, the Debtor informed UnitedHealthcare of an improved offer from the Affiliate DIP Lender.  The Debtor did not make

a counteroffer to UnitedHealthcare, ask UnitedHealthcare to modify the arm's-length economic terms, or otherwise seek any further offers from UnitedHealthcare.

6.     UnitedHealthcare informed the Debtor that the hair trigger on sale milestones is unsupportable and that, if the Affiliate DIP Lender would not provide appropriate runway, the DIP loan proposed by UnitedHealthcare would not involve similar hair-trigger milestones, but instead would have a true 180-day maturity available to fully maximize the value of the Debtor's assets in a considered and deliberate process.  UnitedHealthcare further conveyed to the Debtor that the arm's-length terms of UnitedHealthcare's DIP loan proposal were intended to avoid one creditor (UnitedHealthcare) subsidizing any other creditors and were open to negotiation and that economic terms would not be an impediment to agreement on a UnitedHealthcare DIP loan.

7.     On August 13, 2025, UnitedHealthcare informed the Debtor that its only motives in providing the DIP offer were to ensure liquidity and continuity of care, an unencumbered sale process, and a thorough investigation of claims against insiders and affiliates. UnitedHealthcare informed the Debtor that, since the Debtor appeared determined to borrow money only from the Morse family, if the Affiliate DIP Facility could be modified to protect creditors, UnitedHealthcare also could support it instead.  UnitedHealthcare then outlined certain changes to the improved Affiliate DIP Facility to resolve UnitedHealthcare's objections. UnitedHealthcare and the Debtor, through counsel, exchanged emails on the settlement proposal over the course of August 14, 2025.

8.     Without providing any notice whatsoever to UnitedHealthcare, late on the evening of August 14, 2025, the Debtor filed the Modified DIP Motion seeking approval of the revised Affiliate DIP Facility.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing in true and correct to the best of my knowledge, information, and belief.

Executed in New York, New York on this 17th day of August, 2025.

> /s/ Andrew G. Dietderich
> Andrew G. Dietderich, New York Bar No. 2850584
> SULLIVAN & CROMWELL LLP
> 125 Broad Street
> New York, New York 10004
> Telephone: (212) 558-4000
> Facsimile: (212) 558-3588
> E-mail: dietdericha@sullcrom.com

## **Exhibit A**

**UnitedHealthcare's Proposed DIP Term Sheet**

S&C Draft of August 2, 2025
PRIVILEGED AND CONFIDENTIAL

**INDICATIVE TERMS FOR CHAPTER 11 CREDIT FACILITY
THE VILLAGES HEALTH SYSTEM LLC**

*The following summary of indicative terms and conditions (the "Term Sheet") is not legally binding and is presented for discussion purposes only. All transactions contemplated below are subject to due diligence, internal approvals (not yet obtained), and appropriate documentation acceptable to all applicable parties in their sole discretion. Except as may be set forth in a potential future written agreement that expressly states it is legally binding, no person or entity shall have any commitment or liability based on any failure to agree to the transactions contemplated by this Term Sheet or any past, present or future action or omission, course of dealing or conduct.*

