ORDERED.

**Dated:  September 09, 2025**

_____

Lori V. Vaughan
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| In re: | **Case No.: 25-04156 (LVV)** |
| **THE VILLAGES HEALTH SYSTEM, LLC,**[1] | **Chapter 11** |
| **Debtor.** | |

## ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the motion [Docket No. 29] (the "Motion")[2] filed by the Villages Health System,

LLC (the "Debtor" or "Seller")  for entry of an order (this "Sale Order"), (i) authorizing and

---

[1] The address of the Debtor is 600 Sunbelt Road, The Village, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

[2] Capitalized terms used but not defined herein shall have the meanings provided in the Motion or the Stalking Horse APA, as applicable.

approving the sale of substantially all of the assets of the Debtor (as such assets may be more particularly defined in the governing Stalking Horse APA, the "Purchased Assets"), free and clear of all liens, interests, claims, and encumbrances (other than Assumed Liabilities) to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Sale Transaction"), (ii) authorizing and approving the assumption and assignment of the Assumed Contracts (as defined herein) to the fullest extent permitted under section 365 of the Bankruptcy Code, and (iii) granting related relief; and this Court having considered any and all objections to the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, their creditors, and other parties in interest; and this Court having found that the Debtor's notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed and considered the Motion, all relief related thereto, the objections thereto, including the objections of the United States Trustee ("UST") [Docket No. 208], the United States [Docket No. 209], Highspring LLC (f/k/a Vaco LLC) ("Highspring") [Docket. No. 197], Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("BCBSFI") and its commercial HMO, Health Options, Inc. ("HOI") (collectively, "Florida Blue") [Docket. No. 177], VaxCare, LLC ("VaxCare") [Docket. No. 175], Jim Besong ("Besong") [Docket. No. 172], and UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc., together with their affiliates (collectively, "UnitedHealthcare") [Docket. No. 168], and the statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Motion at the Sale

Hearing, including, among other things, the declarations of Neil Luria and A.J. Berens [Doc. Nos. 215 and 216]; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS**:

A.　　The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.　　On July 3, 2025, the Seller entered into that certain Asset Purchase Agreement (as further modified and amended, the "Stalking Horse Bid" or the "Stalking Horse APA") for the Purchased Assets with CenterWell Senior Primary Care (FL), Inc. (the "Buyer" or "Stalking Horse Bidder").[3]  The Stalking Horse Bid was subject to higher and better offers made in accordance with the Bid Procedures Order (defined below).

C.　　By order dated July 28, 2025 [Docket No. 110] (the "Bid Procedures Order"), the Court, among other things, approved (i) the Bid Procedures; (ii) the procedures for notice of the proposed sale of the Purchased Assets free and clear of all claims and encumbrances (other than Assumed Liabilities); (iii) procedures for the assumption and assignment of executory contracts

---

[3] As used herein, in the Bid Procedures, or in any order of this Court, the terms "Successful Bid" and "Successful Bidder" shall be interpreted as referring to the "Stalking Horse Bid" or "Stalking Horse APA," as to the former, and the "Buyer" or "Stalking Horse Bidder," as to the latter.  As used herein, except as used for historical context, "Stalking Horse Bid" and "Stalking Horse APA" shall refer to the document(s) appended hereto as Exhibit 1.

and unexpired leases to be assumed and assigned as part of the Purchased Assets (the "Assumed Contracts"); and (iv) the Bid Protections (as defined in the Bid Procedures Order), among other relief, all as more particularly set forth in the Bid Procedures Order.

D.    The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders, were the result of arm's-length negotiations, and afforded notice and a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise best offer to the Purchased Assets.  The Debtor conducted the sale process without collusion and in accordance with the Bid Procedures.

E.    The Debtor solicited offers and noticed the Auction in accordance with the provisions of the Bid Procedures Order. The Auction was duly noticed, and the Debtor afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer than the Stalking Horse Bid to purchase the Purchased Assets. The Debtor received one timely Qualified Bid in addition to the Stalking Horse Bid before the Bid Deadline from The Villages Buyer, LLC, an affiliate of Kinderhook Industries, LLC ("Kinderhook"). Accordingly, the Debtor held an Auction on September 7, 2025. Following the Auction, the Stalking Horse Bidder was properly designated as the Successful Bidder and the Stalking Horse Bidder entered into a modified and amended Stalking Horse APA, which memorializes the Successful Bid for the Purchased Assets enumerated therein, in each case, in accordance with the Bid Procedures Order. A true and correct copy of the Stalking Horse APA memorializing the Successful Bid is attached to this Order as **Exhibit 1**. The Buyer and its professionals have complied in all material respects with the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, and all other applicable orders of this Court in negotiating and entering into the Stalking Horse

134562.000004\4920-5390-5255.5

APA, and the Sale Transaction and the Stalking Horse APA likewise comply with the Bid Procedures Order and all other applicable orders of this Court.

F.      Proper, timely, adequate, and sufficient notice of the Motion, the Buyer, the Stalking Horse APA, the Sale Transaction proposed in the Motion, including the assumption and assignment of the Assumed Contracts and any cure amounts related thereto, and of the terms of this Sale Order has been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, Local Rule 6004-1, and other applicable law. As demonstrated by the certificates of service and affidavits of publication filed on the docket, the Debtor has provided sufficient and appropriate notice under the circumstances, and no other or further notice of the Motion, the Sale Agreements, the Sale Hearing, or the related deadlines is required.

G.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

H.      Consistent with its fiduciary duties, the Debtor has demonstrated both (i) good, sufficient, and sound business purposes and justification, and (ii) compelling circumstances for the sale of the Purchased Assets to the Buyer pursuant to section 363 of the Bankruptcy Code. Such justification and compelling circumstances include, but are not limited to, the fact that (x) the Buyer's offer under the Stalking Horse APA constitutes the highest and best offer available for the Purchased Assets; (y) the Debtor provided all Qualified Bidders at the Auction a reasonable opportunity to submit an Overbid to the Stalking Horse APA before the close of the Auction; and (z) consummation of the Sale Transaction with the Buyer presents the best opportunity to realize the highest value for the Purchased Assets and avoid potential decline and devaluation thereof,

134562.000004\4920-5390-5255.5

relieves the Debtor's bankruptcy estate of significant liabilities and provides a viable path for continued operations of the Facilities in the communities they serve.

I.     The consideration provided at Closing by the Buyer is fair and reasonable, represents the highest and/or best offer for the Purchased Assets, is in the best interests of the Debtor, its creditors and its estate, and constitutes a valid and sound exercise of the Debtor's business judgment.

J.     The terms set forth in this Sale Order and the Stalking Horse APA, are fair and reasonable and constitute reasonably equivalent value and full, adequate, and fair consideration for the Purchased Assets under the Bankruptcy Code, or any other applicable laws of the United States, any state, territory, or possession.

K.     As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing, as applicable, and the representations of counsel made on the record at the Sale Hearing, as applicable, (a) the Debtor and its professionals adequately marketed the Purchased Assets and conducted the sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any interested party to conduct due diligence and make an offer to purchase the Purchased Assets and submit higher or better offers for the Purchased Assets than the Successful Bid; (c) the consideration provided by the Buyer is fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia or any other applicable law; (e) the Sale Transaction will provide a greater recovery to the Debtor's creditors than would be provided by any other presently available alternative

6

transaction with respect to the Purchased Assets; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtor or its estate than the Buyer; and (g) the Debtor determined that the Stalking Horse APA constitutes the highest or otherwise best offer for the Purchased Assets, maximizes value for the Debtor's estate, and constitutes a valid and sound exercise of the Debtor's business judgment. There is no legal or equitable reason to delay Closing, as contemplated by the Stalking Horse APA.

L.     The sale process engaged in by the Debtor and the Buyer was conducted in accordance with the Bid Procedures and the Bid Procedures Order. The Stalking Horse APA was negotiated, proposed, and entered into by the Debtor and the Buyer in good faith, without collusion of any kind, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties in interest. The Debtor and the Buyer and their respective advisors have complied, in good faith, in all material respects with the Bid Procedures Order and the Bid Procedures. The Debtor and its management, employees, agents, advisors, and representatives, and the Buyer and its employees, agents, advisors and representatives, actively participated in the bidding process, and each acted in good faith and without collusion or fraud of any kind. The Buyer subjected its bid to competitive bidding in accordance with the Bid Procedures and was designated the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures and the Bid Procedures Order. All payments to be made by the Buyer to the Debtor or any insider of the Debtor in connection with the Sale Transaction, and other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been disclosed. The form and total consideration to be realized by the Debtor under the Stalking Horse APA constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value, and reasonable market value

for the Purchased Assets.  Neither the Debtor nor the Buyer has engaged in any conduct that would cause or permit the Stalking Horse APA or the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtor nor the Buyer has violated section 363(n) of the Bankruptcy Code by any action or inaction.

M.    The Buyer is a purchaser in "good faith," as that term is used in section 363(m) of the Bankruptcy Code, with respect to the Purchased Assets and the Sale Transaction, and, as such, is entitled to all of the rights, privileges, immunities, and protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Buyer has proceeded in good faith in all respects in connection with the Sale Transaction specific and this chapter 11 case generally. Neither the Debtor nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code. The Debtor was free to deal with any other party interested in buying or selling some or all of the Purchased Assets on behalf of the Debtor's estate. The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale Transaction and the Buyer would not consummate the Sale Transactions without such protections. The Stalking Horse APA and this Sale Order were negotiated, proposed, and entered into by the Debtor and the Buyer in good faith, from arm's-length bargaining positions, and without collusion. The Buyer is not connected to or related to the Debtor or those in control of the Debtor in any manner that could reasonably affect the marketing, bidding, negotiating, or ultimate sale of the Purchased Assets on the terms set forth herein. The sale process conducted was non-collusive, fair, and reasonable, and it was conducted openly and in good faith. The Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Purchased Assets and the Sale Transaction.

N.      The sale of the Purchased Assets to the Buyer is a sale in good faith within the meaning of Bankruptcy Code section 363(m). The Buyer, the Debtor, and their respective representatives and affiliates, have not engaged in any conduct that would cause or permit the sale of the Purchased Assets, the Sale Transaction, or this Sale Order to be avoided. Neither the Buyer nor any of its affiliates, officer, directors, managers, shareholders, members or any of their respective successors or assigns is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.   No common identity of directors, managers, controlling shareholders, or members exists between the Debtor and the Buyer.  All payments to be made by the Buyer to the Debtor or any insider of the Debtor in connection with the Sale Transaction, and all agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been fully disclosed, and the negotiation and execution of the Stalking Horse APA and the other related documents were at arms' length and in good faith.

O.      The consideration provided by the Buyer for the Purchased Assets pursuant to the Stalking Horse APA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtor's creditors and estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession, and the District of Columbia, or any other applicable law.

P.      The Stalking Horse APA was not entered into, and neither the Debtor nor the Buyer has entered into the Stalking Horse APA or proposes to consummate the Sale Transaction, for the purpose of (i) escaping liability for any of the Debtor's debts or (ii) hindering, delaying or defrauding the Debtor's present or future creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under

9

the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable law substantially similar to the foregoing.

Q.    The Buyer would not have entered into the Stalking Horse APA and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, if (a) the sale of the Purchased Assets to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code and any other applicable law and except for Assumed Liabilities, free and clear of (i) all liens, whether consensual or statutory, replacement liens, adequate protection liens or other liens granted under sections 361, 363, or 364 of the Bankruptcy Code, mortgages, deeds of trust, hypothecations, pledges, security interests, charges, contractual commitments, options and transfer restrictions, including rights of first refusal or first offer, defect or objection liens, easements, encroachments or servitudes, in each case, that constitutes an "interest" for purposes of section 363(f) of the Bankruptcy Code (collectively, the "Liens"), (ii) any and all "claims," as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including (1) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (A) ERISA (as defined below), (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Age Discrimination and Employment Act of 1967, as amended, (G) the Americans with Disabilities Act of 1990, (H) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue

Code and of any similar state law, (I) state anti-discrimination, harassment, or retaliation laws, (J) state unemployment or workers' compensation laws or any other similar state laws, (K) the Family and Medical Leave Act and paid leave laws or other leave of absence laws, (L) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors, or (M) the WARN Act (29 U.S.C. §§ 2101 et seq.), or in each case in (A) through (M) any equivalent applicable laws outside the United States, (2) any rights under any multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA")), pension, health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including any pension plans of the Debtor or any multiemployer plan to which the Debtor has at any time contributed to or had any liability or potential liability, (3) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, (4) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (5) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including the Internal Revenue Code of 1986, as amended (the "IRC"), and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing, including any ad valorem taxes assessed by any applicable taxing authority, and (6) any other rights or causes of action (whether in law or in equity), warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtor or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent

to the commencement of the above-captioned case, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"), (iii) any losses, obligations, liabilities, settlement payments, damages, awards, judgments, reimbursements, fines, penalties, assessments and interest arising out of, resulting from, or in connection with (1) the self-disclosure to the U.S. Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") and U.S. Department of Justice ("DOJ") made on December 27, 2024, (2) the Debtor's billing, coding and clinical documentation practices, or (3) any related action, charge, order, audit, investigation, formal inquiry, complaint, suit, litigation, arbitration, qui tam action, written notice of violation or noncompliance, or other Claim or proceeding, whether administrative, civil, criminal or otherwise; (iv) any losses, obligations, liabilities, settlement payments, damages, awards, judgments, reimbursements, refunds, fines, penalties, assessments and interest, whether now existing or hereafter arising, imposed by, or owed to, the DOJ, OIG or any other Governmental Authority, any Medicare Advantage plan, any federal healthcare program, or any other health plan, third-party payor, patient or person (such liabilities described in clauses (iii) and (iv), the "Healthcare Program Claims"); and (v) any and all claims, causes of actions, encumbrances, payments, charges, judgments, assessments, losses, monetary damages, penalties, fines, fees, interest obligations, deficiencies, debts, obligations, costs and expenses, judgments, orders and decrees of any court or foreign domestic governmental entity (including foreign, state, and local taxes), and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), including any amounts paid in settlement, interest, court costs, costs of investigators, attorneys' fees, legal or other expenses incurred in connection therewith (collectively, the "Interests"); or (b) if the Buyer would, or in the

future could, be liable for or subject to any such Liens, Claims, or Interests (other than Assumed Liabilities).

R.       A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities) would have yielded substantially less value for the Debtor's estate, with less certainty, than the Sale Transaction as contemplated by the Stalking Horse APA.  Therefore, the Sale Transaction contemplated by the Stalking Horse APA free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities) is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.

S.       The Debtor may transfer the Purchased Assets free and clear of all Claims and Encumbrances (other than Assumed Liabilities) because, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)–(5) have been satisfied. Each creditor or other person or entity asserting a Claim or Encumbrance (as defined below) in the Purchased Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim or Encumbrance, or (iii) otherwise falls within the provisions of Bankruptcy Code section 363(f). Those holders of Claims or Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Motion are deemed to have consented to the Motion and the Sale Transaction pursuant to section 363(f)(2).

T.       As a condition to purchasing the Purchased Assets pursuant to the Stalking Horse APA, the Buyer requires that the Purchased Assets be transferred free and clear of all Claims and Encumbrances (other than Assumed Liabilities) and free from any successor liability claims, including, for the avoidance of doubt, any Healthcare Program Claims.

134562.000004\4920-5390-5255.5

U.      The Buyer would not have entered into the Stalking Horse APA, or any subsequent version thereof, and will not consummate the Sale Transaction, thus adversely affecting the Debtor's estate, if the transfer of the Purchased Assets is not free and clear of all Claims and Encumbrances (other than Assumed Liabilities), including, for the avoidance of doubt, any Healthcare Program Claims or if the Buyer were or could be liable for any Claims or Encumbrances against the Debtor or the Purchased Assets (other than Assumed Liabilities).

V.      Neither the Buyer nor any of its affiliates are a mere continuation or substantial continuation of the Debtor or its estate, there is no continuity or common identity between the Buyer, the Debtor, or any of their respective affiliates, and there is no continuity of enterprise between the Buyer, the Debtor, or any of their respective affiliates.  Neither the Buyer nor any of its affiliates are holding themselves out to the public as a continuation of the Debtor.  Neither the Buyer nor any of its affiliates are a successor to the Debtor or its estate and none of the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates with or into any Debtor.  Except as otherwise set forth in the Stalking Horse APA, neither the Buyer nor any of its affiliates are a successor employer as defined in the IRC or by the U.S. National Labor Relations Board or under other any other applicable law.

W.      Without limiting the generality of the foregoing, and other than as may be set forth in the Stalking Horse APA, none of the Buyer, its affiliates, the present or contemplated officers, directors, managers, shareholders, or members of the Buyer and its affiliates, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Liens,

Claims, or Interests relating to any U.S. federal, state or local tax liabilities, that the Debtor may incur in connection with consummation of the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts, or that the Debtor has otherwise incurred prior to the consummation of the transactions contemplated by the Stalking Horse APA.

X.    Except as otherwise set forth in the Stalking Horse APA, none of the Buyer, any of its affiliates, and any of their respective officers, directors, members, partners, principals, employees, independent contractors, and shareholders (or equivalent), and any of their respective representatives, agents, predecessors, successors, or assigns shall have any liability for any Lien, Claim, including, for the avoidance of doubt, any Healthcare Program Claim, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Debtor or is related to the Purchased Assets prior to the Closing.  None of the Buyer, any of its affiliates, and any of their respective officers, directors, members, partners, principals, employees, independent contractors, and shareholders (or equivalent), and any of their respective representatives, attorneys, advisors, agents, predecessors, successors, or assigns are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Debtor, (iii) be a successor employer as defined in the IRC or by the U.S. National Labor Relations Board or under applicable law, or (iv) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect.  Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of the Debtor or its estate, including, for the avoidance of doubt, any Healthcare Program Claim, other than the Assumed Liabilities, to the extent provided in the Stalking Horse APA.

134562.000004\4920-5390-5255.5

Y.      Any Assumed Contracts that the Buyer have or will designate for assumption and assignment, and which are in default at the time of the Closing, may be cured as provided in the Notice of Executory Contracts and Unexpired Leases that may be Assumed and Assigned in Connection with the Sale Transaction (the "Cure Notice") [Doc. No. 186], Stalking Horse APA, and this Sale Order, or as otherwise agreed to by the Buyer and the non-debtor counterparties to such contracts.

Z.      The assumption and assignment of the Assumed Contracts pursuant to the Contract Assumption and Assignment Notice, the terms of this Sale Order, and the Stalking Horse APA is integral to the transactions contemplated by the Stalking Horse APA. Such assumption and assignment is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest, and represents a reasonable exercise of the Debtor's sound and prudent business judgment.

AA.      Pursuant to section 365 of the Bankruptcy Code, the Debtor has demonstrated that assuming all Assumed Contracts and assigning such Assumed Contracts to the Buyer is appropriate.  To the extent a Cure Amount is owed to the counterparty of any Assumed Contract, the applicable Cure Amount will be paid on or before Closing of the Sale Transaction approved pursuant to this Sale Order in accordance with the Stalking Horse APA, or as otherwise expressly agreed to between the Debtor and the Buyer, as applicable, and such counterparty.  The Buyer has, in accordance with the Assumption and Assignment Procedures, provided adequate assurance of future performance to any non-Debtor contract counterparty to the extent required by section 365 of the Bankruptcy Code.  The Cure Amounts set forth on **Exhibit 2** attached hereto (or any supplemental notice served in accordance with the Assumption and Assignment Procedures or an order of this Court) are the sole amounts necessary to cure any and all defaults under the applicable Assigned Contracts under sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and,

16

upon payment of the Cure Amounts, the Debtor shall have no further liability under the Assigned Contracts whatsoever.

BB.    The Assumed Contracts being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtor's estate.  To the extent any Assumed Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it is appropriate that such Assumed Contract be transferred to the Buyer in accordance with the terms of the Stalking Horse APA and, other than with respect to Assumed Liabilities, the Buyer shall have no liability or obligation for any (a) defaults or breaches under such contract that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date; and (b) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, to the extent permitted by applicable law, any right of recoupment) with respect to such Assumed Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

CC.    The Debtor has full corporate power and authority to sell and deliver the Purchased Assets and execute and perform under, the Stalking Horse APA and any other documents necessary or appropriate to consummate the Sale Transaction, as approved herein. All actions contemplated by the Stalking Horse APA have been duly and validly authorized by all necessary action of the Debtor. No further consents or approvals are required for the Debtor to consummate the Sale Transaction, except as otherwise provided in the Stalking Horse APA.

DD.    The sale of the Purchased Assets to the Buyer under the Stalking Horse APA will be a valid, legal, and effective transfer of the Purchased Assets and will vest the respective Buyer with all right, title, and interests of the Debtor in and to the same, free and clear of all Claims and Encumbrances (other than Assumed Liabilities).

134562.000004\4920-5390-5255.5

EE.     The sale of the Purchased Assets, including, without limitation, the assignment of the Assumed Contracts, pursuant to the Stalking Horse APA outside a chapter 11 plan, neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of the Debtor's subsequent chapter 11 plan.  Neither the Stalking Horse APA nor the Sale Transaction constitutes a *sub rosa* chapter 11 plan as they do not and do not propose to: (i) impair or restructure any existing debt of, or equity interests in, the Debtor; (ii) impair or circumvent any party's voting rights with respect to any current or future chapter 11 plan proposed by the Debtor; (iii) circumvent any chapter 11 plan process safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

FF.     To the maximum extent permitted by the Bankruptcy Code, each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

GG.     To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the Stalking Horse APA occur within the time constraints set forth therein.  Time is of the essence in consummating the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

HH.     The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the

transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts prior to, and outside of, a chapter 11 plan because, among other things, the Debtor's estate will suffer irreparable harm if the relief provided herein is not granted on an expedited basis.

II.     The releases provided herein are fair and reasonable, are in the best interests of the Debtor, its estate, its creditors and all other parties in interest, and are being provided in return for fair consideration.

JJ.     After consideration of the circumstances described in the Motion and the evidence admitted at the Sale Hearing, the Court has determined that the proposed Sale Transaction and transfer of the Purchased Assets to the Buyer pursuant to the Stalking Horse APA are in the best interests of the Debtor's estate and should be approved on the terms set forth herein.

KK.     All findings of fact and conclusions of law announced by this Court at the Sale Hearing in relation to the Motion are incorporated herein by reference as though fully set forth in this Sale Order.

**IT IS HEREBY ORDERED THAT**:

1.     The Motion is granted and the Sale Transaction, including without limitation, the sale of the Purchased Assets to the Buyer pursuant to the Stalking Horse APA, is **APPROVED** in all respects as set forth herein.

2.     Any objections to the Motion or the Proposed Order, which have not been voluntarily withdrawn, waived, or resolved, and all reservations of rights included in such objections which have not been otherwise preserved, are hereby **OVERRULED** on the merits. Any objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred. Notwithstanding any other provisions of this Sale Order, this

paragraph [2] does not apply to UnitedHealthcare's objection (the "United Objection") [Docket. No. 168] and Florida Blue's objection (the "Florida Blue Objection") [Docket. No. 177]. The United Objection and the Florida Blue Objection are preserved and continued until the objections are consensually resolved or finally determined by the Court.

3.      The Stalking Horse APA is hereby **APPROVED**, and the Debtor and its professionals are authorized, empowered, and directed to perform their obligations under the Stalking Horse APA and to take such actions as are necessary or appropriate to effectuate the terms of the Stalking Horse APA and this Sale Order. The failure specifically to include any particular provision of the Stalking Horse APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the transfer of the Purchased Assets and all other Transactions set forth in the Stalking Horse APA be authorized and approved in their entirety. In the event of any inconsistency between the terms of any prior pleading related to the Motion, the Stalking Horse APA, the Transaction Documents, and this Sale Order, the terms of this Sale Order shall control.

4.      The Villages Buyer, LLC is hereby **APPROVED** as the Back-Up Bidder per the terms of its last Bid, which, for the avoidance of doubt, is memorialized in that certain amended asset purchase agreement that was read into the record during the Auction and is appended to the Auction transcript, and such Bid shall constitute the "Back-Up Bid" under the Bid Procedures. If Kinderhook is declared the Successful Bidder and the Back-Up Bid the Successful Bid, the Debtor shall file a copy of the Back-Up Bid on the docket with the understanding that certain dates and deadlines contained therein may need to be amended to account for the passage of time. Per the Bid Procedures and Bid Procedures Order, the Debtor may proceed with closing the transaction

20

memorialized in the Back-Up Bid and pursuant to the terms thereof without further order of this Court.

5.      Notice of the Motion, the hearing on the Bid Procedures, the Bid Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Transaction, and the Sale Hearing, all deadlines related thereto, and the relief granted in this Sale Order, were and/or are each fair, sufficient, proper, adequate, appropriate, and equitable under the circumstances and complied in all respects with sections 102(1), 363, and 365 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, and the procedural due process rules of the United States Constitution, and as such no order or further notice is or shall be required.

6.      Upon the closing of the Sale Transaction (the "Closing"), the transfer of the Purchased Assets pursuant to this Sale Order and the Stalking Horse APA: (i) shall be a legal, valid, and effective transfer of the relevant Purchased Assets from the Debtor to the Buyer; (ii) shall vest in the Buyer all rights, titles, and interests of the Debtor to the Purchased Assets and good and marketable title thereto; (iii) shall constitute a transfer for reasonably equivalent value and full, adequate, and fair consideration under the Bankruptcy Code and all other law applicable to such transfer; and (iv) shall be on an "as is, where is" basis without any representations or warranties, except as provided in the Stalking Horse APA.

7.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Sale Transaction and the transfer of the Purchased Assets to the Buyer shall be free and clear of, but not limited to, the following (other than Assumed Liabilities): (i) any mortgage, lien (as such term is defined in 11 U.S.C. § 101(37), including any mechanic's, materialman's, statutory, and any other consensual or non-consensual lien), security interest, charge, hypothecation, deed of

trust, pledge, right of use, first offer or refusal, easement, servitude, restrictive covenant, lease, sublease, covenant, right of way, option, restriction (including, without limitation, any restriction on transfer or on the use, voting, receipt of income or other rights or exercise of any attributes of ownership), conditional sale or other title retention agreements, interest (including as that term is used in Bankruptcy Code section 363(f)), encroachment, or other encumbrance of any kind arising from or related in any way to the Debtor or the Purchased Assets (all of the foregoing collectively referred to as "<u>Encumbrances</u>"), and (ii) any Claims. Without limitation, the sale of the Purchased Assets to the Buyer shall be free and clear of all Claims and Encumbrances (other than Assumed Liabilities) regardless of whether any such Claim or Encumbrance is in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the filing of the Debtor's bankruptcy petition, or occurring or arising prior to the Closing Date.

8.      Effective upon the Closing, this Sale Order (i) is and shall be effective as a determination that all Liens, Claims, and Interests of any kind or nature whatsoever (other than Assumed Liabilities) existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated (with such Liens, Claims, and Interests attaching solely to the proceeds of the Sale Transaction with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and Interests encumbered the Purchased Assets immediately prior to the Closing) and that the conveyances described herein have been effectuated, (ii) is and shall be binding upon and shall govern the acts of all entities,

including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Buyer, and (iii) is and shall be effective as a determination that all recorded Liens, Claims, and Interests (other than Assumed Liabilities) against the Purchased Assets shall be deemed stricken from such entities' records, official and otherwise.

9.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing a Lien, Claim, or Interest in all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the Stalking Horse APA shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims, and/or Interests (other than Assumed Liabilities), which such person or entity has with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the Stalking Horse APA, then (i) the Debtor and/or the Buyer are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such person or entity with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the Stalking Horse APA, and (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Liens, Claims, and Interests (other than Assumed Liabilities) of any kind or nature whatsoever in the Purchased Assets being sold pursuant

to the Sale Transaction and the Stalking Horse APA.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA, including, without limitation, recordation of this Sale Order.

10.     All persons or entities that are currently, or as of the Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Buyer at the Closing.

11.     Following the Closing, any and each holder of any Lien, Claim or Interest in the Purchased Assets shall be and are hereby forever prohibited and barred from taking any action that would interfere with the Buyer's title to, or use and enjoyment of, the Purchased Assets sold pursuant to the Sale Transaction and the Stalking Horse APA based on, or related to, any such Lien, Claim, or Interest or based on any actions that the Debtor may take in the chapter 11 case.

12.     Without limiting the foregoing, upon the Closing, none of the Buyer, any of its affiliates, and any of their respective officers, directors, members, partners, principals, employees, independent contractors, and shareholders (or equivalent), and any of their respective representatives, agents, predecessors, successors, or assigns shall have any liability for any Lien, Claim, including, for the avoidance of doubt, any Healthcare Program Claims, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Debtor or is related to the Purchased Assets prior to the Closing.  None of the Buyer, any of its affiliates, and any of their respective officers, directors, members, partners, principals, employees, independent contractors, and shareholders (or equivalent), and any of their respective representatives, attorneys, advisors, agents, predecessors, successors, or assigns are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtor or its estate by reason of any theory

134562.000004\4920-5390-5255.5

of law or equity, (ii) have, *de facto* or otherwise, merged with or into the Debtor, (iii) be a successor employer as defined in the IRC or by the U.S. National Labor Relations Board or under applicable law, or (iv) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect.  Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtor or its estate, including, for the avoidance of doubt, any Healthcare Program Claims, other than the Assumed Liabilities, to the extent provided in the Stalking Horse APA.

13.     For the avoidance of doubt, the Buyer shall not be liable for any Claims, Liens or Interests (other than Assumed Liabilities) against the Debtor, or its predecessors or affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character, whether known or unknown, as of the Closing, including, without limitation, (i) any monetary assessments imposed against any of the Facilities, the Debtor, or its predecessors and affiliates, by or on behalf of any Governmental Authority, (ii) any Healthcare Program Claims, (iii) any taxes of any kind, whether now existing or hereafter arising, or whether fixed or contingent, owed by the Debtor, or the Debtor's predecessors or affiliates, (iv) any other liabilities of the Debtor, or its predecessors or affiliates, to the State of Florida, Florida Agency for Health Care Administration, Centers for Medicare & Medicaid Services, Florida Department of Health, HHS, DOJ, OIG, or any other Governmental Authority, and (v) any other liabilities owed by the Debtor, or its predecessors or affiliates.

14.     With respect to Assumed Liabilities, nothing contained in this Sale Order or the Stalking Horse APA shall be interpreted as providing that the Buyer is liable for any Assumed Liability that is not (j) directly related to the operations or assets of the relevant facility that the

Buyer shall operate following Closing, or (ii) expressly assumed pursuant to any document at Closing.

15.     As of the Closing, all persons and entities holding Claims or Encumbrances and their respective successors and assigns, are hereby forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Claims against the Buyer, including, for the avoidance of doubt, any Healthcare Program Claims, or Encumbrances of any kind and nature against the Buyer, the Purchased Assets, or any other assets or properties of the Buyer, or commencing or continuing any action against the Buyer that does not comply or is inconsistent with this Sale Order. Without limiting the foregoing, no persons or entities may condition the issuance to the Buyer of new licenses, new certifications, new provider agreements or other payor program agreements on the assumption or payment by the Buyer of any such Claims or Encumbrances, including without limitation, any liability, penalty or obligation that arose under or relate to any Debtor provider agreements. As of the Closing, the Court hereby reserves exclusive jurisdiction over this Sale Order and the injunctions provided herein, including, without limitation, in this paragraph.

16.     Notwithstanding any other provision, the Sale Order does not enjoin any person or entity (other than the Company Releasors pursuant to paragraph [33]), or governmental unit, including the United States and its agencies, from asserting, prosecuting, or pursuing any action, whether administrative, civil, or criminal, including but not limited to Healthcare Program Claims, against the Buyer that arises from (1) conduct unrelated to its acquisition of the Purchased Assets under § 363(f) of the Bankruptcy Code or (2) any obligation the Buyer may have related to the Purchased Assets independent of its acquisition of the Purchased Assets from the Debtor under § 363(f) of the Bankruptcy Code; and nothing in this Sale Order should be interpreted to imply or

otherwise mean that any Medicare Advantage Organization ("MAO") or its related entities may avoid deleting or correcting erroneous diagnosis codes from CMS data systems that the MAO received from the Debtor and any associated financial obligations.  Nor should this Sale Order be construed to provide any sort of waiver, release, or discharge, of any claims of any nature the United States may have against a MAO or its related entities arising from their own obligations to correct erroneous or false submissions to any federal healthcare program or in any way limits the MAO's or related entities' obligation to investigate the validity of diagnoses in any audit universe created by TVH.

17.    The Court **APPROVES** the assumption and assignment of the Assumed Contracts as set forth herein pursuant to section 365 of the Bankruptcy Code.  All requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtor, and the assignment by the Debtor to the Buyer, of each Assumed Contract. All counterparties of the Assumed Contracts that did not timely file an objection to the Cure Notice are deemed to consent to the assumption and assignment by the Debtor of their Assumed Contract to the Buyer and to have waived any defaults or breaches thereunder, and the Buyer shall enjoy all of the rights and benefits under each such Assumed Contract as of the Closing without the necessity of obtaining such counterparty's consent to the assumption or assignment thereof.

18.    Notwithstanding anything to the contrary in the trust agreements, all assets and all trusts and all assets held in such trusts on behalf of or otherwise relating to any Assumed Plan, including, for the avoidance of doubt the Physicians and Executive DC Plan and the Executive Deferred Compensation Plan, and the rabbi trust(s) related thereto, are assigned to the Buyer.

19.    In accordance with the terms of the Stalking Horse APA, the Buyer may, at its discretion, add or remove any executory contract or unexpired lease from the list of Assumed

Contracts that shall be assumed and assigned to the respective Buyer at Closing. Following the Closing, the Debtor shall file the final list of Assumed Contracts that have been assumed and assigned to the respective Buyer at Closing. Other than the Assumed Contracts designated in such final list of Assumed Contracts filed on the docket, no other executory contract or unexpired lease shall be deemed assumed by the Debtor and assigned to the Buyer.

20.     The cure amounts designated in the Cure Notice are deemed the amounts necessary to "cure" all "defaults" (within the meaning of Bankruptcy Code section 365(b)) under the Assumed Contracts. Any objections to the cure amounts, to the extent not otherwise resolved, are hereby **OVERRULED**. The Court finds that with respect to all Assumed Contracts, the payment of the cure amounts, as provided herein, is reasonable and appropriate and is deemed to fully satisfy the Debtor's obligations under Bankruptcy Code sections 365(b) and 365(f). Notwithstanding any other provisions of this Sale Order, this paragraph [20] does not apply to the United Objection and/or the Florida Blue Objection. The United Objection and the Florida Blue Objection are preserved and continued until the objections are consensually resolved or finally determined by the Court.

21.     Pursuant to the Stalking Horse APA, the Debtor will pay the cure amounts under any Assumed Contracts at Closing (subject to the obligations of Buyer under the Stalking Horse APA), or as otherwise agreed by the Buyer and the counterparty to any Assumed Contract.

22.     The Buyer has demonstrated adequate assurance of future performance of each Assumed Contract within the meaning of section 365 of the Bankruptcy Code. The Buyer's payment of cure amounts in accordance with the terms of the Stalking Horse APA, and the Buyer's promise to perform the obligations under the Assumed Contracts after the Closing Date, constitute adequate assurance of future performance.

134562.000004\4920-5390-5255.5

23.     Upon assignment of the Assumed Contracts to the Buyer in accordance with the terms of the Stalking Horse APA and this Sale Order, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, and the Debtor shall have no further liability or obligation under such Assumed Contracts. Without limiting the foregoing, each and every provision of the Assumed Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assumed Contract has been or will be satisfied or is otherwise unenforceable under Bankruptcy Code section 365. Upon the reasonable request of the Buyer, all counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, and shall not charge the Debtor or Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

24.     Other than with respect to Assumed Liabilities, the Buyer shall have no liability or obligation for any (i) defaults or breaches under any Assumed Contract that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date, or (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to any Assumed Contract that relate to any acts or omissions that arose or occurred prior to the Closing Date.

25.     The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtor's or the Buyer's respective rights to enforce every term and condition of such Assumed Contract.

26.     If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or other documents or agreements evidencing interests with respect to the Debtor and/or the Purchased Assets shall not have delivered to the Debtor or Buyer prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of Claims and Encumbrances which the person or entity has with respect to the Debtor, the Purchased Assets, or otherwise (except Assumed Liabilities) then (i) the Buyer and/or the Debtor are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets and (ii) the Buyer and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of (but not a necessary condition to) the release of all such Claims and Encumbrances in, against, or with respect to the Debtor and/or the Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order and the transfer of the Purchased Assets to the Buyer free and clear of all Claims and Encumbrances (other than Assumed Liabilities) shall be and are self-executing without the necessity of any recording or filing of any document.

27.     All entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Buyer may rely on this Sale Order as confirmation from this Court that the Debtor has all right, title, and authority and approval to transfer legal title to the Purchased Assets to the Buyer, free and clear of all Claims and Encumbrances (other than Assumed Liabilities).

28.     No person or entity shall take or cause to be taken any action that would interfere with the Sale Transaction, including without limitation the transfer of the Purchased Assets to the Buyer, in accordance with the terms of this Sale Order and the Stalking Horse APA.

29.     Any persons or entities that are presently, or as of the Closing may be, in possession of any portion of the Purchased Assets to be transferred pursuant to this Sale Order are hereby directed to surrender possession of such Purchased Assets to the Buyer on the date of the Closing.

30.     The Sale Transaction contemplated by this Sale Order and the Stalking Horse APA have been bargained for and undertaken by the Debtor and Buyer at arm's length, without collusion, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Debtor and the Buyer have not engaged in any conduct that would cause or permit this Sale Order or the Sale Transaction to be avoided.

31.     Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or *vacatur* shall not affect the validity and enforceability of any obligation or right granted pursuant to the terms of this Sale Order. Notwithstanding any reversal, modification, or vacatur of this Sale Order, any actions taken by the Buyer or the Debtor pursuant to the terms of this Sale Order prior to the effective date of any such

reversal, modification, or *vacatur* shall be governed in all respects by the original provisions of this Sale Order and the Stalking Horse APA, as the case may be.

32.    None of the Debtor, the Buyer, any designees of the Buyer, or their respective representatives and affiliates have engaged in any conduct that would cause or permit the Sale Transaction and/or the Stalking Horse APA to be avoided or costs and damages to be imposed against the Buyer, their affiliates, their representatives, or designees of the Buyer pursuant to section 363(n) of the Bankruptcy Code.

33.    Effective as of the Closing, the Debtor, for itself and each of its controlled affiliates and any former, current or future estates, heirs, executors, administrators, trustees, successors and assigns of any of the foregoing (each, a "Company Releasor"), irrevocably, knowingly and voluntarily releases, discharges and forever waives and relinquishes all claims, demands, obligations, liabilities, defenses, affirmative defenses, setoffs, counterclaims, actions and causes of action of whatever kind or nature, whether known or unknown, which any Company Releasor has, may have, or might have or may assert now or in the future, against Buyer, its affiliates or any of its or their respective former or current directors, officers, employees, general or limited partners, managers, members, direct or indirect equityholders, controlling persons, affiliates, attorneys, assignees, agents, advisors, or representatives, or representatives or affiliates of any of the foregoing, or any former, current or future estates, heirs, executors, administrators, trustees, successors or assigns of any of the foregoing (each, a "Company Releasee") arising out of, based upon or resulting from any contract, transaction, event, circumstance, action, failure to act or occurrence of any sort or type, whether known or unknown, and which occurred, existed or was taken or permitted at or before the Closing to the extent relating to the Debtor's business or the Purchased Assets, including, without limitation the negotiation, investigation, preparation,

execution, or delivery of the Stalking Horse APA and the entry into and consummation of the transaction; *provided*, that nothing contained in this paragraph shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any person or entity under the Stalking Horse APA, any other Transaction Document or any other agreement delivered or required to be delivered pursuant to the Stalking Horse APA for any claims of fraud, intentional misconduct or gross negligence.  The Debtor shall, and shall cause its controlled affiliates to, refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced any legal proceeding of any kind against a Company Releasee based upon any matter released pursuant to this paragraph.

