UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| **THE VILLAGES HEALTH SYSTEM, LLC,** | § | CASE NO. 6:25-bk-04156-LVV |
| Debtors. | § | |

**FIRST REPORT OF SUZANNE RICHARDS
AS PATIENT CARE OMBUDSMAN OF THE DEBTORS**

1. **INTRODUCTION**

   1. This is the First Report of Suzanne Richards, Patient Care Ombudsman ("PCO"), appointed in the Chapter 11 case of THE VILLAGES HEALTH SYSTEM, LLC (the "Debtors" or "THE VILLAGES") for the period of August 1 to September 29, 2025. This appointment was made pursuant to §333 of the Bankruptcy Code, Bankruptcy Rule 2007.2(c), and the Order of the Bankruptcy Court (the "Court") Directing U.S. Trustee to Appoint Patient Care Ombudsman ("PCO") entered on August 1, 2025 (the "Appointment Order").

   2. Pursuant to §333 of the Bankruptcy Code, the PCO must:

      a. Monitor the quality of patient care provided to patients of the debtors, to the extent necessary under the circumstances, including interviewing patients and physicians.

      b. No later than 60 days after the date of appointment, and not less frequent than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided of the debtor; and

      c. If the PCO determines that the quality of patient care provided to parties of the debtors is declining significantly or is otherwise becoming materially compromised, file with the Court a motion or written report, with notice to the parties in interest, immediately upon making such determination.

**EXECUTIVE SUMMARY**

1. The Debtors operate eight primary clinics and two specialty clinics which provide medical services in a clinical setting. Total membership is about 42,000 members. Staffing consists of about 8 medical directors, 49 physicians, 57 advanced practice providers and 213 clinical supports.

2. Patient service volumes during this reporting period remained consistent throughout the clinic sites. It was reported that a clinic physician can care for up to eighteen patients a day, but usually cares for about twelve to fourteen patients on an average day. A clinical advanced practice practitioner can care for about 20-25 patients on an average day.

3. The debtors employ medical doctors, advanced practice registered nurses and physician assistants with teams of professionals at each of the sites of service. Each clinic has a clinic manager, along with a staffing plan that may include patient reception services (front desk), practice support supervisor, clinic supervisor, licensed practice nurses, medical assistants, housekeepers, radiology professionals, phlebotomists, audiologists, and other professionals. For behavioral health, there are also Licensed Clinical Social Workers and Psychologists.

4. The debtors maintain the electronic health record system, AthenaHealth, for patient charting and recordkeeping.

2. **MONITORING PROCESS**

    a. On August 8, 2025, the PCO had an introductory call with the chief restructure officer. During this call, the PCO reviewed the PCO role and established the best way to review patient care operation, and how the sites would be visited. A process and calendar was set up for arranging site visits with the locations in the best effort to visit as many clinics as possible to properly assess the quality of care being delivered. The goals of the visit were:

        - To determine and document the safety and quality of care being provided to patients by the debtor; and
        - To determine if safety and quality of patient care is/is not being compromised because of Chapter 11 proceedings.

To achieve the above goals the PCO visited the Debtor's clinics and spoke with key administrative, providers and clinic staff. Prior to the visit, several documents regarding operations were reviewed. During the visit, six of the ten clinics were toured, five of the eight primary clinics and one of the two specialty clinics. All clinics appear to be very similar and have the same protocols and policies organization wide.

b.  The facilities toured during the First On-site visit of the PCO:

Survey of clinics on September 12, 2025

1. The Villages Health Brownwood Care Center, 2910 Brownwood Blvd, The Villages, Florida 32163
2. The Villages Health Creekside Care Center, 1050 Old Camp Road, Building 100, The Villages, Florida 32162
3. The Villages Health Pinellas Care Center, 24865 Pinellas Place, The Villages, Florida 32163
4. The Village Health Eastport Care Center, 1346 Dewey Drive, The Villages, Florida 34762
5. The Villages Health Mulberry Grove Care Center, 8877 SE 165th Mulberry Lane, The Villages, Florida 32162
6. The Villages Health Specialty Care for Advanced Healthcare at Brownwood, 2955 Brownwood Blvd, Suite 304, The Villages, Florida 32163

7.

