**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:25-bk-04156-LVV |
| THE VILLAGES HEALTH SYSTEM, LLC,[1] | Chapter 11 |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER
APPROVING SETTLEMENT AGREEMENT BY AND AMONG:
(1) THE DEBTOR, (2) PMA LENDER LLC, (3) THE VILLAGES HEALTH
HOLDING COMPANY, LLC, AND (4) CERTAIN RELATED PARTIES**

The Villages Health System, LLC ("TVH" or the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this motion (the "Motion") requesting entry of an order, approving the settlement agreement (the "Settlement Agreement")[2] attached hereto as **Exhibit A** by and among the Debtor, on the one hand, and PMA Lender, LLC ("PMA Lender"), The Villages Health Holding Company, LLC ("TVHH"), and certain other affiliated entities (collectively with PMA Lender and TVVH, the "Developer" or "Settling Parties"), on the other hand. In support of the Motion, the Debtor respectfully submits as follows:

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This Court is the proper venue for the Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the relief sought herein is section 105(a) of title 11 of the United States

---

[1] The address of the Debtor is 600 Sunbelt Road, The Villages, Florida 32159. The last four digits of the Debtor's federal tax identification number is 6436.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

134562.000010\4933-7145-7177.1

Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the U.S. Bankruptcy Court for the Middle District of Florida (the "Local Rules").

## FACTUAL BACKGROUND

### A.     TVH's Formation and Operations

2.     In or about 2012, TVH was formed as the result of a collaboration between The Villages and The University of South Florida to provide high-quality health care to its residents and the surrounding community. TVH focused on providing patients with exemplary service and care by, among other efforts, reducing the physician-to-patient ratio and, in so doing, increasing the availability of and interactions with primary care physicians and specialists. Ultimately, TVH employed more than 800 doctors and staff and cared for more than 55,000 patients from ten primary and specialty care clinics located in and around The Villages.

3.     To ensure adequate operational funding, TVH obtained a line of credit (the "TVHH Line of Credit") from TVHH which owned approximately 70% of the equity in TVH. Over time, the balance of the TVHH Line of Credit grew, and was more than $115 million by the beginning of 2021.

4.     In or about September 2022, TVH retained Evercore Group, LLC ("Evercore") as its investment banker and advisor to assist TVH in evaluating potential strategic opportunities to assist the Debtor's management in evaluating sales and other strategic alternatives, by identifying and engaging strategic counterparties, facilitating due diligence for various parties in interest, and soliciting proposals from various parties in interest and third parties, among other services. Over the ensuing year, Evercore assisted TVH in evaluating *ad hoc* in-bound interest from a select group of investors and financiers as well as managed care health plans. Then, starting in September 2023,

Evercore engaged in a formal marketing process to market and solicit proposals from qualified strategic partners to acquire or finance TVH. Such efforts proved successful, and TVH executed a term sheet with CenterWell Senior Primary Care, Inc. ("CenterWell"), which entailed an acquisition by CenterWell via the purchase of TVH's equity.

**B.    HCC Coding Irregularity Issues**

5.      In or about August 2024, TVH learned of potential issues related to its Hierarchical Condition Categories ("HCC") coding practices, including guidance provided by certain Medicare Advantage plan administrators. Upon learning of the potential coding issue, TVH terminated the subject practices and retained Goodwin Procter LLP ("Goodwin") and FTI Consulting Inc. ("FTI") to evaluate its coding practices and guidelines, and if deemed erroneous, to ascertain the magnitude of any resulting overpayments from Medicare (the "Potential Overpayment Liability") and retained Alvarez & Marsal ("A&M") to advise on regulatory compliance. In addition to retaining professionals, TVH also retained Christina Steiner as Chief Compliance Officer and established a compliance committee on the board of managers. Goodwin conducted an investigation into the HCC coding practices, and, as explained more fully below, interviewed employees and reviewed hundreds of thousands of documents in connection with the investigation.

6.      In December 2024, TVH initiated a voluntary self-disclosure to the Office of Inspector General ("OIG") for the Department of Health & Human Services and informed its patients of the potential coding issues and implications thereof. TVH was officially accepted into the OIG self-disclosure protocol on January 31, 2025, and since that time, has continually worked with OIG and the Department of Justice, Civil Division ("DOJ") in good faith to facilitate the DOJ's independent investigation, including producing more than 100,000 documents and communications and providing access to facilities and personnel.

**C.**     **TVH Analyzes Available Options and Files Chapter 11**

7.     In or about April 2025, the TVH board of managers determined that it was in the best interests of the company to consider potential options to restructure its existing debt and address potential liability related to apparent Medicare overpayments. In furtherance of this initiative, on or about May 5, 2025, the TVH board of managers appointed Anna Phillips as an independent manager of TVH and formed a restructuring committee. Additionally, the TVH board of managers approved the retention and appointment of Neil Luria (the "CRO") of GBH SOLIC Holdco, LLC ("SOLIC") as Chief Restructuring Officer for TVH. Such efforts provided much needed experience and insulated decisions related to, among other things, restructuring pre-petition debt and obtaining bridge and post-petition financing in the event TVH elected to obtain funding from one or more affiliated entities.

8.     TVH required additional funding to finance operations and additional costs associated with ongoing investigations and restructuring efforts. Accordingly, in April 2025, TVH obtained a secured credit facility from PMA Lender—pursuant to which PMA Lender agreed to provide TVH a line of credit in the initial principal amount of $15 million (the "PMA Line of Credit"). Amounts drawn on the PMA Line of Credit and other amounts due thereunder were secured by a first-priority security interest in all assets of TVH. Over the next two (2) months, TVH drew $15 million under the PMA Line of Credit.

9.     Ultimately, and after considering multiple restructuring options, the TVH board of managers authorized TVH to commence the Chapter 11 Case and obtain post-petition financing from PMA Lender (the "DIP Facility") for purposes of funding the Chapter 11 Case and operational shortfalls pending approval and consummation of an asset sale to CenterWell or another purchaser through the Chapter 11 Case.

10.     On July 3, 2025 (the "Petition Date"), the Debtor commenced the above-captioned Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to act as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 4, 2025, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee").

11.     Initially, the DIP Facility provided $24 million in post-petition new money financing. Following approval of the DIP Facility, UnitedHealthcare Insurance Company and UnitedHealthcare of Florida, Inc. (together, "UnitedHealthcare" or "UHC") unilaterally withheld certain funds payable to TVH under the parties' agreements, which resulted in an anticipated $20 million budgetary shortfall under the DIP Facility and necessitated additional post-petition financing. Accordingly, TVH sought approval for an extension of additional post-petition financing under the DIP Facility, increasing the new money component of the DIP Facility from $24 million to $46 million. The Court approved the increased DIP Facility by final order entered on November 20, 2025. The final payoff on the DIP Facility was $25 million plus approximately $413,555 in interest and fees.

**D.     Investigations Conducted by TVH and Third Parties**

12.     Prior to the Petition Date, TVH engaged Goodwin to conduct an internal investigation of TVH's HCC coding and to advise related to, among other things, the False Claims Act. In connection with Goodwin's internal investigation, Goodwin conducted interviews and reviewed hundreds of thousands of documents related to the HCC coding issues.