| | |
|---|---|
| **Parties** | **Borrower**: The Villages Health System LLC (the "Debtor")<br><br>**DIP Lender**: [*UNITEDHEALTHCARE ENTITY*], as initial lender, and its permitted assignees from time to time (the "DIP Lender"). |
| **Facility Structure and Commitment** | Senior secured super-priority debtor-in-possession loan facility (the "DIP Facility") in the chapter 11 case (the "Chapter 11 Case") of the Debtor for the extension of loans not to exceed $45,500,000 in principal amount (the "DIP Loans").<br><br>Funds shall be advanced upon request by the Debtor to the DIP Lender (a) to fund the repayment of the interim DIP financing (the "Affiliate DIP Loans") in an aggregate principal amount of $5,000,000 (plus accrued and unpaid interest and reasonable and documented fees and expenses due under the Court-approved documentation) and (b) to fund expenditures permitted under the DIP Budget (defined below), which requests shall include (i) the specific amount requested and the proposed use of proceeds and (ii) a statement of the Chief Restructuring Officer that (A) the Debtor is not in default under the DIP Documentation (defined below) and (B) an summary explanation of any deviation from the DIP Budget (e.g., Permitted Variances, etc.). Upon repayment of the Affiliate DIP Loans, all liens and security interest granted to the lender of the Affiliate DIP Loans shall be automatically released.<br><br>The initial funding shall be $10,500,000, $500,000 of which will be used to pay the Funding Fee (defined below). The DIP Lender shall respond to subsequent funding requests within two (2) business days of the date of the request by either (i) transferring the requested funds or (ii) objecting to the request in writing and, in so doing, providing a detailed description of all reasons for the objection. |
| **Documentation** | The DIP Facility would be evidenced by a credit agreement (the "DIP Credit Agreement") and related loan documentation (including the Final Order (defined below), collectively, the "DIP Documents"); *provided,* |

| | |
|---|---|
| | *however*, that the Final Order shall control in the event of conflicting or inconsistent terms.<br><br>The DIP Documents shall be in form and substance reasonably acceptable to the parties.  For purposes hereof, the term "<u>Final Order</u>" shall mean an order of the United States Bankruptcy Court for the Middle District of Florida (the "<u>Bankruptcy Court</u>" or the "<u>Court</u>") approving the terms and conditions of the DIP Facility substantially in the form set forth as <u>Exhibit A</u> hereto or as otherwise agreed by the DIP Lender in its reasonable discretion, which Final Order would be entered on such prior notice to such parties (including, without limitation, the Primed Party (defined below)) as may be reasonably satisfactory to the DIP Lender, approving the transactions contemplated herein and granting the superpriority claim status and senior priming and other liens contemplated herein, which Final Order would, among other things, (i) authorize the extensions of credit in the aggregate amount of the DIP Loans, (ii) approve the payment by the Debtor of all of the fees and expenses provided for herein and in the DIP Credit Agreement, (iii) approve a grant of a first priority lien on any amounts that are recovered or otherwise received by the Debtor in respect of avoidance actions and any proceeds thereof, (iv) approve a waiver of any rights to pursue the collateral of the Prepetition Lender for any amounts pursuant to section 506(c) of the Bankruptcy Code and (v) not have been stayed, vacated, reversed or rescinded. |
| **Maturity Date** | The DIP Facility shall mature and the DIP Loan be payable in full on the "<u>Maturity Date</u>," which shall mean the earliest of the following dates (unless extended by the DIP Lender):<br><br>1)    January 15, 2026;<br><br>2)    the date on which the Debtor closes a sale of all or substantially all of its assets (a "<u>Transaction</u>"); and<br><br>3)    the date of an Event of Default, if such Event of Default is either (a) incapable of being cured or (b) capable of being cured but has not been cured within 10 business days of the Debtor receiving a written notice of an Event of Default from the DIP Lender.<br><br>If the Maturity Date is a result of the closing of a Transaction, all outstanding DIP Obligations shall be paid in full prior to or upon closing of the Transaction either (i) directly from the buyer in such Transaction or (ii) directly from the escrow account, via the escrow agent, established for the consummation of the Transaction.  Such payment shall be made |