34.     Notwithstanding any other provision, the Sale Order does not waive, release, or discharge any estate claims and causes of action of any nature against the Debtor's current or former officers, directors, owners, affiliates, and related persons.

35.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Stalking Horse APA, the transfer of the Purchased Assets pursuant thereto, or this Sale Order.

36.     The Debtor shall be and is hereby authorized, empowered, and directed to take such actions, including the execution and delivery of any and all instruments and documents, as may be required to effectuate the terms of the Stalking Horse APA and this Sale Order. The Stalking Horse APA and any agreements, documents, or other instruments related to this Sale Order or the transactions contemplated herein may be modified, amended, or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on Debtor's estate.

37.    The Debtor is authorized to pay, without further order of the Court, whether before, at, or after Closing, any expenses or costs required to be paid to perform its obligations in accordance with the Stalking Horse APA.

38.    Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the Sale Transaction or use of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of this chapter 11 case or the consummation of the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtor or any of its affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

39.    The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of the chapter 11 case and the entry of any other order which may be entered in the chapter 11 case, including any order: (i) confirming any plan of reorganization; (ii) converting the case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner; or (iv) dismissing the chapter 11 case or any successor case. The terms and provisions of this Sale Order, as well as the rights granted under the Stalking Horse APA, shall continue in full force and effect and shall be binding upon the Debtor and its successors, assigns, any reorganized Debtor, trustee, plan trustee, plan administrator (or similar representative), or chapter 7 trustee applicable to the Debtor and its estate, or any person or entity acting on behalf of the Debtor, notwithstanding any such conversion, dismissal, or entry of any order.

40.    All of the transfers and other performance set forth in this Sale Order and the

Stalking Horse APA, together with the performance under all of the agreements identified herein to be executed and performed at Closing, are part of a single transaction such that the same is not subject to being avoided, rejected, or otherwise terminated or modified by a division or separate treatment of the various agreements or component transactions. Accordingly, the provisions of this Sale Order and the Stalking Horse APA are non-severable and mutually dependent.

41.    The Court shall retain exclusive jurisdiction to enforce the provisions of this Sale Order and to resolve any dispute concerning this Sale Order, the Stalking Horse APA, and/or the rights and duties of the parties hereunder or thereunder, or any issues relating to the Sale Transaction and this Sale Order, including, but not limited to, interpretation of the terms, conditions, and provisions hereof, and the status, nature, and extent of the Purchased Assets, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of Claims and Encumbrances (other than Assumed Liabilities) as set forth herein.

42.    For the avoidance of doubt, notwithstanding anything contained in this Order or the Transaction Documents to the contrary, the Buyer shall not acquire any interest in any Excluded Assets, as that term is defined in the Stalking Horse APA; *provided further* that the definition of Avoidance Actions in the Stalking Horse APA shall include and be deemed to include any state law analogues to any claims or causes of action arising under Sections 542 through 553 of the Bankruptcy Code.  Further, any and all claims, causes of action, or rights of recovery, belonging to the Debtor or its estate against any current or former director, officer, manager, member, insider, shareholder or employee of the Debtor or any of the Debtor's controlled affiliates, including, without limitation, claims for breach of fiduciary duty, mismanagement, negligence, gross negligence, misconduct, fraud, corporate waste, or any similar cause of action under applicable

law ("D&O Claims") and all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event, or circumstance occurring on or prior to the Closing Dateshall constitute Excluded Assets. Nothing in this Order or the Transaction Documents shall release any party (other than the Company Releasees, pursuant to paragraph 33) for any liability for any Claims that constitute Excluded Assets, including without limitation Avoidance Actions or D&O Claims.

43.     The Buyer shall provide any liquidating trustee access to the Debtor's books and records so the liquidating trustee may wind down and fully administer the bankruptcy estate.

44.     Notwithstanding anything to the contrary in this Sale Order, neither the Buyer nor the Debtor shall have an obligation to close the Sale Transaction until all conditions precedent in the Stalking Horse APA or other Sale Transaction documents have been satisfied or waived in accordance with the terms of the Stalking Horse APA.

45.     Notwithstanding any provision of the Bankruptcy Code or Federal Rules of Bankruptcy Procedure to the contrary, this Sale Order shall be effective and enforceable immediately upon entry, and any stays thereof, including without limitation pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d), are hereby abrogated. Time is of the essence in closing the transactions referenced herein, and the Debtor and the Buyer intend to close the transactions as soon as practicable. This Sale Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

### 

Attorney Elizabeth A. Green is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of this order.

36

## EXHIBIT 1

**Stalking Horse APA**

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

**by and among**

**CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.,**

**HUMANA INC., solely for the purposes of <u>Section 13.18</u>,**

**and**

**THE VILLAGES HEALTH SYSTEM, LLC**

**September 9, 2025**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINITIONS ............................................................................................2

    1.01    Definitions.............................................................................................2
    1.02    Other Defined Terms ..........................................................................14

ARTICLE II PURCHASE AND SALE ..........................................................................16

    2.01    Purchase and Sale of Assets................................................................16
    2.02    Excluded Assets ..................................................................................17
    2.03    Assumed Liabilities ............................................................................19
    2.04    Excluded Liabilities ............................................................................19
    2.05    Prorated Expenses ..............................................................................19
    2.06    Assignment and Assumption of Certain Contracts..............................20
    2.07    Consents to Certain Assignments ........................................................22
    2.08    Designations of Assets and Liabilities.................................................22
    2.09    Wrong Pockets ...................................................................................23

ARTICLE III PURCHASE PRICE .................................................................................23

    3.01    Purchase Price ....................................................................................23
    3.02    Allocation...........................................................................................24
    3.03    Withholding .......................................................................................25
    3.04    Deposit ..............................................................................................25

ARTICLE IV THE CLOSING ........................................................................................25

    4.01    The Closing........................................................................................25
    4.02    Closing Deliveries..............................................................................26

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLER .........................26

    5.01    Organization and Power......................................................................27
    5.02    Authorization; No Breach; Valid and Binding Agreement...................27
    5.03    Financial Statements ..........................................................................28
    5.04    Absence of Certain Developments; Undisclosed Liabilities .................29
    5.05    Title to Assets; Sufficiency.................................................................29
    5.06    Real Property .....................................................................................29
    5.07    Tax Matters........................................................................................30
    5.08    Contracts and Commitments................................................................32
    5.09    Material Payors; Material Referral Sources; Material Vendors .............34
    5.10    Intellectual Property; Information Technology ....................................35
    5.11    Litigation; Orders...............................................................................37
    5.12    Governmental Consents, etc. ..............................................................37
    5.13    Employee Benefit Plans......................................................................37

5.14    Insurance .................................................................................................39
5.15    Compliance with Laws .............................................................................39
5.16    Environmental Matters ..............................................................................40
5.17    Related Party Transactions ......................................................................41
5.18    Employees ...............................................................................................41
5.19    Brokerage ................................................................................................42
5.20    Health Care Compliance ..........................................................................42
5.21    No Other Representations or Warranties ..................................................47

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ...................................47

6.01    Organization and Power............................................................................47
6.02    Authorization ...........................................................................................47
6.03    No Violation..............................................................................................48
6.04    Governmental Consents, etc. ...................................................................48
6.05    Brokerage ................................................................................................48
6.06    Buyer Financial Resources .......................................................................48
6.07    No Reliance ..............................................................................................48
6.08    No Other Representation...........................................................................48

ARTICLE VII PRE-CLOSING COVENANTS OF THE SELLER .........................................49

7.01    Conduct of the Business............................................................................49
7.02    Access to Books and Records ...................................................................51
7.03    Credentialing Applications; Qualification ................................................52
7.04    Tail Insurance...........................................................................................52
7.05    Transition Services Agreement .................................................................53

ARTICLE VIII TAX MATTERS .................................................................................53

8.01    Cooperation ..............................................................................................53
8.02    Apportionment of Property Taxes. ...........................................................53
8.03    Transfer Taxes. ........................................................................................53
8.04    Tax Audits................................................................................................54
8.05    Tax Clearance Certificate. .......................................................................54

ARTICLE IX CONDITIONS TO CLOSING ..................................................................54

9.01    Conditions to Obligations of Each Party ..................................................54
9.02    Conditions to Buyer's Obligations............................................................54
9.03    Conditions to Seller's Obligations ............................................................55

ARTICLE X SURVIVAL.........................................................................................56

10.01   Survival ...................................................................................................56

ARTICLE XI TERMINATION ....................................................................................56

    11.01  Termination ....................................................................................56
    11.02  Effect of Termination ....................................................................58

ARTICLE XII ADDITIONAL COVENANTS ......................................................58

    12.01  Commercially Reasonable Efforts; Cooperation ..................................58
    12.02  Approvals ......................................................................................59
    12.03  Payor Arrangements......................................................................59
    12.04  Books and Records .......................................................................59
    12.05  Pending Audits and Appeals Pre-Closing Access to Information ........60
    12.06  Confidentiality .............................................................................60
    12.07  Submission for Bankruptcy Court Approval ...................................61
    12.08  Overbid Procedures; Adequate Assurance ......................................62
    12.09  Employee Matters ........................................................................63
    12.10  Termination Payment ....................................................................68
    12.11  Assumed General Unsecured Claims Reconciliation Procedures. .......68
    12.12  Further Assurances.......................................................................69

ARTICLE XIII MISCELLANEOUS ....................................................................69

    13.01  Press Releases and Communications ...........................................69
    13.02  Expenses ......................................................................................69
    13.03  Notices ........................................................................................70
    13.04  Assignment .................................................................................71
    13.05  Severability .................................................................................71
    13.06  References; Interpretation .............................................................71
    13.07  Construction ................................................................................72
    13.08  Amendment and Waiver ...............................................................72
    13.09  Complete Agreement ...................................................................72
    13.10  Third-Party Beneficiaries .............................................................72
    13.11  Waiver of Trial by Jury.................................................................72
    13.12  Delivery by Email ........................................................................72
    13.13  Counterparts; Electronic Delivery .................................................73
    13.14  Governing Law ............................................................................73
    13.15  Jurisdiction .................................................................................73
    13.16  Specific Performance ...................................................................73
    13.17  No Recourse ................................................................................74
    13.18  Parent Guarantee .........................................................................75
    13.19  Fiduciary Obligations...................................................................76

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Amended and Restated Leases: |
| | 1.  Amended and Restated Lease (Primary Care) |
| | 2.  Amended and Restated Lease (Specialty Care) |
| | 3.  Form of Amendment to Lease (Corp/Administrative) |
| Exhibit B | Form of Amendment to the Facilities Management Agreement |
| Exhibit C | Form of Bill of Sale, Assignment and Assumption Agreement |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Form of Services Agreement |
| Exhibit F | Form of Non-Competition Agreement |
| Exhibit G | Form of Transition Services Agreement |
| Exhibit H | Form of Escrow Agreement |
| Exhibit I | Form of Employment Agreement |

## INDEX OF SCHEDULES

| | |
|---|---|
| Schedule A | Non-Competition Agreement Parties |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 9, 2025, is made by and among CenterWell Senior Primary Care (Vitality), Inc., a Florida corporation ("Buyer"), Humana Inc., a Delaware corporation, solely for the purposes of Section 13.18 ("Parent"), and The Villages Health System, LLC, a Florida limited liability company (the "Seller"). Buyer and the Seller shall each be referred to herein from time to time as a "Party" and collectively as the "Parties." Capitalized terms used and not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS:

WHEREAS, the Seller commenced a voluntary case under the Bankruptcy Code in the Bankruptcy Court on July 3, 2025 (the "Petition Date");

WHEREAS, the Seller is engaged in the Business;

WHEREAS, Buyer desires to purchase from the Seller, directly and/or, in the Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, and the Seller desires to sell to Buyer and/or such Buyer Designees, the Purchased Assets, and Buyer desires to assume from the Seller, directly and/or, in Buyer's sole discretion subject to Section 13.04, through one or more Buyer Designees, the Assumed Liabilities, in each case pursuant to the terms and subject to the conditions set forth herein (the "Acquisition");

WHEREAS, as a condition and inducement of Buyer entering into this Agreement, each Person set forth on Schedule A hereto, concurrently with the execution and delivery of this Agreement, is entering into a Non-Competition Agreement with Buyer, each of which shall become effective as of and contingent upon the Closing of the Transactions;

WHEREAS, the Seller and Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Seller to Buyer shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the Bankruptcy Code; and

WHEREAS, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding Buyer as the prevailing bidder at the Auction, the Seller shall sell and transfer to Buyer, and Buyer shall purchase and acquire from the Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from the Seller the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

1.01    <u>Definitions</u>. For purposes hereof, the following terms when used herein shall have the respective meanings set forth below:

"<u>Accrued PTO</u>" has the meaning set forth in <u>Section 12.09(i)</u>.

"<u>Affiliate</u>" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such particular Person, where "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or ownership interests, by contract or otherwise.

"<u>Affiliate Contract</u>" means any Contract between (a) Seller, on the one hand, and (b) (i) TVHHC or any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC or any of their Affiliates (other than Seller) or (iii) any director, manager or officer of any of the Persons in <u>clause (b)(i)</u> or <u>(ii)</u>, on the other hand.

"<u>Alternative Transaction</u>" means (a) a sale of all or a material portion of the Purchased Assets in one transaction or a series of transactions with a Person or Persons other than the Buyer or an Affiliate of the Buyer (including, for the avoidance of doubt, a Successful Bidder other than the Buyer) and/or (b) a stand-alone reorganization, in which a Person or Persons other than the Buyer or an Affiliate of the Buyer, including any creditors or stakeholders receive all or a material portion of the equity in the Seller or all or a material portion of the Purchased Assets; provided that, for the avoidance of doubt, any liquidation (other than as described in the foregoing) or wind-down of the Seller shall not constitute an Alternative Transaction.

"<u>Amended and Restated Leases</u>" means the amended and restated leases relating to the Leased Realty in substantially the form attached hereto as <u>Exhibit A</u>.

"<u>Amendment to the Facilities Management Agreement</u>" means the amendment to the Facilities Management Agreement between the Seller and TVHHC dated August 1, 2022, in substantially the form attached hereto as <u>Exhibit B</u>.

"<u>Assumed General Unsecured Claim</u>" means any Claim set forth on <u>Schedule 2.03(d)</u> and not to exceed the corresponding amount set forth on <u>Schedule 2.03(d)</u> for such Claim.  For the avoidance of doubt, an Assumed General Unsecured Claim is not, and shall not be (i) any Claim held by PMA Lender, LLC in its capacity as lender under the debtor-in-possession financing facility, (ii) any Claim incurred on or after the Petition Date and before the effective date of any chapter 11 plan for costs and expenses of administration of the bankruptcy estate under section 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, (iii) any Claim by a Person employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to confirmation of a chapter 11 plan or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, or (iv) any Claim of a Governmental Entity of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Auction" has the meaning set forth in Section 12.08(a).

"Avoidance Actions" means all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code.

"Backup Bidder" has the meaning specified in Section 12.08(c).

"Backup Termination Date" means the first to occur of (a) 30 days after entry of an order of the Bankruptcy Court approving an Alternative Transaction with a Successful Bidder following the conclusion of the Auction in accordance with the Bidding Procedures Order, (b) consummation of an Alternative Transaction, or (c) Buyer's receipt of notice from the Seller of the release of Buyer's obligations as Backup Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with an Alternative Transaction.

"Bankruptcy Case" means the voluntary case under the Bankruptcy Code of The Villages Health System, LLC, to be filed in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the Bankruptcy Court for the Middle District of Florida.

"Bidding Procedures Motion" means the Bidding Procedures Motion filed in the Bankruptcy Court by the Seller on July 3, 2025, in form and substance reasonably satisfactory to Buyer, seeking entry of the Bidding Procedures Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit D, approving, among other matters (a) the proposed bidding procedures attached thereto and (b) allowance and payment of the Termination Fee and the Expense Reimbursement in accordance with Section 12.10.

"Bill of Sale, Assignment and Assumption Agreement" means one or more Bill of Sale, Assignment and Assumption Agreements to be executed and delivered by Buyer and/or, if applicable, one or more Buyer Designees, and the Seller at the Closing, substantially in the form of Exhibit C.

"Business" means the operation of Senior-Focused Primary Care Centers located in The Villages in Florida as historically conducted by Seller.

"Business Contract" means any (i) Contract with Third Party Payors and (ii) all other Contracts (excluding the Leases) to which Seller is a party.

"Business Data" means all business information and all Personal Data (whether of employees, contractors, consultants, customers, consumers, or other Persons) that is collected by or on behalf of the Seller.

"Business Day" means a day that is neither a Saturday or Sunday, nor any other day on which banking institutions in New York, New York or The Villages, Florida are authorized or obligated by Law to close.

"Buyer Designee" means one or more Affiliates of Buyer designated by Buyer in writing to the Seller.

"Buyer Fundamental Representations" means the representations and warranties of Buyer set forth in Sections 6.01, 6.02 and 6.05.

"Buyer Material Adverse Effect" means any Effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the ability of Buyer to carry out timely, or that has had or would prevent or impair Buyer from consummating the Transactions on or prior to the Outside Date.

"Cash" means all cash and cash equivalents and marketable securities, if any, held by the Seller, including checks and drafts received by the Seller or deposited for the account of the Seller.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Clinician" means each Physician and each licensed physician assistant, podiatrist, advanced practice registered nurse, licensed clinical social worker, registered dietitian nutritionist, licensed mental health counselor/licensed practical clinician, licensed marriage and family therapist, audiologist, or other licensed healthcare professional employed or engaged by, or contracted with Seller, in each case licensed or registered in the State of Florida.

"CMS" means the Centers for Medicare and Medicaid Services, or any successor Governmental Entity exercising similar authority.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Operating Agreement" means that certain Amended and Restated Operating Agreement of the Seller, as amended.

"Company Plan" means (a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), (b) a share bonus, share purchase, share option, restricted shares, share appreciation right or similar equity-based plan or (c) any other employment, consulting, severance, deferred-compensation, pension, retirement, welfare-benefit, health, dental, disability, life insurance, bonus, incentive or other compensatory, employee benefit plan, policy, program, agreement or arrangement sponsored, maintained, contributed to, or required to be contributed to by Seller or pursuant to which Seller would reasonably be expected to have any

Liability, contingent or otherwise, to any current or former employee, officer, director or individual contractor of the Seller.

"Consent" means any consent, approval, clearance, authorization, waiver, permit, filing, notice, report, registration or waiting period expiration or termination required to be obtained from, filed with or delivered to any Person in connection with the consummation of the Transactions.

"Contract" means any agreement, contract, purchase order, arrangement, deed, mortgage, lease, sublease, subcontract, note, loan agreement, guaranty, pledge, bond, evidence of indebtedness, security agreement, license, binding agreement, instrument, commitment, undertaking, indenture or other similar instrument or obligation to which the party in question is a party, whether oral or written. "Contract" shall not include any Company Plan.

"Devices" means cellphones, tablets, iPads, laptop and desktop computers, printers, fax machines, copy machines, and any other electronic device that stores or processes Personal Information in connection with the Business or are otherwise used in connection with the Business by the Seller's personnel, and for the avoidance of doubt excluding personal devices owned by any Seller personnel.

"DIP Facility" means that certain debtor in possession financing facility to be provided by PMA Lender, LLC pursuant to the DIP Facility Term Sheet and in accordance with the terms of orders entered by the Bankruptcy Court on the Debtor's Emergency Motion for Interim and Final Orders (1) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expense Status, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.

"Effect" means any change, effect, event, occurrence or development.

"Employment Agreement" means an employment agreement in substantially the form attached hereto as Exhibit I.

"Environmental Claim" means any written claim, Action, cause of Action, Order, threatened Orders, investigation or notice by any Person alleging potential Liability (including, without limitation, potential Liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, Release or threatened Release of or exposure to any Hazardous Materials at any location, whether or not owned or operated by the Seller, or (b) circumstances forming the basis of any actual or alleged violation of or Liability under any Environmental Law.

"Environmental Laws" means all Laws relating to pollution or protection of the environment, natural resources and human health and safety, including, without limitation, those Laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the generation, manufacture, processing, labeling, distribution, use, treatment, storage, transport, handling of, or exposure to, Hazardous Materials.

"Equity Interests" means, with respect to any entity, any corporate stock, shares, options, warrants, convertible securities, partnership interests, limited liability company interests,

membership interests or units, or any other security or equity interests of, or other equity participation in, such entity that confers on any Person the right to receive a share of the profits and losses of, or distribution of the assets of, such entity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Seller, Buyer, and the Escrow Agent attached hereto as Exhibit H.

"Excluded General Unsecured Claim" means (i) any portion of any Claim set forth on Schedule 2.03(d) to the extent exceeding the amount set forth on Schedule 2.03(d), or (ii) any Claim not described on Schedule 2.03(d), including, but not limited to, any potential Claims against or in any way related to Medicare Advantage Plans, including, but not limited to, Claims held by United Healthcare of Florida Inc., United Behavioral Health, Inc., Blue Cross and Blue Shield of Florida, Inc., Humana Insurance Company, and the United States of America, in each case, or any of their respective Affiliates that underwrite or administer health plans, and (b) any litigation Claims against the Seller. For the avoidance of doubt, all Excluded General Unsecured Claims shall be Excluded Liabilities pursuant to Section 2.04 of this Agreement.

"Executory Contract" means any executory Business Contract or unexpired lease to which Seller is a party.

"Final Order" means an Order of the Bankruptcy Court, which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Fraud" means, with respect to a Party to this Agreement, the actual common law fraud in Delaware (and not negligent misrepresentation or omission or any statutory fraud) by such Party with respect to the making of a representation or warranty by such Party expressly set forth in this Agreement (as qualified by the Disclosure Schedules, as applicable) or in any certificates delivered pursuant to Article IX.

"GAAP" means United States generally accepted accounting principles.

"Governmental Entity" means any federal, national, state, foreign, provincial, territorial, local or other government or any governmental, regulatory, administrative authority, self-regulatory authority, executive, legislature, regulator, agency, bureau, board, commission, court, judicial or arbitral body, department, tribunal or other instrumentality thereof.

"Governmental Program" means any "federal health care program" as such term is defined in 42 U.S.C. § 1320a 7b(f), including Medicare, state Medicaid programs and TRICARE.

"Hazardous Materials" means any material, waste or substance that is listed, regulated, categorized or otherwise defined as "hazardous," "toxic," "radioactive," "pollutant," or "contaminant" (or words of similar intent or meaning) under any Environmental Law, including, without limitation, petroleum or petroleum by products, asbestos or asbestos-containing material, polychlorinated biphenyls, chlorinated solvents and per- or polyfluoroalkyl substances.

"Health Care Laws" means all Laws that govern, restrict or relate to the provision of health care services or treatment, healthcare industry or healthcare services regulation, professional, entity and facility licensure, qualification, operation, or certification, patient records and documentation, rate setting, fee splitting, referrals, patient brokering, patient acquisition and management, kickbacks, corporate practice of medicine and any other profession of Persons employed by or contracted with such Person, referrals, billing, coding, coding validation, clinical documentation, claims submission, medical necessity, reimbursement, coverage, collection and submission of false or fraudulent claims to Third Party Payors or Governmental Programs, standards of care, quality assurance, risk management, utilization review, peer review, mandated reporting of incidents, occurrences, diseases and/or events, telehealth, advertising or marketing of health care services, laboratory services, diagnostic testing, pharmacology and the securing, administering and dispensing of drugs, devices and controlled substances, diversion, patient privacy and security, patient confidentiality and informed consent, including (a) any state and federal controlled substance and drug diversion Laws, the Federal Controlled Substances Act, 21 U.S.C. § 801, et seq., all Laws relating to peer review, all Laws relating to mandated reporting of incidents, occurrences, diseases and/or events, all Laws relating to advertising or marketing of health care services, (b) all Laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals, drugs or devices, (c) the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301 et seq.), (d) health care fraud and abuse, false claims, self-referral, and anti-kickback Laws, including the federal Anti Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Anti Kickback Act of 1986 (41 U.S.C. §§ 51 et seq.), the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Anti Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the Ethics in Patient Referrals Act, as amended (42 U.S.C. § 1395nn) (the "Stark Law"), the Florida Patient Self-Referral Act of 1992 (Fla. Stat. § 456.053), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the exclusion laws (42 U.S.C. § 1320a-7) and criminal Laws relating to health care fraud and abuse, (e) the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and all rules and regulations promulgated thereunder, including the breach notification regulations ("HIPAA"), (f) the Eliminating Kickbacks in Recovery Act of 2018 (Pub. L. 115 271, § 8122), (g) Medicare (Title XVIII of the Social Security Act), (h) the Federal Health Care Fraud Law (18 U.S.C. § 1347), (i) TRICARE (10 U.S.C. § 1071), (j) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a et seq.), (k) Medicaid (Title XIX of the Social Security Act), (l) the Prescription Drug Marketing Act of 1987, (m) the Deficit Reduction Act of 2005, (n) the Consolidated Omnibus Budget Reconciliation Act of 1985, (o) the Patient Protection and Affordable Care Act of 2010 (Pub. L. 111 148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111 152), (p) all applicable Laws governing imaging facilities, radiation therapy centers,

ambulatory care facilities and ambulatory surgical facilities, and (q) in each case for the foregoing clause (a)-(p), as amended, and all rules and regulations promulgated thereunder and federal, state, local and foreign equivalents of any of the foregoing.

"Intellectual Property Rights" means any and all common law or statutory rights anywhere in the world arising under or associated with: (a) patents, patent applications, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and all rights therein provided by international treaties and conventions ("Patents"); (b) trademarks (whether or not registered), service marks, trade dress, trade names, logos, and other designations of origin, including application and registrations therefor ("Marks"); (c) domain names, uniform resource locators, Internet Protocol addresses, social media handles, and other names, identifiers, and locators associated with Internet addresses, sites, and services; (d) copyrights and any other equivalent rights in works of authorship (including rights in Software as a work of authorship) and any other related rights of authors ("Copyrights"); (e) trade secrets and industrial secret rights, and rights in know-how, data, and confidential or proprietary business or technical information, in each case, that derives independent economic value, whether actual or potential, from not being known to other Persons ("Trade Secrets"); and (f) other similar or equivalent intellectual property rights anywhere in the world.

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means the computer systems, networks, hardware, digital storage media, applications and Software possessed, maintained, used or operated by Seller, and includes any technical components that Seller uses to Process data.

"knowledge of the Seller" and "the Seller's knowledge" mean the actual or constructive knowledge of those Persons set forth in Schedule 1.01(b), after reasonable inquiry of their respective direct reports as of the applicable date.

"Law" means any law, common law, treaty, rule, statute, code, regulation, treatise, directive, judgment, injunction, Order, ordinance, decree, resolution, promulgation, guidance or other restriction, in each case, enacted, promulgated, issued or put into effect by any Governmental Entity.

"Liabilities" means all indebtedness, debts, claims, obligations and other liabilities of a Person whether known, unknown, accrued, unaccrued, absolute, matured, unmatured, direct or indirect, contingent or otherwise, whether due or to become due.

"Liens" means liens, licenses (excluding non-exclusive licenses with respect to Intellectual Property Rights), options, hypothecations, security interests, encroachments, claims, infringements, rights of first refusal, covenants, restrictions, servitudes, preemptive rights, charges, pledges, bailments, mortgages, deeds of trust, conditional sales and title retention agreements or other restrictions or encumbrances or substantively similar arrangements.

"Local Rules" means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida.

"Material Adverse Effect" means any Effect occurring on or after the date hereof that, individually or considered together with all other Effects has had or would reasonably be expected to have a material adverse effect on the Purchased Assets or condition (financial or otherwise) of the Business, taken as a whole; provided, however, that with respect to clause (a) none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) Effects directly arising from, or attributable to the announcement of the Transactions or the pendency of the Transactions, or the identity of Buyer or any of its Affiliates, including any litigation resulting directly therefrom, any adverse changes in supplier, customer, distributor, employee, financing source, partner, patient, vendor, Third Party Payor, Clinician, regulator or similar relationships resulting directly therefrom; (ii) Effects that generally affect the industry in which the Seller operates (including legal and regulatory changes); (iii) changes to general economic, financial, market, business, regulatory or political conditions (or changes therein) or Effects affecting the financial, credit, securities, commodities or derivatives markets in the United States, including changes in interest rates or foreign exchange rates; (iv) Effects arising from, or attributable to, changes or modifications in GAAP or applicable Law after the date of this Agreement, or the authoritative interpretation thereof; (v) Effects that result from any action taken, or failure to take action, by the Seller that is either (A) in compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or the Transaction Documents, or (B) at the written request of Buyer, or such other changes, in each case, which Buyer or any of its Affiliates has approved, consented to or requested or otherwise taken or omitted to take (or any action not taken as a result of the failure of Buyer to consent to any action requiring Buyer's consent pursuant to Section 7.01); (vi) the failure of the Seller to meet or achieve any internal or published projections, forecasts, estimates or predictions of revenue, earnings, cash flow or cash position and any seasonal changes which are consistent with seasonal changes in prior years in the results of operations of the Seller for any period ending on or after the date hereof (provided that, to the extent not the subject of any of clauses (i) through (viii) of this definition, the underlying cause of such failure may be taken into account to determine whether a Material Adverse Effect has occurred or will occur); (vii) Effects arising from, or attributable to any national, international or supranational political, geopolitical or similar conditions, including civil unrest, (including riots, looting and revolutions), the threatening of, engagement in, continuation or escalation of, hostilities or war, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or cyber attack or terrorist attack, weather related or other force majeure event (including earthquakes, hurricanes, tornadoes or any other natural disasters (whether or not caused by any Person or any force majeure event)) results of elections or any other national or international calamity or crisis and, in each case, any responses thereto (e.g., sanctions, boycotts, or curfews); (viii) Effects arising from, or attributable to, a hurricane, earthquake, flood or other natural or man made disaster, act of God, force majeure event or any epidemic, pandemic, disease, outbreak or significant public crisis; (ix) (A) events as described in Schedule 1.01(c) or (B) any objections in the Bankruptcy Court to (I) this Agreement or any of the Transactions; (II) the Sale Order; or (III) the assumption or rejection of any Executory Contract by Buyer; provided that any Effect described in any of the foregoing clauses (ii), (iii), (iv), (vii) and (viii) may constitute, or be taken into account in determining whether there has been or would be reasonably be expected to be, such a material adverse effect to the extent that it disproportionately affects the Seller relative to other participants in the industries in which the Seller conducts their business generally.

"Multiemployer Plan" has the meaning set forth in Section 3(37) of ERISA.

"<u>Multiple Employer Plan</u>" means a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA (whether or not the plan is subject to ERISA).

"<u>Non-Competition Agreement</u>" means a non-competition agreement in the form attached hereto as <u>Exhibit F</u>.

"<u>OIG</u>" means the Office of the Inspector General of the U.S. Department of Health and Human Services.

"<u>Patient Records</u>" means all records including "health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, and other patient-related documentation maintained by Seller).

"<u>Permitted Liens</u>" means any of the following: (a) Liens for Taxes, assessments, charges, levies or other claims not yet due and payable; (b) Liens imposed by Law, such as materialmen's, mechanics', carriers', warehousemen's, workmen's and repairmen's liens, and other similar liens incurred in the ordinary course of business, for amounts not yet delinquent and for which adequate reserves or accruals have been made in accordance with GAAP, or the validity of which are being contested in good faith; (c) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (d) with respect to real property, Liens, irregularities, easements, reserves, servitudes, encroachments, rights of way or other minor imperfections of title of record, the existence of which do not, individually or in the aggregate, materially interfere with the use or value of the affected property or the operation of the Business on the affected property; (e) customary contractual provisions providing for retention of title to goods until payment is made, but only to the extent adequate reserves or accruals have been made in accordance with GAAP; (f) matters disclosed in the Financial Statements; and (g) Liens that will be released by operation of the Sale Order or otherwise prior to the Closing.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Entity or any department, agency or political subdivision thereof, or any other organization or entity of any kind.

"<u>Personal Data</u>" means (a) any information relating to an identified or identifiable natural person, where an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that person, and (b) "personal information," "protected health information," "personal data," or the equivalent term under applicable Privacy and Security Laws.

"<u>Physician</u>" means an individual who is (i) licensed to practice medicine in the State of Florida and (ii) employed or engaged by, or contracted with, the Seller.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or prior to the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"<u>Privacy and Security Laws</u>" means (a) HIPAA; and (b) applicable Laws relating to the privacy, security, confidentiality, breach, or Processing of Personal Data or other Business Data, medical records, or other records generated in the course of providing or paying for health care services.

"<u>Privacy Policies</u>" means all published, posted, and internal agreements and policies relating to the Seller's Processing of Personal Data or other Business Data.

"<u>Process</u>," "<u>Processed</u>" or "<u>Processing</u>" means, with respect to any data, the use, collection, processing, storage, protection of, recording, organization, adaption, alteration, transfer, retrieval, consultation, disposal, disclosure, dissemination, or combination of such data.

"<u>Promissory Notes</u>" means each of the promissory notes set forth on <u>Schedule 1.01(d)</u>.

"<u>Property Taxes</u>" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"<u>Referral Source</u>" means any Person in a position to refer, recommend or arrange for the referral of patients or other health care business, including any physician, physician practice, hospital or other health care provider.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, pumping, pouring, injection, escaping, emptying, dumping, deposit, disposal, dispersal, leaching or migration into or through the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"<u>Sale Hearing</u>" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"<u>Sale Motion</u>" means the motion filed by the Seller with the Bankruptcy Court, which may be the Bidding Procedures Motion, in form and substance reasonably satisfactory to Buyer, seeking entry of the Sale Order.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court, which Order shall be in form and substance acceptable to Buyer in its sole discretion and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement and its obligations hereunder and (ii) the sale of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Liens, Claims (including, without limitation, Claims based on theories of successor liability or similar doctrines), and other interests, in each case, other than the Assumed Liabilities, (b) authorize each of the Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the Purchased

Assets, and (c) provide that Buyer is receiving good and marketable title to all of the Purchased Assets.

"Seller Fundamental Representations" means the representations and warranties of the Seller set forth in Section 5.01, Section 5.02, Section 5.05(a), the first sentence of Section 5.05(b) and Section 5.19.

"Seller Information" means all data and information, including all Personal Data, Patient Records, used or processed in the conduct of the Business or by or on behalf of the Seller.

"Seller IP Rights" means all Intellectual Property Rights that the Seller owns or purports to own that is included in Purchased Assets.

"Senior-Focused Primary Care Center" means a medical facility that primarily provides primary care medical services and where at least twenty percent (20%) of patients are aged greater than or equal to 62, which shall include any multispecialty medical facility where primary care medical services are provided and where at least twenty percent (20%) of the patients receiving primary care medical services are aged greater than or equal to 62.

"Services Agreement" means the Services Agreement to be executed and delivered by the Seller or an Affiliate thereof to Buyer and/or, if applicable, one or more Buyer Designee at the Closing, substantially in the form of Exhibit E.

"Software" means all computer software, firmware, programs, data libraries and databases, in any form, including source code, object code, apps, extensions including make files, Gerber files, user interfaces, development tools, library functions, compilers, internet websites, web content and links, all versions, updates, corrections, enhancements, replacements, and modifications thereof, and all documentation related thereto.

"Straddle Period" means any taxable period that begins on or before and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation of which a majority of the total voting power of shares entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more subsidiaries of such Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, association or other business entity or is or controls the managing director or general partner of such partnership, association or other business entity.

"Successful Bid" has the meaning assigned in the Bidding Procedures Motion.

"Successful Bidder" has the meaning assigned in the Bidding Procedures Motion.

"<u>Tax</u>" or "<u>Taxes</u>" means any U.S. federal, state, local or non-U.S. taxes, including income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital shares, social security, unemployment, disability, payroll, license, employee or other withholding, or other similar tax, levy, fee, impost, duty or assessment imposed by any Governmental Entity, including any interest, penalties or additions to tax with respect to the foregoing.

"<u>Tax Returns</u>" means any return, report, information return or form (including schedules or any related or supporting information) filed or required to be filed with any Governmental Entity in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"<u>The Villages Health Marks</u>" means the trademarks set forth on <u>Schedule 1.01(e)</u>.

"<u>Third Party Payor</u>" means any insurance company, managed care organization, health maintenance organization, preferred provider organizations, health plan or program or other third-party payor, whether private, commercial or a Governmental Program.

"<u>Transaction Documents</u>" means this Agreement, the Non-Competition Agreements, the Amended and Restated Leases, the Amendment to the Facilities Management Agreement, the Services Agreement, the Bill of Sale, the Bill of Sale, Assignment and Assumption Agreement, the Transition Services Agreement, and any and all certificates, agreements, documents or other instruments to be executed and delivered by any Person pursuant thereto, any exhibits, attachments or schedules to any of the foregoing, as any of the foregoing may be amended, supplemented or otherwise modified from time to time.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Documents.

"<u>Transferred Contracts</u>" has the meaning set forth in <u>Section 2.06(b)</u>.

"<u>Transition Services Agreement</u>" means the Transition Services Agreement to be executed and delivered by the Seller to Buyer and/or, if applicable, one or more Buyer Designees, at the Closing, substantially in the form of <u>Exhibit G</u>.

"<u>TVHHC</u>" means The Villages Health Holding Company, LLC, a Florida limited liability company.

"<u>United</u>" means UnitedHealthcare of Florida Inc. and United Behavioral Health, Inc.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act and any similar applicable state, local or foreign law or regulation.

"<u>Willful Breach</u>" means a willful and intentional act or a willful and intentional failure to act, in each case, by a party with awareness that the taking of such act or failure to take such act could reasonably be expected to give rise to a material breach of this Agreement.