Clinics not visited:

1. The Villages Health Colony Care Center, 280 Farner Place, The Villages, Florida 32163
2. The Villages Health Santa Barbara Care Center, 1575 Santa Barbara Blvd, The Villages, Florida 32159
3. The Villages Health Lake Deaton Care Center, 779 Kristine Way, The Villages, Florida 32163
4. The Villages Health Specialty Care Center at Spanish Springs, 1400 US-441, Bldg. 810, The Villages, Florida 32159

c.  The monitoring process included, but was not limited to, a combination of an on-site visit, client interviews, employee interviews, service observations, staffing analysis, policy review, virtual/telephonic interviews and quality report reviews. During this reporting period, the PCO visited of the debtor's sites of service was announced.
- Interviews were conducted with:
  1. Chief Compliance Officer
  2. HIPAA Privacy Officer and Security Officer
  3. Medical Director of Clinical Operations
  4. Senior Manager Clinical Operations
  5. Clinic Manager #1
  6. Clinic Supervisor
  7. LVN
  8. Advanced Practice Registered Nurse #1
  9. Clinical Lead
  10. Advanced Practice Registered Nurse #2

11. Clinic Physician
12. Phlebotomist
13. Patient #1 of 11 years
14. Clinic Manager #2
15. Coder #1
16. Coder #2
17. Central Supply Coordinator
18. Director Operations Specialty Clinics
19. Clinical Manager Specialty Clinics
20. Registered Medical Assistant
21. Patient Support Lead
22. Patient #2 of 3 years
23. Care Center Manager
24. Advanced Practice Registered Nurse #3
25. Clinical Certified Medical Assistant
26. Patient #3 of 1 year

- Documents Reviewed
    1. Privacy Policies for The Villages Health Center
        a. 10 Simple Rules to Stay on the Right Side of HIPAA
    2. Operations KPI Dashboard
        a. Open Panel Provider Availability
        b. Same Day Visits by Care Center and Provider
        c. Saturday and Sunday EZ Care Clinic Metrics
        d. Provider Scheduling
        e. Provider Schedule Utilization
        f. Annual Preventative
        g. Hospital Admissions
        h. Lab Multi-Order Resulting
        i. Patient Experience
    3. 2025 Budget
    4. FLBL HEDIS
    5. UHC HEDIS
    6. Humana HEDIS
    7. Infection Control Policies
    8. OSHA Guidelines
    9. Clinical Documents
    10. Clinical Affiliation Agreement
    11. Operation Workflows
        a. Clinical Staff Assignments Weekly Checklist
        b. End of Day Checklist
        c. Primary Care Hospital Records
        d. Medical Records Quality Assurance Athena Bucket
        e. Point of Care Urinalysis

    f. Reconciliation of Summary of Care Record/Continuity of Care Document
    g. Walk in Acute Care Protocol
   12. Cheers for Peers

 d. Staffing remained consistent during this reporting period.  Staffing levels have remained unchanged since the filing of the bankruptcy as reported by staff during interviews and in some cases, there was an increase in staffing.  There have been a few resignations due to normal course in business.  The debtors are continually reviewing staffing needs and making appropriate changes to meet the needs of their patients.  Clinic managers voiced very few to no openings for staff and no critical position resignations.

 e. The two of the three clients interviewed stated that their providers and caregivers were "…wonderful…", "…why I come here…", "…very caring to me and my wife…", "…would not go anywhere else…", and "…love my doctor…".  The clients interviewed are ongoing clinic patients and were able to compare the services rendered by the Debtors both now and prior to bankruptcy filing.  The clients were engaging, and highly motivated to express compliments of the services rendered.   Review of the Patient Experience Dashboard indicates high satisfaction with services.

 f. During the onsite visit the PCO experienced a very high level of cooperation and willingness work with the PCO in the discharge of the related responsibilities.  All staff and providers interviewed were both engaging and interested in meeting the clinical demands of their clients.  Several providers and staff members were interviewed, and comments received were "business as usual", "no significant changes" and continued ability to render high quality care to patients.

 g. The PCO requested complaint reviews and found very little complaints were discovered.  The PCO did not note any change in the care during this reporting period.  The PCO believes the patients were and are receiving appropriate levels of care based on their individual circumstance.  There does not appear to be any changes (decrease) in the levels of care as result of the bankruptcy.