13.     After the Petition Date, TVH continued its investigation of all potential claims relating to transactions between TVH and certain insiders, including the Developer, Developer

Affiliates,[3] and individual owners of TVH and related entities. In addition, Goodwin, acting as special counsel to TVH, continued to review documents and interacted with both the Debtor and DOJ. In connection with its investigation, TVH has compiled and reviewed hundreds of thousands of documents and communications related to time periods relevant to the TVHH Line of Credit, PMA Line of Credit, and HCC coding issues.

14.    Also, after the Petition Date, SOLIC concluded a cash reconciliation report for TVH, which evaluated TVH cash flow and debt serving from 2020 through the filing of the Chapter 11 Case (the "SOLIC Reconciliation Report"). The SOLIC Reconciliation Report, among other things, identified (i) transfers from TVH to TVHH on account of the TVHH Line of Credit; (ii) transfers to the Developer and Developer Affiliates for rent, services, or other reasons; and (iii) transfers to the owners of TVHH and other members on account of pass-through tax liability. In particular, SOLIC concluded that, between 2020 and 2025, TVH paid a net amount of approximately $108 million[4] to TVHH on account of amounts due under the TVHH Line of Credit, over $69 million to owners of TVH on account of pass-through tax liability, including $59 million to TVHH and over $10 million to other owners of TVH, and aggregate payments to the Developer and Developer Affiliates for rent or other services of approximately $268 million.

---

[3] Developer Affiliate has the meaning set forth in the Settlement Agreement and includes: (i) The Villages of Lake-Sumter, Inc.; (ii) Holding Company of The Villages, Inc.; (iii) The Villages Operating Company – CPM; (iv) The Villages CAHB, LLC; (v) The Villages Land Holding Company, LLC; (vi) The Villages Technology Solutions Group; (vii) The Villages Daily Sun; (viii) Brownwood Hotel & Spa, LLC; (ix) TV Diversified Commercial Property Services; (x) The Villages.net; (xi) The Villages Chilled Water Pit; (xii) The Waterfront Inn; (xiii) Village Center District; (xiv) The Villages Charter Campus / High School / Athletics; (xv) The Villages Homeowners Advocates, Inc.; (xvi) Properties of The Villages, Inc.; (xvii) The Villages Entertainment; (xviii) Beyond the Stars; (xix) The Villages Marketing; and (xx) The Villages Polo Club.

[4] The gross amount of payments from TVH to TVHH, without considering offsetting payments from TVHH to TVH, is more than $245 million.

15. Additionally, the DOJ, Committee, and UHC, among others, have independently conducted similar investigations. TVH has engaged cooperatively with these third parties to ensure their ability to conduct their respective investigations. To facilitate the parallel investigations being conducted by these third parties, TVH has produced hundreds of thousands of documents and communications to the DOJ, the Committee, and UHC, as follows:

a. The Debtor granted UHC and the Committee access to the data room (the "VDR") that was created for the sale of the Debtor's assets, which contained over 100,000 historical corporate and financial documents of the Debtor, including, but not limited to: (i) corporate and organizational documents, (ii) capitalization tables, (iii) board composition documents, (iv) insurance policies, (v) financial statements, (vi) valuation reports, (vii) tax returns, (viii) leases, (ix) the SOLIC Reconciliation Report and accompanying backup data, (x) affiliate contract, (xi) board materials, and (xii) account information. Many of these documents were responsive to the document requests of the Committee and UHC.

b. In addition to providing the Committee and UHC access to the foregoing documents, the Debtor began formally producing responsive documents from the VDR to the Committee and UHC on or about October 16, 2025.

c. On or about November 26, 2025, the Debtor produced approximately 100,000 additional responsive documents and communications to UHC and the Committee from Goodwin.

d. Finally, the Debtor has produced an additional over 200,000 documents and communications to the Committee and UHC as part of a rolling production that is ongoing as of the filing of this Motion.

**E.      The Settled Claims**

16.      By and through its investigation, as well as its collaboration with the DOJ and Committee, TVH has identified potential claims against certain insiders and affiliates of TVH— including the Developer, the Developer Affiliates, and the current and former managers (collectively, the "Managers") and officers (collectively, the "Officers")—the most significant of which include:

a.   potential claims for recharacterization and avoidance of payment obligations under the TVHH Line of Credit as fraudulent transfers and preferential transfers (the "TVHH Line of Credit Claims");

b.   potential claims challenging and recharacterizing the PMA Line of Credit (the "PMA Line of Credit Claims", together with the TVHH Line of Credit Claims, the "Line of Credit Claims");

c.   potential claims for avoidance of tax distributions made to TVHH and other equity holders of the Debtor on account of pass-through tax liability (the "Tax Distribution Claims");

d.   potential claims for avoidance of payments made to the Developer and Developer Affiliates for rent and other services (the "Affiliate Transaction Claims"); and

e.   potential claims against the Managers and Officers for breach of fiduciary duty or otherwise (the "Manager and Officer Claims", together with TVHH Line of Credit Claims, PMA Line of Credit Claims, Tax Distribution Claims, Affiliate Transaction Claims, and all other claims and causes of action of any kind or character whatsoever that may be assertable by the Debtor's estate against the Developer, Developer Affiliates, or the Managers and Officers, the "Settled Claims").

8

17. As discussed above, TVH has identified net repayments under the TVHH Line of Credit of approximately $108 million, reimbursement of pass-through tax obligations of TVH equity holders of approximately $69 million, and payments to the Developer and Developer Affiliates for rent or other services of approximately $268 million. The Settled Claims were identified and vetted through the parallel investigations of TVH, the DOJ, and the Committee.

**F. Settlement Negotiations Among the Debtor, Committee, Developer, and the DOJ**

18. Beginning in approximately October 2025, the Debtor, Committee, representatives of the Developer, and the DOJ engaged in extensive good-faith and arms' length settlement negotiations regarding the Settled Claims that involved multiple in-person meetings, telephone conferences, and correspondence. These negotiations included a settlement offer from the Developer to TVH, the Committee, and the DOJ, and a settlement offer from TVH with the consent of the Committee and DOJ to the Developer.

19. In addition to the settlement negotiations for the Settled Claims, TVH and the DOJ engaged in months of extensive negotiations for claims related to or arising from the Potential Overpayment Liability. As a result of these extensive negotiations, in January 2026, TVH and the DOJ reached an agreement in principle (the "DOJ Settlement"), pursuant to which the parties agreed to resolve all claims related to the Potential Overpayment Liability via the allowance of a DOJ general unsecured claim in the amount of $541.5 million (the "DOJ Claim").[5] Contemporaneously herewith, the Debtor has filed a separate motion seeking Court approval of the DOJ Settlement under Bankruptcy Rule 9019.

---

[5] As of the date of this filing, this claim comprises 97% of the unsecured creditor class.

20.     TVH has further engaged in negotiations with the DOJ, the Committee, UHC, and other interested parties regarding the terms of a chapter 11 plan of liquidation and formation of a post-confirmation liquidating trust. On January 29, 2026, TVH filed its chapter 11 plan of liquidation (as amended, the "Plan"). *See* Docket No. 387.