4905-8641-5192 v.3

| | |
|---|---|
| | by wire transfer of immediately available funds to account(s) designated in writing by the DIP Lender prior to the closing of such Transaction. |
| **Interest Rate** | A *per annum* rate equal to 12%, which shall be calculated on the basis of the actual days elapsed in a year of 360 days from the closing date (the "<u>Closing Date</u>") of the DIP Facility to the Maturity Date. Upon the occurrence of an Event of Default, and thereafter until such default is cured, and following the Maturity Date, if the DIP Facility has not been paid in full, interest on the unpaid amounts due under the DIP Facility shall accrue at a rate of 18% *per annum*. |
| **Funding Fee** | The DIP Lender shall be entitled to a funding fee of $500,000 (the "<u>Funding Fee</u>") payable to the DIP Lender in cash and due and payable on the Closing Date. There will be no commitment fees. |
| **Exit Fee** | The DIP Lender shall be entitled to an exit fee of $1,500,000 payable to the DIP Lender in cash and due and payable on the date that is the earliest of (a) the Maturity Date, (b) the date of termination of the DIP Facility or acceleration of the DIP Loans, and (c) the date on which the DIP Loans are otherwise paid in full. |
| **Fees and Costs** | The DIP Lender shall be entitled to reimbursement for any reasonable fees and costs, including attorneys' fees, incurred by the DIP Lender in connection with the DIP Facility; *provided* that, in connection with the initial negotiation and documentation of the DIP Facility, such reimbursement for reasonable fees and costs shall not exceed $200,000. |
| **DIP Budget** | Subject to the terms of the DIP Documents, as may be amended, the DIP Lender consents to, and the Debtor shall be authorized to, use any "cash collateral" of the DIP Lender, and any proceeds thereof, and the DIP Facility in accordance with the budget attached hereto as <u>Schedule I</u> (as modified in accordance with the DIP Documents from time to time, the "<u>DIP Budget</u>"). The Debtor and the DIP Lender may agree to amend or otherwise alter the DIP Budget at any time without further approval of the Bankruptcy Court so long as the alteration does not increase the principal commitment under the DIP Facility.<br><br>For purposes of compliance with the DIP Documents, receipts, operating disbursements, capital expenditures and non-operating disbursements, shall be tested every other week on a cumulative basis beginning on the [fifth] full week following July 3, 2025 (the "<u>Petition Date</u>") (i.e., from the Petition Date through the Friday prior to each testing date) in each case, on an aggregate basis (i.e., the aggregate applicable receipts less aggregate applicable disbursements reflected as Net Cash Flow in the approved DIP Budget) and subject to a twenty (20%) permitted variance) (the "<u>Permitted Variance</u>"). |

| | Any modifications to the DIP Budget (including any extension beyond the current DIP Budget period) must be approved by the DIP Lender in its reasonable discretion.<br><br>By no later than 5:00 p.m. (Eastern Time) on Friday of the [fifth] full calendar week following the Petition Date (and each Friday thereafter), the Debtor shall provide (a) a variance report to the DIP Lender comparing the previous week's budget-to-actuals and (b) updated cash flow projections through the Maturity Date, and the Debtor shall provide any backup information upon request. |
|---|---|
| **Security and Priority of DIP Facility** | Subject to Bankruptcy Court approval and, as applicable, the Carve-Out (defined below), the indebtedness and other amounts due under the DIP Facility to the DIP Lender, including, without limitation, all principal and accrued interest, costs, fees, expenses, and other amounts due under the DIP Facility (collectively, the "<u>DIP Obligations</u>"), shall be entitled to the following classification and treatment in the Debtor's chapter 11 case:<br><br>1)   pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior secured super-priority administrative expense claims, having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Debtor, including, but not limited to, the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114, and any other provision of the Bankruptcy Code or otherwise (the "<u>Super-Priority DIP Claim</u>");<br><br>2)   pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, non-avoidable, automatically perfected first priority priming lien and security interest in and lien on (the "<u>DIP Lender Liens</u>") the DIP Collateral and all cash and non-cash proceeds of the DIP Collateral,[1] including, without limitation, the collateral |

---

[1] "<u>DIP Collateral</u>" means: all property of the estate under Section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtor, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including governmental and credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property, hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accession and proceeds of the foregoing, wherever located, including insurance or other proceeds (provided that the liens and rights granted herein shall not interfere with any rights held by a landlord to insurance

securing the obligations of the Debtor under or in connection with that certain $15,000,000.00 Line of Credit dated as of April 7, 2025 and as amended on May 30, 2025, June 13, 2025 and June 27, 2025, as evidenced and secured by a Master Secured Promissory Note, Security Agreement, UCC-1 Financing Statement, and Deposit Account Control Agreement (the "Prepetition Secured Loan"), between the Debtor and PMA Lender, LLC (the "Primed Party") (such liens, the "Primed Liens");