1.02    <u>Other Defined Terms</u>. The following terms have the meanings set forth in the Sections set forth below:

<u>Term</u>                                                                                      <u>Section</u>

$ ................................................................................................................. 13.06
Accrued PTO ...........................................................................................12.09(i)
Acquisition .............................................................................................. Recitals
Action .......................................................................................................5.11(a)
Adjusted Balance Sheet ...........................................................................5.03(a)
Agreement................................................................................................ Preamble
Allocation................................................................................................. 3.02
Anti-Bribery Laws ...................................................................................5.15(d)
Assumed Liabilities ................................................................................. 2.03
Assumed Plan ...........................................................................................12.09(n)
Auction .....................................................................................................12.08(a)
Available Contract Schedule.................................................................... 2.06(a)
Backup Bidder ......................................................................................... 12.08(c)
Buyer........................................................................................................ Preamble
Buyer's 401(k) Plan .................................................................................12.09(j)
Buyer's Prorated Responsibilities............................................................ 2.05(a)
Buyer's Representatives ........................................................................... 7.02
Cash.......................................................................................................... 24
Closing .....................................................................................................4.01
Closing Date.............................................................................................4.01
Closing of the Bankruptcy Case ..............................................................2.07(b)
Collective Bargaining Agreement............................................................5.18(c)
Compensation Payments..........................................................................12.09(h)
Contracting Parties...................................................................................13.17(a)
control ......................................................................................Definition of Affiliate
Copyrights.............................................. Definition of Intellectual Property Rights
Coverage Period.......................................................................................7.04
Cure Costs ............................................................................................... 2.06(g)
Cure Costs Cap ........................................................................................2.06(g)
Cure Notice ..............................................................................................2.06(a)
Data Protection Requirements .................................................................5.20(k)
Deposit .....................................................................................................3.04(a)
Disclosure Schedule................................................................................. 13.06
Employee Withholding Documents .........................................................12.09(l)
Excluded Assets ...................................................................................... 2.02
Excluded Liabilities .................................................................................2.04
Exhibit ..................................................................................................... 13.06
Expense Reimbursement.......................................................................... 12.10
Final Allocation ....................................................................................... 3.02
Financial Statements ............................................................................... 5.03(a)
Health Care Permits .................................................................................5.20(b)
HIPAA .....................................................................................Definition of Health Care Laws

Labor Union ........................................................................................................5.18(c)
Leased Realty .....................................................................................................5.06(a)
Leases ................................................................................................................5.06(b)
Marks ........................................................ Definition of Intellectual Property Rights
Material Contracts .............................................................................................5.08(b)
Material Payor ............................................................................................. 5.08(a)(xi)
Material Referral Source .............................................................................. 5.08(a)(xv)
Material Vendor ............................................................................................ 5.08(a)(v)
Non-Party Affiliates .........................................................................................13.17(a)
Order ..................................................................................................................5.11(b)
Outside Date......................................................................................................11.01(d)
Parent .............................................................................................................. Preamble
Parties.............................................................................................................. Preamble
Party ................................................................................................................ Preamble
Patents ....................................................... Definition of Intellectual Property Rights
Permits ...............................................................................................................5.15(e)
Petition Date...................................................................................................... Recitals
Preliminary Executory Contract List ............................................................... 2.06(a)
Prorated Expenses .............................................................................................. 2.05(a)
Purchase Price ..............................................................................................3.01(a)(iii)
Purchased Assets................................................................................................. 2.01
Related Party ...................................................................................................... 5.17
Schedule ............................................................................................................ 13.06
Section............................................................................................................... 13.06
Security Incident ...............................................................................................5.20(o)
Security Risk Analysis.......................................................................................5.20(n)
Seller ............................................................................................................... Preamble
Seller Disclosure Schedules ............................................................................ Article V
Seller Registered IP...........................................................................................5.10(a)
Seller's 401(k) Plan....................................................................................... 12.09(j)
Seller's Prorated Responsibilities .................................................................... 2.05(a)
Specified Proceeding .........................................................................................7.01(l)
Standard Procedure ..........................................................................................12.09(l)
Stark Law ......................................................................Definition of Health Care Laws
Tail Insurance..................................................................................................... 7.04
Termination Fee ................................................................................................. 12.10
Termination Payment ......................................................................................... 12.10
Trade Secrets.............................................. Definition of Intellectual Property Rights
Transfer Taxes ................................................................................................... 8.03
Transferred Contracts......................................................................................... 2.06(b)
Transferred Employee .......................................................................................12.09(c)
Undisclosed Contract ......................................................................................... 2.06(a)
Withholding Agent............................................................................................. 3.03

## ARTICLE II

## PURCHASE AND SALE

2.01    <u>Purchase and Sale of Assets</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to Buyer and/or one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase and acquire from the Seller (other than the Excluded Assets), all of the Seller's right, title and interest, free and clear of all Liens, Claims and other interests (other than the Assumed Liabilities), in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller of every nature (wherever located, whether real, personal or mixed, whether held directly or indirectly and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), used or held for use in, or related to, the Business, including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "<u>Purchased Assets</u>"); <u>provided</u>, <u>however</u>, that the Purchased Assets shall not include any Excluded Assets, none of which shall be sold, assigned, conveyed, transferred or delivered to Buyer. Without limiting the generality of the foregoing, the Purchased Assets shall include all of Seller's right, title and interest in and to the following assets to the extent used or held for use in, or related to, the Business (except to the extent an Excluded Asset):

(a)    all advances, prepaid assets and expenses, security and other deposits and prepayments;

(b)    the Transferred Contracts and all rights and benefits thereunder;

(c)    all inventory and supplies;

(d)    all tangible personal property, including all Devices, equipment, leasehold improvements, computer hardware, furniture, furnishings, machines, tools, supplies, telephones, office equipment, vehicles and all rights in all warranties of any manufacturer or vendor with respect thereto (express or implied), including all such property (i) located at any clinic or administrative site operated by the Seller; or (ii) located at any Business-related facility;

(e)    except to the extent listed on <u>Schedule 2.01(e)</u>, all Intellectual Property Rights and all tangible embodiments thereof, to the extent owned by Seller, but excluding, for the avoidance of doubt, The Villages Health Marks and any other Marks incorporating "THE VILLAGES", subject to <u>Section 2.07</u>;

(f)    except to the extent listed on <u>Schedule 2.01(f)</u>, all IT systems, Software programs and all hardware or data processing equipment and data processing system manuals, whether owned or licensed pursuant to any Transferred Contract, subject to <u>Section 2.07</u>;

(g)    all Seller Information, and all databases and other repositories containing such data and information, and all records, including all data, know-how, Software, and media content, subject to <u>Section 2.07</u>;

(h)     all regulatory licenses, Permits and accreditations (including any issued or granted by, or filed with or delivered to, any Governmental Entity or accrediting body), and all rights thereunder, except for any such Permits that are Excluded Assets set forth in Section 2.02(m), subject to Section 2.07;

(i)     all telephone and facsimile numbers, post office boxes and directory listings;

(j)     each Assumed Plan and the Seller's right, title and interest in any assets of or relating thereto;[1]

(k)     all claims, causes of action or rights against third parties (including, warranties, indemnities, rebates and guarantees), other than such claims, causes of action or rights against third parties which are (i) against any Person who is a current or former officer, director, equityholder, or Affiliate of Seller or of the Seller's Affiliates (other than such claims arising under the Transferred Contracts), (ii) related to any overpayment, recoupment, offset, refund or improper billing practices of any nature related to the operation of the Business prior to the Closing, (iii) Avoidance Actions, and (iv) claims, causes of action or rights to the extent related to Excluded Assets or Excluded Liabilities;

(l)     all assets and all trusts and all assets held in such trusts on behalf of or otherwise relating to any Assumed Plan, including, for the avoidance of doubt the Physicians and Executive DC Plan and the Executive Deferred Compensation Plan, and the rabbi trust(s) related thereto; *provided,* to the extent any such assets or trusts are unable to be assigned or otherwise conveyed to the Buyer, the Purchased Assets shall include Cash in an amount equal to the value of the non-assignable assets or trusts as of the Closing Date;

(m)     any insurance proceeds arising in connection with damage to, or losses related to, the Purchased Assets occurring prior to the Closing, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing and to the extent not relating to an Excluded Asset or Excluded Liability;

(n)     all goodwill to the extent relating to or associated with the Purchased Assets or the Business; and

(o)     any other assets that are of a type not otherwise addressed by this Section 2.01 that are not Excluded Assets.

2.02     Excluded Assets. The Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)     any Equity Interests in the Seller or held by the Seller;

(b)     any Equity Interests in TVH Real Estate Holdings, LLC;

---

[1] *Note to Draft*: The Deferred Compensation Plan is to be an Assumed Plan.

(c)     any interest in the real property, or the furniture, fixtures or equipment (excluding Devices) located at 11368 Laufersky Lane, Oxford, Florida, 34484;

(d)     any interest in the lease agreement with respect to 600 Sunbelt Road, The Villages, Florida, 32159 dated May 19, 2025, by and between The Villages Operating Company, as lessor, and Seller, as lessee, or the furniture, fixtures or equipment (excluding Devices) at that premises;

(e)     organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the Seller's organization, maintenance, existence, and operation;

(f)     all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller, including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Closing, and any intercompany receivables between Seller on the one hand, and any Affiliate of Seller on the other hand;

(g)     any Cash;

(h)     all bank accounts of Seller;

(i)     any Contracts other than the Transferred Contracts;

(j)     all Avoidance Actions;

(k)     the Villages Health Marks (subject to any transitional rights granted thereto pursuant to any Transaction Documents), any other Marks incorporating "THE VILLAGES" and domain names (including "thevillageshealth.com"), webpages and social media accounts incorporating or related thereto;

(l)     any insurance policies of the Seller or proceeds thereof or any rights thereunder, except as set forth on Schedule 2.02(l) or described in Section 2.01(m);

(m)     the Seller's Medicare and Medicaid provider numbers and all associated National Provider Identifier (NPI) numbers related to owners, employees and independent contractors of Seller;

(n)     any rights to rebates, refunds or discounts due to Seller with respect to assets or services purchased prior to the Closing Date;

(o)     all Company Plans, other than the Assumed Plans and the Seller's right, title and interest in any assets of or relating thereto;

(p)     all payroll records, personnel files and other personnel records; or

(q)      any Tax assets, including prepaid Taxes and any refund, rebate or credit of Taxes.

2.03    <u>Assumed Liabilities</u>. Subject to the terms and conditions of this Agreement, effective as of the Closing, Buyer and/or one or more Buyer Designees shall assume and agree to pay, perform and discharge when due in accordance with their respective terms solely Liabilities (collectively, the "<u>Assumed Liabilities</u>") as follows:

(a)      all Liabilities to the extent relating to the ownership, operation, or conduct of the Purchased Assets or the Business following the Closing, including without limitation Liabilities to the extent arising under Transferred Contracts after the Closing;

(b)      Cure Costs up to the Cure Costs Cap;

(c)      Accrued PTO;

(d)      Assumed General Unsecured Claims that are not Excluded General Unsecured Claims; and

(e)      (i) Liabilities for Taxes relating to the Purchased Assets or the Business for any Post-Closing Tax Period, as determined pursuant to <u>Section 8.02</u> with respect to any Straddle Period, and (ii) all liability for Transfer Taxes

2.04    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary herein, neither the Buyer nor any Buyer Designee shall assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Seller, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities (all such Liabilities that neither the Buyer nor any Buyer Designee is assuming being referred to collectively as the "<u>Excluded Liabilities</u>"). For the avoidance of doubt, Excluded General Unsecured Claims shall be Excluded Liabilities.

2.05    <u>Prorated Expenses</u>. Except as otherwise expressly provided herein, (i) the Seller shall be responsible for all Prorated Expenses incurred in the operation of the Business prior to the Closing (the "<u>Seller's Prorated Responsibilities</u>"), and (ii) Buyer shall be responsible for all Prorated Expenses incurred in the operation of the Business after the Closing (the "<u>Buyer's Prorated Responsibilities</u>"); provided that in no event shall Buyer's Prorated Responsibilities include any Excluded Liabilities. "<u>Prorated Expenses</u>" shall mean expenses arising from the conduct of the business and operations of the Purchased Assets and the Business (other than Taxes subject to proration pursuant to <u>Article VIII</u> hereof), water charges, sewer, rents, real estate, fuel and utility charges, license fees, assessments and other fees, prepaid and deferred expenses, and other expenses relating to the Purchased Assets and/or the Business. In the event Buyer and the Seller are prohibited by a vendor from paying a partial invoice for the Prorated Expenses, Buyer shall submit payment in full for such invoice to the vendor, and the Seller agrees to reimburse Buyer for the Seller's pro rata share of the invoice within seven (7) Business Days of Seller's receipt of notice and proof of payment from Buyer that such invoice has been paid by Buyer. In the event that either Buyer or Seller pays any Prorated Expenses that are Seller's Prorated

Responsibilities or Buyer's Prorated Responsibilities, respectively, the other party shall promptly reimburse such amount within seven (7) Business Days of receipt of notice and proof of payment from Buyer or Seller that such invoice has been paid by Buyer or Seller, as applicable.

2.06    Assignment and Assumption of Certain Contracts.

(a)    Within fourteen (14) days of the date hereof, the Seller shall deliver to Buyer and file with the Bankruptcy Court a preliminary list setting forth the Executory Contracts and unexpired Leases used in, or otherwise related to, the Business along with its good faith estimate of the Cure Costs associated with each such Executory Contract (the "Preliminary Executory Contract List"), and will in good faith update the Preliminary Executory Contract List to add additional Executory Contracts and unexpired Leases not included in the Preliminary Executory Contract List, correct any inaccuracies in the Preliminary Executory Contract List and file such updated list (such updated list, the "Available Contract Schedule") with the Bankruptcy Court on a rolling weekly basis during the twenty-eight (28) day period following the date hereof with the final such Available Contract Schedule filed on the twenty-eighth day following the date hereof. The Seller shall serve written notice (each, a "Cure Notice") to the non-Seller counterparty to each Executory Contract on the Available Contract Schedule in accordance with the Bidding Procedures Order. From the date hereof through the Closing, the Seller shall cooperate and provide such additional information to Buyer as may be reasonably necessary in order to identify all Executory Contracts. If, at any time after filing of the final Available Contract Schedule and prior to the Closing Date, Seller becomes aware that it is a party to an Executory Contract that is not listed on the Available Contract Schedule (each, an "Undisclosed Contract"), or becomes aware that the Available Contract Schedule reflects inaccurate information, Seller will promptly update the Available Contract Schedule with respect to such Undisclosed Contract or inaccurate information and (i) file with the Bankruptcy Court and provide to Buyer such updated Available Contract Schedule, and (ii) serve a Cure Notice, to the non-Seller counterparty to such Undisclosed Contract. In addition, the Seller shall supplement the Available Contract Schedule to add any Executory Contracts used in, or otherwise related to, the Business that are entered into by the Seller during the pendency of the Bankruptcy Case and provide such updated Available Contract Schedule to the Buyer. The Seller shall provide an update of such good faith estimate of Cure Costs not less than ten (10) Business Days prior to the Closing Date.

(b)    From and after the date hereof until the fifth (5th) Business Day prior to the Closing Date, Buyer may, in its sole discretion, (i) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Contract to be rejected) for assumption and assignment to Buyer or its designee, effective on and as of the Closing (such Executory Contracts, together with any other Executory Contracts assumed by Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Transferred Contracts"), or (ii) designate any Executory Contract listed on the Available Contract Schedule (whether or not previously designated as a Transferred Contract) for rejection effective on and as of the Closing.

(c)    Seller shall take all actions reasonably required to assume and assign the Transferred Contracts to Buyer or its designee, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Transferred Contracts and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Transferred Contracts to Buyer or a Buyer Designee satisfies all

applicable requirements of section 365 of the Bankruptcy Code. If any objections are filed by, or received from, any non-Seller counterparty in response to a Cure Notice, Seller will take all actions reasonably required to resolve any such objections with such non-Seller counterparty.

(d)     From and after the date hereof until the Closing Date, Seller shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Transferred Contract or Executory Contract, not yet designated by Buyer for rejection, or take any affirmative action not required thereby, without the prior written consent of Buyer. For the avoidance of doubt, this Section 2.06(d) shall not apply to the expiration or extension of any Contract in accordance with its terms.

(e)     As part of the Sale Motion (or, as necessary in one or more separate motions), the Seller shall request that by virtue of the Seller providing the Cure Notices, the Bankruptcy Court deem any non-Seller party to such Transferred Contract that does not file an objection with the Bankruptcy Court to have given any required Consent to the assumption of the Transferred Contract by the Seller and assignment to the Buyer and/or one or more Buyer Designees.

(f)     The Sale Order shall provide for the assumption by the Seller, and to the extent permitted by applicable Law, provide for the assignment by the Seller to the Buyer and/or one or more Buyer Designees, effective upon the Closing, of the Transferred Contracts on the terms and conditions set forth in this Section 2.06.

(g)     In connection with the assumption and assignment to the Buyer or a Buyer Designee of any Transferred Contract pursuant to this Section 2.06, the Seller shall pay, at or prior to the Closing, all of the cure amounts ("Cure Costs"), as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Transferred Contracts, that relates to the period prior to the Closing; provided that Buyer hereby agrees to pay to Seller at the Closing in accordance with Section 3.01(a)(iii) (or, solely with respect to any Cure Costs (or portions thereof) for which reserves are established pursuant to Section 2.06(h) hereof, on the date of consensual resolution or final determination by the Bankruptcy Court of the applicable cure objection in accordance with Section 2.06(h) hereof) an amount equal to the lesser of (1) the aggregate amount of applicable Cure Costs and (2) $1,000,000 (the "Cure Costs Cap" and any Cure Costs above the Cure Costs Cap, "Excess Cure Costs") for Transferred Contracts that are not Affiliate Contracts to be paid to non-Seller counterparties pursuant to Section 2.06(h) below.

(h)     If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Transferred Contract that is an Affiliate Contract, Seller shall (x) pay on or before the Closing Date such non-Seller counterparty an amount equal to the undisputed portion of Cure Costs payable with respect to such Transferred Contract and (y) appropriately reserve funding for the disputed portion of such Cure Costs pending resolution of such cure objection, and, subject to entry by the Bankruptcy Court of the Sale Order, Seller shall assume and assign such Transferred Contract to Buyer at the Closing. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection with respect to any Transferred Contract that is an Affiliate Contract, Seller shall promptly pay to such

non-Seller counterparty any remaining Cure Costs owing to such non-Seller counterparty with respect to such Transferred Contract.

2.07    <u>Consents to Certain Assignments</u>.

(a)    If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the efforts of the Seller pursuant to <u>Section 2.06</u>, any Consent is not obtained prior to Closing and as a result thereof the Buyer cannot receive any of the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Seller shall, at the request of Buyer, prior to the Closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in any lawful and reasonable arrangement proposed by Buyer under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer; <u>provided</u>, that the Seller's cooperation obligations contemplated by this <u>Section 2.07</u> shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts. The Seller shall as promptly as practicable pay to the Buyer when received, all monies received by the Seller attributable to such Purchased Asset from and after the Closing Date and the Buyer shall promptly pay the Seller for all reasonable and documented out-of-pocket costs incurred by the Seller associated with, arising or resulting from such arrangement. Subject to the terms and limitations set forth in this Agreement, Seller shall use commercially reasonable efforts (which shall not include any obligation of the Seller to pay money (other than Cure Costs) to any third party or to incur out-of-pocket expenses unless Buyer funds such amounts) to secure such Consent as promptly as practicable after the Closing. Upon receiving any such Consent applicable to such Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

(b)    To the extent that the Buyer has not obtained all of the Permits that are necessary for the Buyer to take title to all of the Purchased Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in a substantially similar manner in all material respects as it was operated by the Seller immediately prior to the Closing, the Seller shall, to the extent permitted by applicable Laws, maintain, at the Buyer's sole expense, after the Closing such Permits that the Buyer requests, until the earlier of the time the Buyer has obtained such Permits and the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning the Seller in the Bankruptcy Case, and such plan has become effective in accordance with its terms (the "<u>Closing of the Bankruptcy Case</u>").

2.08    <u>Designations of Assets and Liabilities</u>.

(a)    At any time on or prior to the second (2nd) Business Day prior to the Closing Date, the Buyer may, in its sole discretion by written notice to the Seller, (a) designate any of the Purchased Assets as Excluded Assets, and (b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or

Liabilities so designated; <u>provided</u>, that there shall be no reduction in the Purchase Price in connection with any such designation by the Buyer. Notwithstanding any other provision hereof, the Liabilities of the Seller under or related to any asset designated as an Excluded Asset under this paragraph shall constitute Excluded Liabilities.

2.09    <u>Wrong Pockets</u>.

(a)    During the twelve (12) month period following the Closing, if either Buyer or the Seller becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to Buyer or that any right, property or asset forming part of the Excluded Assets has been transferred to Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to (i) Buyer, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to Buyer at or in connection with the Closing, or (ii) the Seller, in the case of any right, property or asset forming part of the Excluded Assets which was transferred to Buyer at the Closing.

(b)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates receives any (i) funds or property intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds or property to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds or property, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise) or (ii) mail, courier package or document intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds, property or document to, the other Party.

(c)    From and after the Closing, if either Buyer or Seller or any of their respective Affiliates pays any amount to any third party in satisfaction of any Liability of the other Party pursuant to the terms of this Agreement or any other Transaction Document, (i) the paying Party shall promptly notify the other Party of such payment and (ii) the other Party shall promptly reimburse the paying Party for the amount so paid by the paying Party to such third party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such amount, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise).

## ARTICLE III

## PURCHASE PRICE

3.01    <u>Purchase Price</u>.

(a)    The consideration for the sale and transfer of the Purchased Assets from the Seller to Buyer (and or one or more Buyer Designees) shall be as follows:

(i)    an amount in cash equal to $68,000,000; plus

(ii)    an amount of cash equal to the Cure Costs for Transferred Contracts that are not Affiliate Contracts, subject to the Cure Costs Cap, in accordance with Section 2.06(g) for use by Seller in paying the amounts required pursuant to Section 2.06(h) (such amounts in clauses (i) and (ii), collectively, the "Cash Purchase Price"); plus

(iii)    the assumption of the Assumed Liabilities by execution of the Bill of Sale, Assignment and Assumption Agreement (such amounts in clauses (i) – (iii), collectively, the "Purchase Price").

(b)    On the Closing Date, Buyer shall pay or cause to be paid to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller at least three (3) Business Days prior to the Closing, an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price less the Deposit (which shall not be less than $20,400,000[2] and shall be released to Seller upon the joint instruction of Buyer and Seller instructing the Escrow Agent to pay the Deposit to the Seller).

3.02    Allocation. No later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets (the "Allocation") in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as appropriate) for Seller's review and comments. Any reasonable comments provided by the Seller to Buyer under this Section 3.02 shall be considered by Buyer in good faith. The Allocation shall be conclusive and binding on the Parties unless the Seller notifies Buyer in writing that they object to one or more items reflected in the Allocation, and specify the reasonable basis for such objection, within thirty (30) days after delivery to the Seller of the Allocation. In the case of such an objection, the Seller and Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by the Seller and Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "Final Allocation"). If the Seller and Buyer are unable to resolve all disputed items within thirty (30) days after the delivery of the Seller's written objection to Buyer, each of Buyer and the Seller may separately determine the allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account under the Code) among the Purchased Assets and there shall be no Final Allocation. The Parties agree to file all Tax Returns (including, but not limited to, the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Final Allocation (if any) unless otherwise required by applicable Law; provided, however, that nothing contained herein shall prevent Buyer or the Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Final Allocation (if any), and neither Buyer nor the Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Final Allocation (if any). In administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Final Allocation (if any) in determining the manner in which the Purchase Price should be allocated as between the Seller and their estate for non-Tax purposes.

---

[2] *Note to Draft*: To be 30% of amount of cash listed at (i) and to be further increased if the cash purchase price is increased.

3.03    <u>Withholding</u>. Buyer, the Seller and any other Person that has any withholding obligation with respect to any payment made pursuant to this Agreement (each, a "<u>Withholding Agent</u>") shall be entitled to deduct and withhold any amounts otherwise payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code or any other provision of applicable Tax Law. To the extent that amounts are so properly deducted and withheld and paid to the appropriate Governmental Entity, such amounts shall be treated as having been paid to such Person in respect of which such deduction and withholding was made. If a Withholding Agent determines that any such withholding or deduction is required, the Withholding Agent shall use commercially reasonable efforts to notify the payee at least ten (10) days in advance of such withholding or deduction, and shall use commercially reasonable efforts to cooperate with such Person to reduce or eliminate such withholding and deduction (including by providing a reasonable opportunity for such Person to provide documentation establishing exemptions from such withholding or deduction).

3.04    <u>Deposit</u>.

(a)    No later than one (1) Business Day after the date hereof, Buyer will make an earnest money deposit (the "<u>Deposit</u>") into escrow with the Escrow Agent in the amount equal to $20,400,000.00 by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Seller or Buyer and shall be applied against payment of the Cash Purchase Price. At Closing, the Deposit (which shall not be less than $20,400,000) shall be delivered to the Seller in accordance with <u>Section 3.01(b)</u> and the terms of the Escrow Agreement and credited toward payment of the Cash Purchase Price.

(b)    If this Agreement has been validly terminated prior to Closing by the Seller pursuant to <u>Section 11.01(c)</u>, then within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to the Seller.

(c)    If this Agreement has been validly terminated prior to the Closing by any party hereto for any reason other than as contemplated by <u>Section 3.04(b)</u> then, within three (3) Business Days after the date of such termination, Buyer and Seller shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

## ARTICLE IV

## THE CLOSING

4.01    <u>The Closing</u>. The closing of the Transactions (the "<u>Closing</u>") shall take place remotely by means of electronic delivery or release of documents, at 10:00 a.m., New York City time, on the third (3rd) Business Day following satisfaction or due waiver of all of the closing conditions set forth in <u>Article IX</u> (other than those conditions to be satisfied at the Closing itself, but subject to the satisfaction or waiver of such conditions) or on such other date and/or time as is mutually agreed in writing by Buyer and the Seller; <u>provided</u>, that in no event shall the Closing be required to occur earlier than October 31, 2025 without the written consent of the Buyer; <u>provided</u>, <u>further</u>, that, in the event that the Buyer serves as the Backup Bidder, in no event shall the Closing

be required to occur earlier than the date that is 53 days following the Backup Effective Date without the written consent of the Buyer; provided, further, that, in the event that Seller does not meet the deadline in Section 7.03(a), then the dates set forth in the preceding provisos will be tolled on a day by day basis based on how late the Seller is in providing the required materials.. The date and time on which the Closing actually occurs is referred to herein as the "Closing Date." The Closing will be deemed effective as of 12:01 a.m. New York City time, on the Closing Date.

4.02    Closing Deliveries. At the Closing:

(a)    in addition to the payments contemplated by Section 3.01(b), Buyer shall deliver, or cause to be delivered, to the Seller the following items:

(i)    a duly executed counterpart from Buyer and/or one of its Affiliates, as applicable, to each of the Transaction Documents to which Buyer and/or such Affiliate is a party; and

(ii)    the certificate required to be delivered pursuant to Section 9.03(c);

(b)    the Seller shall deliver, or cause to be delivered, to Buyer the following items:

(i)    a duly executed counterpart to each of the Transaction Documents to which the Seller or any of its Affiliates is a party (including, for the avoidance of doubt, the Affiliates of the Seller party to the Non-Competition Agreements, the Amended and Restated Leases, the Services Agreement, and the Amendment to the Facilities Management Agreement);

(ii)    the certificate required to be delivered pursuant to Section 9.02(d);

(iii)    a copy of the Sale Order as entered by the Bankruptcy Court;

(iv)    evidence in a form acceptable to Buyer of payment of the Excess Cure Costs with respect to the Transferred Contracts as of the Closing;

(v)    a properly executed and completed IRS Form W-9 from the Seller; and

(vi)    as promptly as reasonably practicable following the date hereof, but in any event no later than fifteen (15) Business Days prior to the Closing Date, completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in writing in the corresponding section of Article V of the disclosure schedule delivered by Seller to Buyer as of the execution of this Agreement (the "Seller Disclosure

Schedules"), or in another section of <u>Article V</u> of the Seller Disclosure Schedules to the extent that the relevance thereof would be reasonably apparent on its face that such disclosure is applicable to such section of <u>Article V</u> of the Seller Disclosure Schedules, the Seller represents and warrants to Buyer, as of the date hereof and as of the Closing (unless the representation and warranty speaks as of a specific date, in which case such representation and warranty shall be made only as of such specific date), as follows:

5.01    <u>Organization and Power</u>. The Seller (i) is a limited liability company duly organized and validly existing under the Laws of the State of Florida and (ii) has paid all fees and filed all reports due to, and the Seller's status is active with, the Florida Department of State. The Seller has all requisite corporate power and authority and all authorizations, licenses and permits necessary to own, lease and operate its properties and assets as they are now being owned, leased and operated and to carry on its businesses as now conducted. The Seller is qualified or licensed to do business and is in good standing (where such concept is recognized) in every jurisdiction where it is required to qualify or be licensed, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected, individually or in the aggregate, be material to the Seller. The Seller has delivered to Buyer true and complete copies of the organizational documents of the Seller (including the Company Operating Agreement), together with any amendments thereto. The Seller is not in material violation of any provision of its operating agreement.

5.02    <u>Authorization; No Breach; Valid and Binding Agreement</u>.

(a)    Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the execution, delivery and performance of this Agreement and any other Transaction Document to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions, including the Acquisition, have been duly and validly authorized and approved by all requisite action on the part of the Seller and upon entry and effectiveness of the Sale Order and subject to receipt of the requisite Bankruptcy Court approvals, in accordance with the terms hereof, will have all necessary corporate or similar authority to consummate the transactions contemplated hereby and thereby, and no other actions or corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party.

(b)    Other than as provided for in <u>Section 5.12</u> and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, the Seller's execution, delivery, performance and compliance with the terms and conditions of this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party and the consummation of the Transactions do not and shall not (i) violate, conflict with, result in any violation, breach of, or constitute a default under any of the provisions of the certificates of incorporation or bylaws (or equivalent organizational documents) of the Seller, (ii) except as disclosed on <u>Schedule 5.02(b)</u>, require any consent of or other action by any Person or the Seller under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, modification, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any Contract or Permit, (iii) violate any Law or Order to which the Seller is subject or by which any

of their respective properties or assets are bound or affected, or (iv) result in the creation or imposition of any Lien (other than those Liens released by operation of the Sale Order or otherwise prior to the Closing) on any properties or assets of the Seller, except where the failure of any of the representations and warranties contained in <u>clause (ii)</u> or <u>(iv)</u> above to be true would not reasonably be expected, individually or in the aggregate, be material to the Seller.

(c)    Assuming this Agreement and the other Transaction Documents are (or, at the Closing, will be) valid and binding obligations of Buyer and its Subsidiaries and Affiliates, as applicable, this Agreement and the other Transaction Documents to which the Seller is (or, at the Closing, will be) a party constitute legal, valid and binding obligations of the Seller, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws of general application, and subject in all cases to the entry and effectiveness of the Sale Order and requisite Bankruptcy Court approvals and limitations imposed by Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

5.03    <u>Financial Statements</u>.

(a)    The Seller's unaudited adjusted consolidated balance sheets as of December 31, 2023, December 31, 2024 and May 31, 2025 (the "<u>Adjusted Balance Sheets</u>") and the related statement of income and cash flows and the unaudited consolidated balance sheet and related unaudited statements of operations, changes in members' deficit and cash flows for the same period (collectively, the "<u>Financial Statements</u>") (i) have been prepared from and are in accordance with the books and records of the Seller, and in accordance with GAAP applied on a consistent basis throughout the periods set forth therein, subject to the notes included therein, and (ii) present fairly in all material respects the consolidated financial condition and results of operations of the Seller as of the times and for the periods referred to therein. The Seller has provided Buyer with true and complete copies of the Financial Statements in <u>Schedule 5.03</u>. Neither the Seller, nor to the knowledge of the Seller, any of their respective officers and independent auditors, have identified or been made aware of any material complaint, allegation, deficiency, assertion or claim, whether written or oral, regarding the Financial Statements.

(b)    The Seller has devised and maintained systems of internal accounting controls with respect to its businesses sufficient to provide reasonable assurances that (i) all transactions are executed in accordance with the general and specific authorization of the management of the Seller and (ii) all transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and to maintain proper accountability for items.

(c)    As of May 31, 2025, the Seller has accrued approximately $16,100,000 of medical expenses in excess of the medical expenses reflected in the service funds prepared by UnitedHealthcare of Florida, Inc. and Blue Cross and Blue Shield of Florida, Inc. for the period beginning January 1, 2025 and, in the case of Blue Cross and Blue Shield Florida, Inc., ending April 25, 2025, and, in the case of UnitedHealthcare of Florida, Inc., ending April 30, 2025, which service funds are set forth on <u>Schedule 5.03(c)</u>.

5.04    Absence of Certain Developments; Undisclosed Liabilities.

(a)    Other than as a result of the events set out on Schedule 1.01(c) and the preparation for, commencement, and pendency of the Bankruptcy Case, since January 1, 2025, (i) the Business has been conducted in the ordinary course of business and consistent with past practice and (ii) the Seller has not taken any action that, if taken from, and after the date of this Agreement and prior to Closing, would require the consent of the Buyer pursuant to Section 7.01(a), (b) (provided that solely for purposes of this Section 5.04(a), references to $10,000 individually shall be deemed to be $50,000 and references to $50,000 in the aggregate shall be deemed to be $500,000), (c), (d), (f), (g) (provided that solely for purposes of this Section 5.04(a), references to $25,000 shall be deemed to be $100,000), (h), (i), (l), (m), (n), (o), (p), (q), (r), (t), or (u), and there has not been any Effect that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)    The Seller does not have any Liability, except for Liabilities (i) specifically and adequately reflected in or reserved against on the face of the Adjusted Balance Sheets, (ii) incurred in the ordinary course of business consistent with past practice since the date of the latest Adjusted Balance Sheet (none of which is a Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation under any Contract or Law or any Action), (iii) otherwise disclosed in Schedule 5.04(b), (iv) that would not be required to be reflected on a consolidated balance sheet or the notes thereto of the Seller, (v) incurred in connection with this Agreement or the Transactions and (vi) that would not, individually or in the aggregate, be materially adverse to the Seller. The Seller is not a guarantor or is otherwise liable for any Liability of any other Person.

5.05    Title to Assets; Sufficiency.

(a)    The Seller has good, valid and marketable title to, or a valid leasehold interest in or valid license to, each of the Purchased Assets and in each case, free and clear of any Lien, except for Permitted Liens.

(b)    The Purchased Assets, together with the rights under the Transaction Documents and the Excluded Assets, constitute all of the properties and assets used or held for use for the conduct of the Business as of the date hereof and, subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, will constitute all of the assets necessary and sufficient to conduct the Business in all material respects as conducted by the Seller in the 12 (twelve) month period prior to the filing of the Bankruptcy Case, except as disclosed on Schedule 5.05(b). The Purchased Assets (i) are in good operating and working condition and repair (normal wear and tear excepted), (ii) have been operated and maintained in accordance with customary industry practices and (iii) are suitable and adequate for the purposes for which they are presently used.

5.06    Real Property.

(a)    Schedule 5.06(a) sets forth a list of all real property to which the Seller has a valid and existing leasehold, subleasehold, licensed or other occupancy interest (collectively, the

"Leased Realty"). The Seller has provided Buyer with true and complete copies of all Leases as currently in effect.

(b)      The Seller possesses valid and existing leasehold interests in the Leased Realty pursuant to the leases, subleases, licenses or other occupancy agreements set forth on Schedule 5.06(b) (including any and all amendments and guaranties thereto, collectively, the "Leases"), free and clear of any Liens, except (i) Permitted Liens and (ii) any Lien on the applicable fee title, the payment or performance of which is not the responsibility of the Seller under the applicable Lease and does not materially impair the current operations by the Seller. Subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals, and other than as a result of the Bankruptcy Case, with respect to each Lease: (i) such Lease is in full force and effect and is the legal, valid and binding obligation of the Seller, and to the knowledge of the Seller, the other party thereto, in each case, enforceable in accordance with its respective terms, except as the enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (ii) there is no existing default by the Seller or, to the knowledge of the Seller, the counterparty thereto, as applicable, of such Lease and (iii) there exists no event, occurrence, condition or act (including the Transactions), that with or without notice or lapse of time, or both, or the happening of any further event or condition would constitute a default by the Seller or, to the knowledge of the Seller, any counterparty thereto under each such Lease.

(c)      No portion of the Leased Realty is subject to any pending condemnation requisition or taking by any public or municipal authority and to the knowledge of the Seller, no such condemnation, requisition, or taking is threatened or contemplated. To the knowledge of the Seller, the Seller has not been notified in writing of future material improvements by any public authority, any part of the cost of which would or might reasonably be asserted against the Seller.

(d)      To the knowledge of the Seller, no assessment or charge to the Seller is due with respect to any streets, roads and avenues adjoining the Leased Realty. Each of the buildings, improvements and building systems situated or located on the Leased Realty is in good condition and repair for the current uses, reasonable wear and tear and the applicable landlord's repair and replacement obligations excepted.

(e)      Except as set forth on Schedule 5.06(e), no Leased Realty is subject to any options to purchase or lease or purchase or sale contracts in favor of any Person other than the Seller. The Seller is not a lessor, sublessor, grantor or licensor under any sublease, license or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any Leased Realty, as applicable, except as set forth on Schedule 5.06(b).

5.07    Tax Matters.

(a)      The Seller has filed all income and other material Tax Returns that are required to be filed by it (taking into account any extensions of time to file), and all such Tax Returns are true and complete in all material respects. All material Taxes (including any Liability for "imputed underpayments" under Section 6225 of the Code) that are due and payable by or with

respect to the Seller has been fully paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    The Seller is not the subject of a Tax audit, examination or other proceeding with respect to any material amounts of Taxes and to the knowledge of the Seller, no such Tax audit, examination or other proceeding has been threatened in writing. No outstanding deficiencies for material amounts of Taxes with respect to the Seller has been claimed, proposed or assessed by any Governmental Entity.

(c)    The Seller (i) is not and has not been a member of any affiliated, consolidated, combined, unitary or other group for Tax purposes (other than any such group the common parent of which is the Seller), (ii) has no material Liability for Taxes of any Person (other than the Seller) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) or as a transferee or successor, or (iii) is not subject to any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Tax Law), private letter ruling, or other written agreement with a Governmental Entity regarding Taxes or Tax matters, which agreement or ruling would be binding on the Seller in a taxable period beginning after the Closing Date.

(d)    The Seller has not participated in a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b).

(e)    No claim that remains pending has been made by any Tax authority in writing, in a jurisdiction where the Seller has filed a Tax Return, that such entity is or may be subject to Tax by such jurisdiction.

(f)    The Seller has withheld and remitted all material Taxes required to have been withheld and remitted.

(g)    There are no Liens for Taxes upon the Purchased Assets, other than Permitted Liens.

(h)    The Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)    None of the Contracts, the Liabilities of which are assumed under this Agreement constitute a Tax sharing, Tax allocation, Tax indemnity agreement or similar arrangement (other than any agreement entered into in the ordinary course of business that is not primarily related to Taxes and contains customary Tax indemnification, sharing or gross up provisions), pursuant to which Buyer or any of its Affiliates may have any obligations to make payments after the Closing.

(j)    There are no material Tax Liabilities of Seller or its Affiliates that could result in Liability to Buyer or any of its Affiliates as a transferee or successor or otherwise attach to any of the Assets.