3. **<u>FINDINGS</u>**

 a.  The Villages operating procedures and protocols were reviewed relating to quality, staffing, training, environment of care assessments, data (incidents, client satisfaction surveys, complaints, quality).  Materials appear to be satisfactory with respect to meeting regulatory standards and management of quality of care.

 b. No red flag issues reported with respect to staffing, incidents, purchasing/supplies and quality of care.

c. The clinics continue to provide classes to clients that include but are not limited to, nutrition, balance, and stress.

d. No reports or complaints regarding financial issues (meeting payroll obligations, supplies, medications impacting operations).

e. No coverage gaps were identified. The Medical Director of Clinical Operations reported that they strive to focus on outcomes and are value-based.

f. Twenty-three (23) staff/leadership/providers were interviewed. All expressed no reduction in care delivered; no reports of supply issues; no equipment needs or inability to get equipment fixed or maintained. No reported resignations of critical openings. Access to care is available via appointment, walk-in at the EZ Care. Key Performance Indicators are collected to ensure proper access is available to clients.

g. Two patients were interviewed and expressed "care was good", "no changes felt", "providers and staff provide good care".

h. One patient complaint was received via email and call was returned. Complaint regarding access and did not involve patient care. This complaint was sent to Chief Compliance Officer for resolution. The Medical Director of Clinical Operations followed up and has provided a solution to the patient. The complaint was deemed as low risk to patient quality and safety.

i. All Clinics were clean, no clutter with clear egress. Security precautions with lock release doors and cameras at entries and exits.

j. Computers were locked with password screens; no patient confidential information was found. Employees reported HIPAA training annually. Very little printing of patient confidential information and if printed, locked shred boxes are in each clinic to properly dispose of Patient Health Information. HIPAA and Security Policies of the Debtor were reviewed and found to be in compliance.

k. The PCO considers the level of cooperation and transparency of the Debtors as key ingredients in the efficient discharge of monitoring responsibilities. In this regard, the PCO received excellent cooperation and transparency from all Debtors personnel and healthcare professionals. This process was managed by Mr. Neil Luria and Ms. Christina Steiner. The tour was facilitated by Dr Robert Reily and Mr. James Easter who devoted the entire day to ensure a seamless visit and all requested information was received.

    l. Personnel interviewed displayed a positive attitude of change towards providing quality and safe care to patients. All employees were welcoming, transparent and engaging with the PCO.

4. **RISK Assessment**

    a. The PCO assessed each clinic to monitor the level of risk. Based on this level of risk, the PCO plans an appropriate level of monitoring. The PCO assigns the debtor to one of three categories of risk—low, medium, or high. The level is based on data collection and interview with management, patients and staff. This initial determination of level of risk may be adjusted as findings either improve or deteriorate. These three potential levels are outlined below:

- Low-level risk evidenced by transparent reporting, and no observable staffing, supply or quality of care issues that are not readily resolved.

- Mid-level risk evidenced by transparent reporting with some significant observable staffing, supply or quality issues, or lack of transparent reporting.

- High-level risk evidenced by significant staffing, supply, or quality issues observed, or risk of partial or full closing of services.

    b. Healthcare debtors can move between levels of risk over the course of the bankruptcy, and the risk level will continue to be reassessed with each encounter between the PCO and the facility.

    c. In the case of this debtor there appears to be no difficulty currently meeting payroll obligations, nor with obtaining supplies, medications, vendor services, etc. There are no reported or observable staffing, medical records, or quality of care issues. The debtor and management have been cooperative, and communication with the PCO appears to be transparent.

    d. Based upon the above findings made during this monitoring period, the risk level at this time is determined to be low risk.

5. **CONCLUSIONS/RECOMMENDATIONS**

Based on the low-level risk determination, the PCO will implement the following monitor plan for the next 60-day period:

    a. Interviews with key staff every 45-days.

    b. Review quality reports and operational reports, and other filings in the case for potential red flags.

    c. Monitor status conferences with attendance periodically as needed or requested by parties.

    d. The PCO did not note any issues that have resulted in a change in the quality of the care as a result of their pending bankruptcy. The Debtors continue to provider care in the manner consistent with that prior to the current proceeding. Staffing levels and competency have remained consistent. The Debtors appears to strive to meet the needs of their clients.

    e. The PCO strongly encourages the debtors to remain vigilant with regards to patient care.

    f. The PCO will continue to monitor the debtors' operations consistent with the above protocols. The monitoring process will continue to include announced monthly site visits, charge reviews, client and staff interactions. The PCO reserves the right to alter these protocols based on the needs of these cases and related facts and circumstances.

6. **SERVICE OF REPORT**

    a. A copy of this First Report will be filed with the Court, served on the Office of the United States Trustee for the Middle District of Florida, Orlando Division; counsel for the Debtors counsel for the Official Committee of Unsecured Creditors; and all parties who filed a Notice of Appearance, as well as any current patients requesting a copy of the Report.

Dated: September 30, 2025                        Submitted by:

                                                                                            Suzanne Richards, RN, MPH, MBA
                                                                                            SMR Healthcare Management, Inc
                                                                                            Patient Care Ombudsman for
                                                                                            The Villages