**G.      The Settlement Agreement**

21.     Following resolution of the DOJ Claim, one of the principal issues remaining pertained to the Settled Claims. For months, TVH has engaged in negotiations with the Committee, DOJ, and the Developer in an effort to reach an amicable resolution. Under the DOJ Settlement, the DOJ holds approximately 97% of all general unsecured claims, and is the principal beneficiary of any recovery related to the Settled Claims and the resolution thereof. Accordingly, TVH and Developer engaged with the DOJ in an effort to progress discussions regarding the Settled Claims and, ultimately, ensure the DOJ supported any proposed settlement.

22.     In February 2026, the DOJ and the Developer continued negotiations on the terms of a potential settlement and reached an understanding as to the level at which the DOJ—as TVH's largest creditor—would support a settlement between TVH and the Developer. On February 20, 2026, the Committee and UHC were advised that the Debtor's professionals were evaluating supporting a settlement at that level.  The Debtor believes that the Settlement Agreement, described in detail below, is in the best interests of the bankruptcy estate and its creditors, and accordingly, files this Motion seeking Court-approval of the Settlement Agreement.

23.     On or about March 20, 2026, TVH and the Developer entered into the Settlement Agreement, the principal terms of which are summarized as follows:

    a.  PMA Secured Claim. Debtor agrees and acknowledges that PMA Lender holds
        a valid secured claim on account of the indebtedness under the PMA Line of

Credit in the amount of $15 million of outstanding principal, plus interest, fees,[6] expenses, all other amounts due and owing under the PMA Line of Credit (the "PMA Secured Claim").

b. Settled Claims. Developer agrees to pay the Debtor an aggregate amount of $80 million (the "Developer Settlement Amount") in settlement of the Settled Claims, which amount shall be paid, at the option of Developer, as follows (i) a cash payment totaling $80 million to be paid after the Debtor pays the PMA Secured Claim in full; or (ii) in lieu of the Debtor paying the PMA Secured Claim in full, the Developer Settlement Amount shall be reduced by the amount of the PMA Secured Claim and the balance shall be paid to the Debtor in cash.

c. Mutual Releases.  The Debtor agrees to release the Settlement Release Parties and their Related Parties for any and all Estate Causes of Action. The Settlement Release Parties agree to release the Debtor and the Exculpated Parties from all claims.

d. Released Parties. Debtor agrees to revise the Plan to incorporate the Settlement Agreement and include the Settlement Release Parties and Related Parties within the scope of "Released Parties" under the revised Plan.

e. DOJ Support. The DOJ agrees to file a statement in support of the resolution of the Settled Claims pursuant to the Settlement Agreement.

24.     If approved, the Settlement Agreement provides the funding necessary to confirm the Plan, fund the liquidating trust, pay administrative claims and "Convenience Class" claims under the Plan on the effective date, and pay a sizable initial dividend to beneficiaries of the liquidating trust (*i.e.*, general unsecured creditors), while enabling the parties to avoid the uncertainty, cost, and delay inherent in adversarial litigation.

**RELIEF REQUESTED**

25.     The Debtor respectfully requests that the Court enter an order (a) approving the Settlement Agreement pursuant to and in accordance with section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a), and (b) granting the Debtor such further and additional relief as

---

[6] The only attorneys' fees included in the PMA Secured Claim are for PMA Lender's local counsel at Trenam Law.

may be necessary to effectuate the terms of the Settlement Agreement and relevant orders of this Court.

## BASIS FOR RELIEF REQUESTED

26.     Pursuant to Bankruptcy Rule 9019(a), "after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). "[Bankruptcy] Rule 9019(a) gives the Court broad authority in approving compromises or settlements. … 'The determination of whether to approve an application to compromise is a matter within the sound discretion of the bankruptcy judge.'" *In re Kay*, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998) (*quoting Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602-03 (5th Cir. 1980)). "A proposed settlement will be approved unless it 'falls below the lowest point in the range of reasonableness.'" *In re Vosotas*, 666 B.R. 684, 690 (Bankr. S.D. Fla. 2025).

27.     In evaluating a proposed compromise or settlement, the court must "make an independent judgment as to whether the settlement presented is fair and equitable." *In re Ortiz*, 619 B.R. 273, 274-75 (Bankr. M.D. Fla. 2020). The court, however, need not "conduct a 'mini-trial' on the merits of the underlying litigation" [*Id*. at 275]; rather, "the bankruptcy court must simply 'make a pragmatic decision based on all [of the] equitable factors.'" *In re Huckleberry Partners LLC*, No. 6:23-CV-1849-PGB, 2024 WL 4332610, at *5 (M.D. Fla. Sept. 27, 2024). In deciding whether a compromise or settlement is fair and equitable, the court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990) (*quoting Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986).

28.      The court, however, "'may certainly give weight to the trustee's informed judgment that a compromise is fair and equitable.'" *In re Vosotas*, 666 B.R. at 690 (*quoting In re S & I Investments*, 421 B.R. 569, 584 (Bankr. S.D. Fla. 2009)). Indeed, in evaluating a proposed compromise or settlement, "the court's role is to ensure that the trustee has exercised property judgment in making the decision to agree to the proposed settlement." *In re Ortiz*, 619 B.R. at 275 (internal quotations omitted). And, in so doing, courts give the estate "considerable deference to exercise their business judgment with respect to settlements"; although, such deference is not without limits, as "[t]here must be at least some rational business purpose to support the disinterested trustee's decision."[7] *Id*. (internal quotations omitted); *see also In re Kenny*, 630 B.R. 853, 859 (M.D. Fla. 2021) ("approval of a settlement agreement must be affirmed unless the [bankruptcy] court's decision is (1) completely devoid of minimal evidentiary support or (2) bears no rational relationship to the evidence"), *aff'd,* No. 21-12295, 2022 WL 2282843 (11th Cir. June 23, 2022). The estate representative, however, is deemed to have "exercised sound business judgment when he [or she] evaluates 'the strength and weaknesses of the potential claims and the

---

[7] Under certain circumstances, courts may apply a heightened level of scrutiny to transactions with "insider[s]" of the debtor. *See, e.g., In re J.E.L. Site Development, Inc.*, 642 B.R. 471 (Bankr. M.D. Fla. 2022). Heightened scrutiny, however, is inapplicable where, as here, the decision to settle a dispute was made by a disinterested agent. *See In re Huckleberry Partners LLC*, 2024 WL 4332610, *9. As explained by the *Huckleberry Partners* court,

> [The] potential conflict of interest is precisely why the Liquidating Agent was appointed to oversee matters such as the instant Settlement. … [I]t was the Liquidating Agent's job to determine [whether] a settlement offer concerning matters to which Herborn had a conflict of interest was fair and appropriate before accepting. The fact that Debtor Huckleberry also supported approval of the Settlement is irrelevant absent evidence that the *Liquidating Agent*—who was to act as a "check" on the Herborn conflict of interest—was compromised in his role. … Absent [] concrete evidence that *Herborn's* purported conflict of interest swayed the *Liquidating Agent's* judgment, the Court does not find that the Bankruptcy Court abused its discretion by approving the Settlement here.