3)    immediate payment in full in cash as a simultaneous condition to the consummation of a Transaction; and

4)    the right to credit bid the outstanding amount of DIP Obligations in connection with any Transaction involving an affiliate of the DIP Lender, *provided* that the DIP Lender shall have no right to credit bid DIP Obligations in an aggregate amount in excess of $46,500,000 plus accrued and unpaid interest.

All Primed Liens would be primed by and made subject, and subordinate, to the perfected first priority, senior priming liens granted to the DIP Lender, which senior priming liens in favor of the DIP Lender would also prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens but would not prime liens, if any, to which the Primed Liens are subject or subordinate as of the Petition Date or which the Primed Liens become subject or subordinate subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code.

The DIP Lender Liens shall be effective and perfected with the foregoing specified priority as of the entry of the Final Order and without requiring the execution, filing, or recording of mortgages, security agreements, intercreditor agreements, subordination agreements, control agreements, acknowledgments, financing statements, fixture filings, or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral; *however*, if the DIP Lender so

---

proceeds for damage to a landlord's property); (b) all proceeds of leased real property; (c) subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtor's exercise of rights under Sections 506(c) and 550 of the Bankruptcy Code; (e) all property of the Debtor that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date; (f) all proceeds from the sale, assignment, or other disposition of (i) commercial real estate leases and (ii) the Debtor's right to select, identify, and designate which commercial leases may be assumed and assigned under Section 365 of the Bankruptcy Code. Notwithstanding the foregoing, DIP Collateral shall not include the Debtor's real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lender Lien is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease.

| | |
|---|---|
| | requires, the Debtor shall use reasonable efforts to execute, file or record any documents and/or take any actions necessary or prudent to ensure the perfection of the DIP Lender Liens.<br><br>The DIP Lender Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and/or upon dismissal of the Chapter 11 Case.<br><br>The DIP Lender Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.<br><br>No lien or interest avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Lender Liens. |
| **Use of DIP Facility and Cash Collateral** | The proceeds of the DIP Loan will be used solely in accordance with the DIP Budget and the Final Order, including to fund the repayment of the Affiliate DIP Loans. |
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the Final Order, the DIP Budget, or the DIP Documents, neither the funds available under the DIP Facility, the DIP Collateral, nor the Carve-Out may be used to fund or pay expenses in connection with: (a) preventing, hindering, or delaying the DIP Lender's enforcement of the DIP Documents, collection of the DIP Obligations, or realization upon any of the DIP Collateral, subject to compliance with the DIP Documents, orders of the Bankruptcy Court, and applicable law; (b) using or seeking to use the DIP Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender; (d) incurring any junior priority indebtedness without prior notice to the DIP Lender; (e) incurring any senior priority or equal priority indebtedness without the prior written consent of the DIP Lender; (f) seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Documents, including the Final Order; (g) objecting to or challenging in any way the DIP Lender Liens, the DIP Obligations, the DIP Collateral or any other claims or liens, held by or on behalf of the DIP Lender; (h) examining, asserting, commencing, prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Lender, or any of its respective affiliates, successors and |