5.08    Contracts and Commitments.

(a)    Schedule 5.08(a) sets forth a complete list, as of the date hereof, of all Contracts to which the Seller is party to or bound by that are of a type described below, excluding (x) purchase orders entered into in the ordinary course of business and (y) Company Plans:

(i)    Contracts (and all related loan documents) or indentures under which (A) the Seller has created, incurred, assumed or guaranteed any indebtedness in excess of $10,000, (B) any Lien has been placed on any Purchased Asset (other than a Permitted Lien), or (C) under which any Person has guaranteed any indebtedness of the Seller;

(ii)    any Collective Bargaining Agreement with any Labor Union;

(iii)    any Contract for capital expenditures in an amount in excess of $50,000 in the current or any subsequent calendar year;

(iv)    any Contract with any Third Party Payor or Governmental Entity;

(v)    any Contract or groups of related Contracts for the purchase by the Seller, or the sale or furnishing to the Seller, of materials, supplies, merchandise, equipment or services that has required aggregate payments in excess of $200,000 in the (12)-month period ending on the date hereof or is reasonably expected to require aggregate payments in excess of $200,000 in the (12)-month period from the date hereof (the counterparty to each such Contract, a "Material Vendor");

(vi)    any Contract under which the Seller is (A) a lessee or sublessee of any machinery, equipment, vehicle or other tangible personal property, or (B) a lessor of any tangible personal property owned by the Seller, in any single lease under the foregoing clause (A) or (B) that has future required scheduled payments in excess of $10,000 per annum;

(vii)    any Contract that contains a license, covenant not to assert, release, agreement not to enforce or prosecute, or other immunity to any Person (A) with respect to material Intellectual Property Rights to the Seller from a third party (other than non-exclusive licenses granted by service providers or licenses to open source Software or licenses for commercially available Software or other technology), or (B) from the Seller to a third party under any material Seller IP Rights (other than non-exclusive licenses granted to service providers for the purpose of providing services to the Seller in the ordinary course of business or licenses to Marks which are ancillary to such Contract);

(viii)    any Contract pursuant to which the Seller develops, acquires, or contracts with any other Person to develop or acquire Seller IP Rights, including under any joint development relationship (but excluding employment, consulting, services or invention assignment agreements entered into in the ordinary course of business with employees, contractors or consultants of the Seller);

32

(ix)    any Contract involving any partnership, limited liability company agreement (or operating agreement of a limited liability company), joint venture, or similar enterprise, joint operating agreement, or sharing of profit agreement;

(x)    any Contract (A) containing a covenant of the Seller not to compete in any material line of business or with any Person in any geographical area with respect to a material line of business, (B) granting any exclusive right, right of first refusal, right of first offer, preemptive right or similar right to any Person, (C) containing "most favored nation" clauses, (D) limiting the freedom of the Seller to hire, solicit or retain any Person for employment in any geographical area, or (E) obligating the Seller to purchase a minimum of goods or services;

(xi)    any Contract with any health care service plan, health insurer, health maintenance organization, carrier, Company Plan, organized delivery system, hospital and/or other Third Party Payor (including any such Contracts held through a downstream provider agreement, or management services or independent practice association arrangement) (a "Material Payor");

(xii)    any agency, dealer, distributor, sales representative, marketing or other similar agreement;

(xiii)    any letters of credit or bonds required by a Third Party Payor;

(xiv)    any Contracts for "value-based care," gainsharing, shared savings or other upside and/or downside risk-sharing arrangements between the Seller and Third Party Payor, hospital, health system, physician group or other health care provider organization;

(xv)    any Contract with a top ten (10) Referral Source of the Seller for the fiscal year ended December 31, 2024 and the five (5) months ended May 31, 2025 (each, a "Material Referral Source");

(xvi)    any Contract relating to the disposition of (other than sales or acquisitions of inventory in the ordinary course of business) any business, assets or properties of the Seller (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise);

(xvii)    any Contract relating to (A) the acquisition of any Person, business, asset or properties (whether by merger, consolidation or other business combination, sale of Equity Interests, sale of Purchased Assets or otherwise) by the Seller or (B) any disposition of any Equity Interests or Purchased Assets of the Seller in the case of this clause (B) pursuant to which after the Closing the Seller (x) is, or may become, obligated to pay or cause to be paid any amount, including (I) outstanding "earn-out" or deferred payments or (II) purchase price adjustment or (y) is subject to surviving indemnification obligations;

(xviii)    Contracts related to the settlement of any Action that impose material ongoing obligations (including nonmonetary obligations) on the Seller (other than customary release, confidentiality and non-disparagement obligations);

(xix)    other than ordinary course severance and separation agreements, all settlements, conciliations or similar agreements the performance of is reasonably expected to involve any payment by the Seller after the date of the latest Adjusted Balance Sheets;

(xx)    any Affiliate Contract;

(xxi)    Leases, including (A) for any Leased Realty, the primary permitted use of which is medical care, (B) subleases by the Seller to any Person for any Leased Realty, the primary permitted use of which is operation of a health insurance resource center or the provision of medical care, or (C) those other Leases disclosed on Schedule 5.08(a)(xxi); and

(xxii)    any other contractual obligation (or group of related contractual obligations) the performance of which requires payment by the Seller or the contractual counterparty in excess of $1,000,000 per annum.

(b)    Buyer has been supplied with true and complete copies of all Contracts (excluding purchase orders), including all amendments, modification and supplements thereto, that are referred to on Schedule 5.08(a) (collectively, the "Material Contracts"). Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, each Material Contract is in full force and effect and is a valid and binding obligation of, and enforceable against, the Seller and, to the knowledge of the Seller, is a valid and binding obligation of, and enforceable against, each other party thereto.

(c)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller (or, if applicable, its Affiliates) has not in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract. To the knowledge of the Seller, no other Person has, in any material respect violated or breached, or committed any default under (or is alleged to be in default or breach in any material respect under), any Material Contract and, to the knowledge of the Seller, no event or circumstance has occurred that with or without notice or lapse of time, or both, would constitute a breach or default in any material respect under or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of benefit under any Material Contract. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, the Seller has properly paid all amounts to be paid and otherwise performed all material obligations required to be performed by it under the Material Contracts. The Seller nor any of its Affiliates has received written notice from any other party to any Material Contract threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

5.09    Material Payors; Material Referral Sources; Material Vendors.

(a)    Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement

and as described on Schedule 5.09(a), to the knowledge of the Seller, no Material Payor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Payor has proposed to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business, including the scope of services, with the Business that is inconsistent with the terms of its existing agreement with the Seller. Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, and as described on Schedule 5.09(a), to the knowledge of the Seller, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Payor. Except as described on Schedule 5.09(a), the Seller has not, or has not been in the last three (3) years, involved in any material claim or dispute with any of its Third Party Payors.

(b)     Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on Schedule 5.09(b), to the knowledge of the Seller, no Material Referral Source plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Referral Source has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify terms or amount of the business relationship with the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Referral Source. Except as described on Schedule 5.09(b), the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Referral Sources.

(c)     Subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case and as described on Schedule 5.09(c), to the knowledge of the Seller, no Material Vendor plans to stop, limit, change or negatively alter the amount of business done with the Business, and no Material Vendor has proposed in writing (or to the knowledge of the Seller, orally) to adversely modify costs, rates or prices paid to or paid by, or terms or amount of the business with, as applicable, the Business that is inconsistent with the terms of its existing agreement with the Business. To the knowledge of the Seller, subject to entry into and effectiveness of the Sale Order, the requisite Bankruptcy Court approvals, and payment of Cure Costs, and except as a result of commencement of the Bankruptcy Case, no event has occurred that is reasonably likely to adversely affect the Business' relationship with any Material Vendor. Except as described on Schedule 5.09(c), is the Business has not, nor has been in the last three (3) years, involved in any material claim or dispute with any of its Material Vendors.

5.10    Intellectual Property; Information Technology.

(a)     Schedule 5.10(a) sets forth a true, correct and complete list as of the date hereof of all Patents, registered Marks, registered Copyrights and domain name registrations included in the Seller IP Rights (the "Seller Registered IP").

(b)    Except as disclosed on <u>Schedule 5.10(b)</u>, the Seller exclusively owns all Seller IP Rights free and clear of all Liens (other than Permitted Liens). The Seller Registered IP is subsisting and has not expired, been cancelled, or been abandoned and, to the knowledge of the Seller, not invalid or unenforceable. The Seller is current in the payment of all registration, maintenance and renewal fees with respect to the Seller Registered IP, except in each case as the Seller has elected in its reasonable business judgment to abandon or permit to lapse a registration or application.

(c)    None of the Seller Registered IP is subject to any Order adversely affecting the use thereof or rights thereto by the Seller. There is no opposition or cancellation Action pending or, to the knowledge of the Seller, threatened in writing against the Seller concerning the ownership, validity, enforceability, registration, use or ownership of any Seller Registered IP (other than ordinary course proceedings related to the application for any item of Seller IP Rights).

(d)    The Seller owns, licenses, sublicenses, or otherwise possesses legally enforceable and sufficient rights to all Intellectual Property Rights necessary to conduct the Business as currently conducted, all of which rights shall survive the consummation of the Transactions without being terminated or materially changed, other than the Excluded Assets, taking into account the rights to be provided under the Transaction Documents and subject to entry into and effectiveness of the Sale Order and the requisite Bankruptcy Court approvals. The Seller IP Rights, together with the rights under the Transaction Documents and the Excluded Assets, together with all Intellectual Property Rights of third parties which are licensed or sublicensed to the Seller or for which the Seller otherwise has a legally enforceable right to use, constitute all Intellectual Property Rights necessary to conduct the Business as currently conducted.

(e)    During the three (3) years prior to the date of this Agreement, the Seller has not (i) received any written notice alleging that the conduct of its business infringes, misappropriates, or violates the Intellectual Property Rights of a third party, or (ii) made an allegation in writing that a third party is infringing or misappropriating, or otherwise violating any Seller IP Rights.

(f)    The conduct of the Business, as currently conducted or as conducted during the three (3) years prior to the date of this Agreement has not infringed, violated, or misappropriated any Intellectual Property Rights of any Person and, to the knowledge of the Seller, no Person is infringing, misappropriating or otherwise violating any Seller IP Rights.

(g)    The Seller has taken commercially reasonable steps to protect the confidentiality of material Trade Secrets included in the Seller IP Rights and all such Intellectual Property Rights have been maintained in confidence in accordance with procedures that are customarily used in the industry to protect rights of like importance. The Seller has obtained, either by operation of Law or by valid assignment or transfer, exclusive ownership of all Intellectual Property Rights from each employee or contractor who is or was involved in the creation or development of any material Intellectual Property Rights for the Seller and, all employees and contractors with access to material Trade Secrets and other material confidential information constituting Seller IP Rights are bound by confidentiality obligations that obligate such Person to protect the material Trade Secrets and other material confidential information constituting such Seller IP Rights.

5.11    <u>Litigation; Orders.</u>

(a)    During the three (3)-year period prior to the date of this Agreement, except for the Bankruptcy Case and as set forth on <u>Schedule 5.11(a)</u>, there has not been any material charge, claim, cross-claim or third-party claim, complaint, legal action, litigation, suit, arbitration, prosecution, audit, investigation, inquiry, hearing or proceeding (whether civil, criminal, regulatory or otherwise or federal, state, local or foreign), audit, assessment, grievance, charge, complaint or demand at Law or in equity, by or before any Governmental Entity ("<u>Action</u>"), pending or threatened in writing (or, to the knowledge of the Seller, threatened orally) against (i) the Seller or its respective officers or directors or (ii) any Clinician with respect to the Business.

(b)    The Seller is not, nor any of its assets or properties are, subject to any settlement, stipulation, order, writ, judgment, injunction, decree, ruling, determination or award of any court or of any Governmental Entity ("<u>Order</u>") that (i) restricts the manner in which the Seller may conduct their business or which would, individually or in the aggregate, reasonably be expected to be material to the Seller or its business, (ii) would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the execution, delivery, performance and consummation of the Transactions or (iii) could otherwise materially affect the ability of the Seller or any of its Affiliates to perform its or their obligations pursuant to any Material Contract.

5.12    <u>Governmental Consents, etc.</u> Except as set forth on <u>Schedule 5.12</u>, and to the extent not obviated by the Sale Order, (a) the Seller is not required to submit any material notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and (b) no material consent, approval, clearance or authorization of any Governmental Entity is required to be obtained by the Seller in connection with its execution, delivery or performance of this Agreement or any other Transaction Document to which the Seller is (or, at the Closing, will be) a party or the consummation by the Seller of the Transactions.

5.13    <u>Employee Benefit Plans.</u>

(a)    <u>Schedule 5.13(a)</u> sets forth, as of the date hereof, each Company Plan. With respect to each material Company Plan, the Seller has provided or made available to Buyer or its representatives prior to the date hereof true and complete copies, as applicable, of: (i) the plan and trust documents, and any amendments thereto, and the most recent summary plan description, (ii) the most recent annual report filed on Form 5500 or other annual regulatory filing, (iii) the most recent financial statements and actuarial reports (iv) the most recent favorable determination or opinion letter from the Internal Revenue Service with respect to each Company Plan intended to qualify under Section 401(a) of the Code, (v) the results of annual compliance testing for the most recently completed plan year and (vi) all non-routine, material correspondence with any Governmental Entity in the past three (3) years.

(b)    No Company Plan is a Multiemployer Plan, Multiple Employer Plan or a plan that is subject to Title IV of ERISA. No Company Plan is a "registered pension plan" as that term is defined in Section 248(1) of the Income Tax Act. No Company Plan provides, and the Seller does not otherwise have any obligation to provide, any health or other welfare benefits to

current or former employees of the Seller following their termination of employment, other than health continuation coverage pursuant to COBRA or other similar applicable Law.

(c)     Each Company Plan has been maintained and administered in compliance in all material respects with its terms and the applicable requirements of ERISA, the Code and any other applicable Laws. All amounts due and owing under any Company Plan have been paid in full or accrued up to the Closing Date in accordance with GAAP. Each Company Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter or is the subject of a favorable opinion letter from the Internal Revenue Service on the form of such Company Plan on which the Seller can rely and nothing has occurred, whether by action or failure to act, that would reasonably be expected to affect the qualified status of any such Company Plan.

(d)     There are no actions, suits, claims or disputes pending, or, to the knowledge of the Seller, threatened, anticipated or expected to be asserted against or with respect to any Company Plan or the assets of any such plan (other than routine claims for benefits and appeals of denied routine claims).

(e)     No Liability under Title IV of ERISA has been or, to the knowledge of the Seller, is reasonably expected to be incurred by the Seller. Without limiting the generality of the foregoing, neither the Seller nor its ERISA Affiliates has maintained or contributed to an employee benefit plan that is subject to Title IV of ERISA during the last six years.

(f)     The Seller has not engaged in any transaction with respect to any Company Plan that would be reasonably likely to subject the Seller to any material Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law during the last six years.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions would (either alone or in conjunction with any other event) (i) cause the accelerated vesting, funding or delivery of, increase the amount or value of, or result in, any payment or benefit to any employee, officer, individual contractor or director of the Seller, or (ii) result in any limitation on the right of the Seller to amend, merge, terminate or receive a reversion of assets from any Assumed Plan or related trust.

(h)     Without limiting the generality of Section 5.13(g), no amount paid or payable in connection with the Transactions (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

(i)     The Seller does not have any obligation to gross-up, indemnify or otherwise reimburse any current or former employee, officer, director or individual contractor of the Seller for any Tax incurred by such individual, including under Section 409A or 4999 of the Code.

(j)     Each Company Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code) that is subject to Section 409A of the Code has been maintained and operated in documentary and operational compliance with Section 409A of the Code and the regulations thereunder.

(k)    The Seller has not made any loan or advance to any current or former employee of the Seller, other than advances for business and travel expenses in the ordinary course of business. There are no outstanding obligations of the Seller under any promissory note or similar obligation of the Seller issued to any current or former employee of the Seller, except for the Promissory Notes.

5.14    Insurance. Schedule 5.14 lists each material insurance policy maintained by the Seller as of the date hereof, including the type of insurance, policy number, term, identity of the issuer, coverage limits and applicable deductibles. The Seller has provided to Buyer true and complete copies of all such policies. Neither the Seller nor any of its Affiliates have received any written notice of pending cancellation of, premium increase with respect to, or material alteration of coverage under, any of such policies. Since January 1, 2021, the Seller has complied in all material respects with the terms and conditions of such policies. All such policies are (i) in full force and effect, (ii) fully paid and valid and binding in accordance with their terms and (iii) have not been subject to any lapse in coverage, and the Seller is not in material breach or material default thereunder. There is no material claim by or with respect to the Seller pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies or in respect of which such underwriters have reserved their rights, and the Seller has not failed to present any material claim which is still outstanding to the carrier of any such policy. Such policies are in amounts and provide coverages as required by the applicable Governmental Entity, applicable Laws and any Contract to which Seller is a party or by which any of its assets or properties is bound. Each Clinician providing professional services on behalf of the Seller as of the date hereof (a) currently maintains and historically has maintained (during all periods that such Person provided services to or on behalf of the Seller) valid professional liability insurance policies, with liability limits of at least $1,000,000 per occurrence and $3,000,000 in the aggregate and (b) is listed on the declarations page of the Seller's professional liability insurance policies.

5.15    Compliance with Laws.

(a)    The Seller (including its directors, officers and employees, and, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is, and during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Laws in all material respects.

(b)    No written (or to the knowledge of the Seller, oral) notices or inquires have been received by and no claims have been filed or threatened against the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller (i) alleging a violation by such Person of any applicable Laws, or (ii) indicating that such Person is under investigation, inspection, inquiry or audit related to a potential violation or breach of any applicable Law (in each case, regardless of whether such violation would constitute a criminal, civil, administrative or other violation) applicable to their business, operations, assets and properties. During the five (5)-year period prior to the date of this Agreement, the Seller has not received any allegation by any Person or has reasonable cause to believe that the Seller or any director, officer, employee, agent, Affiliate or representative of the Seller has violated applicable Laws or company compliance policies, in any material respects, in the performance of its responsibilities or business.

(c)     The Seller (nor any of its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) has established or maintained any unrecorded fund or asset or made any false entries on any books or records of the Seller for any purpose.

(d)     Without limiting the other provisions of this Section 5.15, the Seller (including its directors, officers, employees, or, to the knowledge of the Seller, agents, Affiliates or representatives, in their capacity as such) is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended and other federal, foreign, or state anti-corruption or anti-bribery Laws or requirements applicable to the Seller (the "Anti-Bribery Laws"). During the five (5)-year period prior to the date of this Agreement, the Seller has not received any written communication, or to the knowledge of the Seller, oral communication from any Governmental Entity or from any third Person that alleges that the Seller or any employee or agent of the Seller is in violation of any Anti-Bribery Laws.

(e)     All material approvals, filings, permits, franchises, consents, exemptions, licenses, bonds, approvals, rights, privileges, registrations, certificates, accreditations, enrollments, supplier or provider numbers and similar authorizations of Governmental Entities or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound (collectively, "Permits") required to conduct the Business (including the receipt of payment or reimbursement from customers and Third Party Payors), (i) are in the possession of the Seller, (ii) are valid and in full force and effect, (iii) have been and are being complied with in all material respects, and (iv) the Seller is not in material breach or violation of, or default under, any such Permit, and to the knowledge of the Seller, no event has occurred that, with or without notice or lapse of time or both, would constitute any material breach, violation or default.

5.16    Environmental Matters.

(a)     Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on the Seller, the Seller is and, during the five (5)-year period prior to the date of this Agreement, has been, in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the Seller of all Permits and other governmental authorizations required under applicable Environmental Laws to conduct the Business, and compliance with the terms and conditions thereof).

(b)     There is no material Environmental Claim existing, pending or, to the knowledge of the Seller, threatened against or adversely affecting the Seller or any of its Leased Realty.

(c)     The Seller has not Released any Hazardous Materials at, in, on, under or from any location and no Hazardous Materials have been Released by the Seller or, to the knowledge of the Seller, by any other Person at any Leased Realty, in either case in a quantity or manner that would reasonably be expected to result in the Seller incurring any material Liability under Environmental Law or any material obligation for cleanup or remedial action.

(d)     The Seller has not assumed by contract, Order or by operation of Law any material Liability of any other Person under any Environmental Law (including any obligation to remediate any Release of any Hazardous Material).

(e)     The Seller has delivered for inspection to Buyer true and complete copies of material studies, audits, assessments, memoranda and investigations regarding the Seller's current and former operations and their compliance with or Liabilities arising under applicable Environmental Laws and the environmental condition of the Leased Realty that are in the possession or under the reasonable control of the Seller.

5.17    <u>Related Party Transactions</u>. Except as set out on <u>Schedule 5.17</u>, neither (i) TVHHC nor any of its Affiliates (other than Seller), (ii) any equityholder of TVHHC nor any of their Affiliates (other than Seller) nor (iii) any director, manager or officer of any of the Persons in <u>clause (i)</u> or <u>(ii)</u> (any such Person, a "<u>Related Party</u>") nor, to the knowledge of the Seller, any member of the immediate family of any Related Party, (a) is or has been a party to any Contract or material transaction with the Seller or otherwise indebted to the Seller or has any ownership interest in any Material Payor, Material Referral Source or Material Vendor or other business relationship material to the conduct of the Business as currently conducted (other than ownership of five percent (5%) or less of any class of securities of a company whose securities are publicly traded), other than Company Plans and employment arrangements with the Seller entered into in the ordinary course of business (for the avoidance of doubt, Company Plans and employment arrangements with a Person who is only included in the foregoing due to an employment relationship with the Seller shall be considered entered into in the ordinary course of business) or (b) directly or indirectly, owns any material property or right, tangible or intangible, used by the Seller in the conduct of the Business.

5.18    <u>Employees</u>.

(a)     <u>Schedule 5.18(a)</u> sets forth a complete and accurate list of all Clinicians and non-Clinician employees of the Seller, in each case, as of June 15, 2025 identifying for each such employee: his/her name, position/title, date of hire, rate of compensation, any target bonus amounts for 2025, any bonus amounts paid in 2025, work location, any visa or work permit status and the date of expiration, if applicable, status (active or on-leave) and, solely with respect to Physicians and Non-Physician Providers (in each case, as identified in Column N of <u>Schedule 5.18(a)</u>), medical specialty. The Seller has made available to Buyer the Contract of employment or engagement between each Clinician and the Seller as of the date hereof.

(b)     <u>Schedule 5.18(b)</u> sets forth a complete and accurate schedule of the accrued sick, vacation and personal leave for all Clinician and non-Clinician employees of the Seller, in each case, as of June 15, 2025.

(c)     The Seller currently is not, and has not been during the past three (3) years, a party to or bound by any collective bargaining, works council, or other labor agreement ("<u>Collective Bargaining Agreement</u>") with any union, employee association, works council, or other labor organization ("<u>Labor Union</u>"). To the Seller's knowledge, no employee of the Seller is represented by a Labor Union in connection with such employment. There is, and during the past three (3) years there has been, no pending or, to the knowledge of the Seller, threatened (i)

slowdown, labor strike, lockout, concerted work stoppage, or other material labor disputes or disruptions or (ii) to the Seller's knowledge, union organizing activity.

(d)     The Seller is in material compliance, and in the past three (3) years has complied, in each case, in all material respects, with applicable Law respecting employment, employment practices and labor with respect to employees and any independent contractors, including overtime, wages and hours, prevailing wages, equal pay, classification of workers (including exempt and non-exempt employee classification, independent contractor classification and leased workers from another employer), meal periods and rest breaks, affirmative action, employment discrimination, retaliation, harassment, whistleblower protections, background checks and screenings (including use of consumer reports), employee privacy, employee trainings and notices, drug testing, recordkeeping, paid sick days/leave, vacation and other entitlements and benefits, workers' compensation, leaves of absence, immigration, occupational safety and health, collective bargaining, plant closures and mass layoffs, hiring, promotion, demotion and termination, and withholding of Taxes.

(e)     There have not been in the past three (3) years, and there are no pending or threatened, unfair labor practice charges or Actions against the Seller before the National Labor Relations Board or any Governmental Entity relating to an alleged violation or breach of any applicable Laws respecting employment and employment practices. There has not been, within the past four (4) years, and there are no pending or, to the knowledge of the Seller, threatened, material labor or employment related audit or investigation of the Seller including those concerning discrimination, harassment, retaliation, wages and hours, classification and/or occupational safety and health. The Seller is not subject to any employment related consent decree. The Seller is not delinquent in any material respects in any payments to any employee or independent contractor, including wages, commissions, incentives, bonuses, severance or other compensation, or any Taxes or any penalty for failure to comply with withholding or reporting requirements.

(f)     The Seller has not incurred any Liabilities, nor failed to provide any required notice, under the Worker Adjustment and Retraining Notification Act, or any similar applicable state or local law. As of the date hereof, no employee of the Seller is involuntarily on temporary layoff or working hours that have been reduced by fifty percent (50%) or more.

(g)     Each current employee and independent contractor of the Seller is properly so classified. No employee of the Seller is working in the United States on a visa or requires a visa sponsorship in order to work in the United States. Each current employee of the Seller is authorized to work in the United States.

5.19    Brokerage. No broker, finder, financial advisor, investment banker or similar agent is entitled to any brokerage, finder's, financial advisor's or investment banker's fee or commission or similar payment in connection with the Transactions based upon arrangements made by or on behalf of the Seller.

5.20    Health Care Compliance.

(a)     The Seller is, and for the past five (5) years has been, in compliance with all Health Care Laws, in each case, in all material respects. The Seller has not received in the five

(5) years prior to the date hereof any written or, to the Seller's knowledge, other notification of any pending or threatened Action from any Governmental Entity, Third Party Payor or other Person alleging potential or actual material non-compliance by, or material Liability of, the Seller under any Health Care Laws. No officers, directors, managers, employees or Clinicians of the Seller is, or has been (during the shorter of (i) the past five (5) years, or (ii) since such officer, director, manager, employee or Clinician has been employed or engaged by the Seller) in material violation of or subject to any materially adverse finding, penalty, assessment, judgment, civil investigative demand, enforcement action or other Action related to noncompliance with or a breach of, or to the Seller's knowledge, investigated by any Governmental Entity for any material violation of or non-compliance with, any Health Care Laws. Each of the services and items provided to patients by the Seller (including the Seller's Clinicians) has for the past five (5) years been provided in compliance with Health Care Laws in all material respects. To the Seller's knowledge, no Person has filed or has threatened in writing to file any Action against any the Seller under the federal False Claims Act (31 U.S.C. §§ 3729, et seq.) or analogous state whistleblower Laws.

(b)    The Seller, and for the past five (5) years has held, all such material Permits required under applicable Health Care Laws for the conduct of its business and currently (or then) conducted (collectively, the "Health Care Permits") and all Health Care Permits are, and have been for the past five (5) years, valid and in full force and effect. The Seller is, and for the past five (5) years has been, in compliance with all terms and conditions of any Health Care Permit in all material respects. In the past five (5) years, the Seller has not received any written or, to the Seller's knowledge, other communication from any Governmental Entity that alleges material noncompliance with any Health Care Permits or any pending or threatened Action to terminate, revoke, suspend, or withdraw any such Health Care Permit.

(c)    During the shorter of (A) the past five (5) years, or (B) since such Clinician has been employed or engaged by the Seller to provide professional services, each Clinician (i) has held all material Permits required under Health Care Laws to perform the functions that he or she performs for the Seller and for the Seller to obtain reimbursement from Third Party Payors and related fiscal intermediaries or administrative contractors with respect to the services provided by such Clinician on behalf of the Seller; (ii) to the extent required in connection with the scope of such Clinician's practice, is, and has been, validly registered with the United States Drug Enforcement Administration under Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq. and any similar applicable state Health Care Laws; (iii) is not, and has not been, debarred, suspended, excluded from or otherwise ineligible to participate in any Governmental Program, in each case; and (iv) is not, and has not been, subject to any material pending (or threatened) disciplinary proceeding, inquiry, monitoring, investigation or other Action under the bylaws or rules of procedure of the Seller, any state professional board or agency or other Governmental Entity charged with regulating the professional activities of such Person or any other Health Care Law related to such Clinician role with the Seller, including any denial or revocation of medical staff privileges or licensure of any Clinician. During the past five (5) years, while employed or engaged by the Seller, to the Seller's knowledge each Clinician is and has been appropriately providing services within the relevant scope of practice, and has entered into and maintained compliance with all reasonable and necessary collaborative practice, supervision and other similar arrangements. To the knowledge of the Seller, no event has occurred, and no fact, circumstance or condition exists, that has resulted or may result in the denial, loss,

restriction, revocation or rescission of any Clinician's professional license, certification, or registration. During the past five (5) years, all disciplinary actions, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for any Clinician while any such Clinician has been employed or engaged by the Seller requiring reporting to local, state, federal or quasi-public authorities that are required of the Seller have been effected in all material respects as required.

(d)     The Seller and its unitholders, members, officers, directors, employees and to the knowledge of the Seller, agents are not, and have not been while any such Person has been employed or engaged by the Seller, debarred, suspended or otherwise ineligible to participate in any Governmental Program or Third Party Payor program, and no such Action is pending or to the Seller's knowledge, threatened. The Seller has not received any written notice during the past five (5) years that the Seller or its respective officers, directors, employees and agents is or has been investigated, charged with or convicted of a criminal offense related to any Governmental Program or Third Party Payor program, patient neglect or abuse in connection with the delivery of a healthcare item or service, or Fraud, theft, embezzlement, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service.

(e)     The Seller is not subject to, and for the past five (5) years have not been subject to any pending or, to the Seller's knowledge, threatened material Actions, audits, investigations or focused reviews by any Third Party Payor, against it in connection with the provision of healthcare services or goods by the Seller for overpayment, recoupment, offset, refund or improper billing practices of any nature. During the past five (5) years, no Third Party Payor has imposed any material fine, penalty or other sanction against the Seller. The Seller has not received and identified during the past five (5) years any material undisputed overpayment by the Seller, which has not been repaid to such Governmental Program.

(f)     During the past five (5) years, the Seller (i) has not been a party to a corporate integrity agreement with the OIG or similar agreement with any Governmental Entity, deferred or non prosecution agreement, monitoring agreement, consent decree, or any similar agreement with any Governmental Entity and (ii) has no material reporting obligations pursuant to any settlement agreement entered into with any Governmental Entity. During the past five (5) years, the Seller has not been served with or received any search warrant, subpoena or civil investigation demand by or from any Governmental Entity with regard to any alleged or actual violation of Health Care Laws by the Seller. During the past five (5) years, the Seller has not made any material voluntary disclosure to any Governmental Entity relating to any Governmental Program or violation of any Health Care Law, and no such disclosure is pending.

(g)     The Seller maintains a compliance program having the elements of an effective corporate compliance and ethics program identified in U.S.S.G. § 8B2 designed to comply with applicable Health Care Laws.

(h)     The Seller and, to the Seller's knowledge, each Clinician employed by Seller as of the date hereof that participates in a Governmental Program is qualified to participate in such Governmental Program and is enrolled and certified in such Governmental Program as a provider of health care services, except as would not be material to the Seller. During the past five (5) years, received written notice of any Action by any Governmental Entity to terminate, revoke,

suspend, withdraw or materially limit the participation of, or impose any payment suspension or termination on, the Seller in any Governmental Program. To the Seller's knowledge, each Clinician is operating and, at all times during the shorter of (i) the past five (5) years, or (ii) since such Clinician has been employed or engaged by the Seller, has operated, in compliance in all material respects with, all Governmental Program rules and regulations and each Governmental Program contract to which it is party or by which it is bound. The Seller is not, nor, to the Seller's knowledge, any Clinician (x) is party to an individual or corporate integrity agreement with the OIG, (y) has during the past five (5) years (and with respect to Clinicians, while such Clinician was employed or engaged by the Seller if shorter than five (5) years) made, intends to make, a voluntary disclosure to any Governmental Entity for any material violation of Health Care Laws, including pursuant to the OIG or CMS self disclosure protocols, or (z) otherwise has any material continuing reporting obligations pursuant to any deferred prosecution, settlement or other agreement with any Governmental Entity.

(i)     All documentation, coding, billing and collection practices of the Seller, and all claims submitted to Third Party Payors are, and for the past five (5) years have been, in compliance in all material respects with all applicable Health Care Laws and applicable Third Party Payor requirements governing (1) the provision, documentation, coding and billing of healthcare services and the preparation and submission of claims, and (2) capitated risk reimbursement, including reserves, bonds, and letters of credit. With respect to each Contract with a Third Party Payor to which the Seller is a party, the Seller has complied with all material applicable requirements, including, without limitation, conditions of payment or participation, applicable manuals, instructions, FAQs and guidance and is not in material breach of or default under any such Contract and no other party to such Contract is in material breach thereof or default thereunder. To the knowledge of the Seller, no event has occurred, is pending or has been threatened, which, after the giving of notice, lapse of time or otherwise, would constitute a material breach or default by the Seller under any such Contract or any other party to such Contract. During the past five (5) years, the Seller (i) has timely filed all material reports and billings required to be filed, all of which were prepared in compliance in all material respects with all applicable Health Care Laws governing reimbursement and claims, (ii) has paid all known and undisputed material refunds, overpayments, discounts and adjustments due with respect to any such report or billing, (iii) is not aware of any pending or, to the Seller's knowledge, threatened material appeal, adjustment, challenge, audit (including written notice of an intent to audit), written inquiry or litigation concerning the billing practices of the Seller, and (iv) has adequately reserved for all performance based reimbursement incentives and penalties, including all quality performance metrics, in each case, except as would not be material to the Seller, taken as a whole. All billings submitted by the Seller during the past five (5) years were for goods actually sold and services actually performed in accordance in all material respects with applicable Health Care Laws and the Seller has sufficient documentation that is required to support such findings.

(j)     The Seller and its respective Affiliates, officers, directors, managers, employees and, to the knowledge of the Seller, agents are operating and during the past five (5) years (and, with respect to officers, directors, managers, employees and Clinicians, while such Persons have been employed by the Seller) have operated in compliance in all material respects with the federal health care program anti-kickback statute (42 U.S.C. § 1320a-7b, et seq.), and any similar state Health Care Laws, the federal physician self referral law (commonly known as the Stark Law) (42 U.S.C. § 1395nn, et seq., and its implementing regulations, 42 C.F.R. Subpart J),

any patient brokering Laws, and all other applicable Health Care Laws with respect to direct and indirect compensation arrangements, ownership interests or other relationships between such Person and any past, present or potential patient, physician, supplier, contractor, customer, Third Party Payor or other Referral Source or to whom such Person refers, recommends or arranges for the referral of patients or other health care business.

(k)    The Seller's Processing of Personal Data presently materially complies, and has during the last five (5) years materially complied with (i) all applicable Privacy and Security Laws, (ii) applicable industry standards to which the Seller has agreed to be bound, including the Payment Card Industry Data Security Standard, (iii) terms of any Contracts relating to the Processing of Personal Data by which the Seller is bound, and (iv) all Privacy Policies, consents and authorizations that apply to the Seller's Processing of Personal Data (collectively, "Data Protection Requirements").

(l)    To the knowledge of the Seller, the IT Systems are adequate for and perform in all material respects as required in connection with the operation of the Business is currently conducted, free and clear of all material bugs, errors, defects, trojan horses, time bombs, malware and other corruptants. The Seller has taken all commercially reasonable measures to protect and maintain the integrity, security and confidential nature of the IT Systems, and all Personal Data and Business Data and to protect it against loss, corruption, and unauthorized access to or other Processing. To the Seller's knowledge, no third party has experienced, or made or has been required to make any notifications under any applicable Data Protection Requirements in connection with, any Security Incident. The Seller has implemented and maintained, all commercially reasonable privacy and security policies and procedures as required by Data Protection Requirements.

(m)    The Seller has requisite authority, including applicable consents and Permits, to Process the Personal Data in the Seller's possession or under its control to the extent required and in the manner in which it is Processed by the Seller in connection with the operation of the Seller's businesses as currently conducted, except as would not be material to the Seller, taken as a whole. To the extent required by HIPAA, the Seller has executed a "business associate agreement" with each Person who is a "covered entity" or "business associate" (as such terms are defined under HIPAA), as required for the conduct of the Business.

(n)    During the past five (5) years, the Seller has not received written notice of, and there is no Action pending or, to the Seller's knowledge, threatened with respect to, the Seller's compliance with Data Protection Requirements, including with respect to any alleged "breach" (as defined in 45 C.F.R. § 164.402) or any other violation of HIPAA by the Seller or its "workforce" (as defined in 45 C.F.R. § 160.103), except as would not be material to the Seller, taken as a whole. The Seller has performed a security risk analysis that meets the standards set forth at 45 C.F.R. § 164.308(a)(1)(ii) (A) (the "Security Risk Analysis") and have remediated all risks identified in the Security Risk Analysis as critical or high risks.

(o)    During the past five (5) years there has been (i) no material "breach" or other material violation of HIPAA the Seller or its "workforce" or successful "security incident" with respect to "protected health information" (each as defined under HIPAA) in the possession or under the control of the Seller, and (ii) no material unauthorized access to, or use, acquisition

or disclosure of, the IT Systems or any Business Data including Personal Data Processed by or on behalf of the Seller (each, a "Security Incident"). During the past five (5) years, the Seller has not notified, either voluntarily or as required by Data Protection Requirements, any affected individual, customer, employee, any Governmental Entity or the media or any other Person of any unauthorized Processing of any Personal Data.

(p)     The Seller does not transmit or store any Personal Data outside of the United States and do not have in effect any Contract with any third party vendor under which, to the Seller's knowledge, the third party vendor transmits or stores any Personal Data of the Seller outside of the United States.

5.21     No Other Representations or Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS Article V OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO BUYER PURSUANT TO SECTION 9.02(D), THE SELLER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER OR ITS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller, as of the date hereof and as of the Closing, as follows:

6.01     Organization and Power. Buyer is a Florida corporation, incorporated, validly existing and in good standing under the Laws of the State of Florida, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder. There are no pending, or to the knowledge of Buyer, threatened, actions for the dissolution, liquidation or insolvency of Buyer.

6.02     Authorization. The execution, delivery and performance of this Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action, and no other proceedings on the part of Buyer are necessary to authorize the execution, delivery or performance of this Agreement or any other Transaction Document to which Buyer is (or, at the Closing, will be) a party. This Agreement and the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party has been or will be duly executed and delivered by Buyer and, assuming that this Agreement is a valid and binding obligation of the other Parties, this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party constitute a valid and binding obligation of Buyer, enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general

application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

6.03    No Violation. Neither the execution and delivery of this Agreement, the other Transaction Documents to which Buyer is (or, at the Closing, will be) a party, nor the consummation by Buyer of the Transactions, nor compliance by Buyer with any of the provisions hereof or thereof, will: (i) conflict with or result in a breach of any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Buyer; or (ii) except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, (x) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Buyer is a party or by which any of their respective properties or assets is bound or (y) violate any Order or Law applicable to Buyer or any of its properties or assets in any material respect.

6.04    Governmental Consents, etc. Subject to entry into and effectiveness of the Sale Order and requisite Bankruptcy Court approvals, Buyer is not required to submit any notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the consummation of the Transactions and no consent, approval, clearance or authorization of any Governmental Entity or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement and any other Transaction Document to which Buyer is (or, at the Closing, will be) a party or the consummation of the Transactions.

6.05    Brokerage. Except for any fees that will be paid solely by Buyer or its Subsidiaries, there are no claims for brokerage commissions, finders' fees, financial advisor fees, investment banker fees, agents fees or similar compensation in connection with the Transactions based on any agreement made by or on behalf of Buyer.

6.06    Buyer Financial Resources. Buyer will have available on the Closing Date sufficient readily available funds to make payment of the Cash Purchase Price and Cure Costs up to the amount of the Cure Costs Cap, on the Closing Date and to consummate the Transactions. The obligations of Buyer under this Agreement are not subject to any conditions regarding Buyer's, its Affiliates' or any other Person's ability to obtain any financing for the consummation of the Transactions.

6.07    No Reliance. Buyer acknowledges and agrees that it has not relied and is not relying on any representations, warranties, or other statements whatsoever, whether written or oral, by the Seller or any Person acting on their respective behalf, other than those expressly set forth in Article V or in any other Transaction Document, in the certificate to be delivered to Buyer pursuant to Section 9.02(d), or any document or instrument pursuant hereto or thereto.