*In re Huckleberry Partners LLC*, 2024 WL 4332610, *9. As in *Huckleberry Partners*, any potential conflict between TVH and the Developers is irrelevant as it was the CRO, not the TVH board at large or potentially interested management or equity holders, who determined whether the Settlement Agreement was fair and appropriate before accepting.

cost and time it would take to litigate the claims.'" *In re Vosotas*, 666 B.R. at 690 (*quoting United States v. Hartog (In re Exp. Bonded Corp.)*, 597 B.R. 673, 679 (S.D. Fla. 2019), *appeal dismissed sub nom.*, *In re Exp. Bonded Corp.*, 2019 WL 4137769 (11th Cir. 2019).

29.     As set forth in detail below, each of the *Justice Oaks* factors weighs in favor of approving the Settlement Agreement, and the Settlement Agreement should be approved under either the *Justice Oaks* or heightened scrutiny standard.

**A.     The First *Justice Oaks* Factor Weighs in Favor of Approving the Settlement Agreement.**

30.     The first *Justice Oaks* factor requires the Court to consider TVH's chances of succeeding on the Settled Claims. Although TVH believes that the Settled Claims have substantial merit and value, TVH would also be required to overcome significant legal and factual hurdles to be successful. Moreover, it is anticipated the Developer would assert defenses that will create additional risk in litigating the Settled Claims. As provided in detail below, TVH's likelihood of success with respect to the most significant Settled Claims is uncertain, and the first *Justice Oaks* Factor weighs in favor or approving the Settlement Agreement.

31.     Line of Credit Claims. TVH has potential claims against TVHH for recharacterization and avoidance of payment obligations under the TVHH Line of Credit as fraudulent transfers and preferential transfers. TVH also has potential claims against PMA Lender for recharacterization of the PMA Line of Credit. To be successful on these claims, TVH must demonstrate that the TVHH Line of Credit and PMA Line of Credit should be recharacterized as equity. The Eleventh Circuit uses a multi-factor test to determine whether recharacterization of debt to equity is appropriate. *See In re Lane*, 742 F.2d 1311, 1314–15 (11th Cir. 1984). The multi-factor test encompasses thirteen factors, including (i) the form of the agreement, (ii) whether the debt accrued interest, (iii) whether the debt had a fixed maturity date, (iv) whether the debtor could

14

have obtained loans from outside institutions, (v) whether the debtor was undercapitalized, (vi) identity of interest between creditor and equity holder, and (vii) the intent of the parties. *Id.*

32. Here, certain factors potentially weigh in favor of recharacterization (*e.g.*, undercapitalization of the debtor and a significant identity of interests between the Developer and the Debtor's equity holders). However, many of the factors weigh against recharacterization (*e.g.*, the TVHH Line of Credit and PMA Line of Credit were evidenced by a formal loan agreement, accounted for as loans, had fixed maturity dates, and accrued interest at market-based rates). And certain factors that initially appear to weigh in favor of recharacterization, such as the identify of interests between the Developer and the Debtor's equity holders, could weigh against recharacterization on a deeper review. For example, TVHH owns a substantial majority of the equity of TVH, but TVH has other equity owners (primarily doctors and other employees of TVH). TVHH provided these funds as a loan and the parties appeared to contemplate treatment as loans, because TVH's minority equity holders were not requested to contribute via capital calls, nor were their ownership interests diluted by the loans from the majority shareholder. The intent of the parties factor may also weigh against recharacterization based on TVH's course of conduct—that occurred over years—of drawing funds from the TVHH Line of Credit and making repayments with interest. *See In re Lane*, 742 F.2d at 1316 (noting that a court must "examine the circumstances surrounding the advances, the objective facts, to determine whether the parties intended the advances to constitute debt rather than equity" and focusing on whether interest was actually paid on advances).

33. Even if TVH successfully demonstrates that the TVHH Line of Credit should be recharacterized, TVH would then have to establish insolvency at the time of each loan repayment to avoid many of the payments, which would require expert testimony and add significant expense

to pursuit of the TVHH Line of Credit Claims. TVHH would also have ordinary course arguments to defend against any preferential transfer claims. TVH believes that success in litigating the Line of Credit Claims is uncertain given the complexity in demonstrating recharacterization and defenses available to TVHH and PMA Lender. TVH further believes that such litigation would be costly given the need for expert testimony on these issues.

34.    <u>Tax Distribution Claims.</u> TVH has potential claims for avoidance of tax distributions paid to TVHH and other equity holders on account of pass-through tax liability (the "<u>Tax Distributions</u>"). To avoid any Tax Distributions as constructive fraudulent transfers,[8] TVH must establish that the "debtor received less than reasonably equivalent value for the transfer and was insolvent or became insolvent as a result of the transfer." *In re ATIF, Inc.*, 629 B.R. 634, 644 (Bankr. M.D. Fla. 2021), *aff'd,* No. 2:17-BK-1712-FMD, 2023 WL 2013524 (M.D. Fla. Feb. 15, 2023), *aff'd,* 160 F.4th 1124 (11th Cir. 2025). Some courts have found that a pass-through entity receives reasonably equivalent value in exchange for tax distributions to its owners where the entity elected to change its corporate form from a taxable entity to a pass-through entity to take advantage of desirous tax consequences. *See, e.g.*, *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256–57 (11th Cir. 2013); *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 671 (Bankr. D. Del. 2021); *In re Kenrob Info. Tech. Sols., Inc.*, 474 B.R. 799, 803 (Bankr. E.D. Va. 2012).

35.    Here, TVH conducted an extensive factual and legal analysis of the Tax Distributions. Although TVH believes it has colorable arguments for pursuing the Tax Distribution Claims, certain facts will make recovering on such claims challenging. For example, the Amended and Restated Operating Agreement of the Villages Health System, LLC (the "<u>Operating

---

[8] TVH has not found evidence to support a finding of actual fraud for any of the of the Tax Distributions.

Agreement") provides that TVH must distribute to each member amounts sufficient to cover its respective share of pass-through tax liability. *See* Operating Agreement, § 6.4(b). The Developer and other equity holders could argue that satisfaction of TVH's obligation under the Operating Agreement is sufficient to demonstrate reasonably equivalent value. *See In re Ballantyne Brands, LLC*, 656 B.R. 117, 144 (Bankr. W.D.N.C. 2023). In addition, the Developer and other members may not have ultimately kept the Tax Distributions, but subsequently transferred them to the IRS in satisfaction of the members' passed-through tax liabilities. Based on these facts and the legal arguments that TVH would have to overcome, TVH may not be successful in avoiding the Tax Distributions as constructive fraudulent transfers.