| | |
|---|---|
| | assigns and the partners, shareholders, members, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (i) litigating, objecting to, challenging, contesting in any manner, or raising any of the DIP Obligations, the DIP Lender Liens, or any other rights or interests of the DIP Lender; or (j) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations. |
| **Representations & Warranties** | The Debtor hereby represents and warrants that:<br><br>1) The [amended DIP Motion][2] and the Final Order shall be consistent with this Term Sheet and in all other respects in form and substance reasonably satisfactory to the DIP Lender;<br><br>2) The execution and delivery of all agreements, instruments, and other documents evidencing or securing the DIP Facility consistent with this Term Sheet and in all other respects in form and substance reasonably satisfactory to the DIP Lender; and<br><br>3) All necessary governmental, shareholder, and third-party approvals and/or consents have been obtained by the Debtor and remain in effect. |
| **Covenants** | The DIP Facility shall include a covenant to comply with the DIP Budget (subject to Permitted Variances), a covenant to enter into and comply with an investigation protocol among the Debtor, the DIP Lender and health insurance company or other creditors who wish to participate (the "Multiparty Investigation Protocol"), for funding and conducting a collaborative investigation into potential estate causes of action excluded from the Transaction ("Excluded Claims"), and customary affirmative and negative covenants related to other matters to be agreed. |
| **Condition Precedent to Lending** | The obligation of the DIP Lender to fund the DIP Loan shall be subject to the condition precedent that on the date of such release, the following statements shall be true:<br><br>1) the Bankruptcy Court has entered the Final Order;<br><br>2) the DIP Lender shall have received and shall have approved the DIP Budget;<br><br>3) the Debtor and the DIP Lender shall have entered into the Multiparty Investigation Protocol; and |

---

[2] NTD:  TBD.

|  | 4)    the Debtor has not committed an Event of Default (defined below) which remains uncured at the time of lending.<br><br>Subject to the foregoing conditions being satisfied, the DIP Lender shall release funds to the Debtor under the terms set forth herein.  For the avoidance of doubt, the DIP Lender may waive any of the conditions precedent at any time in writing. |
|---|---|
| **Mandatory Prepayment** | Upon the Maturity Date, the Debtor shall repay to the DIP Lender the aggregate outstanding principal amount under the DIP Facility and all accrued but unpaid interest and fees thereon.  The Debtor may prepay without penalty all or any portion of the DIP Facility, together with accrued and unpaid interest and, in the case of termination of the DIP Facility, the exit fee. |
| **Carve-Out Reserve** | The DIP Lender agrees to a carve-out reserve (the "Carve-Out"), which sum as calculated herein shall remain in the estate notwithstanding the exercise of the DIP Lender of its rights as a result of an Event of Default and/or repayment of the DIP Loan.<br><br>The Carve-Out shall be calculated as the sum of the following amounts as of the earliest day the DIP Lender issues a Carve-Out Trigger Notice ("Carve-Out Effective Date"): (i) all unpaid professional fees and disbursements incurred by the Debtor and any statutory committees appointed in the Chapter 11 Case pursuant to Sections 327, 328, 363 and 1103 of the Bankruptcy Code for any of their respective professionals retained by final order of the Bankruptcy Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "Case Professionals") at any time prior to the delivery of the Carve-Out Trigger Notice to the extent allowed by the Bankruptcy Court (the "Allowed Professional Fees"), in an aggregate amount not to exceed the amounts set forth in the DIP Budget for Professional Fees prior to the delivery of a Carve-Out Trigger Notice; and (ii) the payment of allowed and unpaid professional fees and disbursements incurred by the Case Professionals following the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $250,000 (the "Wind-Down Carve-Out Amount"), plus (iii) the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk of the Court for the Debtor for the time period beginning on the Petition Date and ending on the Carve-Out Effective Date, which fees shall not be limited to amounts that may be set forth in the DIP Budget.<br><br>"Carve-Out Trigger Notice" means a written notice, delivered by email or U.S. Mail by the DIP Lender to the Debtor, its counsel, the U.S. Trustee, and counsel to any committees, of any default hereunder. |