6.08    No Other Representation. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER IN THIS

ARTICLE VI OR ANY OTHER TRANSACTION DOCUMENT, OR THE CERTIFICATE TO BE DELIVERED TO THE SELLER PURSUANT TO SECTION 9.03(c), BUYER DOES NOT MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO BUYER OR ITS BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE SELLER OR ANY OF ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

## ARTICLE VII

### PRE-CLOSING COVENANTS OF THE SELLER

7.01    Conduct of the Business. From the date hereof until the earlier of the termination of this Agreement and the Closing Date except (i) as set forth on Schedule 7.01 of the Disclosure Schedules, (ii) if Buyer shall have consented in writing (which such consent shall not be unreasonably withheld, conditioned or delayed), (iii) as required by applicable Laws or Order of the Bankruptcy Court, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as otherwise expressly permitted or required by this Agreement or any of the other Transaction Documents, the Seller shall (1) conduct the Business in accordance with applicable Law, including Health Care Laws and at the direction of relevant Governmental Entities, (2) conduct the Business in the ordinary course of business in all material respects, (3) preserve intact, in all material respects the business, organization, operations, workforce, assets, properties, rights, relationships and goodwill of the Business and the Purchased Assets, including with Third Party Payors, (4) preserve and maintain in good standing all of its Permits, (5) maintain its tangible personal property in the same condition, in all material respects, as they were on the date hereof and make all necessary repairs to restore all such tangible personal property to such condition, in all material respects, subject in all cases to reasonable wear and tear and disposal consistent with the ordinary course of business, (6) maintain the Seller Information in all material respects, and (7) with respect to the compliance, documentation, coding, billing and collection practices of the Business, undertake and implement the items forth in Schedule 7.01(7); provided, however, that no action or inaction by the Seller with respect to matters specifically addressed by the second sentence of this Section 7.01 shall be deemed a breach of this first sentence of this Section 7.01 unless such action or inaction would constitute a breach of the second sentence of this Section 7.01. Except as described in Schedule 7.01 of the Disclosure Schedules, as required by Law, or the Bankruptcy Court, as expressly permitted or required by this Agreement or any other Transaction Document, to the extent related to an Excluded Asset or Excluded Liability, or with the prior written consent of Buyer (which such consent shall not be unreasonably withheld, conditioned or delayed), the Seller covenants and agrees that, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, the Seller shall not:

(a)    amend or make any change to the organizational documents of the Seller (except for ministerial changes);

(b)    sell, assign, transfer or dispose of any Purchased Assets in excess of $10,000 individually or $50,000 in the aggregate, in each case, except for sales of obsolete assets or assets no longer used in the operation of the Business;

(c)     sell, assign, abandon, permit to lapse, transfer, or license any Seller IP Rights, except non-exclusive licenses in the ordinary course of business;

(d)     fail to maintain or abandon any Seller Registered IP;

(e)     amend, modify, waive, supplement, grant any release or relinquishment of any material rights under or, let lapse, terminate or consent to the termination of (in each case, other than expiration of Executory Contracts in accordance with their terms), renew or extend, fail to perform any material obligations under any Executory Contract.

(f)     provide any loan or advance to any Person, other than advances to employees for business and travel expenses in the ordinary course of business;

(g)     enter into any new commitment to make capital expenditures that individually or in the aggregate cost in excess of $25,000;

(h)     enter into any transaction with a Related Party other than the DIP Facility;

(i)     enter into any Collective Bargaining Agreement with any Labor Union;

(j)     except as required under the terms of any Company Plan or applicable Law: (i) grant or pay any special bonus (other than spot bonuses in the ordinary course of business not exceeding $5,000 each), severance, termination, incentive, change in control, transaction or retention compensation or benefits, (ii) make any increase in the salaries, bonuses or other compensation and benefits payable by the Seller to any of its employees, officers or directors other than increases in base salary or wages of up to three percent (3%) in the aggregate per year in the ordinary course of business for any current employee of the Seller whose annual base salary does not exceed $185,000, (iii) terminate or amend any Company Plan, other than annual renewals of welfare benefit plans that do not materially increase costs, (iv) adopt or enter into any plan, policy or arrangement that would be a Company Plan if it were in existence as of the date hereof, other than in connection with the renewal of an expired agreement with a Clinician that provides for substantially the same compensation terms as the expired agreement, except as otherwise permitted pursuant to this Section 7.01(j), or (v) accelerate the time of payment or vesting of any compensation and benefits of any employee or director of the Seller (or pay to any such individual any amount not otherwise due);

(k)     (i) terminate (other than for cause) any Clinician employed by Seller as of the date hereof or (ii) hire or promote any employee, unless such employee is (A) a Clinician hired in the ordinary course of business, or (B) a non-Clinician hired to fill a vacancy arising following the date of this Agreement or disclosed on Schedule 7.01(k);

(l)     commence or initiate any Action or compromise, waive, release, resolve or settle the matter disclosed on Schedule 5.20(f) (the "Specified Proceeding") or any other Action (other than any Action in respect of Taxes, which shall be governed exclusively by clause (p) below);

(m)     other than pursuant to the DIP Facility, create, incur, guaranty, assume or otherwise become liable for any indebtedness for borrowed money;

(n)    create, incur or permit any Lien on any Purchased Asset;

(o)    make any material change to its financial accounting methods, policies or practices or practices with respect to the maintenance of books of account and records, except as required by GAAP or applicable Law;

(p)    except to the extent Buyer reasonably agrees that any action set forth in this clause (p) is not expected to result in a Tax Liability to Buyer or any of its Affiliates, (i) make, change or revoke any material Tax election, (ii) file any material amended Tax Return, (iii) enter into any closing agreement with a Governmental Entity (iv) fail to timely file (taking into account valid extensions) any material Tax Return required to be filed, in each case, with respect to the Purchased Assets or (v) fail to timely pay any material amount of Tax with respect to the Purchased Assets when due;

(q)    fail to maintain insurance coverage substantially equivalent to the insurance coverage maintained as of the date of this Agreement with respect to the Purchased Assets;

(r)    make any change to the policies or practices with respect to cash management, the payment of accounts payable or accrued expenses or the collection of the accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable;

(s)    make any changes to the policies, practices and processes with respect to documentation, billing, coding and collection practices of the Seller;

(t)    engage in any new line of business;

(u)    grant, or permit any Affiliates or other third parties to grant, any licenses or sublicenses to any third party to use any of The Villages Health Marks;

(v)    authorize any of, or agree or commit to do any of, the foregoing actions.

Notwithstanding the foregoing, Seller shall, at all times prior to the Closing Date and consistent with applicable Law, exercise complete control and supervision over the Business and operations.

7.02    Access to Books and Records. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, and subject to permissibility under applicable Law, the Seller shall, upon reasonable notice, (a) provide Buyer and its authorized representatives (the "Buyer's Representatives") with reasonable access during normal business hours, to the properties, assets, personnel and agents, Contracts, books and records and other documents and data of the Seller and (b) otherwise cooperate with Buyer and Buyer's Representatives in order for such Person to have the opportunity to make such investigation as it shall reasonably desire; provided, however, that (a) all such requests shall be coordinated through the Seller's designee, who shall be solely responsible for coordinating all such requests and all access permitted pursuant to this Section 7.02 and (b) any request for access pursuant to this Section 7.02 shall be for the purpose of facilitating the Transaction or Buyer's post-Closing integration planning. Notwithstanding anything to the contrary set forth in this Agreement, the Seller and its Affiliates shall not be required to disclose to Buyer or Buyer's Representatives any information (i) if doing

so would violate any applicable Law to which the Seller is a party or is bound; (ii) which would (in the good faith judgment of the Seller's legal counsel) violate or result in the loss of the ability to assert attorney client, work product or similar privileges; or (iii) if the Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse (or would reasonably be expected to be adverse) parties in a litigation or similar proceeding and such information is reasonably pertinent thereto; provided that the Seller shall, provide Buyer, or Buyer's Representatives access and disclosure to the maximum extent possible in a manner that would not result in the adverse effects described in this sentence, including by providing redacted copies if necessary, entering into join defense agreements (to the extent related to a pending or threatened action) or by obtaining the consent of the applicable third parties to permit disclosure. The Seller may elect to limit disclosure of any competitively sensitive information to certain Persons designated as belonging to a "clean team" by Buyer, provided such Persons are reasonably acceptable to the Seller for such purpose. Notwithstanding anything contained herein to the contrary, no access or examination provided pursuant to this Section 7.02 shall qualify or limit any representation or warranty set forth herein or the conditions to Closing set forth in Section 9.02(a).

7.03    Credentialing Applications; Qualification.

(a)    Subject to Section 4.01, the Seller shall as promptly as reasonably practicable, and in no event later than seven (7) Business Days following the date on which the Bankruptcy Court enters the Sale Order, deliver to Buyer completed provider credentialing applications, and medical malpractice applications or waivers, each in form and substance reasonably acceptable to Buyer, for all of the Accepted Clinicians.

(b)    Buyer will use commercially reasonable efforts as promptly as practicable following the date hereof to (A) either (i) have all Accepted Clinicians qualified by United under United's current payor arrangements with the Buyer; or (ii) enter into a new payor arrangement with United to qualify all of the Accepted Clinicians, on terms consistent in all material respects with Seller's or Buyer's existing payor arrangement with United; and (B) provide reasonable assistance as may be reasonably requested by Seller in connection with the preparation of provider credentialing applications and medical malpractice applications or waivers.

7.04    Tail Insurance. The Seller shall use commercially reasonable efforts to obtain "tail insurance" on or prior to the Closing Date for medical malpractice liability in respect of Transferred Employees for claims made under such policies related to any period prior to Closing, with a carrier or carriers reasonably acceptable to Buyer and with the same per-claim and aggregate coverage limits as in effect prior to the Closing for the Seller's existing insurance coverage in connection with such types of insurance (the "Tail Insurance"), and naming Buyer as additional insureds, effective for a period of not less than the lesser of (a) the applicable statute of limitations in the State of Florida, or (b) six (6) years after the Closing Date (the "Coverage Period"). In the event any medical malpractice claim is asserted against Buyer during the Coverage Period arising out of or relating to the operation of the acquired Senior-Focused Primary Care Centers prior to the Closing, (i) Seller shall be responsible for any deductible payment required under the Tail Insurance, and (ii) Seller shall promptly assign the proceeds under the Tail Insurance to Buyer to the extent of the losses incurred by Buyer.

7.05    Transition Services Agreement. Buyer and Seller will work in good faith prior to the Closing Date to reasonably identify the services to be provided pursuant to the Transition Services Agreement.

## ARTICLE VIII

## TAX MATTERS

8.01    Cooperation. Buyer and Seller agree to use reasonable best efforts to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to books and records, as is reasonably necessary for the filing of all Tax Returns by Buyer or Seller, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Each of Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Date.

8.02    Apportionment of Property Taxes.

To the extent not otherwise provided in this Agreement, (i) Seller shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period, and (ii) Buyer shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Post-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes, Buyer or Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 8.02 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement but in no event earlier than three (3) days prior to the due date for payment of the relevant Property Taxes (taking into account extensions). In the event that Buyer or Seller makes any payment to a taxing authority for which it is entitled to reimbursement under this Section 8.02, the applicable party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. For purposes of this Agreement, in the case of any Straddle Period, Taxes (other than Property Taxes) for the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the end of the day on the Closing Date.

8.03    Transfer Taxes.

All transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with this Agreement and the transactions contemplated hereby ("Transfer Taxes") will be borne by Buyer.

8.04    Tax Audits.

Seller shall notify Buyer in writing as soon as practicable upon receipt by Seller of notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of Seller that reasonably may be expected to relate to or give rise to a Lien on the Purchased Assets or the Business. Each of Buyer and Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Tax audit or assessment challenging the Allocation.

8.05    Tax Clearance Certificate.

Seller shall use its commercially reasonable efforts to provide Buyer, at the Closing, a clearance certificate or similar document(s) that may be required by any state taxing authority in order to relieve Buyer of any obligation to withhold any portion of the Purchase Price.

## ARTICLE IX

## CONDITIONS TO CLOSING

9.01    Conditions to Obligations of Each Party. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction or written waiver in their sole discretion, as of the Closing, of each of the following conditions as of the Closing Date:

(a)    No Governmental Entity having competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order, in each case, after the date of this Agreement, that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions; and

(b)    The Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order (declaring, among other things, that the Purchased Assets can be sold free and clear of all Liens, Claims and interests (other than the Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code).

9.02    Conditions to Buyer's Obligations. The obligations of Buyer to consummate the Transactions are subject to the satisfaction or written waiver in Buyer's sole discretion of each of the following conditions as of the Closing Date:

(a)    (i) The Seller Fundamental Representations shall be true in all respects (other than de minimis inaccuracies) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date) and (ii) all other representations and warranties of the Seller contained in Article V, and any certificate or other writing delivered pursuant hereto, shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (in each case, except to the extent expressly made only as of an earlier date, in

which case only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct does not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with each of the covenants and agreements required to be performed or complied with by it under this Agreement at or prior to the Closing (including the due delivery of the items required pursuant to Section 4.02(b));

(c)     Since the date of this Agreement, no Material Adverse Effect shall have occurred that is continuing;

(d)     Seller shall have delivered to Buyer a certificate of an authorized officer of Seller, in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in Sections 9.02(a) (with respect to Seller's representations and warranties) and 9.02(b) (with respect to Seller) have been satisfied;

(e)     [Reserved]

(f)     The Sale Order shall have become a Final Order; and

(g)     [Reserved]Seller or any of its Affiliates have not entered into or otherwise agreed in principle with the U.S. Department of Justice, the OIG, CMS, any Third Party Payor or any other Governmental Entity, a settlement agreement, corporate integrity agreement, deferred or non prosecution agreement, monitoring agreement, consent decree, correction action plan or any other resolution, Order or Contract (any of the foregoing, a "Resolution") that requires, imposes or otherwise makes the Buyer, any of its Affiliates, or the Purchased Assets subject to any ongoing compliance, auditing, monitoring, disclosure or reporting obligations or oversight other than any obligations under Section 12.04.

9.03     Conditions to Seller's Obligations. The obligation of the Seller to consummate the Transactions is subject to the satisfaction or written waiver by the Seller in writing in Seller's sole discretion of each of the following conditions as of the Closing Date:

(a)     (i) The Buyer Fundamental Representations shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at and as of the Closing Date and (ii) all other representations and warranties contained in Article VI shall be true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (except to the extent expressly made only as of an earlier date, in which case only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "Buyer Material Adverse Effect" set forth therein) has not had, and would not have, individually or in the aggregate, a Buyer Material Adverse Effect;

(b)     Buyer shall have performed and complied with in all material respects each of the covenants and agreements required to be performed by it or complied with them under this

Agreement at or prior to the Closing (including the due delivery of the items required pursuant to Section 4.02(a)); and

(c)    Buyer shall have delivered to the Seller a certificate of an authorized officer of Buyer in his or her capacity as such, dated as of the Closing Date, stating that the conditions specified in Sections 9.03(a) and 9.03(b) have been satisfied.

## ARTICLE X

## SURVIVAL

10.01    Survival. None of the representations and warranties of any party contained in this Agreement shall survive the Closing. The covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole before the Closing shall terminate on the Closing, and, except in the case of Fraud or Willful Breach by such Party, no Party shall have any Liability from and after Closing for any breach by Buyer or the Seller of any of the covenants or agreements contained herein that by their terms are required to be performed in whole before the Closing. Unless otherwise indicated, the covenants and agreements set forth in this Agreement that by their terms are required to be performed in whole or in part after the Closing, shall survive the Closing until they have been fully performed or satisfied in accordance with their terms.

## ARTICLE XI

## TERMINATION

11.01    Termination. Subject to Section 12.08, this Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(b)    by Buyer, if Seller shall have breached any of its representations or warranties set forth in Article V, or if Seller has failed to perform any covenant or agreement set forth in this Agreement, such that the conditions to Closing set forth in either Section 9.02(a) or Section 9.02(b) would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Seller; provided that Buyer may not terminate this Agreement pursuant to this Section 11.01(b) if Buyer is in breach of this Agreement such that the conditions to Closing set forth in Section 9.03(a) or Section 9.03(b) would not be satisfied;

(c)    by Seller, if Buyer shall have breached any of the representations or warranties of Buyer set forth in Article VI, or if Buyer has failed to perform any covenant or agreement on the part of Buyer, respectively, set forth in this Agreement, in each case such that the conditions to Closing set forth in either Section 9.03(a) or Section 9.03(b) would not be satisfied and, in the case of any breach capable of being cured by the Outside Date, the breach or

breaches causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, are not cured prior to the date that is the earlier of (A) three (3) Business Days prior to the Outside Date, or (B) ten (10) Business Days after written notice thereof is delivered to Buyer; provided that Seller may not terminate this Agreement pursuant to this Section 11.01(c) if Seller is then in breach of this Agreement such that the conditions to Closing set forth in Section 9.02(a) or Section 9.02(b) would not be satisfied;

(d)    by Buyer, on the one hand, or Seller, on the other hand, if the Transactions shall not have been consummated on or prior to October 31, 2025 (the "Outside Date"); provided, that the Seller shall have the ability, in its sole discretion, to extend the Outside Date up to December 1, 2025; provided, further, that Buyer (if Buyer is seeking to terminate this Agreement pursuant to this Section 11.01(d)) or Seller (if Seller is seeking to terminate this Agreement pursuant to this Section 11.01(d)), as applicable, shall not have the right to terminate this Agreement pursuant to this Section 11.01(d) if, in the case of Buyer, it is in breach of this Agreement such that the conditions to Closing set forth in Section 9.03(a) or Section 9.03(b) would not be satisfied (including, if Buyer has failed to consummate the Closing when required by this Agreement) or, in the case of Seller, it is then in breach of this Agreement such that the conditions to Closing set forth in Section 9.02(a) or Section 9.02(b) would not be satisfied;

(e)    by Buyer, on the one hand, or Seller, on the other hand, if the Bankruptcy Court or any Governmental Entity having competent jursidiction shall have enacted, issued, promulgated, enforced or entered any Law or final Order that has the effect of making the Transactions illegal or otherwise restraining, enjoining or prohibiting the consummation of the Transactions;

(f)    by Buyer, if (i) Seller has not filed the Sale Motion on the Petition Date, (ii) the Bankruptcy Court has not entered the Bidding Procedures Order by the date that is twenty-one (21) days after the Petition Date, or (iii) following the entry of the Bidding Procedures Order but prior to the entry of the Sale Order, the Bidding Procedures Order (A) ceases to be in full force and effect, (B) is revoked, rescinded, vacated, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction, or (C) is amended, modified or supplemented in a manner that is materially adverse to the Buyer;

(g)    by Buyer, if the Auction contemplated by the Sale Motion is not conducted and completed pursuant to the Bidding Procedures Order by the date that is fifty-five (55) days after the Petition Date;

(h)    by Buyer, if (i) Buyer is not selected as the Successful Bidder or the Backup Bidder at the conclusion of the Auction, or (ii) Buyer has been selected as Backup Bidder and the Backup Termination Date has occurred without the Closing having occurred;

(i)    by Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is sixty (60) days after the Petition Date; provided, however, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 11.01(i) if the failure of the Bankruptcy Court to enter the Sale Order by such date is solely the result of delay by the Bankruptcy Court in entering the Sale Order following the conclusion of the hearing to consider entry thereof;

(j)      by Seller or Buyer, if Seller enters into a definitive agreement, or seeks approval from the Bankruptcy Court with respect to, or otherwise consummates or effects, an Alternative Transaction including if Buyer is not the Successful Bidder at the conclusion of the Auction or the Backup Bidder; *provided*, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 11.01(j) if Buyer is selected as the Backup Bidder in connection with any such Alternative Transaction constituting a Successful Bid (it being understood that, notwithstanding Buyer's selection as Backup Bidder, Buyer shall be permitted to terminate this Agreement pursuant to any other applicable subsection of this Section 11.01, including, without limitation, Section 11.01(h));

(k)      by Seller, if the Board of Directors of Seller (or other equivalent governing body) determines in good faith after consultation with outside counsel that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its fiduciary duties under applicable Law; or

(l)      by Buyer, if (i) the Seller withdraws the Sale Motion, (ii) the Seller moves to voluntarily dismiss the Bankruptcy Case or the Bankruptcy Court otherwise orders such dismissal, (iii) the Seller moves for conversion of the Bankruptcy Case to Chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders such conversion, or (iv) the Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders such appointment.

11.02    Effect of Termination. In the event this Agreement is terminated by either Buyer or the Seller as provided above, the provisions of this Agreement shall immediately become wholly void and of no further force and effect (other than Article I, Article XIII, Section 3.04, Section 3.02, this Section 11.02, Section 12.08 and, Section 12.10, which shall survive the termination of this Agreement (other than the provisions of Section 13.16, which shall terminate)), and there shall be no Liability on the part of Buyer or the Seller to one another except as provided in such surviving provisions, including, without limitation, Section 12.08; provided that no such termination shall relieve any Party hereto from any Liability or damages resulting from, incurred by or suffered by another Party as a result of Fraud or Willful Breach of this Agreement prior to such termination. No termination of this Agreement shall affect the obligations contained in the Confidentiality Agreement, all of which obligations shall survive termination of this Agreement in accordance with their terms.

## ARTICLE XII

## ADDITIONAL COVENANTS

12.01    Commercially Reasonable Efforts; Cooperation. Subject to the terms of this Agreement, including Section 12.02, the Seller, on the one hand, and Buyer, on the other, agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, as promptly as practicable and in any event before the Outside Date, the Transactions and to obtain satisfaction or waiver of the conditions precedent to the consummation of the Transactions, including the execution and

delivery of any additional instruments necessary to consummate the Transactions, and to fully carry out the purposes of, this Agreement; provided that no Party shall be required to (a) pay any fees or make other payments in connection with any Consent other than normal filing fees, (b) commence any Action, or (c) waive the benefits of any representation, warranty or covenant under this Agreement or any condition precedent to its obligations to consummate the Closing.

12.02    Approvals. The Seller, on the one hand, and Buyer, on the other, shall, within fifteen (15) Business Days after the date hereof, make or cause to be made all filings to any Governmental Entity set forth on Schedule 5.02(b). The Seller and Buyer shall reasonably cooperate in obtaining all other consents and authorizations required to be obtained from, and the making of any filings required to be made with, any Governmental Entity and reasonably cooperate with and provide reasonable assistance as may be requested by any other Party in responding to, as promptly as reasonably practicable, to any request for additional information, data or documentary material as may be requested by any such Governmental Entity.

12.03    Payor Arrangements. From and after the date hereof, Buyer shall use commercially reasonable efforts to put in place new payor arrangements (on terms substantially similar to Buyer's or the Business' existing payor arrangements) with UnitedHealthcare of Florida Inc. and Blue Cross Blue Shield of Florida of Florida, Inc. for respective periods of not less than three (3) years after the Closing Date. From and after the Closing Date, Buyer shall use commercially reasonable efforts to maintain payor arrangements with at least three (3) Medicare Advantage payors (in each case as selected by Buyer in its sole discretion).

12.04    Books and Records. For a period of five (5) years following the Closing, each of Buyer and the Seller shall (and shall cause their respective Affiliates to) maintain all books and records relating to the Purchased Assets to the extent relating to periods ending on or prior to the Closing (in the case of the Seller and their Affiliates, to the extent that such books and records are in the possession of the Seller and their Affiliates as of the Closing) and use commercially reasonable efforts to provide reasonable access to Buyer or the Seller, as the case may be, and their respective representatives to such books and records and, in the case of Seller, to any Transferred Employees, upon reasonable advance notice during normal business hours as may be reasonably necessary for (i) the preparation of financial statements, (ii) complying with any audit request, subpoena or other investigative demand by any Governmental Entity or for any Action (other than Actions as between Parties to this Agreement) (including for the purpose of furnishing such books and records to any such Governmental Entity) and (iii) solely with respect to access by Buyer, any reasonable business purpose, provided, however, any such access which is contemplated by the Transition Services Agreement shall be governed by the Transition Services Agreement. Any such access by Seller and their Affiliates shall be subject in all cases to reasonable restrictions imposed from time to time upon advice of counsel in respect of any applicable Law relating to the confidentiality of information (provided that Buyer shall use commercially efforts to provide such access and information to the maximum extent so that no such violation or waiver shall occur) and shall be conducted in such a manner so as not to interfere unreasonably with the operation of the business of Buyer and its Affiliates. In no event will Buyer, the Seller, or their respective Affiliates, be required to furnish any documents or information pursuant to this Section 12.04 that are required by any applicable Law or Order to be kept confidential, or if furnishing such documents or information would reasonably be expected to jeopardize the status of such documents or information as privileged; provided that Buyer, the Seller, or their respective Affiliates, as

applicable, shall use commercially reasonable efforts to provide such access and information to the maximum extent so that no such waiver shall occur. Notwithstanding the foregoing, if the Parties are in an adversarial relationship in any Action, the furnishing of information, documents or records in accordance with this <u>Section 12.04</u> shall be subject to any applicable rules relating to discovery. Nothing in this <u>Section 12.04</u> shall change any obligation of Seller to fully deliver all books and records in connection with <u>Section 2.01(g)</u>.

12.05  <u>Pending Audits and Appeals Pre-Closing Access to Information</u>. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, the Seller shall, prior to entering into any settlement or repayment agreement or other Resolution or otherwise agree in principle with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding (i) a Resolution of the Specified Proceeding, (ii) any material negative findings resulting from any audits by the U.S. Department of Justice, OIG, CMS or a Third Party Payor in connection with or relating to the Specified Proceeding, or (iii) any other Actions by any Governmental Entity or Third Party Payor in connection with or relating to the Specified Proceeding, provide Buyer a copy of the proposed settlement agreement and notice of such discussions and an opportunity to communicate with the Seller or its counsel regarding such settlement agreement or Resolution. The Seller must promptly notify Buyer of any correspondence or other communication with the U.S. Department of Justice, OIG, CMS or Third Party Payor regarding any material negative findings or any settlement or repayment agreement or potential Resolution of any audits or other Action by any Governmental Entity or Third Party Payor.

12.06  <u>Confidentiality</u>.

(a)    Each of the Parties shall hold, and shall cause its representatives to hold, in confidence all documents and information furnished to it by or on behalf of the other Parties in connection with the Transactions pursuant to the terms of the Confidentiality Agreement and all documents and information furnished to any party to this Agreement or its representatives by any of the other Parties to this Agreement or their respective representatives in connection with the Transactions shall be deemed to be Confidential Information (as defined in the Confidentiality Agreement) and, if applicable, Clean Team Information (as defined in that certain Clean Team Non-Disclosure Agreement by and among the Seller, TVHHC and Humana Inc. dated as of May 8, 2024) until the Closing Date, at which time obligations under the Confidentiality Agreement or the Clean Team Non-Disclosure Agreement with respect to (i) Sections 11 and 12 of the Confidentiality Agreement and (ii) information concerning the Business shall cease to apply to Humana Inc., Buyer and their Affiliates; <u>provided</u>, that the Confidentiality Agreement shall continue in full force and effect with respect to information concerning the Seller and its Affiliates, including any equityholder of TVHHC, or any Person affiliated with any equityholder of TVHHC. Notwithstanding anything to the contrary herein, if this Agreement is terminated prior to the Closing Date, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with their terms.

(b)    Following the Closing until three (3) years following the Closing, the Seller shall not, and shall cause each of its representatives and Affiliates not to, directly or indirectly, without the prior written consent of Buyer, disclose to any third party or use in any manner (other than for the express purposes set forth in the Transaction Documents) any confidential or proprietary information to the extent related to the Seller or the Business; provided that the

foregoing restriction shall not (i) apply to any information generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), or (ii) prohibit any use or disclosure (A) required by Law or any Governmental Entity or self-regulatory authority process so long as, to the extent legally permissible and reasonably practicable, Seller provides Buyer with reasonable prior notice of such disclosure and a reasonable opportunity to contest such disclosure, (B) to comply with reporting, disclosure, filing or other requirements imposed on Seller (including under applicable securities Laws) by any Governmental Entity or self-regulatory authority, (C) made in connection with the enforcement of any right or remedy relating to this Agreement or any other Transaction Document or the Transactions, or (D) in the course of performing any duties for the Seller as an employee or pursuant to any contract. Nothing herein shall prevent Seller or any of its representatives or Affiliates from using or disclosing information that is not specific to the Business or related to the Buyer or its Affiliates.

12.07   <u>Submission for Bankruptcy Court Approval</u>.

(a)     The Seller shall use commercially reasonable efforts to take all actions necessary to cause the Sale Order to be issued and entered by the Bankruptcy Court and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court, which Sale Order shall provide for the transfer of the Purchased Assets free and clear from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the Local Rules in obtaining entry of the Sale Order. In furtherance of the foregoing, the Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens in the Purchased Assets and all non-debtor parties to all Contracts, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by the Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code relating to this Agreement.

(b)     No later than the date that is one (1) Business Day following the date hereof, the Seller shall commence the Bankruptcy Case, and file the Bidding Procedures Motion on such date. All of the Parties shall use their respective reasonable best efforts to have the Bidding Procedures Order entered no later than 21 days after the Petition Date. All of the Parties shall use their respective reasonable best efforts to have the Auction concluded no later than September 8, 2025, and the Sale Order entered no later than September 11, 2025.

(c)     The Seller and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order, including, (i) the Seller providing to Buyer the Bidding Procedures Motion, Sale Motion, any proposed Bidding Procedures Order, any proposed Sale Order, together with any motions, declarations, or replies submitted by the Seller in support of entry of the Bidding Procedures Order or the Sale Order, in each case, as promptly as practicable in advance of filing same, and (ii) to the extent reasonably practicable, the Seller providing to buyer any drafts of any other documents in connection with the Sale Order, in each case, as promptly as practicable in advance of filing same. Seller shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without the prior written consent of the Buyer. The Seller shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to the Buyer and its counsel.

(d)     If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Seller shall diligently defend such appeal, petition or motion and use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

12.08   Overbid Procedures; Adequate Assurance.

(a)     The Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Seller acknowledges that the Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Seller's business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that any additional qualified prospective bidder desires to bid for the Business, conducting an auction (the "Auction").

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court, so long as it is consistent in all material respects with Exhibit D or otherwise acceptable to Buyer in its sole discretion. Buyer agrees and acknowledges that, until the conclusion of the Auction, the Seller and their Affiliates and the Seller's representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order and agrees and acknowledges

that the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement.

(c)     If an Auction is conducted, and the Buyer is not the Successful Bidder at the Auction but is the next highest bidder at the Auction, Buyer shall serve as a backup bidder (the "Backup Bidder") and keep the Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement open and irrevocable, notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to Article XI hereof, until the Backup Termination Date. Following the Sale Hearing and prior to the Backup Termination Date, if the Successful Bidder fails to consummate the Successful Bid as a result of a breach or failure to perform on the part of such Successful Bidder and the purchase agreement with such Successful Bidder is terminated, the Backup Bidder (as the next highest bidder at the Auction in Buyer's sole discretion) will be deemed to have the new prevailing bid (the date on which that has occurred and Buyer is notified of such fact, the "Backup Effective Date"), and the Seller will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Backup Bidder so long as Buyer has not previously terminated this Agreement in accordance with its terms.

(d)     Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer or any applicable Buyer Designee of each Transferred Contract. Buyer agrees that it will reasonably cooperate with the Seller to obtain a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Transferred Contracts, including furnishing affidavits, non-confidential financial information and other non-confidential documents or information for filing with the Bankruptcy Court and making the Buyer's representatives available to testify before the Bankruptcy Court upon reasonable prior notice.

(e)     The Seller and the Buyer agree, and the Bidding Procedures Motion shall reflect the fact, that the provisions of this Agreement, including this Section 12.08 and Section 12.10, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Purchased Assets.

12.09    Employee Matters.

(a)     Offers of Employment to Clinicians. Following the date hereof and no later than twenty (20) Business Days prior to the Closing Date, subject to each Clinician's completion of Buyer's credentialing process and satisfaction of the underwriting guidelines for Buyer's or its Affiliate's captive insurance company in accordance with Section 7.03(a), the Buyer or an Affiliate of the Buyer shall offer employment to each Clinician who is employed by the Seller and its Affiliates as of the date of this Agreement, with such employment with Buyer (or its applicable Affiliate) to be effective as of Closing. The offer of employment to each such Clinician shall provide for: (i) a term of employment no greater than such Clinician's term of employment under the employment agreement then in effect between such Clinician and the Seller, or, in the absence of such agreement, a term of employment that is comparable to that which applies to similarly situated Clinicians of Buyer and its Affiliates, and (ii) substantially the same duration and

geographic scope of non-compete and non-solicit restrictions as those applicable to such Clinician as of the Petition Date, or, if no such restrictive covenants applied to the Clinician as of the Petition Date, restrictive covenants comparable to those which apply to similarly situated Clinicians of Buyer and its Affiliates.

(b)     Offers of Employment to Non-Clinicians. Following the date hereof and no later than ten (10) days prior to the Closing Date, the Buyer or an Affiliate of the Buyer may offer employment, effective as of Closing, to those non-Clinician employees of the Seller as the Buyer may elect at its sole discretion, on terms and conditions of employment reasonably determined by the Buyer in its discretion. The Buyer shall provide notice to Seller of those non-Clinicians who have been offered employment by the Buyer or an Affiliate of Buyer.

(c)     Termination of Employment by the Seller. Not later than the Closing Date, the Seller shall terminate the employment of any Clinician or non-Clinician employee who has accepted or not rejected an offer of employment from the Buyer or an Affiliate of the Buyer. Any Clinician or non-Clinician who accepts an offer of employment from the Buyer or an Affiliate of the Buyer (including, in the sole discretion of the Buyer, a deemed acceptance) and commences employment with the Buyer or an Affiliate of the Buyer shall be hereinafter referred to as a "Transferred Employee" effective as of the Closing. Any Clinician or non-Clinician who fails to accept an offer of employment from the Buyer or an Affiliate of the Buyer, or who otherwise fails to commence employment with the Buyer or an Affiliate of the Buyer on the Closing Date, will not become an employee of the Buyer or an Affiliate of the Buyer, and, for the avoidance of doubt, the Buyer or an Affiliate of the Buyer will have no obligations of any kind with respect to such employees. Except as expressly set forth herein, the Buyer or an Affiliate of the Buyer will not assume or be obligated under any Contracts, commitments or undertakings between the Seller and the Transferred Employees.

(d)     Except for any liabilities, claims and losses arising directly as a result of any material breach by the Buyer or any of its Affiliates of its obligations under, or as otherwise specifically provided for in, this Section 12.09, the Seller shall be solely responsible for, and shall indemnify and hold harmless Buyer and its Affiliates against, all potential or actual employment- or employee benefits- or compensation-related liabilities, claims and losses relating to (i) the Transferred Employees that arise as a result of an event that occurred on or prior to the Closing Date (including any severance, termination, change in control, retention or other compensation or benefits payable as a result of the execution of this Agreement or the transactions contemplated hereby) or (ii) any current or former employee of the Seller (or any dependent or beneficiary of any such employee) other than the Transferred Employees (and their dependents or beneficiaries). For purposes of clarification, the Buyer shall be solely responsible for any and all severance or similar liabilities relating to the termination of employment of any Transferred Employee by the Buyer or its Affiliates after the Closing Date.

(e)     Employee Census. Following the date of this Agreement, the Seller shall update Schedule 5.18(a) and Schedule 5.18(b) as promptly as practicable upon the reasonable request of the Buyer, to reflect any termination or hiring of employees as permitted by this Agreement, or any voluntary resignations of employees, in each case, following the date of this Agreement.

(f)    <u>Communications; Cooperation</u>. No later than three (3) days after the date of this Agreement, the Seller shall provide to the Buyer (A) with respect to each Clinician employed by Seller as of the date hereof, the employment contract by and between the Seller or its applicable Affiliate and such Clinician and any current incentive compensation plan or arrangement applicable to the Clinician (including, without limitation, compensation in the form of Relative Value Units (RVUs)), and (B) with respect to the non-Clinician employees of Seller as of the date hereof, the forms of employment agreement, offer letter or similar employment contract, if any, with the Seller or its applicable Affiliate (along with a list setting forth the form applicable to each such non-Clinician), and, to the extent any individual employment agreement, offer letter or similar employment contract with a non-Clinician employee of Seller as of the date hereof materially differs from the provided forms thereof, each such materially different individual employment agreement, offer letter or similar employment contract by and between the Seller or its applicable Affiliate and each non-Clinician employee of Seller as of the date hereof. With respect to any Clinician or non-Clinician hired by the Seller in accordance with this Agreement after the date hereof, the Seller shall provide to the Buyer the documents contemplated by clause (i) of the preceding sentence with respect to such Clinician or non-Clinician, as applicable, immediately after such individual's commencement of employment with the Seller. From and after the date of this Agreement, and subject to applicable Law, the Seller and the Buyer shall, and each shall cause their respective Affiliates to, reasonably cooperate with the other parties hereto and their respective Affiliates to provide such information regarding and access to any employee of the Seller as may be necessary to facilitate the transactions and activities contemplated by this Agreement, including (i) exchanging information and data relating to workers' compensation and employee benefit and compensation plans (including, without limitation, COBRA continuation coverage under such employee benefit plans), (ii) sharing with each other and their respective agents and vendors all participant information reasonably necessary for the efficient and accurate administration of their respective employee benefit plans with respect to employees of the Seller, (iii) resolving any and all employment-related claims regarding employees of the Seller, and (iv) in responding to questions posed by employees or any other individual service providers. The Seller and the Buyer shall each cooperate with the other in good faith to provide any employment-related notice required by Law or Contract in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, Buyer and its Affiliates shall be free to contact and communicate with Clinicians with respect to future employment or engagement without restriction or any notice to, or consent by, Seller or its representatives, and Seller shall promptly provide Buyer with the contact information necessary for Buyer to do so.

(g)    <u>WARN Act</u>. Seller shall timely provide all notices required pursuant to the WARN Act in connection with the termination of employees or contractors of the Seller resulting from or relating to the transactions contemplated by this Agreement. On the Closing Date, Seller shall provide the Buyer with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any employee of the Seller during the ninety (90) day period ending on the Closing Date. For purposes of clarification, the Buyer or its applicable Affiliate shall be responsible for providing any notice required pursuant to the WARN Act with respect to the termination of Transferred Employees that occurs after the Closing Date.

(h)    <u>Compensation Payments</u>. The Seller shall continue to provide all employee benefits and fringe benefits including continued participation in the Company Plans to all

Transferred Employees through the Closing for the applicable Transferred Employee and, except with respect to any Accrued PTO, shall cause to be taken whatever steps are necessary to pay to Transferred Employees, at Seller's sole expense, all accrued compensation and benefits arising and payable under the Company Plans or any employment or consulting Contract, or relating to payroll, compensation, vacation, sick leave, workers' compensation, unemployment benefits, retirement or pension benefits, profit sharing plans, healthcare plans or benefits, bonus or commission arrangements, severance or other termination pay or benefits, and any other employer plans or benefits or similar Liabilities of the Seller to any current or former employee, contractor or other similar Person, in each case to the extent allocable to services performed on or prior to the Closing Date for the applicable Transferred Employee in accordance with applicable Laws, and Seller, at its sole expense, shall timely pay all employment or other withholding Taxes with respect to such payments to the appropriate taxing authority (collectively, the "Compensation Payments"). Such Compensation Payments shall be made, for each Transferred Employee, on the Closing Date or the next regularly scheduled payroll following the Closing Date, in each case, in accordance with applicable Laws. The intent of this Section 12.09(h) is to ensure that Buyer and its Affiliates will have no Liability, responsibility or obligation whatsoever at any time in the future with respect to any of the Seller's employees, consultants or other similar Persons with respect to periods up to and including the Closing Date, including under any Company Plan and with respect to the Compensation Payments, and any such Liability shall be an Excluded Liability.

(i)    Paid Time Off. Subject to applicable Law, effective as of the Closing, the Buyer shall credit, or cause to be credited, each Transferred Employee under the applicable paid-time-off policies of the Buyer and its Affiliates, with the paid-time-off unused and accrued by such Transferred Employee as of the Closing under the applicable paid-time-off policies of Seller and its Affiliates (such unused and accrued paid-time-off of all Transferred Employees, in the aggregate, the "Accrued PTO").