36.     Affiliate Transaction Claims. TVH is a party to several lease and service agreements with the Developer and the Developer Affiliates (the "Affiliate Transactions"). TVH has potential claims for avoidance of payments made in connection with these Affiliate Transactions (each, an "Affiliate Transaction Payment" and collectively, the "Affiliate Transaction Payments"). To successfully avoid an Affiliate Transaction Payment to the Developer or a Developer Affiliate as a constructive fraudulent transfer,[9] TVH must establish that the "debtor received less than reasonably equivalent value for the transfer and was insolvent or became insolvent as a result of the transfer." *Id.*

37.     Here, TVH conducted an extensive analysis of Affiliate Transaction Payments and the underlying agreements for the Affiliate Transactions. To demonstrate that TVH received less than reasonably equivalent value for the Affiliate Transaction Payments, TVH must establish an "above-market" portion of the payments, likely through expert testimony. However, based on

---

[9] TVH has not found evidence to support a finding of actual fraud for any of the of the Affiliate Transaction Payments.

TVH's analysis undertaken to date, TVH believes that most of the Affiliate Transactions were market or not materially above market as to constitute less than reasonably equivalent value. TVH believes that success avoiding any related Affiliate Transaction Payment is at least uncertain because it has not identified a substantial basis to challenge such transactions, and establishing the requisite elements would likely involve competing expert testimony.

38.     Manager and Officer Claims. TVH has potential claims against the Managers and Officers for breach of fiduciary duty and their conduct and decision-making related to the HCC coding issues. The duties of TVH's Managers and Officers are governed by Florida law, the TVH Articles of Organization (the "Articles"), and the Operating Agreement.

39.     Under the Florida Revised Limited Liability Company Act, Fla. Stat. Ann. §§ 605.0101–605.1108 (the "LLC Act"), managers of a manager-managed LLC owe duties of care and loyalty to the LLC. Fla. Stat. Ann. § 605.04091(1). The duty of care requires managers "to refrain from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law." *Id.* § 605.04091(3). Florida's business judgment rule, codified in section 605.04093 of the LLC Act, affords managers broad protection and insulates them from liability for breach of the duty of care unless there is a "showing of bad faith, self-dealing, or criminal conduct." *New Horizons Condo. Master Ass'n, Inc. v. Harding*, 336 So. 3d 796, 799 (Fla. Dist. Ct. App. 2022); *see also* Fla. Stat. Ann. § 605.04093(1). The LLC Act does not ascribe specific fiduciary duties to officers of a manager-managed LLC.

40.     The Operating Agreement further provides that the Managers must "perform their managerial duties in good faith, in a manner that they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonably inquiry, as an ordinarily prudent Person in the same position would exercise in similar circumstances." Operating

18

Agreement, § 5.7(a). The Operating Agreement allows for the appointment of officers but does not ascribe specific fiduciary duties to such officers. *See id.* § 5.12. For purposes of this analysis, TVH has assumed that the Officers owe a duty substantially similar to the duty of care owed by the Managers.

41.     Here, TVH conducted investigations into the conduct and decision making of the Managers and Officers. TVH engaged multiple professionals, compiled and reviewed hundreds of thousands of documents and communications, and worked with third parties conducting their own independent investigations. Based on TVH's investigation and the investigations of third parties, TVH believes that there is evidence supporting positions on both sides, making the Manager and Officer Claims subject to reasonable dispute.

42.     For example, TVH believes the evidence may support a finding that certain of the Managers and Officers knew of issues relating to TVH's coding initiatives. However, TVH believes the evidence may also support a finding that the Managers and Officers (i) were informed by one of their payors that TVH was historically undercoding, (ii) relied on subject-matter experts and legal advice, and (iii) acted quickly to correct TVH's HCC coding initiative, which evidence would support a finding that the Managers and Officers acted in good faith. The Managers and Officers may also assert defenses, including a statute of limitations defense,[10] that would create more risk around litigating the Manager and Officer Claims. Given the high bar for demonstrating a breach of the duty of care under Florida law, the existence of inconsistent evidence, and the

---

[10] The statute of limitation for breach of fiduciary duty under Florida law is four years. *See* Fla. Stat. § 95.11(3)(o); *see also Kelly v. Lodwick*, 82 So.3d 855, 857 (Fla. 4th DCA 2011) ("Under the statute of limitations, actions for . . . breach of fiduciary duty must be commenced within four years of when the cause of action accrued."). TVH adopted the retroactive amendment initiative in 2020. Any fiduciary duty claims related to adoption of the retroactive amendment initiative may be vulnerable to a statute of limitations defense unless TVH can offer an alternative theory for when the statute of limitations began to run or demonstrate that a tolling theory should apply.

defenses available to the Managers and Officers, TVH believes that success in litigating the Manager and Officer Claims is not certain and would be costly.

43.     Thus, likelihood of succeeding on the Settled Claims is uncertain. Due to the uncertainty, complexity, and expense involved in pursuing the Settled Claims, TVH submits that the first *Justice Oaks* factor weighs in favor of approving the Settlement Agreement.

**B.      The Second *Justice Oaks* Factor Weighs in Favor of Approving the Settlement Agreement.**

44.     The second *Justice Oaks* factor evaluates the potential difficulties of collecting. In determining whether to accept the terms of the Settlement Agreement, TVH assumed that there would not be difficulties collecting on any judgment. However, TVH recognizes that the Settling Parties consist of a holding company (TVHH), a special purpose DIP lending entity (PMA Lender), and individuals. The Settled Claims pertain to, among other things, the recovery of funds transferred to TVHH and PMA Lender as payment on account of their respective debt facilities. To the extent the individuals are not directly implicated in either the improper coding practices or the transfers to TVHH and PMA Lender, TVH's ability (a) to obtain a judgment against such individuals is uncertain at best and (b) to collect from TVHH and PMA Lender could prove difficult as it is anticipated that such entities do not have significant assets.

**C.      The Third *Justice Oaks* Factor Weighs in Favor of Approving the Settlement Agreement**

45.     The third *Justice Oaks* factor considers the complexity of the dispute and the expense, inconvenience and delay necessarily attending its resolution. Here, the resolution of the Settled Claims by adversarial means entails several complex questions of fact and law, including, without limitation, (i) meeting the multi-factor legal standard for recharacterization of debt to equity, (ii) demonstrating insolvency of the debtor at the time of each pre-petition transfer to the

Developer or Developer Affiliate, (iii) demonstrating that the Affiliate Transaction Payments are above-market, and (iv) demonstrating that the conduct of the Managers or Officers rises to the level of bad faith, self-dealing, criminal conduct, or some other actionable level. Litigating the Settled Claims would undoubtedly entail significant expense, inconvenience and delay. While principal targets of the Settled Claims are TVHH and PMA Lender, the discovery notices filed by the Committee and UHC under Bankruptcy Rule 2004 demonstrate that discovery would be extensive and involve requests and inquiries to individuals and entities related to the Developer with significant financial means and sophisticated counsel, which all but guarantees adversarial and costly discovery disputes, vociferous litigation, and associated delays in both the underlying Chapter 11 Case and litigation pursuing collection on any judgment [*see* Docket Nos. 228–34, 413–19, 428, and 429].

46.     In addition to the cost and complexity of litigation, TVH's administration of the bankruptcy estate could be delayed. TVH has negotiated and proposed a chapter 11 plan of liquidation (*i.e.*, the Plan), which entails the payment of administrative expenses and other "convenience" class claims on the effective date of the Plan. Absent the funds from the settlement of the Settled Claims, TVH may be unable to move forward under the proposed Plan or ensure the availability of funds to pay statutory and plan-related expenses on the Plan effective date. In other words, absent the Settlement Agreement, TVH's structured liquidation and projected creditor recoveries may be placed in jeopardy—especially as "holding" costs attendant to maintaining the estate and conducting discovery pending Plan confirmation whittle away at available resources.