8

| No Permitted Liens | The Debtor shall not create or incur any senior priority or equal priority liens on any of the collateral to which the DIP Lender Liens attach, without the DIP Lender's consent. |
|---|---|
| **Assignments and Participations** | The DIP Facility may not be assigned by the Debtor without the prior written consent of the DIP Lender.  DIP Loans may be freely participated or assigned by the DIP Lender to any person or entity not affiliated with the Debtor at the time of the assignment or participation. |
| **Events of Default** | The following shall be events of default (collectively, "Events of Default" and, each individually, an "Event of Default"):<br><br>1) The Debtor fails to operate in accordance with the DIP Budget (after taking into account Permitted Variances), the Multiparty Investigation Protocol, or any reporting requirement, and such defect or deviation remains uncured 10 business days after the DIP Lender notifies the Debtor thereof;<br><br>2) The Debtor fails to make any required payment, including, but not limited to, the payment of the full balance of the DIP Facility upon default or at the Maturity Date;<br><br>3) Any order authorizing the Debtor to obtain the DIP Facility, whether on an interim or final basis, is not in a form satisfactory to the DIP Lender or is reversed, vacated, stayed, amended, supplemented, or otherwise modified in a manner which shall materially and adversely affect the rights of the DIP Lender;<br><br>4) The Debtor's Chapter 11 Case is either dismissed or converted to a case under chapter 7 pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed;<br><br>5) A chapter 11 trustee is appointed such that the Debtor is no longer a debtor-in-possession, pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed; or<br><br>6) The Debtor fails to achieve any of the Milestones (the "Milestones") set forth below, unless extended or waived by the DIP Lender in writing:<br><br>August [•], 2025 — Last date to obtain final approval of DIP Facility<br><br>September 7, 2025 — Last date to conduct and complete any auctions related to the Transaction |

4905-8641-5192 v.3

|  | September 9, 2025 | Last date to obtain Bankruptcy Court approval of the Transaction |
|  | October 14, 2025 | Last date to close the Transaction |
|  | [October 31], 2025 | Last date for Debtor to propose a chapter 11 plan and file a disclosure statement related thereto |
|  | [November 28], 2025 | Last date to obtain Bankruptcy Court approval of disclosure statement |
|  | [December 31], 2025 | Last date for Debtor to solicit votes on the chapter 11 plan |
|  | [January 30], 2026 | Last date to obtain Bankruptcy Court approval and confirm chapter 11 plan |
| **Remedies** | Upon the occurrence of an Event of Default, the DIP Lender shall give written notice of such Event of Default (the "Default Notice") to counsel for the Debtor, counsel to the Official Committee of Unsecured Creditors (if any), and to the Office of the United States Trustee (the "Notice Parties") (which notice shall be given by e-mail transmission, the automatic stay being deemed lifted for such purpose to the extent necessary). | |
|  | Upon the delivery of a Default Notice, the Debtor and the DIP Lender consent to an expedited hearing on not less than five (5) business days' notice to consider: (i) whether an Event of Default has occurred; and (ii) the appropriate relief or remedies. | |
|  | Until the earlier of (a) the ten (10) business days following the date a Default Notice is delivered and (b) order of the Court (the "Remedies Notice Period"), the DIP Lender shall continue to perform under the DIP Facility and the Final Order and the Debtor shall have authority to use cash collateral and DIP Facility proceeds in accordance with the DIP Documents and applicable DIP Budget to avoid immediate and irreparable harm to the Debtor's estate. | |
|  | At the end of the Remedies Notice Period, the Debtor's rights to use the DIP Facility or cash collateral shall immediately cease and all cash collateral or proceeds of the DIP Facility shall be held pending further order of the Bankruptcy Court, except as necessary to fund the Carve-Out, unless (i) otherwise agreed by the parties, (ii) otherwise ordered by the Bankruptcy Court, or (iii) the Event of Default has been cured or waived. | |