(j)    401(k) Plan. The Seller shall cause the accounts of the Transferred Employees in the Company Plan that is a defined contribution plan with a qualified cash or deferred cash arrangement within the meaning of Section 401(k) of the Code ("Seller's 401(k) Plan") to be fully vested as of immediately prior to the Closing Date. Following the Closing, the Buyer agrees to cause a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code that is sponsored by Buyer or an Affiliate of Buyer ("Buyer's 401(k) Plan")  to allow each Transferred Employee to make a "direct rollover" to the Buyer's 401(k) Plan of the account balances of such Transferred Employee (including promissory notes evidencing any outstanding loans that are not in default as of the date such rollover is elected by the Transferred Employee) if the Seller's 401(k) Plan permits such a direct rollover and if such direct rollover is elected in accordance with applicable Law by such Transferred Employee. The rollovers described herein shall comply with applicable Law, and each party shall make all filings and take any actions required of such party under applicable Law in connection therewith. The Buyer shall have no responsibility for any failure of the Seller to properly administer Seller's 401(k) Plan in accordance with its terms and applicable Law, including, without limitation, any failure to properly administer the accounts of Transferred Employees and their beneficiaries who elect a direct rollover pursuant to this Section 12.09(j). The Seller shall not take any action to terminate Seller's 401(k) Plan during the ninety (90)-day period following the Closing Date.

(k)    COBRA. Notwithstanding any contrary provision of this Agreement, Seller shall be responsible and liable for providing, or continuing to provide, health care continuation coverage as required under COBRA with respect to any individual who experienced a COBRA "qualifying event" on or prior to the Closing Date under any Company Plan subject to COBRA, other than an Assumed Plan.

(l)    Standard Procedure. The Buyer and Seller agree to comply with the Standard Procedure described in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320 (the "Standard Procedure"). With respect to Transferred Employees, the Seller shall, in accordance with the Standard Procedure, retain all responsibility for preparing and filing Forms W-2, Wage and Tax Statement; Forms W-3, Transmittal of Income and Tax Statements; Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, Forms 941, Employer's Quarterly Federal Tax Return; and Forms W-4, Employee's Withholding Allowance Certificate including any state and local equivalents (collectively, the "Employee Withholding Documents") with regard to wages paid through the day before the Closing Date. Buyer shall assume all responsibility for preparing and filing the Employee Withholding Documents with regard to wages paid to Transferred Employees on and after the Closing Date. The Buyer and the Seller shall cooperate in good faith to the extent necessary to permit each Party to comply with the Standard Procedure.

(m)    Enforcement of Restrictive Covenants. As applied to any Transferred Employee's employment with the Buyer or any of its Affiliates on and following the Closing, the Seller shall not, and shall cause its Affiliates not to, enforce against the Buyer, its Affiliates or any Transferred Employee (i) any noncompetition provision that would purport to prohibit such individual from working for the Buyer or any of its Affiliates; (ii) any confidentiality restrictions relating to a Transferred Employee's, the Buyer's or its Affiliates' ability to use or disclose non-public, confidential, proprietary or trade secret information relating to the Business or the Buyer or its Affiliates in the course of their employment with the Buyer or any of its Affiliates; and/or (iii) any employee, customer or supplier nonsolicitation or noninterference obligations. The Seller hereby assigns to the Buyer the right to enforce any rights of the Seller or any of its Affiliates with respect to any obligation of any Transferred Employee or any other former employees or current or former independent contractors or consultants of the Business to refrain from (x) competing with all or any portion of the Business, (y) soliciting any employees, customers or suppliers of the Business or (z) disclosing confidential information or other non-public or proprietary information of the Business, in each case in accordance with the terms of the agreement setting forth such obligations. To the extent the assignment in the prior sentence is not permitted by the applicable agreement, from and after the Closing, the Seller agrees, if requested by the Buyer, to enforce such obligation and the Buyer shall reimburse the Seller for all reasonable out-of-pocket costs and expenses incurred by the Seller in connection with any such enforcement at the Buyer's request.

(n)    Assumed Plans. Following the date hereof and no later than thirty (30) days prior to the Closing Date, Buyer shall deliver to Seller a list of each Company Plan that shall be considered Purchased Assets for purposes of this Agreement (each, an "Assumed Plan"), as determined by Buyer in its sole discretion; provided, that, subject in all respects to Seller delivering to Buyer at Closing the Purchased Assets described in Section 2.01(l), Assumed Plans shall include the Physicians and Executive DC Plan and the Executive Deferred Compensation Plan.

(o)     No Third Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to, or shall, (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Company Plan or other benefit plan, agreement or arrangement of the Buyer or its Affiliates, (ii) limit the right of the Buyer or its Affiliates to amend, terminate or otherwise modify any benefit plan, agreement or arrangement of the Buyer for any Transferred Employee following the Closing Date, or (iii) create any third party beneficiary or other right (x) in any Person, including any current or former employee of the Seller, any participant in any Company Plan or other benefit plan, agreement or arrangement (or any dependent or beneficiary thereof) of the Buyer or (y) to continued employment with the Buyer and its Affiliates. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer or its Affiliates to terminate, reassign, promote or demote any of the Transferred Employees after the Closing Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, or terms or conditions of employment of such employees. For the avoidance of doubt, other than the Assumed Plans, neither Buyer nor its Affiliates shall assume sponsorship of, or any obligations under, or Liabilities with respect to, or receive any right or interest in any trusts relating to, any assets of or any insurance, administration or other contracts pertaining to any Company Plan.

12.10   Termination Payment. In consideration of Buyer serving as a stalking horse bidder in connection with the Auction, if (a) this Agreement is terminated by Buyer pursuant to Sections 11.01(b), 11.01(f)(iii)(C), 11.01(h), 11.01(i), or 11.01(j), or by Seller pursuant to Section 11.01(k), and the Seller subsequently consummates an Alternative Transaction, the Buyer will be entitled to receive from the proceeds of any Alternative Transaction, without further order of the Bankruptcy Court, (i) an amount in cash equal to $1,500,000.00 (the "Termination Fee") plus (ii) the amount of the Buyer's reasonable documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred in connection with the Buyer's evaluation, consideration and negotiation of a possible transaction with the Seller and in connection with the transactions contemplated hereby, up to a maximum amount of $1,500,000.00 (the "Expense Reimbursement" and, together with the Termination Fee, the "Termination Payment"). Such Termination Payment shall be made by wire transfer of immediately available funds to an account designated by the Buyer and such payment shall be made on or before the first (1st) Business Day following the consummation of such Alternative Transaction. The Bidding Procedures Order shall provide that the claim of the Buyer in respect of the Termination Payment shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Seller, as administrative expenses under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case and shall be paid in cash prior to delivery of any sale proceeds to any other party.

12.11   Assumed General Unsecured Claims Reconciliation Procedures.

(a)     Buyer shall be entitled to review and evaluate all Assumed General Unsecured Claims (that are not Excluded General Unsecured Claims) listed on Seller's schedules of assets and liabilities and the statements of financial affairs, including any amendments or supplements thereto [Docket Nos. 118, 119], or asserted against Seller via a filed proof of claim, irrespective of whether such proof of claim was filed as of the date hereof or filed after the date of execution of this Agreement, prior to Seller making a determination that any Assumed General Unsecured Claim is an allowed Claim under a chapter 11 plan, the Bankruptcy Code, or by a Final

Order (an "Allowed Claim").  From the date hereof, Seller shall not deem any Assumed General Unsecured Claim an Allowed Claim without Buyer's express written consent approving such classification, which, for the avoidance of doubt, shall be in Buyer's sole discretion.  Seller shall cooperate with Buyer in good faith with respect to the Assumed General Unsecured Claims reconciliation process.

(b)     Seller shall not be permitted to reconcile or otherwise object to any Assumed General Unsecured Claim without the express written consent of Buyer, which, for the avoidance of doubt, shall be in Buyer's sole discretion.  As of the date hereof, solely with respect to Assumed General Unsecured Claims, Buyer shall, and Seller agrees, that Buyer shall be entitled to exercise all rights, claims, defenses, and remedies of Seller under section 502 of the Bankruptcy Code, including, without limitation, the right to object to, seek to disallow, reclassify, subordinate, or otherwise challenge any Assumed General Unsecured Claims filed or scheduled against the Seller's estate. For the avoidance of doubt, this Section 12.11(b) shall in no way limit the rights, claims, defenses, and remedies of Seller with respect to the Excluded General Unsecured Claims.

12.12    Further Assurances. From and after the Closing Date, the Parties shall, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as reasonably required or appropriate to carry out and/or evidence the Transactions consistent with the terms of this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

13.01    Press Releases and Communications. No press release or public statement or announcement related to this Agreement or the Transactions shall be issued or made by or on behalf of any Party hereto (nor any of their Affiliates) without the prior approval of each of Buyer(which consent shall not be unreasonably withheld, conditioned or delayed); provided that, that a Party may, without the prior consent of the other Parties issue such press release or make such public statement (a) to the extent required by applicable Law (including (x) the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and applicable Local Rules to the extent reasonably necessary to obtain entry of the Bidding Procedures Order, or if the Buyer is selected as the Successful Bid, the Sale Order and (y) in any filing made by the Seller and its Affiliates with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of the Seller or its representatives to obtain Bankruptcy Court approval of the Transactions or in connection with conducting the Auction) or the applicable rules or regulations of any stock exchange or (b) to the extent such, press release, public statement or announcement is consistent with previous press releases, public statements and/or announcements made jointly by or otherwise agreed to by Buyer in accordance with this Section 13.01. For the avoidance of doubt, from and after the Closing, Buyer may make other statements to the public regarding the operation of the Business following the Closing.

13.02    Expenses. Except as otherwise expressly provided herein, the Seller and Buyer shall pay all of their own costs, fees and expenses incurred in connection with this Agreement and the Transactions, whether or not the Closing shall have occurred, including the fees and disbursements of counsel, financial advisors and accountants.

13.03   <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when sent via e-mail to the email address set out below if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient (to the extent that no "bounce back," "out of office" or similar message indicating non-delivery is received with respect thereto on the date of delivery), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, return receipt requested, postage prepaid. Notices, demands and communications, in each case to the respective Parties, shall be sent to the applicable address set forth below, unless another address has been previously specified in writing by such Party:

<u>Notices to Buyer</u>:

**c/o Humana Inc.**
500 West Main Street
Louisville, Kentucky 40202
Attention:      Kendra L. Clark, Director, Assistant General Counsel
Email:          kclark154@humana.com

with copies to (which shall not constitute notice):

**Latham & Watkins LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Attention:      Brian Mangino
                Amber Banks
Email:          brian.mangino@lw.com
                amber.banks@lw.com

<u>Notices to Seller</u>:

**The Villages Health System LLC**
c/o GBH SOLIC Holdco LLC
425 W. New England Avenue, Suite 300
Winter Park, Florida 32789
Attention:      Neil Luria, CRO
Email:          nluria@soliccapital.com

with copies to (before the Closing) (which shall not constitute notice):

**BakerHostetler LLP**
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
Attention:      Andrew V. Layden
                Elizabeth A. Green

Jimmy D. Parrish
Email:    alayden@bakerlaw.com
egreen@bakerlaw.com
jparrish@bakerlaw.com

13.04    <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated without the prior written consent of the non-assigning Parties, provided that Buyer shall have the right to assign to a Buyer Designee without prior consent of any other Party its rights, interests and obligations under this Agreement.

13.05    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

13.06    <u>References; Interpretation</u>. The table of contents and the section and other headings and subheadings contained in this Agreement and the exhibits hereto are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement or any exhibit hereto. All references to days (excluding Business Days) or months shall be deemed references to calendar days or months. All references to "<u>$</u>" shall be deemed references to U.S. dollars. Unless the context otherwise requires, any reference to a "<u>Section</u>," "<u>Exhibit</u>," "<u>Disclosure Schedule</u>" or "<u>Schedule</u>" shall be deemed to refer to a section of this Agreement, exhibit to this Agreement or a schedule to this Agreement, as applicable. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Whenever the word "or" is used in this Agreement, it shall not be deemed exclusive. Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms. The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. Any reference to any particular Code section or Law shall be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified. Accounting terms that are not otherwise defined in this Agreement have the meanings given to them under GAAP. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement shall control. Whenever the phrase "ordinary course of business" is used, it shall be deemed to include the phrase "in accordance with past practices" and take into account the matters set forth in <u>Schedule 1.1(c)</u>.

13.07  <u>Construction</u>. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. The information contained in this Agreement and in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of Law or breach of contract).

13.08  <u>Amendment and Waiver</u>. Any provision of this Agreement or the Disclosure Schedules hereto may be amended or waived only in a writing signed by, (a) in respect of any amendment or waiver on or prior to the Closing Date, Buyer, and, only if such amendment or waiver is applicable to the Seller, the Representative, and, only if such amendment or waiver is applicable to the Representative, the Representative; and (b) in respect of any amendment or waiver following the Closing Date, Buyer and the Representative. No waiver of any provision hereunder or any breach or default thereof shall extend to or affect in any way any other provision or prior or subsequent breach or default.

13.09  <u>Complete Agreement</u>. This Agreement, the Transaction Documents, and the documents referred to herein (including the Confidentiality Agreement) contain the complete agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, that may have related to the subject matter hereof in any way, including any data room agreements, bid letters, term sheets, summary issues lists or other agreements.

13.10  <u>Third-Party Beneficiaries</u>. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing expressed or referred to in this Agreement shall be construed to give any Person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

13.11  <u>Waiver of Trial by Jury</u>. THE PARTIES TO THIS AGREEMENT EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

13.12  <u>Delivery by Email</u>. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered via electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original

signed version thereof delivered in person. At the request of any Party hereto or to any such contract, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such contract shall raise the use of email to deliver a signature or the fact that any signature or contract was transmitted or communicated through email as a defense to the formation of a contract and each such Party forever waives any such defense.

13.13   Counterparts; Electronic Delivery. This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one (1) Party, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties. Signatures to this Agreement transmitted by electronic mail in "portable document format" form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

13.14   Governing Law. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the Laws of the State of Florida, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Florida or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Florida.

13.15   Jurisdiction. Any suit, Action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Transaction Documents, or the Transactions shall be brought before, heard by and determined exclusively by the Bankruptcy Court; provided that, if the Bankruptcy Court does not have jurisdiction, any such suit, Action or proceeding shall be brought exclusively in the Fifth Circuit Court of either Lake, Marion, or Sumter County of the State of Florida (or, if the Fifth Circuit Courts decline to accept jurisdiction over a particular matter, any state or federal court within the Fifth District of the State of Florida and any direct appellate court therefrom). Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such suit, Action or proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with Section 13.03, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, Action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, Action or proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Process in any such suit, Action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.03 shall be deemed effective service of process on such Party.

13.16   Specific Performance. Each of the Parties acknowledges that the rights of each other Party to consummate the Transactions are unique and recognizes and affirms that in the event

of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Party may have no adequate remedy at Law. Accordingly, the Parties agree that prior to a valid termination of this Agreement in accordance with this Agreement, such non-breaching Party shall have the right, in addition to any other rights and remedies existing in its favor at Law or in equity, to enforce its rights and the other Party's obligations hereunder not only by an Action or Actions for damages but also by an Action or Actions for specific performance, injunctive and/or other equitable relief (without posting of bond or other security). Each of the Parties agrees that it shall not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, on the basis that the other Parties have an adequate remedy at Law or an award of specific performance is not an appropriate remedy for any reason at Law or equity and hereby waives any requirement under Law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief. Each Party agrees that it shall not oppose a motion for, or the granting of, expedition of any Action or Actions for specific performance, injunctive and/or other equitable relief.

13.17   <u>No Recourse</u>.

(a)     Except as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, all claims, obligations, liabilities, or causes of action (whether at Law, in equity, in contract, in tort or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) the Parties that are expressly identified in the preamble to this Agreement and only to the extent expressly identified in the case of Parent (the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any current, former or future equity holder, incorporator, controlling Person, partner, member, Affiliate, representative, or assignee of, and any financial advisor or lender to, any Contracting Party, or any current, former or future equity holder, incorporator, controlling Person, partner, Affiliate, representative, or assignee of, and any lender to, any of the foregoing or any of their respective successors, predecessors or assigns (or any successors, predecessors or assigns of the foregoing) (the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in Law or in equity, whether in contract or in tort or otherwise) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents), including any alleged non-disclosure or misrepresentations made by any such Person or as a result of the use or reliance on any information, documents or materials made available by such Person, and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents) against any such Non-Party Affiliates; <u>provided</u> that, for clarity, no party to the Confidentiality Agreement, or any of the Transaction

Documents shall be deemed a Non-Party Affiliate with respect to such documents to which it is a party.

(b)       Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents, (i) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available, whether at Law, in equity, in contract, in tort or otherwise, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, in each case arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as expressly set forth in the Confidentiality Agreement, this Agreement or any of the other Transaction Documents); and (ii) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

(c)       The provisions of this Section 13.17 are intended to be for the benefit of, and shall be enforceable by, each Non-Party Affiliate (each of whom shall be an express third party beneficiary of this Section 13.17), and his or her successors, heirs and representatives.

13.18   Parent Guarantee.

(a)       As a material inducement to the Seller's willingness to enter into this Agreement and perform their respective obligations hereunder, Parent agrees to guarantee the performance by Buyer of its obligations (i) in this Agreement (and in any valid amendment and/or modification hereof or thereof) to pay the Purchase Price and Cure Costs up to the amount of the Cure Costs Cap and (ii) to pay damages awarded to Seller or its Affiliates in the event Buyer materially breaches its obligations hereunder as determined in the final judgment of a court of competent jurisdiction. The obligation of Parent pursuant to this Section 13.18 is an unconditional and irrevocable guaranty of payment and performance and may be enforced directly against Parent as a primary obligation of Parent, as if Parent were the principal party obligated to perform such financial obligations.

(b)       Parent hereby represents and warrants as follows: (i) Parent is a corporation duly formed and validly existing under the Laws of the State of Delaware, and has the requisite corporate power and authority to execute, deliver and perform obligations created by this Section 13.18; (ii) the execution, delivery and performance of this Agreement by Parent has been duly and validly authorized and approved by all necessary corporate action; (iii) this Agreement has been duly executed and delivered by Parent and constitutes a valid and legally binding obligation of Parent, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws of general application affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies; (iv) neither the execution and delivery of this Agreement nor compliance by Parent with any of the provisions hereof or thereof, will: (A) conflict with or result in a breach of

any provisions of the certificate or articles of incorporation, bylaws (or similar organizational documents) of Parent; (B) constitute or result in (with or without notice or lapse of time or both) a breach of or default under, require consent or approval under, result in the acceleration of any right or obligation under, or the loss of any benefit under, of the termination of, or create in any party the right to accelerate, terminate, modify or cancel, or result in any violation of any Contract or Permit to which Parent is a party or by which any of their respective properties or assets is bound or (C) violate any Order or Law applicable to Parent or any of its properties or assets in any material respect, except as would not prevent or materially impair or delay, or would not reasonably be expected to prevent or materially impair or delay, the performance of Parent's obligations and covenants under this Section 13.18; and (v) Parent will have available on the Closing Date, sufficient readily available funds to satisfy the payment obligations hereunder.

13.19  Fiduciary Obligations. Subject to Section 11.01 and the consequences thereof, nothing in this Agreement, or any Transaction Document, will require Seller or any of its managers, officers, members or directors, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, (i) Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate, and (ii) Buyer retains all rights under this Agreement (including remedies for breach and the ability to terminate and collect a fee and expenses) in the event Seller exercises its rights under this Section 13.19.

\* \* \* \*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Seller:                                    **THE VILLAGES HEALTH SYSTEM, LLC**

                                           By: _____
                                           Name: _____
                                           Its: _____


Buyer:                                     **CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.**

                                           By: _____
                                           Name: _____
                                           Its: _____


Parent:                                    **HUMANA INC.**
                                           **Solely for the purposes of Section 13.18**

                                           By: _____
                                           Name: _____
                                           Its: _____

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Buyer:                                    **CENTERWELL SENIOR PRIMARY CARE (VITALITY), INC.**

By: _Reneé J. Buckingham_
Name: Reneé J. Buckingham
Its:    President


Parent:                                   **HUMANA INC.**
                                          **Solely for the purposes of Section 13.18**


By: _____
Name: Celeste M. Mellet
Its:    Chief Financial Officer

[Intentionally Omitted.]

## **EXHIBIT 2**

**Cure Amounts**

| Description of Contract or Lease | Counterparty Name | Total Cure Amount |
|---|---|---|
| Services Agreement | 48 Hour Books | $626.36 |
| Employment Contract or Letter | Aaron J Perkins | $0.00 |
| Employment Contract or Letter | Abigail Julia Cunningham | $0.00 |
| Employment Contract or Letter | Abigail Marie Rivera | $0.00 |
| Services Agreement | Access Nurse | $5,235.70 |
| Agreement for Medical Call Center Services | Access Nurse PM, LLC | $0.00 |
| Agreement for Medical Call Center Services | Access Nurse PM, LLC | $0.00 |
| Business Associate Agreement | Access Nurse PM, LLC | $0.00 |
| Employment Contract or Letter | A-Chai'a H Jackson | $0.00 |
| Employment Contract or Letter | Adam Khan Kakar | $0.00 |
| Employment Contract or Letter | Adam M Matheson | $0.00 |
| Sales Order | Adobe | $0.00 |
| Amendment to Global Master Services Agreement | ADP, Inc | $0.00 |
| Global Master Services Agreement | ADP, Inc | $0.00 |
| Global Master Services Agreement | ADP, Inc | $0.00 |
| Global Master Services Agreement | ADP, Inc | $0.00 |
| Global Master Services Agreement | ADP, Inc. | $0.00 |
| Global Master Services Agreement | ADP, Inc. | $0.00 |
| Employment Contract or Letter | Adraian Denise Greer | $0.00 |
| Employment Contract or Letter | Adrienne Mai Jean Ciarletta | $0.00 |
| Services Agreement | Advanced Bionics, LLC | $1,140.00 |
| Evaluation, Demonstration and Support Equipment and Software License Agreem | Advanced Bionics, LLC | $0.00 |
| Evaluation, Demonstration and Support Equipment and Software License Agreem | Advanced Bionics, LLC | $0.00 |
| Provider Agreement | Aetna Network Services LLC | $0.00 |
| Employment Contract or Letter | Airen R Blasky | $0.00 |
| Services Agreement | Akers Media Group, Inc | $1,750.00 |
| Employment Contract or Letter | Alan J Sonsky | $0.00 |
| Employment Contract or Letter | Albert F Turri | $0.00 |
| Employment Contract or Letter | Alecia Nicole Rytter | $0.00 |
| Employment Contract or Letter | Alessandra Claudia Lopiano | $0.00 |
| Employment Contract or Letter | Alexandra Brittany Hall | $0.00 |
| Employment Contract or Letter | Alexandra K Evans | $0.00 |
| Employment Contract or Letter | Alexis M McClain | $0.00 |
| Employment Contract or Letter | Alicia Marie Padget | $0.00 |
| Employment Contract or Letter | Alison C McKelvey | $0.00 |
| Employment Contract or Letter | Aliza-Marie Andrade | $0.00 |
| Permanent Contingency Search Agreement | All Star Recruiting Inc dba All Star Healthcare Solutions | $0.00 |
| Employment Contract or Letter | Allan Thomas Pharmer | $0.00 |
| Botox Pricing Agreement | Allergan USA, Inc. | $0.00 |
| Employment Contract or Letter | Allesha Eva Green | $0.00 |
| Employment Contract or Letter | Allison G Yow | $0.00 |
| Employment Contract or Letter | Allison M Mrozek | $0.00 |
| Employment Contract or Letter | Allison Mae Atherton | $0.00 |
| Employment Contract or Letter | Allison McCoy | $0.00 |
| Services Agreement | All-Secure Graphics LLC | $835.56 |
| Services Agreement | Alpha Source Inc | $9,800.00 |
| Employment Contract or Letter | Alycia Marie Pizzino | $0.00 |
| Employment Contract or Letter | Alysha B Pettis | $0.00 |
| Employment Contract or Letter | Alyssa Cerna | $0.00 |
| Employment Contract or Letter | Amanda Anne Lee | $0.00 |
| Employment Contract or Letter | Amanda Dawn Turner | $0.00 |
| Employment Contract or Letter | Amanda Katherine Dystrup | $0.00 |
| Employment Contract or Letter | Amanda Louise Burkholder | $0.00 |
| Employment Contract or Letter | Amanda P Roberts | $0.00 |
| Employment Contract or Letter | Amanda Rena Jones | $0.00 |
| Employment Contract or Letter | Amanda Sinclair | $0.00 |
| Employment Contract or Letter | Amanda Suzanne Farris | $0.00 |
| Services Agreement | Amazon Capital Services, Inc | $2,615.23 |
| Employment Contract or Letter | Amber D Guinaugh | $0.00 |
| Employment Contract or Letter | Amber Kennedy | $0.00 |
| Employment Contract or Letter | Amber L Krause | $0.00 |
| Employment Contract or Letter | Amber Leigh Teresa Hartzell | $0.00 |
| Employment Contract or Letter | Amber S Lawrence | $0.00 |
| Cyber, Invoice Manipulation & System Hacking Policy | Ambridge & Core Risk Solutions | $0.00 |
| Certification and License Agreement | American Institute of Balance, Inc. | $0.00 |
| Partners in Balance Certification and License Agreement | American Institute of Balance, Inc. | $0.00 |
| Services Agreement | America's Physician Groups | $2,222.00 |
| Employment Contract or Letter | Amy Klimek | $0.00 |
| Employment Contract or Letter | Amy L. Wixted | $0.00 |
| Employment Contract or Letter | Amy Lynn Neilson-Zatorski | $0.00 |
| Employment Contract or Letter | Amy Lynn Pinder | $0.00 |
| Employment Contract or Letter | AnaMaria A Arias | $0.00 |
| Employment Contract or Letter | Anastasha King | $0.00 |
| Employment Contract or Letter | Andrea Christine LeClair | $0.00 |
| Employment Contract or Letter | Andrea H Jacovine | $0.00 |
| Employment Contract or Letter | Andrew Michael Burton | $0.00 |
| Employment Contract or Letter | Angela Cole | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Angela Kilian | $0.00 |
| Employment Contract or Letter | Angela M Bradshaw | $0.00 |
| Employment Contract or Letter | Angela M. Enders | $0.00 |
| Employment Contract or Letter | Angela M. Poisson | $0.00 |
| Employment Contract or Letter | Angela Renee St Amour | $0.00 |
| Employment Contract or Letter | Angela T Linthicum | $0.00 |
| Employment Contract or Letter | Angelica M. Gonzales-Saenz | $0.00 |
| Employment Contract or Letter | Anna Jimenez | $0.00 |
| Employment Contract or Letter | Anna-marie Mendenhall Roswold | $0.00 |
| Employment Contract or Letter | Anthony J Glynn | $0.00 |
| Employment Contract or Letter | April Horwath | $0.00 |
| Learning Project Agreement and Supplement | ARCHway Learning Solutions | $0.00 |
| Learning Services Agreement | ARCHway Learning Solutions | $0.00 |
| Solutions Agreement | Arctic Wolf Networks, Inc | $0.00 |
| Employment Contract or Letter | Ariel C Bender | $0.00 |
| Employment Contract or Letter | Arlene Andrea Henry | $0.00 |
| Employment Contract or Letter | Ashanta Davis | $0.00 |
| Employment Contract or Letter | Ashley Blunt | $0.00 |
| Employment Contract or Letter | Ashley E Laskevicz | $0.00 |
| Employment Contract or Letter | Ashley L. Wood | $0.00 |
| Employment Contract or Letter | Ashley Lauren Howell | $0.00 |
| Employment Contract or Letter | Ashley Nadene McBride | $0.00 |
| Employment Contract or Letter | Ashok Kumar Ojha | $0.00 |
| Services Agreement | ASSA ABLOY Entrance Systems US Inc. | $5,434.92 |
| Employment Contract or Letter | Asyala/Bry Austin | $0.00 |
| Master Services Agreement | Athena Health Inc. | $0.00 |
| Service Proposal | Athena Health Inc. | $0.00 |
| Rate Change Proposal | Athena Health Inc. | $0.00 |
| Master Services Agreement and Amendments and Proposals | Athenahealth, Inc | $25,830.00 |
| Services Agreement | Athenahealth, Inc | $0.00 |
| Employment Contract or Letter | Aubrey Paquette | $0.00 |
| Employment Contract or Letter | Audrey B Goldman | $0.00 |
| Employment Contract or Letter | Avalon Marie Pegg | $0.00 |
| Employment Contract or Letter | Avisha Urmila Sarju | $0.00 |
| Platform Subscription Agreement | Aya DART, LLC dba DocCafe and MedJobCafe | $0.00 |
| Employment Contract or Letter | Bailey Cutler | $0.00 |
| Engagement Letter | Baker & Hostetler LLP | $0.00 |
| Employment Contract or Letter | Barbara A Daniele | $0.00 |
| Employment Contract or Letter | Barbara J Cingel | $0.00 |
| Employment Contract or Letter | Barbara J. Oliver | $0.00 |
| Employment Contract or Letter | Barbara S Young | $0.00 |
| Agreement for Professional Services | BDO USA, LLP | $0.00 |
| Statement of Work | BDO USA, LLP | $0.00 |
| Terms & Conditions of the Services Agreement | BDO USA, LLP | $0.00 |
| Executive Risk (D&O, EPLI, Fiduciary) Policy | Beazley Remedy | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | Beazley Remedy | $0.00 |
| Employment Contract or Letter | Belle Bernita McMahon | $0.00 |
| Employment Contract or Letter | Benjamin Abate | $0.00 |
| Side A Directors' and Officers' Liability Policy | Berkley Professional Liability | $0.00 |
| Employment Contract or Letter | Bess S Scott | $0.00 |
| Employment Contract or Letter | Beth Ann Westlake | $0.00 |
| Employment Contract or Letter | Bethany Mikell Ortega | $0.00 |
| Employment Contract or Letter | Bethanyann Marie Hunter | $0.00 |
| Employment Contract or Letter | Betsi N Garcia Montenegro | $0.00 |
| Employment Contract or Letter | Betty Stratton | $0.00 |
| Employment Contract or Letter | Bhogawattie Tirbeni | $0.00 |
| Master Software and Service Agreement | Bio Bridge Solutions Inc | $0.00 |
| Master Software and Service Agreement | Bio Bridge Solutions Inc | $0.00 |
| Services Agreement | Bio-Cycle Medical Waste Mgmt | $2,247.00 |
| Services Agreement | Bioteque America Inc | $744.00 |
| Administrative Services Agreement | Blue Cross and Blue Shield of Florida d/b/a Florida Blue | $0.00 |
| Physician Group Medical Services Agreement and Amendments | Blue Cross and Blue Shield of Florida, Inc. | $0.00 |
| Value-Based Program Agreement and Amendments | Blue Cross and Blue Shield of Florida, Inc. | $0.00 |
| Amendment to Physician Group Medical Services Agreement | Blue Cross Blue Shield of Florida, Inc. | $0.00 |
| Fourth Amendment to Agreement | Blue Cross Blue Shield of Florida, Inc.  and Health Options, Inc. | $0.00 |
| Promissory Note | Bob Trihn | $0.00 |
| Employment Contract or Letter | Bobby Trinh | $130,658.74 |
| Employment Contract or Letter | Bonita Beth Marburger | $0.00 |
| Services Agreement | Bortone, Nancy L | $15.12 |
| Services Agreement | Boston Scientific Corporation | $3,250.00 |
| Employment Contract or Letter | Bradley Joseph Campbell | $0.00 |
| Subscription Agreement | Brainier Solutions Inc. | $0.00 |
| Subscription Agreement | Brainier Solutions, Inc. | $0.00 |
| Employment Contract or Letter | Brandee N. Shields | $0.00 |
| Employment Contract or Letter | Brandi L Jewell | $0.00 |
| Employment Contract or Letter | Brandi M. Higgins | $0.00 |
| Employment Contract or Letter | Brandie L. Ward | $0.00 |
| Employment Contract or Letter | Brandilynn M Schickert | $0.00 |
| Services Agreement | Breitenbach, Carla | $78.11 |
| Employment Contract or Letter | Brendan F Pelzer | $0.00 |
| Employment Contract or Letter | Brett D Gurden | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Brian A Hoffar | $0.00 |
| Employment Contract or Letter | Brianna Lynn Holm | $0.00 |
| Employment Contract or Letter | Briannette Letta Rachamel Ranger | $0.00 |
| Employment Contract or Letter | Brittany A Alfrey | $0.00 |
| Employment Contract or Letter | Brittany Harris | $0.00 |
| Employment Contract or Letter | Brittany L. James | $0.00 |
| Employment Contract or Letter | Brittany Leigh Stafford | $0.00 |
| Employment Contract or Letter | Brittany Lynn Marlette | $0.00 |
| Employment Contract or Letter | Brittany N Honaker | $0.00 |
| Employment Contract or Letter | Brittany Narvaez | $0.00 |
| Employment Contract or Letter | Brittany Sharice Brown | $0.00 |
| Employment Contract or Letter | Brooke A Leever | $0.00 |
| Employment Contract or Letter | Brooke E Semonasky | $0.00 |
| Employment Contract or Letter | Brooke Thermidor | $0.00 |
| Employment Contract or Letter | Brooks Betts | $0.00 |
| Office Building Sublease Agreement and Amendments | BRP Insurance I, LLC (f/k/a BRP Medicare Insurance, LLC) | $0.00 |
| Employment Contract or Letter | Buffy Ann Austin | $0.00 |
| Services Agreement | Business Techs Inc. | $4,836.60 |
| Services Agreement | CallTower | $79.48 |
| Employment Contract or Letter | Camille I Forrest-Rigsby | $0.00 |
| Employment Contract or Letter | Candice Forza | $0.00 |
| Social Recruiting Service Order | CareerArc Group LLC | $0.00 |
| Employment Contract or Letter | Carla P Marinoni | $0.00 |
| Employment Contract or Letter | Carla Williams | $0.00 |
| Employment Contract or Letter | Carlene Howell | $0.00 |
| Employment Contract or Letter | Carlton R Turner | $0.00 |
| Employment Contract or Letter | Carol Ann Mahaney | $0.00 |
| Employment Contract or Letter | Carol Ann Shifflette | $0.00 |
| Employment Contract or Letter | Carol Lynn Reichbaum | $0.00 |
| Employment Contract or Letter | Carol M Rossa | $0.00 |
| Employment Contract or Letter | Carolyn A. Barner | $0.00 |
| Employment Contract or Letter | Carrie Joan McKinney | $0.00 |
| Employment Contract or Letter | Casey L Palmer | $0.00 |
| Employment Contract or Letter | Cassandra Bridges | $0.00 |
| Employment Contract or Letter | Catherine Faulkner | $0.00 |
| Employment Contract or Letter | Catherine L Sullivan | $0.00 |
| Employment Contract or Letter | Catherine M Heater | $0.00 |
| Employment Contract or Letter | Cathy Lynn Rhodes | $0.00 |
| Services Agreement | Central Florida Health and Wellness Magazine | $1,630.00 |
| Services Agreement | Certiphi Screening Inc | $2,076.00 |
| Veytec, Inc. Cisco Webex Calling Proposal | Ceytec, Inc. | $0.00 |
| Study Collaboration Agreement | CFL Research | $0.00 |
| Master Services Agreement | CFL Research, Inc. | $0.00 |
| Employment Contract or Letter | Chad Collins | $0.00 |
| Employment Contract or Letter | Chandica Misir | $0.00 |
| Services Agreement | Change Healthcare | $279.81 |
| Employment Contract or Letter | Charity Lynn Estelle Ross | $0.00 |
| Employment Contract or Letter | Charlene Ellen Jalovi | $0.00 |
| Employment Contract or Letter | Charlene M Rogers | $0.00 |
| Employment Contract or Letter | Charlene R Brannen | $0.00 |
| Employment Contract or Letter | Charles A Conger Jr | $0.00 |
| Employment Contract or Letter | Charles Edwards Muston | $0.00 |
| Employment Contract or Letter | Charles Williams Axe | $0.00 |
| Employment Contract or Letter | Charliveliz Jones | $0.00 |
| Employment Contract or Letter | Chauntel L Field | $0.00 |
| Employment Contract or Letter | Chelsey May Sundberg | $0.00 |
| Promissory Note | Cheri Benedetti | $130,658.74 |
| Employment Contract or Letter | Cheri Benedetti | $0.00 |
| Employment Contract or Letter | Cheryl Denzer | $0.00 |
| Employment Contract or Letter | Christina Lynette Montgomery | $0.00 |
| Employment Contract or Letter | Christina Marie Houston | $0.00 |
| Employment Contract or Letter | Christina Marie Mancil | $0.00 |
| Employment Agreement | Christina Steiner | $0.00 |
| Employment Contract or Letter | Christina Steiner | $0.00 |
| Employment Contract or Letter | Christine Baes Tomboc | $0.00 |
| Employment Contract or Letter | Christine Elizabeth Sterner | $0.00 |
| Employment Contract or Letter | Christine Marie Hurst | $0.00 |
| Employment Contract or Letter | Christopher S Pead | $0.00 |
| Excess D&O Extension Policy | CHUBB | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | CHUBB | $0.00 |
| Provider Group Services Agreement | Cigna HealthCare of Florida, Inc. | $0.00 |
| Employment Contract or Letter | Cimone Witter | $0.00 |
| Employment Contract or Letter | Cindy Berry | $0.00 |
| Employment Contract or Letter | Cindy L Pauley | $0.00 |
| Employment Contract or Letter | Cindy Louise Biggs | $0.00 |
| Employment Contract or Letter | Cintia Leticia Flores | $0.00 |
| Enterprise Agreement 3.0 Program Terms - End Users | Cisco | $0.00 |
| Deposit Account Control Agreement | Citizens First Bank | $0.00 |
| Irrevocable Standby Letter of Credit No 189 | Citizens First Bank | $0.00 |
| Services Agreement | Citrus Hearing Impaired Program | $360.00 |
| Business Associate Agreement | Citrus Hearing Impaired Program | $0.00 |