47.     Given the costs and risks associated with litigation and the size of the Developer Settlement Amount, TVH submits that the third *Justice Oaks* factor weighs in favor of approving the Settlement Agreement.

**D.      The Fourth *Justice Oaks* Factor Weighs in Favor of Approving the Settlement Agreement**

48.      The fourth *Justice Oaks* factor considers the interests of creditors. Indeed, "[w]hile the desire of the creditors [is] not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *In re Kay*, 223 B.R. at 820-21 (*quoting In re Transcontinental Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1978)). TVH submits that the best interests of creditors would be served by the approval of the Settlement Agreement. If approved, the Settlement Agreement will pave the way for a consensual (or mostly consensual) plan confirmation due to the (a) liquidation of the Settled Claims to the satisfaction of the DOJ (the single largest creditor in the Chapter 11 Case), (b) resolution of potentially costly disputes or litigation pertaining to the PMA Line of Credit, and (c) generation of approximately $63-64 million in cash, which will ensure the feasibility of the Plan. Indeed, if approved, TVH anticipates that the settlement proceeds will enable to TVH to (w) pay all amounts due on the effective date of the Plan, (x) pay holders of "convenience" class claim shortly after the Plan effective date, (y) make a significant initial distribution to holders of general unsecured claims – including the DOJ, and (z) fund the TVH liquidating trust with sufficient funds to administer the liquidation trust assets (as discussed under the Plan). The DOJ, as the holder of approximately 97% of all general unsecured claims (and, thus, a principal beneficiary of the Settlement Agreement), which filed a proof of claim in the amount of $541,500,000.00 (Official Claims Register, Claim No. 40), supports the approval of the Settlement Agreement.

49.      Based on the foregoing, TVH respectfully submits that each of the *Justice Oaks* factors, to the extent applicable, weighs in favor of approving the Settlement Agreement, and such approval serves the best interests of the Debtor's estate, its creditors, and other interested parties.

## CONCLUSION

WHEREFORE, TVH respectfully requests that the Court enter an order approving the Settlement Agreement attached as Exhibit A, authorizing TVH to take any and all actions it deems reasonably necessary or appropriate to effectuate the terms and purposes of the Settlement Agreement, and granting such further and additional relief the Court deems just and proper.

RESPECTFULLY SUBMITTED the 20th day of March 2026.

**BAKER & HOSTETLER LLP**

*/s/ Danielle L. Merola*
Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
FL Bar No.: 0526401
E-mail: jparrish@bakerlaw.com
Andrew V. Layden, Esq.
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
Benjamin R. Taylor, Esq.
FL. Bar No.:1024101
Email: brtaylor@bakerlaw.com
Danielle L. Merola, Esq.
FL Bar No. 120120
Email: dmerola@bakerlaw.com
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

Michael T. Delaney, Esq.
Admitted *Pro Hac Vice*
Email: mdelaney@bakerlaw.com
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone:    216.621.0200
Facsimile:    216.696.0740

*Counsel for the Debtor and Debtor in Possession*

23

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 20, 2026, a true copy of the foregoing was filed with the Court using the CM/ECF System, which will provide notice of such filing to all parties requesting such notice.

*/s/ Danielle L. Merola*
Danielle L. Merola, Esq.

# Exhibit A

*Execution Copy*

## SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (as may be amended, supplemented, or otherwise modified from time to time, this "Settlement Agreement") is made and entered into as of March 20, 2026 (the "Execution Date"), by and among The Villages Health System, LLC (the "Debtor") and The Villages Health Holding Company LLC ("TVHH"), PMA Lender, LLC ("PMA Lender"), and other affiliated entities (collectively with TVHH and PMA Lender, the "Developer") (the Debtor and the Developer are, collectively, the "Parties" and each, a "Party").[1]

While not expressly a Party to this Settlement Agreement, the United States of America, acting through the United States Department of Justice, on behalf of the Department of Health and Human Services, Centers for Medicare & Medicaid Services (collectively, the "United States") hereby expresses its support for the terms of the Settlement Agreement, through its execution of the Support Addendum, attached hereto as **Exhibit A**.

## RECITALS

A.    **WHEREAS**, on July 3, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court", and the case captioned *In re The Villages Health System, LLC*, No. 6:25-bk-04156-LVV (Bankr. M.D. Fla.), the "Bankruptcy Proceeding").

B.    **WHEREAS**, PMA Lender is the lender under a prepetition secured credit facility (the "PMA Loan Facility"), pursuant to which PMA Lender provided a secured line of credit to the Debtor, with a principal balance of $15 million as of the Petition Date (all obligations owed to the PMA Lender by the Debtor under the PMA Loan Facility, including all accrued and unpaid interest as of the Settlement Effective Date (as defined below), the "PMA Secured Claim").

C.    **WHEREAS**, on January 29, 2026, the Debtor filed the Plan, including certain provisions concerning releases, injunctions, discharges, and exculpation (collectively, the "Plan Release Provisions").

D.    **WHEREAS**, the Parties have been engaged in discussions regarding claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or

---

[1]    Capitalized terms used but not otherwise defined in this Settlement Agreement shall have the meanings ascribed to them in the *Chapter 11 Plan of Liquidation for The Villages Health System, LLC* [Docket No. 387] dated January 29, 2026 (the "Plan"), the *Disclosure Statement for the Chapter 11 Plan of Liquidation for The Villages Health System, LLC* [Docket No. 388] dated January 29, 2026 (the "Disclosure Statement"), or the *[Settlement Motion]* (the "Settlement Motion") filed contemporaneously herewith, as applicable. For the avoidance of doubt, to the extent that any of the defined terms in the Plan are revised, modified, or amended in an amended, supplemented, or otherwise modified joint chapter 11 plan of reorganization of the Debtor filed after the date of this Settlement Agreement, the defined terms in the Plan dated January 29, 2026 shall govern with respect to this Settlement Agreement.

unliquidated, matured or unmatured, suspected or unsuspected, assertable, directly or derivatively, in contract, tort, law, equity, or otherwise, that may be assertable by the Debtor's estate in connection with the Bankruptcy Proceeding (collectively, the "Estate Causes of Action") against the Developer, any Developer Affiliates,[2] or any current or former directors and officers of the Debtor (collectively, the "Settlement Release Parties").

E.    **WHEREAS**, following good-faith and arm's-length negotiations, with the participation and support of the United States, the Parties have reached agreement on a settlement resolving the PMA Secured Claim and all Estate Causes of Action against the Settlement Release Parties (collectively, the "Settled Claims").