| | |
|---|---|
| **Indemnity** | The Debtor agrees to indemnify and hold harmless the DIP Lender and each of its respective shareholders, directors, members, managers, principals, agents, advisors, officers, subsidiaries and affiliates in such capacity (each, an "<u>Indemnified Person</u>") from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, the transactions contemplated thereby or hereby, or any claim, action, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Debtor or any other person or entity, except to the extent resulting from the fraud, gross negligence, recklessness or willful misconduct of such Indemnified Person, as determined by a final non-appealable order of a court of competent jurisdiction. |
| **Amendment and Waiver** | No waiver, modification, or amendment of the terms of this Term Sheet shall be valid unless such waiver, modification, or amendment is in writing and has been signed by the Debtor and the DIP Lender.  No waiver of any of the provisions of this Term Sheet shall be deemed or constitute a waiver of any other provisions of this Term Sheet, whether or not similar, nor shall any waiver be deemed a continuing waiver. |
| **Other Terms** | <u>Adequate Protection</u>. No adequate protection shall be provided to any prepetition creditor, except on terms acceptable to the DIP Lender in its reasonable discretion.<br><br><u>506(c) Waiver</u>. All rights to surcharge the DIP Lender Liens, or the collateral to which such DIP Lender Liens attach, under Section 506(c) of the Bankruptcy Code shall be waived in the Final DIP Order.<br><br><u>552(b)(1) Entitlement</u>. The DIP Lender shall be entitled to all of the rights and benefits of Section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply in the Final DIP Order.<br><br><u>Granting of Lien on Claims/Causes of Action</u>. Subject to entry of the Final DIP Order, the DIP Lender Liens shall attach to and encumber the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents.<br><br><u>Status of Prepetition Secured Loans</u>.  The Debtor shall not enter into any agreement with respect to the Prepetition Secured Loans so long as any DIP Obligations remain outstanding and unpaid.  The rights of all parties with respect to the Prepetition Secured Loans and the Primed Liens, |

11

| | |
|---|---|
| | including their ranking against the Debtor and its assets after repayment of the DIP Obligations, otherwise will be fully reserved. |

4905-8641-5192 v.3

**Exhibit A**

**Proposed Form of Final Order**

[*To be provided*]

13

**Schedule I**

**DIP Budget**

[*To be provided*]

4905-8641-5192 v.3

**<u>Exhibit B</u>**

**UnitedHealthcare's Proposed Investigation Protocol**

S&C Draft of July 30, 2025
PRIVILEGED AND CONFIDENTIAL

**<u>Related Party Investigation Protocol:  Summary of Terms</u>**

- ***Introduction.***  Upon entering into the DIP Facility, UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc. (together, "<u>UnitedHealthcare</u>") and The Villages Health System LLC (the "<u>Debtor</u>") (and together with UnitedHealthcare, the "<u>Parties</u>") shall enter into an agreement setting forth a protocol for collaboration and cooperation between the Parties in connection with the investigation of all potential estate causes of action against any direct and indirect affiliates and owners of the Debtor, together with their and the Debtor's directors and officers (collectively, the "<u>Related Parties</u>"; and such investigation, the "<u>Related Party Investigation</u>"; such causes of action, the "<u>Related Party Claims</u>"; and such protocol, the "<u>Related Party Investigation Protocol</u>").

- ***Common Interest and Confidentiality.***  The Related Party Investigation Protocol shall provide that the Parties have a common legal interest in the Related Party Investigation and that communications between them concerning the Related Party Investigation shall be kept confidential in order to maintain any privilege, immunity, or protection from disclosure that applies to such communications.  The Related Party Investigation Protocol will prohibit either Party from sharing information concerning the Related Party Investigation with third parties, including, with respect to the Debtor, any Related Parties (including attorneys jointly representing the Debtor and any such Related Parties), without the express written consent of the other Party.  The Related Party Investigation Protocol shall provide that the Parties will memorialize such common legal interest and confidentiality obligations in a formal written agreement to the extent that either Party deems it advisable to do so.

- ***Prompt Completion and Efficiency.***  The Parties desire that the Related Party Investigation be completed as promptly and efficiently as is reasonably practicable.  To that end, the Parties shall endeavor to complete the Related Party Investigation promptly after entering into the Related Party Investigation Protocol and, pursuant to the division of responsibilities set forth below, to avoid duplication of effort in the Related Party Investigation.