| | | |
|---|---|---|
| Services Agreement | City of Wildwood | $335.62 |
| Employment Contract or Letter | Cody DeLibro | $0.00 |
| Employment Contract or Letter | Colleen Egger | $0.00 |
| Employment Contract or Letter | Colleen Lyn Culver | $0.00 |
| Services Agreement | Comcast | $854.93 |
| Services Agreement | Comfort Care Medical Equipment & Uniforms Inc | $2,929.41 |
| Storage Space Rental Agreement | Compass Self Storage, LLC, agentfor ASV 15, and Rich Nescio | $0.00 |
| Agreement for Physician Locum Tenens Coverage | CompHealth | $0.00 |
| Agreement for Physician Locum Tenens Coverage Fees in Confirmation | CompHealth | $0.00 |
| Contingency Search Agreement Confirmation | CompHealth Associates, Inc. | $0.00 |
| Contingency Search Agreement | CompHealth Associates, Inc. | $0.00 |
| Contingency Search Agreement Confirmation | CompHealth Associates, Inc. | $0.00 |
| Master Lease Agreement | Connection Financial Services | $0.00 |
| Services Agreement | Connective Health Inc. | $21,000.00 |
| Provider Agreement | Connective Health, Inc. | $0.00 |
| First Amendment to Provider Agreement | Connective Health, Inc. | $0.00 |
| Employment Contract or Letter | Connie Leree Perry | $0.00 |
| Services Agreement | Consensus Cloud Solutions, LLC | $1,683.70 |
| Employment Contract or Letter | Cortney Alysse Pope | $0.00 |
| Qualified Entity Data Use Agreement | Cotiviti, Inc. | $0.00 |
| Qualified Entity Data Use Agreement | Cotiviti, Inc. | $0.00 |
| Business Associate Agreement | CounselEar, LLC | $0.00 |
| Business Associate Agreement | CounselEar, LLC | $0.00 |
| Employment Contract or Letter | Courtney A. Boyer | $0.00 |
| Employment Contract or Letter | Courtney Beall Benner | $0.00 |
| Employment Contract or Letter | Courtney Blair Orrange | $0.00 |
| Employment Contract or Letter | Courtney Johnson | $0.00 |
| Employment Contract or Letter | Courtney Nicole Holley | $0.00 |
| Employment Contract or Letter | Courtney Tompkins | $0.00 |
| Services Agreement | Covidien Sales LLC | $0.00 |
| Services Agreement | Cox Fire Protection | $112.50 |
| Employment Contract or Letter | Creshawnia Hazel Griffin | $0.00 |
| Employment Contract or Letter | Crista J. Willis | $0.00 |
| Employment Contract or Letter | Cristina France Arana De Fonseca | $0.00 |
| Services Agreement | Crothall | $0.00 |
| Master Service Agreement and Amendments | Crothall Healthcare Inc. | $0.00 |
| Addendum C to Master Service Agreement and Janitorial and Day Porter Service | Crothall Healthcare, Inc. | $0.00 |
| Amendment to Agreement | Crothall Healthcare, Inc. | $0.00 |
| Amendment to Agreement | Crothall Healthcare, Inc. | $0.00 |
| Addendum D to Master Service Agreement | Crothall Healthcare, Inc. | $0.00 |
| Letter Agreement | Crowe LLP | $0.00 |
| Consulting Services Agreement | Crowe LLP | $0.00 |
| Employment Contract or Letter | Crystal B Hart | $0.00 |
| Employment Contract or Letter | Crystal M Long | $0.00 |
| Employment Contract or Letter | Crystal Nadareski | $0.00 |
| Services Agreement | CSU | $4,297.97 |
| Services Agreement | Customize It Right LLC | $3,512.97 |
| Employment Contract or Letter | Cynthia Dawn Steele | $0.00 |
| Employment Contract or Letter | Cynthia Lee Patricelli | $0.00 |
| Employment Contract or Letter | Dana Marie Dowling | $0.00 |
| Employment Contract or Letter | Dana Marie Podrasky | $0.00 |
| Employment Contract or Letter | Daneen Kay Hayes | $0.00 |
| Employment Contract or Letter | Daniel M Goolsby | $0.00 |
| Employment Contract or Letter | Daniel Pressner | $0.00 |
| Employment Contract or Letter | Daniel W Whinnen | $0.00 |
| Employment Contract or Letter | Daniel Wade Dunham | $0.00 |
| Employment Contract or Letter | Danielle Ann Clary | $0.00 |
| Employment Contract or Letter | Danielle D Collins | $0.00 |
| Employment Contract or Letter | Danielle L McFaddin | $0.00 |
| Employment Contract or Letter | Danielle Lenee Blakemore | $0.00 |
| Employment Contract or Letter | Danielle N Wilson | $0.00 |
| Employment Contract or Letter | Danielle R Moncada | $0.00 |
| Employment Contract or Letter | Danna Jimenez Torres | $0.00 |
| Employment Contract or Letter | Danny Omar Rivera | $0.00 |
| Employment Contract or Letter | Daphne A. Bagwell | $0.00 |
| Employment Contract or Letter | Daris N Redmon | $0.00 |
| Employment Contract or Letter | Darlene P Strossi | $0.00 |
| Employment Contract or Letter | Darrell M Zaugg | $0.00 |
| Employment Contract or Letter | David Goss | $0.00 |
| Employment Contract or Letter | David K Goolsby | $0.00 |
| Employment Contract or Letter | David Keleher | $0.00 |
| Employment Contract or Letter | David L Modders | $0.00 |
| Employment Contract or Letter | Dawn Carla McCue | $0.00 |
| Employment Contract or Letter | Dawn Davis | $0.00 |
| Employment Contract or Letter | Deanna Nicole Dameron | $0.00 |
| Employment Contract or Letter | Debbie S. Gillespie | $0.00 |
| Employment Contract or Letter | Deborah Jeanne Mills | $0.00 |
| Employment Contract or Letter | Debra A Fisette | $0.00 |
| Employment Contract or Letter | Debra J. Clare | $0.00 |
| Employment Contract or Letter | Debra L. Siwinski | $0.00 |
| Employment Contract or Letter | Deirdre Mahadeo | $0.00 |

| | | |
|---|---|---|
| Directed Trust Agreement | Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Compa | $0.00 |
| Employment Contract or Letter | Delina Marie Chapman | $0.00 |
| Confidential Settlement Agreement and general Release | Deneal Sullivan | $0.00 |
| Employment Contract or Letter | Denise Hopkinson | $0.00 |
| Employment Contract or Letter | Denise Marie O'Connor | $0.00 |
| Employment Contract or Letter | Denise Portillo | $0.00 |
| Employment Contract or Letter | Denise Vinci | $0.00 |
| Employment Contract or Letter | Deon K. Sutherland | $0.00 |
| Employment Contract or Letter | Derrick Carl Dickens | $0.00 |
| Employment Contract or Letter | Derrick Dees | $0.00 |
| Employment Contract or Letter | Desiree Casasnovas-Lopez | $0.00 |
| Employment Contract or Letter | Desiree Hartzell | $0.00 |
| Employment Contract or Letter | Diana Flaker Andrade | $0.00 |
| Employment Contract or Letter | Diana Matos-Brito | $0.00 |
| Employment Contract or Letter | Diane M Ostroski | $0.00 |
| Employment Contract or Letter | Diane S Welzel | $0.00 |
| Employment Contract or Letter | Dianna Iannarino | $0.00 |
| Benefit Advisory and Consulting Services Service Agreement | Digital Insuarance LLC ("ONEDigital") | $0.00 |
| Benefit Advisory and Consulting Services Service Agreement | Digital Insuarance LLC ("ONEDigital") | $0.00 |
| Employment Contract or Letter | Dina Adame | $0.00 |
| Master Services Agreement | DispatchHealth - Florida, Inc. | $0.00 |
| Services Agreement | Dixie Safe and Lock Services LLC | $765.00 |
| Employment Contract or Letter | Dody Lynn Divell | $0.00 |
| Employment Contract or Letter | Dominica Labrie Penny | $0.00 |
| Employment Contract or Letter | Donna K Koss-Bradish | $0.00 |
| Employment Contract or Letter | Donna M Meeks | $0.00 |
| Employment Contract or Letter | Donna M Vitani | $0.00 |
| Employment Contract or Letter | Donna Martinez | $0.00 |
| Employment Contract or Letter | Dorothy Black Love | $0.00 |
| Employment Contract or Letter | Dorrisa Mullen | $0.00 |
| Talent Finder Order Form | Doximity, Inc. | $0.00 |
| Services Agreement | Dr Lakhvir Pabla | $541.98 |
| Services Agreement | Dr. Stephen Rachael | $1,455.09 |
| Employment Contract or Letter | Dustin Whitehead | $0.00 |
| Services Agreement | DynaFire | $706.20 |
| Master Services Agreement | Echo, Inc. | $0.00 |
| Employment Contract or Letter | Edith Waggie | $0.00 |
| Employment Contract or Letter | Edmund G. Lewis | $0.00 |
| Employment Contract or Letter | Edward John Kowalski | $0.00 |
| Employment Contract or Letter | Eileen R Tschirhart | $0.00 |
| Employment Contract or Letter | Elexa C Molinary | $0.00 |
| Employment Contract or Letter | Elisa Marie Romero | $0.00 |
| Employment Contract or Letter | Elizabeth Ann Lewis | $0.00 |
| Employment Contract or Letter | Elizabeth Ann Rush | $0.00 |
| Employment Contract or Letter | Elizabeth Anne Pautler | $0.00 |
| Employment Contract or Letter | Elizabeth M Raquet | $0.00 |
| Employment Contract or Letter | Elizabeth Mann | $0.00 |
| Employment Contract or Letter | Elizabeth Renita Koppel | $0.00 |
| Employment Contract or Letter | Elliot J Sussman | $130,658.74 |
| Promissory Note | Elliot Sussman | $0.00 |
| Employment Contract or Letter | Emilio Noble | $0.00 |
| Employment Contract or Letter | Emily Alexis Guthrie | $0.00 |
| Employment Contract or Letter | Emily Descano | $0.00 |
| Employment Contract or Letter | Emily Elizabeth Ocasio | $0.00 |
| Employment Contract or Letter | Emily Gore | $0.00 |
| Contingency Agreement | Enterprise Medical Recruiting | $0.00 |
| Employment Contract or Letter | Eric Christopher Taupier | $0.00 |
| Employment Contract or Letter | Eric Diaferio | $0.00 |
| Employment Contract or Letter | Ericina Gaines | $0.00 |
| Employment Contract or Letter | Erika Alejandra Ordonez | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | Erisk | $0.00 |
| Employment Contract or Letter | Evelyn T Bonoso Velasco | $0.00 |
| Services Agreement | Executive Livery Service LLC | $240.00 |
| Services Agreement | Expert Cleaning | $150.00 |
| Employment Contract or Letter | Fadia Mola | $0.00 |
| Master Services Agreement and Proposal #002 | Fast Slow Motion, LLC | $0.00 |
| Proposal | Fast Slow Motion, LLC | $0.00 |
| Proposal #: 002 Change Order #: 001 | Fast Slow Motion, LLC | $0.00 |
| Proposal #: 002 Change Order #: 001 | Fast Slow Motion, LLC | $0.00 |
| Employment Contract or Letter | Faustino Ang MACUHA | $0.00 |
| Services Agreement | FedEx | $415.51 |
| Employment Contract or Letter | Felicia Laundry | $0.00 |
| Employment Contract or Letter | Felicia Lynn Marie Bare | $0.00 |
| Virtual Care Services Agreement | First Stop Health, LLC | $0.00 |
| Services Agreement | FitThumb | $1,300.00 |
| Office Building Sublease Agreement and Amendments | Florida Blue Medicare, Inc. | $0.00 |
| Care Collaboration and Data Use Agreement | Florida Cancer Specialists & Research Institute, LLC | $0.00 |
| Care Collaboration and Data Use Agreement | Florida Cancer Specialists & Research Institute, LLC | $0.00 |
| Search Assignment Confirmation Letter and Agreement | Focus Search Partners | $0.00 |
| Engagement - General Employment Matters | Ford & Harrison LLP | $0.00 |
| Rental Agreement | Fort Knox Self Storage – Lady Lake | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Francena Williford | $0.00 |
| Employment Contract or Letter | Frank James Melidona | $0.00 |
| Employment Contract or Letter | Frederick Boado Niegos | $0.00 |
| Direct Hire Recruitment Services | Frederick Fox LLC | $0.00 |
| Excess D&O Side A $5X$20 Policy | Freedom Specialty Insurance Company | $0.00 |
| Excess D&O Side A $5X$5 Policy | Freedom Specialty Insurance Company | $0.00 |
| Services Agreement | Frontier Therapeutics Inc | $844.83 |
| Letter | FTI Consulting, Inc. | $0.00 |
| Recruiting Contract and Supplements | Fuel Medical Group, LLC | $0.00 |
| Recruitment Contract | Fuel Medical Recruiting Services | $0.00 |
| Employment Contract or Letter | Gabrielle Iyoob | $0.00 |
| Services Agreement | GE Healthcare | $560.97 |
| Employment Contract or Letter | Gena L. Winnings | $0.00 |
| Employment Contract or Letter | Genia M Lozinski | $0.00 |
| Employment Contract or Letter | Gillian DiCara | $0.00 |
| Employment Contract or Letter | Gina Renee Carter | $0.00 |
| Services Agreement | Gipson Place Utility | $0.00 |
| Employment Contract or Letter | Giselle Leonard | $0.00 |
| Employment Contract or Letter | Gladis Mata | $0.00 |
| Employment Contract or Letter | Glenda Gail Albers | $0.00 |
| Order Form | Glooko | $0.00 |
| Services Agreement | GN ReSound | $41.90 |
| Engagement Letter | Goodwin Procter LLP | $0.00 |
| Letter | Goodwin Procter LLP | $0.00 |
| Contingency Fee Agreement | Goodwin Recruiting | $0.00 |
| Employment Contract or Letter | Gracie Mae Alley | $0.00 |
| Employment Contract or Letter | Greg J Jun | $0.00 |
| Employment Contract or Letter | Greg Joseph Hawkesworth | $0.00 |
| Employment Contract or Letter | Greg V Freeman | $0.00 |
| Employment Contract or Letter | Haile M Holder | $0.00 |
| Employment Contract or Letter | Hannah Hrab | $0.00 |
| Employment Contract or Letter | Hannah Shuyler | $0.00 |
| Employment Contract or Letter | Harsha Rajashekar | $0.00 |
| Services Agreement | Hawkins, Charles | $20.00 |
| Employment Contract or Letter | Haydee C. Colon | $0.00 |
| Employment Contract or Letter | Haylee Natasha Mathis | $0.00 |
| Employment Contract or Letter | Hayvis Decan Morffe | $0.00 |
| Physician Group Medical Services Agreement and Amendments | Health Options, Inc. | $0.00 |
| Amendment to Physician Group Medical Services Agreement | Health Options, Inc. | $0.00 |
| Services Agreement | Healthcare Support Staffing, Inc. | $0.00 |
| Services Agreement - Criminal Background Check Package | Healthcare Support Staffing, Inc. | $0.00 |
| Services Agreement - Criminal Background Check Package | Healthcare Support Staffing, Inc. | $0.00 |
| Services Agreement | Healthcare Support Staffing, Inc. | $0.00 |
| Services Agreement | HealthStream | $27,098.00 |
| Order Form | HealthStream Inc. | $0.00 |
| Order Form Pricing | HealthStream Inc. | $0.00 |
| Contingency Agreement | Healthwaze, Inc. | $0.00 |
| Employment Contract or Letter | Heather Ann Goss | $0.00 |
| Employment Contract or Letter | Heather Dawn Robinson | $0.00 |
| Employment Contract or Letter | Heather Ellington | $0.00 |
| Employment Contract or Letter | Heather Hanson Vann | $0.00 |
| Employment Contract or Letter | Heather L Stevens | $0.00 |
| Employment Contract or Letter | Heather VanRiet | $0.00 |
| Employment Contract or Letter | Helen Dorothea Grinstead | $0.00 |
| Services Agreement | Henry Schein, Inc. | $1,841.04 |
| Services Agreement | Hills Shred Express | $1,330.00 |
| Direct-Hire Contract/Right to Hire Service Agreement | HireProHealth, LLC | $0.00 |
| Addendum | HireProHealth, LLC | $0.00 |
| Intellectual Property License Agreement and Amendment(s) | Holding Company of The Villages, Inc. | $0.00 |
| Trademark License Agreement | Holding Company of The Villages, Inc. | $0.00 |
| Employment Contract or Letter | Holly Ann Peninger | $0.00 |
| Services Agreement | Honey-Do's LLC | $1,548.92 |
| Employment Contract or Letter | Hugo Bloise | $0.00 |
| Participation Agreement | Humana | $0.00 |
| Participation Agreement | Humana | $0.00 |
| Independent Practice Association Participation Agreement and Amendment | Humana Health Insurance Company of Florida, Inc. | $0.00 |
| Amendment to the Agreement | Humana Health Insurance Company of Florida, Inc. | $0.00 |
| Independent Practice Association Participation Agreement and Amendment | Humana Insurance Company | $0.00 |
| Amendment to the Agreement | Humana Insurance Company, Humana Health Insurance Company of Florida, Inc. | $0.00 |
| Office Building Sublease Agreement and Amendments | Humana Marketpoint, Inc. | $0.00 |
| Independent Practice Association Participation Agreement and Amendment | Humana Medical Plan, Inc. | $0.00 |
| Provider Agreement and Amendment | Ilumed, LLC | $0.00 |
| First Amendment to Participating Provider Agreement | Ilumed, LLC | $0.00 |
| Services Agreement | ImageFirst | $848.46 |
| Business Associate Agreement | In What Language LLC | $0.00 |
| Services Agreement | In What Language LLC | $0.00 |
| Services Agreement | Inferscience | $33,325.95 |
| Master Software as a Service Agreement and Service Order | Inferscience Inc. | $0.00 |
| Services Agreement | Innovative Card Scanning, Inc. dba INUVIO | $3,080.00 |
| Service Order | Interscience | $0.00 |

| | | |
|---|---|---|
| Master Software As a Service Agreement | Interscience Inc. | $0.00 |
| Employment Contract or Letter | Irina Shubov | $0.00 |
| Employment Contract or Letter | Iris Magdalena Marquez | $0.00 |
| Pricing Schedule | Iron Mountain | $0.00 |
| Employment Contract or Letter | Isaida Rodriguez Sanderson | $0.00 |
| Direct Hire Agreement | J. Morrissey | $0.00 |
| Employment Contract or Letter | Jaclyn D Peccia | $0.00 |
| Employment Contract or Letter | Jacob Nathanael Tonsberg | $0.00 |
| Employment Contract or Letter | Jacqueline S Betz | $0.00 |
| Employment Contract or Letter | Jacquelyn Walko | $0.00 |
| Employment Contract or Letter | Jaiastri R. Sankar | $0.00 |
| Employment Contract or Letter | Jake R. Andrews | $0.00 |
| Employment Contract or Letter | Jale Keskin | $0.00 |
| Employment Contract or Letter | Jameka Brown | $0.00 |
| Employment Contract or Letter | James Besong | $0.00 |
| Employment Contract or Letter | James Flaherty | $0.00 |
| Employment Contract or Letter | James Mersey | $0.00 |
| Employment Contract or Letter | James Richard Mahaffey | $0.00 |
| Employment Contract or Letter | James S Wrobel | $0.00 |
| Employment Contract or Letter | Jamie M. Howard | $0.00 |
| Employment Contract or Letter | Jan Crawford West | $0.00 |
| Employment Contract or Letter | Jan Renee Crosser | $0.00 |
| Employment Contract or Letter | Janelle L Hamshar | $0.00 |
| Employment Contract or Letter | Janet F Innis | $0.00 |
| Employment Contract or Letter | Janet L Psaris | $0.00 |
| Employment Contract or Letter | Janet L Wheeler | $0.00 |
| Employment Contract or Letter | Janet Metcalfe | $0.00 |
| Employment Contract or Letter | Janice D Langley | $0.00 |
| Employment Contract or Letter | Janice Trujillo | $0.00 |
| Employment Contract or Letter | Janie M Hathcox | $0.00 |
| Employment Contract or Letter | Janne T Boswell | $0.00 |
| Employment Contract or Letter | Jashawn D Fluitt | $0.00 |
| Employment Contract or Letter | Jasmine Jeanty | $0.00 |
| Employment Contract or Letter | Jean Jun | $0.00 |
| Employment Contract or Letter | Jeanine Marie Baker | $0.00 |
| Employment Contract or Letter | Jeanne Lynn Zimmerman | $0.00 |
| Employment Contract or Letter | Jeannette Marie Souza | $0.00 |
| Employment Contract or Letter | Jeannie A Torres | $0.00 |
| Employment Contract or Letter | Jean-Paul Leroy | $0.00 |
| Employment Contract or Letter | Jeffrey Glenn Snyder | $0.00 |
| Contractor Agreement | Jeisson Certuche | $0.00 |
| Employment Contract or Letter | Jenna Leigh Remington | $0.00 |
| Employment Contract or Letter | Jenna Michele Aliberti | $0.00 |
| Employment Contract or Letter | Jennifer A Ledbetter | $0.00 |
| Employment Contract or Letter | Jennifer A. Belcher | $0.00 |
| Employment Contract or Letter | Jennifer Ann Haack | $0.00 |
| Employment Contract or Letter | Jennifer D Kelly | $0.00 |
| Employment Contract or Letter | Jennifer E Pavlik | $0.00 |
| Employment Contract or Letter | Jennifer E Reinoso | $0.00 |
| Employment Contract or Letter | Jennifer G Miller | $0.00 |
| Employment Contract or Letter | Jennifer J Stetkiewicz | $0.00 |
| Employment Contract or Letter | Jennifer Joy Neumann | $0.00 |
| Employment Contract or Letter | Jennifer L Howlett | $0.00 |
| Employment Contract or Letter | Jennifer Leigh Anderson | $0.00 |
| Employment Contract or Letter | Jennifer M Guzman | $0.00 |
| Employment Contract or Letter | Jennifer M Spiridigliozzi | $0.00 |
| Employment Contract or Letter | Jennifer M. Randall | $0.00 |
| Employment Contract or Letter | Jennifer Marie Baker | $0.00 |
| Employment Contract or Letter | Jennifer N Dauss | $0.00 |
| Employment Contract or Letter | Jennifer Nicole White | $0.00 |
| Employment Contract or Letter | Jennifer R Atkinson | $0.00 |
| Employment Contract or Letter | Jennifer Sackett | $0.00 |
| Employment Contract or Letter | Jennifer Steed | $0.00 |
| Employment Contract or Letter | Jeremy Richard Duncan | $0.00 |
| Employment Contract or Letter | Jessica L. Kubis | $0.00 |
| Employment Contract or Letter | Jessica Lynn Crites | $0.00 |
| Employment Contract or Letter | Jessica Maria Delgadillo | $0.00 |
| Employment Contract or Letter | Jessica Rachael Desmond | $0.00 |
| Employment Contract or Letter | Jessie Ann Junker | $0.00 |
| Employment Contract or Letter | Jill Marie Rongholt | $0.00 |
| Services Agreement | Jim Besong, MD | $953.12 |
| Employment Contract or Letter | Jimmie L. Atkinson | $0.00 |
| Employment Contract or Letter | Jimmy P Ester | $0.00 |
| Employment Contract or Letter | Joan Taccini-Olson | $0.00 |
| Employment Contract or Letter | Joanixia Mary Serrano Castro | $0.00 |
| Employment Contract or Letter | Joanne Kitson | $0.00 |
| Employment Contract or Letter | Jodie S Geller | $0.00 |
| Employment Contract or Letter | Jody L Costanzo | $0.00 |
| Employment Contract or Letter | Jody Spallone | $0.00 |
| Employment Contract or Letter | Jofy Gerard | $0.00 |
| Employment Contract or Letter | John D. Thompson | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | John E Hocutt | $0.00 |
| Employment Contract or Letter | John French Jr. | $0.00 |
| Employment Contract or Letter | John Marshall | $0.00 |
| Employment Contract or Letter | John Michael Murphy | $0.00 |
| Employment Contract or Letter | John R Ross | $0.00 |
| Agreement for Legal Services | Johnson Pope Bokor Ruppel & Burns | $0.00 |
| Employment Contract or Letter | Jolie Ann Remy | $0.00 |
| Employment Contract or Letter | Jordan Taylor Deboer | $0.00 |
| Employment Contract or Letter | Jordynn C Lansford | $0.00 |
| Employment Contract or Letter | Joseph Rios | $0.00 |
| Employment Contract or Letter | Joseph Rizzi | $0.00 |
| Employment Contract or Letter | Joyce Devina Kusuma | $0.00 |
| Employment Contract or Letter | Joyce T. Bridges | $0.00 |
| Employment Contract or Letter | Judith Lynn Thake | $0.00 |
| Employment Contract or Letter | Julia Christ Rochester Greenidge | $0.00 |
| Employment Contract or Letter | Julia Lueallen | $0.00 |
| Employment Contract or Letter | Julia R Solberg | $0.00 |
| Employment Contract or Letter | Julie A Steinberg | $0.00 |
| Employment Contract or Letter | Julie Diane Roberts | $0.00 |
| Employment Contract or Letter | Julie E. Sudduth | $0.00 |
| Employment Contract or Letter | Julie Thompson | $0.00 |
| Employment Contract or Letter | Julie Wuest | $0.00 |
| Employment Contract or Letter | Justin P Pierro | $0.00 |
| Employment Contract or Letter | Justine Nicole Sherman | $0.00 |
| Software-as-a-Service Subscription Agreement | KAID Health, Inc | $0.00 |
| Order Form | KAID Health, Inc. | $0.00 |
| Employment Contract or Letter | Kaitlin Salvadori | $0.00 |
| Employment Contract or Letter | Kaitlyn Paige Lampe | $0.00 |
| Employment Contract or Letter | Kalee A Gordon | $0.00 |
| Employment Contract or Letter | Kaley Caruthers | $0.00 |
| Employment Contract or Letter | Kanika Whitehead | $0.00 |
| Employment Contract or Letter | Karen D Tobin | $0.00 |
| Employment Contract or Letter | Karen L Chabrier | $0.00 |
| Employment Contract or Letter | Karen L Swain | $0.00 |
| Employment Contract or Letter | Karen L Van Es | $0.00 |
| Employment Contract or Letter | Karen Teresa Turner | $0.00 |
| Employment Contract or Letter | Kari L Walker | $0.00 |
| Employment Contract or Letter | Karla Marie Mercado | $0.00 |
| Employment Contract or Letter | Karla Zepeda Aguilar | $0.00 |
| Employment Contract or Letter | Karlene Neil | $0.00 |
| Employment Contract or Letter | Karrie Ann Clausen | $0.00 |
| Employment Contract or Letter | Kate Moore | $0.00 |
| Employment Contract or Letter | Katherine J DaVia | $0.00 |
| Employment Contract or Letter | Katherine R Hildenbrand | $0.00 |
| Employment Contract or Letter | Kathie T Greene | $0.00 |
| Employment Contract or Letter | Kathleen Elizabeth Napier | $0.00 |
| Employment Contract or Letter | Kathrine L Warring | $0.00 |
| Employment Contract or Letter | Kathryn A. Livesay | $0.00 |
| Employment Contract or Letter | Kathryn Ellen Ricks | $0.00 |
| Employment Contract or Letter | Kathryn Leigh Montgomery | $0.00 |
| Employment Contract or Letter | Kathy L Gehlhausen | $0.00 |
| Employment Contract or Letter | Kathy Ourso | $0.00 |
| Employment Contract or Letter | Katie Rose D'agostino | $0.00 |
| Employment Contract or Letter | Kayla C McKenney | $0.00 |
| Employment Contract or Letter | Kayla Music | $0.00 |
| Employment Contract or Letter | Kayla Phillips | $0.00 |
| Employment Contract or Letter | Kaylee M Ramsey | $0.00 |
| Employment Contract or Letter | Kelley Everson | $0.00 |
| Employment Contract or Letter | Kelley Maland | $0.00 |
| Employment Contract or Letter | Kelley Maureen Clifford | $0.00 |
| Employment Contract or Letter | Kelli Ann Kowalski | $0.00 |
| Employment Contract or Letter | Kelly Ann Belanger | $0.00 |
| Employment Contract or Letter | Kelly Ann Buckley | $0.00 |
| Employment Contract or Letter | Kelly K Gallenberger | $0.00 |
| Employment Contract or Letter | Kelly L Bennett | $0.00 |
| Employment Contract or Letter | Kelly L. Hogan | $0.00 |
| Employment Contract or Letter | Kelly Lynn Deboer | $0.00 |
| Employment Contract or Letter | Kelly Lynn Schwan | $0.00 |
| Employment Contract or Letter | Kenneth Randolph | $0.00 |
| Employment Contract or Letter | Kent Alan Kirby | $0.00 |
| Services Agreement | Kereeis LLC | $1,438.00 |
| Master Software as a Service Agreement | Kestrel Software LLC | $0.00 |
| Master "Software as a Service" Agreement | Kestrel Software LLC | $0.00 |
| Employment Contract or Letter | Kiana D McIntyre | $0.00 |
| Employment Contract or Letter | Kimberly Ann Farmer | $0.00 |
| Employment Contract or Letter | Kimberly Ann Guzman | $0.00 |
| Employment Contract or Letter | Kimberly D. Spurgeon | $0.00 |
| Employment Contract or Letter | Kimberly Elizabeth Gentry | $0.00 |
| Employment Contract or Letter | Kimberly J Basham | $0.00 |
| Employment Contract or Letter | Kimberly Leighan Tidwell | $0.00 |
| Employment Contract or Letter | Kimberly Mae Behney | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Kimberly T. Weaver | $0.00 |
| Employment Contract or Letter | Kimberly Venarchick | $0.00 |
| Employment Contract or Letter | Kimberly Wollett Giovannelli | $0.00 |
| Employment Contract or Letter | Kira Lynn Kaminski | $0.00 |
| Services Agreement | Kirsha, LLC | $0.00 |
| Services Agreement | Kirsha, LLC | $0.00 |
| Employment Contract or Letter | Korey Ann Goodwin | $0.00 |
| Engagement Letter | KPMG LLP | $0.00 |
| Engagement Letter | KPMG LLP | $0.00 |
| Engagement Letter re: Confirmation to Provide Services | KPMG LLP | $0.00 |
| Employment Contract or Letter | Kristen C. Smith | $0.00 |
| Employment Contract or Letter | Kristen Michelle Hubbard | $0.00 |
| Employment Contract or Letter | Kristin DeBusk | $0.00 |
| Employment Contract or Letter | Kristin H Gordon | $0.00 |
| Employment Contract or Letter | Kristina M Azar | $0.00 |
| Employment Contract or Letter | Krystine Cortes Bou | $0.00 |
| Employment Contract or Letter | Kyle Jernigan | $0.00 |
| Services Agreement | Laboratory Corp of America | $27.80 |
| Services Agreement | Laboratory Corp of America Hdg | $975.41 |
| Services Agreement | Laborie Medical | $2,225.06 |
| Employment Contract or Letter | Lacey Myers | $0.00 |
| Employment Contract or Letter | Ladonna F. Collinsworth | $0.00 |
| Agreement | Lake Technical Center, Inc. | $0.00 |
| Employment Contract or Letter | Lakhvir Pabla | $0.00 |
| Employment Contract or Letter | Lakshmidevi Persaud | $0.00 |
| Letter Re: Dosimetry Services for Radiation Monitoring | Landauer, Inc. | $0.00 |
| Employment Contract or Letter | Larissa L Turner | $0.00 |
| Employment Contract or Letter | Lashaundra Gray | $0.00 |
| Employment Contract or Letter | Latefa L. Masoline | $0.00 |
| Employment Contract or Letter | Latifah Sabree | $0.00 |
| Employment Contract or Letter | Latisha Shephard | $0.00 |
| Employment Contract or Letter | Laura Anne Williams | $0.00 |
| Employment Contract or Letter | Laura Butler Bass | $0.00 |
| Employment Contract or Letter | Laura Marie Budill | $0.00 |
| Employment Contract or Letter | Laura T Cloukey | $0.00 |
| Employment Contract or Letter | Lauralee Golightly | $0.00 |
| Employment Contract or Letter | Lauren Elizabeth Bartram | $0.00 |
| Employment Contract or Letter | Lauren M Hana | $0.00 |
| Employment Contract or Letter | Lauren Watts | $0.00 |
| Employment Contract or Letter | Laurie L. Johnson | $0.00 |
| Employment Contract or Letter | Laurie Zlotek | $0.00 |
| Employment Contract or Letter | Lawanna Renae Young | $0.00 |
| Employment Contract or Letter | Laynee Aleise Bibler | $0.00 |
| Employment Contract or Letter | Leanne Alaine McGuire | $0.00 |
| Employment Contract or Letter | Leanne Carnivale | $0.00 |
| Employment Contract or Letter | Lela C. Johnson | $0.00 |
| Services Agreement | Lenovo Inc | $2,648.38 |
| Services Agreement | LifeSource Medical | $2,582.50 |
| Employment Contract or Letter | Lina Fernandez | $0.00 |
| Employment Contract or Letter | Linda G Gibson | $0.00 |
| Employment Contract or Letter | Linda Kay Marts | $0.00 |
| Employment Contract or Letter | Linda L. Riccio | $0.00 |
| Employment Contract or Letter | Linda Marie Camilleri | $0.00 |
| Employment Contract or Letter | Linda Marie Lupica | $0.00 |
| Employment Contract or Letter | Lindsey Danielle Garcia | $0.00 |
| Employment Contract or Letter | Lindsey Hope Hale | $0.00 |
| Employment Contract or Letter | Lisa A. Ronan | $0.00 |
| Employment Contract or Letter | Lisa Ann Smith | $0.00 |
| Employment Contract or Letter | Lisa Hawk Bueter | $0.00 |
| Employment Contract or Letter | Lisa Hemminger | $0.00 |
| Employment Contract or Letter | Lisa J. Hernandez | $0.00 |
| Employment Contract or Letter | Lisa Jo Jones | $0.00 |
| Employment Contract or Letter | Lisa L. Edwards | $0.00 |
| Employment Contract or Letter | Lisa M Gonzalez | $0.00 |
| Employment Contract or Letter | Lisa Marie Pierro | $0.00 |
| Employment Contract or Letter | Lisa Marie Taylor | $0.00 |
| Employment Contract or Letter | Lisa Middleton | $0.00 |
| Employment Contract or Letter | Lisette Flores | $0.00 |
| Cyber Liability Policy | Lloyds America | $0.00 |
| Med Defense (E&O) Policy | Lloyds America | $0.00 |
| Paramedics at Home Program Services Agreement | Local Health Council of East Central Florida, Inc. | $0.00 |
| Employment Contract or Letter | Loni Kay Williams | $0.00 |
| Employment Contract or Letter | Lori A Vaccaro | $0.00 |
| Employment Contract or Letter | Lori Ann Kramer | $0.00 |
| Employment Contract or Letter | Lori Phipps | $0.00 |
| Employment Contract or Letter | Lorrie A Moneymaker | $0.00 |
| Employment Contract or Letter | Lourdes Berrios | $0.00 |
| Services Agreement | LRMC Medical Staff | $800.00 |
| Services Agreement | LSSA | $1,468.52 |
| Employment Contract or Letter | Luke Isaiah Flores | $0.00 |
| Employment Contract or Letter | Lydia Ann Hartney | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Lynikia S Gray | $0.00 |
| Services Agreement | M&S Air Conditioning | $2,625.00 |
| Employment Contract or Letter | Madeline Caraballo Gonzalez | $0.00 |
| Employment Contract or Letter | Madhu L Sharma | $0.00 |
| Employment Contract or Letter | Maggie Flatt | $0.00 |
| Employment Contract or Letter | Maggie McClarnon Johnson | $0.00 |
| Employment Contract or Letter | Makenzie Hope Carrier | $0.00 |
| Employment Contract or Letter | Mandy Gayle Pimental | $0.00 |
| Employment Contract or Letter | Mandy M Pinney | $0.00 |
| Employment Contract or Letter | Manuel Martinez | $0.00 |
| Master Services Agreement | Many Hats, LLC | $0.00 |
| Statement of Work | Many Hats, LLC | $0.00 |
| Master Services Agreement | Many Hats, LLC | $0.00 |
| Employment Contract or Letter | Marcol Gonzales | $0.00 |
| Employment Contract or Letter | Marcy Ann Christopher | $0.00 |
| Employment Contract or Letter | Margaret Stott | $0.00 |
| Employment Contract or Letter | Maria E Melendez | $0.00 |
| Employment Contract or Letter | Maria Eugenia Parker | $0.00 |
| Employment Contract or Letter | Maria Nicole Rocker | $0.00 |
| Employment Contract or Letter | Marietta Milton | $0.00 |
| Employment Contract or Letter | Marigrace Brumley | $0.00 |
| Services Agreement | Marion CPR, Inc | $810.00 |
| Employment Contract or Letter | Marisel R Chibas | $0.00 |
| Employment Contract or Letter | Marisol Perez | $0.00 |
| Employment Contract or Letter | Marjorie Goolsby | $0.00 |
| Employment Contract or Letter | Mark Nagy Samuel Basily | $0.00 |
| Excess D&O S5X$5 Policy | Markel American Insurance Company | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | Markel American Insurance Company | $0.00 |
| Employment Contract or Letter | Marlene Dee Garcia | $0.00 |
| Employment Contract or Letter | Marsha Elaine Henry | $0.00 |
| Employment Contract or Letter | Marsha Janeczko | $0.00 |
| Employment Contract or Letter | Marshalyne Major | $0.00 |
| Employment Contract or Letter | Marsue A May | $0.00 |
| Employment Contract or Letter | Mary A George | $0.00 |
| Employment Contract or Letter | Mary Catherine Allen | $0.00 |
| Employment Contract or Letter | Mary Elizabeth Pliego | $0.00 |
| Employment Contract or Letter | Mary Grace S Tanangkingsing | $0.00 |
| Employment Contract or Letter | Mary Maelin McFaddin | $0.00 |
| Employment Contract or Letter | Mary Melati Busto | $0.00 |
| Employment Contract or Letter | Maryame Bousfiha | $0.00 |
| Services Agreement | Massey Services | $128.00 |
| Services Agreement | Matheson Tri-Gas Inc. | $221.36 |
| Employment Contract or Letter | Mathew Elijah Flores | $0.00 |
| Employment Contract or Letter | Matthew Andrew Shlapack | $0.00 |
| Employment Contract or Letter | Matthew C Snow | $0.00 |
| Employment Contract or Letter | Matthew David Pletka | $0.00 |
| Employment Contract or Letter | Maureen E Bugnacki | $0.00 |
| Employment Contract or Letter | Max Wesley Andrade Silva | $0.00 |
| Independent Contractor Agreement and Amendment | Maxwell College | $0.00 |
| Independent Contractor Agreement | Maxwell College | $0.00 |
| First Amendment To Independent Contractor Agreement | Maxwell College | $0.00 |
| Employment Contract or Letter | Maya Satmary | $0.00 |
| Services Agreement | MBK Electric, Inc. | $6,626.38 |
| Purchase Order | McKesson | $0.00 |
| Services Agreement | McKesson Medical-Surgical (PO) | $5,775.25 |
| Employment Contract or Letter | Mechelle A. Sanders | $0.00 |
| Master Subscription Agreement and Modified Sales Order | Medical Design Technologies | $0.00 |
| Master Subscription Agreement/ EULA | Medical Design Technologies | $0.00 |
| Services Agreement | Medical Design Technologies, LLC | $512.03 |
| Services Agreement | Medical Professionals | $0.00 |
| Services Agreement | Medline Industries, Inc. | $44.33 |
| Medical Malpractice Policy | MedPro Group | $0.00 |
| Employment Contract or Letter | Megan N Terrell | $0.00 |
| Employment Contract or Letter | Melanie L Mendoza | $0.00 |
| Employment Contract or Letter | Melanie Marquez Rodriguez | $0.00 |
| Employment Contract or Letter | Melia Rose Steinbacher | $0.00 |
| Employment Contract or Letter | Melinda Susan Wiley | $0.00 |
| Employment Contract or Letter | Melissa A Finney | $0.00 |
| Employment Contract or Letter | Melissa Ann Dement | $0.00 |
| Employment Contract or Letter | Melissa Ann Dunham | $0.00 |
| Employment Contract or Letter | Melissa Ann Jacob | $0.00 |
| Employment Contract or Letter | Melissa B Vealey | $0.00 |
| Employment Contract or Letter | Melissa D. Moll | $0.00 |
| Employment Contract or Letter | Melissa E Vincent | $0.00 |
| Employment Contract or Letter | Melissa Joy Kelly | $0.00 |
| Employment Contract or Letter | Melissa L Trumpy | $0.00 |
| Employment Contract or Letter | Melissa Riexinger Swope | $0.00 |
| Employment Contract or Letter | Melody Voorheis | $0.00 |
| Organizational Membership Agreement | MGMA | $0.00 |
| Employment Contract or Letter | Mia C Green | $0.00 |
| Employment Contract or Letter | Mia Huff | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Mia Maestre | $0.00 |
| Employment Contract or Letter | Michael Brandon Sparks | $0.00 |
| Employment Contract or Letter | Michael Daugherty | $0.00 |
| Employment Contract or Letter | Michael E Clifford | $0.00 |
| Employment Contract or Letter | Michael Reed | $0.00 |
| Employment Contract or Letter | Michael Robert Valdes | $0.00 |
| Employment Contract or Letter | Michael Roy Young | $0.00 |
| Independent Contractor Agreement | Michael Rusnak | $0.00 |
| Employment Contract or Letter | Michele Franz | $0.00 |
| Employment Contract or Letter | Michell Ann Garner | $0.00 |
| Employment Contract or Letter | Michelle Davine Bernard | $0.00 |
| Employment Contract or Letter | Michelle Kirsten Smith | $0.00 |
| Employment Contract or Letter | Michelle Lehman | $0.00 |
| Employment Contract or Letter | Michelle Marie Simpson | $0.00 |
| Employment Contract or Letter | Michelle Rae Aleman | $0.00 |
| HIPPA Business Associate Agreement | Microsoft | $0.00 |
| Employment Contract or Letter | Miguel Andres Mantilla | $0.00 |
| Employment Contract or Letter | Mikki Lynn Digaetano | $0.00 |
| Employment Contract or Letter | Mildred Danielle Cherry | $0.00 |
| License Agreement | Milliman, Inc. | $0.00 |
| Employment Contract or Letter | Mireya Mahaffey | $0.00 |
| Employment Contract or Letter | Mirko Roethlisberger | $0.00 |
| Employment Agreement | Mirko Roethlisberger, MD | $0.00 |
| Employment Contract or Letter | Misty Jewell | $0.00 |
| Employment Contract or Letter | Monica A Urbaez | $0.00 |
| Employment Contract or Letter | Monica L Marrero | $0.00 |
| Employment Contract or Letter | Monica Rae Rortvedt | $0.00 |
| Institutional Consulting Agreement for Participant Directed Retirement Plans | Morgan Stanley Smith Barney LLC | $0.00 |
| Employment Contract or Letter | Mykala L Wimbish | $0.00 |
| Business Associate Agreement | Myriad Genetics | $0.00 |
| Employment Contract or Letter | Nadia L Hughes | $0.00 |
| Employment Contract or Letter | Nancy Marie Robbins | $0.00 |
| Employment Contract or Letter | Nancy Nolte Valenta | $0.00 |
| Employment Contract or Letter | Nancy Sawyer Hite | $0.00 |
| Employment Contract or Letter | Nancy T Grebenor | $0.00 |
| Employment Contract or Letter | Na'She Grant | $0.00 |
| Services Agreement | Natus Medical Inc | $1,702.06 |
| Functional Requirements Document | Net at Work | $0.00 |
| Sage Intacct Implementation Proposal | Net at Work | $0.00 |
| Change Request | Net at Work | $0.00 |
| Functional Requirements Document | NetatWork | $0.00 |
| Change Request | NetatWork | $0.00 |
| Proposal | NetatWork | $0.00 |
| Employment Contract or Letter | Netrali S Patel | $0.00 |
| Office Building Sublease Agreement | Network Insurance Senior Health Division ALG, LLC | $0.00 |
| General Staffing Agreement | Networks Connect Healthcare Staffing, LLC | $0.00 |
| Master Hosted Services Agreement | NeuroFlow | $0.00 |
| Master Hosted Services Agreement | NeuroFlow Inc | $0.00 |
| Employment Contract or Letter | Neutt Diamse Dellareeda | $0.00 |
| Services Agreement | Nichols Construction Services | $835.95 |
| Employment Contract or Letter | Nicole B Pennels | $0.00 |
| Employment Contract or Letter | Nicole Danielle Votour | $0.00 |
| Employment Contract or Letter | Nicole Dinnall | $0.00 |
| Employment Contract or Letter | Nicole K Cawvey | $0.00 |
| Employment Contract or Letter | Nicole Lorraine Anderson | $0.00 |
| Employment Contract or Letter | Nicole Marie Southcott | $0.00 |
| Employment Contract or Letter | Nicole Michell Chapuseaux-Taylor | $0.00 |
| Employment Contract or Letter | Nikia Deshae Wilcox | $0.00 |
| Employment Contract or Letter | Nitzylee Rodriguez | $0.00 |
| Employment Contract or Letter | Nora Rae Bruins | $0.00 |
| Master Services Agreement | Norwood Staffing Solutions | $0.00 |
| Statement of Work + Business Associate Agreement | Norwood Staffing Solutions LLC | $0.00 |
| Mutual Non-Disclosure Agreement | Norwood Staffing Solutions LLC | $0.00 |
| Master Services Agreement | Norwood Staffing Solutions LLC | $0.00 |
| Terms & Conditions | NP Now, LLC | $0.00 |
| Services Agreement | NSU | $1,007.95 |
| Services Agreement | Nuance Communications Inc | $510.63 |
| Services Agreement | Nupur Technologies, LLC | $707.33 |
| Services Agreement | Oaktree Products, Inc. | $255.14 |
| Employment Contract or Letter | Obie L. Ramsay | $0.00 |
| Master Subscription Agreement | Okta, Inc. | $0.00 |
| Master Subscription Agreement | Okta, Inc. | $0.00 |
| Employment Contract or Letter | Olivia Sliwa | $0.00 |
| Services Agreement | Olympus America Inc | $8,532.92 |
| Employment Contract or Letter | Omar Torres | $0.00 |
| Services Agreement | OnePacs, LLC | $6,800.16 |
| Master Services Agreement | OPN Healthcare, Inc. | $0.00 |
| Master Services Agreement | OPN Healthcare, Inc. | $0.00 |
| Master Services Agreement | OPN Healthcare, Inc. | $0.00 |
| Equipment Lease Agreement and Amendment | Orthopedic Care Partners Management, LLC | $0.00 |
| Business Enhancement Support Plus Rewards Program Enrollment Form | Oticon Inc | $0.00 |