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby contract, covenant, and agree that all Settled Claims shall be fully resolved, settled, compromised, extinguished, and dismissed with prejudice, as applicable, subject to the approval of the Bankruptcy Court, on the following terms and conditions (the "Settlement"):

## AGREEMENT

1.    **For Settlement Purposes Only.** This Settlement Agreement is for settlement purposes only. Except as explicitly set forth in this Settlement Agreement, the fact of this Settlement Agreement or any provision herein, the negotiations or proceedings related hereto, and any actions taken hereunder shall not constitute or be construed as (a) any admission of the validity of any claim or any fact alleged by any of the Parties, (b) any admission of any wrongdoing, fault, violation of law, breach of contract, or liability of any kind on the part of any of the Parties, (c) any admission as to any claim or allegation made in any demand of, action against, or proceeding against any of the Parties, and/or (d) a waiver of any applicable defense by any of the Parties. This Settlement Agreement shall not be offered or admissible as evidence against any Party in any action or proceeding in any forum for any purpose whatsoever, except as evidence of its existence or terms or in any action or proceeding brought to enforce its terms.

2.    **Approval.** This Settlement Agreement shall be effective on the date (the "Settlement Effective Date") on which the Bankruptcy Court enters an order approving the motion seeking approval of this Settlement Agreement (the "Settlement Motion"), which order shall be consistent in all respects with this Settlement Agreement and otherwise in form and substance acceptable to each of the Parties (the "Settlement Approval Order"). Although the Parties shall sign this Settlement Agreement prior to the entry of the Settlement Approval Order, this Settlement Agreement shall not be effective or binding on the Parties if the Settlement Approval Order is not entered by the Bankruptcy Court.

---

[2]    "Developer Affiliate" means any other entity directly or indirectly controlling or controlled by or under direct or indirect common control with TVHH or the PMA Lender, excluding the Debtor. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by," and "under common control with") shall mean possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of an entity (whether through the ownership of voting securities, by contract, or otherwise).

3.    **PMA Secured Claim Stipulations.** The Debtor hereby admits, stipulates, acknowledges and agrees, effective as of the Settlement Effective Date, that: (a) as of the Petition Date, the Debtor was justly and lawfully indebted to the PMA Lender, without defense, claim, counterclaim, challenge or offset of any kind, on account of the PMA Secured Claim, in the outstanding aggregate principal amount under the PMA Loan Facility of $15,000,000.00, *plus* all other interest,[3] fees, costs, expenses, charges, disbursements, indemnification and reimbursement obligations, and all other amounts that may be due and owing under the PMA Loan Facility; (b) the Debtor granted to the PMA Lender validly and properly perfected continuing first priority liens on and security interests in the PMA Prepetition Collateral (as defined in the DIP Orders) (the "PMA Liens"); (c) the PMA Liens on the PMA Prepetition Collateral (i) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the PMA Prepetition Collateral, (ii) were granted to the PMA Lender for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, and (iii) are senior with priority over any and all other liens on or security interests in the PMA Prepetition Collateral; (d) the PMA Secured Claim constitutes a legal, valid, non-avoidable, and binding obligation of the Debtor, enforceable in accordance with the terms of the PMA Loan Facility (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (e) no portion of the PMA Liens or the PMA Secured Claim is subject to any contest, attack, objection, challenge, defense, claim, counterclaim or cause of action, including, without limitation, any avoidance action or any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or cause of action of any nature or description, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, in each case, that may be asserted by the Debtor, its estate, or any other person or entity; and (f) the PMA Secured Claim constitutes an allowed secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code against the Debtor and its estate.

4.    **Settlement Payment.** An aggregate amount of $80,000,000.00 (the "Payment Amount") shall be paid in cash by the Developer to the Debtor within five (5) business days of the Settlement Effective Date in accordance with the wire instructions to be provided by the Debtor to the Developer; *provided, however*, upon entry of the Settlement Approval Order, the Debtor shall pay the outstanding amount of the PMA Secured Claim in full in cash as of such date, including, for the avoidance of doubt, all accrued and unpaid interest, in full and final satisfaction of such PMA Secured Claim (such deemed payment, the "PMA Secured Claim Payment"). If PMA Lender provides advance notice to the Debtor, in lieu of the Debtor making the PMA Secured Claim Payment, the PMA Secured Claim Payment amount will be retained by the Debtor and reduce the Payment Amount on a dollar-for-dollar basis. The settlement agreement between the Debtor and the DOJ regarding the DOJ Claim (as defined in the Debtor's pending Chapter 11 Plan (Doc. No. 387)) shall provide that $416,000,000.00 of the DOJ Claim will be on account of

---

[3] Accrued interest as of February 28, 2026 is $742,808, and interest continues to accrue at a rate of approximately $3,082 per diem.

3

restitution and that, until the United States has received, in the aggregate, $416,000,000.00 from the Debtor on account of the DOJ Claim, any such payments made by the Debtor to the United States shall be treated as a payment of restitution.

5.  **Revised Plan.** As soon as reasonably practicable after entry of the Settlement Approval Order and in any event prior to the Plan Confirmation Hearing, the Debtor shall file a revised Plan reflecting the Settlement. Such Plan, as revised in accordance with this Section 5 and as may be further amended, supplemented, revised, or otherwise modified (the "Revised Plan"), shall add the Settlement Release Parties to all relevant provisions concerning releases, injunctions, discharges, or exculpation, including, without limitation, providing that the Settlement Release Parties and their respective officers and directors, equity holders, members, partners, managers, and employees (each, a "Related Party") are "Released Parties" under the Revised Plan. The Debtor shall incorporate reference to the terms of this Settlement Agreement in any supporting documents accompanying the Revised Plan, as necessary. The Debtor shall not seek to amend, supplement, revise, or otherwise modify the Revised Plan in a manner that relates to the Settlement absent the prior written consent of the Developer.

6.  **Release.** Effective as of the Settlement Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, (a) the Debtor, on behalf of itself and its successors and assigns (including, without limitation, any liquidating trust established to liquidate assets of the Debtor's estate), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Settlement Release Parties and their Related Parties from any and all Estate Causes of Action and (b) the Settlement Release Parties, on behalf of themselves and their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtor from all claims (as defined in the Bankruptcy Code) of any nature whatsoever, whether arising before or after the date of this Settlement Agreement, against the Debtor and the Exculpated Parties (as defined in the Debtor's Plan at Doc. No. 387), all of which claims shall be deemed fully and finally satisfied upon entry of the Settlement Approval Order as set forth in Section 4. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising under this Settlement Agreement or the Settlement Approval Order.

7.  **Tax Matters.** TVHH and the Debtor shall work together regarding the preparation and filing of all flow-through federal, state and local income tax returns of the Debtor for each period, or portion thereof, with respect to which TVHH is or was an owner of the Debtor for U.S. federal income tax purposes. The Debtor will cooperate, including making Debtor professionals reasonably available, with TVHH in connection with the preparation and filing of any such tax returns and promptly respond to requests for information that TVHH determines is needed in connection with the preparation and filing of any tax returns described in the preceding sentence. Neither the Debtor nor TVHH shall take any tax related action(s) that would be reasonably expected to have an adverse impact on the other party or its owners without consulting with the other party.

4

8.    **Notice.** All notices, demands, instructions, and other communications required or permitted under the Settlement Agreement to any Party must be in writing, will be effective upon receipt, and must be delivered by hand delivery, overnight courier, or e-mail.