- ***Division of Responsibilities.***  The Parties anticipate that the Related Party Investigation will comprise two main workstreams:  (1) the identification and analysis of all outflows of funds from the Debtor over the [x]-year period preceding the filing of the chapter 11 petition (the "<u>Funds Tracing Exercise</u>"); and (ii) the factual investigation of all Related Party Claims, including, as set forth below, documentary and written discovery and depositions ("<u>Related Party Discovery</u>").  The Parties agree that GBH SOLIC Holdco, LLC ("<u>SOLIC</u>") shall be principally responsible for conducting the Funds Tracing Exercise and that legal counsel for UnitedHealthcare ("<u>UHC Counsel</u>") shall be principally responsible for conducting Related Party Discovery.

- ***Funds Tracing Exercise.***  Within [three (3) days] of entering into the Related Party Investigation Protocol, the Debtor shall cause SOLIC to provide to UHC Counsel a proposed plan describing the scope of, and setting forth the specific steps that SOLIC intends to take in conducting and proposed timetable for, the Funds Tracing Exercise, and the Parties shall promptly meet and confer in good faith to amend the plan based on feedback from UHC Counsel and UnitedHealthcare.  The purpose of the Funds Tracing Exercise shall be, among

S&C Draft of August 3, 2025
PRIVILEGED AND CONFIDENTIAL

other things, to determine how the Debtor used the funds it received in connection with its participation in Medicare Advantage, including identifying the recipients, and the timing and reasons for any disbursements by the Debtor, of such funds. During the course of the Funds Tracing Exercise, the Debtor shall cause SOLIC to provide S&C with periodic updates, to respond to inquiries from S&C, and to share any drafts of reports, presentations, memoranda, or other work product with S&C, and the Parties agree to meet and confer in good faith to address any comments that S&C or UnitedHealthcare may have on such work product. S&C shall have the same access to SOLIC's work papers and other work product in connection with the Funds Tracing Exercise as the Debtor.

- ***Related Party Discovery.*** Within [three (3) days] of entering into the Related Party Investigation Protocol, UnitedHealthcare shall cause S&C to provide to the Debtor's bankruptcy counsel and SOLIC a proposed plan describing the scope of and setting forth the specific steps that S&C intends to take in conducting and proposed timetable for, Related Party Discovery, and the Parties shall promptly meet and confer in good faith to amend the plan based on feedback from the Debtor's bankruptcy counsel and SOLIC. The purpose of Related Party Discovery shall be to gather factual evidence in support of the pursuit of all potential Related Party Claims, including the nature and quantum of such claims and underlying theories of liability. During the course of Related Party Discovery, UnitedHealthcare shall cause S&C to provide the Debtor's bankruptcy counsel and SOLIC with draft discovery requests within at least twenty-four (24) hours of serving such requests to third parties and to endeavor to schedule any depositions on dates and at times that are mutually agreeable to S&C, the Debtor's bankruptcy counsel, and SOLIC. S&C shall take the lead in drafting and propounding all Related Party Discovery requests, meeting and conferring with counsel for Related Parties concerning such requests, and taking depositions of Related Parties. UnitedHealthcare shall cause S&C to make all document productions and other responses to discovery requests, and all deposition transcripts and exhibits, obtained through Related Party Discovery available to the Debtor's bankruptcy counsel and SOLIC.

- ***Participation by Other Creditors.*** Subject to the terms set forth in the Related Party Investigation Protocol, the Parties agree that other creditors of the Debtor may participate in the Related Party Investigation and receive access to the discovery record and, subject to appropriate common interest and confidentiality restrictions, the benefit of any analyses or other work product shared between the Parties.

- ***Coordination of Party Discovery.*** For the avoidance of doubt, the Related Party Investigation Protocol does not apply to discovery that UnitedHealthcare may seek from the Debtor or that the Debtor may seek from UnitedHealthcare, as to which the Parties agree that they will comply in good faith with their obligations under applicable law and rules. Nevertheless, each Party agrees, during the term of the Related Party Investigation, to endeavor in good faith to minimize the burden of any discovery served on the other Party and to conduct such discovery as far as is reasonably practicable only after the sale of the Debtor's assets has been consummated.