| | | |
|---|---|---|
| Services Agreement | Oticon Inc. | $1,633.18 |
| Employment Contract or Letter | Pamela A Pengilly | $0.00 |
| Employment Contract or Letter | Pamela A Snyder | $0.00 |
| Employment Contract or Letter | Pamela A. Repko | $0.00 |
| Employment Contract or Letter | Pamela K Iserloth | $0.00 |
| Employment Contract or Letter | Pamela Sue Clift | $0.00 |
| Employment Contract or Letter | Pamela Susan Wise | $0.00 |
| Employment Contract or Letter | Pammie Koerwitz | $0.00 |
| Administrative Services Agreement | Pathways Clinical Partners, LLC | $0.00 |
| Administrative Services Agreement | Pathways Clinical Partners, LLC | $0.00 |
| Employment Contract or Letter | Patricia A Tubbs | $0.00 |
| Employment Contract or Letter | Patricia Ann Knapp | $0.00 |
| Employment Contract or Letter | Patricia Eileen Smith | $0.00 |
| Employment Contract or Letter | Patricia O'Rourke | $0.00 |
| Employment Contract or Letter | Patrick Dawson Kelly | $0.00 |
| Employment Contract or Letter | Patrick John Chunn | $0.00 |
| Employment Contract or Letter | Patrick T Daskol | $0.00 |
| Employment Contract or Letter | Paul A Luzynski | $0.00 |
| Employment Contract or Letter | Paula Levin | $0.00 |
| Employment Contract or Letter | Pauline Marie Meyers | $0.00 |
| Agreement Applicable to Certain Cloud Services Provided by Microsoft and Con | PC Connection Inc. | $0.00 |
| Service Agreement | People 2.0 North America, LLC | $0.00 |
| Order Form | PerfectServe, Inc | $0.00 |
| Business Associate Agreement | PerfectServe, Inc | $0.00 |
| Contingency Placement Agreement | Permanent Placement Resources, LLC | $0.00 |
| Recruitment Services Agreement | Phaidon International (US) Inc. | $0.00 |
| Employment Contract or Letter | Philip James | $0.00 |
| Employment Contract or Letter | Phuong-Thi Ngoc Tran | $0.00 |
| Services Agreement | Physicians Care Network | $240.00 |
| Office Building Sublease Agreement and Amendments | Pinnacle Financial Services Group LLC | $0.00 |
| Services Agreement | Pitsch Plumbing Service Inc | $65.00 |
| Services Agreement | PMA Lender LLC | $843.00 |
| Master Secured Promissory Note | PMA Lender LLC | $0.00 |
| Security Agreement | PMA Lender LLC | $0.00 |
| Line of Credit Letter Agreement and Supplements | PMA Lender LLC | $0.00 |
| Deposit Account Control Agreement | PMA Lender LLC | $0.00 |
| Services Agreement | PMI South Inc. | $33,842.20 |
| Online Agreement | PracticeLink Online | $0.00 |
| License Agreement | Practicematch Corporation | $0.00 |
| License Agreement | Practicematch Corporation | $0.00 |
| License Agreement | Practicematch Corporation | $0.00 |
| Employment Contract or Letter | Pranav Ravi | $0.00 |
| Sales Proposal | Prestige Medical Imaging | $0.00 |
| Services Agreement | Pride Solutions LLC | $70.00 |
| Directed Trust Agreement | Principal Trust Company | $0.00 |
| Employment Contract or Letter | Priscilla Hernandez | $0.00 |
| Employment Contract or Letter | Priscilla J Myers | $0.00 |
| Professional Services Work Order | Prophix | $0.00 |
| Services Agreement | Prophix Software Inc | $1,047.67 |
| Initial Cloud Services Order and Supplements | Prophix Software Inc. | $0.00 |
| Cloud Reconfiguration Order Form | Prophix Software Inc. | $0.00 |
| Initial Cloud Services Order | Prophix Software Inc. | $0.00 |
| Master Agreement | Protenus, Inc | $0.00 |
| Master Agreement | Protenus, Inc. | $0.00 |
| Services Agreement | Quest Diagnostics | $202.25 |
| Project Work Order | R Systems | $0.00 |
| Project Work Order | R Systems | $0.00 |
| Project Work Order | R Systems | $0.00 |
| Project Work Order - Amendment | R Systems | $0.00 |
| Services Agreement | R Systems International Limited | $19,150.00 |
| Master Services Agreement | R Systems International Ltd. | $0.00 |
| Business Associate Agreement | R Systems International Ltd. | $0.00 |
| Project Work Order | R Systems International Ltd. | $0.00 |
| Project Work Order | R Systems International Ltd. | $0.00 |
| Project Work Order | R Systems International Ltd. | $0.00 |
| Project Work Order | R Systems International Ltd. | $0.00 |
| Master Services Agreement | R Systems International Ltd. | $0.00 |
| Employment Contract or Letter | Rachael D Hall | $0.00 |
| Employment Contract or Letter | Rachel Jacob | $0.00 |
| Employment Contract or Letter | Rachel Lea Sabol | $0.00 |
| Professional Services Agreement | Radiology Associates of Central Florida | $0.00 |
| Professional Services Agreement | Radiology Associates of Central Florida | $0.00 |
| Professional Services Agreement | Radiology Associates of Central Florida | $0.00 |
| Professional Services Agreement | Radiology Associates of Central Florida | $0.00 |
| Health Master Services Agreement | Radix Health, Inc | $0.00 |
| First Amendment to Health Master Services Agreement | Radix Health, Inc | $0.00 |
| Second Amendment to Health Master Services Agreement | Radix Health, Inc | $0.00 |
| Second Amendment to Health Master Services Agreement | Radix Health, Inc | $0.00 |
| Health Master Services Agreement | Radix Health, Inc | $0.00 |
| Master Services Agreement and Amendment | Radix Health, Inc. | $0.00 |
| Non-Executive Direct Hire Search Agreement | Randstad Professionals US, LLC, dba Tatum | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Rani Marie Powierza | $0.00 |
| Employment Contract or Letter | Ravean Jackson | $0.00 |
| Employment Contract or Letter | Raymond J Mis | $0.00 |
| Employment Contract or Letter | Rebecca Ann Eberly | $0.00 |
| Employment Contract or Letter | Rebecca L Byars | $0.00 |
| Employment Contract or Letter | Rebecca L Craven | $0.00 |
| Employment Contract or Letter | Rebecca L Flynt | $0.00 |
| Employment Contract or Letter | Rebecca Lael Morehead | $0.00 |
| Employment Contract or Letter | Rebecca M Ware | $0.00 |
| Order Form | Relatient | $0.00 |
| Services Agreement | Relatient, Inc | $0.00 |
| Order Form | Relatient, Inc | $0.00 |
| Sales Order | Relaymed | $0.00 |
| Employment Contract or Letter | Rica Ramos-Keenum | $0.00 |
| Employment Contract or Letter | Richard S. Hoffer | $0.00 |
| Services Agreement | RLS (USA) Inc | $4,634.88 |
| Employment Contract or Letter | Robert A. Skotnicki | $0.00 |
| Employment Contract or Letter | Robert Buckley | $0.00 |
| Employment Contract or Letter | Robert C Reilly | $0.00 |
| Employment Contract or Letter | Robert E Appleby | $0.00 |
| Employment Contract or Letter | Robert L Herman | $0.00 |
| Employment Contract or Letter | Roberta Gayle Simoneau | $0.00 |
| Services Agreement | Roberts Oxygen Company, Inc | $518.16 |
| Employment Contract or Letter | Robin Fiedler | $0.00 |
| Employment Contract or Letter | Robin M Moore | $0.00 |
| Employment Contract or Letter | Robin Paquette | $0.00 |
| Employment Contract or Letter | Robyn Bolduc | $0.00 |
| Employment Contract or Letter | Robyn M Merrill | $0.00 |
| Employment Contract or Letter | Rochelle Frazier | $0.00 |
| Employment Contract or Letter | Roger J. Madore | $0.00 |
| Marketing Services and Support Agreement | Roger West, LLC | $0.00 |
| Marketing Services and Support Agreement | Roger West, LLC | $0.00 |
| Employment Contract or Letter | Roland R More | $0.00 |
| Rental Agreement | Rolling Acres Self Storage, LLC | $0.00 |
| Employment Contract or Letter | Ronald Grose | $0.00 |
| Employment Contract or Letter | Ronald K Herb | $0.00 |
| Employment Contract or Letter | Rosa De Carvalho | $0.00 |
| Employment Contract or Letter | Rosa Hermida | $0.00 |
| Employment Contract or Letter | Rosalyn Wahler | $0.00 |
| Employment Contract or Letter | Rosario Rose Camitoc | $0.00 |
| Employment Contract or Letter | Rosario Samson Snow | $0.00 |
| Employment Contract or Letter | Rose Mary Frausto | $0.00 |
| Employment Contract or Letter | Roshni S Samuel | $0.00 |
| Employment Contract or Letter | Roxana Montelongo | $0.00 |
| Employment Contract or Letter | Roxana Portillo | $0.00 |
| Employment Contract or Letter | Roxanne Elizabeth Storm | $0.00 |
| Employment Contract or Letter | Roxanne P Johnson | $0.00 |
| Excess D&O $5X$15 Extension Policy | RSUI Indemnity Company | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | RSUI Indemnity Company | $0.00 |
| Employment Contract or Letter | Rubie Pantera Tamayo | $0.00 |
| Services Agreement | RxCompass | $8,775.00 |
| Program Agreement | RxCompass | $0.00 |
| Program Agreement | RxCompass, LLC | $0.00 |
| First Amendment to Program Agreement | RxCompass, LLC | $0.00 |
| Employment Contract or Letter | Sabrina Cotta | $0.00 |
| Employment Contract or Letter | Sabrina L Davelt | $0.00 |
| Main Services Agreement and Supplement | Salesforce.com | $0.00 |
| Main Services Agreement | Salesforce.com, Inc. | $0.00 |
| Employment Contract or Letter | Sally J Culberson | $0.00 |
| Employment Contract or Letter | Samantha Johnson | $0.00 |
| Employment Contract or Letter | Samantha Nelson | $0.00 |
| Candidate Placement Agreement | Samuel Contract Staffing, LLC | $0.00 |
| Employment Contract or Letter | Samuel Joel Estochen | $0.00 |
| Employment Contract or Letter | Sandra Duff | $0.00 |
| Employment Contract or Letter | Sandra Francheska Landers | $0.00 |
| Employment Contract or Letter | Sandra L. Walsh | $0.00 |
| Employment Contract or Letter | Sandra Silvestri | $0.00 |
| Employment Contract or Letter | Sandy Ann Foreman | $0.00 |
| Services Agreement | Sanofi Pasteur Inc. | $0.00 |
| Employment Contract or Letter | Sara Elizabeth Gosik | $0.00 |
| Employment Contract or Letter | Sara Ishaq | $0.00 |
| Employment Contract or Letter | Sarah Jespersen | $0.00 |
| Employment Contract or Letter | Sarah L. Zimmerman | $0.00 |
| Employment Contract or Letter | Sarah M Makarewicz | $0.00 |
| Employment Contract or Letter | Sarah May Smith-Guinyard | $0.00 |
| Employment Contract or Letter | Saul Rosenblum | $0.00 |
| Employment Contract or Letter | Savanna Westmoreland | $0.00 |
| Employment Contract or Letter | Savitri Devi Thompson | $0.00 |
| Employment Contract or Letter | Schanda R Strawder | $0.00 |
| Excess D&O $5X$10 Extension Policy | Scottsdale Indemnity Company | $0.00 |
| Services Agreement | Screen Vision Media | $1,125.00 |

| | | |
|---|---|---|
| Services Agreement | Seara Health LLC | $19,972.15 |
| Master Subscription & Services Agreement and Statements of Work | Seara Health, LLC | $0.00 |
| Master Subscription & Services Agreement MSA 10004 | Seara Health, LLC | $0.00 |
| Statement of Work 1053 | Seara Health, LLC | $0.00 |
| Statement of Work 1044 | Seara Health, LLC | $0.00 |
| Services Agreement | SECO ENERGY | $8,318.50 |
| Participation Agreement | SEI Trust Company | $0.00 |
| Participation Agreement | SEI Trust Company | $0.00 |
| Employment Contract or Letter | Shaddai M Hernandez | $0.00 |
| Employment Contract or Letter | Shanderia A Miles | $0.00 |
| Employment Contract or Letter | Shannon D Carrico | $0.00 |
| Employment Contract or Letter | Shantreace Gordon | $0.00 |
| Employment Contract or Letter | Sharda Deoranie Boodhoo | $0.00 |
| Employment Contract or Letter | Sharlene Tamatha Wolfe | $0.00 |
| Employment Contract or Letter | Sharon L Peterson | $0.00 |
| Employment Contract or Letter | Sharon Lynn O'Brian | $0.00 |
| Employment Contract or Letter | Shaun Lea Santoro | $0.00 |
| Employment Contract or Letter | Shavell Sutherland | $0.00 |
| Employment Contract or Letter | Shawanda L Hamilton | $0.00 |
| Employment Contract or Letter | Shayla McIntyre | $0.00 |
| Employment Contract or Letter | Sheila A Thomas | $0.00 |
| Employment Contract or Letter | Shelby Fauntleroy | $0.00 |
| Employment Contract or Letter | Shelby Vordemark | $0.00 |
| Employment Contract or Letter | Shelia Moore-Faine | $0.00 |
| Employment Contract or Letter | Siddharth Dhar | $0.00 |
| Services Agreement | Siemens Medical Solutions USA Inc | $6,018.75 |
| Clinical Affiliation Agreement | Simmons University | $0.00 |
| Staffing Services Agreement | SkyBridge Healthcare | $0.00 |
| Employment Contract or Letter | Smita Ojha | $0.00 |
| Employment Contract or Letter | Sobia Ahmad | $0.00 |
| Services Agreement | Solventum Health Information Systems, Inc. | $8,477.83 |
| Services Agreement | Sonova USA Inc | $19,959.12 |
| Services Agreement | Sonova USA Inc | $0.00 |
| Employment Contract or Letter | Sonya Leatrice Fitch | $0.00 |
| Pharmacy Products and Services Administration Agreement and Amendment | Southern Scripts, LLC d/b/a Liviniti, LLC | $0.00 |
| Pharmacy Products and Services Administration Agreement | Southern Scripts, LLC d/b/a Liviniti, LLC | $0.00 |
| First Amendment to Pharmacy Products and Services Administration Agreement | Southern Scripts, LLC d/b/a Liviniti, LLC | $0.00 |
| Client Services Agreement | SphereCommerce | $0.00 |
| Client Services Agreement | SphereCommerce, LLC | $464.65 |
| Services Agreement | SphereCommerce, LLC | $0.00 |
| Client Services Agreement | SphereCommerce, LLC | $0.00 |
| Direct Hire Fee Schedule and Agreement | Spherion Staffing, LLC | $0.00 |
| Services Agreement | Spring Crest Blinds & Shutters | $85.00 |
| Employment Contract or Letter | Stacey Bowstring | $0.00 |
| Employment Contract or Letter | Stacie Shepherd | $0.00 |
| Employment Contract or Letter | Stanley Rodriguez Bureros | $0.00 |
| Services Agreement | Staples (Atlanta-PO) | $194.64 |
| Facilities Solutions Equipment Agreement | Staples Contract & Commercial LLC | $0.00 |
| Breakroom Solutions Standard Program Equipment Agreement | Staples Contract & Commercial LLC | $0.00 |
| Services Agreement | Starkey Laboratories, Inc | $22,727.85 |
| Services Agreement | State Farm | $378.10 |
| Services Contract | Stealth Partner Group, LLC | $0.00 |
| Employment Contract or Letter | Stephanie Aaron Lee Brissette | $0.00 |
| Employment Contract or Letter | Stephanie Ann Diaz | $0.00 |
| Employment Contract or Letter | Stephanie Ann Langston | $0.00 |
| Employment Contract or Letter | Stephanie Ann Lein | $0.00 |
| Employment Contract or Letter | Stephanie Denise Cline | $0.00 |
| Employment Contract or Letter | Stephanie L Hicks | $0.00 |
| Employment Contract or Letter | Stephanie L McGlothlin | $0.00 |
| Employment Contract or Letter | Stephanie Lynn Reimel | $0.00 |
| Employment Contract or Letter | Stephanie Rose Scott | $0.00 |
| Employment Contract or Letter | Stephen Fields | $0.00 |
| Employment Contract or Letter | Stephen J Sandler | $0.00 |
| Employment Contract or Letter | Stephen T Richardson | $0.00 |
| Employment Contract or Letter | Stephen Troy Rachael | $0.00 |
| Recruitment Agreement | Sterling Physician Recruiters, LLC | $0.00 |
| Contingency Search Agreement | Steven Douglas Associates, LLC | $0.00 |
| Employment Contract or Letter | Steven R Siddell | $0.00 |
| Employment Contract or Letter | Steven S Schiller | $0.00 |
| Employment Contract or Letter | Suheiry Lopez | $0.00 |
| Employment Contract or Letter | Summer Bodie | $0.00 |
| Employment Contract or Letter | Summernea Lynectrica Robinson | $0.00 |
| Stop Loss Policy | Sun Life Assurance Company of Canada | $0.00 |
| Employment Contract or Letter | Susan Courtney | $0.00 |
| Employment Contract or Letter | Susan E. Hopper | $0.00 |
| Employment Contract or Letter | Susan J Burlock | $0.00 |
| Employment Contract or Letter | Susan L Lephart | $0.00 |
| Employment Contract or Letter | Susan M Aliberti | $0.00 |
| Employment Contract or Letter | Susan M Perez | $0.00 |
| Employment Contract or Letter | Suzanne E Graham-Hooker | $0.00 |
| Employment Contract or Letter | Suzanne Kay Willi | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Suze Helens Tessier | $0.00 |
| Employment Contract or Letter | Swati Joshi | $0.00 |
| Employment Contract or Letter | Sweny Gulati | $0.00 |
| Employment Contract or Letter | Sydney Taylor Cline | $0.00 |
| Employment Contract or Letter | Sylvia F Wallace | $0.00 |
| Memorandum of Understanding | T. Menichino, Inc. | $0.00 |
| Employment Contract or Letter | Tabatha Joy Harley | $0.00 |
| Employment Contract or Letter | Tammy Jeanette Sanders | $0.00 |
| Employment Contract or Letter | Tammy L Bossio | $0.00 |
| Employment Contract or Letter | Tammy L. Plotner | $0.00 |
| Employment Contract or Letter | Tammy R Davis | $0.00 |
| Employment Contract or Letter | Tandra Bauman | $0.00 |
| Employment Contract or Letter | Tangela Mayer | $0.00 |
| Employment Contract or Letter | Tara Naran | $0.00 |
| Employment Contract or Letter | Tarah M Abshier | $0.00 |
| Contractor Agreement | Technology Solutions Group (TSG) | $0.00 |
| Services Agreement | TECO | $296.99 |
| Employment Contract or Letter | Teighlor Elizabeth Giles | $0.00 |
| Employment Contract or Letter | Teresa Adkins | $0.00 |
| Employment Contract or Letter | Teresa E Jazgarzynska | $0.00 |
| Employment Contract or Letter | Teresa Hare | $0.00 |
| Employment Contract or Letter | Teresa Horst | $0.00 |
| Employment Contract or Letter | Teresa M Gonzalez-Barragan | $0.00 |
| Employment Contract or Letter | Teresa R. Perry | $0.00 |
| Employment Contract or Letter | Teri Cheyenne Trink | $0.00 |
| Employment Contract or Letter | Terri E Holloway | $0.00 |
| Employment Contract or Letter | Terri Lynn Burke | $0.00 |
| Employment Contract or Letter | Terri Parker | $0.00 |
| Master Service Agreement | Tews Company | $0.00 |
| Order Form | Text Us Services, Inc. | $0.00 |
| Services Agreement | That Party Girl | $375.00 |
| Services Agreement | The Brownwood Hotel & Spa | $732.83 |
| Client Service Agreement | The Execu\|Search Group, LLC | $0.00 |
| Client Service Agreement | The Execu\|Search Group, LLC | $0.00 |
| General Liability Policy | The Hartford Insurance | $0.00 |
| Property Policy | The Hartford Insurance | $0.00 |
| Umbrella Policy | The Hartford Insurance | $0.00 |
| Commercial Auto Policy | The Hartford Insurance (Trumbull) | $0.00 |
| Home Services Agreement | The Local Health Council of East Central Florida, Inc | $0.00 |
| Home Program Services Agreement | The Local Health Council of East Central Florida, Inc | $0.00 |
| Medical Malpractice Policy | The Medical Protective Group | $2,000.00 |
| Recruiting Services Agreement | The Medicus Firm, Inc. | $0.00 |
| Recruiting Services Agreement | The Medicus Firm, Inc. | $0.00 |
| Business Associate Agreement | The School Board of Marion County, Florida | $0.00 |
| Services Agreement | The Sourcing Group Inc | $2,815.19 |
| Sublease Agreement and Amendments | The University of Florida Board of Trustees | $0.00 |
| Center for Advanced Healthcare at Brownwood Lease Agreement and Amendme | The Villages CAHB, LLC | $0.00 |
| Agreement for Program Support and Teaching Enhancement | The Villages Charter School, Inc. | $0.00 |
| Agreement for Program Support and Teaching Enhancement | The Villages Charter School, Inc. | $0.00 |
| Services Agreement | The Villages Chilled Water Plt | $1,555.39 |
| East Port Lease Agreement and Amendment | The Villages Development Operating Company, LLC | $0.00 |
| Intellectual Property License Agreement and Amendment(s) | The Villages Health Holding Company, LLC | $0.00 |
| Services Agreement | The Villages Operating Co -CPM | $1,643.73 |
| Lease Agreement | The Villages Operating Company | $2,206.29 |
| First Amendment to Facilities Agreement | The Villages Operating Company | $0.00 |
| Brownwood Sublease Agreement | The Villages Operating Company | $0.00 |
| Colony Lease Agreement | The Villages Operating Company | $0.00 |
| Creekside Lease Agreement | The Villages Operating Company | $0.00 |
| Lake Deaton Lease Agreement | The Villages Operating Company | $0.00 |
| Mulberry Lease Agreement | The Villages Operating Company | $0.00 |
| Wedgewood Lease Agreement | The Villages Operating Company | $0.00 |
| Pinellas Sublease Agreement and Amendment | The Villages Operating Company | $0.00 |
| Santa Barbara Lease Agreement | The Villages Operating Company | $0.00 |
| Administration Lease Agreement and Amendments | The Villages Operating Company | $0.00 |
| Specialty Care Lease Agreement and Amendment | The Villages Operating Company | $0.00 |
| Brownwood Professional Plaza Lease Agreement | The Villages Operating Company | $0.00 |
| Industrial Center Lease Agreement | The Villages Operating Company | $0.00 |
| Facilities Management Agreement and Amendment | The Villages Operating Company | $0.00 |
| Agreement for Commercial Internet Use | The Villages Operating Company | $0.00 |
| Services Agreement | The Villages Operating Company | $0.00 |
| Facilities Management Agreement | The Villages Operating Company | $0.00 |
| First Amendment to Facilities Management Agreement | The Villages Operating Company | $0.00 |
| IT Management Services Agreement | The Villages Operating Company | $0.00 |
| Admin PBS Lease Agreement | The Villages Operating Company | $0.00 |
| Admin Powell Lease Agreement | The Villages Operating Company | $0.00 |
| Southern Trace Lease Agreement | The Villages Operating Company | $0.00 |
| Agreement for Commercial Internet Use | The Villages Operating Company | $0.00 |
| IT Management Services Agreement and Amendments | The Villages Operating Company d/b/a The Villages Technology Solutions | $0.00 |
| IT Management Services Agreement | The Villages Operating Company d/b/a The Villages Technology Solutions | $0.00 |
| Services Agreement | The Villages Technology SolGrp | $6,874.35 |
| Business Associate Agreement | The Villages Technology Solutions Group | $0.00 |

| | | |
|---|---|---|
| EA 3.0 Agreement - 3 Years | The Villages Technology Solutions Group | $0.00 |
| Employment Contract or Letter | Theresa A. Bailey | $0.00 |
| Employment Contract or Letter | Theresa M Elder | $0.00 |
| Independent Contractor Agreement | Thiruvallur Vallabhan, M.D. | $0.00 |
| Employment Contract or Letter | Thomas Ciesla | $0.00 |
| Memorandum of Understanding | Thomas Menichino | $0.00 |
| Employment Contract or Letter | Thor Henriksen | $0.00 |
| Employment Contract or Letter | Thumati Gurappa Jagalur | $0.00 |
| Employment Contract or Letter | Tiffany Renee Hunt | $0.00 |
| Employment Contract or Letter | Tiffany S Croft | $0.00 |
| Independent Contractor Agreement | Tiffany West | $0.00 |
| Employment Contract or Letter | Tina Baldwin | $0.00 |
| Employment Contract or Letter | Tina Lynn Berube | $0.00 |
| Employment Contract or Letter | Tina Marie Robinson-Plumb | $0.00 |
| Employment Contract or Letter | Tishana K Allen | $0.00 |
| Employment Contract or Letter | Todra Bellamy | $0.00 |
| Employment Contract or Letter | Tomas Perez | $0.00 |
| Employment Contract or Letter | Toni Ann M Cicalese | $0.00 |
| Employment Contract or Letter | Tonya D Heskett | $0.00 |
| Employment Contract or Letter | Tracey A Fondaw | $0.00 |
| Employment Contract or Letter | Tracey Kruesi | $0.00 |
| Employment Contract or Letter | Tracey Lee Moore | $0.00 |
| Employment Contract or Letter | Tracy Marie Cowley | $0.00 |
| Employment Contract or Letter | Tracy Perregaux | $0.00 |
| Employment Contract or Letter | Trevor Jerome Danvers | $0.00 |
| Employment Contract or Letter | Tricia A Limjoco | $0.00 |
| Contingency Fee Schedule and Guarantee Placement Details | Trova, LLC | $0.00 |
| Employment Contract or Letter | Troy Black Pace | $0.00 |
| Services Agreement | Tucker Copeland | $199.00 |
| Employment Contract or Letter | Tucker W. Copeland | $0.00 |
| Services Agreement | ULINE | $452.74 |
| Services Agreement | UltraLinq Healthcare Solutions Inc | $1,048.80 |
| Employment Contract or Letter | Uniquia Shandrell Mitchell | $0.00 |
| Behavioral Health Group Participating Provider Agreement | United Behavioral Health, Inc. | $0.00 |
| Group Participating Provider Agreement | United Behavioral Health, Inc. | $0.00 |
| Services Agreement | United Healthcare Insurance Company | $187.36 |
| Medical Group Participation Agreement and Amendment | United Healthcare Insurance Company | $0.00 |
| Services Agreement | United Refrigeration, Inc. | $14,545.28 |
| Twenty-fourth Amendment to the Medical Group Participation Agreement | UnitedHealthcare Insurance Company | $0.00 |
| 21st Amendment to the Medical Group Participation Agreement | UnitedHealthcare Insurance Company, on behalf of itself, UnitedHealthcare of Florida, Inc. and its other affiliates | $0.00 |
| Twenty-fourth Amendment to the Medical Group Participation Agreement | UnitedHealthcare Insurance Company, on behalf of itself, UnitedHealthcare of Florida, Inc. and its other affiliates | $0.00 |
| Medical Group Participation Agreement | UnitedHealthcare Insurance Company, on behalf of itself, UnitedHealthcare of Florida, Inc. and its other affiliates | $0.00 |
| Medical Group Participation Agreement and Amendment | UnitedHealthcare of Florida, Inc. | $0.00 |
| Intellectual Property License Agreement and Amendment(s) | UnitedHealthCare Services, Inc. | $0.00 |
| Office Building Sublease Agreement and Amendments | UnitedHealthCare Services, Inc. | $0.00 |
| Subscription and License Terms Agreement | UpToDate | $0.00 |
| Services Agreement | Urgo Medical North America | $502.20 |
| Employment Contract or Letter | Uyen Anh A Nguyen | $0.00 |
| Client Services Agreement | Vaco LLC | $8,528.00 |
| Client Services Agreement #408905 | Vaco LLC | $8,528.00 |
| Addendum #2469387 | Vaco LLC | $8,528.00 |
| Services Agreement | Vaco Orlando LLC | $8,528.00 |
| Direct Hire Fee Agreement | Vaco Orlando, LLC | $8,528.00 |
| Addendum #2524459 to Client Services Agreement #408905 | Vaco: Highspring LLC dba Vaco | $8,528.00 |
| Addendum # 2524439 to Client Services Agreement # 408905 | Vaco: Highspring LLC dba Vaco | $8,528.00 |
| Employment Contract or Letter | Valerie Anne Pagliaro | $0.00 |
| Employment Contract or Letter | Valerie J Comeau | $0.00 |
| Employment Contract or Letter | Valerie Schaefer | $0.00 |
| Employment Contract or Letter | Vanessa I Gallo | $0.00 |
| Employment Contract or Letter | Vanessa Lynn Bingamon | $0.00 |
| Terms of Service Agreement | VaxCare, LLC | $14,188.12 |
| Terms of Service Agreement | Vaxcare, LLC | $14,188.12 |
| Services Agreement | VCSA | $121.14 |
| Employment Contract or Letter | Veilia V Jackson | $0.00 |
| Service Agreement | Velocity Resource Group | $0.00 |
| Order Form | VerityStream, Inc. | $0.00 |
| Services Agreement | Veytec, Inc | $21,617.26 |
| Employment Contract or Letter | Vicky L Brenner | $0.00 |
| Employment Contract or Letter | Vicky Rivera | $0.00 |
| Employment Contract or Letter | Victor Flores | $0.00 |
| Employment Contract or Letter | Victoria Anne Liccardi | $0.00 |
| Employment Contract or Letter | Victoria E Matos | $0.00 |
| Employment Contract or Letter | Victoria K Wynn | $0.00 |
| Employment Contract or Letter | Victoria Lynn Merrick | $0.00 |
| Services Agreement | Village Center Fire Safety | $122.00 |
| Services Agreement | VISA | $5,377.43 |
| Employment Contract or Letter | Visalsandan Hoanh | $0.00 |
| Contingency Physician Search Agreement | VISTA Staffing Solutions, Inc. | $0.00 |

| | | |
|---|---|---|
| Employment Contract or Letter | Viviana Garcia Cruz | $0.00 |
| Employment Contract or Letter | Wanda Blevins | $0.00 |
| Standard Software-as-a-Services Terms and Conditions | Waymaker | $0.00 |
| Employment Contract or Letter | Wayne C Burgess | $0.00 |
| Services Agreement | Welch Allen Inc | $253.00 |
| Equipment Lease Agreement Number 450-9693542-005 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-006 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-007 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-008 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-009 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-010 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-011 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-012 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-013 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-014 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-015 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-9693542-017 | Wells Fargo Vendor Financial Services, LLC | $73.37 |
| Equipment Lease Agreement Number 450-0105519-000 | Wells Fargo Vendor Financial Services, LLC | $56.50 |
| Equipment Lease Agreement Number 450-0113477-000 | Wells Fargo Vendor Financial Services, LLC | $14.20 |
| Equipment Lease Agreement Number 450-0149125-000 | Wells Fargo Vendor Financial Services, LLC | $26.96 |
| Equipment Lease Agreement Number 450-0151311-000 | Wells Fargo Vendor Financial Services, LLC | $78.75 |
| Equipment Lease Agreement Number 450-0151762-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-0154392-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-0155612-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-0157339-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-0160143-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Equipment Lease Agreement Number 450-0160178-000 | Wells Fargo Vendor Financial Services, LLC | $0.00 |
| Employment Contract or Letter | Wendy L Dixon | $0.00 |
| Employment Contract or Letter | Wesley Crowson | $0.00 |
| Commercial General Liability Policy | Western World Insurance Company | $0.00 |
| Commercial General Liability Policy | Western World Insurance Company | $0.00 |
| Excess Liability Policy | Western World Insurance Company | $0.00 |
| Services Agreement | Westone | $275.70 |
| Employment Contract or Letter | Whitney Lee Eijkelboom | $0.00 |
| Services Agreement | Widex USA Inc | $2,608.67 |
| Employment Contract or Letter | William A Poole | $0.00 |
| Employment Contract or Letter | William H Wallick | $0.00 |
| Services Agreement | WS Audiology USA, Inc. | $0.00 |
| Services Agreement | WVLG-AM 640 | $2,062.50 |
| Employment Contract or Letter | Wynette Gould | $0.00 |
| Employment Contract or Letter | Xavier Potter | $0.00 |
| Employment Contract or Letter | Xia Xiong | $0.00 |
| Commercial Crime Policy | XL Specialty Insurance Company | $0.00 |
| Excess Side A D&O & Tail Policy | XL Specialty Insurance Company | $0.00 |
| Management Liability Extension (D&O) & Tail Policy | XL Specialty Insurance Company | $0.00 |
| Employment Contract or Letter | Yanice Rivera Collazo | $0.00 |
| Employment Contract or Letter | Yareli Vanessa Arteaga-Cornejo | $0.00 |
| Employment Contract or Letter | Yazmin A Fuentes | $0.00 |
| Employment Contract or Letter | Yerania Rodriguez Navedo | $0.00 |
| Employment Contract or Letter | Yolanda Alexy Rodriguez | $0.00 |
| Terms and Conditions | Yooz Inc. | $0.00 |
| Subscription Form | Yooz Inc. | $0.00 |
| Employment Contract or Letter | Yzmaela Parica Esma | $0.00 |
| Workers Compensation Policy | Zenith | $0.00 |
| Master Subscription and Service Agreement | Zluri Inc. | $0.00 |
| Master Subscription and Service Agreement | Zluri Inc. | $0.00 |
| Employment Contract or Letter | Zoey Grace Betz | $0.00 |
| Severance Agreement | David Hutchinson, MD | $0.00 |