**If to the Debtor:**

The Villages Health System, LLC c/o Neil F. Luria
SOLIC Capital Advisors
425 W. New England Avenue, Suite 300
Winter Park, FL 32789
E-mail: nluria@soliccapital.com

**with a copy to:**

Baker & Hostetler LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
Attn: Elizabeth A. Green, Jimmy D. Parrish, Andrew Layden, Michael T. Delaney, Benjamin R. Taylor
E-mail: egreen@bakerlaw.com, jparrish@bakerlaw.com, alayden@bakerlaw.com, mdelaney@bakerlaw.com, brtaylor@bakerlaw.com

**If to the Developer:**

Holding Company of The Villages, Inc.
7850 Middleton Drive
Middleton, FL 34762
Attn: Brian Hudson
E-mail: brian.hudson@thevillages.com

**with a copy to:**

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn: Lisa Laukitis
E-mail: llaukitis@milbank.com

and

Milbank LLP
1101 New York Avenue NW
Washington, DC 20005
Attn: Andrew M. Leblanc, Erin E. Dexter
E-mail: aleblanc@milbank.com, edexter@milbank.com

5

**If to the United States**

> United States Attorney's Office
> Middle District of Florida
> 400 N. Tampa Street, Suite 3200
> Tampa, FL 33602
> Attn: Civil Division/Christopher Emden
> E-mail: christopher.emden@usdoj.gov

9. **Governing Law.** This Settlement Agreement, and any disputes related thereto, shall be governed by and be construed in accordance with (a) applicable federal law, or (b) to the extent federal law does not apply, the laws of the state of Florida without regard to the rule of conflict of laws of the state of Florida or any other jurisdiction that would require the application of the law of another jurisdiction. The Parties hereto consent to submit to the jurisdiction of the federal district court for the Middle District of Florida, Ocala Division, for any litigation relating to this Settlement Agreement and agree not to commence any litigation relating to this Settlement Agreement except in such federal district court. For the avoidance of any doubt, during the pendency of the Bankruptcy Proceeding, all proceedings shall be brought in the Bankruptcy Court.

10. **Authority.** Each of the Parties hereto represents and warrants that it has the authority to enter into this Settlement Agreement and to undertake the transactions contemplated hereunder, subject only to the Bankruptcy Court's approval.

11. **Successors and Assigns.** The rights and obligations of each of the Parties under this Settlement Agreement shall be binding upon, and inure to the benefit of, any successor or assign of each such Party, including, for the avoidance of doubt, any liquidating trust established to liquidate assets of the Debtor's estate.

12. **Non-Severability.** Each of the terms of this Settlement Agreement is a material and integral part hereof. Should any provision of this Settlement Agreement be held to be unenforceable or contrary to law, the entire Settlement Agreement shall be deemed null and void. Notwithstanding anything to the contrary herein, following payment by the Developer of the Settlement amount in accordance with Section 4, the release described in Section 6(a) shall not be voided or otherwise affected in any manner.

13. **Entire Understanding.** This Settlement Agreement constitutes the entire understanding of the Parties hereto in connection with the matters covered herein, and may not be amended, modified, or altered except by an agreement in writing signed by each of the Parties.

14. **No Party Deemed Drafter.** The signatories to this Settlement Agreement are competent persons, each of whom is experienced in business and represented by counsel. Therefore, any ambiguous language in this Settlement Agreement will not be construed against any particular Party as the drafter of such language.

15. **Failure to Enforce.** The failure of any Party to enforce a provision of this Settlement Agreement will not constitute a waiver of such Party's right to enforce that provision.

16.     **Publicity**. Except for seeking Bankruptcy Court approval of this Settlement Agreement as indicated in paragraph 2, prior to publication of any disclosures or statements by or on behalf of the Debtor, by press release or otherwise, regarding the terms or substance of this Settlement Agreement, the Debtor shall notify the Developer of all such disclosures or statements to be issued, the contents of which publications shall be subject to, and which publications shall not be made without, the prior written approval of the Developer.

17.     **Counterparts**. This Settlement Agreement may be executed in any number of counterparts and by the Parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same document. Delivery of an executed counterpart of this Settlement Agreement by electronic mail to the contacts listed in Section 8 shall be equally effective as delivery of an original executed counterpart.

The Villages Health System, LLC

By: _____
      Name: _____
      Title: _____


The Villages Health Holding Company LLC


By: _____
      Name:
      Title:


PMA Lender, LLC


By: _____
      Name:
      Title:

*[DEVELOPER SIGNATURE PAGE TO SETTLEMENT AGREEMENT]*

134562.000015\4918-1430-5432.1
134562.000015\4904-5750-7993.1

**The Villages Health System, LLC**


By: _____
      Name:
      Title:



**The Villages Health Holding Company LLC**


By: _____*Mark Morse*_____
      Name:  Mark Morse
      Title:  Manager



**PMA Lender, LLC**


By: _____*Mark Morse*_____
      Name:  Mark Morse
      Title:  Manager

*[DEVELOPER SIGNATURE PAGE TO SETTLEMENT AGREEMENT]*

134562.000015\4918-1430-5432.1
134562.000015\4904-5750-7993.1

## Exhibit A

## SUPPORT ADDENDUM

Reference is made to the Settlement Agreement (the "Settlement Agreement") dated as of March 20, 2026 (the "Execution Date"), by and among The Villages Health System, LLC (the "Debtor") and The Villages Health Holding Company LLC ("TVHH"), PMA Lender, LLC ("PMA Lender"), and other affiliated entities (collectively with TVHH and PMA Lender, the "Developer") (the Debtor and the Developer are, collectively, the "Parties" and each, a "Party"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

The United States represents and warrants to the Parties, as of the Execution Date, that the United States shall support the Debtor's entry into the Settlement by taking affirmative steps to express its support for the Settlement, including, but not limited to, timely filing a pleading in support of the Settlement Motion. The United States hereby acknowledges and agrees that: (a) the Developer engaged in good-faith negotiations with the United States over the terms of the Settlement; (b) the United States was aware and apprised of potential Estate Causes of Action against the Settlement Release Parties in connection with such negotiations and had multiple discussions with the Debtor, the Developer, and the Creditors' Committee regarding the same; (c) the United States fully supports the Debtor's entry into this Settlement with the Developer on the terms provided herein and believes that the Settlement represents a fair resolution of the Estate Causes of Action as against the Settlement Release Parties; and (d) the United States believes that approval of the Settlement is in the paramount interests of creditors of the Debtor, including in its own interest, because it avoids the cost, expense and risk of further litigating the Estate Causes of Action against the Settlement Release Parties. The United States' support for the Settlement Agreement does not extend to Paragraph 7 (Tax Matters) for which the United States takes no position. Further, nothing in this Support Addendum limits the United States from pursuing any individual or entity in a civil or criminal action.

*[Signature Page Follows]*

**United States**

By: CHRISTOPHER EMDEN

Digitally signed by
CHRISTOPHER EMDEN
Date: 2026.03.20 15:22:49 -04'00'

Christopher Emden
United States Attorney's Office
Middle District of Florida